IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| In the Matter of the Arbitration of Certain Controversies between<br><br>**GETMA INTERNATIONAL**,<br><br>               Petitioner,<br><br>and<br><br>**THE REPUBLIC OF GUINEA**,<br><br>               Respondent. | Civil Action No. 1:14-cv-01616-RBW<br><br><br><br>**DECLARATION OF LAURENT JAEGER IN SUPPORT OF RESPONDENT'S OPPOSITION TO PETITIONER'S PETITION TO CONFIRM AND RESPONDENT'S MOTION TO STAY** |

LAURENT JAEGER declares the following to be true, pursuant to the provisions of 28 U.S.C. § 1746:

1.      I am a member of the bar of Paris, France and partner of the law firm Orrick, Herrington & Sutcliffe LLP ("Orrick"), counsel to Respondent The Republic of Guinea ("Guinea") in the above-entitled action.  I was lead counsel for Guinea in the arbitration conducted pursuant to the Arbitration Rules of the Common Court of Justice and Arbitration (the "CCJA Rules") of the *Organisation pour l'Harmonisation en Afrique du Droit des Affaires*[1] ("OHADA") that is the subject of this action.

2.      I submit this Declaration in support of Guinea's Opposition to Petitioner Getma International's ("Getma") Petition to Confirm the arbitral award dated April 29, 2014 (the "Award") in the above-referenced arbitral proceedings and in support of Guinea's motion to stay

---

[1] In English, the Organization for the Harmonization of Business Law in Africa.  For the Court's convenient reference, annexed hereto as Exhibit 1 is a true and correct copy of the English language version of the Treaty on the Harmonization of Business Law in Africa dated October 17, 1993, which created OHADA and established the Common Court of Justice and Arbitration (the "CCJA").

this action pending the conclusion of annulment proceedings pending before the CCJA in

Abidjan, Ivory Coast.  I am also counsel to Guinea in that annulment proceeding.

**The Arbitration Proceeding**

3.      On May 10, 2011, Getma commenced arbitration proceedings pursuant to Article

31 of a Concession Agreement dated September 22, 2008 between Getma and Guinea (the

"Concession Agreement") alleging that Guinea did not properly terminate the Concession

Agreement in accordance with its terms.  Article 31 of the Concession Agreement provides that

the Agreement is governed by the OHADA Treaty and the OHADA Uniform Acts, and that any

disputes between the parties shall be arbitrated in accordance with the CCJA Rules.  A true and

correct copy of the English language version of the CCJA Rules, together with an English

translation of Annexes 1 and 2 thereto (the administrative and arbitrator fee schedules), is

annexed hereto as Exhibit 2.  A true and correct copy of the English language version of the

OHADA Uniform Arbitration Act is annexed hereto as Exhibit 3.

4.      On October 24, 2011, in accordance with Article 11.2 of the CCJA Rules, the

CCJA fixed the total costs of the arbitration at CFA 100,480,332 (or approximately €174,443), of

which CFA 40,480,332 (or approximately €61,000) was allocated to arbitrator fees.  A true and

correct copy of the CCJA's written decision fixing the costs of arbitration is annexed hereto as

Exhibit 4.

5.      The three-member arbitral tribunal (the "Tribunal") was fully constituted by late

January 2012.

6.      On March 12, 2012, in accordance with Article 15 of the CCJA Rules, the

Tribunal and the parties held an initial hearing in Paris, France.  The purpose of that hearing was

to discuss the conduct of the arbitration and the parties' initial positions concerning the merits of

the dispute, as well as to set a procedural timetable for the proceeding.  A true and correct copy

of the Tribunal's written report of that hearing, together with an English translation of certain

excerpts thereof, is annexed hereto as Exhibit 5.  During that hearing, Guinea preliminarily

outlined its defenses to Getma's claims, including that the bid process and negotiations through

which Getma obtained a concession at the port of Conakry were highly irregular.  *See* Ex. 5 at

pp. 12-15.  The procedural timetable set by the Tribunal called for written submissions by the

parties throughout 2012 and the beginning of 2013, an evidentiary hearing in May 2013 and oral

argument in June 2013.  *Id*. at Annex to the Minutes of the Meeting.

7.      In its written submissions to the Tribunal, Guinea submitted documentary

evidence concerning the irregular manner in which Getma had obtained the concession at the

port of Conakry, as well as the basis for Guinea's termination of the Concession Agreement.  For

example:

(i)      As part of its bid, Getma purported to act in partnership with the Swiss group
MSC.  This partnership allowed Getma to invoke MSC's considerable experience in the
construction and exploitation of container terminals, as well as MSC's substantial
financial resources.  MSC's revenues were approximately €19 billion, or approximately
20 times more than that of the Necotrans group, of which Getma was a part.  In order to
create the appearance of a partnership with MSC, Getma submitted a "technical
partnership agreement" with MSC's affiliate, Europe Terminal, as part of its bid.
However, Article 7 of that partnership agreement provided that it would expire no later
than the date of signature of the Concession Agreement.  Thus, MSC was presented as a
partner, but apparently had no intention of being involved in the construction, financing
or exploitation of the container terminal at the port of Conakry. A true and correct copy
of the agreement between Getma and Europe Terminal, as well as an English translation
thereof, is annexed hereto as Exhibit 6.

(ii)      Pursuant to the rules governing the bid process, bidders were required to provide a
certificate from a highly regarded bank certifying, with supporting figures, that the bidder
had the financial capacity to make the required investments.  Getma submitted a
document from Société Générale entitled "financial capacity certificate," but it did not
provide any information concerning Getma's ability to finance the required investments,
and merely indicated that Getma had an account with the bank since 1993 and that the

3

bank had good business relations with Getma.  Because Getma did not provide a genuine financial capacity certificate, its offer should have been automatically rejected pursuant to Article 16 of the bid rules.  A true and correct copy of those rules, as well as an English translation of Articles 5 and 16 thereof, is annexed hereto as Exhibit 7.

(iii)    The Ministry of Administration and Control of Large-Scale Projects ("ACGP") and the Autonomous Port of Conakry ("PAC"), two entities that would ordinarily play a crucial role in selecting the concessionaire at the port of Conakry and negotiating the terms and conditions of a concession agreement, were largely excluded from those processes and had serious concerns about the award of the concession to Getma.  Annexed hereto as Exhibit 8 is a true and correct copy of a letter dated September 22, 2008 from the Administrator of the AGCP to the Minister of Transportation referring to ACGP's exclusion from those processes, together with an English translation thereof.   Annexed hereto as Exhibit 9 is a true and correct copy of a Technical Memorandum from the PAC dated September 15-16, 2008, which raised concerns about the award of the concession to Getma and the negotiation of the Concession Agreement, together with an English translation thereof.

(iv)    During the negotiation of the Concession Agreement, the PAC retained Ernst & Young to review the draft agreement.  In a report dated September 11, 2008, Ernst & Young expressed concern that the terms of the draft agreement were skewed heavily in Getma's favor and recommended renegotiation of several key provisions.  A true and correct copy of Ernst & Young's report, together with an English translation thereof, is annexed hereto as Exhibit 10.

(v)    On December 31, 2008 and January 2, 2009, the Board of Directors of the PAC met to discuss the Concession Agreement and recommended termination of the Agreement on the basis of, *inter alia*, irregularities in the award of the concession to Getma, including deficiencies in Getma's qualifications and its bid documents.  A true and correct copy of the minutes of those meetings, together with an English translation thereof, is annexed hereto at Exhibit 11.

(vi)    On January 4, 2011, representatives of the PAC met with Getma to discuss the PAC's concerns relating to Getma's performance under the Concession Agreement, including its obligation to invest nearly €100 million during its first two years operating the container terminal at the port of Conakry.  That meeting is described in the Witness Statement of Mr. Sory Camara, a true and correct copy of which is annexed hereto as Exhibit 12, together with an English translation thereof.  Getma's €100 million investment obligation is set out in its financial bid for the concession, which was also Annex 1 to the Concession Agreement.  A true and correct copy of relevant excerpts of Getma's financial bid, together with an English translation thereof, is annexed hereto as Exhibit 13.

8.    By letter dated April 22, 2013, approximately one month before the scheduled

evidentiary hearing, the President of the Tribunal wrote to the parties informing them he had

asked the CCJA to increase the arbitrators' fees to €450,000 "in order to enable [the Tribunal] to properly perform their duties." The President of the Tribunal stated that he wished "to obtain any comments from the parties" concerning its request to the CCJA. A true and correct copy of that letter, together with an English translation thereof, is annexed hereto as Exhibit 14.

9.      In communications dated May 6, 2013, May 10, 2013 and May 23, 2013, the President of the Tribunal continued to contact the parties directly with respect to the Tribunal's request for an increased fee. True and correct copies of those communications, together with English translations thereof, are annexed hereto as Exhibits 15, 16 and 17, respectively. Both parties responded to the Tribunal that they did not have any comments with respect to the Tribunal's request for an increased fee. True and correct copies of the parties' communications to the Tribunal in that regard, together with English translations thereof, are annexed hereto as Exhibits 18 and 19, respectively.

10.     On May 27, 2013, a three-day evidentiary hearing began in Paris. The President of the Tribunal opened the hearing by lamenting the amount of the arbitrators' fees and requested that each party express either agreement or disagreement with the Tribunal's proposed fee, which he stated was necessary for the CCJA to rule on the Tribunal's request. The Tribunal stated that if the parties did not agree to the fee increase, the Tribunal would have to reconsider its involvement in the case. A true and correct copy of that portion of the transcript of the May 27, 2013 hearing relating to the Tribunal's fees is annexed hereto as Exhibit 20, together with an English translation thereof.

11.     By letter dated May 30, 2013, Getma responded to the Tribunal's request at the May 27, 2013 hearing and consented to the €450,000 fee proposed by the Tribunal. A true and

correct copy of that letter, together with an English translation thereof, is annexed hereto as

Exhibit 21.

12.     By email dated June 25, 2013 to me and my colleagues, the President of the

Tribunal noted Getma's express agreement to the €450,000 fee proposed by the Tribunal and

asked whether Guinea would consent to that fee.  Again, the President claimed that Guinea's

views were required to permit the CCJA to rule on the Tribunal's request for a fee increase.  A

true and correct copy of the President of the Tribunal's June 25, 2013 email, together with an

English translation thereof, is annexed hereto as Exhibit 22.

13.     Given that the Tribunal had repeatedly pressed Guinea concerning the arbitrators'

fee, that the case was at a critical stage and that Getma had already given its consent, we did not

believe Guinea could freely withhold its consent without taking the risk that the Tribunal would

retaliate against Guinea in ruling on the merits of the dispute.  Accordingly, on June 28, 2013,

Romain Sellem, an associate working under my supervision, responded to the President's June

25, 2013 email and stated that Guinea would consent to the Tribunal's proposed fee increase.  A

true and correct copy of that email, together with an English translation thereof, is annexed

hereto as Exhibit 23.  However, in line with the Tribunal's communications with the parties

referring to a decision to be made by the CCJA, Guinea's consent was solely with respect to the

CCJA's consideration of the matter.  Guinea never explicitly or implicitly agreed to the

Tribunal's proposed fee regardless of whether the CCJA approved it.  In that regard, I note that

Article 31 of the Concession Agreement expressly states that the CCJA Rules apply to the

proceeding, which includes the CCJA's rules mandating that the CCJA fixes the arbitrators' fees

and that the parties pay the costs of the arbitration to the CCJA, not to the Tribunal.  Prior to the

Tribunal receiving the case file, the parties paid the costs fixed by the CCJA in its October 24, 2011 decision, reflecting the parties' agreement that the CCJA would set the arbitrators' fees.

14.     On July 8, 2013, the Tribunal heard oral argument from the parties, which was the last scheduled hearing in the proceeding.  However, the Tribunal expressly stated that it was not closing the record at that time in case further issues arose during the Tribunal's deliberations.  A true and correct copy of an excerpt of the July 8, 2013 hearing transcript reflecting the Tribunal's comments in that regard, together with an English translation thereof, is annexed hereto as Exhibit 24.

15.     On August 1, 2013, the CCJA denied the Tribunal's request to increase its fee to €450,000 and affirmed the amount of fees fixed by the CCJA on October 24, 2011.  In its ruling, the CCJA cited the CCJA Rules and its ruling of February 3, 1999, which made clear that separate fee arrangements between parties and arbitrators were prohibited.  A true and correct copy of the CCJA's August 1, 2013 ruling, together with an English translation thereof, is annexed hereto as Exhibit 25.  A true and correct copy of the CCJA's February 3, 1999 ruling, together with an English translation thereof, is annexed hereto as Exhibit 26.

16.     By email to the parties dated September 5, 2013, the secretary to the Tribunal stated that the President of the Tribunal wished to hold a conference call with the parties on September 6, 2013.  A true and correct copy of that email, together with an English translation thereof, is annexed hereto as Exhibit 27.  I participated in that telephone conference, during which the President of the Tribunal asked the parties for their assistance in convincing the CCJA to increase the arbitrators' fees.  Getma's counsel indicated that Getma was prepared to support the Tribunal's efforts to convince the CCJA to reverse its August 1, 2013 ruling denying an

increase of the arbitrators' fees.  I indicated, on behalf of Guinea, that I could not respond without my client's consent.

17.     Later that day, Getma's counsel, Mr. Cédric Fischer, sent a list of the judges and administrators at the CCJA to the President of the Tribunal which, as far as I am aware, was not solicited by the Tribunal.  A true and correct copy of that email, together with an English translation thereof, is annexed hereto as Exhibit 28.

18.     I also understand that Mr. Fischer thereafter met Mr. Antoine Joachim Oliveira, the President of the CCJA, in Abidjan, Ivory Coast, and that the purpose of that meeting was to support the Tribunal's petition to increase its fees.  Mr. Fischer's meeting with the President of the CCJA is recounted on page four of a letter from the President of the Tribunal to the Secretary General of the CCJA dated June 3, 2014.  A true and correct copy of that letter, together with an English translation thereof, is annexed hereto as Exhibit 29.

19.     On a September 18, 2013 telephone conference in which I was a participant, Mr. Fischer, who was calling from Abidjan, presented a report to the Tribunal concerning his meeting with the President of the CCJA.  Mr. Fischer expressed that it was his impression that the President of the CCJA believed that the arbitrators' fee would be increased.  The President of the Tribunal stated that, once this problem was solved, the Tribunal would begin deliberations and proceed with drafting the Award, with a view toward completing it by the end of the year.

20.     In addition, on September 19, 2013, Mr. Fischer sent a letter to the President of the CCJA, requesting that the CCJA reconsider its denial of the Tribunal's request to increase its fee to €450,000.  A true and correct copy of that letter, together with an English translation thereof, is annexed hereto as Exhibit 30.

21.    On October 3, 2013, the CCJA affirmed its August 1, 2013 ruling denying the

Tribunal's request to increases its fee.  A true and correct copy of the CCJA's October 3, 2013

ruling, together with an English translation thereof, is annexed hereto as Exhibit 31.

22.    By letter dated November 4, 2013, I informed the Tribunal that Guinea had

obtained specific and detailed evidence that Getma had procured the concession at the port of

Conakry through corruption; namely, by providing substantial amounts of money to various

government officials.  I requested that the Tribunal suspend its deliberations, authorize Guinea to

produce evidence concerning such corruption and schedule a hearing to address the matter.  A

true and correct copy of my November 4, 2013 letter to the Tribunal, together with an English

translation thereof, is annexed hereto as Exhibit 32.

23.    In a procedural order dated November 7, 2013, the Tribunal ordered Guinea to

produce evidence of corruption within one week and ruled that no other evidence could be

submitted without the Tribunal's prior authorization.  A true and correct copy of that procedural

order, together with an English translation thereof, is annexed hereto as Exhibit 33.

24.    On November 14, 2013, in accordance with the Tribunal's order, Guinea

submitted a witness statement from Mr. Steven Fox, a former United States diplomat and current

Chief Executive Officer of Veracity Worldwide LLC, a well-known consulting firm that

conducts investigations and provides advisory services on anti-corruption issues.  Upon Guinea's

request, Mr. Fox conducted an inquiry concerning the award of the concession to Getma, the

results of which are set forth in his witness statement.   In sum, Mr. Fox discovered that, in

collaboration with a local partner, Getma had engaged in a corruption scheme to obtain the

concession in which it paid over $3 million in bribes to various government officials, including

most members of the commission that oversaw the bid process for the concession.  A true and correct copy of Mr. Fox's witness statement is annexed hereto as Exhibit 34.

25.     On December 2, 2013, the Tribunal issued a procedural order scheduling a hearing for December 16, 2013 solely on Mr. Fox's witness statement.  The Tribunal prohibited Guinea from producing any additional evidence.  A true and correct copy of that procedural order, together with an English translation thereof, is annexed hereto as Exhibit 35.

26.     Meanwhile, on the basis of the facts set out in Mr. Fox's witness statement, a criminal complaint was filed by the Guinean authorities on December 13, 2013 against the individuals involved in the corruption scheme.  A true and correct copy of that criminal complaint, together with an English translation thereof, is annexed hereto as Exhibit 36.

27.     Also on December 13, 2013, Guinea obtained witness statements from two members of the commission overseeing the award of the concession: Mr. Demba Kourouma and Mr. Ibrahima Lamizana Condé.  Both of these individuals were identified in Mr. Fox's witness statement as having received cash payments in connection with the bribery scheme described in that statement.  Mr. Kourouma and Mr. Condé each admitted in their witness statements that they had accepted significant cash payments in connection with the award of the concession to Getma.  A true and correct copy of the witness statement of Mr. Kourouma, together with an English translation thereof, is annexed hereto as Exhibit 37.  A true and correct copy of the witness statement of Mr. Condé, together with an English translation thereof, is annexed hereto as Exhibit 38.

28.     By email dated December 14, 2013, I informed the Tribunal of the existence of the witness statements of Messrs. Kourouma and Condé, and indicated that Guinea would seek authorization to produce the witness statements at the hearing scheduled for December 16, 2013.

A true and correct copy of that email, together with an English translation thereof, is annexed hereto as Exhibit 39. Prior to the December 16, 2013 hearing, I provided Getma's counsel with the witness statements of Messrs. Kourouma and Condé, as well as the criminal complaint referred to above. A true and correct copy of my letter to Getma's counsel, together with an English translation thereof, is annexed hereto as Exhibit 40.

29.     At the December 16, 2013 hearing, in which I participated, Mr. Fox was subject to cross-examination and the Tribunal heard oral argument from the parties. On behalf of Guinea, I requested that the Tribunal permit Guinea to enter the witness statements of Messrs. Kourouma and Condé into the record, as well as grant Guinea a four-month period to further investigate and produce additional evidence of corruption and present its case on the matter. Getma objected to Guinea's allegations of corruption, as well as the request for a four-month period to present evidence of corruption. However, during the hearing, Getma repeatedly expressed its willingness to directly confront Guinea's allegations of corruption. Relevant excerpts of the transcript of the December 16, 2013 hearing, together with English translations thereof, are annexed hereto as Exhibit 41.

30.     In a procedural order dated January 8, 2014, the Tribunal joined Guinea's request for a four-month adjournment to the merits and formally closed the record without any adjournment. A true and correct copy of that procedural order, together with an English translation thereof, is annexed hereto as Exhibit 42.

31.     By letter to the Tribunal dated January 15, 2014, I objected to the Tribunal's decision to close the record, explaining that it deprived Guinea of the ability to produce evidence essential for its defense, and requested that the Tribunal reconsider its ruling. A true and correct copy of my letter, together with an English translation thereof, is annexed hereto as Exhibit 43.

The Tribunal never responded to that letter.  Indeed, as the Tribunal later informed the parties in

a letter dated March 17, 2014, the Tribunal sent a draft of the Award to the CCJA on January 13,

2014.  A true and correct copy of the Tribunal's March 17, 2014 letter to the parties, together

with an English translation thereof, is annexed hereto as Exhibit 44.

      32.     On April 14, 2014, the CCJA rejected, for the fourth time, the Tribunal's demand

for an increase of its fee to €450,000.  *See* Ex. 29 at 4.

      33.     On April 30, 2014, the President of the Tribunal wrote directly to the parties,

without copying the Secretary General of the CCJA, enclosing invoices and requesting that the

parties directly pay the arbitrators €450,000 by return wire transfer before the Award was sent to

the CCJA for distribution to the parties.  The President stated the Award would include a

reimbursement mechanism such that "[i]f one of the Parties pays more than its share, the award

will reserve that Party's right to claim the surplus from the other Party."  A true and correct copy

of the Tribunal's April 30, 2014 letter to the parties, together with an English translation thereof,

is annexed hereto as Exhibit 45.

      34.     By letter to the Secretary General of the CCJA dated May 14, 2014, Getma's

counsel, Mr. Fischer, stated that the parties had previously paid the amount of the costs of the

arbitration fixed by the CCJA in its October 24, 2011 decision, and asked for confirmation that

there was no impediment to the CCJA's notification of the Award to the parties.  Mr. Fischer

also noted Getma's intention to "comply with the agreement between the Parties as set forth in

the letter from the President of the Arbitral Tribunal dated 30 April 2014 so that the award would

have its full effect."  A true and correct copy of Mr. Fischer's May 14, 2014 letter to the CCJA,

together with an English translation thereof, is annexed hereto as Exhibit 46.

35.     In an email to the Tribunal dated May 19, 2014, the Secretary General of the
CCJA reprimanded the Tribunal for pursuing fees directly from the parties and stated that the
Tribunal was formally prohibited from seeking payment of fees directly from the parties.  A true
and correct copy of the Secretary General's May 19, 2014 email to the Tribunal, together with an
English translation thereof, is annexed hereto as Exhibit 47.

36.     The next day, on May 20, 2014, the Secretary General of the CCJA responded to
Mr. Fischer's letter of May 14, 2014.   The Secretary General confirmed that the CCJA would
issue the Award to the parties as soon as it was received from the Tribunal, and in response to
Mr. Fischer's statement that Getma would comply with the parties' purported agreement
concerning the arbitrators' fees, stated that private fee arrangements between parties and tribunals
are prohibited under the CCJA Rules.  The Secretary General stated that, if the Award reflected the
€450,000 fee requested by the Tribunal, it could threaten the enforceability of the Award.   A true
and correct copy of the Secretary General's May 20, 2014 email to Mr. Fischer, together with an
English translation thereof, is annexed hereto as Exhibit 48.

37.     By email dated May 22, 2014, the President of the Tribunal responded to the
Secretary General's May 19, 2014 email to the Tribunal, stating that he would transmit the
Award to the CCJA, "which refers to the fees set by the Court."  A true and correct copy of the
President's May 22, 2014 email to the Secretary General of the CCJA, and the Secretary
General's May 23, 2014 response, together with English translations thereof, is annexed hereto
as Exhibit 49.

38.     By email dated May 22, 2014, the Tribunal transmitted the Award to the
Secretary General and the parties.  By email dated May 23, 2014, the Secretary General

reprimanded the Tribunal for transmitting the Award directly to the parties because the CCJA

Rules require that the Secretary General distribute the final award to the parties.  *See* Exhibit 49.

> 39.      After rendering the Award, the Tribunal continued to seek payment of its

proposed €450,000 fee directly from the parties.  A letter from the Tribunal to the parties dated

August 27, 2014 reflects that Getma paid half of that amount.  A true and correct copy of that

letter, together with an English translation thereof, is annexed hereto as Exhibit 50.  Because the

CCJA denied the Tribunal's request to increase the arbitrators' fee in accordance with the CCJA

Rules, Guinea has not paid any part of the Tribunal's requested €450,000 fee, which has

prompted threats of legal action against Guinea by the President of the Tribunal.  A true and

correct copy of correspondence from the President of the Tribunal in that regard, together with a

English translations thereof, is annexed hereto as Exhibit 51.

**The Annulment Proceedings Before the CCJA**

> 40.      On July 23, 2014, pursuant to Article 29 of the CCJA Rules, Guinea filed a

petition with the CCJA challenging the validity of the Award (the "Annulment Petition").  In the

Annulment Petition, the Republic of Guinea requests that the CCJA invalidate the Award on the

grounds that (i) the Award is contrary to international public policy because it gives effect to a

contract procured by corruption; (ii) the Tribunal breached Guinea's rights to adduce evidence

and to be heard by refusing to examine evidence of corruption and hold further proceedings on

the matter; and (iii) the arbitrators breached their duties by failing to comply with the CCJA

Rules, which prohibit fee arrangements between parties and preclude arbitrators from seeking

payment of fees directly from the parties.  A true and correct copy of the Annulment Petition,

together with an English translation thereof, is annexed hereto as Exhibit 52.

41.     The annulment proceedings before the CCJA are almost complete.  Getma filed

its response to the Annulment Petition on December 23, 2014, which requested that the CCJA

deny Guinea's petition and enforce the Award.  On January 26, 2015, the CCJA granted

Guinea's request to file a reply to Getma's response, and directed Guinea to file that reply within

15 days.  Guinea filed its reply submission on February 10, 2015.  We anticipate that Getma will

be permitted to file a reply submission by the beginning of April 2015, at which time the

Annulment Petition will be fully submitted to the CCJA.  Thereafter, the parties may request a

hearing before the CCJA.  Although it is difficult to estimate when oral argument may occur, we

anticipate, on the basis of information provided by the Clerk of the CCJA, that such a hearing

may take place a few months after the parties' last written submission.

42.     There is not a deadline for the CCJA to rule on the Annulment Petition.

However, based on a review of available cases, in most instances, the CCJA takes, on average,

approximately one and a half years from the date of the filing of an annulment petition to issue a

ruling.  For the Court's convenience, annexed hereto as Exhibit 53 is a chart prepared by

attorneys working under my supervision, which reflects the time it took the CCJA to resolve

eight recent annulment petitions.   This information was compiled based on publicly available

decisions of the CCJA.  Based on such information and the current status of the case, I anticipate

that the CCJA will rule on the Annulment Petition by the end of 2015 or by early 2016.  The

CCJA's ruling will be final in the sense that Guinea will have no further appeals or avenues to

contest the Award before the CCJA.

I declare under penalty of perjury under the laws of the United States of America that the

foregoing is true and correct.

      Executed at Paris, France on March 2, 2015.

                                       Laurent Jaeger

16