IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

In the Matter of the Arbitration of Certain
Controversies between

**GETMA INTERNATIONAL**,

Petitioner,

and

**THE REPUBLIC OF GUINEA**,

Respondent.

Civil Action No. 1:14-cv-01616-RBW

**THE REPUBLIC OF GUINEA'S MEMORANDUM OF POINTS AND AUTHORITIES
IN OPPOSITION TO GETMA INTERNATIONAL'S PETITION TO CONFIRM**

Jeffrey M. Prokop (D.C. Bar. No. 992687)
Brooke Daley (D.C. Bar. No. 1013387)
ORRICK HERRINGTON & SUTCLIFFE LLP
1152 15th St. N.W.
Washington, D.C. 20005
Telephone: (202) 339-8400
Fax: (202) 339-8500

Jamie L. Shookman (admitted *pro hac vice*)
ORRICK HERRINGTON & SUTCLIFFE LLP
51 West 52nd Street
New York, NY 10019-6142
Telephone: (212) 506-5141
Fax: (212) 506-5151

*Attorneys for Respondent
The Republic of Guinea*

# TABLE OF CONTENTS

**Page**

I.  INTRODUCTION ...........................................................................................1

II.  STATEMENT OF FACTS ............................................................................4

    A.  The Award of the Concession to Getma and the Concession Agreement.............4

    B.  Guinea's Termination of the Concession Agreement ...........................................8

    C.  The Arbitration Proceeding .................................................................................11

        1.  Getma Commences Arbitration, the CCJA Fixes the Total Costs of the Arbitration and the Tribunal Is Constituted......................................11

        2.  In Contravention of the CCJA Rules, the Tribunal Seeks to Dramatically Increase Its Fees and Directly Involves the Parties in the Matter.................................................................................................12

        3.  The CCJA Denies the Tribunal's Demand for an Increased Fee and Getma's Counsel Lobbies the CCJA on Behalf of the Tribunal .............14

        4.  The Tribunal Refuses to Consider New Evidence Demonstrating That Getma Obtained the Concession Through Corruption....................15

    D.  Notwithstanding the CCJA's Refusal to Increase the Arbitrators' Fees, the Tribunal Demands a €450,000 Payment From the Parties as a Condition to Issuing the Award .............................................................................................19

    E.  The Award ...........................................................................................................20

        1.  The Tribunal Transmits the Award to the Parties in Breach of the CCJA Rules ...................................................................................................20

        2.  The Tribunal's Rulings ........................................................................21

    F.  Guinea Seeks to Annul the Award Before the CCJA...........................................22

III.  ARGUMENT .................................................................................................22

    A.  The Tribunal's Refusal to Consider Evidence of Corruption Was a Clear Violation of Due Process and Compels Denial of the Petition Under Article V(1)(b) of the Convention .....................................................................23

        1.  United States Law Requires That Parties Have a Meaningful Opportunity to Be Heard ........................................................................24

        2.  The Tribunal Denied Guinea a Full and Fair Opportunity to Present Its Case .................................................................................................25

    B.  Enforcing the Award Would Give Effect to a Contract Obtained Through Bribery, and Thus Would Violate U.S. Public Policy...........................................28

        1.  Corruption is an Issue of U.S. and International Public Policy...............28

# TABLE OF CONTENTS
(continued)

Page

2.      Allegations of Corruption Warrant Close Scrutiny of Arbitral Awards................................................................................30

3.      The Substantial Evidence of Corruption Here Compels Denial of the Petition Under Article V(2)(b) ........................................................31

C.      The Tribunal's Conduct Concerning Its Fees Compels Denial of the Petition............................................................................................33

1.      The Tribunal's Improper Conduct Concerning Its Fees Compels Denial of the Petition Under Article V(1)(d) of the Convention.............33

a. Breach of Agreed-Upon Arbitral Procedures Provides a Basis to Deny Confirmation of an Award………………………………………..33

b. The Parties Unambiguously Agreed that the CCJA Would Fix The Costs of the Arbitration…………………………………………………34

c. The Tribunal Repeatedly Breached the Parties' Agreement Concerning the Arbitrators' Fees……………………………………………………36

d. The Tribunal's and Getma's Claims That the €450,000 Fee was Proper are Entirely Without Merit……………………………………………..37

2.      The Tribunal's Improper Demand for Fees Compels Denial of the Petition Under Articles (V)(1)(b) and V(2)(e) of the Convention............39

IV.      CONCLUSION ........................................................................................42

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ameropa AG v. Havi Ocean Co. LLC*,
  2011 U.S. Dist. LEXIS 15803 (S.D.N.Y. Feb. 16, 2011) ......................................................30

*Cargill Rice, Inc. v. Empresa Nicaraguense Dealimentos Basicos*,
  25 F.3d 223 (4th Cir. 1994) .................................................................................................34

*Changzhou AMEC Eastern Tools & Equipment v. Eastern Tools & Equipment*,
  No. 11-00354, No. 10 Civ. 3240, 2012 U.S. Dist. LEXIS 106967 (C.D. Cal.
  July 30, 2012) ......................................................................................................................30

*Commonwealth Coatings Corp. v. Continental Casualty, Co.*,
  393 U.S. 145 (1968) .............................................................................................................39

*Encylopaedia Universalis S.A. v. Encylopaedia Britannica, Inc.*,
  403 F.3d 85 (2d Cir. 2005) ........................................................................................33, 34, 42

*Godley v. U.S.*,
  5 F.3d 1473 (Fed. Cir. 1993) ...............................................................................................29

*Goldman, Sachs & Co. v. Athena Venture Partners, L.P.*,
  No. 13-MS-130, 2013 U.S. Dist. LEXIS 107966 (E.D. Pa. Aug. 1, 2013)............................34

*Hall v. Eastern Air Lines, Inc.*,
  511 F.2d 663 (5th Cir. 1975) ...............................................................................................25

*Harvey Aluminum v. United Steelworkers of America*,
  263 F. Supp. 488 (C.D.Cal. 1967) .......................................................................................25

*Hoteles Condado Beach, La Concha and Convention Center v. Union De
  Tronquistas Local 901*, 763 F.2d 34 (1st Cir. 1985) .............................................................25

*HSMV Corp. v. ADI Ltd.*,
  72 F. Supp. 2d 1122 (C.D. Cal. 1999)..................................................................................39

*Iran Aircraft Indust. v. Avco Corp.*,
  980 F.2d 141 (2d. Cir. 1992) ...........................................................................................24, 27

*Karaha Bodas Co. L.L.C. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara*,
  364 F.3d 274 (5th Cir. 2004) ...............................................................................................36

*Mathews v. Eldridge*,
  424 U.S. 319 (1976) .............................................................................................................24

*Oscanyan v. Arms Co.*,
  103 U.S. 261 (1880) .............................................................................................................28

*Parsons & Whittemore Overseas Co. v. Société Generale De L'Industrie Du Papier*,
  508 F. 2d 969 (2d Cir. 1974) ...............................................................................................28

*Polimaster Ltd. v. RAE Sys.*,
  623 F.3d 832 (9th Cir. 2010) ...........................................................................................33, 34

*Sanko S.S. Co., Ltd. v. Cook Industries, Inc.,*
  495 F.2d 1260 (2d Cir. 1973) .................................................................................. 39

*Shaw Group Inc. v. Triplefine Intern. Corp.,*
  322 F.3d 115 (2d. Cir. 2003) ................................................................................... 35

*Sonera Holding BV v. Cukurova Holding AS,*
  895 F. Supp. 2d 513 (S.D.N.Y. 2012) ...................................................................... 24

*Szuts v. Dean Witter Reynolds, Inc.,*
  931 F.2d 830 (11th Cir. 1991) .................................................................................. 34

*Teamsters, Chauffeurs, Warehousemen and Helpers, Local Union No. 506 v.*
  *E.D. Clapp Corp.,*
  551 F.Supp. 570 (N.D.N.Y. 1982) ........................................................................... 24

*Tempo Shain Corp. v. Bertek, Inc.,*
  120 F.3d 16 (2d. Cir. 1997) ................................................................................ 24, 27

*Transmarine Seaways Corp. of Monrovia v. Marc Rich & Co. A.G.,*
  480 F.Supp. 352 (S.D.N.Y. 1979) ............................................................................ 30

*U.S. v. Mississippi Valley Generating Co.,*
  364 U.S. 520 (1961) ................................................................................................. 29

*Yusuf Ahmed Alghanim & Sons v. Toys "R" Us, Inc.,*
  126 F.3d 15 (2d. Cir. 1997) ...................................................................................... 25

**Treaties, Statutes, and Rules**

*Convention on the Recognition and Enforcement of Foreign Arbitral Awards,
  21 U.S.T. 2517, T.I.A. S. No. 6997, 9 U.S.C. § 201, *et seq.* (1958) ......................... 1

  Article V ............................................................................................................... 3, 23

  Article V(1)(b) ..................................................................... 23, 24, 33, 39, 42

  Article V(1)(d) ............................................................................. 23, 33, 36

  Article V(2) ............................................................................................................. 39

  Article V(2)(b) ................................................... 23, 28, 30, 31, 32, 33, 42

  Article VI .............................................................................................................. 3, 42

*Arbitration Rules of the Common Court of Justice and Arbitration ................................... *passim*

  Article 10.1 ................................................................................................... 11, 34, 35

  Article 11.2 .............................................................................................................. 11

  Article 15 ................................................................................................................. 11

  Article 25 .................................................................................................................

  Article 24.2 ................................................................................................... 11, 34, 35

  Article 24.3 .............................................................................................................. 35

  Article 25. .......................................................................................................... 19, 20

Article 29 ...................................................................................................................22

*Federal Arbitration Act, 9 U.S.C. § 201, *et seq* ...................................................1, 25

    Chapter 1 ...........................................................................................................25

    Chapter 2 ......................................................................................................1, 25

*Treaty on the Harmonisation of Business Law in Africa ......................................8, 35

OHADA Uniform Arbitration Act ...............................................................................8

    Article 10 .....................................................................................................35, 38

Foreign Corrupt Practices Act, 15 U.S.C. §§ 78dd-1 – 78dd-3 ................................29

IBA Rule of Ethics for International Arbitrators, effective 1987 ...............................40

International Chamber of Commerce Arbitration Rules, effective January 1, 2012

    Appendix III, Article 2:4 ........................................................................... 35, 40

London Court of International Arbitration Arbitration Rules, effective October 1,
    2014

    Article 28.1 ........................................................................................................35

Restatement Second of the Conflict of Laws 117 (1970)...........................................28

Restatement Third, International Commercial Arbiration, Tentative Draft No. 1,
    2010 ...................................................................................................................34

**Foreign Cases**

*Excelsior Film TV v. UGC-PH,*

    French Cour de cassation, Decision of 24 March 1998,  1999 Rev. Arb. 255. ......................40

*Goldtron Lts. (Singapore) v. Media Most B.V. (Netherlands),*

    Rechtbank [Court of First Instance], Netherlands No. 27, Amsterdam, Decision of August 27,
    2002 ...................................................................................................................39

*Ict Pty. Ltd. v. SeaContainers Ltd.,*

    Judgment of New South Wales Court of Appeal, SC 55007/02, NSW Sup. 77, Decision of
    February 22, 2002...............................................................................................41

*Plama c/ Bulgarie,*

    ICSID no. ARB/03/24, Decision of August 27, 2008 ............................................30

*Rumeli Telekom A.S. and Telsim Mobil Telekom UniKasyon Hizmetleri A.S. v. Republic of
    Kazakhstan*, ICSID No. ARB/05/16, Decision of July 28, 2008 ...........................32

*Westacre Invs. Inc. v. Jugoimport-SDRP Holding Co. Ltd.,*

    Court of Appeal of England and Wales, Decision of May 12, 1999.....................31

*World Duty Free c/ Kenya,*

    ICSID no. ARB/00/7, Decision of October 4, 2006 .............................................30

ICC Case No. 110,

    Arbitration International, Vo.l 10, No. 3, (1992) ...................................................................30

*Common Court of Justice and Arbitration,
Decision 004/99/CCJA, February 13, 1999 ..................................................................20, 37

*Cour d'Appel de Paris,

    Pole 1 – Chambre 1, Case number 12/17681, Decision of March 4, 2014 ............................31

**Other Authorities**

*A.M. Whitesell, *The Psychological Aspects of Dispute Resolution*, in Albert
Vanderberg (ed.), International Commercial Arbitration .......................................................40

*A.T. Martin, *International Arbitration and Corruption: an Evolving Standard*,
Vol. 1, Issue 2 Transnat'l Dispute Mgmt. (2004) .................................................................29

*Abdulhay Sayed, CORRUPTION IN INTERNATIONAL TRADE AND COMMERCIAL
ARBITRATION, Kluwer Law International (2004) ...............................................................29, 32

*Christian Albanesi and Emmanuel Jolivet, *Dealing with Corruption in
Arbitration: A Review of ICC Experience*, 24 ICC International Court of
Arbitration Bulletin, Special Supplement 3 (2013) ..........................................................28, 29

African Union Convention on Preventing and Combatting Corruption,

    adopted July 11, 2013 .............................................................................................................9

Albert Jan van den Berg, The New York Convention of 1958, An Overview .............................28

Amnesty International, Amnesty International 2007 Annual Report for Guinea...........................4

Corruptions Perception Index 2006, Transparency International....................................................5

Council of Europe Civil Law Convention on Corruption,

    signed in Strasbourg on November 4, 1999 .........................................................................29

Council of Europe Criminal Law Convention on Corruption,

    signed in Strasbourg on January 27, 1999...........................................................................29

Economic Community of West African States Protocol on the Fight Against Corruption,
adopted December 21, 2001 ....................................................................................................9

*Gary B. Born, INTERNATIONAL COMMERCIAL ARBITRATION

    (Kluwer Law International, 2d. ed. 2014) ...........................................................24, 26, 28, 39

Gary B. Born, *Principle of Judicial Non-Interference in International Arbitration
Proceedings, The Anniversary Contributions – International Litigation &
Arbitration* 30 J. Int'l L. 999 (2014)......................................................................................33

Guinea, 1999 Country Reports on Human Rights Practice, Bureau of Democracy,
Human Rights and Labor, U.S. Department of State, February 23, 2000 ................................4

*Guinea, A Historic Inauguration*, THE NEW YORK TIMES, December 22, 2010 .............................9

*Guinea: Change or Chaos,*

    International Crisis Group, Africa report no. 121, pp. 2-5, February 14, 2007....................4, 5

*Guinea: Enhanced Initiative for Heavily Indebted Poor Countries Completion*
*Point Document and Multilateral Debt Relief Initiative,*

    International Monetary Fund Country Report (October 2012) ...............................................10

*Guinea's President Promises to Turn Country Into Stable Democracy*,

    THE GUARDIAN, September 24, 2012 ......................................................................................9

Important Contemporary Questions, ICCA Congress Series, 2002 London
    Volume 11, Kluwer Law ......................................................................................................40

*Lansana Conté Profile: Death of an African 'Big Man,'* THE GUARDIAN,
    December 23, 2008..............................................................................................................4

OECD Convention on Combatting Bribery of Foreign Public Officials in
    International Business Transactions, adopted November 21, 1997.......................................29

Patrick Radden Keefe, *Buried Secrets: How an Israeli billionaire wrested control*
    *of one of Africa's biggest prizes*, THE NEW YORKER, July 8, 2013 .......................................16

Paul-Gérard Pougoué, Jean-Maris Tchakoua, Alain Fénéon, *Droit de l'arbitrage*
    *dans l'espace OHADA*, Presses Universitaires d'Afrique (2000) ..........................................31

United Nations Convention Against Corruption,

    entered into force December 14, 2005..............................................................................9, 29

W. Craig, W. Park & J. Paulsson, INTERNATIONAL CHAMBER OF COMMERCE
    ARBITRATION (Oceana Publications, Inc. 3rd ed. 1998)........................................................36

*We Have Lived in Darkness*: *A Human Rights Agenda for Guinea's New*
    *Government*, Human Rights Watch......................................................................................4, 5

Through its undersigned counsel, Respondent The Republic of Guinea ("Guinea") hereby submits this Memorandum of Points and Authorities in opposition to Petitioner Getma International's ("Getma") Petition to Confirm Arbitration Award and Enter Judgment (the "Petition to Confirm") pursuant to the New York Convention on the Recognition and Enforcement of Foreign Arbitral Awards, 21 U.S.T. 2517, T.I.A. S. No. 6997, implemented by Chapter 2 of the Federal Arbitration Act ("FAA"), 9 U.S.C. § 201, *et seq.* (the "Convention").

## I.   **INTRODUCTION**

In March 2008, Guinea's Ministry of Transportation invited bids to expand, operate and maintain the cargo container terminal at the Port of Conakry, Guinea's capital and largest city. At the time, Guinea's President Lansana Conté was near the end of his 24-year presidency during which the country was mired in extreme poverty, corruption and violence.  On August 27, 2008, Getma was provisionally awarded a concession to operate the container terminal over several other larger and more experienced companies in what was purportedly a competitive bidding process.  Less than three weeks after Getma was invited to begin negotiations on the terms of the concession, Getma and the Transportation Ministry executed a concession agreement (the "Concession Agreement") providing Getma the right to operate the container terminal for at least 15 years.

The negotiation of the Concession Agreement was plagued by serious irregularities and heavily criticized both within the government and in the press.  Key government stakeholders— including the Autonomous Port of Conakry (the "PAC"), which owns the land comprising the port—were largely excluded from the negotiation of the Concession Agreement and attempted, unsuccessfully, to reopen the bidding.  Ernst & Young, which the PAC had retained to review the draft agreement, denounced it as unconscionably skewed in Getma's favor and also called for renegotiation, to no avail.

In December 2010, Professor Alpha Condé was elected President of Guinea in the first free election since the country gained independence in 1958.  He immediately called for a review of public contracts recently awarded by the previous administration.  Amid serious concerns that Getma had failed to meets its obligations under the Concession Agreement, and in light of continuing suspicions that Getma had obtained the concession through improper means, the PAC recommended that President Condé terminate the Concession Agreement.  On March 8, 2011, President Condé followed the PAC's recommendation and issued a decree terminating the Concession Agreement.

In May 2011, in accordance with the arbitration clause in the Concession Agreement, Getma initiated arbitration proceedings against Guinea in Abidjan, Ivory Coast, claiming that Guinea improperly terminated the Agreement.  In a final award dated April 29, 2014 (the "Award"), a three-member arbitral tribunal (the "Tribunal") ruled in Getma's favor and awarded it nearly €40 million.  The proceedings that led to the Award were highly irregular.  In particular:

> (i) The arbitrators repeatedly pressured the parties to consent to a substantial increase in the arbitrators' fees, notwithstanding that the parties agreed that the arbitral institution (the Common Court of Justice and Arbitration of the *Organisation pour l'Harmonisation en Afrique du Droit des Affaires*, or the "CCJA") would fix the arbitrators' fees, as is universally the case in administered arbitrations.

> (ii) After the CCJA denied the arbitrators' request for additional fees, Getma's Paris-based counsel personally lobbied the President of the CCJA, both in writing and in person, on behalf of the Tribunal;

> (iii) Despite the CCJA's refusal to increase the arbitrators' fees, the Tribunal invoiced the parties directly for such fees, attempted to condition the release of the Award on the payment of its proposed fee by one of the parties, and included a provision in the Award entitling that party to seek reimbursement

from the other party.  The Tribunal even threated legal action against Guinea for non-payment of the unsanctioned fee increase.  Getma ultimately paid a portion of that fee; Guinea did not.

(iv) In October 2013, while the Tribunal was deliberating, but before it closed the record, Guinea obtained detailed and specific evidence that Getma had procured the concession by paying over $3 million in bribes to various government officials.  Details of that scheme were set forth in a witness statement prepared by Steven Fox, a former U.S. diplomat and well-known expert and investigator on anti-corruption matters.  Shortly thereafter, Guinea obtained witness statements from two individuals who served on the commission that awarded Getma the concession, each of whom admitted that he had received large cash payments in connection with the selection of Getma as concessionaire.  Guinea asked that the Tribunal admit those witness statements into the record and adjourn deliberations for four months to permit Guinea to fully address the issue of corruption.

(v) The Tribunal permitted Guinea to submit Mr. Fox's witness statement, but it abruptly closed the record and refused to permit further evidence or argument on the issue of corruption, including the two witness statements from direct participants in the bribery scheme.  The only plausible explanation for the Tribunal's rush to close the record was its frustration with the CCJA's refusal to increase its fees.

As a result, Guinea was deprived of its right to a full and fair opportunity to present its case, and the Award impermissibly gives effect to a contract that was procured by corruption. Accordingly, the Court should deny the Petition in accordance with Article V of the Convention. Alternatively, the Court should stay this case pursuant to Article VI of the Convention until the conclusion of proceedings to annul the Award currently pending before the CCJA.  In that

regard, Guinea respectfully refers the Court to its separate motion to stay, which is filed concurrently herewith.

## II.   STATEMENT OF FACTS

### A.   The Award of the Concession to Getma and the Concession Agreement

On February 13, 2008, the Council of Ministers of the Republic of Guinea decided to seek bids to expand the container terminal at the Port of Conakry, the only commercial port in Guinea, and to award a concession to operate and maintain it.  *See* Exhibit 1 to the Declaration of Cédric Fischer dated September 22, 2014 in support of the Petition ("Fischer Decl.") at ¶ 27 (hereinafter cited as the "Award").[1]  Shortly thereafter, in March 2008, the Transportation Ministry called for expressions of interest in the project by firms with extensive experience in designing, financing and operating container terminals.  *Id*. at ¶ 27.

At the time, President Lansana Conté was in the latter stages of his 24-year presidency, which began in 1984 when he assumed power in a military coup.  *See Lansana Conté Profile: Death of an African 'Big Man,'* THE GUARDIAN, December 23, 2008, *available at* http://www.theguardian.com/world/2008/dec/23/lansana-conte-profile.  Under President Conté, elections were widely regarded as rigged, political opposition and protests were met with violence, the country was beset by extreme crime and poverty, and the Guinean government and military were awash in corruption.[2]  Indeed, in 2006, Transparency International identified

---

[1] To avoid unnecessarily burdening the record with voluminous foreign language documents, Guinea cites to the Award when referring to background facts or documents that are not in dispute between the parties.

[2] *See, e.g., We Have Lived in Darkness: A Human Rights Agenda for Guinea's New Government at pp. 10-11, Human Rights Watch, available at* http://www.hrw.org/reports/2011/05/24/we-have-lived-darkness-0; International Crisis Group, *Guinea: Change or Chaos,* International Crisis Group, Africa report no. 121, pp. 2-5, February 14, 2007, *available at* http://www.crisisgroup.org/~/media/Files/africa/west-africa/guinea/Guinea%20Change%20or%20Chaos.pdf; Amnesty International, Amnesty International 2007 Annual Report for Guinea, *available at* http://www.amnesty.org/en/region/guinea/report-2007; Guinea, 1999 Country Reports on Human Rights Practice, Bureau of Democracy, Human Rights and Labor, U.S. Department of State, February 23, 2000, *available at* http://www.state.gov/j/drl/rls/hrrpt/1999/250.htm.

Guinea as the second most corrupt country in the world, tied with Iraq and Myanmar, with its Corruption Perception Index score indicating that corruption in Guinea was "rampant." Corruptions Perception Index 2006, Transparency International, *available at* http://www.transparency.org/research/cpi/cpi_2006/0/. Corruption was particularly widespread in the negotiation of large public contracts.[3]

Four candidates that responded to the Transportation Ministry's call for an expression of interest were asked to submit bids: Maersk, Afrimarine, Bolloré and Getma. Award, ¶ 29. The bid rules required each of those firms to, *inter alia*, (i) indicate whether the bid was from a single entity or a consortium of companies; and (ii) submit a certificate of financial capacity using a pre-drafted form annexed to the bid specifications that required submission of financial figures and a certification from an established bank that the bidder had the ability to make the necessary investments in the project. Award, ¶ 147.

In its bid, Getma claimed that it was acting in partnership with Mediterranean Shipping Company S.A. ("MSC"), a recognized global leader in maritime transport with operations and revenues far exceeding that of Getma and NCT Necotrans, Getma's parent company. *Id.* at ¶ 28. As part of its bid, Getma submitted a letter from MSC indicating that the planned concession concerning the container terminal at the Port of Conakry came within the scope of a technical partnership between Getma and MSC's subsidiary, Europe Terminal. Award, ¶¶ 28, 132; Exhibit 6 to the Declaration of Laurent Jaeger, dated March 2, 2015 ("Jaeger Decl.")[4] ("The

---

[3] *See We Have Lived in Darkness: A Human Rights Agenda for Guinea's New Government*, at p. 37, Human Rights Watch, *available at* http://www.hrw.org/reports/2011/05/24/we-have-lived-darkness-0; *id.* at 38 ("By late 2008, the International Monetary Fund … remained concerned about the procedures involved in large procurement contracts."); International Crisis Group, *Guinea: Change or Chaos*, Africa Report No. 121, p. 2, February 14, 2007, *available at* http://www.crisisgroup.org/~/media/Files/africa/west-africa/guinea/Guinea%20Change%20or%20 Chaos.pdf ("The misappropriation of funds, bribes during public procurement, over-invoicing, everything was permitted to those who were in the President's good books and posed no threat to his power.").

[4] Hereinafter, "Jaeger Ex." refers to exhibits annexed to the Jaeger Declaration.

duties of the Technical Partner [MSC] are to provide technical support to allow the Project to be completed."). That letter stated that Europe Terminal intended to "to provide all necessary support" in connection with the project, and that Getma was authorized to present MSC as a jointly and severally liable partner of Getma. Award, ¶ 28. Getma's bid included numerous references to Europe Terminal's extensive experience in cargo handling, claiming that "Europe Terminal therefore has the proven capabilities to successfully complete any new container terminal project, from design to physical operation of the tool including its financing and construction." Award, ¶ 133. Notably, however, Article 7 of the partnership agreement between Getma and Europe Terminal provided that the agreement would expire, at the latest, on the date that Getma signed a concession agreement with Guinea. Award, ¶ 134; Jaeger Ex. 6 at Art. 7.

As part of its bid, Getma proposed to invest over €100 million between 2008 and 2010. *See* Jaeger Decl. ¶ 7; *see also* Award, ¶ 102. As its purported "certificate of financial capacity" to make those substantial investments, Getma supplied a letter from Société Générale noting merely that Getma had an account in good standing with the bank and that Getma had honored its financial commitments. Award, ¶ 149. However, the letter provided no information at all about Getma's financial capacity. *Id*. Getma also submitted a nearly identical letter from Natixis, a French investment bank with which Getma previously had an account. *Id*.

The National Commission for Major Supply Contracts (the "Commission") was formed to evaluate the four bids. Award, ¶ 29. The Commission was made up of eight representatives of various government ministries, including the Transportation Ministry and the Ministry of Administration and Control of Large-Scale Projects ("ACGP"). While two members of the Commission were representatives of the PAC, neither had experience evaluating proposals for such a complex port project; in fact, none of the other Commission members had any such

experience in the port sector.  Jaeger Ex. 12 at ¶¶ 15-16.  On August 27, 2008, the Commission provisionally awarded the concession contract to Getma, notwithstanding the fact that, on its face, Getma's "certificate of financial capacity" did not comply with the bid requirements or the rules governing the bid process, which required the Commission to reject any bids that did not include the required documentation.  Award ¶¶ 147, 149; Jaeger Decl. ¶ 7(ii); Ex. 7 at Art. 16.

The Commission invited Getma to begin negotiations on September 2, 2008.  Award, ¶ 30.  Only 20 days later, on September 22, 2008, the parties entered into the Concession Agreement, which awarded the concession to Getma for a period of at least fifteen years.  *Id*. at ¶¶ 30, 32.  Getma's selection, the negotiations that led to the Concession Agreement and the terms of that agreement were subject to sharp criticism in the press and within the government. *Id*. at ¶ 33.  For example, both the PAC and the Ministry of Administration and Control of Large-Scale Projects, which would ordinarily be closely involved in such a project, were largely excluded from the negotiation of the Concession Agreement and denounced the award of the concession to Getma and the terms of the Agreement.[5]

In the midst of the negotiation of the Concession Agreement, the PAC retained Ernst & Young to review the draft agreement.  In a report dated September 11, 2008, Ernst & Young concluded that the terms of the draft agreement conferred enormous benefits on Getma at the expense of Guinea, including, *inter alia*, providing Getma with a total tax exemption for the duration of the concession.  Jaeger Decl. ¶ 7(iv); Ex. 10 at 8, ¶ 1.10.2 ("This situation does not

---

[5] *See* Jaeger Decl. ¶ 7(iii); Ex. 8 ("The ACGP…should host the tender opening and analysis sessions, as well as the contract negotiation and finalization work.  This has not been the case with the present matter.  Unfortunately, all of these activities have taken place solely at the level of the Project Client (Ministry of Public Works)."); Ex. 9 ("First, it seems that the Commission that handled the evaluation and thus designated the Successful Bidder was also asked to negotiate the Agreement.  This practice is hardly orthodox to the extent that the Commission, at the risk of going back on its decision, will negotiate with little rigor, if not favorably, for the company that it itself has chosen…Given all of the foregoing, it would be prudent to defer the signing of the Agreement in order to better negotiate it.").

seem to us to be beneficial for the Contracting Authority and in our opinion constitutes an unconscionable provision.").   Ernst & Young therefore recommended, to no avail, that the draft agreement be renegotiated.  *Id.*

Under Article 31 of the Concession Agreement, the treaty establishing the *Organisation pour l'Harmonisation en Afrique du Droit des Affaires*[6] ("OHADA"), and its subsequent uniform acts, governed the agreement.[7]  *See* Fischer Decl., Ex. 2 (hereinafter cited as the "Concession Agreement") at Art. 31.  Article 31 provides that all disputes arising from the agreement will be "be permanently and irrevocably settled through arbitration proceedings subject to the Arbitration Rules of the Common Court of Justice and Arbitration of the OHADA," that such proceedings will be conducted in French and that the seat of arbitration will be Abidjan, Ivory Coast.  *Id.*[8]

**B.**    **Guinea's Termination of the Concession Agreement**

On December 23, 2008, President Conté died.  Award, ¶ 34.  Immediately following President Conté's death, the Government was dissolved and the Constitution was suspended.  *Id.*  On December 24, 2008, Captain Moussa Dadis Camara seized control in a military coup, declared himself head of the military junta and was named President of the Republic.  *Id.*  On

---

[6] In English, the Organization for the Harmonization of Business Law in Africa.

[7] The OHADA Treaty was signed in October 1993 for the purpose of creating a uniform system of business laws in West and Central Africa in order to encourage investment and economic expansion in the region.  *See* Jaeger Ex. 1 at Preamble.  Subsequent to the execution of the OHADA Treaty, the OHADA member states adopted a series of uniform acts that apply in each of the member states and supersede all prior and future conflicting national laws. Jaeger Ex. 1 at Art. 10.

[8] The OHADA Treaty established the CCJA as an adjudicative body for OHADA law in the member states.  Jaeger Ex. 1 at Art. 14.  The CCJA serves a dual role as both the highest appellate court that adjudicates legal disputes in member states concerning interpretation or application of the OHADA Uniform Acts and as an arbitration center administering arbitration proceedings brought under the OHADA Treaty and subject to the Arbitration Rules of the CCJA (the "CCJA Rules").  Jaeger Ex. 1 at Arts. 14, 21.  The CCJA administers arbitration proceedings in much the same way as the International Court of the International Chamber of Commerce (the "ICC"), but its judges also have jurisdiction, similar to that of a national court, to review and set aside an arbitral award rendered under the CCJA Rules.

December 31, 2008 and January 2, 2009, the Executive Board of the PAC met to discuss the Concession Agreement and recommended that the new government terminate the Agreement on the basis of serious irregularities in the award of the concession to Getma, including, *inter alia*, deficiencies in Getma's qualifications and its bid documents, and because the negotiation and execution of the Concession Agreement violated Guinean law.  *See* Award, ¶ 35; Jaeger Decl. ¶ 7(v), Ex. 11.  In January 2009, President Camara suspended operation of the Concession Agreement, as well as any proceedings to cancel it.  Award, ¶ 35.  However, he did not act upon the PAC's recommendation to terminate the Concession Agreement and lifted the suspension of the Concession Agreement in April 2009.  *Id.*

In December 2009, President Camara, who was the victim of an assassination attempt, was replaced as President by General Sekouba Konate, who called for a democratic presidential election.  Award, ¶ 37.  In December 2010, Professor Alpha Condé was elected President in what was the first free election in Guinea since its independence in 1958.  *Id*; *see also Guinea, A Historic Inauguration*, THE NEW YORK TIMES, December 22, 2010, *available at* http://www.nytimes.com/2010/12/22/world/africa/22briefs-GuineaBrf.html?_r=0.

Combatting corruption was a central pillar of President Condé's election campaign, and upon assuming office he took steps to address the rampant corruption that had characterized the previous regime, including ratifying the United Nations Convention Against Corruption, the African Union Convention on Preventing and Combatting Corruption and the Economic Community of West African States Protocol on the Fight Against Corruption.  *See Guinea's President Promises to Turn Country Into Stable Democracy*, THE GUARDIAN, September 24, 2012, *available at* http://www.theguardian.com/world/2012/sep/24/guinea-president-country-stable-democracy.  In addition, in conjunction with the World Bank, President Condé's

administration proposed and passed a new procurement law.  Moreover, soon after the presidential elections, the new government froze all public contracts signed during the rule of the military junta in 2009 and 2010 and launched an audit of those contracts, cancelling those that did not comport with the law.  *See Guinea: Enhanced Initiative for Heavily Indebted Poor Countries—Completion Point Document and Multilateral Debt Relief Initiative*, at ¶ 23, International Monetary Fund Country Report (October 2012), *available at* http://www.imf.org/external/pubs/ft/scr/2012/cr12295.pdf.

On January 4, 2011, the new Minister of Transportation under President Condé called for a meeting with Getma to review the Concession Agreement amid serious concerns that Getma was not meeting its obligations under the contract.  Award ¶ 37; Jaeger Ex. 12 at ¶ 26.  At a meeting on January 14, 2011, representatives of the PAC ordered Getma to prove it had the requisite financing for the construction of the new container terminal.[9]  Jaeger Ex. 12 at ¶¶ 27-28.  Getma did not respond to that inquiry, and on February 9, 2011, the PAC's Director of Technical Services rendered an opinion noting, *inter alia*, that Getma had not complied with any of the construction deadlines agreed upon in the Concession Agreement and recommending termination of the Concession Agreement.  *Id*. at ¶¶ 28-33.  The PAC's board of directors subsequently asked President Condé to terminate the Concession Agreement.  *Id*. at ¶¶ 32-35.

On March 8, 2011, President Condé issued a written decree terminating the Concession Agreement with immediate effect on the basis of Getma's failure to fulfill its obligations under the Agreement.  Award, ¶ 38.  A new concession was granted to the Bolloré group, which had ranked second behind Getma during the 2008 bid process.  *Id*. at ¶ 40.

---

[9] Under Article 13 of the Concession Agreement, which incorporated Getma's financial bid, Getma agreed to invest a total of €92.7 million over the first two years of the concession.  Jaeger Decl. ¶ 7(vi), Ex. 13 at 5.  The primary investment, accounting for more than €50 million, was for the construction of a second container terminal to relieve congestion at the existing terminal.  *Id.*

### C.      The Arbitration Proceeding

#### 1.      Getma Commences Arbitration, the CCJA Fixes the Total Costs of the Arbitration and the Tribunal is Constituted

On May 10, 2011, Getma filed a request for arbitration with the CCJA pursuant to Article 31 of the Concession Agreement, alleging that Guinea improperly terminated the Concession Agreement and seeking over €42 million in damages.  Award, ¶ 6, ¶ 56.

On October 24, 2011, in accordance with Article 11.2 of the CCJA Rules, the CCJA fixed the total costs of the arbitration at CFA 100,480,332 (or approximately €174,443), of which CFA 40,480,332 (or approximately €61,000) was allocated to arbitrator fees, and CFA 25,000,000 (or approximately €38,114) was allocated to the arbitrators' expenses.  Jaeger Decl. ¶ 4, Ex. 4.[10]

By late January 2012, a three-member tribunal consisting of Juan Antonio Cremades (nominated by Getma), Eric Teynier (nominated by Guinea) and Professor Ibrahim Fadlallah (jointly nominated by Messrs. Cremades and Teynier) was fully constituted in accordance with the CCJA Rules.  Award, ¶ 9.  In accordance with Article 15 of the CCJA Rules, the Tribunal held an initial hearing with the parties on March 12, 2012 in order to, *inter alia*, establish a procedural timetable and agree on the conduct of the arbitration.  As the Tribunal's written report of the hearing makes clear, the parties agreed that the CCJA Rules—including, specifically the rules and schedules governing the costs of the arbitration—applied to the proceeding.  Jaeger Decl. ¶ 6, Ex. 5 at 1.  At that hearing, both parties provided the Tribunal with an overview of their respective positions on the merits of the dispute.  In particular, Guinea noted, *inter alia*, a number of apparent irregularities in the process by which Getma was awarded the concession, as

---

[10] As explained in more detail in Section III.C.1.c, *infra*, pursuant to the CCJA Rules, the administrative fees of the arbitration and arbitrator fees are set by the CCJA according to a fee scale annexed to the CCJA Rules.  Jaeger Ex. 3 at Arts. 10.1, 24.2.

well as in the Concession Agreement itself.  Jaeger Ex. 5 at 12-15.  Thereafter, the Tribunal set a procedural timetable calling for written submissions throughout 2012 and early 2013, an evidentiary hearing in May 2013 and oral argument in June 2013.  *Id*. at 25.

### 2.   In Contravention of the CCJA Rules, the Tribunal Seeks to Dramatically Increase its Fees and Directly Involves the Parties in the Matter

By letter dated April 22, 2013, approximately one month before the evidentiary hearing, the President of the Tribunal wrote to the parties informing them that he had asked the CCJA to increase the arbitrators' fees to €450,000 "in order to enable [the Tribunal] to properly perform their duties."  Jaeger Decl. ¶ 8, Ex. 14.  The President stated that he wished "to obtain any comments from the parties" concerning the proposed fee.  *Id.*

In the subsequent weeks, the President of the Tribunal repeatedly contacted the parties with respect to the Tribunal's request for substantially increased fees.  *See* Jaeger Decl. ¶ 9, Exs. 15-17.  Both parties eventually responded that they had no comments concerning the Tribunal's request.  Jaeger Decl. ¶ 9, Exs. 18-19.  The President of the Tribunal interpreted this to mean that "the Parties have no objection to this fee revision" and, by letter dated May 10, 2013, asked the parties to confirm that his understanding was correct.  Jaeger Ex. 16.  On May 23, 2013, the President of the Tribunal emailed the parties again concerning the issue of the Tribunal's fees, noting that, at the upcoming evidentiary hearing beginning on May 27, 2013, "we should set aside a little time for the question of fees (with respect to which we have received no response)…".  Jaeger Ex. 17.

On May 27, 2013, the President of the Tribunal opened the evidentiary hearing by complaining on the record about the arbitrators' fees.  Jaeger Decl. ¶ 10, Ex. 20.  He insisted that the parties express either agreement or disagreement with the Tribunal's proposed fee increase, which he claimed was required for the CCJA to render a decision on the matter, and suggested

that failure to acquiesce to the fee increase would threaten the Tribunal's willingness to decide the case:

> We received a literal response to the subtle question, stating that you had no comments—the same response from both side.  Unfortunately, such a response will not suffice for the OHADA to make a fully informed decision.  It is for this reason that I ask you to give me a clear answer, preferably at the end of the day today, and at the latest at the end of the day tomorrow.  I would like to be able to tell, the Tribunal would like to be able to tell…the OHADA whether the Parties agree or do not agree on the estimate given for the arbitrators' fees.  *Of course, if the Parties were not to agree, the Tribunal would be forced to reconsider its involvement in this matter*, as you can imagine the time it takes and the expenses that they incur, which are all at Parisian prices, sadly!

Jaeger Ex. 20 at 4:41-46 and 5:1-6 (emphasis added).

On May 30, 2013, Getma consented to the fee increase proposed by the Tribunal.  *See* Jaeger Decl. ¶ 11, Ex. 21.  In response, the Tribunal confronted Guinea's counsel with Getma's consent and again asked for Guinea's position concerning the arbitrators' fees:

> As you know, GETMA gave its express agreement.  The Republic of GUINEA has merely confirmed that it has no comments.  Would it be possible for you to clarify your position this week, so that we may close this chapter and enable the OHADA to make its determination.

*See* Jaeger Decl. ¶ 12, Ex. 22.  Under the circumstances, Guinea had no choice but to give its consent to the Tribunal's proposed fee increase for purposes of facilitating a ruling by the CCJA on the Tribunal's request, which it did by email dated June 28, 2013.  *See* Jaeger Decl. ¶ 13, Ex. 23.

On July 8, 2013, the Tribunal heard oral argument from the parties, which was the last scheduled hearing in the proceeding.  However, the Tribunal expressly stated that it was not closing the record at that time.  *See* Jaeger Decl. ¶ 14, Ex. 24 at 84:2-5.

3. **The CCJA Denies the Tribunal's Demand for an Increased Fee and Getma's Counsel Lobbies the CCJA on Behalf of the Tribunal**

On August 1, 2013, the CCJA denied the Tribunal's request to increase its fee to

€450,000 and confirmed the original fee amount fixed by the CCJA on October 24, 2011.  *See*

Jaeger Decl. ¶ 15, Ex. 25.  In its ruling, the CCJA cited the CCJA Rules as well as its decision of

February 3, 1999, which held that:

> [t]the arbitrator's fees and expenses are set exclusively by the Court, in
> accordance with the provisions of the Rules of Arbitration.  Any separate
> arrangement between the parties and the arbitrators concerning their fees is null
> and void.

*See* Jaeger Ex. 26 at Art. 9.

In response, the President of the Tribunal informed the parties on September 5, 2013 that

he wished to hold a conference call on September 6, 2013 to discuss the matter.  *See* Jaeger Decl.

¶ 16, Ex. 27.  During that conference, the President of the Tribunal asked the parties for their

assistance in convincing the CCJA to increase the arbitrators' fees.  Jaeger Decl. ¶ 16.  Getma's

counsel indicated it was prepared to support the Tribunal's petition to the CCJA, but Guinea's

counsel indicated that he could not respond without his client's consent.  *Id.*

Later that day, Getma's counsel, Mr. Cédric Fischer, sent the Tribunal a list of the

members of the CCJA.  *See* Jaeger Decl. ¶ 17, Ex. 28.  Mr. Fischer, a member of the French bar

whose office is in Paris, then traveled to Abidjan, Ivory Coast and met with the President of the

CCJA for the purpose of supporting the Tribunal's petition to increase its fees.  *See* Jaeger

Decl. ¶ 18, Ex. 29 at 4.  While still in Abidjan, Mr. Fischer presented a report concerning that

meeting on a September 18, 2013 conference call with the Tribunal and Guinea's counsel.

Jaeger Decl. ¶ 19.  He stated that his impression was that the CCJA would grant the Tribunal's

request for an increased fee.  Jaeger Decl. ¶ 19, Ex. 29 at 4.  Mr. Fischer also sent a letter to the

President of the CCJA on September 19, 2013 urging the CCJA to reconsider its denial of the

14

Tribunal's request.  Jaeger Decl. ¶ 20, Ex. 30.  On October 3, 2013, however, the CCJA

confirmed its August 1, 2013 ruling denying the Tribunal's request to increases its fees.  *See*

Jaeger Decl. ¶ 21, Ex. 31.

### 4.   The Tribunal Refuses to Consider New Evidence Demonstrating That Getma Obtained the Concession Through Corruption

By letter dated November 4, 2013, Guinea informed the Tribunal that it had recently

obtained specific and highly detailed evidence that Getma had obtained the concession at the

Port of Conakry through corruption, namely by making substantial payments to government

officials, including most members of the Commission.  Jaeger Decl. ¶ 22, Ex. 32.  Because the

new facts "constitute[d] a clear breach of international public policy" and were "sufficient to

challenge the validity of the Concession Agreement," Guinea requested that the Tribunal

suspend deliberations, authorize Guinea to produce additional evidence and schedule a hearing to

address the matter.  Jaeger Ex. 32.  In a procedural order dated November 7, 2013, the Tribunal

ordered Guinea to produce any evidence of corruption within one week and ruled that no other

evidence could be submitted without the prior authorization of the Tribunal.  Jaeger Decl. ¶ 23,

Ex. 33.

On November 14, 2013, in accordance with the Tribunal's order, Guinea submitted a

witness statement from Mr. Steven Fox, a former United States diplomat and Chief Executive

Officer of Veracity Worldwide LLC, a well-known consulting firm that conducts investigations

and provides advisory services on anti-corruption issues.  *See* Jaeger Decl. ¶ 24, Ex. 34.  Mr. Fox

has extensive experience conducting anti-corruption investigations in Africa, particularly in

Guinea,[11] and investigated the award of the concession to Getma, the results of which are set forth in his witness statement.  *See* Jaeger Ex. 34 at 1.

As a result of his investigation, Mr. Fox learned that Mr. Richard Talbot, founder and Chief Executive Officer of NCT Necotrans, Getma's parent company, had collaborated with a local partner, Mr. Gamal Challoub,[12] to bribe various Guinean officials for purposes of securing the concession.  *See id*.  Specifically, Mr. Talbot provided Mr. Challoub with a bribery budget of €2.5 million (approximately $3.4 million) that was funded out of a bank account in Zug, Switzerland.  *Id.* at 2.  Of that budget, $1 million was paid to then Transport Minister Dr. Mohamed Cheickh Touré; $200,000 was paid to Finance Minister Ousmane Doré; a total of $600,000 was paid to six of the eight members of the Commission; and the rest was paid to various other influential individuals.  *Id*.  The two members of the Commission who did not receive payments were the representatives of the PAC.  *Id*.  On the basis of the facts set out in Mr. Fox's witness statement, a criminal complaint was filed by the Guinean authorities against the individuals involved in the corruption scheme.  *See* Jaeger Decl. ¶ 26, Ex. 36.

On December 2, 2013, the Tribunal scheduled a hearing for December 16, 2013 solely regarding Mr. Fox's witness statement and prohibited Guinea from producing any additional evidence.  *See* Jaeger Decl. ¶ 25, Ex. 35.  On December 13, 2013, Guinea obtained witness statements from two members of the Commission, Mr. Demba Kourouma and Mr. Ibrahima Lamizana Condé, both of whom admitted that they had accepted bribes in connection with the

---

[11] Mr. Fox was instrumental in uncovering corruption in the award of concessions concerning the Simandou iron ore mine in Guinea, which was widely covered in the press and led to criminal prosecutions in Guinea and the United States.  *See, e.g.,* Patrick Radden Keefe, *Buried Secrets: How an Israeli billionaire wrested control of one of Africa's biggest prizes*, The New Yorker, July 8, 2013, *available at* http://www.newyorker.com/magazine/2013/07/08/buried-secrets.

[12] As Mr. Fox explained, Mr. Challoub is the managing director of a freight and logistics company in Guinea, Transco, S.A.  Getma and Transco formed a joint venture, Société du Terminal à Conteneurs de Conakry, which was to be the container terminal's operating company.  *See* Jaeger Ex. 34 at 1.

award of the concession to Getma.  *See* Jaeger Decl. ¶ 27, Exs. 37-38.  Specifically, Mr.

Kourouma, the Rapporteur of the Commission, stated that, several days after Getma signed the

Concession Agreement, "on 29 September and 9 October 2008, I received the amounts of

€15,000 and €20,000, respectively, from Mr. Mamadou Diallo, an official of the Transportation

Ministry and member of the Bid Evaluation Commission, on behalf of Getma International."  *See*

Jaeger Ex. 37.

Mr. Condé, who was a member of the team that negotiated the Concession Agreement,

stated in his witness statement that Mr. Diallo was in contact with Mr. Challoub, Getma's local

partner, and that over the course of negotiating the Concession Agreement, Mr. Diallo gave Mr.

Condé "an envelope containing €20,000 in €50 bills."  *See* Jaeger Ex. 38.  Mr. Condé stated that

"Mr. Diallo indicated to me this amount was being offered by Getma International in return for

my signature on the negotiation report, a condition precedent to the signature of the concession

agreement."  *Id.*

The next day, December 14, 2013, Guinea's counsel informed the Tribunal of the

existence of the witness statements from Messrs. Kourouma and Condé, and indicated that

Guinea would seek authorization to produce those statements at the December 16, 2013 hearing.

*See* Jaeger Decl. ¶ 28, Ex. 39.  Prior to that hearing, Guinea's counsel sent copies of those

witness statements and the criminal complaint filed in Guinea to Getma's counsel.  *See* Jaeger

Decl. ¶ 28, Ex. 40.

During the December 16, 2013 hearing, at which Mr. Fox was present and cross-

examined, Guinea requested that the Tribunal permit it to enter the witness statements of Messrs.

Kourouma and Condé into the record, as well as grant Guinea a four-month period to produce

additional evidence of corruption and put forward its case on the issue. *See* Jaeger Decl. ¶ 29,

Ex. 41 at 25:26-34.

Guinea's counsel acknowledged that such evidence came at a late stage in the

proceeding, but reminded the Tribunal of its duty to investigate acts of corruption:

> If you will permit me, I will quote the words of Mr. Bernardo Cremades in the 2003 special issue of the ICC Bulletin on corruption and fraud in arbitration… Mr. Bernardo Cremades said as follows: "Possibly the greatest error that an arbitral tribunal can commit, where there is any suspicion of corruption, money-laundering or serious fraud, is to ignore it. It is far preferable for the suspicion to be acknowledged and for the evidence to be taken into account, even if the final conclusion is that the evidence is not convincing." He adds a bit further, "*This is the only approach that can ensure the enforceability of the award and the integrity of international commercial arbitration as an institution.*"

Jaeger Decl. ¶ 29, Ex. 41 at 24:21-32 (emphasis added).

While Getma objected to Guinea's allegations of corruption and the request for a four-

month adjournment, Getma expressed its willingness to directly confront those allegations:

> Getma is in full agreement with the opinion of Mr. Bernardo Cremades: the very serious questions of corruption should be examined and dealt with, and once more, Getma has no problem with that….

> If today, you were told, "I have two witnesses, I have exhibits and documents, I would like to send them to you, to enter into evidence, give me four months (though that is a little excessive), give me a few weeks to be able to examine them,"—there would not be the slightest problem.

Jaeger Ex. 41 at 28:46-29:8.

In a procedural order dated January 8, 2014, the Tribunal rejected Guinea's request for a

four-month adjournment to the merits, without explanation, and closed the record without any

adjournment at all. *See* Jaeger Decl. ¶ 30, Ex. 42. By letter to the Tribunal dated January 15,

2014, Guinea's counsel objected to the Tribunal's decision to close the record, explaining that it

deprived Guinea of the ability to produce evidence essential for its defense, and asked that the

Tribunal reconsider its ruling. *See* Jaeger Decl. ¶ 31, Ex. 43. The Tribunal never responded to

that letter.  Indeed, by that point, the Tribunal had already submitted a draft of its award to the

CCJA.  *See* Jaeger Decl. ¶ 31, Ex. 44.

**D.**     **Notwithstanding the CCJA's Refusal to Increase the Arbitrators' Fees, the Tribunal Demands a €450,000 Payment From the Parties as a Condition to Issuing the Award**

On April 14, 2014, the CCJA rejected, for the fourth time, the Tribunal's demand for an

increase of its fee to €450,000.  *See* Jaeger Ex. 29 at 4.  On April 29, 2014, the Tribunal signed

the Award.  Under Article 25.1 of the CCJA Rules, the arbitrators were required to send the

signed award to the Secretary General, who notifies the parties of the decision after the

arbitration costs have been paid to the Secretary General of the CCJA.  *See* Jaeger Ex. 2 at Art.

25.1.  However, notwithstanding the CCJA's repeated refusals to increase the arbitrators' fees,

the President of the Tribunal wrote directly to the parties on April 30, 2014—without copying

the Secretary General of the CCJA—requesting that, "for the sake of good order," they directly

pay the arbitrators €450,000 by return wire transfer before the Award was sent to the CCJA for

distribution.  Jaeger Decl. ¶ 33, Ex. 45.  The President stated that the Award included a

reimbursement mechanism such that "[i]f one of the Parties pays more than its share, the award

will reserve that Party's right to claim the surplus from the other Party."  *Id.*

By letter to the Secretary General of the CCJA dated May 14, 2014, Getma's counsel,

Mr. Fischer, stated that the parties had previously paid the amount of the CCJA's initial fee

allocation and asked for confirmation that there was no impediment to the CCJA's notification of

the award to the parties.  Getma also noted its intention to "comply with the agreement between

the Parties, which, according to the letter from the President of the Arbitral Tribunal dated 30

April 2014, is reflected in the award."  Jaeger Decl. ¶ 34, Ex. 46.  In an email dated May 19,

2014, the Secretary General of the CCJA reprimanded the Tribunal for demanding fees directly

from the parties:

I remind you, for what it is worth, that this is an institutional and not an ad hoc arbitration. First, your requests for adjustment of your fees were rejected by the Court, by means of several administrative decisions of which you were properly notified.

Second, pursuant to Article 9 of Decision No. 004/99/CCJA dated 3 February 1999, "[t]he arbitrator's fees and expenses are set exclusively by the Court, in accordance with the provisions of the Rules of Arbitration. **Any separate arrangement between the parties and the arbitrators concerning their fees is null and void**."

The CCJA system of arbitration categorically prohibits any arrangement between the parties and the arbitrators relating to fees, the determination of which falls within the discretionary power of the Court. The arbitrators may not ignore these mandatory rules of CCJA-OHADA arbitration.

As a result, you are formally prohibited from seeking payment of fees directly from the parties, who have already paid in full the amounts due.

*See* Jaeger Decl. ¶ 35, Ex. 47 (emphasis in original).[13]  The next day, the CCJA responded to Mr.

Fischer's letter of May 14, 2014, reiterating that any award which reflected the Tribunal's

proposed fee would be subject to invalidation by the CCJA:

In addition, I call your attention to the fact that, if the final award includes the payment of the amount of €450,000 to the arbitrators, in accordance with the invalid arrangement, **the award will potentially be subject to invalidation by the community's high court.**

Jaeger Decl. ¶ 36, Ex. 48 (emphasis added).

### E.   The Award

#### 1.   The Tribunal Transmits the Award to the Parties in Breach of the CCJA Rules

On May 22, 2014, 23 days after it signed the Award, the Tribunal transmitted it directly

to the parties in breach of Article 25.1 of the CCJA Rules, which requires that the Secretary

General of the CCJA issue the Award to the parties.  By email dated May 23, 2014, the Secretary

General reprimanded the Tribunal for its breach of the CCJA Rules:

---

[13] Notably, in a return email to the Secretary General dated May 22, 2014, the President of the Tribunal stated that the award "refers to the fees set by the Court."  *See* Jaeger Decl. ¶ 37, Ex. 49.

> I regret that you directly transmitted the electronic version of the arbitral award to the parties despite the fact that pursuant to our arbitration rules, notice is the responsibility of the Secretary General.
>
> As a result, the weekly publication Jeune Afrique has already been informed of the content of the award, the hard copy of which we have still not received. I deeply regret these serious violations of the principle of the confidentiality of arbitral proceedings, which is binding on the arbitrators and the parties.

Jaeger Ex. 49.

## 2.     The Tribunal's Rulings

In the Award, the Tribunal (i) rejected the allegations of corruption in Mr. Fox's witness statement and denied Guinea's request for a four-month period to produce additional evidence of corruption (Award, ¶ 82); (ii) ruled that Guinea's termination of the Concession Agreement was improper (*id.* at ¶ 187); and (iii) awarded Getma €38,531,127, plus interest.  *Id.* at p. 111.

The Tribunal rejected Mr. Fox's testimony on the basis that he was not a direct or indirect witness to the events that are the subject of his statement.  *Id.* at ¶ 75.  At the same time, the Tribunal refused to admit the witness statements of Messrs. Kourouma and Condé into evidence, although they were percipient witnesses testifying against their penal interest.  *Id.* at ¶¶ 75-76. The Tribunal, which had not reviewed those witness statements, characterized them as "irrelevant" and noted that they were "prepared on 13 December, for the hearing of December 16."  *Id.* at ¶ 76.

As the Tribunal indicated in its letter to the parties dated April 30, 2013, the Award included a provision by which one party that paid the entire €450,000 fee requested by the Tribunal would be able to recover the amount of its overpayment from the other party.  *See* Award, p. 112 ("On the expenses…[o]rders that the Party who has paid more than his share has the right to request that the other party repay the surplus;").  That provision related solely to the

Tribunal's requested €450,000 fee because each party had already paid its share of the arbitration costs fixed by the CCJA.

After rendering the Award, the Tribunal aggressively pursued payment of its proposed €450,000 fee.  *See* Jaeger Decl. ¶ 39, Exs. 50-51.  A letter from the Tribunal to the parties dated August 27, 2014 reflects that Getma paid half of that amount.  *See* Jaeger Decl. ¶ 39. Ex. 50.  In light of the CCJA's refusal to increase the arbitrators' fee, Guinea has not paid any part of the Tribunal's requested fee, which has prompted threats of legal action against Guinea by the Tribunal.  *See* Jaeger Decl. ¶ 39, Ex. 51.

### F.    Guinea Seeks to Annul the Award Before the CCJA

On July 23, 2014, in accordance with Article 29 of the CCJA Rules, Guinea filed a petition with the CCJA challenging the validity of the award (the "Annulment Petition").  *See* Jaeger Decl. ¶ 40, Ex. 52.  In the Annulment Petition, Guinea requested that the CCJA invalidate the Award on the grounds that (i) it is contrary to international public policy because it gives effect to a contract procured by corruption (Jaeger Ex. 52 at ¶¶ 49-106); (ii) the Tribunal breached Guinea's rights to present evidence and to be heard by refusing to examine evidence of corruption and to hold further proceedings on the matter (*id*. at ¶¶ 106-163); and (iii) the arbitrators breached their duties by failing to comply with the CCJA Rules, which prohibit them from seeking payment of fees directly from the parties (*id*. at ¶¶ 164-214).  As set forth in the Jaeger Declaration (*see* ¶¶ 41-42) and Guinea's Memorandum of Points and Authorities in Support of its Motion to Stay, the annulment proceedings before the CCJA are nearly complete.

## III.   ARGUMENT

The parties agree that the Convention applies to this proceeding.  Convention Art. 1(1), (2) (the Convention applies to "the recognition and enforcement of arbitral awards made in the territory of a State other than the State where the recognition and enforcement of such awards are

sought … and to "arbitral awards not considered as domestic awards in the State where recognition and enforcement are sought.").  Article V of the Convention sets forth the grounds upon which a court may refuse to recognize an arbitral award, including, *inter alia*, where:

(i)     "The party against whom the award is invoked was … unable to present his case." Convention Art. V(1)(b).

(ii)    "The … arbitral procedure was not in accordance with the agreement of the parties, or failing such agreement, was not in accordance with the law of the country in which the arbitration took place."  Convention Art. V(1)(d).

(iii)   "The recognition or enforcement of the award would be contrary to the public policy" of the country in which enforcement is sought.  Convention Art. V(2)(b).

As set out below, each of the foregoing grounds provides a compelling basis to deny the Petition.

**A.      <u>The Tribunal's Refusal to Consider Evidence of Corruption Was a Clear Violation of Due Process and Compels Denial of the Petition Under Article V(1)(b) of the Convention</u>**

The Court should deny the Petition under Article V(1)(b) of the Convention because the Tribunal violated Guinea's right to a full and fair opportunity to be heard.  As explained below, the Tribunal inexplicably gave Mr. Fox's witness statement no weight and refused to accept two witness statements from individuals directly involved in Getma's corruption scheme, deeming them irrelevant without ever having seen them.  The Tribunal also prevented Guinea from adducing additional evidence of corruption, despite Getma's willingness to address the issue, but then claimed to reject the corruption allegations on the basis of the purported incomplete nature of the evidence.  The Tribunal's true motivation for denying Guinea's request is clear: its rush to close the record coincided with its desire to complete a case for which it believed it was significantly underpaid.  Hiding this motive beneath layers of faulty reasoning makes the violation of Guinea's due process rights even more egregious, and denial of the Petition all the more warranted.

1.    **United States Law Requires That Parties Have a Meaningful Opportunity to be Heard**

Due process rights are "entitled to full force under the New York Convention as defenses to enforcement."  *See Iran Aircraft Indust. v. Avco Corp.*, 980 F.2d 141, 145 (2d. Cir. 1992) (quotations omitted).  National courts typically apply the law of the forum in which recognition of an arbitral award is sought to determine if a party was denied an opportunity to present its case.  *See id.*; *see also Sonera Holding BV v. Cukurova Holding AS*, 895 F. Supp. 2d 513, 521 (S.D.N.Y. 2012) (holding that denying enforcement of an award under Article V(1)(b) requires showing that the award "was rendered pursuant to procedures inconsistent with the [forum of the enforcement action's] standards of due process."); GARY B. BORN, INTERNATIONAL COMMERCIAL ARBITRATION, 3500 (Kluwer Law International, 2d. ed. 2014).  Under United States law, the "[t]he fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner.'"  *Iran Aircraft Indust.*, 980 F.2d  at 146 (quoting *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976)); *see also Teamsters, Chauffeurs, Warehousemen and Helpers, Local Union No. 506 v. E.D. Clapp Corp.*, 551 F.Supp. 570, 578 (N.D.N.Y. 1982) (vacating award where party was deprived of a full and fair opportunity to present its case)).

Moreover, while courts afford arbitrators wide latitude in making evidentiary determinations, that deference is not absolute.  Denying enforcement of an award is warranted "where fundamental fairness is violated."  *Tempo Shain Corp. v. Bertek, Inc.*, 120 F.3d 16, 20 (2d. Cir. 1997) (vacating District Court's confirmation of award where arbitrators had "no reasonable basis" to determine that "omitted testimony would be cumulative with regard to the

fraudulent inducement claims.").[14]   For example, denial of enforcement is warranted where an

arbitrator "prejudices the rights of the parties, by refusing to honor pertinent and material

evidence," *Hoteles Condado Beach, La Concha and Convention Center v. Union De Tronquistas*

*Local 901*, 763 F.2d 34, 40 (1st Cir. 1985) (affirming vacatur of award where arbitrator's refusal

to ascribe any weight to testimony that was "unquestionably relevant," and "central and

decisive" to the offering party's position, destroyed that party's right to present its case); *see also*

*Harvey Aluminum v. United Steelworkers of America*, 263 F.Supp. 488, 493 (C.D.Cal. 1967)

(vacating award where arbitrator refused to admit material rebuttal evidence, without giving

parties any previous notice that rules of evidence precluding rebuttal evidence applied).[15]

> ### 2.    The Tribunal Denied Guinea a Full and Fair Opportunity to Present its Case

The Tribunal violated Guinea's due process rights by refusing to consider pertinent and

material evidence of corruption without any justifiable reason.  The Tribunal disregarded Mr.

Fox's witness statement, refused to review or consider the witness statements of Messrs.

Kourouma and Condé, and denied Guinea's request for a modest adjournment of the Tribunal's

deliberations in order to present its corruption case.

*First,* Mr. Fox, who has extensive experience investigating corruption matters,

particularly in Guinea, provided highly detailed testimony concerning Getma's bribery scheme,

---

[14] The Second Circuit's ruling was based on Section 10(a)(3) of the Federal Arbitration Act ("FAA"), which mandates vacatur of an award if "the arbitrators were guilty of…refusing to hear evidence pertinent and material to the controversy."  However, that ruling is relevant here because the provisions of Chapter 1 of the FAA (of which Section 10(a)(3) is a part) apply to proceedings under Chapter 2 of the FAA, which implemented the Convention, so long as they do not conflict with the provisions of Chapter 2.  *See* 9 U.S.C. § 208; *see also Yusuf Ahmed Alghanim & Sons v. Toys "R" Us, Inc.*, 126 F.3d 15, 20 (2d. Cir. 1997) ("We have held that the FAA and the Convention have overlapping coverage to the extent that they do not conflict.") (internal quotations and citations omitted).  Here, there is no such conflict, because both Chapter 1 and Chapter 2 of the FAA permit a court to deny enforcement of an award where fundamental due process rights are violated.

[15] Similarly, an arbitrator's refusal to consider evidence simply because a party delayed in presenting it also warrants denial of enforcement.  *See Hall v. Eastern Air Lines, Inc.*, 511 F.2d 663, 664 (5th Cir. 1975) (vacating arbitral award because arbitrator refused to consider pertinent and material evidence simply because the plaintiff "was tardy in presenting it.").

including the identity of Getma's local partner, the amount of Getma's bribery budget, the identity of the individuals who received bribes and the amounts of money each received, and the geographic location of the bank account used to fund the bribes.  *See* Jaeger Decl. ¶ 24, Ex. 34 at 2.  Guinean authorities deemed Mr. Fox's report credible enough to file a criminal complaint against the individuals identified in his report.  *See* Jaeger Ex. 36.

*Second,* despite the seriousness of the issues raised in Mr. Fox's statement, and the fact that a valid claim of corruption would render the Concession Agreement null and void, the Tribunal treated this new evidence as a mere speed bump on its road to conclude the proceedings, and took multiple steps to strictly limit the evidence Guinea could produce.  *See* Jaeger Decl. ¶¶ 25, 30, Exs. 35, 42.  It never responded to Guinea's requests to provide the witness statements of Messrs. Kourouma and Condé, who were direct participants in the bribery scheme and thus corroborated Mr. Fox's testimony, and abruptly closed the record without explanation.  *Id.* at ¶ 30, Ex. 42.  It never responded to Guinea's request that the Tribunal reconsider its decision to close the record.  *Id.* at ¶ 31, Ex. 43.  Most remarkably, the Tribunal closed the record even though Getma expressly stated at the December 16, 2013 hearing that it was willing to confront the issue of corruption.  *Id.* at ¶ 29, Ex. 41 at p. 28:46-48, 29:5-8.

*Third,* the manner in which the Tribunal dealt with the corruption issue in the Award is striking.  The Tribunal determined that Mr. Fox's testimony was entitled to no weight because he was not a direct or indirect witness to the events described in his witness statement (Award ¶ 76),[16] yet refused to consider the witness statements of two individuals who were direct

---

[16] Notably, there is no rule against hearsay in international arbitration.  See Gary B. Born, INTERNATIONAL COMMERCIAL ARBITRATION 2307 (Kluwer Law International, 2d. ed. 2014) (stating that U.S. courts routinely uphold awards based on evidentiary rulings that would not be accepted in judicial proceedings, including those admitting hearsay evidence).  Moreover, the International Bar Association Rules on the Taking of Evidence in International Arbitration, which parties frequently adopt in international arbitration, do not prohibit hearsay evidence.  *See* IBA Rules on the Taking of Evidence in International Arbitration, effective May 29, 2010, International Bar Association.

participants in those events.  *Id*. at ¶¶ 77, 82.  As to those two witness statements, the Tribunal

declared them to be irrelevant without ever having seen them, and bizarrely criticized them as

"prepared on December 13, for the hearing of December 16."  *Id*. at ¶ 76.  The Tribunal never

explained how that fact impacted the credibility of the testimony considering that witness

statements are, by their nature, prepared for use at hearings.  *See Tempo Shain Corp*. 120 F.3d at

20.  By strictly limiting Guinea's ability to submit evidence without any plausible justification,

but then finding the evidence of corruption it did submit to be insufficient, the Tribunal seriously

prejudiced Guinea and deprived it of its fundamental right to be heard.  *See Iran Aircraft Indus*.,

980 F.2d at 145 (tribunal violated party's due process rights by directing it not to submit

particular evidence, but ultimately denying its claim for lack of sufficient evidence).  The

Tribunal's conduct is all the more striking considering the substantial evidence Guinea had

adduced earlier in the proceeding concerning the serious irregularities surrounding Getma's bid

and the negotiation of the Concession Agreement.  *See* Section II.A, *supra*.

 *Fourth,* the circumstances make clear that the Tribunal's decision to close the record was

based not on the strength or weakness of Guinea's evidence of corruption or the merits of its

request for a brief adjournment to present its case, but on the Tribunal's discontent with its fees.

Indeed, the Tribunal's determination to close the record came after the CCJA repeatedly refused

to increase the arbitrators' fees and the Tribunal had threatened to discontinue its participation in

the case.  *See* Section II.C.2-4, *supra*.  The most compelling indication of the Tribunal's true

motives for hastily concluding the proceedings is its June 3, 2013 letter to the CCJA, sent after it

issued the Award, which stated as follows:

> The amount [€450,000], which was fixed at a time when the arbitration was far
> advanced and when there was some visibility as to the size of the case and the
> work required from the arbitrators **(which was nevertheless subject to surprises**

**following the Republic of Guinea's last requests**), corresponded to established practice in international arbitration.

Jaeger Ex. 29 at 4 (emphasis added).  That letter—which explicitly links the Tribunal's frustration with its fees to Guinea's request for additional time to pursue its corruption claim—undermines the legitimacy of the Tribunal's proffered reasons for denying that request.

### B.   Enforcing the Award Would Give Effect to a Contract Obtained Through Bribery, and Thus Would Violate U.S. Public Policy

An award made under the Convention may be vacated if enforcement would be contrary to the recognition forum's public policy.  Conv. Art. V(2)(b).  In the United States, an arbitral award will not be enforced if it "would violate the forum state's most basic notions of morality and justice."  *Parsons & Whittemore Overseas Co. v. Société Generale De L'Industrie Du Papier*, 508 F. 2d 969, 974 (2d Cir. 1974) (citing Restatement Second of the Conflict of Laws 117, comment c, at 340 (1971)).[17]

### 1.   Corruption is an Issue of U.S. and International Public Policy

Corruption in the procurement of government contracts undoubtedly implicates U.S. public policy.  U.S. courts have long treated contracts obtained through bribery of foreign officials, or other improper means, as void as against public policy.  *See e.g.*, *Oscanyan v. Arms Co.*, 103 U.S. 261, 277 (1880) ("A contract to bribe or corruptly influence officers of a foreign government will not be enforced" because of "the inherent viciousness of the transaction, its

---

[17] Moreover, the drafting history of the Convention indicates that refusal to enforce an award under Article V(2)(b) is warranted if enforcement would violate a forum state's international public policy.  Albert Jan van den Berg, The New York Convention of 1958, An Overview, at 19; Gary B. Born, INTERNATIONAL COMMERCIAL ARBITRATION 3656 (Kluwer Law International, 2d. ed. 2014) (stating that a majority of commentators approve applying the forum state's international public policy when reviewing an arbitral award on Article V(2)(b) grounds).  As set out below, fighting corruption is undoubtedly part of the United States' international public policy.  Countries, including the United States, have enacted anti-corruption legislation in recent years precisely because of "the demands of cross-border trade and the prevalence of illicit practices internationally."  *See* Christian Albanesi and Emmanuel Jolivet, *Dealing with Corruption in Arbitration: A Review of ICC Expertise*, 24 ICC International Court of Arbitration Bulletin, Special Supplement, Prologue (2013).

repugnance to our morality, and the pernicious effect which its enforcement by our courts would have upon our people."); *see also U.S. v. Mississippi Valley Generating Co.*, 364 U.S. 520, 564-565 (1961) (holding that because of "inherent difficulty in detecting corruption," a contract procured in violation of federal conflict-of-interest law was unenforceable, and explaining that a primary purpose of the law was "to protect the public from the corruption").  As a general matter, a government contract "tainted by fraud or wrong-doing is void *ab initio*."  *See Godley v. U.S.*, 5 F.3d 1473, 1475 (Fed. Cir. 1993).

The U.S. public policy against corruption in the procurement of government contracts is embodied most prominently in the Foreign Corrupt Practices Act ("FCPA"), 15 U.S.C. §§ 78dd-1 – 78dd-3.  When the FCPA was enacted in 1977, the United States became the first developed country to criminalize bribery of foreign officials by its nationals.  *See* Abdulhay Sayed, CORRUPTION IN INTERNATIONAL TRADE AND COMMERCIAL ARBITRATION 201, Kluwer Law International (2004).  Since that time, similar legislation has become widespread throughout the world.[18]

Fighting corruption is so essential to international commerce that international arbitration tribunals consider it part of binding international public policy.  *See* A.T. Martin, *International Arbitration and Corruption: an Evolving Standard*, Vol. 1, Issue 2 Transnat'l Dispute Mgmt. (2004), 9-10; *see also* Christian Albanesi and Emmanuel Jolivet, *Dealing with Corruption in Arbitration: A Review of ICC Experience*, 24 ICC International Court of Arbitration Bulletin,

---

[18] For example, the UN Convention Against Corruption, entered into force December 14, 2005, *available at* http://www.unodc.org/unodc/en/treaties/CAC/, currently has 140 signatories.  The member countries of the Organization for Economic Co-Operation and Development ("OECD") have also signed the OECD Convention on Combating Bribery of Foreign Public Officials in International Business Transactions, adopted November 21, 1997, *available at* http://www.oecd.org/corruption/oecdantibriberyconvention.htm, which requires State parties to criminalize the offering and accepting of bribes in international business.  Similarly, the Council of Europe enacted the Criminal Law Convention on Corruption signed in Strasbourg on January 27, 1999, *available at* http://conventions.coe.int/Treaty/en/Treaties/Html/173.htm, as well as the Civil Law Convention on Corruption, signed in Strasbourg on November 4, 1999, available at http://conventions.coe.int/Treaty/en/Treaties/Html/174.htm.

Special Supplement 3 (2013); ICC Case No. 110, Arbitration International, Vol. 10, No. 3, (1992), pp. 282-294.  Accordingly, tribunals consistently refuse to enforce contracts obtained through corruption.  *See Plama c/ Bulgarie,* ICSID no. ARB/03/24, Decision of August 27, 2008, ¶ 143 (upholding claims under investment agreement that were "obtained by deceitful conduct that is in violation of Bulgarian law" would "be contrary to the basic notion of international public policy."); *World Duty Free c/ Kenya,* ICSID no. ARB/00/7, Decision of October 4, 2006, ¶ 157 ("claims based on contracts of corruption or contract obtained by corruption cannot be upheld.").

### 2.     Allegations of Corruption Warrant Close Scrutiny of Arbitral Awards

Because corruption is such a critical public policy issue, an arbitral award enforcing a contract alleged to have been procured by corruption should receive close scrutiny by a court asked to enforce the award.  Indeed, courts have consistently held that if an arbitral award involves a contract procured through improper means, such as coercion or duress, it would violate the United States' "most basic notions of morality and justice" to enforce the award.  For example, in *Changzhou AMEC Eastern Tools & Equipment v. Eastern Tools & Equipment,* No. 11-00354, No. 10 Civ. 3240, 2012 U.S. Dist. LEXIS 106967 (C.D. Cal. July 30, 2012), the court conducted a detailed analysis of the facts surrounding the negotiation of the parties' agreement and determined that the defendant had executed it under duress.  *Id.* at *45-55.  Accordingly, the court denied confirmation of the award on public policy grounds under Article V(2)(b).  *Id.* at *60-61; *see also Ameropa AG v. Havi Ocean Co. LLC*, 2011 U.S. Dist. LEXIS 15803, at *6 (S.D.N.Y. Feb. 16, 2011) (arbitral award could be denied enforcement under Article V(2)(b) if court found that "defendant had been subject to coercion or any part of the agreement had been the result of duress") (citing *Transmarine Seaways Corp. of Monrovia v. Marc Rich & Co. A.G.*, 480 F. Supp. 352, 358 (S.D.N.Y. 1979) (arbitrators' findings on issue of duress were subject to

judicial review, and a finding of duress would result in denial of enforcement under Article V(2)(b)).

Similarly, courts in other jurisdictions have emphasized that when an arbitral award implicates allegations of corruption, the facts and law underlying the award should be closely scrutinized.  Commentators on the CCJA Rules stress that, when reviewing annulment petitions based on violations of international public policy, the CCJA may conduct an in-depth review of the award.  *See* Paul-Gérard Pougoué, Jean-Maris Tchakoua, Alain Fénéon, Droit de l'arbitrage dans l'espace OHADA, Presses Universitaires d'Afrique (2000), p. 281.[19]  Courts in Europe have followed a similar approach, particularly when allegations of corruption are at issue.  *See e.g.*, Case number 12/17681, Cour d'Appel de Paris, Pole 1 – Chambre 1, March 4, 2014 (on motion to vacate arbitral award, court reviewed all factual and legal elements underlying the allegation that the parties' contract was procured by corruption)[20]; *see also Westacre Invs. Inc. v. Jugoimport-SDRP Holding Co. Ltd.,* Court of Appeal of England and Wales, Decision of May 12, 1999, ¶¶ 53, 64 ("in an appropriate case [the court] may inquire.... into an issue of illegality even if an arbitrator…has found there was no illegality," because it is "important that the English court is not seen to be turning a blind eye to corruption on this scale.").

### 3.   The Substantial Evidence of Corruption Here Compels Denial of the Petition Under Article V(2)(b)

The compelling evidence that Getma procured the concession through corrupt means warrants denial of the Petition.  In addition to the witness statements of Messrs. Fox, Kourouma and Condé, which are described above, Guinea adduced a vast amount of circumstantial evidence, demonstrating that Getma procured the concession by the improper means.  For

---

[19] An English translation of this book excerpt is annexed as Exhibit 1 to the Prokop Declaration.

[20] An English translation of this case is annexed as Exhibit 2 to Prokop Declaration.

example:

> (i) There were numerous irregularities with Getma's bid, including the illusory partnership with Europe Terminal and Getma's failure to provide adequate proof of its financial capacity.  *See* Section II.A, *supra*; Jaeger Exs. 6-7.  Although these irregularities were obvious, the Commission ignored them.

> (ii) The Concession Agreement was concluded in less than three weeks,[21] even though the bid rules consider bids active for 120 days after their submission.  *See* Jaeger Ex. 7, Article 5.

> (iii) The terms of the Concession Agreement were so heavily skewed in favor of Getma that an independent firm (Ernst & Young) recommended that the agreement be renegotiated.  *See* Jaeger Ex. C44.

> (iv) Key stakeholders were largely excluded from the negotiation of the Concession Agreement, which were dominated by the Transportation Ministry, whose officials were at the center of the bribery scheme uncovered by Mr. Fox.  *See* Section II.A, *supra*; Jaeger Exs. 8-9.

> (v) The award of the concession to Getma caused an outcry both within and outside the government, with the PAC repeatedly attempting to reopen the bidding process.  *See* Section II.A, *supra*; Jaeger Exs. 11-12.

> (vi) The award of the concession to Getma occurred during the notoriously corrupt regime of President Conté, when Guinea was considered one of the most corrupt countries in the world.  *See* Section II.A, *supra*.[22]

Were the Court to confirm the Award and render judgment in favor of Getma in the face of this evidence, it would give effect to a contract procured by the type of corrupt conduct that unquestionably violates U.S. and international public policy.  Accordingly, the Court should deny the Petition pursuant to Article V(2)(b) of the Convention.

---

[21] The speed with which a party obtains a government contract often raises suspicions of corruption.  *See* Abdulhay Sayed, CORRUPTION IN INTERNATIONAL TRADE AND COMMERCIAL ARBITRATION 129, Kluwer Law International (2004).

[22] Tribunals have viewed the endemic nature of corruption in a country as important circumstantial evidence of corruption.  *See Rumeli Telekom A.S. and Telsim Mobil Telekom UniKasyon Hizmetleri A.S. v. Republic of Kazakhstan*, ICSID No. ARB/05/16, Decision of July 28, 2008, ¶ 446.

C.      **The Tribunal's Conduct Concerning its Fees Compels Denial of the Petition**

The Tribunal's conduct concerning its fees compels denial of the Petition under Article

V(1)(d), because it was a clear breach of the parties' agreement that the CCJA Rules on costs

governed the dispute, as well as Articles V(1)(b) and V(2)(b), because it deprived Guinea of its

right to a fair hearing and a fair and impartial tribunal.

1.      **The Tribunal's Improper Conduct Concerning Its Fees Compels Denial of the Petition Under Article V(1)(d) of the Convention**

a.      **Breach of Agreed-Upon Arbitral Procedures Provides a Basis to Deny Confirmation of an Award**

Article V(1)(d) of the Convention provides that a court may refuse to confirm an arbitral

award rendered under the Convention if "[t]he composition of the arbitral authority or the arbitral

procedure was not in accordance with the agreement of the parties, or, failing such agreement,

was not in accordance with the law of the country where the arbitration took place."   Courts in

the United States have repeatedly emphasized that the Convention "favors enforcement of

arbitration clauses *according to the intent of the contracting parties*" and thus "recognizes the

central role of the parties in fashioning arbitration procedure, and provides sanctions for failing

to adhere to the agreed procedures."  *See Polimaster Ltd. v. RAE Sys.*, 623 F.3d 832, 841 (9th

Cir. 2010) (emphasis in original); *see also Encylopaedia Universalis S.A. v. Encylopaedia

Britannica, Inc.*, 403 F.3d 85, 91 (2d Cir. 2005); Gary Born, *Principle of Judicial Non-

Interference in International Arbitration Proceedings, The Anniversary Contributions –

International Litigation & Arbitration*, 30  J. Int'l L. 999 (2014).

While minor procedural violations or exercises of arbitrator discretion concerning routine

procedural matters do not typically provide a basis to deny recognition of an award under the

Convention, U.S. courts have not hesitated to deny enforcement of an award where a tribunal

materially deviates from the arbitral procedures agreed upon by the parties.  That is the case even

33

if such procedures were unusual or inefficient, and even if the deviation did not substantively

impact the award.  *See Polimaster Ltd.*, 623 F.3d at 843 (denying enforcement of award where

arbitrators failed to comply with parties' agreed-upon procedure to arbitrate counterclaims in a

different jurisdiction); *Encylopaedia Universalis S.A*, 403 F.3d at 91 (affirming District Court's

refusal to confirm arbitral award where two arbitrators did not attempt to agree on appointment

of third arbitrator, as required by the parties' agreement); *Cargill Rice, Inc. v. Empresa*

*Nicaraguense Dealimentos Basicos*, 25 F.3d 223, 226 (4th Cir. 1994) (denying enforcement of

award where trade association's arbitration committee did not comply with parties' agreement to

jointly appoint the arbitral tribunal); *Szuts v. Dean Witter Reynolds, Inc.*, 931 F.2d 830, 831 (11th

Cir. 1991) (reversing confirmation of arbitral award rendered by two-arbitrator tribunal in breach

of arbitration agreement that required three-arbitrator tribunal); *Goldman, Sachs & Co. v. Athena*

*Venture Partners, L.P.*, No. 13-MS-130, 2013 U.S. Dist. LEXIS 107966, at *27-28 (E.D. Pa.

Aug. 1, 2013) (vacating award because it violated the parties' agreement requiring arbitrators to

be qualified under FINRA's rules, standards and code of conduct); *see also* Restatement Third,

International Commercial Arbitration, Tentative Draft No. 1, at 133, 2010 ("the party opposing

recognition or enforcement does not need to demonstrate that the divergence affected the

substantive outcome of the arbitration.").

> ### b. The Parties Unambiguously Agreed that the CCJA Would Fix The Costs of the Arbitration

The question of whether an arbitral tribunal failed to comply with the parties' arbitration

agreement is, in the first instance, a matter of contract interpretation.  *See Polimaster Ltd.*, 623

F.3d at 836.  Here, the parties unambiguously agreed to arbitrate any disputes in accordance with

the CCJA Rules.  Concession Agreement at Art. 31.  Articles 10.1 and 24.2 of the CCJA Rules

clearly provide that the CCJA—not the parties—fixes the costs of the arbitration, including the

arbitrators' fees, in accordance with a schedule affixed to the Rules.  *See* Jaeger Ex. 2 at Arts.

10.1, 24.2, Annex 1-2.[23]  Arbitrator fees may only depart from the rate schedule if the CCJA

determines that "the circumstances of the case make it exceptionally necessary." *Id.* at Art. 24.3.

In this regard, the CCJA Rules are consistent with the arbitration rules of most major arbitration

institutions around the world, such as the ICC and the London Court of International Arbitration

("LCIA"), which likewise mandate that the institution fixes and collects the costs of the arbitration

and prohibit private fee arrangements between parties and arbitrators.[24]

The parties' and the Tribunal's conduct throughout the arbitration further confirms that all

involved understood that the CCJA's mandatory rules on costs governed the proceedings.  Neither

party objected when the CCJA fixed the costs of the arbitration at the beginning of the case and

both parties paid those costs directly to the CCJA.  Moreover, the written report of the initial

hearing in the case, which was signed by the Tribunal and the Parties, expressly confirmed that

the CCJA's rules on costs applied to the proceeding:

> This arbitration is governed by the provisions of Title IV of the OHADA Treaty,
> the Arbitration Rules of the Common Court of Justice and Arbitration of the
> OHADA dated 11 March 1999, the Internal Rules of the Court, *their annexes and
> the arbitration fee scale as in effect on 10 May 2011 (Art. 10.1 of the Rules)*.

Jaeger Decl. ¶ 6, Ex. 5 at 1(emphasis added).  Moreover, the fact that the Tribunal repeatedly

sought relief from the CCJA in respect of its fees demonstrates that it was fully aware of the

parties' agreement that the CCJA fixes the arbitrators' fees.

---

[23] Article 10.1 of the CCJA Rules provides that when parties agree to CCJA arbitration, they subject themselves to the CCJA Rules and the internal rules of the CCJA, including specifically "their appendixes [sic] and costs of arbitration rates."   Jaeger Ex. 3 at Art. 10.1; *see also Shaw Group Inc. v. Triplefine Intern. Corp.*, 322 F.3d 115, 122 (2d. Cir. 2003) (parties' agreement to refer all disputes to an arbitral institution in accordance with that institution's rules operates to incorporate those rules into the parties' agreement).

[24] *See, e.g.,* ICC Arbitration Rules, effective  January 1, 2012, Appendix III, Article 2:4 ("The arbitrators fees and expenses shall be fixed exclusively by the Court as required by the Rules.  Separate fee arrangements between the parties and the arbitrators are contrary to the Rules."); LCIA Arbitration Rules, effective October 1, 2014, Art. 28.1 ("costs of the arbitration…shall be determined by the LCIA Court in accordance with the Schedule of Costs.").

### c. The Tribunal Repeatedly Breached the Parties' Agreement Concerning the Arbitrators' Fees

It is beyond question that the Tribunal breached the parties' agreement to the CCJA's

mandatory rules on costs, and flagrantly so, by, *inter alia*:

(i)     Repeatedly involving the parties in the Tribunal's attempt to exact a fee increase from the CCJA, including demanding express statements to the Tribunal of consent or non-consent to the increase.  Jaeger Decl. ¶¶ 8-9, Exs. 14-16.

(ii)    Invoicing the parties directly after the CCJA ruled on four occasions that a fee increase was inappropriate and warned that any private fee arrangements were prohibited.  Jaeger Decl. ¶¶ 32-33, Exs. 29, 45.

(iii)   Conditioning release of the Award on one party's payment of the requested fee to the Tribunal and including a provision in the Award calculated to elicit payment of the Tribunal's fee by a single party.  Jaeger Decl. ¶ 33, Exs. 45; 2 at Art. 25.1.

(iv)    Threatening legal action against Guinea for non-payment of the unsanctioned fee increase.  *See* Jaeger Decl. ¶ 39, Ex. 51.

There can be no reasonable argument that these breaches of the parties' agreement

amount to a mere minor procedural violation or an appropriate exercise of procedural discretion

by the Tribunal.[25]  To the contrary, the Tribunal trampled on one of the most fundamental

aspects of administered (as opposed to *ad hoc*) arbitration—management of the proceeding by an

independent institution, which creates appropriate distance between the parties and the arbitrators

concerning matters that may influence an arbitrator's view of the parties, such as the setting and

payment of arbitrators' fees.[26]

---

[25] *See, e.g., Karaha Bodas Co. L.L.C. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara*, 364 F.3d 274, 295 (5th Cir. 2004) (consolidation of claims into a single arbitration proceeding where applicable arbitration rules provided arbitrators with wide discretion to consolidate did not justify denial of enforcement under Article V(1)(d)).

[26] *See* W. Craig, W. Park & J. Paulsson, INTERNATIONAL CHAMBER OF COMMERCE ARBITRATION (Oceana Publications, Inc. 3rd ed. 1998), § 4.03, p. 39 (administered arbitration avoids "unpleasant situations" that may occur in *ad hoc* arbitration, such as where an over-reaching arbitrator demands a high fee which leaves one party "feeling dismayed, particularly if its adversary for tactical reasons instantly accepts an unreasonable fee structure.  Such situations do not arise in ICC arbitration, where the parties' only discussion about fees and costs is conducted with the Secretariat.").

One need look no further than the CCJA's correspondence to the Tribunal, which lays bare the extent and seriousness of the Tribunal's breaches of the agreed-upon CCJA Rules:

> I remind you, for what it is worth, that this is an institutional and not an ad hoc arbitration. First, your requests for adjustment of your fees were rejected by the Court, by means of several administrative decisions of which you were properly notified.

> Second, pursuant to Article 9 of Decision No. 004/99/CCJA dated 3 February 1999, "[t]he arbitrator's fees and expenses are set exclusively by the Court, in accordance with the provisions of the Rules of Arbitration. **Any separate arrangement between the parties and the arbitrators concerning their fees is null and void**."

> The CCJA system of arbitration categorically prohibits any arrangement between the parties and the arbitrators relating to fees, the determination of which falls within the discretionary power of the Court. *The arbitrators may not ignore these mandatory rules of CCJA-OHADA arbitration.*

> As a result, *you are formally prohibited from seeking payment of fees directly from the parties, who have already paid in full the amounts due.*

Jaeger Ex. 47 (bolded text in original; italics added).  Indeed, in a letter to Getma's counsel, the Secretary General of the CCJA made clear that, if the Award included the improper fee requested by the Tribunal, which it ultimately did, "the award will potentially be subject to invalidation by the community's high court."  Jaeger Ex. 48.

### d.   The Tribunal's and Getma's Claims That the €450,000 Fee was Proper are Entirely Without Merit

The Tribunal, in its correspondence with the CCJA (*see* Jaeger Ex. 29 at 2), as well as Getma in the annulment proceedings before the CCJA, have claimed that the Tribunal acted properly by seeking fees directly from the parties because (i) Article 31 of the Concession Agreement purportedly provides for direct payment of the arbitrators' fees by the parties, and thus authorizes private fee arrangements between the parties and the Tribunal; and (ii) the parties agreed to forego the fees set by the CCJA in favor of the €450,000 demanded by the Tribunal. Both arguments are entirely without merit.

37

*First,* the provision in Article 31 of the Concession Agreement relied upon by the Tribunal and Getma provides as follows: "Each of the Parties will bear the cost of the arbitrator it appoints.  The other costs incurred for arbitration will be shared equally by the Parties." Fischer Ex. 2 at Art. 31; Jaeger Ex. 29 at 2.  However, on its face, that provision concerns the *apportionment* of costs between the parties, not how the amount of fees is to be fixed or the manner in which payment of the arbitrators' fees is to be made.[27]

*Second*, the notion that the parties and the Tribunal reached agreement on a €450,000 fee is entirely incorrect (and disingenuous) for two reasons.  First, the context of Guinea's "consent" to the Tribunal's proposed fee makes clear that such "consent" was given for purposes of facilitating a ruling by the CCJA on the Tribunal's request to increase its fee.  *See* Jaeger Decl. ¶¶ 9-10, Exs. 15; 20 at p. 4, ¶¶ 41-44 ("We received a literal response to the subtle question, stating that you had no comments—the same response from both side.  *Unfortunately, such a response will not suffice for the OHADA to make a fully informed decision.*") (emphasis added); 22 ("Would it be possible for you to clarify your position this week, so that we may close this chapter and *enable the OHADA to make its determination*.") (emphasis added).  Guinea never expressly or impliedly agreed to pay the requested fee even if the CCJA did not approve it, and indeed, Guinea has not paid its purported share of that fee for precisely that reason.  Jaeger Dec. ¶ 39. Second, as discussed directly below, Guinea's "consent," was not freely given, but was coerced by the Tribunal in a highly improper way.

---

[27] Notably, Article 10 of the OHADA Uniform Arbitration Act, which applies to the Concession Agreement by the express terms of Article 31 thereof, provides that submission to administered arbitration binds the parties to the rules of the arbitral institution administering the proceeding "[e]xcept where the parties expressly exclude the application of certain provisions of the arbitration rules of an institution."  Jaeger Ex. 3 at Art. 10.  The above-quoted provision cannot reasonably be construed as an express exclusion of the CCJA Rules on costs.

2. **The Tribunal's Improper Demand for Fees Compels Denial of the Petition under Articles (V)(1)(b) and V(2)(e) of the Convention**

As explained in Section III.A and III.B above, confirmation of an arbitral award may be refused under Article V(1)(b) of the Convention where the proceedings that gave rise to the award are inconsistent with fundamental notions of due process, and under Article V(2), where enforcement of the award would violate the public policy of the country in which enforcement is sought. The Tribunal's misconduct concerning its fees compels denial under both provisions.

As a matter of public policy, parties have the right to a fair arbitration presided over by impartial and unbiased arbitrators. Arbitral awards that do not comport with that right should not be enforced. *See Commonwealth Coatings Corp. v. Continental Casualty, Co.*, 393 U.S. 145, 146, 150 (1968) (vacating award where arbitrator and party failed to disclose close business connection, stating that "any tribunal permitted by law to try cases and controversies not only must be unbiased but also must avoid even the appearance of bias."); *Sanko S.S. Co., Ltd. v. Cook Industries, Inc.*, 495 F.2d 1260, 1263-1264 (2d Cir. 1973) (reversing order denying motion to vacate arbitral award, holding that "where dealings might create an impression of possible bias, they must be disclosed."); *HSMV Corp. v. ADI Ltd.*, 72 F. Supp. 2d 1122, 1132 (C.D. Cal. 1999) (granting motion to vacate arbitral award on the grounds that the arbitrator had a duty to investigate whether a possible conflict of interest existed between his arbitration duties and the representation of respondent by his law firm); *see also* Gary B. Born, INTERNATIONAL COMMERCIAL ARBITRATION 3682-3687 (Kluwer Law International, 2d. ed. 2014) (stating that Article V(2) can be evoked to annul an award based on procedural irregularities, including fraud in the arbitral process or arbitrator bias).[28]

---

[28] Courts in other jurisdictions have ruled similarly. *See e.g. Goldtron Lts. (Singapore) v. Media Most B.V. (Netherlands),* Rechtbank [Court of First Instance], Netherlands No. 27, Amsterdam, Decision of August 27, 2002 (refusing to recognize award on public policy grounds where presiding arbitrator engaged in biased *ex parte* contacts

With respect to the issue of arbitrators' fees in particular, it is accepted international

arbitration practice that arbitrators in an administered proceeding are prohibited from seeking

payment of money directly from the parties.  The reason for this rule is obvious.  As the former

Secretary General of the ICC Court explained:

> Any separate fee arrangement between the parties and the arbitrators is prohibited.
> This fundamental principle of the ICC Rules takes away the possibility of
> psychological pressure being exercised by the arbitral tribunal on the parties.

 A.M. Whitesell, *"The Psychological Aspects of Dispute Resolution"* in Albert Van den Berg

(ed.), International Commercial Arbitration: Important Contemporary Questions, ICCA Congress

Series, 2002 London Volume 11, Kluwer Law International 2003; *see* E. Jolivet & C. Albanesi,

*Dealing with Corruption in Arbitration: A Review of ICC Experience*, in "Special Supplement

2013: Tackling Corruption in Arbitration" ("ICC arbitration forbids payments directly between

the parties and the arbitrators …. precisely to avoid the risk of unjust coercion or pressure.").

Indeed, the International Bar Association's Rules of Ethics for International Arbitrators expressly

provide that "[u]nless the parties agree otherwise or a party defaults, *an arbitrator shall make no*

*unilateral arrangements for fees or expenses*."  IBA Rule of Ethics for International Arbitrators,

Fees, § 6 (1987) (emphasis added).  Here, it is clear that the Tribunal breached these well-

established principles.

*First,* not only did the Tribunal improperly seek the parties' "consent" to a substantially

increased fee, but it did so at crucial moments in the proceeding, including at the opening of a

three-day evidentiary hearing and during the Tribunal's deliberations.  Jaeger Exs. 20 at 4:41-46

and 5:1-6; 27.  In fact, at the opening of the evidentiary hearing in May 2013, the President of the

---

and "arbitral procedure did not comply with the principles of due process accepted in the Netherlands"); *Excelsior Film TV v. UGC-PH*, French Cour de cassation, Decision of 24 March 1998, 1999 Rev. Arb. 255 (refusing recognition of award due to lack of impartiality of arbitrator who was serving on two tribunals and had provided information regarding one of the arbitrations to the other tribunal).

Tribunal threatened that "if the Parties were not to agree [to the €450,000 fee], the Tribunal would be forced to reconsider its involvement in this matter…" Jaeger Ex. 20 at 5:3-5.  The timing and manner in which the Tribunal raised the fee issue thus served to increase the pressure on the parties to accede to the Tribunal's demands for an increased fee.

*Second,* the Tribunal repeatedly pressured the parties to express their agreement or disagreement with the Tribunal's proposed fee, rejecting both parties' initial response that they had no comments on the matter.  Jaeger Ex. 20 at 4:41-44.[29]  The Tribunal's coercion in that regard fell disproportionally on Guinea because Getma quickly agreed to the Tribunal's proposed fee increase.  Indeed, once the President of the Tribunal confronted Guinea with Getma's consent, Guinea could not freely withhold its consent or otherwise object to the Tribunal's approach without risking the possibility that the Tribunal would retaliate against it in the form of an adverse award.  Jaeger Decl. ¶ 13.  Of course, to avoid the risk of coercion, the Tribunal could have simply asked the parties to provide their comments directly to the Secretary General of the CCJA, but it chose not to do so.

*Third,* the Tribunal raised serious doubts as to its impartiality and independence when it permitted Getma's counsel, Mr. Fischer, to actively lobby the President of the CCJA, both in writing and in person in Ivory Coast (presumably at Getma's expense), to increase the Tribunal's fee.  Jaeger Decl. ¶ 18, Ex. 29.  Remarkably, Mr. Fischer's lobbying efforts on behalf of the Tribunal took place during the period in which the Tribunal was conducting its deliberations.  Jaeger Exs. 29, 30.

---

[29] Notably, an Australian court dismissed an arbitral tribunal for similar misconduct where the arbitrators repeatedly pressured the parties to pay a hearing cancellation fee.  The court ruled that the fee "assumed such importance in their minds that they allowed themselves to be swayed by this concern to the detriment of their duty to maintain the appearance of acting in the interests of bringing down a just award."  *Ict Pty. Ltd. v. SeaContainers Ltd.,* Judgment of New South Wales Court of Appeal, SC 55007/02, NSW Sup. 77, Decision of February 22, 2002.

*Fourth*, by attempting to condition the release of the Award on payment of its requested fee by one party, and by surreptitiously including a provision in the Award to permit reimbursement of a party that paid the entire fee, the Tribunal, at the very least, created the perception that the award was up for sale.  Jaeger Ex. 45; Award, ¶ 278.  Perhaps not surprisingly, Getma—the party that lobbied on behalf of the Tribunal before the CCJA, expressed its willingness to pay the Tribunal's increased fee (*see* Jaeger Ex. 46) and paid half of that fee—was the prevailing party.

Based on the foregoing, there should be no question that the Tribunal's conduct "irremediably spoiled the arbitration process" and warrants denial of the Petition under Articles V(1)(b) and V(2)(B).  *Encylopaedia Universalis S.A.*, 403 F.3d at 91.  Any other result would effectively endorse an arbitral process that violates fundamental notions of fairness and due process.

## IV.   <u>CONCLUSION</u>

For the foregoing reasons, the Petition should be denied.  Alternatively, for the reasons set forth in Guinea's accompanying Motion to Stay, this proceeding should be stayed pursuant to Article VI of the Convention pending conclusion of annulment proceedings before the CCJA.  Guinea respectfully requests oral argument with respect to the Petition and its accompanying Motion to Stay.

Dated: March 2, 2015
        Washington D.C.

ORRICK, HERRINGTON & SUTCLIFFE LLP

By: _/s/ Jeffrey M. Prokop_____
        Jeffrey M. Prokop (D.C. Bar. No. 992687)
        Brooke Daley (D.C. Bar. No. 1013387)
        1152 15th St. N.W.
        Washington, D.C. 20005
        Telephone: (202) 339-8400
        Fax: (202) 339-8500
        jprokop@orrick.com
        bdaley@orrick.com


        Jamie L. Shookman (admitted *pro hac vice*)
        51 West 52nd Street
        New York, NY 10019-6142
        Telephone: (212) 506-5141
        Fax: (212) 506-5151
        jshookman@orrick.com

        *Attorneys for Respondent*
        *The Republic of Guinea*

43

## CERTIFICATE OF SERVICE

I, Jeffrey M. Prokop, hereby certify that on this 2nd day of March, 2015, I electronically filed the

foregoing Memorandum of Points and Authorities in Opposition to Getma International's

Petition to Confirm via the Court's CM/ECF system, which will automatically serve all counsel

of record as follows:

Allen Barksdale Green
Ivan W. Bilaniuk
MCKENNA, LONG & ALDRIDGE, LLP
1900 K Street, NW
Suite 100
Washington, DC 20006-1110

ORRICK HERRINGTON & SUTCLIFFE LLP

/s/ Jeffrey M. Prokop
Jeffrey M. Prokop (D.C. Bar. No. 992687)
jprokop@orrick.com
1152 15th St. N.W.
Washington, D.C. 20005
Telephone: (202) 339-8400
Fax: (202) 339-8500

*Attorney for Respondent*
*The Republic of Guinea*