THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| In the Matter of the Arbitration of Certain Controversies between<br><br>GETMA INTERNATIONAL,<br><br>Petitioner,<br><br>and<br><br>THE REPUBLIC OF GUINEA,<br><br>Respondent. | Civil Action No. 1:14-cv-01616-RBW |

## OPPOSITION TO RESPONDENT'S MOTION TO STAY

Allen B. Green (D.C. Bar No. 222158)
William T. O'Brien (D.C. Bar No. 450891)
Ivan W. Bilaniuk (D.C. Bar. No. 494315)
MCKENNA LONG & ALDRIDGE LLP
1900 K Street, N.W.
Washington, D.C. 20006
Telephone: (202) 496-7500
Fax: (202) 496-7756


*Attorneys for Petitioner*
*Getma International*

Dated:     April 20, 2015

## TABLE OF CONTENTS

**Page**

I.  INTRODUCTION ...................................................................................................1

II.  STATEMENT OF FACTS ......................................................................................2

III.  THE COURT SHOULD PROCEED TO CONFIRM THE ARBITRAL AWARD
AND ENTER JUDGMENT AND NOT STAY PENDING THE CONCLUSION
OF PROCEEDINGS IN THE CCJA ......................................................................3

    A.  The First and Second *Europcar* Factors Overwhelmingly Weigh in Favor
of Enforcement of the Arbitral Award ......................................................................5

        1.  Factor one: "the general objectives of arbitration--the expeditious
resolution of disputes and the avoidance of protracted and
expensive litigation" ......................................................................................5

        2.  Factor two: "the status of the foreign proceedings and the
estimated time for those proceedings to be resolved" ...............................10

    B.  The Remaining *Europcar* Factors Support Enforcing the Arbitral Award............12

        1.  Factor three: "whether the award sought to be enforced will receive
greater scrutiny in the foreign proceedings under a less deferential
standard of review"......................................................................................13

        2.  Factor four: "the characteristics of the foreign proceedings" ...................16

            a.  "the characteristics of the foreign proceedings including: (i)
whether they were brought . . . to set the award aside
(which would tend to weigh in favor of enforcement)"................16

            b.  "the characteristics of the foreign proceedings including:
[…] (ii) whether they were initiated before the underlying
enforcement proceeding so as to raise concerns of
international comity" ....................................................................16

            c.  "the characteristics of the foreign proceedings including:
[…] (iii) whether they were initiated by the party now
seeking to enforce the award in federal court" ............................19

            d.  "the characteristics of the foreign proceedings including:
[…] (iv) whether they were initiated under circumstances
indicating an intent to hinder or delay resolution of the
dispute ..........................................................................................19

        3.  Factor five: "a balance of the possible hardships to each of the
parties . . ."...................................................................................................22

        4.  Factor six: "any other circumstances that could tend to shift the
balance in favor of or against adjournment"..............................................24

## TABLE OF AUTHORITIES

**Page(s)**

CASES

*Alto Mar Girassol v. Lumbermens Mut. Cas. Co.*,
  No. 04 C 7731, 2005 WL 947126 (N.D. Ill. Apr. 12, 2005)..............................................9, 23

*Belize Soc. Dev. Ltd. v. Gov't of Belize*,
  5 F. Supp. 3d 25 (D.D.C. 2013) ...........................................................................................17

*Caribbean Trading Fid. Corp. v. Nigerian Nat'l Petroleum Corp.*,
  No. 90 Civ. 4169, 1990 WL 213030 (S.D.N.Y. Dec. 18, 1990)............................................18

*Chevron Corp. v. Republic of Ecuador*,
  949 F. Supp. 2d 57 (D.D.C. 2013) .................................................................................. *passim*

*CPConstruction Pioneers Baugesellschaft Anstalt v. Gov't of the Republic of Ghana*,
  578 F. Supp. 2d 50 (D.D.C. 2008) .....................................................................................9, 17

*DRC, Inc. v. Republic of Honduras*,
  774 F. Supp. 2d 66 (D.D.C. 2011) ....................................................................................18, 23

*Europcar Italia, S.p.A. v. Maiellano Tours, Inc.*,
  156 F.3d 310 (2nd Cir. 1998)........................................................................................... *passim*

*Fertilizer Corp. of India v. IDI Mgmt., Inc.*,
  517 F.Supp. 948 (S.D. Ohio 1981) ...................................................................................18, 19

*G.E. Transp. S.p.A. v. Republic of Albania*,
  693 F. Supp. 2d 132 (D.D.C 2010) ................................................................................. *passim*

*Higgins v. SPX Corp.*,
  No. 1:05-CV-846, 2006 WL 1008677 (W.D. Mich. Apr. 18, 2006) .....................................18

*Hunt v. Mobil Oil Corp.*,
  654 F. Supp. 1487 (S.D.N.Y. 1987).....................................................................................20

*In re Arbitration Between Interdigital Commc'ns Corp. & Samsung Elecs. Co.*,
  528 F. Supp. 2d 340 (S.D.N.Y. 2007).........................................................................6, 13, 19

*Jorf Lasfar Energy C., S.C.A. v. AMCI Export Corp.*,
  No. 05-0423, 2005 WL 3533128 (W.D. Pa. Dec. 22, 2005) ........................................9, 10, 23

*MGM Productions Grp., Inc. v. Aeroflot Russian Airlines*,
  573 F. Supp. 2d 772 (S.D.N.Y. 2003).............................................................................. *passim*

*Nedagro B.V. v. Zao Konversbank*,
   No. 02 Civ. 3946, 2003 WL 151997 (S.D.N.Y. Jan. 21, 2003)..........................................18, 23

*Spier v. Calzaturificio Tecnica S.p.A.*,
   663 F. Supp. 871 (S.D.N.Y. 1987) ....................................................................................4, 23

*TMR Energy Ltd. v. State Prop. Fund of Ukraine*,
   411 F.3d 296 (D.C. Cir. 2005)..............................................................................................17

*Yusuf Ahmed Alghanim & Sons v. Toys "R" Us, Inc.*,
   126 F.3d 15 (2d Cir. 1997)......................................................................................................8

STATUTES

9 U.S.C. § 207....................................................................................................................................3

OTHER AUTHORITIES

Abdulhay Sayed, *Corruption in International Trade and Commercial Arbitration* 385
   (2004).........................................................................................................................................15

Emmanuel Gaillard, *Enforcement of Awards Set Aside in the Country of Origin: The
   French Experience, in 9* International Council for Commercial Arbitration Congress,
   *Improving the Efficiency of Arbitration Agreements and Awards: 40 Years of
   Application of the New York Convention* (Albert Jan van den Berg ed., 1998) .....................14

New York Convention, June 20, 1958, 21 U.S.T. 2517 ...................................................................3

**ARGUMENT**

## I.   INTRODUCTION

Four years ago, Getma International ("Getma") sought to obtain justice for the Republic of Guinea's breach of contract terminating its 2008 Concession Agreement to develop and operate the country's main port.  Getma prevailed in an arbitration that lasted almost three years and was awarded €38,531,127 plus interest.  In this arbitration, the Republic of Guinea had raised issues of corruption, but only made specific allegations and moved to present evidence after hearings and briefing had concluded.  The tribunal was composed of three well-known, experienced, and independent arbitrators.  They were Chairman Ibrahim Fadlallah, Eric Teynier, and Juan Antonio Cremades.  This tribunal respected the Republic of Guinea's right to be heard by granting the Republic of Guinea's request to submit any additional evidence of alleged corruption and holding a special hearing concerning the corruption allegations.  The Republic of Guinea submitted its additional evidence and the special hearing on alleged corruption took place, despite Guinea's allegation that they were not heard.

The factors that the Court will weigh in deciding to confirm or stay proceedings strongly favor confirmation of the award.  This Court has discretion under both Article V and Article VI of the New York Convention, as implemented by the Federal Arbitration Act, to enforce the award despite the fact that there are ongoing annulment proceedings.  Respondent's request to annul the Award, it filed in a foreign court, is nothing more than an impermissible attempt to appeal Respondent's alleged evidence of corruption in the procurement of the Concession Agreement that Respondent raised in the arbitration and that the Arbitral Tribunal unequivocally dismissed.  Respondent's opposition is merely a further attempt to delay, by any possible means, Getma's effort to collect on the award against the Republic of Guinea's United State assets and be compensated for Guinea's unilateral termination in breach of their Concession Agreement.

1

II.   **STATEMENT OF FACTS**

Getma's more complete statement of facts is found in its contemporaneously filed Memorandum in Further Support of Petition.  Getma respectfully refers the Court to the Statement of Facts in that brief and incorporates it by reference in this memorandum.  Getma below states facts of particular importance to this opposition to its motion to stay.

Getma filed for arbitration approximately four years ago, on May 10, 2011.  Second Declaration of Cédric Fisher ("Second Fischer Decl.") ¶ 10.  On April 29, 2014, the tribunal rendered its final award, finding Guinea's unilateral termination of the Concession Agreement with Getma was unlawful.  *Id.* ¶ 75.  Shortly thereafter, Getma moved to enforce the award in France on June 2, 2014, and received an exequatur judgment order from the President of the Paris High Court on June 18, 2014.  *Id.* ¶ 76; Ex. 23 at 2 (Order Rendered by Paris High Court (June 18, 2014); Ex. 24 (First and Last Page of Award Exequatur Granted (June 18, 2014)).  Despite being served with the exequatur judgment promptly on July 18, 2014, the Republic of Guinea never responded to the judgment or appealed.  Second Fischer Decl. ¶¶ 77-79.  It is prohibited from doing so now.  *Id.*

Five days later, on July 23, 2013, the Republic of Guinea filed an annulment petition in the CCJA.  Second Fischer Decl. ¶ 79; Ex. 52 to Jaeger Decl. (Guinea Annulment Petition (July 23, 2014)).  Getma responded on December 23, 2014.  Second Fischer Decl. ¶ 79.  It is unknown when this annulment petition will be resolved.  There are no formal or informal CCJA rules establishing a timeline for resolution of these proceedings, but anecdotal evidence shows resolution may take longer than two years.  *Id.* ¶ 80.  In two recent cases, filed between 2008 and 2010, the CCJA took well over two years to resolve one case and almost four years to resolve the other.  *Id.* ¶ 81.  Despite these pending annulment proceedings, the award remains enforceable

outside OHADA member states.  *See* Ex. 2 to Jaeger Decl. at art 30.2 (Arbitration Rules of the

Common Court of Justice and Arbitration (Dec. 9, 1998)).

## III.   THE COURT SHOULD PROCEED TO CONFIRM THE ARBITRAL AWARD AND ENTER JUDGMENT AND NOT STAY PENDING THE CONCLUSION OF PROCEEDINGS IN THE CCJA

The New York Convention, as implemented by the Federal Arbitration Act, authorizes

the courts to confirm foreign arbitral awards.  *See* 9 U.S.C. § 207.  Under the Convention, courts

"*shall*" confirm the award except in certain circumstances.  New York Convention, art. III,

V(1)(e), VI, June 20, 1958, 21 U.S.T. 2517 (emphasis added).  However, the court "*may, if it*

*considers it proper*, adjourn the decision on the enforcement of the award . . . .,*" but it is not

required to do so.  New York Convention, art. VI (emphasis added).  Courts have proceeded

under Article VI when set aside or suspension proceedings have been instituted but not finalized

in the originating country.  *See, e.g., Europcar Italia, S.p.A. v. Maiellano Tours, Inc.*, 156 F.3d

310, 316-18 (2nd Cir. 1998); *see also Chevron Corp. v. Republic of Ecuador*, 949 F. Supp. 2d

57, 71-73 (D.D.C. 2013) (applying *Europcar*); *G.E. Transp. S.p.A. v. Republic of Albania*, 693 F.

Supp. 2d 132, 137-39 (D.D.C 2010) (same).  Exercising its discretion, courts may proceed to

enforce an arbitral award when, as here, a balancing of the factors weighs in favor of

enforcement.  *See Europcar*, 156 F.3d at 317-18 (enumerating factors courts should consider);

*see also Chevron Corp.*, 949 F. Supp. 2d at 71-73 (applying *Europcar* to confirm award); *G.E.*

*Transp.*, 693 F. Supp. 2d at 137-39 (same).

While district courts have discretion to adjourn proceedings where a "parallel proceeding

[to set aside the award] is ongoing in the originating country" such "[a] stay of confirmation

should not be lightly granted lest it encourage abusive tactics by the party that lost in

arbitration."  *Europcar*, 156 F.3d at 317.  The policy against a stay exists because "the

3

adjournment of enforcement proceedings impedes the goals of arbitration—the expeditious resolution of disputes and the avoidance of protracted and expensive litigation." *Id*. Thus, in determining whether to exercise discretion, courts must "balance the Convention's policy favoring confirmation or arbitral awards against the principle of international comity embraced by the Convention." *G.E. Transp.*, 693 F. Supp. 2d at 138 (citations omitted).

In balancing these factors, as Respondent concedes, this Court should consider the factors set forth in the leading case on this subject, the Second Circuit's decision in *Europcar*.[1] *See, e.g.*, *G.E. Transp.*, 693 F. Supp. 2d at 137-39; *Chevron Corp*., 949 F. Supp. 2d at 71-72. Respondent failed to meet its burden to demonstrate that the *Europcar* factors weigh in favor of staying these proceedings.[2] *See MGM Productions Grp., Inc. v. Aeroflot Russian Airlines*, 573 F. Supp. 2d 772, 777-78 (S.D.N.Y. 2003) (denying stay because movant "has not demonstrated that these factors weigh in favor of granting a stay."). Rather, an analysis under *Europcar* weighs in favor of immediate enforcement. Therefore, the Court should deny Respondent's request for a stay, and confirm the award.

---

[1] Respondent concedes that "Courts in this Circuit have adopted the *Europcar* factors." Respondent's Motion to Stay (hereinafter "Resp. Mot. to Stay") at 5.

[2] In fact, while Respondent's state that *Europcar* is the "leading case" on the subject (*Id.* at 4), Respondent also improperly cites *Spier v. Calzaturificio Tecnica S.p.A.*, 663 F. Supp. 871, 875 (S.D.N.Y. 1987) for the proposition that federal courts around the country "typically will only refuse to grant a stay when the set-aside proceedings in the rendering jurisdiction are 'transparently frivolous.'" Resp. Mot. to Stay at 5. Respondent errs because *Spier*'s "transparently frivolous" standard is no longer good law. The Second Circuit even cited to *Spier* in *Europcar* decision as an example of how "district courts have resolved [the issue of whether or not to adjourn under Article VI of the Convention] in divergent ways." *Europcar*, 156 F.3d at 317. The Second Circuit in *Europcar* instead established a six-factor analysis for courts to determine whether to grant a stay.

A.      **The First and Second *Europcar* Factors Overwhelmingly Weigh in Favor of Enforcement of the Arbitral Award**

"Because the primary goal of the Convention is to facilitate the recognition and enforcement of arbitral awards, the first and second [*Europcar*] factors . . . should weigh more heavily in the district court's determination." *Europcar*, 156 F.3d at 318.  In this case, the first and second factor strongly support confirmation of the award.

1.      **Factor one: "the general objectives of arbitration--the expeditious resolution of disputes and the avoidance of protracted and expensive litigation"**

The need for the expeditious resolution of this dispute overwhelmingly supports confirmation of the award.  This factor must be considered in light of the history of the *entire* dispute between Getma and the Republic of Guinea, and not just the status of the current proceedings.[3]  *See generally id.* at 317; *G.E. Transp.*, 693 F. Supp. 2d at 138-39 (emphasizing the need for expeditious resolution of the dispute in deciding to enforce the award).

Granting a stay in this case would thwart the objective of arbitration—to obtain "the expeditious resolution of disputes and the avoidance of protracted and expensive litigation." *See Europcar*, 156 F.3d at 317.  The dispute between Getma and the Republic of Guinea originated on March 8, 2011, when the newly elected president of the Republic of Guinea issued a decree terminating the Concession Agreement providing for development of the port of Conakry, effective immediately.  *See* Ex. 1 to Fischer Decl. (Final Award) ¶¶ 37-38.  Getma received no compensation or notice, and was replaced by another company three days after the termination

---

[3] The status of the Republic of Guinea's annulment proceeding, and the time required for its resolution, is a separate factor under the *Europcar* analysis and is analyzed in Section II.A.2 *infra*.  *See Europcar*, 156 F.3d at 317; *G.E. Transp.*, 693 F. Supp. 2d at 138-39; *Chevron Corp.*, 949 F. Supp. 2d at 71-72.

5

on March 11, 2011.  *See id.* ¶¶ 39-40.  On May 10, 2011, four years ago, Getma filed for

arbitration.  *See id.* ¶ 42.  In cases with similarly lengthy procedural histories, this Court found

that the issuance of a stay would "seriously undermine" the objectives of arbitration.  *See, e.g.*,

*G.E. Transp.*, 693 F. Supp. 2d at 139 (citing and quoting *In re Arbitration Between Interdigital*

*Commc'ns Corp. & Samsung Elecs. Co.*, 528 F. Supp. 2d 340, 361-62 (S.D.N.Y. 2007)

("*Interdigital*")); *Chevron Corp.*, 949 F. Supp. 2d at 72.  This dispute's procedural history

supports the same conclusion.

In an analogous case, *G.E. Transport*, this Court denied a stay request and confirmed an

international arbitral award weighing heavily the need for the expeditious resolution of disputes.

*See, G.E. Transp.*, 693 F. Supp. 2d at 138-39.  In that case, Albania agreed in the contract to

submit to binding arbitration.  *Id.* at 138.  Albania fully participated in the resulting proceeding—

"a complex international arbitration . . . [that] involved almost three years of preparation and

work."  *Id*. at 139.  After the lengthy arbitration, the Arbitral Award was issued in favor of G.E.

Transport, who then sought to enforce the award in this Court.

This case was submitted to arbitration nearly four years ago, even longer than in *G.E.*

*Transport*.  *See* Second Fischer Decl. ¶ 10. The arbitration involved intense preparation by both

parties and after the CCJA considered the merits of the case, it issued an award in favor of

Getma.  Thus, applying *G.E. Transport* to the present case that is even more longstanding, "the

first *Europcar* factor plainly weighs in favor of confirmation rather than an adjournment."  693

F. Supp. 2d at 139 (citing *Interdigital*, 528 F. Supp. 2d at 361-62 (concluding that the first

*Europcar* factor "overwhelmingly . . . favor[ed] . . . enforcement of the [a]ward").

This Court reached the same conclusion in *Chevron* weighing heavily the need for the expeditious resolution of disputes in denying a stay request and confirming an international arbitral award. *Chevron Corp.*, 949 F. Supp. 2d at 72. In *Chevron*, the dispute arose in 1991 when Chevron "filed seven breach-of-contract cases there against the Ecuadorian government . . . ." *Id*. at 61. In 2006, those issues were incorporated into an arbitration that was the subject of the court's decision. *Id*. The arbitration extended over five years, and the Tribunal entered an interim award in March 2010 and its final award in August 2011. *Id*. In July 2010, Ecuador petitioned the District Court of The Hague to set aside the award and that petition was denied in May 2012. *Id*. Ecuador then appealed that judgment, and the appeal remained pending at the time of the *Chevron* decision in 2013. *Id*. Analyzing the first *Europcar* factor, this Court found that "Chevron submitted its Notice of Arbitration in this matter more than six years ago, a delay that surely does not constitute an 'expeditious resolution' of the dispute, which originated [twenty years ago]." *Chevron Corp.*, 949 F. Supp. 2d at 72 (citing *G.E. Transp.*, 693 F. Supp. 2d at 139 (even a four year delay was sufficient to "plainly weigh[]" in favor of confirmation). There is no appreciable difference between a four year delay, as Getma is currently experiencing, and the six year delay in *Chevron*. Thus, "the general objectives of arbitration[] weigh[] strongly in favor of confirmation." *Id*.

Contrary to what Respondent argues, annulment proceedings are not of any special significance to the arbitration process, particularly in this case. First and foremost, in the Second Circuit's *Europcar* decision, which Respondent conceded is the "leading case" on the subject, the Second Circuit expressly found the opposite of what Respondent argues. The Second Circuit found that under factor four, if the foreign proceeding at issue is to set aside the award, it would "tend to weigh ***in favor of enforcement.***" *Europcar*, 156 F.3d at 318; *see* Section III.B.2.a.

7

The three authorities to which Respondent cites also do not support the assertion that annulment proceedings are an "integral part of the dispute resolution process" any different from general New York Convention award enforcement cases dealt with by Courts such as the Second Circuit in *Europcar*. *See* Resp. Mot. to Stay at 6. The Republic of Guinea cites to the dispute resolution provision of the Concession Agreement, Article 31, but it is a standard provision and does not mention annulment proceedings. The Treaty on the Harmonization of Business Law in Africa at Article 25 merely sets out the instances in which exequatur may not be issued. *See* Ex. 1 to Jaeger Decl. at 8 (Treaty on the Harmonization of Business Law in Africa (Oct. 17, 1993)). Finally, the Uniform Act on Arbitration at Article 29 simply states that if an award is annulled, a party is entitled to initiate another arbitration. *See* Ex. 3 to Jaeger Decl. at art. 29 (Uniform Act on Arbitration (June 11, 1999)). Article 30 deals with enforcement of awards in the OHADA countries and reiterates that the award is only subject to enforcement by an exequatur awarded by a judge in the member State. *See* Ex. 3 to Jaeger Decl. at art. 30 (Uniform Act on Arbitration (June 11, 1999)).

Additionally, case law cited by the Respondent does support its argument that the Court should stay enforcement and defer to annulment proceedings in this case. First, Respondent overstates the significance of *Yusuf Ahmed Alghanim & Sons v. Toys "R" Us, Inc.*, 126 F.3d 15 (2d Cir. 1997), which did not involve a motion to stay proceedings and is cited for the unremarkable and obvious proposition that only local courts may set aside arbitral awards. By seeking to enforce the award in this Court, Getma does not attempt to contravene the primary jurisdiction of local courts. Instead, Getma requests that the Court effectuate the appropriate procedure established by the New York Convention, which provides that a court "*shall*" confirm

an arbitration award properly in front of it, except in limited circumstances that are not present in this case.  New York Convention, art. III, V(1)(e), VI (emphasis added).

Respondent relies on other cases from outside the District of Columbia which do not appear to weigh the *Europcar* factors.  *See Europcar*, 156 F.3d at 317-18.  In these cases, courts granted stays out of concern that the case would become more complex if the award were set aside in the underlying annulment proceedings.  *Jorf Lasfar Energy C., S.C.A. v. AMCI Export Corp.*, No. 05-0423, 2005 WL 3533128, at *3 (W.D. Pa. Dec. 22, 2005); *Alto Mar Girassol v. Lumbermens Mut. Cas. Co.*, No. 04 C 7731, 2005 WL 947126, at *4 (N.D. Ill. Apr. 12, 2005).  Granting a stay based solely on the underlying risk that an award might be set aside would undermine the Second Circuit's *Europcar* analysis in multiple ways.  The first *Europcar* factor would *always* favor a stay if there was an underlying annulment proceeding, regardless of the underlying merits of that proceeding.  Such an analysis would contradict the fourth *Europcar* factor, which states that underlying annulment proceedings weigh *against* a stay.  *Europcar*, 156 F.3d at 318;  *see* Section III.B.2.a.  As the Second Circuit noted in *Europcar*, "[a] stay of confirmation should not be lightly granted lest it encourage abusive tactics by the party that lost in arbitration."  Europcar, 156 F.3d at 317.

The underlying facts of *CPConstruction Pioneers Baugesellschaft Anstalt v. Gov't of the Republic of Ghana*, 578 F. Supp. 2d 50 (D.D.C. 2008), are also distinguishable.  The court decided that adjournment was proper, in part, because the question at issue involving allegations of fraud would require the court to "have to decide an intricate point of Ghana law."  *Id.* at 54.  At no point in their Opposition does Respondent argue that the corruption it is alleging involves an intricate point of OHADA law.  *See* Respondent's Memorandum in Opposition to Petition

(hereinafter "Resp. Mem."). The inquiry at hand is fact-based and, by Respondent's own

admission, corruption is an issue of "U.S. and International Public Policy." Resp. Mem. at 29.

Considering the entire history of this dispute the Court can only satisfy the objectives of

arbitration by denying a stay. The need for the expeditious resolution of this dispute

overwhelmingly supports confirmation of the award.

### 2. Factor two: "the status of the foreign proceedings and the estimated time for those proceedings to be resolved"

When, as here, the foreign proceedings are not likely to be resolved in the near future,

courts have refused to issue a stay of the enforcement proceedings in the United States. *See G.E.*

*Transp.*, 693 F. Supp. 2d at 139; *MGM Productions Grp., Inc.*, 573 F. Supp. 2d at 778. The

annulment proceedings in the CCJA began last year, yet they are not expected to be resolve until,

at the earliest, the end of 2015 to the beginning of 2016 time period. Respondent admits there is

no deadline for the CCJA to rule on the Annulment Petition, and the data Respondent presents

does not support its argument that the proceeding will not be protracted. *See* Resp. Mot. to Stay

at 8. Based on the more recent CCJA annulment actions cited by Respondent himself, the

proceedings would be estimated to take two and a half years and could drag on for close to four

years. *See* Second Fischer Decl. ¶ 76. Thus, this factor weighs in support of enforcement.

There are no formal or informal CCJA rules dealing with the timeline for resolution of

annulment proceedings, so the time for resolution is highly variable. *See* Second Fischer Decl.

¶75. Respondent cites *Jorf Lasfar* as evidence weighing in favor of a stay if a "decision is

expected from the . . . court before the end of next year." *Jorf Lasfar Energy Co., S.C.A.*, 2005

WL 3533128, at *3. The parallel foreign proceedings in this dispute began when Guinea filed its

Annulment petition on July 23, 2014, Guinea provides no concrete timeline for resolution of this

matter. Respondent's counsel merely presents data from recent CCJA annulment actions and

concludes that in the majority of cases the proceedings took a year and a half to resolve.  *See* Jaeger Decl. ¶ 42.

In *Jorf Lasfar*, cited by Respondent, the petitioners were unable to dispute the timeline of the case.  Due to the variable and indefinite time for resolution, Getma does dispute Guinea's conclusions regarding the potential timeline for resolution of the Annulment proceeding.  In addition, Getma disputes the conclusions that Jaeger, Guinea's counsel, makes on the limited data available.  Jaeger concludes that the annulment proceeding will be complete by the end of 2015 or early 2016[4] based on the fact that of eight CCJA annulment decisions between 2007-2011, six of the proceedings took longer than two years.  *See* Ex. 53 to Jaeger Decl. (Attorney prepared chart "Annulment Petitions Contesting the Validity of Arbitral Awards Before the CCJA").  But, the data actually shows that proceedings may take significantly longer.  Despite the fact that four cases filed between 2005-2007 were resolved within two years, the trend indicates that more recent cases have taken longer to resolve.  Between 2008 and 2010, two of the four cases took significantly longer -- over 3 years, 9 months and over 2 years, 4 months.  *See* Second Fischer Decl. ¶ 76.

The case before this Court is remarkably similar to the procedural posture in *MGM Production Group, Inc.,* 573 F. Supp. 2d at 778.  In that case, Aeroflot Russian Airlines sought to annul the award against it pending a decision by the Svea Hovr-att (Court of Appeal) in Sweden.  *Id.* at 774 n.3, 778.  The annulment proceedings initiated by Aeroflot sought "a broad review" of certain contractual issues "the arbitration panel presumably already considered."  *Id*. at 778.  The court found that the annulment proceedings would "delay the finality of the arbitration, which

---

[4] Resp. Mot. to Stay at 8.

[was] commenced [four and a half years earlier] in 1998" and that this factor weighed against a stay.  *Id*.

The Republic of Guinea likewise is using the annulment proceedings to relitigate issues already considered and resolved *against* the Republic during arbitration, *i.e.,* whether the Contract was procured by Getma through corruption.  *See id.*  Furthermore, similar to Aeroflot's unsubstantiated claim that "the foreign proceedings can be expected to proceed expeditiously," *id*., Respondent asserts that "the annulment proceedings before the CCJA are almost complete," even though Guinea provides no concrete timeline of the proceedings, and admits "there is not a deadline for the CCJA to rule on the Annulment Petition."  Resp. Mot. to Stay at 8.  Confronting nearly identical facts surrounding the parallel annulment proceedings, the court in *MGM Production Group, Inc.* found this factor weighed in favor of enforcement.  573 F. Supp. 2d at 778.  This Court should do the same.  *See also G.E. Transp.*, 693 F. Supp. 2d at 139; *Chevron Corp.*, 949 F. Supp. 2d at 72.

## B.      The Remaining *Europcar* Factors Support Enforcing the Arbitral Award

Although the first two *Europcar* factors should receive the greatest weight and clearly support enforcement of the arbitral award in this case, the Court should also consider the remaining *Europcar* factors in deciding whether to issue a stay.  *See Europcar*, 156 F.3d at 317-18.  These factors also weigh against a stay and in favor of immediate confirmation.

1.     **Factor three: "whether the award sought to be enforced will receive
greater scrutiny in the foreign proceedings under a less deferential
standard of review"**

The third *Europcar* factor, whether the award will receive greater scrutiny in foreign

proceedings, does not weigh in support of a stay.[5]  Respondent has presented no evidence that

the "standard is not so much more exacting than the one applied here . . . ."  *See Chevron Corp.*,

949 F. Supp. 2d at 72.  Respondent bases its proposition that "CCJA will closely scrutinize the

Award" on sources citing CCJA's role in combatting corruption in OHADA member states.

Resp. Mot. to Stay at 9.  Yet, at the same time, Respondent stated in its Opposition to Getma's

Petition to Confirm that "fighting corruption is undoubtedly part of the United States'

international public policy," which is part of the standard by which U.S. courts determine

whether to enforce an arbitral award.  Resp. Mem. at 28 n.17.  Article 30.6 of the CCJA Rules

states that the fourth ground for refusal of exequatur is "if the award is contrary to international

public policy."  *See* Ex. 2 to Jaeger Decl. at 18 (Arbitration Rules of the Common Court of

Justice and Arbitration (Dec. 9, 1998)).  Essentially, both courts will evaluate the award based on

international public policy.

The Republic of Guinea distorts the standard of review and fails to acknowledge that

French courts apply a much more deferential standard when reviewing arbitral awards, and even

recognize awards that have been annulled in courts of primary jurisdiction.  *See* Second Fischer

---

[5] Respondent cites *Interdigital, Co.*, 528 F. Supp. 2d at 361 for the proposition that the
possibility a foreign proceeding will set aside the award "mildly favors adjournment," yet the
*Samsung* court ultimately enforced the award and denied the stay because the factors "on
balance" favored enforcement and the first and second factors "overwhelmingly favor
enforcement."  *Id.* at 360.

Decl. ¶¶ 77-78.  Emmanuel Gaillard, a leading authority on international commercial arbitration has stated:

> French law, which in a highly coherent manner has always favored the universalist conception of arbitration and has tended to reduce as much as possible the role of local idiosyncrasies, even those of French law itself, opted very early to recognize all awards meeting the conditions of French law, *even when they had been set aside by the courts of their country of origin.*

Emmanuel Gaillard, *Enforcement of Awards Set Aside in the Country of Origin: The French Experience*, *in* 9 International Council for Commercial Arbitration Congress, *Improving the Efficiency of Arbitration Agreements and Awards: 40 Years of Application of the New York Convention* 505, 507 (Albert Jan van den Berg ed., 1998) (emphasis added).

Respondent also misstates the French standard of review of arbitral awards in annulment actions that Respondent argues is persuasive authority for the French-inspired OHADA legal system.  *See* Second Fischer Decl. ¶ 79.  Respondent argues that based on French case law, the CCJA will conduct a substantive review of the evidence in cases involving violations of international public policy, including corruption.  Resp. Mot. to Stay at 9.  In making its argument, the Republic of Guinea inexcusably ignores the leading 2014 French Supreme Court's clarification of the standard for judicial review of arbitral awards in annulment actions.  *See* Second Fischer Decl. ¶ 80; Cass. Civ. First, Dec. 2, 2014, No. 10-17076 appeal.  The French Supreme Court upheld the Court of Appeals of Paris's 2009 decision refusing to set aside an ICC arbitral award because inquiry into the underlying merits of the case was not permitted, despite underlying concerns of violation of international law and review was limited to the face of the award.  *Id.*  The French Supreme Court upheld the rationale of the Court of Appeals that the tribunal had already examined the issue of corruption and concluded there was no act of corruption.  *Id.*

Furthermore, the two cases that the Republic of Guinea does cite, the *Gas Turbine* and *Thales Euromissile* cases, are easily distinguishable because these cases addressed the court's review of contracts *intended* to or *created* for the purpose of violating public policy. *See* Ex. 52 to Jaeger Decl. at 12(Guinea Annulment Petition – "Petition to Challenge Validity" (Jul. 23, 2014)); Second Fischer Decl. ¶ 79; Abdulhay Sayed, *Corruption in International Trade and Commercial Arbitration* 385 (2004) (stating that "the Contract had as motive and goal the exercise of influence peddling or payment of bribes . . . . "). At no point has the Republic of Guinea ever claimed that the purpose of the Concession Agreement was to violate public policy, or that the Concession Agreement itself violated public policy. *See* Second Fischer Decl. ¶ 84. After all, the objective of the Concession Agreement, namely, operation of the Port of Conakry, is a perfectly legal activity. In addition, *Thales Euromissile* is distinguishable because the arbitral tribunal had not dealt with the argument that the contract at issue violated international public policy. *Id.*

Finally, if French courts review the award with great scrutiny, the Republic of Guinea fails to explain why it is that it ignored enforcement proceedings that Getma initiated in France and why it failed to appeal the enforcement judgment Getma won. *See* discussion below on Getma's enforcing the award in France. The Republic of Guinea could have easily opposed and then moved for a stay if it was intent on pursuing annulment at the CCJA.

The Respondent's claim that the CCJA, relying on French precedent, will review the award with greater scrutiny is without merit. Just as the U.S. court, the CCJA will review the award based on international public policy; therefore, this factor does not weigh in favor of a stay.

2.      **the characteristics of the foreign proceedings"**

      a.      "the characteristics of the foreign proceedings including: (i)
      whether they were brought . . . to set the award aside (which would
      tend to weigh in favor of enforcement)"

This court has expressly recognized that "[t]he fact that the proceedings were initiated to

vacate the [a]ward, rather than confirm it . . . weigh[s] against a stay." *Chevron Corp.*, 949 F.

Supp. 2d at 72; *G.E. Transp.*, 693 F. Supp. 2d at 139; *see also Europcar*, 156 F.3d at 318.  While

Guinea attempts to obfuscate this point under the analysis of factor four,[6] as discussed above in

Section III.A.1, their analysis of factor one[7] improperly states that an annulment proceeding

weighs in *favor* of a stay.  Respondent's analysis is directly contrary to the *Europcar* analysis in

which the Second Circuit expressly considers that a foreign proceeding ***actually*** "tend[s] to

weigh *in favor of enforcement*." *Europcar*, 156 F.3d at 318 (emphasis added).  By conflating this

factor with the issue of comity, the Respondent not only downplays a factor weighing in favor of

enforcement, but it also misapplies the *Europcar* factors.  *See id.* at 317-18; Resp. Mot. to Stay at

4-5.  Therefore, because the Republic of Guinea filed a petition to annul the award, this factor

weighs in favor of enforcement.

      b.      "the characteristics of the foreign proceedings including: […] (ii)
      whether they were initiated before the underlying enforcement
      proceeding so as to raise concerns of international comity"

Concerns of international comity do not weigh in favor of a stay because the inception of

these two proceedings is separated by only two months, so they are effectively moving at a

parallel pace, and because Getma promptly brought its Petition to Enforce.  The Arbitral

Tribunal issued its Final Award dated May 26, 2014, and Getma filed to enforce the award in

---

[6] Resp. Mot. to Stay at 4.

[7] *Id.* at 6-8.

France on June 2, 2014.  *See* Second Fischer Decl. ¶ 76; Ex. 23 at 2 (Order Rendered by Paris

High Court (June 18, 2014)); Ex. 24 (First and Last Page of Award Exequatur Granted (June 18,

2014)).  The Paris High Court issued its exequatur judgment enforcing the award on June 18,

2014 and Guinea was formally served on July 18, 2014.  *See* Second Fischer Decl. ¶ 77; Ex. 25

at 1-2 (Act of Service (July 18, 2014)).  Guinea only initiated annulment proceedings on July 23,

2014, almost a week after receiving formal service that Getma had obtained an exequatur

judgment from the Paris High Court.  *See* Second Fischer Decl. ¶¶ 78-80.  Getma then filed this

enforcement action on September 23, 2014, only two months after Guinea initiated annulment

proceedings and four months after Getma received the award.[8]  Because Getma submitted its

petition for enforcement in this second jurisdiction within a reasonable time, and because the

proceedings are essentially progressing at the same pace, this factor does not weigh in favor of a

stay.

      The cases Respondent relies on for the proposition that courts routinely grant stays in an

effort to defer to local courts are distinguishable from the instant case because they involve

intricate areas of law, do not fully consider the issue, or the *Petitioner*, not the Respondent, had

already instituted enforcement proceedings abroad.  As discussed in Section III.A.1.,

*CPConstruction Pioneers Baugesellschaft Anstalt* is not analogous to the case at hand because

the *CPConstruction* court found that the issue was enmeshed in "an intricate point of Ghana

law."  578 F. Supp. 2d at 54.  In contrast, the question is a matter of international public policy,

---

[8] D.C. Courts have found awards enforceable in proceedings brought on a similar, or even longer, timeline.  *See, e.g., TMR Energy Ltd. v. State Prop. Fund of Ukraine*, 411 F.3d 296, 299 (D.C. Cir. 2005) (finding an award enforceable when the enforcement proceeding was initiated almost seven months after the arbitrators issued their award); *Belize Soc. Dev. Ltd. v. Gov't of Belize*, 5 F. Supp. 3d 25 (D.D.C. 2013) (enforcing an arbitral award when the enforcement proceeding was initiated eight months after the Tribunal issued its Final Award).

and Respondent has not raised any issue constituting a similarly "intricate" point of OHADA law.  The court in *Higgins v. SPX Corp.*, No. 1:05-CV-846, 2006 WL 1008677, at *4 (W.D. Mich. Apr. 18, 2006) simply granted a stay on the conclusory grounds of "comity and efficient use of judicial resources," while making no effort to apply any law to any facts of the case.  *Id. Caribbean Trading Fid. Corp. v. Nigerian Nat'l Petroleum Corp.*, No. 90 Civ. 4169, 1990 WL 213030 (S.D.N.Y. Dec. 18, 1990) and *Fertilizer Corp. of India v. IDI Mgmt., Inc.*, 517 F.Supp. 948 (S.D. Ohio 1981) were both decided far earlier than *Europcar*.  *Caribbean Trading* applied the "transparently frivolous" standard from the *Spier* case, which has been eclipsed by the *Europcar* factors as discussed in footnote 2 of this brief.  *See Caribbean Trading*, 1990 WL 213030, at *7.

Respondent notes cases in which courts have expressed concerns regarding international comity due to the fact that the party petitioning for enforcement in the U.S. court has already petitioned for enforcement in another court abroad.  The court in *DRC, Inc. v. Republic of Honduras*, 774 F. Supp. 2d 66 (D.D.C. 2011) issued a stay because the **petitioner** had already initiated enforcement proceedings in Honduras.  *Id.* at 69-70.  Because i*n* that case the **petitioner** was responsible for the fact that the exact same issue was already being litigated in a parallel proceeding, the court deferred to the Honduran court to avoid conflicting opinions on the exact same matter.  *Id.* at 73.  Likewise, in *Nedagro B.V. v. Zao Konversbank*, No. 02 Civ. 3946, 2003 WL 151997, at *7 (S.D.N.Y. Jan. 21, 2003), cited by Respondent in support of a stay, the **petitioner** also had initiated the parallel proceedings in Russia, raising issues of comity, and also raising an issue with the finality of the arbitral award.  *Id.*  Likewise, in *Fertilizer Corp.*, cited by Respondent, the **petitioner** had filed for confirmation of the award in Indian courts, in addition to the respondent having filed for annulment of the award in another Indian court.  *Fertilizer Corp.*

18

*of India*, 517 F.Supp. at 950.  The Republic of Guinea cites no persuasive cases supporting a stay

on the basis of international comity where petitioner did not bring parallel proceedings in a

foreign court, this factor does not support issuance of a stay.

> c.   "the characteristics of the foreign proceedings including: […] (iii)
>       whether they were initiated by the party now seeking to enforce the
>       award in federal court"

Respondent, not Petitioner, instituted the annulment proceedings in the CCJA.

Therefore, this factor does not support issuance of a stay.  *Europcar*, 156 F.3d at 317-18 (where

"it is the plaintiff who first sought to enforce [the] award in the originating country, the argument

for enforcement by the plaintiff in the district court loses force . . . .") (citation omitted).[9]  Once

again, Respondent misapplies the *Europcar* factors by conflating it with Respondent's meritless

international comity concerns and by failing to acknowledge the fact that this factor plainly

weighs in favor of enforcement.  *See id.*; Resp. Mot. to Stay at 4-5.

> d.   "the characteristics of the foreign proceedings including: […] (iv)
>       whether they were initiated under circumstances indicating an
>       intent to hinder or delay resolution of the dispute

The Respondent's effort to further delay resolution of this case is even more egregious

considering the meritless allegations in their underlying Annulment Petition.  Courts have found

that a "losing party's assertion 'that the arbitrators failed to give the evidence the "consideration"

it deserved' must be rejected as an improper 'attempt to probe the collective minds of the

arbitrators as to how they reached their judgment.'" *Interdigital*, 528 F. Supp. 2d at 352 (citing

---

[9] While Respondent acknowledges this point, they fail to give it its proper weight, instead
essentially claiming it is negated by concerns of international comity while also ignoring that the
underlying proceedings were brought to annul, not enforce, the award.  Resp. Mem. at 10.
Respondent's arguments further fail to consider that Getma filed its Petition for Enforcement
within a reasonable amount of time, and that the two proceedings are proceeding forward.  *See*
Section III.B.2.b.

*Hunt v. Mobil Oil Corp.*, 654 F. Supp. 1487, 1512 (S.D.N.Y. 1987)).  Despite already having had the opportunity to litigate the issue of corruption,[10] the Republic of Guinea seeks to reopen the issue in its Annulment Petition in order to further delay enforcement of the arbitral award.  *See* Ex. 52 to Jaeger Decl. ¶¶ 72-163 (Guinea Annulment Petition – "Petition to Challenge Validity" (Jul. 23, 2014)).

In the underlying CCJA arbitration, after the hearings were completed,  the Republic of Guinea requested and obtained a special hearing to introduce "documents containing names and figures purportedly showing corruption in awarding Getma the container terminal concession at the Port of Conakry."  *See* Ex. 33 to Jaeger Decl. (Procedural Order No. 8 from Tribunal (Nov. 7, 2013)).  In his request, counsel for the Republic of Guinea explained that his client "recently obtained information and evidence about the circumstances surrounding" the Concession Agreement which constitute "acts of corruption."  *See* Ex. 32 to Jaeger Decl. (Letter from L. Jaeger to Tribunal (Nov. 4, 2013)).  In an effort to avoid unreasonable delay while protecting the parties' right to be present and heard, the tribunal granted the Republic of Guinea a week to submit the evidence and information it had obtained and provided Getma an opportunity to respond.  *See* Ex. 33 to Jaeger Decl. (Procedural Order No. 8 from Tribunal (Nov. 7, 2013)).  When it came time to submit this evidence, over a year since it first raised corruption allegations in the arbitration, the Republic of Guinea submitted only one two-page statement containing a recitation of hearsay from consultant Steven Fox, whom it had hired to investigate its corruption allegations.  *See* Ex. 34 to Jaeger Decl. Witness Statement of Mr. Steven Fox, CEO of Veracity Worldwide (undated)).  The tribunal then called a special hearing for December 16, 2013 dedicated solely to this evidence Guinea submitted to support its corruption allegations.

---

[10] *See* Ex. 33 to Jaeger Decl. (Procedural Order No. 8 from Tribunal (Nov. 7, 2013)).

Then, on the eve of the hearing, December 14, 2013, the Republic of Guinea sent notice that it had more "evidence": two witness statements and a criminal complaint filed in a Guinea court concerning the corruption allegations. The Republic of Guinea presented the documents only to counsel for Getma[11] -- two cursory one-page witness statements from members of the commission responsible for awarding the Concession Agreement, who stated that they had received cash payments from a Guinean citizen, Mr. Mamadou Diallo, pretending to act on Getma's behalf. *See* Ex. 37 to Jaeger Decl. (Witness Statement of Mr. Demba Kourouma (Dec. 13, 2013)), Ex. 38 to Jaeger Decl. (Sworn Witness Statement of Mr. Ibrahima Lamizana Condé (Dec. 13, 2013)).

While these three documents were not formally entered into evidence at the hearing, the court was aware of the substance of the evidence. As the transcript of the December 16, 2013 hearing demonstrates, the Republic of Guinea's witness, Mr. Fox, testified about the two witness statements and their contents. Second Fischer Decl. ¶ 23; Ex. 7 at 14:8-16 (Tr. of Dec. 16, 2013 Hr'g). Thus, the tribunal was aware of the sum total of the evidence possessed by the Republic of Guinea. The Republic of Guinea also sought a four-month extension of the proceedings to permit it to gather additional evidence of corruption. Second Fischer Decl. ¶ 27; Ex. 41 to Jaeger Decl. at 25:17-35 (Tr. of Dec. 16, 2013 Hr'g).

At the conclusion of the special hearing dedicated to the Republic of Guinea's corruption allegations, Guinea stated it had "no objection to the way that the hearing and arbitration was conducted. Second Fischer Decl. ¶ 29; Ex. 41 to Jaeger Decl. at 35:1-6 (Tr. of Dec. 16, 2013 Hr'g).

---

[11] *See* Ex. 40 to Jaeger Decl. (Letter from L. Jaeger to Getma's counsel providing witness statements of Messrs. Kourouma and Condé (Dec. 16, 2013)).

Then in a procedural order after the hearing, the tribunal did not reject the request to admit the new evidence and for the four-month delay, but joined these requests to the resolutions of the merits of the case.  *See* Ex. 42. to Jaeger Decl. (Procedural Order – Government of Guinea CCJA (OHADA) No. 001/2011/ARB Procedural Order No. 11 Joinder To The Merits Closure Of The Debate 8 January 2014 (Jan. 8, 2014)).  The Republic of Guinea had had a full opportunity to shape its case and defenses during the course of the entire arbitration and was granted leave and a special hearing to consider its evidence long after closing arguments in the arbitration.  (*See* Second Fischer Decl. ¶¶ 20-28).  The Republic of Guinea's attempt to "relitigate" this matter after having had multiple opportunities to do so is inappropriate and inconsistent with the need for the expeditious resolution of this dispute.

This blatant attempt to "relitigate" the issues resolved by the Tribunal during arbitration, indicates the Republic of Guinea filed its annulment action with the "intent to [further] hinder or delay resolution of the dispute." *Europcar*, 156 F.3d at 318.  *Europcar* acknowledges that "[a] stay of confirmation should not be lightly granted lest it encourage abusive tactics by the party that lost in arbitration."  *Id*. at 317 (citation omitted).  In these circumstances, a stay would do just that.

### 3.    Factor five: "a balance of the possible hardships to each of the parties . . ."

The balance of hardships supports enforcement of the arbitral award.  First, the arbitration began almost four years ago.  In similar circumstances, this Court has recognized that a "continued inability to obtain enforcement of its award" constitutes a significant hardship that "strongly favor[s] immediate confirmation." *Chevron Corp.*, 949 F. Supp. 2d at 72.  As discussed above in Section III.A.1., the dispute in *Chevron* was more than twenty years old, and the arbitration had begun more than six years prior.  *Id*.  Considering those facts alone under this

factor, this Court held that "[a]fter such an extensive delay, the balance of hardships—and, indeed, the interests of justice—strongly favor immediate confirmation." *Id*. The hardship of excessive delay also supports confirmation here with Getma waiting four years or in the alternative the posting of security by the Republic of Guinea.  In cases granting a stay, including those cited by the Respondent, Courts often require posting of security due to the risk posed to the petitioner's interest.[12]  *See, e.g., Alto Mar Girassol*, 2005 WL 947126, at *4 (requiring "suitable security" as a condition of the stay); *Jorf Lasfar Energy Company, S.C.A.*, 2005 WL 3533128, at *3 (ordering security in the amount of $3.6 million); *Nedagro B.V.,* 2003 WL 151997, at *7 (stating that $2.1 million was "suitable security"); *Spier*, 663 F. Supp. at 876 (requiring Respondent to "show cause why it should not be required . . . to post security in the United States for the full amount of [Petitioner's] award together with interest and allowable costs and fees . . . ."); Second, "the balance of the hardships of a stay is greater on . . . the party that provided services without receiving payment, than upon . . . the party that received services without paying for them." *MGM Productions Grp., Inc.*, 573 F. Supp. 2d at 778 (citing *Europcar*, 156 F.3d at 318).  Getma had in good faith begun performance and made significant financial outlays by purchasing equipment and Guinea has not paid for the benefits it received from Getma.  *See* Second Fischer Decl. ¶ 86.

Finally, the Republic of Guinea fails to provide any authority supporting its position that it would be prejudiced by the potential for immediate enforcement of the award, should it be confirmed under Convention.  Thus, Respondent has failed to meet its burden to show that the

---

[12] *But see*, *DRC, Inc.*, 774 F. Supp. 2d at 76 (deciding stay was unwarranted, but stating *in dicta* that if a stay had been appropriate, the court would not have required security on the presumption that the Republic of Honduras is a solvent sovereign).

balance of hardships weighs in favor of a stay.  The overwhelming evidence indicates that the

Court should immediately enforce the arbitral award in favor of Getma.

**4.**   **Factor six: "any other circumstances that could tend to shift the balance in favor of or against adjournment"**

Respondent raises the unremarkable argument that because there is a stay in OHADA

courts, the U.S. should follow suit and also require a stay.  Yet, at the same time, the Republic of

Guinea admits that the "unenforceability of the Award in the OHADA zone does not necessarily

preclude enforcement elsewhere . . . ."  Resp. Mot. to Stay at 14.

## CONCLUSION

The Republic of Guinea's annulment proceedings, and its request for stay of this

enforcement action, are yet another attempt to raise the exact "corruption" allegations that have

unequivocally been dismissed by the Arbitral Tribunal.  As demonstrated by the *Europcar*

analysis above, a stay is unwarranted here.  The need to provide a resolution of this protracted

dispute supports confirmation of the arbitral award.  This dispute has been ongoing for four years

and foreign annulment proceedings will take even more time to conclude.  These factors, and the

other *Europcar* factors detailed above, overwhelmingly weigh against a stay and in support of

immediate confirmation.  Accordingly, Getma respectfully requests that this Court confirm the

award and enter judgment, and deny the Republic of Guinea's request for a stay of these

proceedings.

## REQUEST FOR ORAL HEARING

Getma respectfully requests an oral hearing on its Petition to Confirm Arbitration Award

and to Enter Judgment.

Dated:  April 20, 2015

Respectfully submitted,

/s/ Allen B. Green
Allen B. Green (D.C. Bar No. 222158)
William T. O'Brien (D.C. Bar No. 450891)
Ivan W. Bilaniuk (D.C. Bar. No. 494315)
MCKENNA LONG & ALDRIDGE LLP
1900 K Street, N.W.
Washington, D.C. 20006
Telephone:  (202) 496-7500
Fax:  (202) 496-7756

*Attorneys for Petitioner*
*Getma International*