# EXHIBIT 1

**Case CCJA (OHADA) No. 001/2011/ARB**

<u>**Getma International**</u>
**vs**
<u>**The Republic of Guinea**</u>

*Hearing of May 28th, 2013*
Version 1 (to be read over by the Parties)

Simone Bardot, Conference Stenotypist – 20, boulevard de la Bastille – 75012 Paris
Phone: 01.42.40.52.38 & 06.03.12.46.16 – Simone_Bardot@msn.com

6   **Mr. Fischer** - Your difference of opinion was with the economic, industrial choice, if I may say
7   of the operator?

8   **Mr. Camara** - From all points of view, yes.

9   **Mr. Fischer** - Your differences of opinion had nothing to do with the legal conditions of
10  the review of offers, or of the organization of the call for tender?

11  **Mr. Camara** - No, it is the result. After…

12  **Mr. Fischer** – Just about the result. Do you think that Maersk…

13  **Mr. Camara** - When the work was done, the minister asked…

14  **Mr. Fischer** - Was the work well done?

15  **Mr. Camara** - When it was finished, the minister asked me: "What do
16  you want? What kind of advice can you give me?" I said: "I prefer
17  that we choose Maersk."  If we have to get someone else, let's get Maersk. From my point
18  of view, Maersk would have been the more important for the port of Conakry than all of the ones that
19  are *(…inaudible).*

20  **Mr. Fischer** - From a strictly procedural point of view, did everything go
21  normally?

22  **Mr. Camara** - Yes, but…

23  **Mr. Fischer** - Can you please read document C 28 under tab 2? Go to
24  the end of page 2. It is an interview with Mr. Cheick Touré. It is October
25  2008, if I am not mistaken.

26  **Judge** - Are you going to supply the magnifying glass?

27  **Mr. Fischer** - I can, even for my sake, Your Honor!

28  Can the witness manage to read the next to last line and the
29  last line without a magnifying glass? Could you read just the end?

30  **Mr. Camara** - Where?

31  **Mr. Fischer** - The journalist asks a question: "Now let's talk about the third port
32  project (container terminal) that is using up a lot of ink and chatter right
33  now. What are the circumstances that preceded reversal of this deal, and
34  if you believe the press, which were not transparent?" Can you read
35  starting with: "I think"? It is tab 2. At the bottom, on the left.

36  **Mr. Camara** - "It is good that you are bringing up this subject so that I can say a few
37  words about it and shed some light on the whole campaign of denigration
38  and poisoning lead in regards to this project. I think it is a shame and absolutely
39  scandalous! I am all the more at ease that the management of this case has adhered to all of
40  the rules and procedures established by the public markets."`

41  **Mr. Fischer** - Do you agree with this assessment?

42  **Mr. Camara** - It is the minister's opinion. But I had my own personal point of view.

43  **Mr. Fischer** - You told us that the procedure had been normal, so that
44  confirms… you confirm… I am not talking about the industrial and economic choice. We

1   do agree on that. You very clearly told us that you believe, surely for
2   good reasons, that it should have been Maersk.

3   **Mr. Camara** - That was my point of view.

4   **Mr. Fischer** - It was your point of view, no ambiguity about that. But about the
5   normalcy of the procedure, the minister who signed says that it was normal and you, you
6   told us, just a moment ago, if I understood correctly, that you agreed, that it had been
7   normal. Do you confirm that the procedure was normal?

8   **Mr. Camara** - Yes, the way things developed, it's normal.

19  **Mr. Fischer** - Confronted with a supplier failure, what was planned for the
20  Concession Agreement that you had negotiated?

21  **Mr. Camara** - The plan was to write, six months after, that during the six months, to see if
22  necessary. We could not commit to that procedure because, first of all, I told you
23  what the port represents for the Guinean economy. We cannot commit.

24  **Mr. Fischer** - You were thus aware that, in order to reach the termination, there was a
25  legal procedure?

26  **Mr. Camara** - Yes, but we thought that at that level, we should not just commit
27  because the port's operations would be blocked. It was responsible. The
28  Board of Directors said: since there was a call for tender, an evaluation that
29  was done, we must stick to the conclusions of the evaluation of the bids previously
30  submitted in order to make a decision. That is what was done!

31  **Mr. Fischer** - So, in full knowledge of the facts that the Port, the Authority, made
32  the decision not to respect the Concession Agreement and to terminate without
33  prior notice?

34  **Mr. Camara** - And stick to the conclusions of the evaluation of the bids submitted. It was
35  more responsible to act in that manner.

36  **Judge** - Wait. Mr. Camara, you said, if I understood correctly, that
37  the Board of Directors decided to stick to the conclusions from the evaluations that
38  had been done and to terminate without going through the legal procedure.

39  **Mr. Camara** - Yes.

40  **Judge** - Does that mean that the Board of Directors terminated Getma's
41  concession with the idea that it would attribute it to Bolloré?

42  **Mr. Camara** - Yes.

43  **Judge** - Did the Board of Directors take the time to verify that
44  Bolloré was still ready for this concession?

1   **Mr. Camara** - Yes.

2   **Judge** - Thank you.

3   **Mr. Fischer** - Was the Board of Directors aware of the
4   consequences of non-compliance with the Concession Agreement?

5   **Mr. Camara** - The Board of Directors was aware.

6   **Mr. Fischer** - So, it was with full awareness of the facts that the Board
7   of Directors decided to make its decision and take the risk?

8   **Mr. Camara** - Absolutely.

9   **Mr. Fischer** -So, for you, the arbitration proceedings, the request for indemnification from
10   Getma is therefore not a surprise.

11   **Mr. Camara** -No. The arbitration reviews the offers from both sides and shall
12   see, this is why we are talking about arbitration.

13   **Mr. Fischer** -When you made this decision to terminate and attribute to another
14   agent, were you aware that Getma International would
15   demand the application of the Agreement and its indemnification?

16   **Mr. Camara** -We were aware. We shall explain the damages
17   they caused us.

18   **Mr. Fischer** -Getma International caused you damages?

19   **Mr. Camara** -Because they delayed us in the implementation of the project. I told
20   you that we had decided on granting a concession for the container terminal because
21   we were not in agreement with the financial backers. We believed
22   that by using public-private partnership, we would save time, we did not
23   have any conditionalities to satisfy or anything else.

LanguageWorks
1123 Broadway
New York, NY 10010
Tel. 212 447 6060
Fax 212 447 6257

LanguageWorks

STATE OF NEW YORK        )
                         )  ss:
COUNTY OF NEW YORK       )

## CERTIFICATION

This is to certify that the accompanying, to the best of my knowledge and belief, is a true

and accurate translation into English, completed on April 16, 2015, of the cover page, pages

41 and 42, and pages 54 and 55 of "Transcript audience 2013.05.28.pdf", originally written

in French.

Christine Muller
Vice President
LanguageWorks

Sworn to and subscribed before me
This 16th of April, 2015

Notary Public

STEVEN J. ALBERT
NOTARY PUBLIC-STATE OF NEW YORK
No. 01AL6234881
Qualified in New York County
My Commission Expires January 31, 2019

# EXHIBIT 1
# FRENCH VERSION

**Affaire CCJA (OHADA) n°001/2011/ARB**

**<u>Société Getma International</u>**
c/
**<u>République de Guinée</u>**

*Audience du 28 mai 2013*
Version 1 (à relire par les Parties)

**LISTE DE PRESENCE**

› **Membres du Tribunal Arbitral**
  - M. le Prof. Ibrahim Fadlallah, Président
  - Me Éric Teynier, Arbitre
  - M. le Prof. Juan Antonio Cremades, Arbitre

  - Me Texidor, Associée du Prof. Fadlallah

› **Secrétariat du Tribunal**
  - Mme Marie Sfeir Slim

› **Pour la Demanderesse**
  - Me Cédric Fischer       Fischer, Tandeau de Marsac, Sur et Associés
  - Me Élisabeth Mahé      Fischer, Tandeau de Marsac, Sur et Associés
  - Me Tristan de Puget    Fischer, Tandeau de Marsac, Sur et Associés
  - Me José-Miguel Júdice         PLMJ
  - Me Filipa Cansado Carvalho       PLMJ

  - M. Grégory Quérel          NCT Necotrans
  - M. Jean-Daniel Littler       Getma International
  - Mme Dominique Perrier        PwC

› **Pour la Défenderesse**
  - Me Laurent Jaeger           Orrick Rambaud Martel
  - Me Romain Sellem           Orrick Rambaud Martel
  - Me Agnès Bizard            Orrick Rambaud Martel
  - Mme Léa Hubert-Rodier       Stagiaire Orrick Rambaud Martel

  - M. Soumah Kabele           Ambassade de Guinée
  - M. Morlaye Camara          Port autonome de Conakry
  - M. Aboubacar Touré         Port autonome de Conakry
  - M. Sory Camara             Port autonome de Conakry
  - M. Jean-Luc Guitera        KPMG

› **Sténotypistes de conférences**
  - Mme Simone Bardot
  - Mme Sylvie Briant

# S O M M A I R E

**AUDITION DE M. SORY CAMARA**........................................................................... **4**

➢   *DIRECT EXAMINATION* **PAR LA DÉFENDERESSE**............................................. 5

➢   **QUESTIONS DU PRÉSIDENT**............................................................................. 8

➢   *RE-DIRECT EXAMINATION* **PAR LA DEMANDERESSE**...................................... 9

➢   *CROSS EXAMINATION* **PAR LA DEMANDERESSE** ........................................ 56

➢   **QUESTIONS ADDITIONNELLES DE LA DEMANDERESSE**............................... 60

➢   **QUESTION ADDITIONNELLE DE LA DÉFENDERESSE** ..................................... 62

➢   **QUESTION DU TRIBUNAL ARBITRAL** .............................................................. 62

**AUDITION SIMULTANÉE DES EXPERTS DES DEUX PARTIES** ........................... **68**

➢   **EXPOSÉ LIMINAIRE DE M. GUITERA (KPMG)** ................................................. 68

➢   **EXPOSÉ LIMINAIRE DE MME PERRIER (PWC)** ............................................... 75

➢   *DIRECT EXAMINATION* **PAR LA DÉFENDERESSE** ........................................... 78

➢   *RE-DIRECT EXAMINATION* **PAR LA DEMANDERESSE** .................................... 78

➢   *CROSS EXAMINATION* **PAR LA DÉFENDERESSE** ........................................... 94

➢   *RE-CROSS EXAMINATION* **PAR LA DEMANDERESSE** .................................... 99

➢   **QUESTIONS DES ARBITRES**........................................................................... 99

1   *L'audience est ouverte à 9 heures 51, sous la présidence de M. le Prof. Fadlallah,*
2   *dans les locaux de la CCI, 112 avenue Kleber, à Paris.*

3   | **Audition de M. Sory Camara** |
    | --- |

4    **M. le Président**.- Mesdames, Messieurs, bonjour. J'ouvre cette deuxième journée
5    d'audience dans l'affaire Getma contre République de Guinée, arbitrage OHADA
6    n° 001/2011.

7    Nous avons au programme de cette journée d'abord l'audition de M. Sory Camara. Où
8    se trouve M. Sory Camara ?... Bonjour, Monsieur. Veuillez prendre place au siège des
9    témoins, cela vous donnera plus d'autorité.

10   Une indication que je n'ai pas donnée hier, mais je crois qu'elle est utile : tout
11   document que vous utiliseriez dans votre audition se trouve automatiquement
12   communiqué et versé aux débats, sauf objection de l'une des Parties. Nous sommes
13   d'accord sur la règle du jeu ? Fort bien.

14   Monsieur Camara, je voudrais vous demander d'indiquer pour le *transcript* vos nom,
15   prénom, date et lieu de naissance, domicile et activité actuelle.

16   **M. Camara.-** Merci, Monsieur le Président. Je suis Sory Camara. Je suis né le
17   25 décembre 1951, à Faranah, République de Guinée. Je réside dans le quartier
18   Almamya de la commune de Kaloum. Je suis au Port autonome de Conakry depuis
19   1989. À ce jour, j'assume les fonctions du directeur général adjoint du port de Conakry.

20   **M. le Président**.- Depuis quand ?

21   **M. Camara.-** Depuis le 20 janvier 2011… 2010. Je suis directeur général-adjoint au
22   Port de Conakry.

23   **M. le Président**.- Bien. Monsieur, vous êtes entendu qu'en tant que témoin. Le
24   Tribunal attend de vous de dire la vérité, toute la vérité, rien que la vérité. Est-ce que
25   vous vous y engagez ?

26   **M. Camara.-** Oui, je m'engage à vous dire la vérité, rien que le la vérité pour avoir
27   participé....

28   **M. le Président**.- …et toute la vérité !

29   **M. Camara.-** Et toute la vérité.

30   **M. le Président**.- Les raisons de dire la vérité sont innombrables, vous nous les direz
31   plus tard. Vous avez signé une attestation sous la cote R 53, qui est en date du
32   22 mars 2013. L'avez-vous devant vous ?

33   **M. Camara.-** Oui, je l'ai devant moi.

34   **M. le Président**.- Est-ce que vous reconnaissez que c'est votre attestation ?

35   **M. Camara.-** Oui.

36   **M. le Président**.- Avez-vous quelque chose à ajouter, corriger ou modifier dans cette
37   attestation ?

38   **M. Camara.-** Je m'en tiens à l'attestation telle qu'elle est présentée.

39   **M. le Président**.- C'est très bien. Maintenant, vous allez être interrogé d'abord, mais
40   de manière courte, par les conseils de la République de Guinée, puis d'une manière

1    sans doute un peu moins amicale par.... Pardon, d'une manière fort amicale mais sans
2    doute un peu plus longue par les conseils de Getma.

3    Vous avez la parole, Maître Jaeger.

4    **Me Jaeger**.- Merci, Monsieur le Président. La *direct examination* sera faite par
5    Me Sellem.

6    &#10148; ***Direct examination* par la Défenderesse**

7    **Me Sellem**.- Bonjour, Monsieur Camara.

8    **M. Camara.-** Bonjour.

9    **Me Sellem**.- Au paragraphe 6 de votre attestation, vous indiquez que dès 1998, un
10   projet de réhabilitation du terminal à conteneurs du port de Conakry a
11   été lancé. Pouvez-vous nous expliquer l'objet de ce projet ?

12   **M. Camara.-** Je voudrais d'abord préciser que le port de Conakry est le principal port
13   de commerce de la République de Guinée : 90 % des échanges avec l'extérieur
14   passent par le port de Conakry, 98 % des recettes générées par la douane sont
15   collectés à partir du port de Conakry. Quand on sait que la douane contribue à hauteur
16   de 45, voire 50 %, dans l'équilibre du budget de l'état, il est aisé de comprendre le
17   rôle-clé que joue le port de Conakry. C'est pour cette raison que le développement du
18   port de Conakry est un objet de préoccupation du gouvernement guinéen.

19   Après la réalisation des deux premiers projets en 1992, on a initié un troisième projet
20   en 1998, à l'époque où le trafic conteneurs était à 35 000 boîtes.

21   **Me Sellem**.- Alors, quel était l'objet principal de ce troisième projet en 1998 ?

22   **M. Camara.-** L'objet de ce troisième projet a été de créer des infrastructures,
23   notamment un terminal à conteneurs de 8 hectares pour porter le terminal à
24   conteneurs dans sa globalité à 16 hectares, ensuite d'avoir un quai de 13 mètres de
25   manière à accroître les capacités d'accostage des navires et de stockage. C'est ça la
26   principale… À côté, on a prévu l'aménagement d'une plateforme ferroviaire et
27   l'aménagement du (… *inaudible*).

28   **Me Sellem**.- D'accord.

29   Sur les modalités de réalisation de ce projet, comment le Port autonome de Conakry
30   en est arrivé à la décision de recourir à un partenaire privé pour faire réaliser ces
31   travaux dans le cadre d'une concession ?

32   **M. Camara.-** Ici, je veux préciser un aspect assez important dans ce que nous avons
33   connu au port de Conakry en matière de financement des infrastructures portuaires.

34   Les premier et deuxième projets ont été réalisés sur la base d'un financement de la
35   Banque mondiale, de la Banque africaine de développement et de la KfW. Dans la
36   même logique, on s'est adressé à trois autres bailleurs de fonds, à savoir la BEI, la
37   KfW et l'AFD. L'objectif était d'avoir un financement pour nous permettre de poursuivre
38   le développement du port de Conakry amorcé dans le cadre du premier et du
39   deuxième projets.

40   Malheureusement, les conditions auxquelles ont été subordonnés les décaissements,
41   même si on avait signé les accords de crédit en 2006, on n'a pas pu honorer ces
42   engagements. Finalement, on a eu un retard important dans le développement du port
43   de Conakry, ce qui fait que le terminal à conteneurs, qui accusait 35 000 conteneurs,
44   en 1998, s'est retrouvé à 140 000 boîtes, ce qui empêchait le développement du port.
45   On a essayé avec nos bailleurs de fonds traditionnels; nous avons fait une visite dans

1  les ports, notamment à Abidjan, à Téma, au Ghana, et à Dakar, qui sont des ports
2  concurrents de la République de Guinée. À ce niveau, on s'est rendu compte que tous
3  ces ports ont opté pour un financement du secteur privé pour le développement des
4  infrastructures portuaires, pour plusieurs raisons : l'accès au financement apparaissait
5  facile, il n'y avait pas de conditionnalité sauf la crédibilité de l'opérateur. On a donc
6  demandé au gouvernement de s'orienter vers un partenariat public-privé. Le
7  8 février 2008, le gouvernement guinéen a accepté, et nous a autorisés à préparer les
8  documents pour le lancement d'un appel d'offres.

9  **M. le Président.**- Monsieur, il y a beaucoup de sigles. Nous en comprenons certains.
10  L'AFD, on nous a dit ce que c'était. La BEI et la KfW, pouvez-vous nous dire les noms
11  complets de ces organismes pour le *transcript* ?

12  **M. Camara.**- L'AFD, c'est l'Agence française de développement. KfW, c'est plus
13  difficile à dire. Dans les documents, on a toujours dit KfW, c'est allemand. Je m'excuse,
14  c'est très difficile de le dire...

15  **M. le Président.**- Mais vous savez quelle est la traduction du titre en français. C'est
16  l'organisme allemand qui s'occupe de quoi ?

17  **M. Camara.**- Il s'occupe du financement dans le cadre de la coopération de
18  l'Allemagne avec les autres pays.

19  **M. le Président.**- Et la BEI ?

20  **M. Camara.**- La Banque européenne d'investissement.

21  **M. le Président.**- Merci, Monsieur. Poursuivez.

22  **Me Sellem.**- Donc sur le modèle de ce qui se faisait dans les grands ports voisins,
23  vous avez décidé, le Port autonome a décidé de recourir à un partenaire privé. Quels
24  étaient les critères sur lesquels le Port a présélectionné ce futur partenaire ?

25  **M. Camara.**- Vous savez que les infrastructures portuaires sont des infrastructures qui
26  coûtent cher, qui en matière de financement exigent des investissements lourds. Pour
27  pouvoir y faire face, dans les critères de sélection, nous avons décidé que le promoteur
28  puisse avoir de l'expérience, au moins cinq ans d'expérience, avoir la capacité
29  financière de faire face au financement de l'infrastructure en question, et surtout de
30  pouvoir assurer la gestion après les travaux d'investissement. Qu'il soit seul ou en
31  partenariat avec quelqu'un d'autre, notre souhait était que l'investissement soit assuré,
32  que l'implémentation des équipements mis en place soit également assurée de
33  manière à ce que la compétitivité du port de Conakry soit une réalité parce que notre
34  objectif, au-delà de tout cela, est de pouvoir tenir la compétitivité par rapport aux ports
35  (… *inaudible*).

36  **Me Sellem.**- Donc Getma International fait partie des sociétés qui ont été
37  présélectionnées à la suite de l'appel à manifestation d'intérêt. Cela veut dire que vous
38  considériez que cette société disposait de l'expérience, des capacités techniques et
39  financières pour réaliser les investissements et les travaux nécessaires à l'extension
40  du terminal.

41  **M. Camara.**- Oui, parce que Getma International, dans son offre, nous a fait état en
42  juin, dans son offre, d'une correspondance, je crois du 5 mars, où il a évoqué son
43  partenariat avec MSC dans le cadre de la réalisation du projet, puis, au-delà, même de
44  son exploitation également. Donc ceci a permis, sur les 13 entreprises qui ont
45  soumissionné au départ, de voir MSC présélectionnée et être admise au niveau de la
46  phase de sélection.

47  **M. le Président.**- Évitez les questions trop *leading*.

48  **Me Sellem.**- Bien, Monsieur le Président.

1 **M**. **le Président**.- Surtout quand il n'y a même pas de question. Allez-y.

2 **Me Sellem**.- Bien, Monsieur le Président.

3 Je voulais savoir, au niveau de la Commission d'évaluation des offres, si celle-ci a pris
4 en considération l'existence de ce partenariat dont vous venez de me parler au stade
5 de la présélection.

6 **M. Camara**.- Oui, au niveau de la Commission d'évaluation, la Commission a tenu
7 compte de ces partenariats parce qu'en plus, ce qui avait été dit, il a été prouvé à la
8 Commission que Getma International, dans le cadre de son partenariat avec MSC,
9 assurait le financement d'infrastructures portuaires dans beaucoup de pays et aussi, ils
10 ont assuré la gestion des terminaux à conteneurs dans beaucoup de pays. Donc cela a
11 permis à la commission d'en tenir compte et de procéder à l'évaluation de son offre,
12 tout comme Maersk, Bolloré et Afrimarine.

13 **Me Sellem**.- D'accord. Je voudrais passer à un autre sujet, qui est la réalisation des
14 travaux. Est-ce que vous pouvez nous indiquer, au début de l'année 2011, quel était le
15 stade d'avancement des différentes composantes de travaux prévues par la
16 Convention ?

17 **M. Camara**.- J'insiste sur un point qui me paraît fondamental : c'est que l'extension du
18 terminal à conteneurs du port de Conakry est en réalité la principale composante du
19 troisième projet. Je disais qu'à l'initiation du troisième projet, nous étions à
20 35 000 boîtes et je crois en 2008, 2010, nous étions à 145 000 boîtes, ce qui fait qu'il y
21 avait un engorgement terrible au niveau du port de Conakry. Les navires étaient
22 détournés sur Dakar et Abidjan parce qu'ils ne parvenaient pas à avoir de place.

23 Donc nous avons demandé, dans le cadre de ces évaluations, on a décidé que la
24 priorité accordée dans le cadre de la mise en œuvre du projet, c'était d'abord d'assurer
25 l'extension du terminal à conteneurs de manière à ce qu'on puisse réinstaurer la fluidité
26 dans l'exploitation du port de Conakry.

27 Dans ces composantes, en plus de l'extension du terminal à conteneurs, nous avons la
28 plateforme ferroviaire, qui était dédiée juste à la mise en œuvre ou bien au stockage de
29 conteneurs vides et plus loin —c'était un aspect conditionnel lié au projet—,
30 l'aménagement du port sec de Kagbelen qui est à 40 km de Conakry.

31 **Me Sellem**.- Est-ce que ces trois composantes de travaux étaient liées entre elles ?

32 **M. Camara**.- Dans l'immédiat, il n'y a pas un lien particulier entre les trois
33 composantes. On peut faire l'extension du terminal à conteneurs sans pour autant
34 toucher la plateforme ferroviaire. On peut aussi réaliser le port sec de Kagbelen sans
35 toucher la plateforme ferroviaire *(… inaudible)*. Donc ce sont trois composantes qui ne
36 sont pas forcément liées en termes de réalisation.

37 **Me Sellem**.- Je reviens donc à ma question précédente : au début de l'année 2011,
38 quel était l'état d'avancement de ces différentes composantes de travaux ?

39 **M. Camara**.- J'avoue qu'à ce niveau, on a été un peu déçu parce que la réhabilitation
40 du terminal à conteneurs n'a pas été existante, n'a pas été assurée. Les murs des
41 quais n'ont pas été réaménagés parce que le terminal à conteneurs a été inauguré en
42 1992, donc il y avait des affaissements, par endroits des défections qui n'ont pas été
43 corrigées. En plus, les murs et les défenses n'ont pas été du tout réhabilités. Donc à ce
44 niveau, rien n'a été fait.

45 Le terminal à conteneurs, dont l'extension devait être assurée, n'a pas été non plus
46 effectué. Rien n'a été fait.

47 C'est au niveau de la plateforme ferroviaire qu'il y a eu un début d'exécution des
48 travaux, mais pas entièrement à notre satisfaction. Donc je puis dire que vers la fin, les
49 travaux de Getma International se limitaient au niveau de la plateforme ferroviaire.

1  **Me Sellem**.- Et sur la construction du nouveau quai ?

2  **M. Camara**.- Rien n'a été fait.

3  **Me Sellem**.- Au paragraphe 27 de votre attestation, vous faites état d'une réunion qui
4  s'est tenue le 14 janvier 2011, à laquelle vous avez participé en tant que représentant
5  du Port de Conakry. Est-ce que vous pouvez nous indiquer ce qui s'est passé lors de
6  cette réunion ?

7  **M. Camara**.- Je voudrais rappeler qu'en janvier, on a connu un changement de
8  gouvernement et surtout la nomination d'un nouveau ministre des Transports. Le
9  nouveau ministre a demandé par lettre circulaire à ce que la situation du projet soit
10  présentée. Donc le 14, Getma International, à travers ses représentants, est venue au
11  port avec la Direction nationale de la Marine marchande, les membres du cabinet du
12  ministère et les cadres du port. Je précise que la réunion s'est tenue dans la salle de
13  conférences du Port autonome de Conakry, donc tout le personnel était là. Le
14  représentant de Getma International qui a fait la représentation s'est livré à l'exercice
15  de présentation du chronogramme du projet. Quand il a commencé, quelque temps
16  après, cinq à dix minutes après, le Directeur général du Port de Conakry l'a interrompu
17  en disant : « Attention, Monsieur, s'il vous plaît, depuis un certain temps, vous avez la
18  responsabilité de gérer le port de Conakry. Nous avons vu que ce que vous avez fait,
19  c'était surtout pour l'exploitation de l'existant qui n'a même pas été corrigé. Je voulais
20  avoir, à partir de cette réunion, la preuve de l'existence des fonds que vous vous êtes
21  engagés à mobiliser pour financer les travaux d'infrastructures, notamment l'extension
22  et puis les autres composantes ».

23  Le porte-parole, le présentateur, était interloqué, subitement surpris par cette question
24  qui était subite de la part du DG. Il a dit : « Attention, je ne suis pas là, Monsieur le
25  Directeur, pour répondre à cette question. Il m'a été demandé de venir présenter le
26  chronogramme du déroulement du projet. Je ne peux pas répondre à cette question ».

27  Du coup, le directeur général du Port a dit : « Attention, je suis préoccupé parce
28  qu'aujourd'hui, on parle de crise sur le plan international, je ne vois pas d'éléments
29  significatifs qui m'indiquent que le projet va se poursuivre. Je n'ai pas de contacts
30  directs avec les gens de Getma International. C'est d'ailleurs la première fois depuis
31  que vous avez le projet que je me retrouve en face de vous...... À ce stade, j'avoue que
32  je ne peux pas continuer à assister à la réunion. Je suis vraiment déçu. »

33  Voilà, tout est parti de là. Aussitôt, le Directeur général a écrit au Conseil
34  d'administration du Port autonome pour lui rendre compte du déroulement de la
35  réunion et de nos préoccupations par rapport à la conduite du projet. C'est ainsi que
36  le CA s'est retrouvé, le 5 février si je me rappelle. La réunion s'est tenue et la décision de
37  résilier la Convention de concession avec Getma a été prise par le Conseil
38  d'administration.

39  **Me Sellem**.- Je n'ai pas d'autres questions, Monsieur le Président.

40  ➢ **Questions du Président**

41  **M. le Président**.- Avant de passer la parole aux conseils de Getma, quelle était
42  d'après vous la tâche la plus urgente, celle qu'il fallait faire en premier ?

43  **M. Camara**.- C'est d'apurer l'extension du terminal à conteneurs. C'est la principale
44  composante du troisième projet du port.

45  **M. le Président**.- L'extension du terminal. Vous voulez dire l'extension du terminal
46  existant ?

1  **M. Camara.-** Oui. Nous avons... Il y a le terminal existant qui est de 8 hectares et on a
2  décidé de faire l'extension et de réaliser un quai à conteneurs. Voilà la principale
3  composante.

4  **M. le Président.-** Donc l'extension, c'est la construction d'un nouveau PAC.

5  **M. Camara.-** D'un nouveau terre-plein avec un quai de moins 13 mètres.

6  **M. le Président.-** C'est cela, c'est le plus urgent. Parce que dans l'offre et dans
7  beaucoup de documents, on voit que ce travail-là devait commencer après 11 mois et
8  se terminer 24 mois après, dans les documents que j'ai sous les yeux.

9  **M. Camara.-** Oui.

10  **M. le Président.-** Alors que les autres tâches devaient se faire avant, d'après le
11  planning.

12  **M. Camara.-** Oui.

13  **M. le Président.-** Alors c'était celui qui était le plus tardif qui était le plus urgent ou
14  peut-être le plus important, vous voulez dire ?

15  **M. Camara.-** Pour nous, c'était en réalité le plus important.

16  **M. le Président.-** Mais pas le plus urgent, d'accord.

17  **M. Camara.-** Monsieur le Président, comme je l'ai dit, le troisième projet portuaire est
18  dicté par notre volonté d'assurer la continuité dans le fonctionnement du port de
19  Conakry en matière de réception de navires et de stockage de conteneurs.

20  **M. le Président.-** J'ai compris. J'ai compris.

21  Un représentant de Getma nous a expliqué que les conteneurs vides occupaient la
22  place et que la libération des travaux sur la gare ferroviaire permettait de disposer
23  aussi de cette place pour désengorger. Est-ce que cela va dans le même sens ?

24  **M. Camara.-** Oui, les conteneurs vides sont généralement stockés au niveau de la
25  plateforme ferroviaire. Mais entre le terminal à conteneurs et la plateforme ferroviaire, il
26  y a une distance, je crois, de deux ou trois kilomètres. Pour nous, l'important est de
27  faire l'extension du terminal à conteneurs de manière à alléger le poids des réceptions
28  de conteneurs sur le terminal parce qu'en fait, c'est d'un seul tenant.

29  **M. le Président.-** Maître...

30  ➢ ***Re-direct examination** par la Demanderesse*

31  **Me Fischer.-** Merci, Monsieur le Président. Je suis Cédric Fischer. Monsieur, je vais
32  vous interroger d'une façon qui, je l'espère, ne sera pas inamicale, et à partir du
33  témoignage que vous avez rappelé.

34  En préambule, au début de ce témoignage, vous indiquez que vous avez reçu une
35  formation en économie et en finances et que vous êtes diplômé de l'Institut
36  polytechnique.

37  Pourriez-vous nous indiquer quel type de formation vous avez reçu à l'Institut
38  polytechnique ?

39  **M. Camara.-** À l'Institut polytechnique, j'ai fait l'École Supérieure d'Administration où
40  j'ai étudié en économie et finances et après ma sortie à l'université de Conakry, j'ai
41  servi dans le cadre de l'administration générale où j'ai été successivement vice préfet
42  avant de me retrouver au niveau du Port de Conakry.

1 **Me Fischer.**- Vos fonctions que vous aviez à l'époque au port de Conakry étaient des
2 fonctions essentiellement administratives ou y avait-il une partie technique ?

3 **M. Camara.-** Au niveau du port de Conakry, j'ai d'abord été Secrétaire général du Port,
4 ensuite j'ai été conseiller économique au moment de la conception et de la mise en
5 œuvre du projet. C'est après que j'ai été élevé au rang de Directeur général adjoint du
6 Port.

7 **Me Fischer.**- Et dans vos fonctions de Secrétaire général puis vos fonctions
8 économiques, aviez-vous des relations avec les services techniques ?

9 **M. Camara.-** Oui, j'avais des relations avec les services techniques parce qu'en fait, on
10 avait la responsabilité de suivre l'évolution d'abord du port dans sa globalité, puis du
11 projet également. J'avais donc un droit de regard sur l'ensemble des secteurs qui
12 composent le port de Conakry dans son fonctionnement et dans son développement.

13 **Me Fischer.**- Quand vous dites l'ensemble des secteurs, c'est également le secteur
14 technique ?

15 **M. Camara.-** Oui, parce qu'on fait des réunions de direction au cours desquelles
16 chaque département présente la situation de son secteur, puis on analyse, on
17 examine, on fixe les orientations, on fait les évaluations. Puis, au besoin, on fait des
18 redressements pour le fonctionnement de la société.

19 **Me Fischer.**- Vous étiez donc, par vos fonctions, informé de l'ensemble des
20 problématiques ayant trait au port de Conakry ?

21 **M. Camara.-** Oui, absolument.

22 **Me Fischer.**- Peut-on considérer que le directeur technique était à l'époque au même
23 niveau hiérarchique que vous ?

24 **M. Camara.-** Oui. Avant d'être Directeur général adjoint, le Secrétaire général, le
25 Conseiller économique était à ce niveau de responsabilité que le directeur sectoriel
26 dans la structure du port.

27 **Me Fischer.**- Aujourd'hui, les choses ne sont plus les mêmes ?

28 **M. Camara.-** Elles ne sont plus les mêmes parce qu'au moment où je vous parle, je
29 suis Directeur général adjoint, donc je suis...

30 **Me Fischer.**- Je ne parlais pas en ce qui vous concerne même, j'avais bien compris
31 que vous aviez reçu une promotion, mais est-ce que l'organisation est la même ? Est-
32 ce que vous avez été remplacé par quelqu'un ? Est-ce qu'il y a toujours un conseiller
33 économique qui a le même rang que le directeur technique ?

34 **M. Camara.-** Oui, il y a un conseiller économique.

35 **Me Fischer.**- Est-ce que le directeur technique et le conseiller économique vous
36 rapportent ?

37 **M. Camara.-** Oui, ils me rapportent.

38 **Me Fischer.**- Vous êtes leur autorité hiérarchique directe ?

39 **M. Camara.-** Oui, absolument.

40 **Me Fischer.**- À l'époque, vous-même, à qui rapportiez-vous ? Quelle était votre
41 autorité hiérarchique directe ?

42 **M. Camara.-** Dans la structure de fonctionnement du port, les directeurs sectoriels
43 relèvent du directeur général, puis, par moment, on peut rendre compte au directeur
44 général adjoint dans nos réunions de concertation et d'orientation de la société. Mais
45 on relève directement de l'autorité du directeur général.

1 **Me Fischer.**- Vous relevez directement... Et vous aviez des contacts fréquents avec le
2 directeur général ?

3 **M. Camara.-** Oui, des contacts fréquents parce que si on ne se retrouve pas, on ne se
4 concerte pas, la société ne peut pas fonctionner. Périodiquement, au-delà des
5 réunions hebdomadaires de direction, on se retrouve tous les jours pour faire le point.

6 **Me Fischer.**- Cela veut donc dire que vous aviez des réunions quotidiennes ?

7 **M. Camara.-** Absolument.

8 **Me Fischer.**- Vous avez témoigné sur des faits qui sont déjà anciens puisque la
9 Convention de concession a été signée en 2008, mais les travaux préparatoires sont
10 antérieurs. Vous l'avez rappelé. Est-ce que pour préparer votre témoignage, vous avez
11 été amené à consulter des archives ?

12 **M. Camara.-** J'avoue que j'ai suivi de près l'évolution du port de Conakry et je me suis
13 concerté pour pouvoir faire ce témoignage sur la base des informations qui sont
14 contenues dans le document.

15 **Me Fischer.**- Je m'excuse, je n'ai pas très bien compris. Vous vous êtes concerté avec
16 qui pour...

17 **M. Camara.-** Avec mes collaborateurs. Je travaille en concertation avec les
18 collaborateurs et puis...

19 **Me Fischer.**- D'accord, vous avez fait une ou plusieurs réunions pour établir votre
20 témoignage, mais avez-vous eu accès à des archives documentaires ou la
21 concertation a-t-elle été suffisante ?

22 **M. Camara.-** Oui, je pense, je pense... On a pris des documents pour donner les
23 informations.

24 **Me Fischer.**- Pour organiser ces réunions et pour consulter ces documents, où avez-
25 vous tenu les réunions ?

26 **M. Camara.-** C'est dans notre salle de conférence, au port, que l'on tient les réunions
27 pour discuter des problèmes d'intérêt général pour la société.

28 **Me Fischer.**- Comment expliquez-vous alors que votre attestation soit datée de Paris ?

29 **M. Camara.-** Là, je donne les informations. Le document qui est sous la main n'est pas
30 écrit par moi. J'ai eu recours aux avocats choisis par la République de Guinée pour
31 mettre en forme les informations que je donne.

32 **Me Fischer.**-  Et vous considérez donc que cette mise en forme entraîne l'indication du
33 lieu de création de votre attestation ?

34 **M. Camara.**- C'est cela.

35 **Me Fischer.**- Vous l'avez signée à Conakry, cette attestation ?

36 **M. Camara.**- Cela a été fait à Conakry, puis je l'ai signée et je l'ai envoyée au cabinet.

37 **Me Fischer.**- Lorsque vous l'avez signée, où étiez-vous ?

38 **M. Camara.**- J'étais à Paris.

39 **Me Fischer.**- Vous nous avez dit que vous l'aviez envoyée aux avocats qui étaient à
40 Paris. Je ne comprends pas.

41 **M. Camara.**- Mais bien sûr ! Je l'ai lue, je l'ai signée et puis je suis venu déposer.

42 **Me Fischer.**- Vous êtes venu de Conakry après l'avoir signée ? Cela veut dire que
43 vous l'avez signée à Conakry ?

1  **M. Camara**.- Non, je l'ai signée ici. Je suis venu avec les informations. J'ai eu le
2  document au cabinet, qui l'a mis en forme, puis je l'ai signé pour le remettre au cabinet.

3  **Me Fischer**.- Mais avant, vous nous aviez dit que vous aviez fait cette attestation à
4  Conakry. Je ne comprends pas.

5  **M. Camara**.- Non, j'ai dit que les éléments d'information contenus dans le document
6  ont été collectés à Conakry. Je suis venu le remettre au cabinet choisi par la
7  République de Guinée pour la mise en forme. C'est pour cette raison qu'il est écrit
8  *« Fait à Paris »*, et j'ai signé. Je précise bien.

9  **Me Fischer**.- Très bien.

10  Vous nous avez indiqué avoir été nommé directeur général adjoint du Port autonome
11  de Conakry (le PAC), le 15 janvier 2011. Est-ce exact ?

12  **M. Camara**.- Je crois que c'était le 20 janvier 2011.

13  **Me Fischer**.- C'est le 15 ou le 20 ? Les dates, comme vous le savez, ont une certaine
14  importance. Vous êtes extrêmement précis dans votre attestation.

15  **M. Camara**.- Je crois que c'est le 15 janvier 2011. Je n'ai pas amené le décret avec
16  moi, mais...

17  **Me Fischer**.- C'est le 15 janvier ?

18  **M. Camara**.- Oui, oui.

19  **Me Fischer**.- Vous venez de nous dire que vous avez été nommé par un décret. De
20  qui ?

21  **M. Camara**.- Dans mon pays, seul le Président de la République signe un décret, et
22  non une autre autorité.

23  **Me Fischer**.- C'est un décret du Président de la République.

24  **M. Camara**.- Oui, absolument.

25  **Me Fischer**.- Avant votre nomination, vous connaissiez le Président de la
26  République ?

27  **M. Camara**.- Est-ce que cela a de l'importance ? Je ne le pense pas.

28  **M. le Président**.- Répondez à la question, sauf s'il y a une objection de la République
29  de Guinée.

30  **M. Camara**.- Je connais le Président de la République parce qu'il a été un grand
31  combattant de la liberté qui s'est engagé pour la démocratie et j'ai milité dans son parti.
32  De ce point de vue, je le connais.

33  **Me Fischer**.- Connaissez-vous Mme Makalé Traoré ?

34  **M. Camara**.- Madame Makalé Traoré ? Oui, je la connais.

35  **M. le Président**.- Le Tribunal aimerait bien la connaître...

36  *(Sourires.)*

37  **Me Fischer**.- Pouvez-vous dire au Tribunal quel a pu être son rôle auprès du président
38  Alpha Condé ? Et auprès de vous ?

39  **M. Camara**.- Monsieur le Président, est-ce que ceci est en rapport avec l'objet... ?

40  **M. le Président**.- Si vous pouvez répondre à la question, répondez.

41  **M. Camara**.- Oui. Reprenez la question, s'il vous plaît.

1 **Me Fischer**.- Pouvez-vous nous indiquer succinctement quelles ont été les relations de
2 Mme Makalé Traoré avec M. Alpha Condé et quelles ont été ou quelles sont les
3 relations de Mme Makalé Traoré avec vous ?

4 **M. Camara**.- D'abord, Makalé Traoré est mon épouse, si c'est ce que vous voulez que
5 je dise.

6 **M. le Président**.- Cela ne se cache pas !

7 **Me Fischer**.- Je n'ai pas d'autres questions sur ce point, je vous rassure ! Je vous
8 avais demandé une réponse brève. Elle est concise et précise.

9 **M. Camara**.- Vous me faites du bien car vous parlez de ma femme... *(Rires.)*

10 **Me Fischer**.- Je vous avais dit que ce ne serait pas inamical.

11 A–t-elle eu un rôle auprès du Prof. Alpha Condé ?

12 **M. Camara**.- Elle a été la directrice de campagne du Président de la République, du
13 professeur.

14 **Me Fischer**.- À ce titre ?

15 **M. Camara**.- Elle a été choisie, non pas parce qu'elle est l'épouse de Sory Camara,
16 mais en fonction de ses compétences et de ce qu'elle pouvait apporter au succès du
17 Président de la République. Cela n'a donc rien à voir.

18 **Me Fischer**.- Personne n'en doute. D'ailleurs, le résultat démontre son efficacité. Je ne
19 vous demanderai pas si, en revanche, vous avez été nommé parce que vous étiez son
20 époux, ce que je ne pense pas.

21 Dans le cadre de ses fonctions, a-t-elle été amenée à travailler ou à percevoir des
22 rémunérations de l'agence Euro-RSCG qui était en charge de l'élection ?

23 **M. Camara**.- Non, je ne le pense pas, car la structure de la campagne est tout à fait à
24 part. La direction de la campagne, c'est différent. Moi, je ne peux pas rentrer dans ces
25 détails.

26 **Me Jaeger**.- Je me permets d'intervenir, avec mes excuses, mais vos questions ont-
27 elles un rapport avec l'affaire ?

28 **Me Fischer**.- Un rapport direct, je crois.

29 **Me Jaeger**.- Elles ont un caractère personnel et je ne voudrais pas, par exemple, que
30 l'on parle des revenus ou de choses…

31 **Me Fischer**.- J'ai terminé. Je n'ai aucune question supplémentaire, mais ces points ont
32 été très clairement précisés.

33 Revenons à votre témoignage. Au paragraphe 9 de votre témoignage, vous expliquez
34 que, le 13 février 2008, le Conseil des ministres, sur les conseils du Port autonome de
35 Conakry, a adopté une résolution entérinant le principe du recours à des opérateurs
36 privés pour la réalisation de la composante du troisième projet portuaire. Est-ce exact ?

37 **M. Camara**.- Oui.

38 **Me Fischer**.- Ce que vous nous avez confirmé. C'est bien cela ?

39 **M. Camara**.- Oui.

40 **Me Fischer**.- Vous nous indiquez qu'il a été convenu qu'un appel d'offres serait lancé
41 et que le PAC établirait le cahier des charges.

42 Lorsque vous dites *« il a été convenu »*, est-ce, dans votre esprit, une décision du
43 Conseil des ministres ou une décision interne au PAC ? C'est le terme « convenu »
44 que j'aurais souhaité que vous précisiez.

1 **M. Camara.**- Oui. Le Conseil des ministres a décidé que le Port autonome de Conakry
2 préparerait les documents d'appel d'offres pour la mise en concession du terminal à
3 conteneurs.

4 **Me Fischer.**- Cette décision du Conseil des ministres faisait suite à votre visite, comme
5 vous l'avez expliqué. J'imagine que vous n'étiez pas seul quand vous avez visité les
6 ports de Téma, d'Abidjan et de Dakar. Qui participait à ces visites ?

7 **M. Camara.**- Ces visites se situent en octobre 2007, si je me rappelle bien. En
8 octobre 2007.

9 Il y avait le directeur général du port, à l'époque c'était (M. Kabasin Kéta ?). Il y avait le
10 directeur de l'audit et du contrôle de gestion et le directeur de l'exploitation aussi, je
11 crois.

12 L'objet de cette visite, de cette tournée que nous avons effectuée dans les ports,
13 notamment dans les ports d'Abidjan, de Téma au Ghana et de Dakar, était de nous
14 enquérir de l'expérience de ces ports en matière de financement des projets
15 portuaires.

16 À Dakar, tout comme à Abidjan, tout comme à Téma au Ghana, on s'est rendu compte
17 que le retard de près de dix ans que l'on avait accusé était dû au fait que l'on était
18 passé par des négociations avec des bailleurs de fonds traditionnels. On s'est rendu
19 compte qu'il y avait une possibilité d'assurer le financement des infrastructures
20 portuaires sans forcément recourir aux bailleurs de fonds institutionnels.

21 C'est la raison pour laquelle nous avons proposé que le Conseil des ministres accepte
22 que le port de Conakry s'engage dans le partenariat public / privé comme l'avaient fait
23 les ports concurrents que je viens de citer.

24 **Me Fischer.**- Vous nous avez dit que votre visite... Vous n'avez pas tout à fait répondu
25 à la question, à savoir quels étaient les membres de la commission, mais j'ai compris
26 qu'il y avait le directeur général à l'époque. Vous nous avez dit que c'était en
27 octobre 2007.

28 Comment, à la suite de cette visite d'octobre 2007, avez-vous pu faire un rapport au
29 gouvernement en août 2007, comme vous l'écrivez au paragraphe 8 de votre
30 témoignage ?

31 **M. Camara.**- J'ai dit qu'en août…

32 **Me Fischer.**- Relisez peut-être la fin de votre paragraphe 8. Vous dites, à la fin : *« À
33 l'issue de notre mission, nous avons transmis en août 2007 »*. Or, vous nous avez dit
34 avoir fait cette mission en octobre 2007. À l'issue, on se retrouve en août 2007…
35 Pourriez-vous préciser cela ? Il y a peut-être une...

36 **M. Camara.**- Une coquille s'est peut-être glissée quelque part. De toute façon, c'est à
37 l'issue de cette visite dans les ports que la lettre a été adressée.

38 **Me Fischer.**- C'est donc une petite erreur.

39 **M. Camara.**- Oui.

40 **Me Fischer.**- C'est tout à fait normal.

41 Savez-vous si ce rapport au gouvernement a été produit dans le cadre de la procédure
42 d'arbitrage ?

43 **M. Camara.**- Je ne sais pas si cela a été adressé dans le dossier. Peut-être que les
44 avocats de la Guinée pourront le dire ?

45 Ce qui est important, c'est que ce rapport nous a amenés à nous présenter devant le
46 gouvernement pendant trois sessions. Nous intervenions en Conseil des ministres pour
47 soutenir notre nouvelle mission en matière de financement des projets portuaires.

1 À l'issue de la troisième intervention, le gouvernement a demandé que le port fasse un
2 état comparatif des avantages liés à la mise en concession, au financement des
3 infrastructures portuaires avec les bailleurs de fonds institutionnels ou avec le
4 partenariat public-privé.

5 C'est sur la base de l'examen de ces avantages comparatifs que, finalement, le
6 13 février, le gouvernement a pris la décision d'autoriser le Port à s'orienter vers le
7 partenariat public-privé.

8 **Me Fischer.**- Avez-vous préconisé que cette mise en concession dans le cadre d'un
9 partenariat public-privé fasse l'objet d'un appel d'offres ou avez-vous préconisé un
10 autre système ?

11 **M. Camara.**- Non, non, non. Je vous ai dit que l'objet de notre mission, au-delà de ce
12 que nous avons vu, était de nous informer auprès des autres collègues. On s'est dit
13 qu'il ne fallait pas faire cela de gré à gré, mais faire un appel d'offres de manière à
14 procéder à une sélection d'opérateurs capables de nous accompagner.

15 **Me Fischer**.- Savez-vous pour quelles raisons, postérieurement à la préconisation du
16 Port, au rapport que vous nous dites être de 2007, le gouvernement guinéen a tenté de
17 procéder par un marché de gré à gré ?

18 **M. Camara**.- Moi, je n'ai pas été au courant de cela. Un marché de gré à gré ?

19 **Me Fischer.**- Vous n'avez pas été informé qu'il y avait un projet de convention de
20 concession avec le Groupe Bolloré dans le cadre d'un marché de gré à gré ?

21 **M. Camara.**- Non, cela n'a jamais été... En tout cas, le Port n'a jamais été saisi. On ne
22 nous en a jamais parlé.

23 **Me Fischer.**- Le Port n'a jamais été... Est-ce que vous confirmez ?

24 **M. Camara.**- Je maintiens : la décision du Conseil des ministres date du
25 13 février 2008. Je suis ferme là-dessus.

26 **Me Fischer.**- Mais après cela, est-ce que vous savez s'il y a eu des discussions avec
27 le Groupe Bolloré, ou avec d'autres groupes d'ailleurs, pour mettre en concession le
28 terminal à conteneurs de Conakry ? Savez-vous si ces discussions ont eu lieu dans le
29 cadre d'un marché de gré à gré ?

30 **M. Camara.**- Non, non. Personnellement, je ne suis pas au courant de cela.

31 **M. le Président.**- Finalement, vous avez posé deux questions. Séparez-les que l'on
32 sache à quoi s'applique le « non ».

33 **Me Fischer.**- Avez-vous préconisé, à une date sur laquelle nous reviendrons peut-être
34 d'ailleurs, d'une part, la mise en concession du terminal à conteneurs ?

35 **M. Camara.**- Oui.

36 **Me Fischer.**- Et, d'autre part, aux fins de cette mise en concession, la réalisation d'un
37 appel d'offres ?

38 **M. Camara.**- Oui.

39 **Me Fischer.**- C'est bien cela ?

40 **M. Camara.**- Oui : la mise en concession du terminal à conteneurs, son extension et
41 son exploitation, puis le lancement d'un appel d'offres. Ce sont ces instructions, à
42 l'époque, que nous avions reçues du Conseil des ministres.

43 **Me Fischer**.- Ce sont des instructions du Conseil des ministres ou des
44 préconisations ?

1   **M. Camara**.- C'est la décision prise par le Conseil des ministres. Le Port avait la
2   responsabilité de la mettre en œuvre.

3   **Me Fischer**.- Cette décision a-t-elle été prise à la suite de votre rapport ?

4   **M. Camara**.- Je le maintiens : je dis que c'est à l'issue de notre mission que l'on a
5   déposé un rapport au Conseil des ministres. Ce dernier s'est retrouvé et a pris la
6   décision.

7   Je le maintiens parce qu'il m'a été donné de faire une communication au Conseil des
8   ministres pour qu'il y ait ce changement d'orientation dans le financement des
9   infrastructures portuaires.

10  À l'époque, c'était osé parce que, si vous me le permettez, Monsieur le Président, on…
11  Au Port de Conakry, nous avons bénéficié de l'accompagnement de la KfW de
12  l'Allemagne, qui nous a accompagnés sur ce projet du Port de Conakry depuis 1981.
13  Ils ont participé au financement des infrastructures du port de Conakry pour le premier,
14  le deuxième et même le troisième projet.

15  Il fallait renoncer à tous ces dispositifs pour nous orienter vers le secteur privé. Le
16  Gouvernement nous a dit : « Attention, si vous vous orientez vers le secteur privé,
17  allez-vous maintenir la collaboration avec l'Allemagne, la coopération avec l'Allemagne
18  qui vous a toujours accompagnés ? » Nous avons dit que c'était un choix à faire.

19  L'Allemagne, dans sa coopération avec le Port, nous accompagne dans le financement
20  et la réalisation des volets qui n'ont pas une incidence directe sur l'activité de
21  production. Ce sont des activités annexes, donc nous négocierons avec l'Allemagne,
22  ils nous comprendront parce qu'ils ont été des partenaires.

23  C'était une décision très difficile à prendre, mais nous avons réussi à convaincre le
24  Gouvernement et finalement la décision a été prise. Je le maintiens, en disant que
25  c'est à l'issue de notre tournée dans les ports africains que le Gouvernement a pris la
26  décision autorisant le Port de Conakry à s'engager dans le cadre d'un partenariat
27  public-privé. Je suis ferme là-dessus parce que c'est une initiative. C'était un courage
28  dans lequel il fallait s'engager. Moi, j'ai la conviction que le développement du port de
29  Conakry partait de là. C'était une conviction, on assume cela parce que c'était
30  incontournable.

31  **M. le Président**.- Monsieur Camara, vos explications sont très intéressantes mais la
32  question était : est-ce que la décision du Conseil des ministres a été prise à la suite de
33  votre rapport ? Ce que vous nous dites signifie que la réponse est : oui.

34  **M. Camara**.- Oui, Monsieur le Président.

35  **M. le Président**.- Merci, poursuivez.

36  **Me Fischer**.- Est-ce que vous avez été informé qu'il y avait ou qu'il y avait eu des
37  discussions dans le cadre d'un projet de marché de gré à gré pour mettre en
38  concession le terminal ? Quand je dis « le terminal », c'est le projet dont vous avez
39  parlé.

40  **M. Camara**.- Non. Je vous ai dit que je n'étais pas informé de cela. On n'a pas été
41  saisi de cette démarche.

42  **Me Fischer**.- Dans votre attestation, vous dites que le Conseil des ministres, à la suite
43  de votre rapport de visite dans les ports que vous nous avez indiqué être en 2007...
44  J'attire simplement l'attention sur le fait que la pièce R-54 fait état d'une visite dans les
45  ports de Téma, d'Abidjan et de Dakar en août 2006. Maintenez-vous 2007 ?

46  **M. Camara**.- C'est 2007.

47  **Me Fischer**.- Ce qui a une certaine logique chronologique. Il doit donc y avoir une
48  coquille.

1 **M. Camara**.- C'est clair, c'est en 2007.

2 **Me Fischer.-** Donc, si je comprends bien, le Conseil des ministres, sur votre
3 suggestion, vous demande de faire un appel d'offres et d'établir un cahier des charges
4 en vue de cet appel d'offres.

5 **M. Camara**.- Oui.

6 **Me Fischer.-** Avez-vous participé à la rédaction de ce cahier des charges ?

7 **M. Camara**.- Nous avons mis au Port une commission en place, nous avions un chef
8 de projet. Dans le cadre d'une commission que nous avons mise en place, on a
9 demandé d'établir le cahier des charges. Ce qui est important, c'est que l'équipe de
10 direction a donné les grandes orientations qui devaient être contenues dans ce cahier
11 des charges.

12 Je reprends en disant que l'extension du terminal à conteneurs devait être l'élément clé
13 de la composante. Nous avions dit également que dans ce dossier d'appel d'offres,
14 qu'il fallait élaborer, il fallait tenir compte d'une préoccupation du Port de Conakry, à
15 savoir faire en sorte que l'on puisse gagner une large part de marché dans les pays
16 enclavés. Je ne sais pas si vous avez une idée de la position géographique de mon
17 pays, nous sommes à 850 kilomètres de Bamako, capitale du Mali, qui est un pays
18 enclavé. Notre volonté, à 850 kilomètres de Bamako, capitale de la République du
19 Mali, pays enclavé, c'est de nous permettre de nous positionner durablement dans la
20 conquête du marché de ce pays.

21 Voilà les éléments-clés dont nous avons demandé à la commission de tenir compte.

22 **Me Fischer.-** Qui était le chef de projet ?

23 **M Camara**.- C'était le directeur des services techniques à l'époque.

24 **Me Fischer.-** C'était le directeur des services techniques. Qui était-ce à l'époque ?

25 **M. Camara**.- C'était M. Camara.

26 **Me Fischer**.- Pourriez-vous préciser son prénom ?

27 **M. Camara**.- M. Morlaye Camara.

28 **Me Fischer**.- M. Morlaye Camara est-il toujours directeur des services techniques ?

29 **M. Camara**.- Oui.

30 **Me Fischer.-** Est-ce bien lui qui est présent...

31 **Me Jaeger**.- Je me permets de préciser qu'il est présent dans cette salle au cas où
32 vous ne le sauriez pas.

33 **Me Fischer.-** Je l'avais compris. C'était lui le chef de projet ?

34 **M. Camara**.- Voilà.

35 **Me Fischer.-** Le règlement a donc été établi collectivement par le Port autonome, on
36 peut...

37 **M. Camara**.- Oui. La commission travaille au nom du Port. Quand la commission
38 travaille, elle vient soumettre le document en Conseil de direction qui l'examine et
39 donne les orientations. S'il y a des corrections à apporter, nous les apportons, mais
40 une fois que c'est produit, c'est fait au nom du Port.

41 **Me Fischer.-** Est-ce que vous avez souhaité que cette commission se fasse assister
42 de personnes extérieures au Port : des conseils techniques, des conseils financiers ou
43 des conseils juridiques ?

1   **M. Camara**.- Cette question que vous posez me paraît très importante dans la
2   conduite de ce troisième projet. Lorsque la décision a été prise, il y avait deux faits qu'il
3   fallait mettre en parallèle, d'abord l'urgence de corriger...

4   **M. le Président**.- Excusez-moi, Monsieur Camara, je suis à l'égard des parties
5   présentes un peu responsable de la gestion du temps. À chaque question qui vous est
6   posée, vous nous donnez beaucoup de développements, sans doute intéressants mais
7   qui ne sont pas la réponse à la question. S'il vous plaît, commencez par répondre à la
8   question. La question était -vous me corrigez, Maître Fischer, si je me trompe : est-ce
9   que la commission s'est adjoint des services extérieurs de conseils juridiques, fiscaux,
10  techniques ou financiers ?

11  **M. Camara**.- Non, nous n'avons pas eu le temps de le faire. L'autorité n'a pas cru
12  devoir permettre de le faire.

13  **Me Fischer.-** Est-ce une question de temps ou une question de décision ?

14  **M. Camara**.- C'est du point de vue de l'autorité. Nous avions toujours demandé à être
15  assistés, mais c'est le département des transports qui a pris la décision, il a dit que
16  cela allait nous retarder. Cela n'a pas été fait.

17  **Me Fischer.-** Vous estimiez que vous n'étiez pas assez capables ?

18  **M. Camara**.- J'avoue que nous n'avions pas toute l'expérience requise en la matière.
19  C'était la première fois que nous nous engagions dans une telle décision. Ceci a
20  affecté sérieusement le déroulement de la suite du travail que nous avions engagé.

21  **Me Fischer.-** C'est-à-dire ?

22  **M. Camara**.- C'est-à-dire que si vous n'avez pas l'expertise qu'il faut, il est possible de
23  commettre des erreurs, surtout que c'était la première fois que nous nous engagions.

24  **Me Fischer**.- Vous estimez que le Port autonome de Conakry a commis des erreurs ?

25  **M. Camara**.- Si c'est comme cela qu'il faut appeler « erreur », je considère que c'était
26  des erreurs. Il fallait que nous soyons assistés comme Dakar et Abidjan l'ont fait.

27  **Me Fischer.-** Le Port de Conakry n'a jamais été assisté de conseils ?

28  **M. Camara**.- Pas dans la dimension que nous voulions parce que nous aurions voulu
29  être accompagnés du début à la fin. C'était de manière ponctuelle que nous faisions
30  venir des personnes pour leur demander leur avis sur tel ou tel aspect. C'est différent
31  que de remettre un document à un cabinet qui l'étudie et vous donne ses observations.

32  **Me Fischer.-** Quand vous l'avez souhaité, vous avez pu de façon ponctuelle avoir
33  accès à des conseils extérieurs ?

34  **M. Camara**.- Quelquefois, oui.

35  **Me Fischer**.- Il n'y a pas eu d'opposition du Ministère à ce que vous recouriez à des
36  conseils extérieurs ?

37  **M. Camara**.- Cela, c'était dans le cadre de l'évaluation des offres. La commission a
38  buté face à l'examen d'un cas, je crois qu'ils ont demandé que le cabinet Lackner
39  vienne donner des informations sur un point précis. Après, il s'est retiré.

40  **M. le Président**.- Quel cabinet ?

41  **M. Camara**.- Le cabinet Lackner.

42  **Me Fischer.-** Inros Lackner. Cela signifie que le cabinet Inros Lackner était
43  ponctuellement conseil du Port ?

44  **M. Camara**.- Oui, le cabinet Lackner a travaillé avec le Port pour le premier, le
45  deuxième et le troisième projets.

1 **Me Fischer.-** Dans le cadre de la présélection des offres, est-ce que vous avez vous-
2 même participé à cette phase ?

3 **M. Camara**.- Au niveau de la présélection, je n'ai pas participé parce que la
4 commission qui a été mise en place était présidée par le directeur de projet, ils ont fait
5 ce travail de présélection, puis ils ont rendu compte à la Direction générale du Port.

6 **Me Fischer.-** Tout le travail de présélection a donc été fait par M. Morlaye Camara ?

7 **M. Camara**.- C'est cela.

8 **Me Fischer.-** À qui a-t-il rendu compte ?

9 **M. Camara**.- À la direction du Port, à l'équipe de direction du Port.

10 **Me Fischer**.- Et faites-vous partie de l'équipe de direction du Port ?

11 **M. Camara**.- Oui, comme je l'ai dit tout à l'heure.

12 **Me Fischer**.- Donc il a rendu compte à l'équipe dont vous étiez membre, et c'est cette
13 équipe qui a pris la décision sur la présélection ?

14 **M. Camara**.- Oui, après avoir recueilli l'avis du ministre à l'époque. Puis, on a pris la
15 décision.

16 **Me Fischer**.- La décision de présélection émane donc bien de la direction du port dont
17 vous faites partie ?

18 **M. Camara**.- C'est cela.

19 **Me Fischer**.- Est-ce que l'on peut dire que vous avez participé à cette décision de
20 présélection ?

21 **M. Camara**.- Oui, j'ai participé.

22 **Me Fischer**.- Est-ce que vous étiez d'accord ? J'imagine —j'ose à peine vous poser la
23 question— que vous avez étudié les dossiers qui vous étaient... ou vous avez étudié
24 l'analyse qui vous était présentée ?

25 **M. Camara**.- On était d'accord parce que les critères d'expérience, de compétence, de
26 crédibilité, de capacité financière, des propositions solides qui étaient contenues
27 étaient… on a estimé que c'était normal. Voilà. On en a tenu compte.

28 **Me Fischer**.- Est-ce que vous pourriez prendre, dans le document qui vous a été
29 remis, qui est à votre gauche, la pièce 38 qui est à l'onglet n° 4 ? Vous avez des
30 onglets dans ce document. À l'onglet n° 4, il y a la pièce C 38 qui a été communiquée
31 dans la procédure, qui est la réponse de la société Getma International dans le cadre
32 de l'appel à manifestation d'intérêt.

33 **M. Camara**.- C 38 ?

34 **Me Fischer**.- C 38, oui, onglet n° 4.

35 **M. Camara**.- « Examen du projet de convention soumise par le Groupe », oui.

36 **Me Fischer**.- C'est après. L'intercalaire est avant la pièce. Est-ce que vous avez déjà
37 vu ce document ?

38 **M. Camara**.- Oui, oui.

39 **Me Fischer**.- Vous vous souvenez de ce que c'est ?

40 **M. Camara**.- Oui. On l'a vu. J'ai vu le document.

41 **Me Fischer**.- Qu'expose ce document ? Qu'est-ce qu'il...

42 **M. Camara**.- Ce document indique d'abord les relations de Getma International dans le
43 secteur maritime, ses prétentions, ses activités dans les ports de Dakar, et puis à

1 Bamako, au Mali, ensuite en Mauritanie, voire en Algérie. Ce qui nous a beaucoup
2 intéressés dans cela, c'est sa vocation de s'implanter à Bamako pour pouvoir accélérer
3 la liaison entre le port et Bamako.

4 **Me Fischer**.- Dans ce document, page 11, il est indiqué que Getma International peut
5 compter sur l'expertise de différents cabinets ou sociétés, notamment du bureau
6 d'études Inros Lackner.

7 **M. Camara**.- Oui.

8 **Me Fischer**.- Est-ce que le fait que Getma indique dans ce document, cette lettre
9 destinée à être admise à la soumission ? qu'elle allait travailler avec Inros Lackner
10 vous a posé une question ?

11 **M. Camara**.- Je crois ici que c'est sur le plan des études que Getma a décidé de
12 s'appuyer sur Getma International dans le cadre des études parce que Getma
13 International… enfin, Bolloré *(… inaudible)* ... Inros Lackner, je le disais tout à l'heure,
14 a travaillé depuis 80 au niveau du port de Conakry, donc ils ont estimé qu'il a une
15 connaissance approfondie dans les travaux au niveau du port.

16 **Me Fischer**.- Est-ce que vous pourriez répondre à la question que j'ai posée ?

17 **M. Camara**.- Cela ne nous a pas posé de question.

18 **Me Fischer**.- Cela ne vous a pas posé de problème, et c'était clairement indiqué.

19 **M. Camara**.- Oui, voilà.

20 **Me Fischer**.- Dans ce document, dans la description, est-ce que Getma International
21 se prévaut des capacités de la société MSC ?

22 **M. Camara**.- Ah oui ! À l'appui de ce document, il y a la correspondance du 5 mars, où
23 MSC et Getma International ont évoqué un partenariat. C'est d'ailleurs l'une des
24 raisons pour lesquelles je suis convaincu qu'il a été présélectionné. C'est cela.

25 **Me Fischer**.- Vous pensez que cette lettre a été plus importante que le Mali ?

26 **M. Camara**.- Pas plus importante que le Mali, mais cela nous rassurait que le
27 partenariat que Getma International a évoqué nous permettait franchement de gagner
28 le trafic malien.

29 **Me Fischer**.- Dans votre attestation, vous avez suggéré que vous aviez le sentiment
30 que Getma International soumissionnait avec MSC. Est-ce que la lecture de cette lettre
31 pouvait le laisser penser ?

32 **M. Camara**.- Oui, dans notre compréhension puisqu'à l'évaluation de l'offre... Il y a
33 aussi des documents où ils ont parlé de...

34 **Me Fischer**.- Je me permets de... Nous sommes au stade de la présélection, pas du
35 tout au stade des offres. Ma question porte exclusivement sur la phase de
36 présélection.

37 Au vu de cette lettre, vous nous avez dit que cette lettre comporte une annexe, ce qui
38 est exact, que cette annexe est une lettre de la société MSC — c'est exact —, et que
39 cette lettre avait eu une importance dans la présélection car vous en aviez tiré les
40 conséquences d'un partenariat.

41 **M. Camara**.- Oui, absolument.

42 **Me Fischer**.- Vous avez admis comme étant autorisé —votre commission—, la
43 commission à laquelle vous appartenez a retenu comme étant habilitée à
44 soumissionner la société Getma, et Getma seule.

45 **M. Camara**.- Vous pouvez reprendre la question, s'il vous plaît ?

1    **Me Fischer**.- La commission à laquelle vous participiez, qui a donc examiné les
2    dossiers et examiné la lettre d'intention de la société Getma International à laquelle
3    était annexée la lettre du 5 mars de la société MSC, a autorisé la société Getma
4    International et la société Getma International seule à soumissionner.

5    **M. Camara**.- Dans la compréhension de la commission, Getma International
6    soumissionnait dans le cadre de son partenariat avec MSC. Cela, c'était la conviction
7    de la commission au vu de cette correspondance.

8    **Me Fischer**.- Donc c'est non seulement Getma International, mais également MSC
9    que la commission a autorisé à soumissionner.

10   **M. Camara**.- On a autorisé... La soumission a été autorisée pour Getma International,
11   qui était en partenariat avec MSC.

12   **Me Fischer**.- Oui mais vous savez — sauf erreur, je pense que c'est l'article 4 du
13   Règlement— que dès lors qu'on a été autorisé à soumissionner, on ne peut plus
14   modifier par la suite le soumissionnaire.

15   **Me Jaeger**.- Je vous propose à ce moment-là de soumettre l'article 4 au témoin.

16   **M**. **le Président**.- Oui.

17   **Me Fischer**.- Cela a été rajouté au dernier moment, c'est pourquoi je ne l'ai pas. C'est
18   la pièce R 16, le Règlement de la consultation. Je vous propose d'aller à l'article 4. Elle
19   n'est pas dans le *bundle*. Elle est en dessous. C'est la page 4. C'est donc le
20   Règlement et vous nous avez indiqué que vous avez participé à la rédaction de ce
21   document. Est-ce que vous pourriez lire le premier alinéa de l'article 4 ?

22   **M. Camara**.- Article 4 : « Modalités de participation à la consultation. La présente
23   consultation est réservée aux candidats sélectionnés suite à l'appel à manifestation
24   d'intérêt. Le terme "soumissionnaire" utilisé ci-après s'applique strictement aux
25   candidats sélectionnés ».

26   **Me Fischer**.- Est-ce que vous considérez qu'à la suite de la phase d'appel à
27   manifestation d'intérêt, Getma International était un candidat strictement sélectionné ?

28   **M. Camara**.- Oui, il était sélectionné.

29   **Me Fischer**.- Est-ce qu'en vertu de cet article 4, il était possible de soumissionner dans
30   le cadre d'un groupement d'entreprises ?

31   **M. Camara**.- Ah oui, nous... C'était possible. C'était possible. Là, on en a tenu compte
32   parce que Getma International à lui seul ne pouvait pas, de notre point de vue, être
33   retenu. C'est la présence de MSC qui a conféré une certaine crédibilité à sa
34   candidature.

35   **Me Fischer**.- Vous estimez donc que l'entité autorisée à soumissionner n'était pas
36   strictement Getma International, mais Getma International et MSC ?

37   **M. Camara**.- MSC, c'est cela.

38   **Me Fischer**.- Pour vous, c'est extrêmement clair ?

39   **M. Camara**.- Oui.

40   **Me Teynier**.- Pardonnez-moi, Maître.

41   La lettre du 5 mars 2008, vous l'avez sous les yeux... Le dernier paragraphe de cette
42   lettre donc de MSC à Getma International précise la chose suivante : « Nous vous
43   autorisons à faire mention dans vos offres finales et présenter MSC comme partenaire
44   conjoint et solidaire de Getma International conformément aux termes du Règlement
45   de consultation ».

1   Est-ce que, vous, vous êtes informé... Vous étiez informé, car ce passage a été biffé,
2   puisque là, dans le document que nous avons, cette mention est rayée...

3   **M. Camara.-** Non, on n'a pas été informés.

4   **Me Teynier**.- N'avez-vous pas été surpris de voir, effectivement, soumissionner Getma
5   International seule alors que cette lettre de MSC autorisait Getma à soumissionner
6   dans le cadre d'un groupement conformément à l'article 4 du Règlement de la
7   consultation ?

8   **M. Camara.-** C'est par la suite que l'on a compris que MSC s'est présentée seule dans
9   la réalisation du projet mais, dans notre esprit, Getma et MSC allaient s'engager
10  communément dans le cadre de leur partenariat pour faire le travail.

11  **M. le Président**.- Excusez-moi, je peux comprendre, quand on n'a pas l'expérience de
12  ce type d'instrument juridique, que l'on puisse parfois tirer des conclusions pas
13  certaines, mais dans l'article 4 que vous avez sous les yeux, il y a un alinéa 2. Est-ce
14  que vous pouvez avoir la courtoisie de le lire pour le *transcript* ?

15  **M. Camara.-** « Il reste entendu qu'aucun regroupement entre les candidats
16  sélectionnés suite à l'appel à manifestation d'intérêt n'est désormais autorisé. »

17  **M. le Président**.- Et malgré cela, vous avez pensé que Getma n'agissait pas seule
18  mais avec MSC ?

19  **M. Camara.-** Oui, Monsieur le Président.

20  **M. le Président**.- Merci. Poursuivez.

21  **Me Fischer**.- Vous aviez donc la conviction que le dossier d'appel d'offres cette fois-ci,
22  puisque, là, nous n'étions que dans la lettre de manifestation d'intérêt, que le dossier
23  d'appel d'offres était déposé au nom, j'allais dire qu'elle était déposée conjointement
24  par Getma International et MSC.

25  **M.·le Président.-** Oui. Oui.

26  **Me Fischer.-** Vous aviez donc conscience que les informations contenues dans ce
27  dossier d'appel d'offres concernaient et Getma et MSC.

28  **M. Camara.-** Absolument.

29  **Me Fischer.-** Il n'y avait pour vous aucune ambiguïté là-dessus ?

30  **M. Camara.-** Non.

31  **Me Fischer.-** Il était très clair que les données ne concernaient pas exclusivement
32  Getma International.

33  **M. Camara.-** Non. Pour nous, les propositions qui sont faites, les propositions de
34  financement tout autour, c'est Getma International avec MSC.

35  **Me Fischer**.- Pour vous, c'est très clair.

36  **M. Camara.-** C'est ça.

37  **Me Fischer**.- Je reviens un peu en arrière. Dans le Mémoire en duplique, la
38  République de guinée indique -c'est un point factuel-, au paragraphe 50, page 16, mais
39  vous ne devez pas avoir le Mémoire, que « sur les neuf candidats ayant répondu à
40  l'appel à manifestation d'intérêt, quatre ont été amenés à présenter une offre : Maersk
41  APM Terminals, Afrimarine, groupe maritime TCB Bolloré et Getma International ».
42  Est-ce que cette information est exacte ?

43  **M. Camara.-** Oui.

44  **Me Fischer.-** Elle est exacte ?

1   **M. Camara.-** Oui.

2   **M. le Président**.- Quelle est la date du Mémoire ?

3   **Me Fischer**.- Le Mémoire en duplique est du 24 mars 2013.

4   Cette information est exacte. Il est donc bien exact de dire que c'est Getma
5   International qui a été amenée à présenter une offre notamment ?

6   **M. Camara.-** Oui.

7   **Me Fischer**.- Dans votre attestation, au paragraphe 12, vous dites que 13 entreprises
8   ou groupements ont répondu à la manifestation d'intérêt. C'est 13 ou 9 ?

9   **M. Camara.-** Je pense que c'est 13... C'est 13.

10  **Me Fischer**.- Vous revenez donc sur votre déclaration selon laquelle le Mémoire en
11  duplique de la République de Guinée est exact ?

12  **M. Camara.-** Oui, c'est 13 entreprises.

13  **Me Fischer**.- C'est 13 entreprises ? Vous avez la certitude ?

14  **M. Camara.-** C'est 13 entreprises.

15  **Me Fischer**.- Vous avez la certitude ?

16  **M. Camara.-** En tout cas, si je me trompe, je maintiens.

17  **Me Fischer**.- Vous maintenez ce que vous avez écrit ?

18  **M. Camara.-** Oui.

19  **Me Fischer**.- Concernant l'appel d'offres, quel a été le champ de votre participation ?
20  Quelle a été votre action ?

21  **M. Camara.-** Dans l'appel d'offres ?

22  **Me Fischer**.- Dans l'appel d'offres. Nous avons terminé la phase de présélection. Vous
23  nous avez dit que la commission à laquelle vous appartenez avait présélectionné
24  Getma International et MSC dans le cadre d'un partenariat.

25  **M. Camara.-** Oui.

26  **Me Fischer**.- Après la présélection, il y a des remises d'appel d'offres, des dossiers
27  d'appels d'offres qui vont être reçus. Quelle a été votre participation à cette phase ?

28  **M. Camara.-** Ma participation à cette phase, c'est de veiller à ce que la distribution des
29  documents, puis les règles qui s'imposent en la matière, soient respectées au niveau
30  de la commission qu'on a mise en place à cet effet.

31  **M. Camara.-** Vous étiez en quelque sorte en charge du bon fonctionnement ?

32  **M. Camara.-** Je veillais à ce que tout soit dans les règles parce qu'on avait des
33  exigences vis-à-vis du gouvernement. Il fallait rendre compte.

34  **Me Fischer**.- Vous vous êtes personnellement assuré que le fonctionnement était dans
35  les règles ?

36  **M. Camara.-** Dans ma compréhension, oui, c'est cela.

37  **Me Fischer**.- Est-ce que vous considérez que vous avez eu une participation active ?

38  **M. Camara.-** J'avoue que... en tout cas, j'ai assumé mes responsabilités en la matière
39  parce que je voulais que le projet réussisse.

40  **Me Fischer**.- Est-ce que vous avez été membre de la commission qui a évalué les
41  offres ?

42  **M. Camara.-** Oui, j'étais membre de la Commission d'évaluation.

1 **Me Fischer.**- Est-ce qu'il y avait d'autres membres du Port autonome de Conakry ?

2 **M. Camara.-** Oui, le directeur des services techniques, le chef de projet, nous étions
3 les deux dans la commission. Maintenant, il y avait d'autres présents dans différents
4 départements ministériels.

5 **Me Fischer.**- Est-ce que vous estimez que le Port autonome était représenté à un
6 niveau hiérarchiquement assez élevé ?

7 **M. Camara.-** Bon, on n'était pas suffisamment représenté parce qu'on n'était que deux.
8 Nous, notre souhait aurait été que la participation du Port soit beaucoup plus élargie
9 mais, puisque ce n'est pas le directeur général du Port a mis la commission en
10 place, c'est un arrêté du ministre qui a mis la commission en place, nous étions obligés
11 de nous contenter de cela.

12 **Me Fischer.**- La décision de composer la commission a donc été une décision
13 ministérielle ?

14 **M. Camara.-** C'est un arrêté du ministre.

15 **Me Fischer**.- C'est un arrêté du ministre. Est-ce que le directeur du Port a émis une
16 remarque, une protestation ?

17 **M. Camara.-** Oui, il avait attiré l'attention du Conseil des ministres en disant que son
18 souhait aurait été une participation du Port beaucoup plus élargie.

19 **M. le Président.**- Parce que l'arrêté du ministre fixait les noms des membres ?

20 **M. Camara.-** Oui. Il y avait les membres et les fonctions.

21 **Me Fischer.**- Il y avait combien de personnes dans cette commission ?

22 **M. Camara.-** Treize.

23 **Me Fischer.**- Nous en étions donc à l'arrêté ministériel qui fixe la composition de la
24 composition. Le Port regrette de n'avoir que 2 membres parmi 13 membres.

25 **M. Camara.-** Oui.

26 **Me Fischer.**- Vous nous avez dit, si j'ai bien compris, qu'il y avait eu une remarque,
27 une protestation ou... Oui ?

28 **M. Camara.-** Oui, je disais qu'à la publication de la liste, le directeur général avait
29 rencontré le ministre pour émettre un avis en disant qu'il aurait souhaité que le port soit
30 suffisamment représenté. Parce que, dans ce genre de négociations, il y a des
31 compétences dans tous les domaines : la fiscalité, les finances...

32 **Me Fischer.**- Vous semble-t-il normal, dans le fonctionnement administratif de la
33 République de Guinée, que lorsqu'un fonctionnaire d'autorité n'est pas tout à fait
34 satisfait, il formule une remarque et s'en plaigne, ou du moins fasse une remarque,
35 comme vous venez de nous l'indiquer du directeur du Port au ministre ?

36 **M. Camara.-** Oui, il a exprimé son point de vue au ministre, je pense. En tout cas, chez
37 moi, quand il y a un acte qui est pris par une autorité, vous pouvez, dans le cadre de la
38 coopération et de la collaboration, exprimer votre point de vue.

39 **Me Fischer**.- Vous qui avez été préfet, si j'ai bien compris, vous considérez que dans
40 un fonctionnement administratif, c'est normal ? C'est peut-être même légitime ?

41 **M. Camara.-** Il faut recueillir l'avis des collaborateurs. Dans la décision que l'on prend,
42 c'est important.

43 **Me Fischer.**- Est-ce que vous pouvez vous reporter à la pièce R 52 qui est sous
44 l'onglet 19, qui est le rapport d'évaluation des offres ? Est-ce que vous pouvez vous

1 reporter aux pages 42 et 65, et je voudrais savoir si c'est bien vous et votre signature
2 qui figurent sur ces pages.

3 **M. Camara.-** Pages 42 et 55 ?

4 **Me Fischer**.- Oui, il y a deux pages.

5 **M. Camara.-** Oui, oui.

6 **Me Fischer**.- C'est bien vous. Est-ce que vous pouvez vous rapporter à l'avant-
7 dernière page, elle n'est paginée. C'est la séance d'ouverture des offres. Il y a une
8 photocopie. Il y a la liste des participants sous un n° 8. Est-ce votre signature ?

9 **M. Camara.-** Oui.

10 **Me Fischer**.- C'est bien vous ? Comme ce n'était pas très clair...

11 **M. Camara.-** Ce n'est pas clair, c'est la photocopie.

12 **Me Fischer**.- Ce n'est pas votre signature qui n'est pas claire, c'est la photocopie.

13 Vous étiez donc bien présent lors de la séance d'ouverture des offres ?

14 **M. Camara.-** Oui.

15 **Me Fischer**.- Avez-vous assisté au dépouillement des offres techniques ?

16 **M. Camara.-** Oui.

17 **Me Fischer**.- Vous avez souvenir quel jour était-ce ?

18 **M. Camara.-** J'avoue que je ne me rappelle pas du jour.

19 **Me Fischer**.- Si je vous dis le 31 juillet, est-ce que vous pensez que c'est quelque
20 chose comme cela ?

21 **M. Camara.-** Si c'est écrit dans le document, c'est cela !

22 **Me Fischer**.- Nous avons vu tout à l'heure que, quelquefois, des dates étaient écrites
23 et qu'il y avait des coquilles comme votre voyage en 2006 qui était en réalité en 2007.

24 **M. Camara.-** Oui, en 2007.

25 **Me Fischer**.- Est-ce que vous étiez présent lors du dépouillement des offres
26 financières ?

27 **M. Camara.-** Oui, j'étais présent.

28 **Me Fischer**.- Quel était votre rôle dans le cadre de cette commission précisément,
29 donc un parmi les treize ?

30 **M. Camara.-** La commission avait un président, qui était du ministère des Finances. Il y
31 avait un rapporteur qui était le représentant de l'Administration des grands projets.
32 Dans le fonctionnement de la commission, dès qu'un problème est posé, il fallait faire
33 une analyse d'une proposition dans le cadre de la soumission. Chacun examinait, se
34 prononçait et attribuait une note. C'est la moyenne des notes attribuées par chacun qui
35 faisait la note affectée au soumissionnaire.

36 **Me Fischer**.- Si je comprends bien, l'Administration des grands projets était également
37 présente dans cette commission ?

38 **M. Camara.-** Oui.

39 **Me Fischer**.- Aviez-vous un rôle particulier dans cette commission ou vous étiez… ?

40 **M. Camara.-** Non, je n'avais pas un rôle particulier parce que c'était de participer aux
41 débats, mais la décision de façon souveraine appartenait aux représentants des
42 départements ministériels, notamment le président de la commission qui était du

1  ministère des Finances. Je rappelle que le ministère des Finances est une autorité de
2  tutelle du Port en termes de financement.

3  **Me Fischer.**- La décision qui a été prise ou les décisions qui ont été prises, vous y
4  avez donc participé. Vous étiez d'accord avec celles-ci ?

5  **M. Camara.**- Oui, on est solidaire, sinon j'aurais démissionné.

6  **Me Fischer.**- Vous étiez donc d'accord. Vous n'avez pas eu, comme nous l'avons vu
7  tout à l'heure, à exprimer d'opinion dissidente ?

8  **M. Camara.**- Est-ce que c'est très responsable de le dire maintenant ? Je préfère me
9  réserver par rapport à ça parce que cela n'a pas de sens à partir du moment où le
10  document a été signé.

11  **Me Fischer**.- Sauf erreur, vous avez dit tout à l'heure que vous diriez toute la vérité.

12  **M. Camara.**- Oui mais ça, c'est dans le cadre de l'examen du dossier, mais je me dis
13  que, s'il y a des avis personnels que j'ai émis, ça… Je pense que cela n'a pas
14  d'importance pour le dire.

15  **Me Fischer**.- Comment s'exprimaient les opinions ?

16  **M. Camara.**- En réunion, chacun disait soit « je suis d'accord sur tel aspect » ou « je
17  ne suis pas d'accord sur tel aspect », puis sur la base de votre point de vue personnel,
18  vous affectez une note. Il y a un rapporteur qui était là, qui tenait le procès-verbal de la
19  réunion.

20  **Me Fischer.**- Est-ce qu'il y a un document dans lequel on exprime la position de
21  chacun ?

22  **M. Camara.**- Oui, mais, cela, c'était le travail du rapporteur.

23  **Me Fischer**.- C'est un document qui existe ?

24  **M. Camara.**- Je le pense, oui. C'est la synthèse de ce document qui fait le rapport de
25  la commission.

26  **Me Fischer**.- Est-ce que, dans ce document, dont je découvre aujourd'hui l'existence,
27  il y a trace de votre opinion personnelle ?

28  **M. Camara.**- Non, je ne pense pas que ce soit consigné dans ce document-là. Je ne
29  pense pas. Cela n'a pas été versé dans le document.

30  **Me Fischer**.- Vous nous avez dit que vous étiez donc d'accord, et vous avez même
31  employé un terme assez fort, « solidaire » avec la décision de la commission. Est-ce
32  que vous maintenez ce point de vue ?

33  **M. Camara.**- Oui, je le maintiens.

34  **Me Fischer.**- Lors de l'ouverture, il y a eu une réunion. Est-ce que vous pouvez vous
35  rapporter au début de cette pièce  52. Il y a le procès-verbal d'ouverture des plis. C'est
36  l'onglet 19. C'est toujours le même document.

37  **M. Camara.**- R 52 ?

38  **Me Fischer.**- C'est à l'onglet 19. C'est la pièce communiquée par la République de
39  Guinée sous le n° R 52. C'est le rapport d'évaluation des offres qui comporte en son
40  sein différents documents, qui est donc du 31 juillet. C'est de là que nous avons pu
41  tirer la conséquence de la date, l'indication de la date, et la confirmation de votre
42  présence.

43  Est-ce que vous pourriez lire la seconde page, le premier paragraphe, s'il vous plaît ?

44  **M. Camara.**- » Avant de lever la séance, le président de la commission a donné la
45  parole au représentant des soumissionnaires pour d'éventuels éclaircissements. Ils se

1  sont déclarés satisfaits du déroulement de la séance d'ouverture des plis. Aucune
2  question n'a été soulevée. Le président a invité les représentants des
3  soumissionnaires à se retirer. ».

4  **Me Fischer.-** Est-ce que, lors de cette séance, des questions ont pu être posées par le
5  président ou les membres de la commission aux soumissionnaires ?

6  **M. Camara.-** Bon, j'avoue que cela fait un bon moment et je ne peux pas me rappeler
7  de tout cela, mais... j'avoue que je ne me rappelle plus si, après, des questions avaient
8  été posées.

9  **Me Fischer.-** Votre équipe que vous avez interrogée pour la préparation de ce
10  témoignage n'avait pas non plus souvenir de ce qui s'est passé ?

11  **M. Camara.-** Personnellement, on n'en a pas parlé. Je ne me suis pas rappelé de ça.

12  **Me Fischer.-** Vous n'avez pas souvenir si cette indication est exacte ou pas ? Est-elle
13  plausible ?

14  **M. Camara.-** Oui, parce qu'après, personne n'a posé de questions. Cela va, c'est
15  plausible.

16  **Me Fischer**.- Est-ce que, si vous vous étiez interrogé sur le fait que le dossier d'appel
17  d'offres n'avait pas été déposé conjointement par Getma International et MSC, est-ce
18  que, à ce moment-là, vous auriez pu poser une question ?

19  **M. Camara.-** Je reprends en disant que, pour nous, tout ce qui avait été à ce niveau
20  concernait Getma International avec sous-entendu MSC, qui était son partenaire.

21  **M. le Président**.- Attendez. « Sous-entendu », je n'entends pas bien. Qu'est-ce que
22  vous entendez par « sous-entendu » ?

23  **M. Camara.-** C'est-à-dire que le document, l'offre, la proposition soumise par Getma
24  International, elle l'a fait dans le cadre de son partenariat avec MSC.

25  **M. le Président**.- Et quand vous vous êtes rendu compte que MSC n'était pas partie à
26  la concession ?

27  **M. Camara.-** Monsieur le Président, c'est au moment de la mise en oeuvre du projet,
28  quand le financement a traîné, qu'on a commencé à se poser des questions.

29  **M. le Président.-** Au moment de la signature de la Convention de concession, vous ne
30  vous êtes pas posé de questions ?

31  **M. Camara.-** J'avoue, peut-être que cela a été une faiblesse, mais on ne s'en est pas
32  rendu compte.

33  **M. le Président**.- Merci. Poursuivez maintenant.

34  **Me Fischer**.- Je reviens un tout petit peu… Mais les questions sont pertinentes à tous
35  les stades de la procédure.

36  Vous avez donc considéré au moment, d'une part, de l'ouverture des plis, qu'il n'y avait
37  pas de questions complémentaires à poser à la société Getma International qui était
38  présente, et vous avez considéré que les documents qui vous étaient remis
39  contenaient bien les références de MSC ?

40  **M. Camara.-** Oui.

41  **Me Fischer**.- Est-ce que, parmi les quatre soumissionnaires, vous aviez
42  personnellement une préférence ?

43  **M. Camara.-** J'avais, à titre personnel, une préférence, c'est Maersk parce que j'ai
44  visité le port de Hambourg, j'ai vu le travail fait par Maersk et j'ai posé la question au
45  directeur général du port de Hambourg. J'ai dit : « Mais comment cela se fait que

1   Maersk, quand vous lancez les appels d'offres, comment vous faites avec Maersk ? ».
2   Il a dit : « Non, quand Maersk est là, on n'a pas d'appel d'offres ». Puisqu'en Guinée,
3   Maersk avait 10 % du marché de la conteneurisation, ma préférence était Maersk.

4   **Me Fischer**.- Pendant ce témoignage, vous avez dit au paragraphe 18 que, finalement,
5   c'est Getma qui a été choisie. Ce terme « finalement » a-t-il une signification
6   particulière ?

7   **M. Camara.-** Oui parce que dans un travail de groupe, il y a toujours des discussions.
8   C'est sur la base des notes de synthèse que la décision est prise, sinon chacun des
9   membres de la commission a son opinion, son point de vue personnel, ses
10  préférences.

11  **Me Fischer**.- On est donc bien dans une interprétation littérale, à savoir à la fin du
12  processus. C'est bien ce que cela signifie ?

13  **M. Camara.-** Oui.

14  **M. le Président**.- Puisque nous sommes à la fin du processus, nous allons nous
15  arrêter quinze minutes, si cela vous va, principalement pour la sténotypie et
16  accessoirement pour ceux qui sont déjà debout.

17          *Suspendue à 11 heures 28, l'audience est reprise à 11 heures 47.*

18  **M. le Président**.- Je compte sur votre habileté pour que les questions soient posées
19  d'une manière qui fasse avancer.

20  **Me Fischer.-** Je vais essayer de rester amical, Monsieur le Président, et de ne pas
21  brusquer notre témoin à qui je demande de se replonger, si je puis dire, dans
22  l'article 13 de sa déclaration où il indique : « La présence de MCS apportait donc une
23  crédibilité à la candidature de Getma International qui lui a permis d'être sélectionnée à
24  ce stade. »

25  Je voulais demander au témoin : est-ce qu'à cette époque il était informé que MSC
26  détenait 49,98 % du capital social de Getma International ?

27  **M. Camara**.- Personnellement, je n'avais pas cette information mais j'étais convaincu
28  que Getma… MSC était important dans le secteur compte tenu de sa position de
29  premier ou deuxième, deuxième en Europe après Maersk. C'était donc suffisant pour
30  nous pour crédibiliser l'offre de Getma International.

31  **Me Fischer.-** C'est une information dont vous ne disposiez pas à l'époque. Maintenant
32  que vous en disposez, est-ce que vous pensez que la présence de MSC au capital de
33  Getma International était de nature à apporter de la crédibilité ?

34  **M. Camara**.- Oui.

35  **Me Fischer.-** Vous confirmez que la détention de près de la moitié du capital social de
36  Getma par MSC renforçait la crédibilité de Getma International.

37  **M. Camara**.- Absolument.

38  **Me Fischer.-** Vous avez analysé les offres et donc tous les dossiers lors de la
39  commission à laquelle vous participiez. Dans le dossier de Getma International, il y
40  avait un accord de partenariat entre Europe Terminal, filiale de MSC, et Getma
41  International. Je vous demande de vous reporter à la pièce C-172, sous l'onglet 11 du
42  document.

43  Ce document était-il bien dans le dossier d'appel d'offres de Getma International ? Est-
44  ce que vous le connaissez ?

45  **M. Camara**.- Je ne me rappelle pas exactement de cela, je n'en ai pas souvenance de
46  cela, mais je maintiens le fait que Getma International était avec MSC.

1   **Me Fischer.-** Oui, je crois que tout le monde a bien noté.

2   Vous n'êtes pas sûr que ce document figurait. Pouvons-nous en conclure que même
3   sans ce document, vous estimiez que la présence de MSC était actée et que cela
4   donnait de la crédibilité ?

5   **M. Camara.-** Oui, absolument.

6   **Me Fischer.-** La lettre du 5 mars que vous nous avez confirmé avoir eue était-elle
7   suffisante ?

8   **M. Camara.-** Oui.

9   **Me Fischer.-** Pour vous ce document est en réalité superfétatoire ?

10   **M. Camara.-** Oui parce qu'à ce stade, je ne pouvais pas imaginer qu'on pouvait
11   simplement se servir du nom de MSC pour avoir le marché et ne pas être rigoureux
12   dans son engagement.

13   **Me Fischer.-** Pouvez-vous lire l'article 7 de ce document ? C'est à la dernière page.

14   **M. Camara.-** Oui. «Entrée en vigueur, durée. L'accord entrera en vigueur à la date de
15   sa signature par les Parties et demeurera en vigueur en cas de non-acceptation de
16   l'offre jusqu'à la date de notification par le Concédant du rejet de l'offre. En cas
17   d'acceptation de l'offre jusqu'à la signature du contrat entre le Concédant Getma
18   International ».

19   **Me Fischer.-** Est-ce que, selon votre compréhension, cela signifie que cet accord de
20   partenariat prenait fin dès lors que l'offre était acceptée et qu'un contrat était signé ?

21   **M. Camara.-** Dans ma compréhension, une fois que la Convention était signée pour le
22   compte de Getma, Getma se retrouvait avec MSC pour discuter des modalités de la
23   mise en œuvre de la Convention de concession. C'était cela, ma compréhension.

24   **Me Fischer.-** Votre compréhension, c'est en réalité...

25   **M. le Président.-** Je n'ai pas entendu votre dernière réponse.

26   **M. Camara.-** Monsieur le Président, je reprécise : ma compréhension était qu'après la
27   signature de la Convention de concession avec Getma, Getma se serait retrouvée
28   avec MSC pour définir entre eux les modalités du financement, de la réalisation et de
29   l'exploitation du terminal à conteneurs.

30   **M. le Président.-** Merci.

31   **Me Fischer.-** Cela signifie que vous estimiez que la soumission était faite au nom de
32   Getma et de MSC ?

33   **M. Camara.-** Oui, absolument.

34   **Me Fischer.-** Mais que MSC ne devait pas être signataire de la Convention de
35   concession et intervenir postérieurement.

36   **M. Camara.-** Non, signataire et peut réaliser conjointement avec MSC.

37   **Me Fischer.-** Pour vous, dans votre compréhension, MSC devait être signataire de la
38   Convention de concession.

39   **M. Camara.-** Oui. Le reste, c'était entre eux.

40   **Me Teynier.-** Si elle ne l'était pas, considérez-vous que MSC continuait d'être
41   impliquée dans l'exploitation du terminal ou est-ce vraiment une question juridique qui
42   est en cause, à savoir la qualité ou non de signataire de MSC ?

1 **M. Camara**.- Pour moi, le signataire vis-à-vis du Port est Getma International. Il y a un
2 partenariat entre Getma International et MSC. Dans notre compréhension, les deux
3 devaient s'associer pour réaliser le projet.

4 **Me Fischer.-** Est-ce que cela signifie que la Guinée ou plus exactement le Concédant
5 avait la faculté de demander à Getma International de s'engager conjointement et
6 solidairement avec MSC, d'être cosignataire ?

7 **M. Camara**.- Pour nous, pas forcément.

8 **Me Fischer.-** Pour vous, on peut signer une convention de concession sans être
9 solidaire ?

10 **M. Camara**.- Si vous me le permettez, je prends l'exemple de Maersk. C'est APM
11 Terminals qui a soumissionné mais APM Terminals est avec Maersk. Maersk est
12 l'exploitant, l'opérateur est APM. C'est selon le même schéma que nous avons
13 considéré que Getma International agirait avec MSC.

14 **M. le Président**.- Excusez-moi. De quel port, parlez-vous pour Maersk ?

15 **M. Camara**.- Maersk, APM Terminals est l'opérateur.

16 **M. le Président**.- De quel port ?

17 **M. Camara**.- APM Terminals est la structure du financement des projets réalisés pour
18 le compte de Maersk.

19 **M. le Président**.- J'ai compris. Toutes les opérations faites par Maersk sont signées
20 comme cela ?

21 **M. Camara**.- Oui, la plupart. C'est APM Terminals qui soumissionne au nom de la
22 formation globale qui est Maersk.

23 **M. le Président**.- Au nom de la formation. Merci.

24 **Me Fischer.-** Dans votre idée, pour reprendre le parallèle avec Maersk, qui est le
25 premier armateur mondial et qui a une filiale dédiée à la manutention portuaire, APM
26 Terminals, si l'on faisait le parallèle avec le port de Conakry, comment auraient dû être
27 l'organisation et les liens entre MSC et Getma ? Pourriez-vous donner des précisions ?

28 **M. Camara**.- Je le dis et je le répète : vis-à-vis du Port, le responsable, le signataire,
29 c'est Getma International. Il s'engage à réaliser le projet compte tenu des exigences
30 que nous lui avons imposées et à lui maintenant, dans le cadre de son partenariat, de
31 s'organiser avec MSC.

32 **Me Fischer.-** Est-ce que vous avez participé à la négociation de la Convention de
33 concession ?

34 **M. Camara**.- Oui, j'ai participé à la négociation de la Convention de concession.

35 **Me Fischer.-** Est-ce que le Port autonome de Conakry était représenté dans l'équipe
36 de négociation par d'autres personnes que vous ?

37 **M. Camara**.- Malheureusement, non. Je l'ai encore dit et je le répète : nous n'étions
38 que deux du Port au niveau de la commission de négociation. Là également, quand
39 nous avons demandé d'être accompagnés d'autres collaborateurs, la première à
40 protester dans la salle ce jour-là a été Getma International qui n'a pas accepté. Ses
41 représentants ont protesté et ont dit : non, nous ne sommes pas d'accord.

42 **Me Fischer.-** « Nous ne sommes pas d'accord » avec quoi ?

43 **M. Camara**.- Avec la proposition d'élargir la délégation du Port dans les négociations
44 dans le cadre de la Convention de concession.

45 **Me Fischer.-** Getma s'est donc opposée.

1    **M. Camara.-** Ses représentants. Je le certifie.

2    **Me Fischer.-** Qui étaient les représentants qui se sont opposés ?

3    **M. Camara.-** Le premier responsable était (M. Kern ?), je crois, il était le fondé de
4    pouvoir. Il a violemment protesté.

5    **Me Fischer.-** Est-ce que vous connaissez Aïssata Aribot ?

6    **M. Camara.-** Oui.

7    **Me Fischer.-** Qui est-ce ?

8    **M. Camara.-** Elle est juriste au Port.

9    **Me Fischer.-** Est-ce que vous connaissez Antoine Traoré ?

10   **M. Camara.-** Antoine Traoré est un juriste auquel le Port fait appel par moment, mais il
11   n'est pas un cadre du Port.

12   **Me Fischer.-** Est-ce que Aïssata Aribot et Antoine Traoré ont participé à la négociation
13   de la Convention de concession ?

14   **M. Camara.-** Non, ils n'y ont pas participé.

15   **Me Fischer.-** Pouvez-vous vous reporter à la pièce C 126, sous l'onglet 9, à la page
16   38/62, qui est l'annexe 10 ? Il y a la liste des participants. Est-ce que vous pouvez lire
17   les noms des participants n° 12 et 13 ?

18   **M. Camara.-** Oui, je me rappelle. À ce niveau, il y a Aïssata Aribot et Antoine Traoré.
19   Je me rappelle. Vous savez, cela fait tellement longtemps. Mais le gros problème de la
20   décision, il y avait les aspects techniques, les aspects financiers. C'est Aribot…

21   **Me Fischer.-** Vous vous rappelez maintenant. Cela veut dire que vous revenez sur
22   votre déclaration selon lesquelles Mme Aïssata Aribot  et M. Antoine Traoré n'ont pas
23   participé ?

24   **M. Camara.-** Oui, je me rappelle.

25   **Me Fischer**.- Vous avez commis une erreur.

26   **M. Camara.-** Oui, c'est vrai.

27   **Me Fischer.-** Cela signifie qu'il y avait quatre membres du PAC dans la délégation de
28   négociation, si je comprends bien ?

29   **M. Camara.-** Oui, mais ce n'était pas suffisant.

30   **Me Fischer.-** Quelle proportion cela représentait-il par rapport à l'équipe de
31   négociation ?

32   **M. Camara.-** On était quatre, je crois. Il y avait les treize membres de la Commission,
33   puis d'autres cadres du département des transports, je crois deux ou trois, puis
34   *(… inaudible)* la négociation parce qu'en fait, ce sont surtout les aspects financiers qui
35   devaient faire l'objet de beaucoup de discussions au niveau de la Commission, donc
36   on a demandé d'étoffer.

37   **Me Fischer**.- Vous dites qu'il y avait treize personnes, puis d'autres encore ?

38   **M. Camara.-** Je peux le lire ?

39   **Me Fischer.-** C'est l'onglet 9, Convention de concession. En annexe 10 à la
40   Convention de concession, il y a la liste des participants aux négociations de la
41   Convention. Il y a, d'une part, la liste de présence des représentants de l'administration
42   et, d'autre part, la liste de présence des représentants de Getma International.

43   **M. Camara.-** Vous dites que c'est sous l'onglet 9 ?

1   **Me Fischer.**- 9. Vous l'avez là. C'est l'annexe 10 de ce document, page 38.

2   **M. Camara.**- Marie Mansour du Département, Ansoumane des Finances, Demba de
3   l'ACGP, Saïfoulaye des Grands marchés, Ibrahim Lamizana Conde de la Commission,
4   Mamoudou Diallo de la Commission, Cheick qui était de la Commission, Camara Sory
5   de la Commission, Morlaye de la Commission. (Amoud Soumaré et … *inaudible*).
6   Mohamed Doukoure, lui, il est du ministère des Transports, Aribot et Traore.

7   **Me Fischer.**- Est-ce qu'il y en avait d'autres ou est-ce que cette liste est exhaustive et
8   exacte ?

9   **M. Camara.**- Oui, c'est ça. Cela, seulement dans les négociations. Lorsqu'il a été
10  question de discuter des aspects liés à la fiscalité, au dédouanement, pour la
11  circonstance, on a fait venir la Douane et puis les Impôts. Cet aspect me semble très
12  important à discuter parce que...

13  **Me Fischer**.- Nous y reviendrons peut-être. Ce qui veut dire que lorsque la
14  Commission avait besoin de compétences extérieures, elle faisait appel. Maintenant,
15  c'est clair. Mais je repose ma question : quelle était, dans sa formation ordinaire, la
16  proportion de membres du PAC dans cette Commission ?

17  **M. Camara.**- Quatre sur les treize...

18  **Me Fischer**.- Vous confirmez qu'il y en avait bien quatre sur treize ?

19   **M. Camara.**- Oui. C'est cela. Ce sont les quatre...

20  **Me Fischer.**- Est-ce que vous trouvez que c'est insuffisant ?

21  **M. Camara.**- Oui, c'est insuffisant.

22  **Me Fischer.**- Pensez-vous que c'est une bonne pratique, dans le cadre d'appels
23  d'offres, que ce soient les mêmes personnes physiques qui participent à la rédaction
24  du Règlement, qui participent à la présélection, qui participent au dépouillement et,
25  enfin, qui participent à la négociation de la convention avec l'adjudicataire ?

26  **M. Camara.**- De mon point de vue, ce n'était pas une bonne pratique parce que les
27  négociations supposent des expériences diverses qu'il faut mettre en œuvre. Il y a
28  l'aspect finances, l'aspect fiscalité, l'aspect...

29  **Me Fischer**.- Je n'ai pas tout à fait compris... C'était une bonne ou une mauvaise
30  pratique ?

31  **M. Camara.**- Ce n'était pas une bonne pratique.

32  **Me Fischer.**- C'est une mauvaise pratique ?

33  **M. Camara.**- Oui.

34  **Me Fischer.**- Pour quelle raison, sachant que c'est une mauvaise pratique, vous avez
35  siégé dans cette commission ?

36  **M. Camara.**- Je suis un cadre qui relève de l'autorité d'un ministre. C'est le ministre qui
37  a signé la chose. Là, je ne peux rien. Je ne peux qu'émettre mon point de vue.

38  **Me Fischer**.- L'avez-vous émis ?

39  **M. Camara.**- Oui, bien sûr.

40  **Me Fischer.**- De quelle façon ?

41   **M. Camara.**- J'ai demandé… connaissant les limites des cadres qui ont travaillé au
42  niveau de la Commission d'évaluation des offres, j'ai attiré l'attention du directeur
43  général qu'il serait bon pour les négociations, d'élargir la mission du Port autonome.

1 **Me Fischer**.- Je ne vous ai pas posé la question de l'élargissement, c'est-à-dire de
2 faire appel à de nouvelles compétences, mais la question de votre présence. Si j'ai
3 bien compris, vous considérez que c'est une mauvaise pratique que d'être présent au
4 stade de l'appel d'offres, pour simplifier, et au stade de la négociation de la
5 convention ?

6 **M. Camara.-** Il fallait.

7 **Me Fischer**.- Si c'était une mauvaise pratique, je repose ma question : pour quelle
8 raison, alors que vous êtes un fonctionnaire d'autorité, avez-vous accepté de
9 cautionner cette mauvaise pratique ?

10 **M. Camara.-** Mais je n'ai pas forcément le droit de désobéir à mon autorité. Ce qui
11 m'importe, c'est d'émettre mon point de vue. À l'autorité de prendre ou de ne pas
12 prendre.

13 **Me Fischer**.- Vous estimez que vous devez obéir à votre autorité.

14 **M. Camara.-** À ma hiérarchie.

15 **Me Fischer**.- À votre hiérarchie. Est-ce que vous estimez qu'il en est de même de
16 M. Morlaye Camara qui était présent lors de la commission ?

17 **M. Camara.-** Je confirme. C'était aussi le point de vue de M. Morlaye parce qu'on a
18 travaillé ensemble.

19 **Me Fischer.-** Donc vous avez participé à une commission en estimant que c'était de
20 mauvaise pratique que d'y participer.

21 **M. Camara.-** Non, pas de mauvaise manière de participer, mais on était conscient des
22 limites, de l'insuffisance sur le plan de l'expérience.

23 **Me Fischer**.- On ne parle pas du tout de cela. Vous êtes assez fin pour comprendre la
24 question. Il y a effectivement la limite de compétences, ce que chacun comprend bien.
25 L'on note, d'ailleurs vous nous l'avez dit, que dès lors qu'on avait besoin de
26 compétences extérieures, on y faisait appel.

27 La question est une question de principe que je repose : considérez-vous que dans le
28 principe même –ce n'est pas vous qui êtes en cause, ce ne sont pas vos compétences,
29 c'est dans le principe même–, c'est une bonne ou une mauvaise pratique que
30 quelqu'un qui a participé à la procédure de sélection de l'adjudicataire soit dans la
31 procédure de négociation avec cet adjudicataire ?

32 **M. Camara.-** Non, ce n'est pas une bonne pratique.

33 **Me Fischer**.- Vous confirmez que ce n'est pas…

34 **M. le Président.-** Je crois que le témoin a déjà répondu à cette question.

35 **Me Fischer**.- Je voulais être sûr qu'il n'y ait pas d'ambiguïté.

36 **M. Camara.-** Non, je suis clair sur cela.

37 **Me Fischer.-** Dans le cadre de cette discussion de négociation, les choses se sont
38 passées comment ? Il y a eu une vraie discussion, une vraie négociation ou avez-vous
39 eu l'impression qu'on vous imposait quelque chose ?

40 **M. Camara.-** Il y a eu beaucoup, beaucoup de discussions parce qu'en ce qui
41 concerne par exemple le dédouanement et les taxes qu'on devait imposer à
42 l'opérateur, les cadres qui étaient dans la salle ne savaient pas quelles orientations il
43 fallait prendre. Les gens se posaient la question. Le BOT pour lequel on optait n'était
44 pas... il n'y avait pas de texte d'application du BOT qui ait été déjà décidé dans le pays.
45 Les gens se posaient la question : mais le projet de convention de concession, c'est un
46 BOT ou un affermage ? Que fallait-il faire ? Comment faut-il prendre la décision pour

1　déterminer les modalités de paiement des taxes et des impôts de dédouanement ?
2　Personne n'a su répondre. Parce que j'ai dit que c'était la première fois que le Port
3　s'engageait dans un tel processus.

4　Donc, pour la circonstance, ils ont fait venir les cadres des Impôts. La décision ne nous
5　revient pas. Les cadres des Impôts ont été consultés : comment vous concevez cet
6　aspect ? Ils ont dit : on ne peut pas se prononcer dans la salle, il faut qu'on se réfère à
7　notre hiérarchie. Ils sont sortis de la salle, après quoi ils sont revenus pour dire : ce que
8　nous comprenons, c'est qu'il faut accorder une exonération à l'opérateur pour une
9　durée de quelque 15 ans, le temps pour lui de faire venir l'équipement et de réaliser les
10　travaux. Il faut l'exonérer.

11　**Me Fischer.**- Quand vous avez négocié, avez-vous eu conscience que personne ne
12　représentait MSC ?

13　**M. Camara.**- Oui. Parce qu'on s'est dit que ceux qui sont là représentent en même
14　temps MSC.

15　**Me Fischer**.- Ils représentaient...　pour vous, la présence de MSC, qui amène si j'ai
16　bien compris un critère de compétences, la crédibilité des compétences, c'est un
17　critère essentiel ?

18　**M. Camara.**- Oui, c'est essentiel.

19　**Me Fischer**.- C'est ce qui avait été arrêté par tout le processus d'appel d'offres dont
20　vous êtes peut-être vous, personnellement, ou le PAC, rédacteur ?

21　**M. Camara.**- Oui.

22　**Me Fischer**.- Pouvez-vous vous reporter à la pièce R 30 qui est à l'onglet 16 ?

23　**M. Camara.**- Oui.

24　**Me Fischer**.- Connaissez-vous ce document ?

25　**M. Camara.**- Oui.

26　**Me Fischer.**- Êtes-vous capable de le dater à peu près ? Il n'est pas daté, sauf erreur.

27　**M. Camara.**- Je peux prendre le temps de le relire pour que je me le remémore.

28　**M. le Président.**- Oui, s'il vous plaît.

29　**M. Camara**.- Si ma mémoire est fidèle, cela a été fait aussi après les négociations,
30　avant même la signature de la Convention de concession, après les négociations. Cela
31　devait être autour...

32　**Me Fischer.**- C'est avant même. Vous le datez d'avant la signature de la Convention
33　de concession.

34　**M. Camara.**- Je pense.

35　**Me Fischer.**- L'indication selon laquelle ce document serait de décembre 2008 est
36　donc erronée.

37　**M. Camara.**- De 2008 ? Il n'y a pas de référence ?

38　**Me Fischer.**- Non, il n'y a pas de référence. Pour vous, c'est antérieur. Qui est l'auteur
39　de ce document ?

40　**M. Camara.**- Non, cela est fait par le Port. C'est un document du Port.

41　**Me Fischer.**- Quand vous dites que c'est fait par le Port, vous avez participé à la
42　rédaction de ce document ?

1 **M. Camara.-** Pas forcément, mais je sais que c'est fait par le Port. On a mis en place
2 une équipe pour essayer d'évaluer un peu les décisions qui étaient prises dans le
3 cadre de la Convention de concession.

4 **Me Fischer.-** D'accord. C'est-à-dire que dans le cadre de la négociation de la
5 Convention de concession il y avait une équipe de quatre personnes du Port dont nous
6 avons rappelé les noms, et il y avait par ailleurs une équipe d'évaluation qui travaillait
7 en parallèle.

8 **M. Camara.-** Non, c'est après !

9 **Me Fischer**.- Après la signature ? J'avais compris avant. C'est avant ou après ?

10 **M. Camara.-** Non, j'ai dit après la négociation. Le document a été porté à la
11 connaissance de l'autorité portuaire. Nous avons, ensemble, émis nos points de vue.
12 Je vous dis qu'on n'avait pas la possibilité de remettre en cause le travail. Nous
13 émettions notre point de vue. C'est quand même très important.

14 **Me Fischer**.- À tout moment, vous avez donc pu émettre votre point de vue.

15 **M. Camara.-** Oui, on émet notre point de vue. À la Commission ou à l'autorité de
16 prendre ou de ne pas prendre.

17 **Me Fischer**.- C'est un point de vue qui a été émis au cours de la négociation et avant
18 la signature ?

19 **M. Camara.-** Oui, avant la signature. Je vais vous dire. Après les négociations, avant
20 même la signature. Je parle, il y a certains de nos collègues qui sont présents, on a
21 demandé au ministre à l'époque. Compte tenu de tout ce qu'il y a, la Douane ne s'est
22 pas très bien prononcée, les Impôts ne se sont pas très bien présentés. Ce qu'ils ont
23 dit ne reflète pas tout à fait les intérêts et du Port et de la société. Mieux vaut ne pas
24 signer la convention de façon à ce qu'on reprenne convenablement. On a dit cela.

25 **Me Fischer.-** Vous avez donc conseillé de ne pas signer la négociation ?

26 **M. Camara.-** Oui.

27 **Me Fischer**.- Je voulais vous faire lire. En page 1, le deuxième point, il est indiqué
28 « légèreté de l'adjudication ».

29 **M. Camara.-** Oui.

30 **Me Fischer**.- Pouvez-vous lire le 2.1 ?

31 **M. Camara.-** Quelle page ?

32 **Me Fischer**.- Première page toujours de ce même document, sous l'onglet 16.

33 **M. Camara.-** Le point 1 ?

34 **Me Fischer**.- 2.1.

35 **M. Camara.-** « Le PAC prévoit que le Ticket d'entrée…

36 **Me Fischer**.- Non, le point 2.1, en dessous de « légèreté de l'adjudication ».

37 **M. Camara.-** « Manque grave de pertinence du point de vue des critères d'évaluation.
38 L'ordre des critères a été inversé… »

39 **Me Fischer.-** Je vous remercie. C'est simplement cela. Vous considériez que l'ordre
40 des critères de sélection avait été inversé.

41 **M. Camara.-** Oui.

42 **Me Fischer.-** Il a été inversé par qui ?

1 **M. Camara.-** Au niveau de la commission, des points avaient été définis. On a essayé
2 de hiérarchiser. Par exemple, quand on dit « l'aspect technique » ou bien « la
3 promotion commerciale », des éléments avaient été portés. C'est ce qui a permis...
4 Des critères avaient été définis. Cela fait tellement longtemps que je ne me rappelle
5 plus de cela précisément mais des critères de notation avaient été introduits.

6 **Me Fischer**.- Nous avions compris qu'il y avait des critères de notation, c'est d'ailleurs
7 le propre d'un appel d'offres. Le Port indique dans ce document, qui manifestement
8 reçoit votre assentiment, qui a été rédigé au cours des négociations auxquelles vous
9 participiez, qu'il fait état d'une inversion des critères. Quel est cette inversion des
10 critères ? Si on a une inversion des critères, c'est que l'on a fait passer un critère qui
11 était en seconde position ou en position inférieure en position supérieure.

12 **M. Camara.-** Cela, je ne me rappelle pas exactement, mais je sais qu'on avait défini
13 des critères d'évaluation. Mais cet aspect-là, je ne me rappelle pas exactement.

14 **Me Fischer.-** Pouvez-vous poursuivre la lecture de cet article après « l'ordre des
15 critères a été inversé » ? Je pense que cela devait vous permettre…

16 **M. Camara.-** « La Commission d'évaluation des offres constituée n'était pas assez
17 étoffée. »

18 **Me Fischer**.- Au-dessus, après « l'ordre des critères a été inversé ».

19 **M. Camara.-** « L'ordre des critères a été inversé. L'importance des investissements : le
20 professionnalisme, l'expérience, la connaissance des terrains des candidats ont été
21 relégués au second plan au profit du Ticket d'entrée, ce qui est déjà contraire à l'avis
22 de manifestations d'intérêt. ».

23 **Me Fischer**.- Vous avez donc estimé que la commission à laquelle vous avez participé
24 avait, de son propre chef, changé l'ordre des critères et avait décidé que le critère
25 financier -Ticket d'entrée, pour faire simple- primait sur le critère technique ?

26 **M. Camara.-** Dans les notes qui avaient été attribuées à chacun des soumissionnaires,
27 les Tickets d'entrée avaient recueilli beaucoup plus de points parce que Getma avait
28 proposé 15 M€ par rapport aux autres qui avaient proposé 5 ou 10 millions. Les
29 redevances qu'ils ont proposées étaient supérieures à celles des autres. Vu le contexte
30 dans lequel on se trouvait, recueillir des fonds pour l'État apparaissait important. Je
31 crois que c'est ce qui a fait... Parce que chaque fois que la commission travaillait, le
32 représentant du ministère des Finances consultait le département pour la décision à
33 prendre. Quand il y a eu les évaluations des offres techniques, il a recueilli l'avis du
34 ministre, quand il y a eu les évaluations financières, l'avis du ministre des Finances. Je
35 crois que c'est ça.

36 **Me Fischer**.- Cette inversion, vous la critiquez ou la trouvez légitime pour un État qui a
37 besoin d'argent ?

38 **M. Camara.-** C'était une démarche que la commission a adoptée pour…

39 **Me Fischer.-** Est-ce que vous adhérez à cette démarche ?

40 **M. Camara.-** Oui, à ce stade-là.

41 **Me Fischer**.- À ce stade-là, vous êtes d'accord avec l'inversion des critères. Vous ne
42 trouvez pas de difficulté ?

43 **M. Camara.-** Je ne trouve pas de difficulté.

44 **Me Fischer.-** Est-ce que vous trouvez en conséquence normal que le critère de
45 capacité ne soit pas un critère éliminatoire ?

46 **M. Camara.-** Ah non, cela pouvait éliminer le candidat. Cela pouvait l'éliminer.

1  **Me Fischer.**- Alors pouvez-vous vous reporter à la pièce R 52, sous l'onglet 19 ? Cela
2  doit être page 19, si mes souvenirs sont exacts. En bas de la page, nous sommes sur
3  un critère technique. Est-ce que vous pouvez lire la phrase en caractères gras en bas
4  de la page ?

5  **M. Camara.-** A quel niveau ?

6  **Me Fischer.**- C'est la page 19.

7  **M. Camara.-** « La commission note que le soumissionnaire… »

8  **Me Fischer.**- Attendez ! C'est la pièce R 52, sous l'onglet 19, et le numéro de la page
9  est comme celui de l'onglet. Est-ce que vous pouvez lire ce paragraphe qui est
10 vraisemblablement en caractères gras sur l'original ?

11 **M. Camara.-** « La commission note que le soumissionnaire n'a présenté aucune
12 expérience en matière de conception, financement et réalisation de terminaux à
13 conteneurs. »

14 **Me Fischer.**- Quelle note a été obtenue ?

15 **M. Camara.-** Ils ont eu 0 sur 2.

16 **Me Fischer.**- Est-ce que vous considérez que cette note devait donc être éliminatoire
17 comme vous venez de nous l'indiquer ?

18 **M. Camara.-** Non, je vous dis qu'à ce niveau…

19 **Me Fischer.**- Est-ce que la note zéro était ou non éliminatoire ?

20 **M. Camara.-** Non, elle n'était pas éliminatoire.

21 **Me Fischer.**- Donc le critère zéro à un critère technique n'était pas éliminatoire.

22 **M. Camara.-** C'était un sous-point. Il y a les propositions techniques. Dans les
23 propositions techniques, on a dénombré les éléments, les critères qui rentrent dans
24 l'analyse des propositions techniques. Les propositions financières, c'est la même
25 chose. Donc on peut avoir zéro quelque part et rattraper…

26 **Me Fischer.**- Ce n'est finalement pas très grave ?

27 **M. Camara.-** Oui. C'est une démarche.

28 **Me Fischer.**- Donc le point B4 n'est finalement pas un point très important ?

29 **M. Camara.-** À ce niveau, si, mais pas dans la totalité des montants, des sommes, des
30 points qu'on attribue.

31 **Me Fischer.**- Sur le total, on est d'accord, mais on peut avoir zéro à la question des
32 terminaux à conteneurs conçus, financés et réalisés par le soumissionnaire et ne pas
33 être éliminé ?

34 **M. Camara.-** Dans la démarche, ici, à ce niveau-là.

35 **Me Fischer.**- Vous confirmez donc que la commission a décidé de plus valoriser le
36 critère financier, le Ticket d'entrée, que les compétences ?

37 **M. Camara.-** J'avoue que, nous, à ce stade, on a estimé sur la base des documents
38 qu'on a examinés que tous pouvaient répondre aux critères entrant dans le cadre de la
39 mise en œuvre de...

40 **Me Fischer.**- Mais un soumissionnaire ne répondait pas aux critères parce qu'il avait
41 zéro. Généralement quand on a zéro, ce n'est pas à un enseignant qu'on va apprendre
42 ça, c'est qu'on n'est pas très bon et qu'on ne répond pas aux critères. C'est
43 généralement quand on a rendu une copie…

44 **M. Camara.-** Je vous dis que ce point était une des composantes.

1  **Me Fischer.**- Je l'ai compris, mais le point B4 sur les terminaux conçus, financés et
2  réalisés, on pouvait ne pas répondre à ce critère et, malgré cela, parce que l'on avait
3  par ailleurs de meilleures notes, être adjudicataire ? On pouvait en d'autres termes se
4  rattraper sur d'autres critères ?

5  **M. Camara.**- On avait déjà dépassé le stade de présélection. Cela, c'est l'évaluation
6  des propositions faites. C'est différent.

7  **Me Fischer.**- Oui, précisément.

8  **M. Camara.**- On était déjà dans la phase d'examen des offres. Cela ne veut pas dire
9  qu'à ce stade, on va l'éliminer.

10  **Me Fischer**.- Ce qui est étonnant, c'est que vous nous dites qu'on est après la
11  présélection, et c'est vrai, mais comment se fait-il qu'on présélectionne des gens sans
12  expérience ?

13  **M. Camara.**- Ils ont proposé en disant : « Nous avons l'expérience avec tel, tel et
14  tel… ». C'est sur cette base qu'ils ont réussi à passer au niveau de la phase de...

15  **Me Fischer.**- Cela veut dire qu'au point B4.0, il n'a pas d'expérience personnelle mais
16  il y a une expérience avec quelqu'un d'autre.

17  **M. Camara.**- Avec quelqu'un d'autre.

18  **Me Fischer.**- Quelle était l'expérience, quel était ce quelqu'un d'autre dont la société
19  Bolloré s'est prévalue, car la page 19 concerne la société Bolloré ?

20  **M. Camara.**- Bolloré n'a pas évoqué le nom de quelqu'un d'autre.

21  **Me Fischer.**- La société Bolloré ne s'est pas prévalue de l'expérience d'un autre ?

22  **M. Camara.**- Non, APM Terminals n'a même pas cité Maersk dans son offre. Non.

23  **M. le Président.**- Cela veut dire que Bolloré, peu importe le nom, un autre
24  soumissionnaire a eu zéro sur son expérience personnelle, n'a pas revendiqué
25  l'expérience d'un autre opérateur et, malgré cela, n'a pas été éliminé ?

26  **M. Camara.**- Au niveau de l'évaluation de l'offre, on ne l'élimine pas puisqu'on avait
27  des offres à examiner. Dans la totalité des notes attribuées, on voit s'il était éligible ou
28  non.

29  **Me Fischer**.- Vous estimez... On a la confirmation... l'indication que la commission à
30  laquelle vous avez participé et à l'égard des décisions de laquelle vous n'avez pas
31  protesté, que la société Bolloré ne rentrait pas dans le critère technique. Comment se
32  fait-il que, par la suite, la Convention de concession retirée à Getma International a été
33  confiée à Bolloré ? Vous avez protesté à ce moment-là ?

34  **M. Camara.**- Protesté ? Non, pas du tout ! Je vous dis que quand on a fini les
35  évaluations des offres, on a procédé à un classement : premier, deuxième, troisième,
36  quatrième. Lorsque Getma International n'a pas fait le travail qu'on voulait, au lieu de
37  faire un autre appel d'offres et de s'engager dans cette procédure interminable,
38  juridique et autre, comme cela se fait maintenant, on s'est dit qu'il fallait aller vite. Je
39  vous ai dit les raisons pour lesquelles on a mis le terminal à conteneurs en concession.
40  De 33 000 conteneurs, on est passé à 165 000 conteneurs. Il faut aller vite ! On ne
41  peut plus s'engager dans d'autre procédure. Le premier n'ayant pas réussi, il faut
42  prendre le deuxième.

43  **Me Fischer.**- Même si le deuxième n'a pas de critère technique ?

44  **M. Camara.**- Critère technique, on ne revient pas sur cela.

45  **Me Fischer.**- C'est inopérant ? Qu'importe !

1  **M. Camara.-** On s'en tient aux résolutions de la commission parce qu'on n'a pas remis
2  en cause la confiance de la commission.

3  **Me Fischer**.- Finalement, le critère technique n'a pas grande importance.

4  **M. Camara.-** On s'en tient aux résultats à ce niveau.

5  **Me Fischer.-** L'urgence prime sur le critère technique à ce niveau-là ?

6  **M. Camara.-** À ce niveau-là, oui.

7  **Me Fischer**.- La question financière était donc le critère le plus important ?

8  **M. le Président**. – Attendez ! Avant d'en venir à cela, le document R 30, qui est sous
9  onglet 16, vous l'avez daté de quand ? C'est la synthèse des réserves. D'après sa
10 lecture, il semble postérieur à la signature de la Convention de concession. C'est bien
11 cela ?

12 **M. Camara.-** C'est bien cela.

13 **M. le Président**. – Ce n'est donc pas avant la signature.

14 **M. Camara.-** C'est quelques jours avant la signature.

15 **M. le Président**. – Non : ou c'est avant ou c'est après. Essayez de faire un effort de
16 mémoire si vous pouvez.

17 **M. Camara.-** C'était en décembre, après la signature.

18 **M. le Président**.- Décembre, c'est après la signature. Merci.

19 **Me Fischer**.- C'est en décembre. Je voudrais simplement vérifier… C'est ce qui nous a
20 été indiqué jusqu'ici, que c'était de décembre. Je suis navré de vous le dire mais, à
21 nouveau, il y a une erreur dans vos déclarations.

22 **M. Camara.-** Oui.

23 **Me Fischer**.- Pourquoi, dans votre attestation, aux paragraphes 19 et 20, vous parlez
24 des références, de la stratégie commerciale dont vous aviez parlé tout à l'heure, et
25 vous ne parlez pas du tout du critère financier alors que vous venez de nous dire que
26 ce critère financier était primordial ?

27 **M. Camara.-** Oui mais, attendez, un Ticket d'entrée, c'est relatif par rapport à une
28 stratégie commerciale. C'est relatif. Je vous dis que ce qui est important pour nous,
29 c'était de capter le trafic malien. Si Getma International avait eu de bonnes notes par
30 rapport à Bolloré, c'est parce qu'ils se sont rendus à Bamako, ils ont pris contact avec
31 le gouvernement malien, les opérateurs maliens, la Chambre de commerce du Mali
32 pour avoir un engagement à dire que « Si vous avez le marché, on prendra part au
33 capital de la société d'exploitation ». Nous, on avait une stratégie. Si cela avait marché,
34 ce qu'on allait gagner, c'était plus de 15 000, 20 000 euros par an. Non ! À ce niveau,
35 c'est relatif.

36 **Me Fischer**.- Le Mali, vous l'avez dit, est un pays enclavé. L'un des accès à Bamako
37 est le port de Conakry.

38 **M. Camara.-** Absolument.

39 **Me Fischer**.- Quel peut être l'autre accès pour accéder à Bamako, à partir de quels
40 autres ports sur la côte -je ne parle pas de la Guinée- de l'Ouest africain ?

41 **M. Camara.-** Vous ne connaissez pas l'Ouest africain ?

42 **M. Camara.-** Je ne pose pas des questions pour ma culture personnelle mais pour la
43 bonne compréhension par l'ensemble.

1  **M. Camara.-** Vous avez le port de Dakar, le port d'Abidjan, qui ont des relations
2  traditionnelles.

3  **Me Fischer**.- Qui sont les opérateurs à Dakar et à Abidjan ?

4  **M. Camara.-** Les opérateurs sont nombreux mais, à Dakar, je veux dire à Abidjan…

5  **Me Fischer.-** Qui est l'opérateur du terminal à conteneurs ?

6  **M. Camara.-** Il y a Maersk qui est en partenariat avec Bolloré, et au niveau du port…

7  **Me Fischer**.- Sur le TC1 ? On ne parle pas du TC2. Sur le TC1, qui est l'opérateur à
8  Abidjan ?

9  **M. Camara.-** Il y a Maersk et Getma… Non, il y a Maersk et Bolloré.

10  **Me Fischer**.- Cela veut dire que Bolloré opère un port concurrent à celui de Conakry ?

11  **M. Camara.-** Vous savez, la concurrence des ports, c'est une question de stratégie. Ce
12  n'est pas parce que Bolloré est à Abidjan et Dakar qu'il ne va pas faire le travail que
13  nous voulons.

14  **Me Fischer**.- La concurrence entre les ports n'était pas un critère retenu.

15  **M. Camara**.- Il faut retenir qu'en Afrique, la concurrence des ports est relative.

16  **Me Fischer**.- Je vous ai demandé si la concurrence des ports était un critère retenu
17  dans le cadre de votre appel d'offres que vous avez rédigé.

18  **M. Camara.-** Oui, parce que nous avons dit : celui qui mettra en place une stratégie
19  commerciale nous permettant de gagner, de faire une conquête du marché des pays
20  enclavés, notamment le Mali, aura un point important. C'est pour cette raison que
21  Getma a eu beaucoup plus de points par rapport aux autres.

22  **Me Fischer**.- Les membres de la commission de négociation de la convention, dont
23  vous faisiez partie -en ce qui vous concerne, on sait que vous avez eu une promotion
24  méritée-, les autres membres ont été maintenus en place, ont été promus, ont été
25  limogés ?

26  **M. Camara**.- Est-ce que c'est en relation avec ces travaux de la convention ?

27  **Me Fischer**.- Je n'ai pas dit cela.

28  **M. Camara**.- Non, cela n'a aucun lien.

29  **Me Fischer**.- Je parle des autres membres. Est-ce qu'on sait si les autres membres
30  ont été limogés ?

31  **M. Camara**.- Non. Non, non. Je ne sais pas.

32  **Me Fischer**.- Il n'y a pas eu… le ministre signataire de la Convention, M. Cheick
33  Touré, aujourd'hui, quelle fonction exerce-t-il ?

34  **M. Camara**.- Il est Secrétaire général du même ministère, le ministère des Transports.

35  **Me Fischer**.- Est-ce que vous avez eu des divergences avec lui ?

36  **M. Camara**.- Oui. À l'époque. À l'époque.

37  **Me Fischer**.- Quel type de divergences ?

38  **M. Camara**.- Vous savez, chacun émet son point de vue quand un travail est fait. Ce
39  que je vous dis là, je le dis sur ma conscience. Quand la Commission a fini son travail,
40  on a remis le rapport au ministre. Ce jour-là, le ministre m'a dit : « Sory, je m'adresse à
41  vous en tant que cadre du Port, pas en tant que membre de la Commission
42  d'évaluation. Quel conseil vous me donnez, parce que je dois être appelé à remettre ce
43  document à M. le Président ? Quel conseil vous me donnez ? »

1  Devant tous les membres de la Commission, j'ai dit : « Moi, ce qui m'intéressait, c'était
2  Maersk parce que dans la définition de notre stratégie de mise en place de la
3  Convention de concession du terminal, à l'époque, Maersk était dans la perspective
4  d'identifier un port et voulait en faire un port d'éclatement, et notre souhait était
5  vraiment de retenir le port de Conakry ».

6  **Me Fischer**.- Votre divergence était sur le choix économique, industriel, si je puis dire
7  de l'opérateur ?

8  **M. Camara**.- À tous points de vue, oui.

9  **Me Fischer**.- Vos divergences ne portaient en rien sur les conditions juridiques
10  d'examen des offres, d'organisation de l'appel d'offres ?

11  **M. Camara**.- Non, cela est le résultat. Après…

12  **Me Fischer**.- Seulement sur le résultat. Vous estimez que Maersk…

13  **M. Camara**.- Quand le travail a été fait, le ministre a demandé…

14  **Me Fischer**.- Le travail a été bien fait ?

15  **M. Camara**.- Quand cela a été terminé, le ministre m'a demandé : « Qu'est-ce que
16  vous voulez ? Qu'est-ce que vous me donnez comme conseil ? » J'ai dit : « Je préfère
17  qu'on choisisse Maersk ». S'il faut qu'on reprenne, on reprend Maersk. De mon point
18  de vue, Maersk aurait été plus important pour le port de Conakry que tous ceux qui
19  sont *(… inaudible)*.

20  **Me Fischer**.- D'un point de vue strictement procédural, tout s'est passé
21  régulièrement ?

22  **M. Camara**.- Oui mais…

23  **Me Fischer**.- Alors, est-ce que vous pouvez lire la pièce C 28, sous l'onglet 2 ? Allez à
24  la fin de la page 2. C'est une interview de M. Cheick Touré. Nous sommes en octobre
25  2008, sauf erreur.

26  **M. le Président**.- Vous fournissez la loupe ?

27  **Me Fischer**.- Je le pourrais même pour ma gouverne, Monsieur le Président !

28  Est-ce que monsieur le témoin, sans loupe, peut arriver à lire l'avant-dernière ligne et
29  la dernière ligne ? Est-ce que vous pourriez lire juste la fin ?

30  **M. Camara**.- Où cela ?

31  **Me Fischer**.- Le journaliste pose une question : « Parlons à présent du troisième projet
32  portuaire (terminal à conteneurs) qui fait couler beaucoup d'encre et salive en ce
33  moment. Quelles sont les circonstances qui ont précédé la passation de ce marché et,
34  à en croire la presse, qui n'ont pas été transparentes ? » Est-ce que vous pouvez lire à
35  partir de : « Je trouve » ? C'est l'onglet 2. En bas, à gauche.

36  **M. Camara**.- « Vous faites bien d'évoquer ce sujet pour que je puisse en dire quelques
37  mots et apporter certains éclairages au regard de toute la campagne de dénigrement
38  et d'intoxication menée autour de ce projet. Je trouve cela dommage et absolument
39  scandaleux ! Je suis autant plus à l'aise que la gestion de ce dossier a obéi à toutes
40  les règles et procédures définies par les marchés publics ».

41  **Me Fischer**.- Vous êtes d'accord avec cette appréciation ?

42  **M. Camara**.- Cela est l'avis du ministre. Mais moi, j'avais mon point de vue personnel.

43  **Me Fischer**.- Vous nous avez dit que la procédure avait été régulière, donc cela
44  confirme… vous confirmez… je ne parle pas du choix industriel et économique. Nous

1 sommes bien d'accord. Vous nous avez dit très clairement que vous estimiez, pour des
2 raisons qui sont sûrement bonnes, que cela devait être Maersk.

3 **M. Camara**.- Cela était mon point de vue.

4 **Me Fischer**.- C'était votre point de vue, aucune ambiguïté là-dessus. Mais sur la
5 régularité de la procédure, le ministre signataire dit que c'était régulier et vous, vous
6 nous avez dit tout à l'heure, si j'ai bien compris, que vous étiez d'accord, que cela avait
7 été régulier. Est-ce que vous confirmez que la procédure a été régulière ?

8 **M. Camara**.- Oui, la manière dont les choses ont évolué, c'est régulier.

9 **Me Fischer**.- Très bien.

10 La Convention a donc été signée le 22 septembre. Il y a eu une réunion au port le
11 31 décembre 2008.

12 **M. Camara**.- Oui.

13 **Me Fischer**.- Est-ce que vous étiez présent ?

14 **M. Camara**.- C'était la réunion de quand, vous dites ?

15 **Me Fischer**.- La réunion était du 31 décembre 2008.

16 **M. Camara**.- 31 décembre 2008... ? Vous avez des documents par rapport à cela ?

17 **Me Fischer**.- Je vous demande si votre mémoire ou... est-ce que vous vous en
18 souvenez ou pas ?

19 **M. Camara**.- J'avoue que...

20 **Me Fischer**.- Alors est-ce que vous pouvez prendre, sous l'onglet 5, la pièce C 53 ?
21 Est-ce que vous connaissez ce document ?

22 **M. Camara**.- La session extraordinaire du Conseil d'administration. Non, je n'ai pas
23 participé.

24 **Me Fischer**.- Vous n'avez pas participé.

25 **M. Camara**.- C'était la réunion du Conseil d'administration.

26 **Me Fischer**.- Est-ce que vous trouvez normal que le Conseil d'administration, sur une
27 question dont on a compris qu'elle était cruciale, centrale, qui faisait couler beaucoup
28 d'encre et de salive, compte tenu de votre position hiérarchique, ne vous ait pas
29 demandé d'être présent ?

30 **M. Camara**.- Oui, mais je ne suis pas membre statutaire du Conseil d'administration.

31 **Me Fischer**.- Le Conseil d'administration, si mes souvenirs sont exacts, peut
32 demander à quiconque d'être présent. Vous n'avez jamais assisté à une réunion d'un
33 Conseil d'administration ?

34 **M. Camara**.- Le Conseil d'administration fait appel aux cadres pour des domaines
35 précis. À ce niveau, je n'avais pas été invité.

36 **Me Fischer**.- Vous avez déjà participé à des conseils d'administration lorsque cela
37 relevait de vos compétences ?

38 **M. Camara**.- Oui, j'étais secrétaire du Conseil d'administration quand j'étais secrétaire
39 général.

40 **Me Fischer**.- Il vous arrivait d'être présent. Là, vous n'étiez pas présent.

41 **M. Camara**.- Oui.

42 **Me Fischer**.- Est-ce que vous savez si le rapport dont vous nous avez dit dans un
43 premier temps qu'il avait été signé antérieurement à la Convention de concession,

1 c'est-à-dire antérieurement au 22 septembre, puis vous nous avez indiqué qu'il était du
2 mois de décembre 2008, est-ce que vous savez si ce rapport a été présenté à ce
3 Conseil d'administration ?

4 **M. Camara**.- J'avoue que je n'ai pas... je n'ai pas souvenance parce que je n'étais pas
5 là, je n'ai pas assisté. Et il appartenait vraiment à Getma International de tirer toutes
6 les conséquences liées aux péripéties qui ont entouré la signature et d'aller plus vite
7 dans la réalisation du projet.

8 **M. le Président**.- Cela est une réponse à une question non posée.

9 **M. Camara**.- Oui, Monsieur le Président !

10 **Me Fischer**.- Ce n'est pas la première fois mais dans chaque réponse, il y a des
11 éléments...

12 **M. Camara**.- J'avoue que j'ai à cœur mon projet, mon port.

13 **Me Fischer**.- Il y a donc eu une réunion, le 31 décembre 2008, du Port. Il y aura une
14 réunion le 11 février 2011. Est-ce que vous étiez présent à cette réunion du Conseil
15 d'administration ?

16 **M. Camara**.- Le 11 février 2011… oui, j'étais présent.

17 **Me Fischer**.- Vous étiez présent. Vous étiez présent en quelle qualité ?

18 **M. Camara**.- J'étais à l'époque directeur général adjoint du Port.

19 **Me Fischer**.- Le 11 février, vous étiez directeur général adjoint. Tout à l'heure, vous
20 nous avez indiqué que vous avez été nommé le 15 février.

21 **M. Camara**.- Non, janvier, j'avais dit !

22 **Me Fischer**.- 15 janvier, j'ai mal compris. 15 janvier, excusez-moi. C'est ma mémoire
23 qui...

24 Ce Conseil d'administration... Alors, vous nous indiquez que la société Getma
25 International n'a pas réalisé les travaux nécessaires et n'a pas réalisé les
26 investissements. Dans ce projet portuaire, vous nous avez dit que lors du lancement
27 de l'appel d'offres, le port devait être développé et qu'il y avait 145 000 TEU, ou EVP
28 en français, qui étaient mouvementés par an, ce qui est le critère de référence des
29 ports. Est-ce que c'est bien exact ?

30 **M. Camara**.- Le volume… ?

31 **Me Fischer**.- Le volume de conteneurs mouvementés par an était, au moment où vous
32 avez décidé de lancer l'appel d'offres pour développer le port, de 145 000 par an, si j'ai
33 bien noté, on verra au *transcript,* et que vous vouliez bien sûr le développer.

34 **M. Camara**.- En 1998, on était à 35 000 boîtes. En 2010, on était à 140 000.

35 **Me Fischer**.- Alors je n'ai pas du tout compris. Est-ce que vous pourriez repréciser
36 quels étaient les volumes de boîtes mouvementés un peu avant et au moment de
37 l'appel d'offres, une manière qu'il y ait un opérateur privé, quel qu'il soit ?

38 **M. Camara**.- Si mes souvenirs sont bons, en 1998, on avait 34 000 ou 35 000 boîtes.
39 Jusqu'en 2010, on s'est retrouvé devant 140, 144, 145, dans la fourchette de
40 140 000 boîtes avec le même terminal à conteneurs. Déjà en 1998, il y avait un
41 engorgement qui se dessinait. Pour y faire face, on a initié le projet. Donc de 1998
42 jusqu'en 2010, c'est le même terminal avec un fort taux d'accroissement du trafic.

43 **Me Fischer**.- Disons en 2009, avant l'arrivée de Getma, quel est le volume ?

44 **M. Camara**.- Si je peux prendre ma machine…

45 **Me Fischer**.- Ce n'est pas à l'unité près.

1   **M. Camara**.- On était déjà à plus de 100 000 boîtes.

2   **Me Fischer**.- Plus de 100 000 ?

3   **M. Camara**.- Oui. Aujourd'hui, on en est à 165 000 boîtes.

4   **Me Fischer**.- Il y avait plus de 100 000 boîtes au moment de l'appel d'offres. Cela
5   signifie qu'un des soumissionnaires avait fait un *business plan* en prévoyant une
6   diminution du trafic.

7   **M. Camara**.- Oui, vous savez... Ils ont dû faire des projections sur la base de
8   l'évolution du trafic puisqu'on a donné la tendance à chacun des soumissionnaires : de
9   98 où on était à 100 000 boîtes, ils ont dû faire les projections.

10   **Me Fischer**.- Afrimarine était à 90 000 boîtes la première année d'exploitation, c'est-à-
11   dire prévoyait une diminution du volume, une baisse de l'activité du port.

12   **M. Camara**.- Vous savez, l'évolution du trafic, cela obéit à plusieurs critères. Oui, oui,
13   cela obéit à plusieurs critères.

14   **Me Fischer**.- Donc vous étiez à l'époque de l'appel d'offres à 100 000, *grosso modo*.

15   **M. Camara**.- Oui, bien sûr.

16   **Me Fischer**.- Maersk, qui était votre favori, avait fait un *business plan* sur la base de
17   102 000, c'est-à-dire que Maersk ne prévoyait une augmentation que de 2 %.

18   **M. Camara**.- Oui.

19   **Me Fischer**.- Est-ce que vous pensez que c'est être compétent de prévoir une
20   augmentation de 2 % dans un port dont la démonstration aura été faite dans les
21   années qui auront suivi, les courtes années qui auront suivi, que les volumes auront
22   été supérieurs. Aujourd'hui, ils sont à 165 000, vous avez dit ?

23   **M. Camara**.- Oui.

24   **Me Fischer**.- Quand Getma est partie, donc en mars 2011, on en était à combien ?

25   **M. Camara**.- Plus de 100 000 boîtes.

26   **Me Fischer**.- Et vous ne pensez pas que l'offre de Maersk, qui avait votre préférence,
27   qui prévoyait simplement une projection de 102 000 boîtes, est-ce que vous ne croyez
28   pas que c'est un manque de compétences ?

29   **M. Camara**.- Vous savez, l'avantage de Maersk, c'est sa capacité dans le trafic. La
30   rentabilité d'un port, au-delà de la conteneurisation et de la manutention des
31   conteneurs, il y a les redevances qu'on perçoit sur les navires. Par semaine, Maersk
32   peut déverser sur le port de Conakry trois ou quatre navires. C'est déjà important.
33   Voilà.

34   **Me Fischer**.- À quel moment vous êtes-vous aperçu que MSC, Europe Terminal, ce
35   qui est pareil, n'était pas dans le projet ?

36   **M. Camara**.- Il y a des signes avant-coureurs. Nous, nous n'avons jamais eu de
37   contacts directs avec les responsables de MSC, qui nous fuyaient toujours. Il n'y a
38   jamais eu de rapports pour nous dire : voilà le niveau du projet. Il n'y avait pas de
39   contacts directs entre nous. Ils estimaient que l'autorité dont ils relevaient, c'était le
40   ministère.

41   À côté de cela, au niveau du terminal existant, rien n'avait bougé, les défenses des
42   quais n'avaient pas été remplacées, les affaissements n'ont pas été corrigés, les
43   murs...

1   **Me Fischer**.- La question n'était pas tout à fait là. À partir de quel moment avez-vous
2   eu conscience que MSC ou sa filiale Europe Terminal n'était pas dans le projet ?
3   J'appelle le projet l'exploitation du terminal à conteneurs de Conakry.

4   **M. Camara**.- Déjà à partir des trois ou quatre premiers mois, personnellement je
5   commençais à douter.

6   **Me Fischer**.- Les trois ou quatre premiers mois, c'est janvier 2009.

7   **M. Camara**.- Oui.

8   **Me Fischer**.- Est-ce que c'est une raison qui a fait que la Convention a été suspendue
9   par le capitaine Moussa Dadis Camara ?

10  **M. Camara**.- Le capitaine Moussa Dadis Camara avait été d'abord informé de la
11  décision du Conseil d'administration qui s'était tenu en décembre, qui disait que les
12  préoccupations de l'État n'étaient pas prises en compte et qu'il fallait revoir la
13  Convention de concession. Dès qu'il a pris ses fonctions, il a aussitôt décidé de...

14  **Me Fischer**.- Je repose ma question : est-ce que l'absence de MSC, que vous avez
15  constatée dans les tout premiers jours de 2009, a été la ou l'une des causes de la
16  décision du Président Moussa Dadis Camara, qui a été informé de la décision du Port,
17  si j'ai bien compris, prise à la suite de sa réunion du 31 décembre 2008 ?

18  **M. Camara**.- Ce n'est pas la présence ou non de MSC qui a fait que le Président Dadis
19  a pris la décision. Je dis qu'au niveau de la Convention de concession, il y avait des
20  aspects qui n'avaient pas été totalement pris en compte : l'aspect fiscalité et douane.
21  On a dit que les intérêts du Port n'étaient pas pris en compte. Il a donc demandé à ce
22  que les cadres du Port se retrouvent avec Getma International pour apporter les
23  corrections qu'il fallait.

24  **Me Fischer**.- Puisque vous avez participé à l'équipe de négociation, est-ce que vous
25  pensez que si l'équipe de négociation avait demandé que MSC soit signataire de la
26  Convention, cela aurait été accepté ?

27  **M. Camara**.- Oui. En considérant que MSC... Non, en considérant Getma International
28  avec MSC. Oui, bien entendu.

29  **Me Fischer**.- Oui, donc si vous l'aviez demandé, cela aurait été signé. Pour vous, cela
30  ne faisait pas de difficulté. Cela n'a donc pas été demandé. Est-ce que vous savez,
31  dans les remarques qui ont été faites par le cabinet Ernst & Young, missionné par...
32  Par qui, déjà ? Je ne sais plus très bien…

33  **M. Camara**.- Par le Premier ministre, je crois.

34  **Me Fischer**.- C'est le Premier ministre qui a... Les remarques de ce cabinet, est-ce
35  que la Commission en a tenu compte ? Est-ce qu'elles se sont retrouvées dans la
36  Convention ?

37  **M. Camara**.- Mais jamais.

38  **Me Fischer**.- Jamais ?

39  **M. Camara**.- Non, elles ne se sont pas retrouvées. Cela n'a pas été pris en compte.

40  **Me Fischer**.- Rien n'a été pris en compte ?

41  **M. Camara**.- Oui. Je vous dis que le cabinet FFA a fait des observations. Lorsque les
42  observations ont été faites, on a demandé à ce qu'on les prenne en compte parce que
43  dans les négociations, on n'a pas bénéficié de l'accompagnement d'un cabinet
44  suffisamment spécialisé dans ce domaine. On a donc demandé à ce que les
45  documents soient repris et la signature est intervenue sans qu'on ne prenne en compte
46  les observations de FSC.

1   **Me Fischer**.- Il n'y a pas eu une ligne de modifiée, pas un mot ?

2   **M. Camara**.- Non, je pense.

3   **Me Fischer**.- Vous pensez ou vous êtes certain ?

4   **M. Camara**.- Je suis certain, Monsieur. C'est pour cette raison d'ailleurs que quand il
5   ya eu… parce que je crois en 2008, la signature est intervenue quelques jours après
6   que le Président a rendu l'âme, les nouvelles autorités se sont même servies des
7   conclusions de FFA pour...

8   **Me Fischer**.- Pour vous, la signature est intervenue après que le Président a rendu
9   l'âme ?

10   **M. Camara**.- Non, un peu avant.

11   **Me Fischer**.- Un peu avant, d'accord. Donc vous confirmez qu'aucune remarque de
12   FFA n'a été prise en compte.

13   **M. Camara**.- Non, non.

14   **Me Fischer**.- Vous avez protesté à ce moment-là ? Vous avez eu connaissance du
15   rapport FFA ?

16   **M. Camara**.- Oui, bien sûr.

17   **Me Fischer**.- Comment se fait-il que la Commission n'a pas réussi à imposer de
18   modifier le texte ?

19   **M. Camara**.- Le travail de la Commission était déjà terminé. Le rapport a été remis au
20   Premier ministre. Au ministre des Transports, puis au Premier ministre. C'est à ce
21   niveau que l'attention du Premier ministre a été attirée.

22   **Me Fischer**.- Le rapport a été établi avant ou après la signature de la Convention de
23   concession ?

24   **M. Camara**.- Je parle de la Convention de concession.

25   **Me Fischer**.- On parle de la Convention qui est signée le 22 septembre.

26   **M. Camara**.- Oui.

27   **Me Fischer**.- Le rapport FFA est établi avant ou après ?

28   **M. Camara**.- Un peu avant. Nous, on a été surpris après...

29   **Me Fischer**.- Est-ce que la Commission, antérieurement à la signature de la
30   Convention de concession, a été informée de ce rapport ?

31   **M. Camara**.- Non, la Commission avait déjà fini son travail, l'avait déposé au ministre.

32   **Me Fischer**.- C'était fini ?

33   **M. Camara**.- C'était fini.

34   **Me Fischer**.- Il n'y a pas eu de discussion, de renégociation de la Commission
35   postérieurement au rapport FFA ?

36   **M. Camara**.- Non, non. Le ministre n'a pas convoqué la Commission pour dire :
37   « Voilà, il y a le rapport de FFA et il faut en tenir compte », non.

38   **Me Fischer**.- Ce rapport a donc a été adressé directement au ministre.

39   **M. Camara**.- Oui.

40   **Me Fischer**.- Vous êtes sûr de cela ?

41   **M. Camara**.- Le rapport a été remis au DG qui a remis le rapport au ministre qui l'a
42   commandité, au Premier ministre.

1 **Me Fischer**.- Je n'ai pas la pièce C 44 parce que je ne pensais pas… Je voulais attirer
2 l'attention du Tribunal que ce rapport a été adressé le 11 septembre 2008, c'est-à-dire
3 antérieurement à la signature, et directement au Port.

4 **M. Camara**.- Oui.

5 **Me Fischer**.- Alors pensez-vous que vous nous donnez des indications inexactes ou
6 que votre mémoire fait défaut ?

7 **Me Jaeger**.- Si vous faites référence à une pièce, il faudrait la montrer au témoin.

8 (*Le document est remis à M. Camara.*)

9 **Me Fischer**.- C'est la pièce C 44.

10 **M. Camara**.- Oui, je vois le rapport de FFA.

11 **Me Fischer**.- Il a été adressé à qui ? C'est la première page.

12 **M. Camara**.- Il a été adressé... cela a été remis... cela a été remis au gouvernement,
13 ce rapport.

14 **Me Fischer**.- C'est indiqué : au Port autonome de Conakry.

15 **M. Camara**.- Oui, mais le Port l'a remis au Premier ministre.

16 **Me Fischer**.- Mais le Port l'a reçu.

17 **M. Camara**.- Bien sûr, le Port l'a reçu. Je ne le conteste pas.

18 **Me Fischer**.- Et à tout le moins son directeur général. Est-ce que vous pensez que le
19 directeur général, dont vous dépendiez, ne vous en aurait pas parlé ?

20 **M. Camara**.- Mais on en a parlé. Je vous ai déjà dit, après les négociations, il y avait
21 des insuffisances déjà dans la Convention...

22 **Me Fischer**.- Le 11 septembre, nous étions après les négociations ?

23 **M. Camara**.- Le 11 septembre…

24 **Me Fischer**.- Le 11 septembre, ce document est…

25 **M. Camara**.- Cela est un document de décembre, je crois.

26 **Me Fischer**.- Non, il est du 11 septembre.

27 **M. Camara**.- 11 septembre, voilà !

28 **Me Fischer**.- La Convention sera signée le 22 septembre. Vous ne croyez pas qu'il y a
29 une incohérence dans vos déclarations ?

30 **M. Camara**.- Non, je ne pense pas parce que quand on a attiré l'attention de l'autorité
31 pour des corrections éventuelles qu'il fallait apporter, avant même la signature, on a
32 demandé au cabinet FFA de faire un travail pour faire ressortir les...

33 **Me Fischer**.- J'ai bien compris. C'est la contradiction : vous nous avez dit que c'était
34 postérieurement aux négociations...

35 **M. Camara**.- Vous savez, cela fait un bon moment...

36 **Me Fischer**.- D'où ma question : est-ce votre mémoire ou une inexactitude ?

37 **M. Camara**.- Oui, c'est ma mémoire. J'ai plus de 60 ans, donc…

38 **Me Fischer**.- Tout le monde a beaucoup de respect pour vous, pas simplement à
39 l'égard de votre âge, qui est un élément supplémentaire.

40 **M. Camara**.- C'est ça. Et on peut se tromper.

1  **Me Fischer**.- Par la suite, est-ce que vous considérez que le climat social et politique
2  en Guinée en 2009 et 2010 a été un climat serein ?

3  **M. Camara**.- Le pays a connu des mouvements consécutifs au décès du Président
4  mais je ne pense pas que cela puisse affecter la conduite d'un projet.

5  **Me Fischer**.- C'est totalement indépendant ?

6  **M. Camara**.- Oui, j'en suis convaincu. Si le promoteur avait déjà tenu compte de nos
7  exigences et préoccupations, il se serait engagé très rapidement à commencer les
8  travaux.

9  **Me Fischer**.- Vos exigences, c'était... ?

10  **M. Camara**.- L'extension du terminal à conteneurs, et puis faire face au
11  décongestionnement du port de Conakry, qui était déjà engorgé.

12  **Me Fischer**.- Est-ce que vous pensez que sans la réalisation des travaux sur la
13  plateforme de la gare ferroviaire, il était possible de décongestionner le port ?

14  **M. Camara**.- Oui, bien sûr, en faisant l'extension du terminal à conteneurs. Cela n'avait
15  rien à voir. Absolument rien à voir.

16  **M. le Président**.- Attendez. L'extension du terminal est un travail pour lequel il est
17  prévu 35 mois (11 mois avant la mise à disposition et 24 mois de réalisation) alors que
18  la gare ferroviaire, c'était 6 mois (2 mois plus 4).

19  **M. Camara**.- Oui.

20  **M. le Président**.- Et vous pensez qu'il fallait décongestionner en commençant par le
21  travail qui prend 35 mois plutôt que par celui qui prend 6 mois ? Essayez de
22  m'expliquer vos degrés d'urgence.

23  **M. Camara**.- Monsieur le Président, la principale composante du troisième projet est
24  l'extension du terminal à conteneurs. Je vous l'ai dit tout à l'heure : la croissance du
25  trafic. Donc si MSC tenait compte de nos préoccupations, c'était d'abord de
26  commencer par réaliser l'extension du terminal à conteneurs, surtout que lorsqu'on a
27  signé, la plateforme ferroviaire était encore occupée. Il fallait déguerpir les gens pour
28  que les gens soient dégagés afin que tout l'espace soit mis à leur disposition. Mais on
29  a dit : « Non, il faut attendre que les gens quittent de l'autre côté ».

30  **Me Fischer**.- Vous pensez donc qu'il était préférable, souhaitable de commencer par
31  l'extension, en quelque sorte le nouveau quai, puis de faire la plateforme, on dit de la
32  gare ferroviaire parce que c'était le nom historique, mais c'est en réalité une zone de
33  stockage. Vous confirmez ?

34  **M. Camara**.- Oui, une zone de stockage pour les conteneurs vides.

35  **Me Fischer**.- Alors pour quelle raison le dossier d'appel d'offres que vous avez rédigé
36  prévoyait le schéma strictement inverse ?

37  **M. Camara**.- Mais il appartenait à l'opérateur d'en tenir compte. Je m'excuse, je ne
38  sais pas si je peux citer un peu ce qui se passe aujourd'hui au port, si vous me
39  permettez de le dire.

40  **Me Fischer**.- Si ce n'est pas trop long, car je vois que le temps passe.

41  **M. le Président**.- Allez-y mais ne soyez pas long.

42  **M. Camara**.- Je ne serai pas long. Nous avons pris un opérateur, Bolloré est
43  actuellement sur le terrain. Dès que Bolloré a pris la concession, ils ont fait les études
44  et très rapidement ils ont engagé sur fonds propres la réalisation de l'extension du
45  terminal à conteneurs. Sur les 12 hectares, ils ont déjà réalisé 5 hectares qui sont
46  aujourd'hui fonctionnels.

1   **Me Fischer**.- Ils ne disposent pas de la plateforme ferroviaire ?

2   **M. Camara**.- Ils ont la plateforme ferroviaire.

3   **Me Fischer**.- Quand ils sont arrivés, la plateforme ferroviaire était opérationnelle ?

4   **M. Camara**.- Bien sûr. Ils stockent le terminal à conteneurs sur l'extension qui est
5   réalisée aujourd'hui. Il y a une partie qui sert de base de vie pour la société CHEC qui
6   fait les travaux d'extension et...

7   **Me Teynier**.- Techniquement, est-il possible de faire l'extension sans avoir la
8   plateforme ou est-ce que les deux étapes sont interdépendantes ?

9   **M. Camara**.- Sur le plan fonctionnel mais pas sur le plan de l'infrastructure.

10   **Me Fischer**.- Si la plateforme ferroviaire n'est pas à disposition, réalisée, où stockez-
11   vous l'augmentation du nombre des conteneurs puisque, selon vos indications, on est
12   passé en une année d'exploitation de 90 000 à 140 000 conteneurs ? Nous reverrons
13   les chiffres mais ce sont des ordres de grandeur. Cela fait 50 000 conteneurs par an.
14   Où les stockez-vous alors qu'on sait, puisque vous nous l'avez dit, que le port de
15   Conakry était déjà engorgé à l'époque ?

16   **M. Camara**.- Cela dépend de l'ingéniosité, de l'expérience et du professionnalisme.

17   **Me Fischer**.- Je m'adresse au professionnel que vous êtes. Vous avez un port qui est
18   engorgé avec 90 000 conteneurs, on va passer de 90 000 à 140 000 conteneurs ou
19   peut-être plus, où met-on les conteneurs supplémentaires ? Où les stocke-t-on ?

20   **M. Camara**.- Mais c'est les deux en même temps. C'est pour cela que le port est
21   engorgé, je vous l'ai dit. C'est pour cela que le port… On avait des suppléments de
22   trafic.

23   **Me Fischer**.- Nous connaissons le port de Conakry pour y être allés plusieurs fois. Où,
24   physiquement…

25   **M. Camara**.- On a des trafics qui sont détournés. C'est pour résoudre tout cela qu'on a
26   besoin de…

27   **Me Fischer**.- Je ne parle pas des trafics et des lignes. Où stocke-t-on le surplus de
28   conteneurs dans l'attente du nouveau quai ? Qu'il soit réalisé en 24 ou 35 mois, à la
29   limite qu'importe. Pendant cette période d'étude et de réalisation du second quai, où
30   stocke-t-on les 50 000 conteneurs supplémentaires par an alors que le port est déjà
31   engorgé ?

32   **M. Camara**.- Nous avons une zone franche au port, un espace que nous appelons la
33   friche.

34   **Me Fischer**.- Cette zone est-elle dans le périmètre de la concession ?

35   **M. Camara**.- Non, elle n'en fait pas partie.

36   **Me Fischer**.- Où le concessionnaire peut-il mettre ces 50 000 conteneurs en plus ?

37   **M. le Président**.- S'il vous plaît, si vous parlez les deux en même temps, c'est comme
38   si aucun de vous ne parlait, alors attendez-vous l'un l'autre, s'il vous plaît. D'abord,
39   Monsieur Camara, attendez la fin de la question, même si elle est répétitive.

40   **Me Fischer**.- Elle est un peu répétitive car -tout le monde l'a compris- c'est un point
41   important. Dès lors qu'avec 90 000 conteneurs, le terminal est engorgé, que c'est une
42   des raisons pour lesquelles vous voulez le développer, que seul le périmètre de
43   l'ancienne gare ferroviaire est dans le périmètre de la concession, où met-on pendant
44   la première, la deuxième ou la troisième année, pendant cette période de montée en
45   volume, les 50 000 conteneurs supplémentaires de la première année ?

1   **M. Camara**.- D'abord, ils superposent les conteneurs, cela a contribué à dégrader le
2   terminal existant. Il y a aussi l'espace de (Fria ?) que nous mettons à disposition pour
3   pouvoir faire face. Ce périmètre appartient à la société (Fria ?), c'est ce qui permet de
4   résoudre temporairement le problème.

5   **Me Fischer**.- À partir de quel moment considérez-vous que MSC ne prend pas part au
6   projet et que Getma International n'a pas respecté ses engagements ?

7   **M. Camara**.- D'abord, j'ai dit qu'il y a des affaissements sur le terminal existant.

8   **Me Fischer**.- Je vous ai posé une question très précise concernant la participation de
9   MSC. À partir de quel moment, considérez-vous que MSC n'est définitivement pas
10   partie à l'exploitation du terminal ou au projet et que cela constitue un manquement de
11   la part de Getma ?

12   **M. Camara**.- J'avoue que je n'avais en face de moi que Getma International. C'est
13   lorsqu'ils ont traîné dans la mobilisation des fonds et dans le déclenchement des
14   opérations que nous avons compris qu'ils n'avaient pas les moyens de le faire.

15   **Me Fischer**.- À partir de quand avez-vous estimé qu'ils tardaient dans la recherche
16   des fonds ?

17   **M. Camara**.- C'était à la réunion du 14 janvier parce qu'à cette date, nous avons eu
18   une réunion élargie avec Maersk, tous les représentants, pour la première fois je crois
19   ils étaient là, en face de nous. Au lieu de nous dire « nous avons mobilisé », ils ont
20   déroulé le programme de la réalisation. C'est là que nous nous sommes dit :
21   franchement, ils n'ont pas la possibilité de réaliser.

22   **M le Président**.- 14 janvier de quelle année ?

23   **Me Fischer**.- 14 janvier 2011.

24   **M. le Président**.- C'est la date de la fameuse réunion.

25   **M. Camara**.- C'est cela.

26   **Me Fischer**.- Est-ce qu'en relisant les termes du paragraphe 27 de votre attestation
27   concernant cette réunion, vous maintenez vos déclarations ?

28   **M. Camara**.- Je relis : « La réunion s'est tenue le 14 janvier 2011 dans les locaux de la
29   salle de conférence du PAC. Trois représentants de Getma International étaient venus
30   présenter l'état d'avancement de l'appel d'offres pour la construction du nouveau quai.
31   J'accompagnais le Directeur général du PAC à cette réunion avec le Directeur des
32   services techniques et plusieurs cadres du PAC. Les cadres du ministère des
33   Transports, notamment ceux du cabinet de monsieur le ministre de la Marine
34   marchande ont également pris part à cette réunion ».

35   **M. le Président**.- Maître Fischer, quand comptez-vous vous arrêter ?

36   **Me Fischer**.- Le plus rapidement possible.

37   **M. le Président**.- Cela veut dire ?

38   **Me Fischer**.- D'ici une petite demi-heure.

39   **M. le Président**.- Alors nous allons arrêter tout de suite parce que l'attention et les
40   sténotypistes ne tiendront pas encore une demi-heure. Nous reprendrons après. Je
41   vous propose que nous arrêtions si nous voulons terminer notre programme. Vous en
42   avez pour une demi-heure...

43   **Me Fischer**.- Je voulais faire un peu plus court. Voyant l'heure tourner, j'avais un peu
44   simplifié mais je ne reviendrai pas en arrière. Si vous m'accordiez trois quarts d'heure,
45   je pense que cela devrait suffire.

**M. le Président**.- Trois quarts d'heure. De toute manière, votre quart d'heure est déjà bien entamé puisque le quart d'heure a fait une heure vingt-cinq. Donc vous avez besoin de trois quarts d'heure, ce qui nous mène à 3 heures.… Combien de temps ?

**Me Jaeger**.- Une demi-heure maximum.

**M. le Président**.- 15 heures 30. Donc nous aurons terminé avec M. Camara vers 16 heures. Demandez aux experts d'être là à partir de 16 heures. Donc nous arrêtons pour une heure.

*Suspendue à 13 heures 10, l'audience est reprise à 14 heures 35.*

**M. le Président.-** Sans tarder, nous reprenons. Maître Fischer, vous avez la parole. Vous nous avez promis une demi-heure.

**Me Fischer.-** Nous verrons si c'était une promesse ou une indication. Avec le témoin, nous allons tout faire pour que cela puisse être respecté.

Monsieur Sory Camara, nous reprenons à la réunion du 14 janvier 2011. Vous avez participé à cette réunion ?

**M. Camara.-** Oui, j'ai participé à la réunion du 14 janvier.

**Me Fischer**.- Qui a convoqué cette réunion ? C'était à l'initiative du PAC ?

**M. Camara.-** C'était à l'initiative de M. le ministre des Transports.

**Me Fischer**.- L'objet de cette réunion était de tirer au clair votre interrogation dont vous nous avez dit qu'elle était… C'était d'ailleurs plus une interrogation sur la question de l'obtention des financements permettant de réaliser les travaux ? C'était l'objet de la réunion ?

**M. Camara.-** Le ministre venait d'être nommé. Il a demandé… comme pour tous les autres secteurs, il voulait savoir comment les choses évoluaient dans les différents secteurs, y compris le secteur maritime avec, en toile de fond, la gestion du terminal à conteneurs à travers le projet.

**Me Fischer.-** Y a-t-il eu un ordre du jour à la réunion de fait ?

**M. Camara.-** C'était principalement sur le terminal à conteneurs l'objet de son intervention.

**Me Fischer.-** Sur le terminal à conteneurs, concernant le terminal, il y avait tout un tas de questions. Y avait-il une question plus particulière qui devait être abordée ?

**M. Camara.-** Il a été demandé à Getma de venir présenter la situation à travers le projet, à travers la Convention de concession.

**Me Fischer.-** Lui a-t-il été demandé de justifier de l'obtention des financements ?

**M. Camara.-** Lorsque la réunion a débuté, il a commencé…

**Me Fischer**.- Est-ce que l'objet de la réunion était indiqué à Getma comme devant porter sur les financements ?

**M. Camara.-** Non, on lui a dit seulement de présenter la situation du projet.

**Me Fischer.-** D'accord. Les participants de Getma ne savaient pas qu'il serait question de l'obtention des financements ?

**M. Camara.-** Cela, je ne sais pas. Nous, en salle, on leur a demandé comment ça se passait.

**Me Fischer.-** Pour vous, il n'est pas évident que cette réunion avait pour objet d'examiner, de savoir si Getma détenait les financements ?

1    **M. Camara.-** C'est le ministre qui a convoqué la réunion. Elle a été convoquée à
2    l'initiative du ministre. Puisque c'était la première fois qu'on avait Getma International
3    en face de nous au port, l'occasion était donc opportune de poser la question. On
4    s'inquiétait : il y avait déjà dix mois et on ne voyait rien derrière.

5    **Me Fischer.-** Vous avez indiqué dans votre témoignage que la question du
6    financement avait été posée, et que les représentants de Getma s'étaient montrés
7    surpris et embarrassés par la question et avaient fini par répondre qu'ils n'étaient pas
8    là pour évoquer les questions liées au financement. C'était en quelque sorte une
9    surprise pour Getma ?

10    **M. Camara.-** Oui.

11    **Me Fischer.-** Pour vous, il est normal de convoquer un concessionnaire pour discuter
12    d'une question semble-t-il importante sans le prévenir ?

13    **M. Camara.-** La réunion s'est tenue le 14, en tout cas, le Conseil d'administration a
14    siégé le 5 février. Ils auraient vraiment dû accélérer. On n'avait même plus besoin
15    d'insister, etc. C'était à eux de… Il manquait (les preuves ?).

16    **M. le Président.-** Monsieur Camara, ce n'était pas la question.

17    **Me Fischer.-** La question était de savoir si vous trouvez normal que le concessionnaire
18    ait été convoqué à une réunion qui devait porter sur les financements sans qu'il en ait
19    été informé ?

20    **M. Camara.-** Pour moi, ils devaient, même s'ils ne sont pas informés, pouvoir le dire.

21    **Me Fischer.-** Le dire ou le justifier ?

22    **M. Camara.-** Le justifier et répondre à la question posée par le directeur général du
23    Port.

24    **Me Fischer.-** Le justifier ?

25    **M. Camara.-** Oui.

26    **Me Fischer**.- Les personnes présentes de Getma étaient les personnes en charge des
27    financements chez Getma International ?

28    **M. Camara.-** Il y avait le directeur du projet, c'était suffisant pour nous.

29    **Me Fischer.-** Il devait pouvoir justifier avoir les financements ?

30    **M. Camara.-** Oui.

31    **Me Fischer.-** À l'issue de cette réunion, vous avez considéré que Getma ne respectait
32    pas son engagement ?

33    **M. Camara.-** Absolument.

34    **Me Fischer.-** Sur quels points précis ?

35    **M. Camara.-** D'abord, au niveau du terminal à conteneurs, il y avait le terminal à
36    conteneurs en exploitation, l'existant. Le Port avait fait des observations sur le non-
37    renouvellement des défenses de quais et les affaissements. Le terminal à conteneurs
38    en extension n'avait pas commencé. La plateforme ferroviaire n'a pas évolué alors que
39    cette dernière ne recevait que des conteneurs vides encore. On a compris vraiment
40    qu'ils n'avaient pas les moyens de réaliser cela.

41    **Me Fischer.-** Vous avez compris qu'ils n'avaient pas respecté leurs obligations ou
42    qu'ils n'avaient pas les moyens de respecter leurs obligations ?

43    **M. Camara.-** Quand vous avez un projet aussi important que la mise en oeuvre d'un
44    terminal à conteneurs…

1 **Me Fischer.**- C'est une question précise Monsieur Camara : n'avaient-ils pas respecté
2 ou pas les moyens de respecter ?

3 **M. Camara.-** L'une est la conséquence de l'autre. S'il n'a pas respecté, cela suppose
4 qu'il n'a pas les moyens. On n'a pas besoin d'insister sur cela.

5 **Me Fischer.**- Face à, selon vous, ce non-respect des obligations, qu'avez-vous fait ?

6 **M. Camara.-** On s'est acquitté de notre devoir : on a informé l'autorité qui a convoqué
7 le Conseil d'administration.

8 **Me Fischer.**- Vous étiez informé de rumeurs disant que, de toute façon, cette
9 concession serait résiliée ?

10 **M. Camara.-** Lorsque le Conseil d'administration a tenu sa session, nous avions la
11 conviction que cela ne pouvait pas continuer…

12 **Me Fischer**.- Antérieurement au 15 janvier, aviez-vous connaissance de rumeurs ?

13 **M. Camara.-** Les rumeurs sont les rumeurs. Je n'ai pas eu connaissance de rumeurs.

14 **Me Fischer**.- Pour vous, c'est le Conseil d'administration, lors de sa séance… De
15 quelle date déjà ?

16 **M. Camara.-** C'était le 5 février.

17 **Me Fischer**.- …postérieure à la réunion avec le ministre qui a déclenché le processus
18 de résiliation ?

19 **M. Camara.-** Oui, je crois.

20 **Me Fischer**.- Lors de cette séance, le Conseil d'administration a pointé quels
21 manquements ?

22 **M. Camara.-** Le Conseil d'administration a fait état… D'abord, c'est l'autorité portuaire
23 qui a rendu compte au Conseil d'administration comme quoi le terminal à conteneurs
24 existant n'a pas été réhabilité, le terminal à conteneurs à réaliser dans le cadre de
25 l'extension n'a pas non plus été entamé et la plateforme ferroviaire n'a pas été non
26 plus entièrement achevée. Ces éléments suffisaient pour que le Conseil
27 d'administration prenne position.

28 **Me Fischer**.- La plateforme ferroviaire était achevée à quelle proportion ?

29 **M. Camara.-** Pas à 100 % en tout cas.

30 **Me Fischer**.- Certes, mais entre 0 et 100 %, il y a…

31 **M. Camara.-** Je n'ai pas une idée exacte, je ne peux pas me rappeler de tout cela,
32 mais ce n'était pas achevé.

33 **Me Fischer.**- Si vous ne pouvez pas vous en rappeler, comment savez-vous que ce
34 n'était pas achevé ?

35 **M. Camara.-** Mais je suis le Port ! *(Rires)*

36 **Me Fischer.**- Si vous êtes le Port, c'est en cette qualité que vous êtes entendu ! Vous
37 devez avoir une idée.

38 **M. Camara.-** La plateforme ne reçoit que les conteneurs vides.

39 **Me Fischer.**- À quel pourcentage à peu près ? C'était 0, 10 % ?...

40 **M. Camara.-** Peut-être 20 ou 30 %. Là, il ne faut pas m'en tenir rigueur.

41 **Me Fischer.**- On ne vous tient rigueur de rien. C'est moins de 50 % ?

42 **M. Camara.-** J'avoue que je n'ai pas évalué. Je n'ai pas une idée exacte.

43 **Me Fischer.**- Pour dire que ce n'était pas terminé, vous n'avez pas fait d'évaluation ?

1   **M. Camara.-** Pas terminé par rapport aux engagements contractuels.

2   **Me Fischer.-** J'ai bien compris mais vous n'avez pas évalué le niveau des travaux ?

3   **M. Camara.-** Notre comité nous a rendu compte que les travaux n'étaient pas faits, et
4   même ceux réalisés étaient contestés par endroit. Voilà !

5   **Me Fischer**.- C'est autre chose. Ce que je ne comprends pas… Vous nous avez dit ce
6   matin que rien n'avait été fait. Là, vous nous dites que ce n'était pas achevé.

7   **M. Camara.-** J'ai dit que rien n'a été fait au niveau de l'extension. Je suis ferme
8   là-dessus.

9   **Me Fischer.-** On est sur la plateforme ferroviaire. Vous dites que les travaux n'étaient
10  pas achevés. Mais entre 0 et 100 %, vous nous avez dit moins de 50 %, et maintenant,
11  c'est plus de 50 % ?

12  **M. Camara.-** Pour ça, ne m'en tenez pas rigueur car, là, je n'ai pas donné la précision.

13  **Me Fischer.-** Quand un concédant constate un manquement, vous ne croyez pas qu'il
14  est nécessaire de faire une étude précise ?

15  **M. Camara.-** Bien sûr !

16  **Me Fischer.-** Cette étude n'a pas été faite ?

17  **M. Camara.-** Cela permet au Conseil d'administration de se prononcer. Je ne peux pas
18  me rappeler.

19  **Me Fischer.-** Face à un manquement du concessionnaire, qu'était-il prévu pour la
20  Convention de concession que vous aviez négociée ?

21  **M. Camara.-** Il était prévu d'écrire, six mois après, que dans les six mois, de voir s'il
22  faut. On ne pouvait pas s'engager dans cette procédure parce que, d'abord, je vous ai
23  dit ce que représente le port dans l'économie guinéenne. On ne peut pas s'engager.

24  **Me Fischer.-** Vous aviez donc conscience que, pour parvenir à la résiliation, il y avait
25  une procédure légale ?

26  **M. Camara.-** Oui, mais on s'est dit qu'à ce niveau, il ne fallait pas s'engager comme ça
27  parce que le port serait bloqué dans son fonctionnement. C'était responsable. Le
28  Conseil d'administration a dit : puisqu'il y a eu un appel d'offres, une évaluation qui a
29  été faite, il faut s'en tenir aux conclusions de l'évaluation des offres antérieurement
30  soumises pour prendre une décision. C'est ce qui a été fait !

31  **Me Fischer.-** C'est donc en toute connaissance de cause que le Port, l'Autorité, a pris
32  la décision de ne pas respecter la Convention de concession et de résilier sans
33  préavis ?

34  **M. Camara.-** Et s'en tenir aux conclusions de l'évaluation des offres soumises. C'était
35  plus responsable d'agir ainsi.

36  **M. le Président.-** Attendez. Monsieur Camara, vous avez dit, si j'ai bien compris, que
37  le Conseil d'administration a décidé de s'en tenir aux conclusions des évaluations qui
38  avaient été faites et de résilier sans passer par la procédure légale.

39  **M. Camara.-** Oui.

40  **M. le Président**.- Est-ce que cela veut dire que le Conseil d'administration a résilié la
41  concession de Getma dans l'idée qu'il l'attribuerait à Bolloré ?

42  **M. Camara.-** Oui.

43  **M. le Président**.- Est-ce que le Conseil d'administration a pris le soin de vérifier que
44  Bolloré était toujours partant pour cette concession ?

1   **M. Camara**.- Oui.

2   **M. le Président**.- Merci.

3   **Me Fischer**.- Est-ce que le Conseil d'administration avait conscience des
4   conséquences du non-respect de la Convention de concession ?

5   **M. Camara**.- Le Conseil d'administration en avait conscience.

6   **Me Fischer**.- C'est donc en toute connaissance de cause que le Conseil
7   d'administration a décidé d'assumer sa décision et de prendre le risque ?

8   **M. Camara**.- Absolument.

9   **Me Fischer**.- Pour vous, la procédure d'arbitrage, la demande d'indemnisation de la
10  société Getma n'est donc pas une surprise ?

11  **M. Camara**.- Non. L'arbitrage examine les propositions des uns et des autres et doit
12  voir, c'est pourquoi on parle d'arbitrage.

13  **Me Fischer**.- Quand vous avez pris cette décision de résilier et d'attribuer à un autre
14  concessionnaire, aviez-vous conscience que la société Getma International
15  demanderait l'application du Contrat et son indemnisation ?

16  **M. Camara**.- Nous en avions conscience. Nous nous expliquerions sur les préjudices
17  qu'ils nous ont causés.

18  **Me Fischer**.- La société Getma International vous a causé préjudice ?

19  **M. Camara**.- Parce qu'ils nous ont retardés dans la mise en œuvre du projet. Je vous
20  ai dit que nous avions décidé la mise en concession du terminal à conteneurs parce
21  que nous ne nous sommes pas entendus avec les bailleurs de fonds. Nous avons cru
22  qu'en ayant recours au partenariat public-privé nous gagnerions du temps, nous
23  n'avions pas de conditionnalités à satisfaire ni rien d'autre.

24  **Me Fischer**.- Comment expliquez-vous que la République de Guinée ne demande pas
25  d'indemnisation du préjudice que vous indiquez avoir été subi ?

26  **M. Camara**.- C'est l'autorité qui le décide. Si celui qui vient après parvient rapidement à
27  combler le déficit de retard en matière d'investissement, comme cela se fait aujourd'hui
28  au port de Conakry, ce sera déjà une grande satisfaction.

29  Je dois vous dire que tout ce que Getma International aurait dû faire en deux ans est
30  fait aujourd'hui : le terminal à conteneurs a été réhabilité et équipé, doté de portiques et
31  de systèmes informatiques, l'extension a été faite, il y a eu…

32  **Me Fischer**.- L'extension est terminée aujourd'hui ?

33  **M. Camara**.- Non, 5 hectares ont été réalisés. Une entreprise a été sélectionnée sur la
34  base d'un appel d'offres, elle est en train de faire les travaux. Le 14 mai 2014, nous
35  aurons le terminal à conteneurs auquel nous rêvions en lançant l'appel d'offres.

36  **Me Fischer**.- En 2014, le second quai sera donc fait ?

37  **M. Camara**.- En mai 2014.

38  **Me Fischer**.- Si cette prévision de travaux est respectée, ce dont nous ne doutons pas,
39  quel délai se sera écoulé entre la signature de la concession avec le nouveau
40  concessionnaire et la fin des travaux ?

41  **M. Camara**.- Je crois que c'est 18 mois, si j'ai souvenance. Je ne sais pas...

42  **Me Fischer**.- D'avril 2011 à mai 2014, il y a combien de mois ?

43  **M. Camara**.- Vous allez faire le compte, je n'ai pas la mémoire. La signature a été faite
44  et l'inauguration aura lieu le 14 mai 2014.

1   **Me Fischer**.- À quelle date a été faite la signature avec le nouveau concessionnaire ?

2   **M. Camara**.- J'ai mentionné cela…Je crois que c'était le...

3   **Me Fischer**.- Il y a combien de temps de mars 2011 à mai 2014 ?

4   **M. Camara**.- Pouvez-vous m'aider à faire les comptes ?

5   **Me Fischer**.- C'est que je vous dois le respect. Pensez-vous que ce délai est supérieur
6   ou inférieur à celui de 24 mois dont vous nous indiquez qu'il était accordé à Getma ?

7   **M. Camara**.- Je pense que c'est quand même inférieur. De toutes les façons, le début
8   de mise en œuvre et l'évaluation faite aujourd'hui, c'est moins du temps mis par Getma
9   avec le terminal.

10   **Me Fischer**.- Nous ferons les comptes.

11   **M. Camara**.- Oui, il faut faire les comptes.

12   **Me Fischer**.- Il est bien clair que le Port a pris une décision de résilier pour le seul
13   motif de la non-réalisation des travaux, c'est bien cela ?

14   **M. Camara**.- Oui, c'est bien cela.

15   **Me Fischer**.- Il n'y avait pas d'autre motif.

16   **M. Camara**.- Non.

17   **Me Fischer**.- Le Port a décidé de procéder à la résiliation sans mise en demeure.

18   **M. Camara**.- Non.

19   **Me Fischer**.- Sans donner un délai.

20   **M. Camara**.- Non, pas du tout. On est ferme sur ce point.

21   **Me Fischer**.- Vous êtes très ferme. Des pénalités de retard étaient prévues dans la
22   Convention de concession. Vous n'avez pas envisagé de demander des pénalités de
23   retard ?

24   **M. Camara**.- Comment voulez-vous que nous l'envisagions ? Comme *(… ?)* n'avait
25   aucune considération pour nous, il n'a jamais répondu à nos invitations. Le Comité de
26   suivi dont le ministre était membre n'a jamais siégé. Voulez-vous encore que nous
27   nous mettions à écrire et à écrire ? Non, nous n'avons pas de temps à perdre. Nous
28   avons une responsabilité : celle de développer notre port et d'être compétitifs. Nous
29   l'avons exécutée. C'est comme cela.

30   **Me Fischer**.- Et en assumant toutes les conséquences.

31   **M. Camara**.- Absolument. Nous sommes conséquents sur ce point, c'est d'abord notre
32   port, nous voulons qu'il soit développé de la même façon que ceux de Dakar et
33   d'Abidjan, c'est pourquoi nous avons décidé de faire le terminal à conteneurs.

34   **Me Fischer**.- Je vous remercie. Monsieur le Président, c'était mieux qu'un
35   engagement.

36   **M. le Président**.- Merci. Il y a toujours des surprises !

37   Vous avez la parole, Maître Jaeger.

38   **Me Jaeger**.- Merci Monsieur le Président.

39        ➢ ***Cross Examination*** **par la Demanderesse**

40   **Me Jaeger**.- Monsieur Camara, j'aurai quelques questions sur les sujets qui ont été
41   abordés ce matin.

1 **M. Camara**.- Oui.

2 **Me Jaeger**.- Nous allons revenir en arrière puisque nous revenons maintenant à
3 l'appel à manifestation d'intérêt. Est-ce que vous pouvez nous dire quels étaient les
4 candidats qui avaient été sélectionnés à la suite de l'appel à manifestation d'intérêt ?

5 **M. Camara**.- Je l'ai dit tout à l'heure. Il y avait Afrimarine, Getma International, Bolloré
6 et APM Maersk.

7 **Me Jaeger**.- D'accord. Est-ce que vous pouvez vous reporter au Règlement de la
8 consultation qui se trouve dans le classeur Orrick vert à l'onglet 7, page 4 ?

9 **M. Camara**.- Oui.

10 **Me Jaeger**.- Si vous prenez la page 4, article 4, 2ème alinéa, pouvez-vous lire le
11 2ème alinéa ?

12 **M. Camara**.- « Il reste entendu qu'aucun regroupement entre les candidats
13 sélectionnés suite à l'appel à manifestation d'intérêt n'est désormais autorisé ».

14 **Me Jaeger**.- Qu'est-ce qui est entendu là par « candidats sélectionnés » ?

15 **M. Camara**.- Les candidats qui ont été sélectionnés à partir de la présélection.

16 **Me Jaeger**.- Oui. Donc la clause vous dit qu'on ne peut pas regrouper des candidats
17 qui ont déjà été sélectionnés entre eux. Par exemple...

18 **M. Camara**.- Par exemple, on a Getma qui, pour nous, était avec MSC.

19 **M. Camara**.- Qu'est-ce que vous voulez dire ?

20 **M. Camara**.- Getma International a été retenue parce qu'elle était déjà...

21 **Me Jaeger**.- Ce n'est pas la question. La question c'est : l'alinéa 2 dit : « aucun
22 regroupement entre les candidats sélectionnés. » Qu'est-ce que cela veut dire dans
23 votre esprit, comment le comprenez-vous ?

24 **M. Camara**.- Oui, quatre étaient retenus.

25 *(M. Camara relit le texte).*

26 C'est-à-dire qu'ici, chacun des candidats présents, même s'il était avec quelqu'un
27 d'autre, celui qui a soumissionné est celui que nous avons en face.

28 **Me Jaeger**.- C'est ce que vous comprenez.

29 **M. Camara**.- Oui, c'est ma compréhension.

30 **Me Jaeger**.- D'accord. Nous allons parler de la plateforme de stockage. À quoi servait-
31 elle ? Qu'est-ce qu'on stockait en quelque sorte sur cette plateforme ?

32 **M. Camara**.- Je l'ai dit, la plateforme de stockage était dédiée jusqu'à maintenant au
33 stockage de conteneurs vides.

34 Que se passe-t-il à Conakry ? Puisque nous n'avons pas suffisamment de place au
35 niveau du terminal à conteneurs, lorsque les conteneurs sont chargés pour le centre-
36 ville, on parvient à déporter les marchandises et, au retour, ils les déposent au niveau
37 de la plateforme avant l'entrée au port. C'est une infrastructure qui est juste destinée à
38 recevoir les conteneurs vides. Or, un port fonctionne d'abord par sa capacité de
39 réception de conteneurs pleins. Quand le bateau arrive, il dépose les conteneurs. S'il
40 n'y a pas de place sur le terminal à conteneurs, le bateau continue. On en a souffert.
41 Le fondamental pour nous n'est pas la plateforme mais le terminal à conteneurs
42 proprement dit, son extension.

43 **Me Jaeger**.- D'accord.

1  Vous vous souvenez de la date à laquelle la plateforme a été mise à disposition de
2  Getma ?

3  **M. Camara**.- Si je me rappelle, je crois que c'était le 9... Je suis un peu perdu dans les
4  dates. Je crois que c'était autour du 9 mars.

5  **Me Jaeger**.- De quelle année ?

6  **M. Camara**.- 2011. Oui, c'était en 2011.

7  **Me Jaeger**.- Non, cela ne peut pas être 2011.

8  **M. Camara**.- 2010, puisque le Président est décédé et la suspension était en 2010.

9  **Me Jaeger**.- En réalité, je crois que c'est le 23 mars 2010.

10  **M. Camara**.- Voilà.

11  **Me Jaeger**.- Est-ce que vous vous souvenez de la durée que l'offre technique
12  prévoyait pour les travaux de cette plateforme ?

13  **M. Camara**.- Je crois qu'on a parlé de six mois.

14  **Me Jaeger**.- Six mois. Nous pouvons vérifier. Quelle est la pièce ? La soumission…
15  C'est la pièce C-170. Si vous l'avez, vous trouverez que...

16  **M. le Président**.- Vous trouverez avec beaucoup de chance.

17  **Me Jaeger**.- Oui. Six mois, à partir du 23 mars, cela nous amène où ?

18  **M. Camara**.- Cela nous amène autour du mois de septembre.

19  **Me Jaeger**.- Septembre 2010. C'est la date d'achèvement des travaux qui était prévue.

20  Au moment du Conseil d'administration du Port en février 2011, vous nous dites que
21  les travaux n'étaient pas achevés.

22  **M. Camara**.- Non.

23  **Me Jaeger**.- Vous confirmez.

24  **M. Camara**.- Je le confirme.

25  **Me Jaeger**.- Cela fait un retard de cinq mois.

26  **M. Camara**.- Oui, je le confirme.

27  **Me Jaeger**.- La question que je vais vous poser est : quel était l'impact du non-
28  achèvement de la plateforme de stockage sur les travaux du terminal à conteneurs ?
29  Est-ce que vous pouvez nous dire quelle était la séquence prévue pour les travaux du
30  terminal à conteneurs et quelle était éventuellement l'interaction avec ceux de la
31  plateforme ?

32  **M. Camara**.- Lorsque les bateaux arrivent chez nous, il y a un engorgement. D'abord,
33  on a cherché...

34  **M. le Président**.- Monsieur Camara, parlez plus fort et plus près du micro.

35  **M. Camara**.- Merci, Monsieur le Président, de me le rappeler !

36  Donc lorsque les bateaux arrivent, on décharge. S'il n'y a pas de place suffisamment,
37  pour ne pas que le bateau retourne avec le contenu, on fait le gerbage, qui peut avoir
38  deux, trois ou quatre niveaux, ce qui accélère l'affaissement du terminal. Il y a eu des
39  affaissements sur le terminal.

40  Au niveau du terminal, nous avons un espace qui est en concession avec (Friguia ?).
41  On a été obligé de négocier pour que (Friguia ?) accepte que certains conteneurs
42  soient déportés à ce niveau-là.

1 Maintenant, les deux faits ont affecté le fonctionnement du port dans sa globalité
2 puisque notre préoccupation à nous, c'était que très rapidement, le Concessionnaire
3 entame les travaux de réalisation de l'extension du terminal de façon à ce que la
4 pression soit réduite au niveau du terminal à conteneurs. Cela n'a pas été fait.

5 Ce qui a été fait au niveau du terminal de la plateforme, c'était juste pour recevoir les
6 conteneurs vides qui venaient de la ville. Voilà. On pouvait commencer à réaliser le
7 terminal à conteneurs dans son extension sans même toucher la plateforme parce que
8 c'est complètement indépendant.

9 **Me Jaeger**.- Quelle était la durée des travaux préparatoires pour le nouveau terminal à
10 conteneurs ? Est-ce que vous vous souvenez de ce qui était prévu ?

11 **M. Camara**.- Normalement, quand on sait qu'il y a des urgences, trois mois suffisent
12 pour prendre les dispositions, sans compter que Getma International n'a même pas fait
13 les études proprement dites. Getma s'est servie des études de Lackner, donc elle avait
14 le temps d'aller plus vite.

15 **Me Jaeger**.- Si vous vous reportez à la soumission… Vous l'avez sous les yeux ? Non.

16 **Me Teynier**.- Page 15.

17 **Me Jaeger**.- Page 15, vous voyez qu'est prévue une période de commencement des
18 travaux 11 mois après l'entrée en vigueur de la Convention.

19 **M. Camara**.- Oui.

20 **Me Jaeger**.- Donc il y avait 11 mois de travaux préparatoires avant qu'on ne
21 commence les travaux proprement dits.

22 **M. Camara**.- Absolument, oui.

23 **Me Jaeger**.- Donc d'un côté, la plateforme de stockage devait être réalisée 8 mois
24 après l'entrée en vigueur de la Convention…

25 **M. Camara**.- Oui.

26 **Me Jaeger**.- … et on ne commençait les travaux véritablement du terminal à
27 conteneurs que 11 mois après.

28 **M. Camara**.- Oui.

29 **Me Jaeger**.- Ce qui signifie que les travaux préparatoires pouvaient être commencés
30 et réalisés pendant que l'on construisait la plateforme.

31 **M. Camara**.- Absolument.

32 **Me Jaeger**.- Même s'il y avait un retard.

33 **M. Camara**.- Absolument. Je suis tellement à l'aise de parler de cela maintenant que...
34 L'opérateur a attaqué tous les chantiers là à la fois.

35 **Me Jaeger**.- Autre question : à votre connaissance, au moment de l'appel à
36 manifestation d'intérêt et surtout d'ailleurs de la remise des offres à la Commission
37 dévaluation, est-ce que le groupe Bolloré avait déjà des concessions portuaires ?Est-
38 ce qu'ils exploitaient des concessions portuaires ?

39 **M. Camara**.- Oui, le groupe Bolloré était déjà avec le port d'Abidjan, où ils exploitaient
40 le terminal à conteneurs. Je crois que c'est le terminal de Vridi. Vous pouvez vérifier, ils
41 étaient déjà là-bas.

42 **Me Jaeger**.- Alors comment expliquez-vous que la Commission d'évaluation lui aurait
43 mis zéro sur l'expérience dans la concession portuaire ?

44 **M. Camara**.- Peut-être que c'est à partir du document qu'ils ont présenté. Si Maersk
45 n'a pas gagné, c'est pour la manière dont il a présenté le document. Puis, à ce niveau,

1 je précise que la note zéro qui a été donnée était une décomposition d'un critère de
2 sélection. Il y a des points qui avaient été soulignés. À ce niveau, cela correspond à
3 telle note. Sinon, l'expérience, qui est fondamentale, c'est 2 sur 2. Mais c'est une
4 décomposition. La commission a décomposé le questionnaire et a affecté des notes à
5 chacune des composantes de la décomposition. Sinon, c'est tellement important...
6 Mais la commission a dit : « À ce niveau, il faut attribuer la note 2 ». Sinon on aurait dû
7 faire 40 %, 50 % ou 60 %. Mais c'est décomposé.

8 **Me Jaeger**.- Est-ce que vous savez comment le Groupe Bolloré a financé les travaux
9 de construction du nouveau terminal ?

10 **M. Camara**.- Le Groupe Bolloré a dû financer sur fonds propres parce que pour les
11 5 ha qu'ils ont réalisés très rapidement, ils n'ont pas fait un appel d'offres, ils l'ont
12 réalisé directement.

13 C'est la deuxième phase qui a été l'objet d'un appel d'offres et CHEC a remporté le
14 marché et a commencé à faire les travaux depuis décembre passé. Donc Bolloré nous
15 a prouvé franchement qu'il avait la capacité de faire face à des engagements de
16 réalisation du projet.

17 **Me Jaeger**.- Par quoi ont-ils commencé pour faire ce tout nouveau terminal ? Quelle a
18 été première étape dans la réalisation de ces travaux ?

19 **M. Camara**.- Ils ont fait venir des équipements, réhabilité le terminal. Ils ont repris un
20 aspect important : ils ont repris le personnel en totalité, soit 400 travailleurs que Getma
21 International n'a même pas engagés mais a sous-traité l'utilisation de ces travailleurs.
22 Cela nous a fait un grand problème. Nous avons demandé à Bolloré de les reprendre
23 en totalité. Ils ont fait cela, ils ont mis les équipements neufs...

24 **Me Jaeger**.- Pour la construction du nouveau terminal, quelles ont été les premières
25 étapes ?

26 **M. Camara**.- D'abord, eux-mêmes ont fait les études, ils n'ont même pas tenu compte
27 des études faites par… Eux-mêmes ont fait les études, ils ont entrepris les études
28 bâtimétriques tout, tout, tout. Aussitôt, ils ont lancé les travaux parallèlement à
29 l'équipement, à la réhabilitation du terminal existant. Nous, déjà, cela nous a donné
30 satisfaction parce qu'aujourd'hui, ce terminal reçoit les conteneurs et sert également de
31 base de vie à la société CHEC qui est en train de travailler sur le terminal. Nous, on est
32 satisfait. Je ne sais pas comment l'arbitrage va le décider mais aujourd'hui, on est à
33 même de présenter le port à tout le monde pour dire que le port s'est engagé dans la
34 véritable dynamique de son développement.

35 **Me Jaeger**.- Monsieur Camara, nous allons terminer sur cette note positive.

36 Monsieur le Président, je n'ai pas d'autres questions.

37 **M. le Président**.- Merci.


38 ➢ **Questions additionnelles de la Demanderesse**


39 **Me Fischer**.- Brièvement, si vous m'y autorisez, j'aurais souhaité demander au témoin
40 quelle est la période de la saison des pluies en Guinée.

41 **M. Camara**.- Les fortes pluies en Guinée, c'est en août où il pleut peut-être tous les
42 jours. En août. Mais ce n'est pas une raison...

43 **M. le Président**.- Répondez à la question.

44 **M. Camara**.- Merci, Monsieur le Président.

45 **M. le Président**.- Répondez à la question : la saison des pluies...

1   **Me Fischer**.- J'ai bien dit la saison.

2   **M. Camara**.- La saison des pluies, c'est à partir de mai-juin jusqu'à novembre-
3   décembre. Cela dépend des régions. Fondamentalement, c'est la fourchette.

4   **M. le Président**.- Est-ce que je peux oser vous demander combien de mois cela fait ?

5   **M. Camara**.- Quatre mois, cinq mois, Monsieur le Président.

6   **M. le Président**.- Merci.

7   **M. Camara**.- Vous savez, la Guinée a quatre régions naturelles. Il y a des spécificités.

8   **Me Fischer**.- J'aurais souhaité demander au témoin de se reporter à la page 82 du
9   Mémoire en duplique du 24 mars 2013. Je crois que vous l'aviez tout à l'heure...

10  **M. Camara**.- Quel est l'intitulé du document ?

11  **Me Fischer**.- C'est page 82 du Mémoire en duplique du 24 mars 2013,
12  paragraphe 316. Il y a un tableau de la situation de réalisation des travaux de la
13  plateforme ex-chemins de fer au 31 mars 2011.

14  Est-ce que ce tableau est exact ou non ?

15  **M. Camara**.- Je suis... Vous me permettrez mais je suis un peu embarrassé parce que
16  la date à laquelle ce travail a été produit, je ne peux vraiment pas certifier. Cela, je
17  m'en excuse, je ne peux pas me prononcer par rapport à cela.

18  **Me Fischer**.- Vous n'êtes pas sûr que cela corresponde à la réalité ?

19  **M. Camara**.- Oui, je ne peux pas me prononcer.

20  **Me Fischer**.- Vous avez des doutes ?

21  **M. Camara**.- Je ne peux pas me prononcer.

22  **Me Fischer**.- Vous ne pensez pas que ce soit un tableau qui soit probant ?

23  **M. Camara**.- Oui, et ce n'est pas fait de façon contradictoire, c'est des gens qui l'ont
24  fait... Je ne sais pas.

25  **Me Fischer**.- On est bien d'accord.

26  Lorsque le nouveau concessionnaire a pris possession du terminal à conteneurs, est-
27  ce que la plateforme… on peut l'appeler la plateforme de stockage, on dit toujours la
28  gare ferroviaire mais il n'y a plus de rails ni de trains depuis longtemps, est-ce que
29  cette plateforme était en service, pouvait être utilisée ?

30  **M. Camara**.- Oui, en partie. En partie, elle était en service.

31  **Me Fischer**.- En partie ou en totalité ?

32  **M. Camara**.- Non, en partie. Le dallage n'était pas terminé, le pavement n'était pas
33  terminé. Ils ont utilisé la partie qui était disponible pour pouvoir servir de relais tout en
34  continuant les travaux.

35  **Me Fischer**.- On pouvait s'en servir.

36  **M. Camara**.- Voilà.

37  **Me Fischer**.- Donc j'ai bien noté, j'aimerais que vous puissiez le confirmer, que le
38  nouveau concessionnaire aura disposé d'un délai supérieur à 36 mois entre la
39  signature de la Convention de concession et la livraison du terminal.

40  **M. Camara**.- Le nouveau ? Vous parlez de Bolloré ?

41  **Me Fischer**.- Je parle de Bolloré. C'est cela ?

42  **M. Camara**.- Oui.

1   **Me Fischer**.- Je n'ai plus de questions.

2    ➢  **Question additionnelle de la Défenderesse**

3   **Me Jaeger**.- Monsieur le Président, si vous me permettez une dernière question…

4   Monsieur Camara, est-ce qu'en Guinée, pendant la saison des pluies, les travaux de
5   construction s'interrompent ?

6   **M. Camara**.- La pluie n'arrête pas, sinon le pays ne se serait pas développé. Ça
7   continue. Cela n'empêche pas. On a fait un grand pont, un échangeur. Peut-être
8   qu'arrivés à Conakry, vous verrez. Cela n'a jamais été interrompu. La pluie n'arrête pas
9   les travaux.

10  **Me Fischer**.- Cela n'interrompt pas non plus les élections !

11  **M. Camara.-** Non !

12  **Me Fischer**.- Parfait, merci.

13  **M. le Président**.- Je n'ai plus de questions.

14    ➢  **Question du Tribunal arbitral**

15  **Me Teynier**.- Quelques questions, Monsieur Camara. C'est peut-être un peu confus
16  dans mon esprit mais, tout à l'heure, vous répondiez à des questions de mon confrère
17  vous disant : « Vous avez résilié la Concession ». Vous avez répondu : « Nous avons
18  résilié la concession », enfin, le *transcript* fera foi mais c'est l'enseignement que j'en
19  tire. Mais aux termes du Contrat, vous n'êtes pas l'autorité concédante. L'autorité
20  concédante… le signataire, c'est le ministre des Transports. Vous êtes le mandataire,
21  aux termes de l'article 2 je crois, du Contrat de concession mais le décret de résiliation
22  émane du Président de la République ?

23  **M. Camara.-** Oui.

24  **Me Teynier**.- Je ne comprends donc pas pourquoi vous dites « J'ai résilié » ou « Nous
25  avons résilié le Contrat ».

26  **M. Camara.-** Le gouvernement a résilié. Je m'excuse alors. Je suis solidaire de la
27  décision qui est prise mais c'est le gouvernement qui a pris la décision.

28  **Me Teynier**.- Si j'ai bien compris, vous avez, vous, préconisé la résiliation du contrat ?

29  **M. Camara.-** Oui car le Conseil d'administration, j'ai assisté et on a demandé de faire
30  comme cela.

31  **Me Teynier**.- Je sais que vous n'êtes pas juriste donc je me permets de poser des
32  questions dans cette direction-là.

33  **M. Camara.-** Merci.

34  **Me Teynier**.- Deuxième série de questions, sur les travaux d'extension. On a cette
35  période dont on a discuté depuis deux jours, à savoir 11 mois, puis 11 à 35 ou à 36,
36  24 mois de travaux véritables. Cela fait trois ans à peu près.

37  Au moment où vous préconisez la résiliation du Contrat de concession, est-ce qu'il
38  entre dans votre réflexion la possibilité ou non, pour Getma International, de réaliser
39  l'extension du terminal, les travaux d'extension, dans le délai contractuel de 36 mois ou
40  est-ce totalement indépendant ? Je ne veux pas...

41  **M. Camara.-** Indépendant de quoi, s'il vous plaît ?

1 **Me Teynier**.- Ou est-ce que cette considération sur l'extrapolation sur la possibilité
2 pour Getma de réaliser les travaux ou pas entre en ligne de compte ? Est-ce que cela
3 entre en ligne de compte ou pas dans votre décision de préconiser la résiliation ?

4 **M. Camara.-** Cela entre en ligne de compte parce que, nous, nous n'avons rien de vu
5 de concret.

6 **Me Teynier**.- À votre avis, est-ce qu'ils avaient la possibilité dans le délai contractuel
7 de réaliser ces travaux d'extension ?

8 **M. Camara.-** Non, on n'avait plus la conviction. D'abord le terminal existant n'était
9 même pas réhabilité, à plus forte raison de faire le travail du terminal à conteneurs.

10 **Me Teynier**.- Le Président n'a pas entendu votre réponse.

11 **M. Camara.-** Je disais : au moment où le terminal à conteneurs existant n'a même pas
12 été réhabilité, le changement de quais, enfin de défense, on ne peut pas parler de
13 travaux d'extension du terminal à conteneurs. C'est comme ça.

14 **Me Teynier**.- On a parlé de Bolloré qui a pris la suite et qui, au bout d'environ trois ans,
15 aurait ou aura réalisé dans un délai d'environ trois ans les travaux d'extension. Est-ce
16 que le même échéancier que celui de Getma était applicable à Bolloré pour réaliser
17 cette extension du terminal ?

18 **M. Camara.-** Oui, c'est applicable. Je suis convaincu que Bolloré le fera avant même
19 l'échéance de trois ans.

20 **Me Teynier**.- C'est-à-dire que les travaux débutaient 11 mois à partir de la signature
21 de la Convention de concession et ils avaient également 24 mois supplémentaires pour
22 faire ces travaux ? C'est cela ?

23 **M. Camara.-** Oui, c'est cela.

24 **Me Teynier**.- *Mutatis mutandis*, c'est les mêmes conditions ?

25 **M. Camara.-** On a renégocié même avec Bolloré parce qu'au départ, ce qui était dans
26 l'offre n'est pas ce qui est aujourd'hui valable avec Bolloré parce que le programme de
27 Bolloré, c'est que, sur 25 ans, il doit faire un investissement de 500 M€, bien supérieur
28 à ce pour quoi Getma s'était engagée.

29 **Me Teynier**.- J'ai une dernière question, quelque chose que je ne comprends pas.
30 Chronologiquement je la comprends mais les motifs sous-jacents, je ne les comprends
31 pas. C'est la question de la suspension de la Convention de concession avec Getma,
32 je crois le 14 janvier 2009. Vous avez dit tout à l'heure qu'il y avait une suspension…

33 **Me Júdice**.- Suspension 14 janvier 2009.

34 **Me Teynier**.- Oui, 14 janvier 2009. Il y a donc une suspension. Vous dites qu'il faut que
35 les intérêts de l'État soient pris en compte. Effectivement, le décret de levée de la
36 suspension, pardon, parle de la préservation des intérêts de l'État.

37 La levée de la suspension a lieu le 9 avril 2009, deux mois et demi à peu près, moins
38 de trois mois après, et l'avenant est signé quand même beaucoup plus tard, l'avenant
39 n° 1. Il est signé en novembre 2009, c'est-à-dire plus de six mois après la levée de la
40 suspension.

41 **M. Camara.-** Oui.

42 **Me Teynier**.- Comment vous êtes-vous assuré que les intérêts de l'État dans cette
43 période étaient préservés alors que l'avenant censé prendre en compte les intérêts de
44 l'État a été signé bien plus tard, postérieurement à la levée de la suspension ? Je
45 poserai juste une deuxième question après, mais c'est la principale.

**M. Camara.-** L'explication, c'est que le Président, à l'époque, a demandé… a pris le décret pour lever mais sous réserve que le port... Getma International se retrouve à faire un avenant au cours duquel les intérêts de l'État seraient pris en compte, que ce soient les tarifs, la perception douanière, la fiscalité et autres compositions du capital.

Ce travail, le Port l'a fait en tenant compte des recommandations faites par FFA, mais que s'est-il passé ? C'est que Getma International, j'avoue c'est pénible de le dire, s'est retrouvée à Paris, ici ; ils ont élaboré un document qui est contraire à ce que nous, nous avons voulu.

**Me Teynier**.- C'est après la levée de la suspension.

**M. Camara.-** C'est après la levée de la suspension. Et l'avenant devait suivre après. C'est ça.

**Me Teynier**.- Donc la levée de la suspension est motivée... Parce qu'on ne comprend pas tellement : il y a une levée de suspension qui n'explique pas les motifs de la levée de la suspension et on ne sait pas comment Getma, dont la concession a été suspendue, a obtenu cette levée de suspension pour des motifs qui ne sont pas indiqués dans le décret lui-même.

**M. Camara.-** Dans l'intitulé du décret, il est dit : « sous réserve de prendre en compte les intérêts de l'État ». C'est sur cette base qu'on a demandé à ce qu'un avenant soit fait, qui puisse corriger toutes les préoccupations exprimées par le Port en la matière.

**Me Teynier**.- S'il n'y a pas eu de suspension consécutive, est-ce que je peux en déduire que par l'avenant n° 1, l'État était satisfait, que ses intérêts donc étaient respectés après la levée de la suspension ?

**M. Camara.-** Oui, à partir du moment où cela a été signé, l'État a été satisfait. C'est ça.

**M. le Président**.- Toujours pour mieux comprendre cette histoire de suspension, la suspension est intervenue par une décision de qui ?

**M. Camara.-** Une décision du Président de la République.

**M. le Président**.- Qui à l'époque était ?...

**M. Camara.-** Moussa Dadis Camara.

**M. le Président**.- C'est cela. On est dans la phase entre le décès du précédent Président et l'élection de l'actuel.

**M. Camara.-** C'est ça.

**M. le Président**.- Bien. Et le décret suspend sous réserve que les intérêts de l'État soient pris en compte ?

**Me Teynier**.- La levée.

**M. le Président**.- Ce n'est pas possible. Cela n'a pas de sens.

**Me Teynier**.- C'est la pièce C 59.

**M. le Président**.- Cela, c'est le décret de levée. Je ne comprends pas... « La suspension et les procédures judiciaires afférentes sont levées sous réserve de la préservation des intérêts de l'État et des actionnaires guinéens initiaux. » Ce « sous réserve » veut dire quoi ?

**Me Fischer.-** La suspension, c'est C 56. C'est la levée de la suspension.

**M. le Président**.- Cela, c'est la levée de la suspension.

Je vous pose ces questions non pas en tant que juriste, car j'ai compris que vous ne l'étiez pas, mais comme une personne ayant vécu la période en question.

1    **M. Camara.-** Oui, Monsieur le Président.

2    **M. le Président.**- Nous avons un décret qui est, je crois, de janvier, c'est cela ?... qui
3    décide qu'est suspendue toute application de la Convention et toute procédure
4    judiciaire tendant à l'annulation de ladite convention ? Cela veut dire qu'il y avait une
5    procédure en annulation ?

6    **M. Camara.-** Il n'y avait pas de procédure en annulation en cours, non. On a suspendu
7    en attendant que les éléments de préoccupation du Port soient clarifiés.

8    **M. le Président.**- Donc est suspendue toute procédure éventuelle ultérieure en
9    annulation ?

10    **M. Camara.-** Voilà.

11    **M. le Président**.- Ensuite, j'ai un décret de mainlevée de suspension. La suspension
12    de l'application de la Convention et les procédures judiciaires y afférentes sont levées.
13    On lève une suspension des procédures ? Cela veut dire que les procédures
14    reprennent.

15    **M. Camara.-** C'est exact. *(Rires.)*

16    **Me Teynier**.- En tout cas, la Convention a repris !

17    **M. le Président.**- Alors oublions les procédures. « La suspension est levée sous
18    réserve de la préservation des intérêts de l'État ». Ce « sous réserve », c'est quoi ?
19    C'est sous conditions ou avec instruction de faire le nécessaire ? Je veux savoir si, au
20    lendemain de ce décret, Getma pouvait entrer dans les lieux, occuper les lieux et
21    reprendre possession de la concession.

22    **M. Camara.-** Oui, je crois qu'après le décret, il y a un acte qui a été pris, qui mettait les
23    installations à sa disposition et, parallèlement, le Port a commencé à relever les points
24    qu'il fallait inclure dans l'avenant pour pouvoir tenir compte de ce que...

25    **M. le Président**.- … de cette réserve finale qui était une réserve à satisfaire par la
26    suite.

27    **M. Camara.-** Absolument.

28    **M. le Président**.- Là, vous nous dites que Getma est venue à Paris, a préparé un acte
29    que vous n'avez pas aimé et qu'ensuite, vous avez renégocié et vous êtes arrivé à
30    l'avenant de novembre 2009.

31    **M. Camara.-** Le premier avenant, oui.

32    **M. le Président**.- L'avenant n° 1.

33    **M. Camara.-** Oui.

34    **M. le Président**.- D'accord.

35    Lorsque vous nous dites que vous étiez convaincu que Getma ne ferait rien, c'est une
36    conviction que vous avez acquise comment ?

37    **M. Camara**.- Nous l'avons acquise par le fait que nous observions sur place l'évolution
38    de la situation au niveau du terminal existant dans sa réhabilitation, dans son
39    équipement, dans son fonctionnement et de l'extension du terminal à conteneurs.

40    **M. le Président.-**Cela vous permettait de projeter une inaction de Getma sur trois
41    ans ?

42    **M. Camara**.- C'est cela, Monsieur le Président.

43    **M. le Président.-** Vous avez dit tout à l'heure : « Nous avons négocié avec Bolloré ».
44    Probablement pour les délais d'extension, c'est cela ?

1 **M. Camara**.- Oui.

2 **M. le Président**.- Avez-vous négocié avant ou après la résiliation ?

3 **M. Camara**.- C'était après la résiliation.

4 **M. le Président**.- D'accord.

5 Vous avez dit tout à l'heure : « Nous ne pouvions pas nous permettre de respecter la
6 procédure légale prévue au contrat. « Est-ce que vous pensez que vous ne pouviez
7 même pas procéder par une mise en demeure ? Au moins pour avoir la réponse du
8 Concessionnaire, pour voir ses propositions pour remédier à la situation. Par exemple,
9 pour le mettre en demeure de justifier de l'obtention des fonds dans un délai
10 déterminé.

11 **M. Camara**.- Monsieur le Président, nous n'avons pas opté pour cela parce que le
12 climat de collaboration qui existait entre le port et Getma International ne le permettait
13 même pas ; les relations de confiance étaient pratiquement rompues.

14 **M. le Président**.- Depuis quand ?

15 **M. Camara**.- Depuis cinq à six mois. Conakry terminal ne venait pas au port et Getma
16 International n'est jamais venue au port pour discuter avec nous. Nous n'avons jamais
17 reçu de rapport, nous n'avons rien reçu d'eux alors que le partenariat public-privé
18 suppose des échanges d'expériences, de faire des évaluations, d'indiquer ce que le
19 projet doit faire, etc. Mais il n'y a pas eu de collaboration.

20 **M. le Président**.- Les six mois précédents, c'est-à-dire après juillet 2010.

21 **M. Camara**.- Oui. Même pour l'avenant, ils ne sont jamais venus à Conakry pour
22 discuter des conditions de réalisation de l'avenant. Aujourd'hui, nous recevons des
23 rapports tous les mois. Eux, ne l'ont jamais fait. Peut-être qu'ils croyaient que ce qui
24 était important c'était le Gouvernement, ce n'était pas le port.

25 **M. le Président**.- Ce qui serait une erreur n'est-ce pas ?

26 **M. Camara**.- C'est clair !

27 Monsieur le Président, je m'excuse mais j'ai toujours dit aux responsables de Getma
28 International que leur premier avocat était le Port et pas le ministre. Les ministres
29 passent mais le Port demeure. Leur premier avocat est le Port, ce n'est pas quelqu'un
30 d'autre.

31 **M. le Président**.- Est-ce que vous vous êtes demandé si la situation politique en
32 Guinée ne rendait pas difficile, à l'époque, l'obtention de crédits ?

33 **M. Camara**.- Non, je ne pense pas. Le troisième projet dans l'optique d'un financement
34 avec les bailleurs de fonds institutionnels était subordonné à des considérations
35 politiques. Je disais tout à l'heure que les bailleurs de fonds ont fait école dans notre
36 secteur. Les bailleurs de fonds disent : on met de l'argent à votre disposition en 2006
37 mais pour que vous puissiez décaisser, il faut que la dette de l'État, contractée pour
38 deux secteurs qui n'avaient rien à voir avec le port, soit assurée. Il faut que l'État
39 honore ses engagements dans d'autres secteurs, il faut que les élections soient
40 organisées, il faut qu'il y ait une Assemblée.

41 **M. le Président**.– Ce sont les bailleurs de fonds.

42 **M. Camara**.- Oui, l'AFD et la BEI.

43 **M. le Président**.- Je ne sais pas si les banques privées ne tiennent pas compte du
44 facteur politique du pays quand vous leur demandez un financement de projet. Vous
45 êtes-vous posé la question ? Est-ce que vous en avez parlé avec Getma ?

1 **M. Camara**.- Monsieur le Président, Getma nous a toujours fait croire qu'il avait la
2 possibilité de nous faire croire en l'opérateur. Puisque le port est un secteur rentable,
3 quand vous investissez, vous récupérer votre argent.

4 **M. le Président**.- D'accord. D'autres questions ?...

5 Monsieur Camara, contrairement à tous les usages de cet arbitrage, nous terminons
6 avant l'heure prévue ! Le Tribunal vous souhaite retour à bon port.

7 **M. Camara**.- Je vous remercie, Monsieur le Président ainsi que cette auguste
8 Assemblée. Merci beaucoup.

9 **Me Jaeger**.- Monsieur le Président, les experts passent-ils successivement ?
10 Écoutons-nous d'abord les experts du Demandeur ?

11 **M. le Président**.- Nous allons les mettre ensemble. Si nous les laissons assister à
12 l'audience, nous voyons qu'ils assistent chacun à l'audition de l'autre. Je crois qu'il
13 pourrait être utile pour vous d'avoir les deux pour éventuellement orienter une question
14 sur les deux. Une audition d'experts, ce n'est pas la même chose que les témoins. Ils
15 ont une opinion sur les mêmes données. Nous allons voir. J'attends qu'ils soient là
16 pour vous faire une proposition.

17 **Me Jaeger**.- Nous allons d'abord les entendre sur le premier rapport. Les deux
18 rapports ne sont pas sur le même sujet.

19 **M. le Président**.- Les deux rapports ne sont pas sur le même sujet.

20 **Me Jaeger**.- Donc si nous les mettons ensemble, nous n'aurons pas forcément la
21 cohérence...

22 **M. le Président**.- Nous allons d'abord les interroger sur le premier rapport.

23 **Me Fischer.**- Nous sommes bien d'accord, sur le premier rapport KPMG, donc sur les
24 conditions financières de la Convention. C'est bien cela ?

25 **M. le Président**.- Le rapport sur les informations financières.

26 **Me Fischer**.- Nous somme bien d'accord, nous ne parlons que de cela.

27 **Me Jaeger**.- Et PwC sur leur rapport sur la Commission d'évaluation des offres, sur le
28 rapport supplémentaire.

29 **Me Fischer**.- Sur le rapport supplémentaire puisque PwC a effectivement fait quelques
30 observations dans son rapport supplémentaire.

31 **M. le Président**.- Ne nous compliquons pas la vie. J'ai un rapport de KPMG sur les
32 informations financières et un rapport de PwC sur les informations financières.

33 **Me Fischer**.- R-65 et C-233.

34 **M. le Président**.- Nous allons commencer par ces deux-là.

35 **Me Fischer**.- Il n'y a pas d'ambiguïté, c'est bien clair.

36 **M. le Président**.- Ils nous ont dit hier qu'ils feraient une présentation de cinq à dix
37 minutes. Ensuite, je vous proposerai que l'avocat qui a appelé l'expert l'interroge
38 rapidement, puis l'autre Partie. Ensuite, nous ferons l'inverse avec le deuxième expert.
39 Je crois que nous avons ainsi un peu d'ordre. Vraisemblablement, ils seront appelés à
40 se recouper.

41 Les deux experts sont-ils là ? L'expert de PwC est là. Nous attendrons celui de KPMG
42 jusqu'à moins le quart. S'il n'est pas là, nous commencerons avec Mme Perrier.

43 (*Suspendue à 15 heures 36, l'audience est reprise à 15 heures 50.*)

| 1 | **Audition simultanée des experts des deux Parties** |

2 **M. le Président**.- Madame Perrier, pouvez-vous vous asseoir à côté de M. Guitera ?

3 Nous abordons la dernière phase de cette audience consacrée à l'audition des témoins
4 et experts. Nous procédons à l'audition simultanée des experts des deux Parties. Je
5 vais leur demander d'indiquer leurs nom, prénom, etc., et la firme à laquelle ils
6 appartiennent. Successivement, on va peut-être commencer par l'expert de la Partie
7 demanderesse. Allez-y, Madame.

8 **Mme Perrier**.- Dominique Perrier, associée PriceWaterhouseCooper.

9 **M. Guitera**.- Jean-Luc Guitera, associé, KPMG.

10 **M. le Président**.- Le Tribunal attend de vous que vous exprimiez votre opinion en toute
11 conscience et sincérité, et d'après ce que vous considérez être les règles de l'art.

12 Est-ce que vous vous y engagez ?

13 **Mme Perrier**.- Je m'y engage, Monsieur le Président.

14 **M. Guitera**.- Je m'y engage.

15 **M. le Président**.- Nous allons procéder de la manière suivante. Nous prenons d'abord
16 les rapports relatifs aux informations financières présentées par Getma, qui font l'objet
17 de deux écrits —je n'ose pas dire rapports— qui sont un rapport du 24 mars 2013 de
18 KPMG sous la référence R 65, et un rapport et des éléments de réponse de PwC, en
19 date du 19 avril 2013, pièce C 233.

20 Sur cette première question, comme c'est la République de Guinée qui a commencé
21 l'attaque, je pense qu'il est normal que ce soit la République de Guinée qui commence
22 par quelques questions rapides à M. Guitera, mais nous avions convenu, je crois, qu'il
23 allait faire une présentation, puis madame fera une autre présentation. Ensuite, on
24 procédera à leur interrogation alternative par les conseils, le Tribunal pouvant intervenir
25 à tout moment et pouvant même ne pas intervenir.

26 Monsieur Guitera, votre déclaration sur ce premier rapport, cette première question...

27 ➢ **Exposé liminaire de M. Guitera (KPMG)**

28 **M. Guitera**.- Monsieur le Président, Messieurs du Tribunal, dans ce premier rapport en
29 fait, j'ai traité à titre principal deux choses : d'une part, des erreurs détectées au cours
30 de nos travaux sur le préjudice lui-même allégué dans le *business plan* ayant été joint
31 en annexe à l'offre financière ; d'autre part, des éléments relatifs au financement et à la
32 capacité financière du groupe Getma International et NCT Necotrans à financer les
33 travaux résiduels de concession à la date de résiliation.

34 Je commencerai par le premier élément. En fait, ce que nous avons fait dans le cadre
35 de nos travaux d'analyse du préjudice allégué a été de reconstituer le *business plan*
36 sous un modèle Excel pour déjà avoir une première idée du caractère raisonnable et
37 rationnel du chiffre d'affaires mis en avant dans le cadre de l'indemnité forfaitaire de
38 résiliation.

39 **M. le Président**.- Excusez-moi, je me demande s'il n'y a pas un peu maldonne dans
40 mon esprit. Ah oui ! Parce que vous l'avez fait dans le premier rapport.

41 **M. Guitera**.- Tout à fait.

1   **M**. **le Président**.- Je me demande, et là je demande un peu l'avis des experts,
2   s'agissant de cet élément-là, s'il ne vaut pas mieux le traiter avec l'autre rapport de
3   PwC sur le préjudice.

4   **M. Guitera**.- Monsieur le Président, quand vous parlez d'autres éléments, s'agit-il du
5   financement ? Parce que mon rapport, en fait, tel que vous pouvez le voir dans la table
6   des matières, adresse essentiellement deux sujets : d'une part, les sujets relatifs au
7   *business plan* fourni dans le cadre de la soumission, d'autre part, les investissements
8   réalisés et leur financement. Dans cette présentation, je vais traiter des deux sujets en
9   quatre *slides*.

10   **M**. **le Président**.- Si je prends vos deux rapports, il y en a un qui est de... Ils sont de
11   mars 2013.

12   **M. Guitera**.- Tout à fait.

13   **M**. **le Président**.- Le premier est du 22 et traite des indemnités contractuelles
14   principalement, notamment l'indemnité de résiliation…

15   **M. Guitera**.- Tout à fait.

16   **M. le Président**.- ...dans laquelle entre pour beaucoup le chiffre d'affaires, n'est-ce
17   pas ?

18   **M. Guitera**.- Tout à fait.

19   **M. le Président**.- Et ensuite quelques autres indemnités estimées par PwC.

20   **M. Guitera**.- Tout à fait.

21   **M. le Président**.- Dans l'autre rapport, qui est du 24 mars, j'ai en premier lieu une
22   étude sur le chiffre d'affaires…

23   **M. Guitera**.- Tout à fait.

24   **M. le Président**.- ... de Getma.

25   **M. Guitera**.- Monsieur le Président, c'est ce sur quoi portait mon propos introductif,
26   pour expliquer comment ces erreurs avaient été découvertes.

27   **M. le Président**.- Donc il y a une première partie sur le chiffre d'affaires...

28   **Mme Perrier**.- … tel qu'il est compris dans le *business plan* alors que moi, c'est un
29   autre chiffre d'affaires que j'ai examiné.

30   **M. Guitera**.- Exactement.

31   **M. le Président**.- Je sais mais M. Guitera, quelque part, conteste votre chiffre
32   d'affaires en se référant en partie au *business plan*.

33   **M. Guitera**.- Non.

34   **M. le Président**.- Jamais ?

35   **M. Guitera**.- Jamais, il n'y a absolument aucun lien entre l'analyse que nous faisons du
36   rapport de Price d'un côté, et de l'autre les travaux effectués ici. Le seul lien entre les
37   deux est que ces travaux n'ont eu lieu que parce que les autres travaux ont révélé
38   quelque chose. C'est le seul lien. Il n'y a autrement absolument aucun lien.

39   **M. le Président**.- J'avais inversé le rapport. Oui. Bien.

40   Donc ce que vous voulez nous démontrer ici, c'est que les informations fournies par
41   Getma au moment de la soumission, qu'il s'agisse du *business plan* ou des autres
42   informations financières, étaient sujettes à critique. C'est cela ?

43   **M. Guitera**.- Pour être plus précis, Monsieur le Président, mon propos est un peu plus
44   limité sur ces éléments-là.

1  Le premier élément consiste à démontrer qu'il y a eu des erreurs techniques de
2  modélisation Excel, donc de tableur, dans la rédaction du tableau annexé à l'appel
3  d'offres financier, et donc donnant ou présentant à l'autorité concédante une vision de
4  la rentabilité attendue du projet, premier élément. Je ne me prononce pas sur la nature
5  de l'erreur : je la constate. Je la constate et je la chiffre.

6  Ensuite, je commente dans le cadre de mon rapport les différents éléments sur les
7  attestations financières présentées.

8  Dans un troisième temps… mais on peut lier ce deuxième temps au premier par
9  simplification.

10  Donc premier temps : analyse, en fait mise en évidence d'erreurs de modélisation
11  donnant une image fausse de la rentabilité du projet —c'est un constat.

12  Deuxième temps : analyse en fait des financements, notamment du programme
13  d'investissement et de son évolution dans le temps pour arriver en fait jusqu'à la date
14  de résiliation de la Convention et voir si effectivement, des financements étaient
15  possibles par rapport à ce que l'on a vu, étaient en place pour financer la suite du
16  programme d'investissement.

17  Sur le premier sujet qui, j'ai cru comprendre, n'est pas contesté, je n'ai qu'une *slide* qui
18  est assez rapide.

19  Sur le second sujet des financements, qui ont concentré pas mal de discussions hier,
20  j'ai trois *slides*.

21  Je vais aller assez rapidement sur la première *slide* parce que je crois qu'il ne fait pas
22  l'objet de discussions, sur l'existence d'une erreur matérielle. En fait, nous avons
23  relevé trois erreurs de modélisation dans le *business plan*.

24  La première, la principale, relative à la prise en compte d'un chiffre d'affaires lié au
25  passage au scanner en douane, où en fait on a multiplié une ligne de chiffre d'affaires,
26  et non pas une ligne de nombre de conteneurs. Donc le résultat de tout cela est une
27  surévaluation de 215 M€ sur 25 ans.

28  Nous avons également relevé deux erreurs mineures.

29  La première : une erreur de calcul sur des revenus de manutention liés à des
30  transbordements de conteneurs, dont l'impact est de 5,2 M€.

31  La deuxième : l'absence de prise en compte d'une franchise de sept jours sur un
32  certain type de manutention, avec un impact de 2,5 M€.

33  La conséquence totale est une surévaluation du chiffre d'affaires attendu du projet de
34  222 M€ sur les 25 années.

35  Deuxième erreur...

36  **M. le Président**.- Dans votre rapport écrit, où se trouve ce chiffre de 222 M€ ?

37  **M. Guitera**.- Au paragraphe 29, page 7, ligne 2.

38  **M. le Président**.- Sous le tableau ?

39  **M. Guitera**.- Exactement. Le tableau donne les 222 M€ dans l'avant-dernière colonne,
40  et le texte est dans la colonne du dessous.

41  **M. le Président**.- D'accord. Poursuivez.

42  **M. Guitera**.- Deuxième erreur, de nature différente, il y a eu une erreur de calcul dans
43  le calcul d'un taux d'actualisation. Le taux d'actualisation est le taux qui permet de
44  ramener la valeur d'un euro ou d'un franc dans le futur à sa valeur d'aujourd'hui.

1   Le taux affiché sur le document était de 4,88 % correspondant en fait au coût moyen
2   pondéré du capital du projet. Ce coût du capital étant en fait de 20 % de fonds propres
3   et de 80 % de dettes hors effet inflation. Pour faire simple, 4,88%. Quand on refait le
4   calcul, on s'aperçoit que, pour arriver à la valeur que l'on obtient dans le *business plan*,
5   le taux d'actualisation est de 2,1 %, donc le taux réellement utilisé n'est pas le taux
6   figurant en fait sur le document lui-même.

7   La combinaison de ces deux erreurs est présentée dans le tableau que vous avez sous
8   les yeux. Vous avez effectivement... Vous partez des *cash-flows* non actualisés...

9   **M. le Président**.- Vous allez nous donner une copie de ces *slides* ?

10   **M. Guitera**.- Tout à fait.

11   **M. le Président**.- D'accord.

12   **M. Guitera**.- Vous aurez tout. Il y a un seul jeu de *slides*, il y a aussi la suite.

13   Ensuite, vous avez le *business plan* corrigé. Là, on corrige l'erreur de chiffre d'affaires.
14   Ensuite, donc toujours en conservant le taux d'actualisation réellement utilisé par
15   Getma dans sa dette financière, et après, on applique la deuxième correction. On
16   applique le taux d'actualisation qu'ils auraient dû utiliser, celui qu'ils ont déclaré comme
17   étant le taux à utiliser. Ils ont donc utilisé réellement un taux différent du taux affiché.

18   La combinaison de tout cela, en fait, c'est une baisse de rentabilité du projet, une
19   baisse de la valeur du projet de 69 % par rapport à ce qui est affiché initialement.

20   Ayant lu après le rapport de mon excellente consœur Dominique Perrier, je vois qu'est
21   indiqué que cet élément n'entrait pas dans la note. Ce n'est pas un domaine sur lequel
22   je me suis prononcé.

23   En revanche, je note aussi qu'il était indiqué que la Commission recherchait une
24   absence de prise de risques excessive, et la rentabilité attendue d'un projet, donc la
25   marge de sécurité qu'elle donne par rapport à des scénarios plus difficiles, est un
26   élément global que tout tiers normalement averti utilisera pour juger de la sécurité de
27   l'offre qui lui est faite.

28   En présentant une rentabilité très supérieure à ce qu'elle était réellement, il est donc
29   probable que…, on peut penser que l'impression donnée est une impression de
30   sécurité financière de marge disponible pour encaisser des variations et des chocs.

31   Je vais maintenant passer à là...

32   **Me Teynier**.- D'un point de vue méthodologique, je suis un parfait béotien…

33   **M. le Président.-** Nul n'est parfait !

34   **Me Teynier.-** Surtout un arbitre !

35   Quand on est conseil, on fait toujours appel à des compétences telles que les vôtres.
36   Dans la méthodologie, qu'elle est la différence entre cette méthode que vous utilisez, si
37   j'ai bien compris, qui s'assoit sur le *cash-flow* actualisé sur la durée du projet, et par
38   exemple la méthode du DCF ?

39   **M. Guitera**.- C'est la même.

40   **Me Teynier.-** C'est la même mais appliquée à la rentabilité, pas au profit net attendu
41   d'un projet, de marge pour l'investisseur en l'occurrence ?

42   **M. Guitera**.- Vous avez tout à fait raison. En fait, toute la finance moderne est basée
43   sur le théorème de Miller-Modigliani.

44   **Me Teynier.-** Je ne connais pas !

1  **M. Guitera.-** C'est très simple, vraiment. La valeur d'un actif est égale à la somme des
2  *cash-flows,* donc des encaissements futurs qu'il produira, et 1 euro aujourd'hui vaut
3  plus cher que 1 euro demain. Tout le reste, c'est de la tuyauterie. Les calculs utilisés
4  au sein d'une entreprise pour juger de la rentabilité d'un projet seront donc
5  effectivement de même nature dans leurs principes que les calculs qu'on utilisera des
6  *waste profits* pour dire ce qu'aurait été la rentabilité du projet en l'absence de, *but for,*
7  le fait dommageable. Les méthodes sont les mêmes.

8  **M. le Président.-** Le théorème s'applique en Guinée ? *(Sourires.)*

9  **M. Guitera.-** J'ignore s'il existe des lois mathématiques ou économiques spécifiques...

10  **Me Teynier.-** Le Président veut dire là que le risque pays joue aussi.

11  **M. Guitera.-** Bien évidemment. Mon but n'était pas, parce que ce n'était pas ma
12  mission, de critiquer le taux retenu. Ils ont pris une prime de risque, je crois, de 6,5 %,
13  enfin, un taux d'intérêt de 7,5 % inflation comprise. On pourrait considérer que ce taux
14  est assez faible. Ce n'est pas mon propos parce que, dans le cadre de ce travail
15  précis, nous sommes juste intervenus, moi et mes équipe, pour corriger une erreur
16  d'Excel, parce qu'on parle d'une erreur d'Excel.

17  **M. le Président.-** D'accord. Poursuivez.

18  **M. Guitera.-** Je vais maintenant passer à la seconde partie de mon rapport qui est une
19  question qui a été extrêmement débattue hier, question relative au financement des
20  investissements. La table que vous voyez devant vous est la table qui est extraite de
21  l'avenant n° 1 qui a été commenté à loisir hier. Vous remarquez la même valeur de
22  92 713 000. C'est la valeur des investissements du programme ferme hors Ticket
23  d'Entrée qu'il faut ajouter pour voir ce que représente le total de dépenses sur le projet.

24  On a pris comme date de début -qui n'engage que KPMG, personne d'autre- l'avenant
25  de plus trois mois, et comme date d'achèvement, les dates de l'offre financière.

26  Je me permets, à ce propos, de remarquer que dans le *business plan* dont nous
27  parlions tout à l'heure, la totalité des décaissements et achats d'immobilisations se font
28  sur deux ans et non pas sur trois ou quatre. Selon le rapport de Price… En fait, le
29  rapport de Price regarde deux éléments d'immobilisation : le premier qui est le montant
30  des immobilisations en cours, qui est chiffré à 3,6 millions ; le deuxième qui est un
31  extrait du Livre comptable de la STCC qui donne un montant d'immobilisations non
32  amorties (équipements, matériels roulants…) de 16,4 millions. La somme des deux fait
33  20 millions.

34  J'ai noté, au cours des débat d'hier, qu'il a été dit de manière répétée que 15 millions
35  seulement avaient été investis, à savoir 12 plus 3. Je ne connais pas la source de
36  l'erreur. Nous verrons demain, quand nous arriverons à l'analyse du préjudice, qu'une
37  des grandes interrogations que j'ai est le caractère fiable des chiffres ayant servi de
38  base à l'évaluation du préjudice. Là, je vois juste 20 millions quand je prends ça, et
39  15 millions dans la déclaration de M. Quérel.

40  Si je prends comme hypothèse à peu près 20 millions, le groupe doit réaliser environ
41  70 à 72 millions d'investissements en dix mois.

42  Ensuite, quels sont les moyens de financement disponibles ?

43  Le premier moyen de financement disponible... D'abord, on va revenir un peu en
44  arrière, on va revenir à fin 2009 et on verra comment s'est passé 2010 pour le groupe,
45  le financement de la Concession et comment s'annonce la situation en 2011. Il faut
46  vraiment prendre une approche dynamique.

47  Il existe une Convention de crédit de décembre 2009 qui a été commentée
48  abondamment hier, avec deux tranches : une tranche A ayant pour seule fin de
49  rembourser des crédits refinancés, et une tranche B ayant pour fin de refinancer

1 partiellement des investissements du groupe. Le montant des deux tranches est de
2 51 millions. Le découvert bancaire du groupe à cette date est de 54 millions.

3 La section 20.21 : le taux d'intérêts à retenir. Le taux d'intérêts prévu est l'Euribor, donc
4 le taux interbancaire à court moyen-terme, plus une marge de 1 à 2 % selon que des
5 ratios financiers sont remplis ou pas. Comme vous pouvez le voir, on n'est pas du tout
6 sur la marge de 5 ou 6 points par rapport à un taux qui est la marge utilisée dans le
7 *business plan* Conakry. Pourquoi ?

8 C'est normal, parce que l'actif à financer ne présente pas le profil de risque que
9 présente le profil de risque de l'actif Conakry. C'est pour cela, du moins c'est ma
10 compréhension, qu'il est indiqué dans la section 20.21, également abondament
11 commentée hier, que les prêteurs devaient présenter un plan de financement avec des
12 ressources de financement de moyen terme dédiées.

13 Pour un financier –pas pour un juriste-, cela veut dire : « Je suis prêteur, je veux bien
14 financer les activités dans différents pays, mais Conakry présentant un profil de risque
15 particulier, je veux isoler ce financement et être sûr que ce financement ou son échec,
16 ou l'échec de la concession, le risque qui y est attaché, n'impactera pas l'argent que je
17 prête à titre principal ». C'est ce que l'on appelle, d'un terme anglo-saxon, le *re-fencing*.
18 On *re-fence* l'*asset* en franglais.

19 **M. le Président.-** Traduction ?

20 **M. Guitera.-** « *To re-fence* », c'est entourer d'une clôture, c'est contenir, un peu
21 comme le réservoir auto-obturant des voitures qui, s'il y a un incendie, ne se renverse
22 pas à l'extérieur. C'est un peu le même concept.

23 **M. le Président**.- Déjà l'anglais, ça suffit.

24 **M. Guitera**.- C'est bien pour cela qu'on explique qu'on doit remettre un *(… inaudible)*
25 spécifique parce qu'on veut aussi s'assurer que, dans le financement de Conakry par
26 le bailleur spécialisé, ce ne sera pas trop tendu et qu'il n'y a pas de risque de mise en
27 danger des *cash-flows* opérationnels du reste du groupe sur lesquels est assis le
28 remboursement des emprunts financés par la Convention de crédit.

29 En décembre 2009, je constate qu'il n'y a pas de financement.

30 Allons maintenant en 2010, que va-t-il se passer ? Je vous invite à prendre l'annexe de
31 mon rapport, le document intitulé « Tableau des flux de trésorerie n° 3 », page 6.

32 Je vais commencer par rappeler un principe simple trop souvent méconnu, qui est le
33 principe sur lequel se fonde la comptabilité privée par rapport à la comptabilité
34 publique. La comptabilité privée est une comptabilité d'engagement, à savoir qu'on
35 enregistre en bilan et en compte de résultat une transaction ou un actif dès qu'on est
36 engagé à réaliser la transaction considérée. Quand on vend quelque chose,
37 j'enregistrerai la vente au moment de la livraison de la chose, pas au moment de
38 l'encaissement de la créance client. En revanche, la comptabilité publique, jusqu'à
39 présent, est une comptabilité de caisse, à savoir que quand je décaisse, j'ai une
40 charge et quand j'encaisse, j'ai un produit. Les banques...

41 **M. le Président**.- En comptabilité privée aussi, mais pour les non-sociétés.

42 **M. Guitera**.- Je restais effectivement sur les grands groupes. Avec Necotrans, nous
43 avons affaire à un grand groupe.

44 **M. le Président**.- Oui, mais ce n'est pas toute la comptabilité privée.

45 **M. Guitera**.- Tout à fait. Un livre remarquable est paru en 90, qui s'appelait
46 « Accounting (for Ross ?) » qui présentait les différentes options comptables utilisées
47 par les sociétés. Un analyste financier les présentait et sa conclusion avait été : « Les
48 comptables donnent une opinion, le *cash* est un fait, faites plutôt confiance aux faits » !

1 Les banques suivent exactement ces sains principes et regardent les flux de trésorerie,
2 notamment le fameux EBITDA qui est quelque chose qui se rapproche du *cash-flow*
3 d'exploitation.

4 Quand vous prenez ce document qui vous présente les flux de *cash*, encaissements/
5 décaissements, donc ce qui peut financer les investissements de Conakry, j'attire votre
6 attention sur la colonne de droite et le troisième pavé en noir avec des caractères
7 blancs.

8 C'est la dernière annexe, Monsieur le Président.

9 **M. le Président**.- Je ne trouve pas la page 6.

10 **M. Guitera**.- C'est la toute dernière annexe. C'est l'annexe du rapport sur les
11 informations financières.

12 Sur cette ligne, il est marqué : « Flux net de trésorerie généré par l'activité ». Qu'est-ce
13 que c'est ? Ce sont les *cash-flows* d'exploitation. C'est le *cash*, la trésorerie positive,
14 l'encaissement net que génère l'exploitation du groupe.

15 Que voit-on en 2010 ? C'est que ces *cash-flows* d'exploitation, loin de pouvoir servir à
16 financer les investissements, sont négatifs -vous avez des parenthèses- à hauteur de
17 2 millions. Disons qu'ils sont à zéro, c'est plus simple.

18 En revanche, vous constatez, en lisant la ligne marquée «Variation de trésorerie», que
19 la trésorerie a diminué de 28 millions. En fait, elle était négative déjà à l'ouverture, c'est
20 la ligne du dessous, cela veut donc dire qu'on a fait des dettes à court terme à hauteur
21 de 28 millions auxquels il faudrait ajouter 2 millions de dettes à moyen terme.
22 Autrement dit, on a gagné zéro avec l'activité normale et on a dépensé 30 millions.

23 Comment a-t-on dépensé 30 millions ? Qu'est-ce qu'on a pu décaisser pour ces
24 30 millions ? Nous avons quelques indications dans ce document.

25 Nous avons d'abord distribué des dividendes à notre maison-mère à hauteur de
26 9,6 millions. Ensuite, comme cela a été indiqué hier, nous avons racheté des
27 minoritaires sur une de nos filiales à hauteur de 12,4 millions. Autrement dit, que nous
28 reste-t-il pour investir sur la concession ? À peu près 9 millions.

29 Nous avons effectivement 9,2 millions d'acquisition d'immobilisations. Je ne connais
30 pas le détail mais comme nous sommes en trésorerie et non pas en comptabilité
31 d'engagement, nous devrions avoir le décaissement du solde de l'acquisition de
32 l'immobilisation Ticket d'Entrée qui a été décaissée en 2010. En d'autres termes, en
33 2010 nous avons consacré en investissements tangibles entre 1,5 et 2 millions,
34 probablement réalisés dans la concession de Conakry, je ne sais pas.

35 **Me Teynier**.- C'est la question que j'allais vous poser. Ce sont les flux de trésorerie du
36 groupe Necotrans. De quoi pouvez-vous déduire qu'ils sont affectés à
37 « l'investissement Conakry » ?

38 **M. Guitera**.- Le solde résiduel. Je n'ai aucune information sur le sujet, c'est une
39 supputation d'expert. Je ne sais pas à quoi ils sont utilisés.

40 **M. le Président**.- Ce tableau est-il tiré du bilan consolidé ?

41 **M. Guitera**.- Tout à fait.

42 **M. le Président**.- Poursuivez.

43 **M. Guitera**.- Ensuite, la Convention du 18 décembre 2009 impose également le
44 respect de ratios, ce que l'on appelle des *covenants*. Quels sont ces ratios ? En fait, ce
45 sont des espèces d'indicateurs d'alerte qui ont pour but d'indiquer aux banquiers si
46 l'investissement qu'ils ont fait en prêtant commence à être mis en danger.

47 Il y a deux *covenants* ?

1   Un *covenant* appelé R1 qui est la comparaison entre l'endettement et les fameux
2   *cash flows* d'exploitation, l'EBITDA. C'est ce que nous appelons un *covenant* de flux
3   car le *cash-flow* est un flux annuel.

4   Le deuxième est un *covenant* de stocks qui va comparer les capitaux propres du
5   groupe, qui sont ses financements propriétaires à long terme par opposition aux dettes
6   qui sont un financement à long terme mais qui n'appartient pas au groupe, et
7   l'endettement net.

8   J'ai fait un graphe pour montrer l'évolution à partir des comptes sur trois années de
9   l'endettement net et du *covenant*.

10   Comme indiqué par l'annexe consolidée des comptes 2011, qui fait référence aux
11   comptes 2010, une provision a été comptabilisée par anticipation par Necotrans sur la
12   Guinée. Pour calculer les capitaux propres 2010, j'ai donc ré-augmenté les capitaux
13   propres consolidés pour neutraliser l'impact de cette provision. C'est donc ce que vous
14   auriez en l'absence de tout fait relatif à la concession en 2011.

15   Que voyons-nous ? Quand je prends la barre rouge, qui est le ratio de couverture des
16   capitaux propres consolidés, elle est légèrement dépassée fin 2010. Le ratio de
17   couverture des *cash flows* est quasiment atteint.

18   Autrement dit, je suis au taquet. Je ne vais donc pas me lancer dans une politique
19   monstrueuse d'investissement ou il faut effectivement que j'aie un financeur qui
20   accepte le financement d'un actif dédié, mais il va falloir que je le rencontre, que je lui
21   donne des garanties, cela va prendre un certain temps.

22   Sur la base de ce que j'ai pu voir dans des cas similaires, le groupe, à ce moment-là,
23   en termes de capacité d'endettement pour un projet de ce type, est au taquet, en tout
24   cas dans le délai imparti.

25   J'ai eu communication du document qui a été discuté hier par rapport au groupe
26   Necotrans, cela semble indiquer qu'il y a eu des cessions d'actifs significatives.

27   Il y a juste un élément sur lequel j'aimerais attirer votre attention. J'ai fait une analyse
28   qui se situe à fin 2010. Quand on se projette dans le temps, en août 2011, et que nous
29   voulions financer un actif de ce type… que se passe-t-il ? Août 2011, nous sommes en
30   plein dans la crise grecque. Août 2011, les départements de financement d'actifs des
31   grandes banques françaises sont mis en sommeil les uns après les autres. D'août
32   2011 à mi-2012, les grandes banques françaises vendent massivement leurs
33   portefeuilles d'actifs à long terme parce qu'elles ont un problème : elles se financent en
34   court terme, liquidités en dollars, pour prêter long, or la liquidité dollar s'est effondrée.
35   Donc si vous voulez faire ce financement à partir de juillet 2011, cela va être quand
36   même très difficile.

37   J'en ai fini.

38   **M. le Président**.- Madame Perrier, est-ce que vous avez quelque chose à nous dire
39   sur les mêmes sujets ?

40      ➢ **Exposé liminaire de Mme Perrier (PwC)**

41   **Mme Perrier**.- Je n'ai examiné qu'un seul des sujets qui est le premier sujet abordé, à
42   savoir le *business plan*. J'ai aussi une petite présentation. Je n'ai regardé que la partie
43   liée au *business plan*.

44   En fait, comme nous l'avons vu à travers la présentation de Jean-Luc Guitera, le
45   cabinet KPMG a indiqué dans son rapport qu'il y avait des erreurs dans le *business*
46   *plan* qui avait été communiqué par Getma dans le cadre de la soumission de son offre.

1  Il m'a été demandé de voir si ces erreurs avaient pu avoir un impact sur le processus
2  de sélection. C'est pourquoi, dans ce contexte, j'ai examiné un document qui figure
3  dans les pièces… je crois que c'est la pièce R-52. Ce document a été établi par la
4  Commission nationale des grands marchés et consiste à dépouiller les offres reçues
5  des quatre candidats.

6  De manière résumée, j'ai analysé ce document. Jean-Luc Guitera a pris pas mal de
7  temps pour expliquer ce qu'il avait fait, je n'avais pas prévu de passer autant de temps,
8  donc je vais peut-être passer un peu plus de temps que ce qui est indiqué sur le *slide*.

9   Ce document a été préparé par la commission, il a consisté à analyser tout d'abord les
10  offres techniques, puis les offres financières et ensuite à donner un certain nombre de
11  points à chaque candidat selon un barème qui était établi dans le document de
12  manière à décider qui était le vainqueur de la soumission.

13  Dans ce document, une partie est dédiée au *business plan* et concerne la partie
14  « Offres financières ». Je ne sais pas si vous avez le document en face de vous mais
15  l'analyse des offres financières commence à la page 42.

16  **M. le Président**.- C'est quel onglet ?

17  **Mme Perrier**.- R-52.

18  **M. le Président**.- C'est l'onglet 6.

19  **Me Fischer**.- Vous aviez le même document dans le précédent *bundle*. Je pense qu'il
20  est un peu plus lisible.

21  **M. le Président**.- C'est à quelle page ?

22  **Mme Perrier**.- Il y a plusieurs pages. Ce que je voulais...

23  Tout d'abord, il y a une partie sur les *business plans*. Si vous voulez bien regarder la
24  page 47, petit D, « *Business plan et projections financières* », donc qui comptent dans
25  l'offre pour un total de 15 points... Il faut savoir qu'il y avait trois hypothèses qui
26  devaient être données pour les *business plans* : hypothèse faible, hypothèse moyenne
27  et hypothèse forte.

28  Ce qui est indiqué, c'est comment va fonctionner ce barème. 5 points vont être affectés
29  au soumissionnaire dont le montant est le plus élevé. Ensuite, les autres
30  soumissionnaires seront notés au prorata des montants.

31  Ce qui est intéressant, c'est de savoir ce que sont les montants indiqués. Pour cela, je
32  vous propose de regarder peut-être le premier candidat, qui est le groupement
33  Afrimarine-TCB. Cela commence à la même page, et donc de regarder en page 50,
34  petit D. Est-ce que vous le voyez ?

35  Ensuite, on voit les trois hypothèses : D1, D2 et D3 page suivante.

36  Quels sont les éléments qui sont évoqués au titre du *business plan* ?

37  C'est le taux moyen de croissance du trafic qui est indiqué, donc 3 %.

38  C'est la redevance par EVP, qui est indiquée à 3,68 €, payable au concédant.

39  Ensuite, il y a le trafic projeté pour les cinq premières années. En fait, cela permet de
40  calculer une redevance attendue en multipliant le trafic attendu par le montant de la
41  redevance.

42  Donc ce calcul montre que ce qui a été examiné par la Commission lorsqu'elle a
43  examiné le *business plan* et les projections financières, c'est uniquement le montant
44  que le Concédant pouvait attendre du fait des données communiquées par les
45  candidats.

46  Donc le montant attendu, c'est la redevance multipliée par le volume sur cinq ans.

1　C'est sur cette base qu'a été fait le choix de la Commission. Si vous allez un peu... Je
2　ne sais pas si vous... On peut peut-être aller un peu plus loin pour prendre le cas de
3　Getma International.

4　Getma International, si vous allez à la page 62, vous pourrez constater, pour
5　l'hypothèse faible, comme pour l'hypothèse moyenne ou l'hypothèse forte, que Getma
6　International a 5 points dans chacune de ces hypothèses. Pourquoi est-ce que Getma
7　a 5 points ? Eh bien, c'est parce que le revenu attendu par le Concédant sur la base de
8　la redevance et des volumes est le plus élevé.

9　Pourquoi est-ce que je dis que l'erreur qui a été relevée par KPMG, dont je n'ai pas
10　vérifié le montant ni l'étendue, n'a pas d'impact ? C'est parce que l'erreur ne porte pas
11　sur le volume d'opérations. Elle porte sur autre chose. Donc j'en ai déduit qu'il n'y avait
12　pas eu d'impact de l'erreur qui avait été chiffrée par KPMG sur l'attribution de la
13　concession à Getma International.

14　Ce que je peux souligner d'autre, c'est que lorsque l'on regarde le dossier, il n'est
15　nullement fait mention des résultats attendus par le Concessionnaire. Pourquoi ?
16　Finalement, c'est sans doute parce que le Concédant, ce qui l'intéresse, c'est ce qu'il
17　va recevoir, lui. Ce n'est pas le résultat que va faire le Concessionnaire sur la durée de
18　la concession.

19　Ce que j'indique aussi, c'est qu'au demeurant, en admettant que l'erreur relevée par
20　KPMG soit exacte, le résultat attendu sur la concession aurait quand même été de, je
21　crois, 89 M€, ce qui est un montant d'ores et déjà très élevé. Donc je ne pense
22　vraiment pas que cela aurait pu affecter en quoi que ce soit la décision.

23　**M. le Président**.- 89 actualisés ou hors actualisation.

24　**Mme Perrier**.- Actualisés, oui.

25　**M. le Président**.- À quel taux ?

26　**Mme Perrier**.- Au taux qui est indiqué dans le *business plan*. Je pense que c'est 4,15.

27　**M. le Président**.- 4,88, je crois, non ? Enfin, c'est au taux indiqué dans le *business*
28　*plan*.

29　**Mme Perrier**.- Voilà.

30　**M. le Président**.- Merci.

31　**Mme Perrier**.- Donc voilà la conclusion que j'ai tirée. Je crois que dans la présentation
32　de Jean-Luc Guitera, il est fait allusion au fait que le Concédant avait recherché des
33　éléments suffisamment prudents en reprenant quelque chose que j'avais mis dans
34　mon rapport. Parce qu'en fait, l'interprétation qui est faite de cette phrase, on va peut-
35　être reprendre ma phrase...

36　**M. Guitera**.- « Sans prise de risque excessive ».

37　**Mme Perrier**.- Voilà : « Sans prise de risque excessive ». Cette petite phrase, qui
38　figure bien dans mon rapport, ne concerne pas le *business plan* en tant que tel. Elle
39　concerne juste ce qu'a pu penser le Concédant en voyant pas le *business plan* mais
40　les volumes annoncés par Getma International et la redevance.

41　Parce que si vous prenez, dans mon rapport *« Éléments de réponse au rapport*
42　*KPMG »*, la page 5, vous pouvez constater que les hypothèses de trafic, si on se situe
43　par rapport au numéro 2 dans le classement, qui est le Groupe Bolloré, les hypothèses
44　de trafic de Getma International sont plus prudentes que celles de Bolloré. Donc c'était
45　cela que je voulais dire en parlant de « sans prise de risque excessive », mais je ne me
46　référais pas du tout au *business plan* ni au résultat dégagé par le Concessionnaire.

47　**M. le Président**.- À la page 5 ?

1 **Mme Perrier**.- Oui, à la page 5 du rapport. Il y a trois tableaux sur cette page. Le
2 premier, c'est Getma, le deuxième c'est Bolloré. Quand vous regardez par exemple le
3 trafic 2009, vous voyez pour Getma...

4 **M. le Président**.- C'est la page 6.

5 **Mme Perrier**.- Écoutez...

6 **M. Guitera**.- Moi, j'ai 5.

7 **Mme Perrier**.- Moi, j'ai 5.

8 **M. le Président**.- Eh bien, on a tout ce qu'il faut pour se comprendre ! Ah oui, je crois
9 comprendre pourquoi. À cause de cette page.

10 **Mme Perrier**.- Oui, d'accord. Alors, regardez la page 6 pour vous. Si vous regardez
11 ces deux tableaux, Getma et Bolloré, vous allez constater que par exemple sur 2009,
12 hypothèses faible, moyenne, forte, on a 114 000, 119 000, 125 000. Pour Bolloré on a
13 138 000, 140 000, 142 000. En conséquence, on voit que Getma, avec un trafic moins
14 important mais avec une redevance plus importante, arrive à un montant plus élevé.
15 Donc c'est en cela que je voulais dire qu'il y avait moins de prise de risque pour le
16 Concédant.

17 **M. le Président**.- Merci.

18 ➢ ***Direct Examination* par la Défenderesse**

19 **M. le Président**.- Je propose que Me Jaeger, s'il en a, pose des questions à
20 M. Guitera. S'il en a !

21 **Me Jaeger**.- Je pense, Monsieur le Président… Vous voulez dire en *direct* ? Non, je
22 n'ai pas de questions en *direct*.

23 **M. le Président**.- Alors, Monsieur Fischer.

24 ➢ ***Re-direct Examination* par la Demanderesse**

25 **Me Fischer**.- Merci, Monsieur le Président. J'ai effectivement, si vous le permettez,
26 quelques questions à poser à M. Guitera sur ce qu'il est convenu d'appeler son
27 premier rapport.

28 Je souhaiterais que M. Guitera nous rappelle à quelle date il a été missionné par
29 l'agent judiciaire de la République de Guinée.

30 **M. Guitera**.- Pour être honnête, j'ai totalement oublié. Cela doit être en annexe de mon
31 autre rapport, que je n'ai pas avec moi.

32 **Me Fischer**.- Non, non, je vous confirme, c'est...

33 **M. Guitera**.- … 27 février 2013.

34 **Me Fischer**.- Vous avez donc travaillé notamment sur des éléments communiqués par
35 la société Getma International dans son Mémoire du 18 juin 2012. Est-ce que vous
36 trouvez que ce délai, qui s'est écoulé entre le 18 juin 2012 et le 27 février 2013, est un
37 délai habituel pour les procédures arbitrales auxquelles vous êtes habitué ?

38 **M. Guitera**.- Je ne comprends pas votre question.

39 **Me Fischer**.- Vous avez été amené à travailler sur une documentation notamment, qui
40 a été notamment sur le rapport de Price Waterhouse, documentation qui a été
41 communiquée dans le cadre de la procédure arbitrale le 18 juin 2012.

1   Selon votre opinion, est-ce que c'est un délai habituel pour les procédures arbitrales,
2   entre le 18 juin 2012 et le 27 février 2013 ?

3   **M. Guitera**.- J'ai vu de tout, moi. J'en ai même vu une qui ne s'est pas conclue en cinq
4   ans, alors...

5   **Me Fischer**.- Vous indiquez dans votre rapport —je crois que c'est au paragraphe 4—
6   que c'est en travaillant sur le préjudice que vous vous êtes aperçu...

7   **M. Guitera**.- Tout à fait.

8   **Me Fischer**.- Et vous vous en êtes aperçu dès le 7 mars.

9   **M. Guitera**.- Ce que l'on a fait, c'est qu'on a répliqué le *business plan* sur un modèle
10  Excel pour voir en fait si le chiffre d'affaires présenté par Price Cooper dans le cadre
11  de son rapport sur l'indemnité forfaitaire de résiliation nous paraissait raisonnable ou
12  s'il y avait, en approche analytique par le haut, un écart qu'on n'arrivait pas à justifier.
13  C'est comme cela qu'on a vu effectivement qu'il y avait un écart qu'on n'arrivait pas à
14  justifier.

15  **Me Fischer**.- Est-ce que vous confirmez que votre mission ne consistait pas à émettre
16  une opinion sur l'information à laquelle vous aviez eu accès ?

17  **M. Guitera**.- À cette date, au moment où nous avons trouvé cet élément, je vous
18  confirme que notre mission n'était absolument pas… notre mission était uniquement,
19  pour dire les choses différemment, notre mission était uniquement de porter une
20  analyse sur le rapport de Price Cooper.

21  **Me Fischer**.- Votre mission a donc évolué le 7 mars. Entre le 27 février et le 7 mars,
22  est-ce que c'était un délai suffisant pour découvrir l'erreur ?

23  **M. Guitera**.- Dès l'instant où on avait répliqué le *business plan*, on appuyait sur un
24  bouton et c'était Excel.

25  **Me Fischer**.- C'était donc assez simple pour un professionnel, s'entend.

26  **M. Guitera**.- Ne vous méprenez pas sur mes propos. Nous avions en fait un chiffre de
27  trafic qui était de 120 000 EVP, de mémoire, 120 000 conteneurs dans les années
28  qu'on avait eues.

29  Quand on a répliqué le *business plan*, on a recopié et repris les formules en fait, on
30  s'est rendu compte qu'il y avait un sujet. Donc vous avez une fonction sur Excel qui
31  s'appelle « *Repérer les antécédents* », qui permet de voir d'où vient un calcul. La
32  cellule X, d'où vient-elle ? C'est la cellule Y fois la cellule Z. C'est ainsi qu'on s'est
33  rendu compte de cela.

34  **Me Fischer**.- Est-ce que vous savez ce qu'est un passage au scanner ?

35  **M. Guitera**.- Oui, c'est le passage sur un scanner.

36  **Me Fischer**.- C'est-à-dire ?

37  **M. Guitera.-** Vous passez un objet au travers d'un scanner qui a pour fonction de
38  vérifier la présence d'un corps dans un objet.

39  **Me Fischer.-** Et en matière portuaire ?

40  **M. Guitera**.- Je suppose que c'est passer sous un portique un conteneur pour voir si,
41  dedans, il y a un sujet particulier. C'est peut-être une des obligations qu'on doit avoir à
42  la suite des importations aux USA. Il me semble qu'ils ont mis cela en 2005-2006.

43  **Me Fischer**.- Là, nous parlons de Conakry. Est-ce que vous savez quel est chiffre
44  d'affaires qui peut être généré par le passage au scanner ?

1  **M. Guitera**.- Absolument pas. Je sais ce qu'il y a dans le *business plan*. Je précise ma
2  réponse. Je sais ce qu'il y a dans le *business plan*. Effectivement, on a détecté une
3  erreur. Après correction de l'erreur…  Pour être plus précis encore dans ma réponse,
4  avant correction de l'erreur, le *business plan* du passage scanner, par exemple sur
5  l'année 2009, est de 5 millions d'euros. Après correction du *business plan*, erreur
6  corrigée, après correction de l'erreur, il est de 63 000 millions d'euros.

7  **Me Fischer**.- C'est effectivement une différence significative.

8  Vous avez indiqué paragraphe 18 de votre rapport, page 5, que le chiffre d'affaires
9  généré par le scanner était de 5 311 000.

10  **M. Guitera**.- Dans le *business plan* !

11  **Me Fischer**.- Oui, bien sûr.

12  Dans votre analyse des écarts générés par les erreurs, c'est-à-dire entre, si j'ai bien
13  compris, le *business plan* figurant dans le dossier d'appel d'offres et la correction que
14  vous avez effectuée, il y a pour la première année -nous ne parlons que de la
15  première- un différentiel, si je comprends bien, de 5 285 352 euros. C'est au haut de la
16  page 7. Est-ce que je comprends bien ? Il y a un tableau, une colonne écarts…

17  **M. Guitera**.- Tout à fait. C'est la somme des trois écarts.

18  **Me Fischer**.- Et la majeure partie... Est-ce que vous avez été informé ou est-ce qu'il a
19  été porté à votre connaissance que la République de Guinée n'a pas retenu la
20  proposition de la société Getma International de lui concéder l'activité scanner et que,
21  dans la Convention de concession, cette activité n'est pas dans le périmètre de la
22  concession ?

23  **M. Guitera**.- Non. Cela n'a pas d'impact sur mes travaux. Moi, je chiffre une erreur.

24  **Me Fischer**.- Sur un *business plan*. Cela a un peu un impact puisqu'après, vous en
25  tirez des conséquences à partir du *business plan* sur les financements ou autres.

26  **M. Guitera**.- Non. Non, continuez.

27  **Me Fischer**.- Peut-on dire que, si l'on neutralise l'activité scanner qui n'a pas été
28  concédée, ce dont semble-t-il vous n'avez pas été informé, le *business plan* sur la
29  question du chiffre d'affaires est exact ou proche de la réalité puisque, si l'on neutralise
30  dans votre correction 5 311 952, l'écart étant de 2 285 000 euros, on va arriver à un
31  *business plan* corrigé un peu supérieur.

32  **M. Guitera**.- Si on supprime le scanner, on va être très proche du *business plan*
33  corrigé que j'ai calculé en termes de chiffre d'affaires. Oui.

34  **Me Fischer**.- Pensez-vous *in fine* que cette question du scanner et de cette erreur, qui
35  me semble-t-il n'est pas contestée, a un véritable intérêt ?

36  **M. Guitera**.- Je n'étais pas dans les négociations, je ne peux pas me prononcer.

37  **Me Fischer**.- Je parle pour notre analyse aujourd'hui.

38  **M. Guitera**.- Tout ce que je peux vous dire, c'est que, un, l'erreur existe. Je crois
39  qu'elle n'est pas contestée. Point.

40  Deuxième élément, la conséquence de l'erreur, avant même toute discussion sur le
41  taux d'actualisation, c'est une baisse de la valeur actuelle nette du projet de
42  251 millions sur 25 ans, soit10 millions par an, soit 160 millions sur 25 ans, soit…

43  **Me Fischer**.- Est-ce que je comprends bien ? C'est la valeur actuelle nette telle quelle
44  résulterait du *business plan* ?

45  **M. Guitera**.- Tout à fait. Corrigée des deux erreurs et hors passages scanner.

1 **Me Fischer.**- On est d'accord pour dire que le gros de l'erreur, c'est le scanner ?

2 **M. Guitera**.- Oui.

3 **Me Fischer.**- Si on rebâtissait un *business plan* en ne parlant plus du scanner, c'est-à-
4 dire en gommant cette erreur, ne parviendrait-on donc pas *grosso modo* à votre
5 *business plan* corrigé ?

6 **M. Guitera**.- Hors actualisation…

7 **Me Fischer.**- Toutes choses étant égales par ailleurs.

8 **M. Guitera**.- Hors actualisation, oui.

9 **Me Fischer.**- Est-ce que vous avez eu connaissance de l'avenant n° 1 du
10 7 novembre 2009, pièce C 128, qui se trouve à l'onglet 3 ?

11 **M. Guitera**.- Oui.

12 **Me Fischer.**- Vous le connaissiez ?

13 **M. Guitera**.- Oui.

14 **Me Fischer.**- Est-ce que vous avez relevé qu'une activité, au terme de cet avenant, qui
15 a tenu compte des intérêts de la Guinée, une activité cette fois-ci concédée dans la
16 concession du 22 septembre 2008 a été retirée ?

17 **M. Guitera**.- La consignation des navires.

18 **Me Fischer.**- Est-ce que vous savez ce qu'est la consignation des navires ?

19 **M. Guitera**.- Non, pour être honnête.

20 **Me Fischer.**- C'est une activité qui était concédée dans le premier périmètre, qui a
21 donc été retirée. C'est des prestations fournies aux navires, mais peu importe. Est-ce
22 que vous admettez que, par rapport au *business plan* qui est en quelque sorte une
23 prévision, on a, pour différentes raisons, retranché deux activités susceptibles de
24 générer du chiffre d'affaires ?

25 **M. Guitera**.- Si par rapport à l'offre financière, il y a des activités en moins, la réponse
26 ne peut être que « oui », sur un plan de principe mais sachant, pardonnez-moi de
27 revenir là-dessus, moi, le travail que j'ai fait, c'est chiffrer un écart.

28 **Me Fischer.**- Oui mais personne ne met en cause votre travail puisque, grâce à vous,
29 nous savons qu'il y a une erreur.

30 Dans la mesure où deux activités, dont une générant un chiffre d'affaires de l'ordre de
31 5 millions par an, ont été retirées, est-ce que, pour la bonne compréhension du
32 dossier, ce *business plan* conserve un intérêt ?

33 **M. Guitera**.- Cela dépend à quel moment on se place. Le *business plan* conserve un
34 intérêt en tant que contrôle de cohérence, mais c'est un problème d'audit, et il a un
35 intérêt pour voir si -je sors de ma mission-, au moment où il a été présenté a une
36 commission, son existence a eu un impact sur la décision d'attribution de la concession
37 à A ou à B. Il faudrait voir effectivement. Le fait que l'erreur n'a été découverte qu'à ce
38 stade très tardif semblerait indiquer que le point que vous mentionnez, à savoir
39 l'absence de passage scanner, comme étant un point important, n'a pas été relevé
40 antérieurement.

41 **Me Fischer.**- C'est l'activité qui n'a pas été concédée.

42 **M. Guitera**.- Je suis sur votre point d'avant. Le point a été découvert pratiquement
43 quatre ans et demi après que l'offre financière eût été fournie. Si on se remet dans les
44 circonstances, et pour répondre à votre question, dans les circonstances de l'époque,

1 j'ignore quels travaux d'analyse ont ou n'ont pas été faits. Quels qu'ils aient été, ils
2 n'ont pas abouti à la découverte de l'erreur, c'est clair, puisque manifestement...

3 **Me Fischer**.- Sauf si on a neutralisé la partie scanner puisqu'elle n'était pas concédée
4 et n'avait donc aucun intérêt.

5 **M. Guitera**.- Je ne sais pas mais, dans mon expérience -je connais un peu les projets-,
6 quand quelque chose est sorti... Enfin, il y a une modification des documents, bon. Au
7 moment où -c'est mon seul point, je n'irai pas au-delà- ce document arrive au niveau
8 de la commission, il y a une erreur technique. En fait, il y a deux erreurs techniques qui
9 donnent à penser que la marge de sécurité, le résultat étant d'à peu près, je crois,
10 10 millions par an dans la version 1, après correction des deux erreurs, on tombe à
11 3,5 millions par an après actualisation. Là, pour répondre à un point qui était évoqué
12 plus tôt par monsieur, je n'ai pas touché au taux. Après, le taux c'est un autre sujet, on
13 pourrait disserter sur le sujet. Est-ce que c'est ou pas le bon taux ? Mais ce n'est pas
14 mon sujet.

15 Mon seul constat, c'est : il y a des erreurs Excel. Leur conséquence, c'est tant...
16 Ensuite, je crois que c'est au Tribunal et aux Parties qu'il appartient de voir quelles ont
17 ou n'ont as été les conséquences de ces erreurs. Moi, ce n'est pas ma mission.

18 **M. le Président**.- Merci !

19 **Me Fischer**.- Vous avez relevé donc une erreur que vous avez qualifiée de
20 « technique ». Est-ce que ce sont des erreurs qui arrivent, qui sont fréquentes, qui ne
21 sont pas fréquentes ?

22 **M. Guitera**.- Alors là, j'ai un avis très tranché sur la question : ce montant d'écart, je
23 n'ai jamais vu !

24 **Me Fischer**.- Est-ce que vous connaissez les professeurs Rogoff et Reinhart ?

25 **M. Guitera**.- Oui

26 **Me Fischer**.- Qui sont-ils ?

27 **M. Guitera**.- Deux professeurs de Harvard qui ont fait une erreur dans leur modèle.

28 **Me Fischer**.- C'était une erreur qui était supérieure ou inférieure à celle commise par…

29 **M. Guitera**.- Ce n'est pas la même nature. Pour Reinhart et Rogoff, il faut lire non
30 seulement la première page de Bloomberg, mais après la suite dans (Wall Street ?),
31 qui est beaucoup plus intéressante. L'erreur de Reinhart et Rogoff, c'est surtout le fait
32 d'avoir sorti des périodes données de pays donnés considérées comme étant non
33 représentatifs statistiquement. Ce n'est pas « A x B = C », c'est un peu plus compliqué.
34 Cela a été simplifié parce que, comme vous le savez très bien, il y a tout un débat
35 politique qui se greffe derrière, avec les keynésiens qui tirent à vue sur les
36 monétaristes pour dire que le seuil des 90 % n'est pas bon. Moi aussi, quand j'ai vu
37 cela, comme tout le monde, j'ai été intéressé. Sachant que j'ai aussi tendance à croire
38 que...

39 **M. le Président**.- Excusez-moi, je crois que c'est passionnant, de même que l'erreur
40 du FMI sur le taux multiplicateur.

41 **M. Guitera**.- Ah oui !

42 **M. le Président**.- … mais ce n'est pas tout à fait l'objet de cet arbitrage.

43 **Me Fischer**.- Je vois simplement que même si on est ancien élève d'Harvard, on peut
44 faire des erreurs dans des tableaux Excel.

45 Avez-vous le sentiment que l'erreur technique commise par Getma, s'il y en a une, a
46 été commise de façon volontaire ?

1   **M. Guitera**.- Je n'en sais absolument rien.

2   **Me Fischer**.- Vous pensez que c'est probable ?

3   **M. Guitera**.- Je n'en sais absolument rien, je ne me prononcerai pas sur ce sujet. Il y a
4   deux erreurs de natures différentes. Il y a une erreur qui est vraiment une erreur de
5   colonne, on le voit bien dans le modèle, et une erreur qui est « on affiche un taux mais,
6   en fait, c'est un autre ». Cela dit, quand on voit comment est fait un tableur Excel, c'est
7   vrai qu'Excel, à un moment donné, prend un peu sa propre vie. Je ne veux pas
8   m'avancer sur ce sujet.

9   **Me Fischer**.- Vous avez eu, bien sûr, connaissance du rapport d'évaluation des offres
10  dont on a discuté avant d'émettre votre rapport ? Vous avez le sentiment que ces
11  erreurs, que vous avez pointées, ont eu une incidence sur la décision de la Guinée ?

12  **M. Guitera**.- J'en ai pris connaissance comme élément de contexte, mais je n'ai en
13  aucun cas travaillé dessus, comme Dominique Perrier a pu le faire. Je n'ai donc pas
14  d'avis sur le sujet. Le seul avis que j'ai, c'est ce que j'ai dit en bas de page, c'est que le
15  niveau de confort attendu, effectivement, n'est pas le même. J'ai donc mis en évidence
16  dans mon rapport, et c'est effectivement les paragraphes 41, 42 et 43, qui concluent
17  sur cette partie, « l'existence d'une surévaluation de la valeur actuelle nette du projet ».
18  L'influence de cette erreur en elle-même sur le processus de notation, à ma
19  connaissance, je ne me suis pas prononcé dessus.

20  **Me Fischer**.- Vous avez relevé une autre erreur concernant la manutention bord au
21  paragraphe 22, page 5 de votre rapport.

22  **M. Guitera**.- Oui, mais d'une importance... La magnitude n'a rien à voir.

23  **Me Fischer**.- Quelle est la magnitude ?

24  **M. Guitera**.- En gros, et vous avez le détail… La magnitude de la manutention bord,
25  c'est page 6, paragraphes 24 et 25, c'est 146 000 euros par an, soit 5 millions sur la
26  concession et, enfin, il y a le stationnement des conteneurs de 40 pieds en
27  transbordement qui fait 2 millions. 95 % ou 96 % de l'écart, c'est le scanner. C'est très
28  clair.

29  **Me Fischer**.- Pouvez-vous confirmer ce que vous avez indiqué, que le chiffre d'affaires
30  bord déterminé par PriceWaterhouseCoopers était cohérent avec le chiffre d'affaires
31  bord reconstitué à partir du *business plan* ?

32  **M. Guitera**.- En francs guinéens... J'aborderai ce point demain de manière plus
33  détaillée parce qu'après, il y a un problème de taux de change qu'il faut traiter de
34  manière spécifique, mais, en tout cas, en termes de nombre de mouvements par
35  rapport au *business plan*, on retombe sur une erreur de magnitude qui est assez
36  raisonnable.

37  **Me Fischer**.- Vous avez dit que vous n'avez pas de sentiment sur les incidences des
38  erreurs que vous avez relevées sur la décision de la commission. Au paragraphe 54,
39  page 13 de votre rapport, vous indiquez qu'il ressort de tous ces éléments que la
40  concession de la gestion et de l'exploitation du terminal a été attribuée à la société
41  Getma International sur la base d'un *business plan* contenant des erreurs matérielles
42  et présentant, en raison de ces erreurs, une vision artificiellement avantageuse. Vous
43  maintenez cela ou…?

44  **M. Guitera**.- C'est factuellement exact. Il été attribué sur la base de certains
45  documents dans l'appel d'offres artificiellement avantageux. Je n'ai pas dit
46  « volontairement avantageux », mais « artificiellement ».

47  **M. le Président**.- « Sur la base de » ne signifie pas simplement « c'était annexé ».
48  « Sur la base de » veut dire que c'est en prenant en considération ce *business plan*

1 que la concession a été attribuée. Si c'est cela que cela veut dire, qu'est-ce qui vous
2 permet de le dire ?

3 **M. Guitera**.- « En prenant en considération », Monsieur le Président, me paraît être un
4 terme particulièrement bien choisi. Cela fait partie des éléments pris en considération
5 par la Commission pour décider. Je n'ai pas écrit que c'était l'élément sur lequel elle
6 s'était basée. Pour moi, un *business plan* joint à l'appel d'offres est effectivement un
7 élément que l'on prend en considération. C'est exactement cela, ni plus ni moins.

8 **Me Fischer**.- Vous pensez donc que l'on a pris en considération le chiffre d'affaires qui
9 aurait pu être généré par l'activité scanner pour ne pas concéder l'activité scanner ?

10 **M. Guitera**.- Je l'ignore. Ce que je sais, et c'est le seul objet de mon témoignage sur
11 ce point précis, c'est qu'il y a 69 % d'écart entre la valeur actuelle nette du projet
12 présentée dans l'offre financière de Getma et le montant corrigé d'erreurs matérielles.
13 Sur les conséquences qui ont été tirées, il appartient à ce Tribunal de statuer. Moi, je
14 m'arrête là.

15 **M. le Président**.- C'est plus sage ! Poursuivez.

16 **Me Fischer**.- Précisément, allons au TRI et à la valeur actuelle nette que vous
17 préconisez. Vous faites donc des calculs sur lesquels vous comprendrez que je ne
18 vienne pas vous poser des questions précises. Je voudrais savoir si j'ai bien compris
19 cette notion de valeur actuelle nette sur laquelle l'un des coarbitres a posé une
20 question : selon vos calculs, de 83 millions et, selon le *business plan* corrigé et selon le
21 *business plan* non corrigé, 267 millions.

22 **M. Guitera**.- Avec l'erreur...

23 **Me Fischer**.- Avec l'erreur, 267 millions, correction de l'erreur, 83 millions.

24 **M. Guitera**.- Puis-je attirer votre attention sur le paragraphe 2, page 9. Vous avez
25 effectivement un tableau qui présente en fait la séquence de calculs. Vous avez les
26 *cash flows* non actualisés sur la première ligne. La première ligne, c'est corrigé de
27 l'erreur de chiffre d'affaires, mais pas corrigé de l'erreur de taux. Actualisé au taux qui
28 a été effectivement utilisé, cela donne une valeur actuelle nette de 160 millions.
29 Actualisé au taux affiché en bas dans l'offre financière, cela donne 83 millions.
30 Effectivement, la différence d'actualisation, c'est l'écart.

31 **Me Fischer**.- Vous, votre calcul corrigé, c'est 83 millions ?

32 **M. Guitera**.- Exactement.

33 **Me Fischer**.- Est-ce que cela signifie que c'est la valeur du projet, 83 millions ?

34 **M. Guitera**.- C'est la valeur économique.

35 **Me Fischer**.- Je m'excuse de poser une question un peu béotienne, mais je voudrais
36 bien comprendre cette notion.

37 **M. Guitera**.- Si le taux d'actualisation retenu est le bon -élément sur lequel je ne me
38 suis pas prononcé, je le précise bien-, ce chiffre correspond à la valeur mathématique
39 du projet selon les paramètres de l'offre financière et en utilisant le taux d'actualisation.
40 Si le taux d'actualisation utilisé était un taux différent, la valeur actuelle nette du projet
41 serait supérieure si ce taux est plus bas, inférieure s'il est plus haut.

42 **M. le Président**.- Pardon, valeur du projet… Aidez-moi à comprendre.

43 **M. Guitera**.- C'est extrêmement simple. La valeur d'un projet, et j'en reviens un peu à
44 ma citation du début qui était de citer Modigliani. La valeur d'un actif, c'est la somme
45 des flux de trésorerie positive que cette chose produira dans le futur.

46 Exemple, vous avez deux manières d'évaluer un appartement : soit le prix que vous
47 payez à l'instant T, soit l'actualisation des loyers futurs que vous recevrez. Quand vous

1  êtes un bailleur professionnel, vous aurez tendance à acheter des appartements non
2  pas sur la base de leur prix de marché instantané mais sur la base du rendement futur
3  attendu. Pour vous, la valeur de la chose, c'est donc les flux futurs que cette chose
4  rapportera. La valeur actuelle nette d'un projet, c'est exactement ça. C'est, en fait,
5  quelle est la valeur, quelle somme d'argent après prise en compte du passage du
6  temps et du risque cette chose vous rapportera ?

7  **M. le Président**.- Mais à qui, pour qui ?

8  **M. Guitera**.- Pour le possesseur de la chose. Pour Getma. Je n'avais pas compris,
9  Monsieur le Président.

10  **M. le Président**.- C'est très important parce qu'il est question... On discute de la valeur
11  du projet pour Getma pour s'interroger sur la décision d'attribution de la concession par
12  le Port de Conakry.

13  **M. Guitera**.- Tout à fait. Peut-être, pour finir ma réponse et élaborer sur votre point, le
14  taux de 4,88 %, pour la Guinée, cela paraît quand même assez faible. Je n'ai pas fait
15  d'analyse détaillée de ce qu'auraient été les taux à l'époque mais, à mon avis, ils
16  auraient été supérieurs. Les taux étant supérieurs, cela veut dire qu'il est assez
17  probable que la valeur du projet aurait été inférieure.

18  Ensuite, quel est l'intérêt pour la Commission de voir cela ? L'intérêt, pour la
19  Commission, c'est de voir s'il y a un matelas de sécurité si les choses vont plus mal. Je
20  n'ai pas fait les travaux réalisés par Dominique Perrier. En revanche, ce que j'ai vu par
21  expérience dans le cadre du dossier, c'est qu'un des éléments pris en compte -je dis
22  bien un des éléments pris en compte-, c'est le degré de sécurité et de confort qu'on a
23  en étant sûr que le concessionnaire a une capacité d'absorption des chocs. C'est à ce
24  titre que la chose aurait été prise en compte.

25  **M. le Président**.- Merci.

26  D'autres questions ?

27  **Me Fischer**.- Je pose des questions vraiment très basiques. Est-ce que ma
28  compréhension est exacte si on dit, pour reprendre votre comparaison : l'appartement,
29  qui là est une activité portuaire, Getma International dans son *business plan* non
30  corrigé et avec des erreurs disait, ou pouvait laisser penser, que cet appartement valait
31  396 millions d'euros et que, si on retient le taux de 4,88 %, il ne valait que 83 millions
32  d'euros ?

33  **M. Guitera**.- Non. Si on retient le bon taux d'actualisation -c'est la colonne de gauche
34  de mon tableau-, il vaut *(… inaudible)*. Si on retient le taux d'actualisation figurant sur
35  le *business plan*...

36  **Me Fischer**.- On est d'accord, c'est une hypothèse.

37  **M. Guitera**.- …il est de 258,5 millions, chiffre d'affaires avec erreur.

38  **Me Fischer**.- Je parle de l'hypothèse sans erreur.

39  **M. le Président**.- Maître Fischer, s'il vous plaît, accélérons parce qu'on est sur des
40  rapports petits et d'une importance secondaire.

41  **Me Fischer**.- Nous sommes sur 158 millions quand même, Monsieur le Président.

42  **M. le Président**.- Non, nous sommes sur la question des informations financières
43  fournies dans l'offre de Getma !

44  **Me Fischer**.- Est-ce que vous pensez que tous ces raisonnements, cette analyse ont
45  été effectués par la Commission de dépouillement d'appel d'offres ?

46  **M. Guitera**.- Le fait de se dire que plus c'est rentable et moins c'est risqué, je pense
47  que oui. Cela n'engage que moi mais quand mon père a un locataire, la première

1  chose qu'il regarde, c'est si ses revenus couvrent ses loyers. C'est juste une réaction
2  « brute de fonderie » instinctive. Plus la personne à qui vous avez affaire a une belle
3  surface financière, moins vous avez de risque. On ne prête qu'aux riches. Je n'étais
4  pas là, je ne sais pas ce qui s'est dit.

5  **Me Fischer.**- Combien de temps pensez-vous qu'il faille pour monter un dossier de
6  financement pour ce type de projet ?

7  **M. Guitera.**- À mon sens plusieurs mois. Cela ne se fera pas en une semaine.

8  Pour répondre à la question, nous avons un département qui fait de la structuration de
9  projets au sein du cabinet, ce qui les emploie à plein temps, donc j'en déduis que cela
10  prend un temps certain.

11  **Me Fischer.**- C'est peut-être une erreur, et vraisemblablement une erreur de ma part,
12  à la lecture du paragraphe 51 de votre rapport, vous indiquez : « Comme indiqué au
13  paragraphe 46, les attestations financières présentées pas Getma International dans
14  sa soumission n'apportaient aucun caractère probant quant à sa capacité de lever le
15  niveau de dettes prévu. La démonstration de la capacité de Getma International à
16  s'endetter à hauteur de 80 M€ sur une période de 3 ans était cependant
17  primordiale…».

18  Ce que je n'ai pas compris, c'est qu'au paragraphe 50, vous parlez d'un endettement
19  sur 15 ans. Est-ce qu'on parle de la même chose ou pas ?

20  **M. Guitera.**- Non. Les 15 années sont la durée de remboursement de l'emprunt, les
21  3 ans, en fait 2 ans et demi, sont la durée de décaissement de l'emprunt. En fait, ce
22  sont deux choses différentes : 15 ans, c'est le temps qu'il faut pour que je rembourse
23  l'emprunt et 80 M€ sur 3 ans, c'est en fait le temps qu'il me faut pour dépenser l'argent.
24  Ce sont deux sujets différents.

25  **Me Fischer.**- Ce sont effectivement deux sujets tout à fait différents.

26  Est-ce que vous pourriez prendre la pièce R-52 qui est sous l'onglet 6, page 34, partie
27  gauche ?

28  Est-ce que vous avez relevé que la Commission avait noté que les attestations
29  bancaires, dont vous avez dit à peu près tout le mal que vous en pensiez, n'étaient pas
30  conformes au modèle du DAO ? Est-ce que vous avez relevé la note qui avait été
31  attribuée ?

32  **M. Guitera.**- Pouvez-vous me donner la page ?

33  **Me Fischer.**- Page 34.

34  **M. Guitera.**- 1 point sur 3, c'est cela ?

35  **Me Fischer.**- Est-ce qu'on peut en conclure que la qualité ou l'absence de qualité de
36  ces attestations, que vous avez relevée, a été également prise en compte par la
37  Commission ?

38  **M. Guitera.**- Effectivement, la note est très claire. Après, la pondération que la
39  Commission ou plutôt l'appréciation que la Commission a portée sur l'importance de la
40  chose... En fait, ce que je vois dans la Commission, c'est le caractère conforme au
41  modèle : ils notent la conformité par rapport à un modèle. Je n'ai pas vu de conformité
42  par rapport au fond, c'est-à-dire par rapport à la capacité. J'ai l'impression -mais c'est
43  une impression car je n'ai pas participé aux débats de la commission- que c'est un
44  contrôle formel et pas un contrôle substantiel.

45  **Me Fischer.**- Pouvez-vous prendre la page 18 du même document concernant un
46  autre soumissionnaire ?

47  **M. Guitera.**- 3 sur 3, tout à fait.

1  **Me Fischer**.- Vous pouvez voir que la BNP Paribas a certifié que Bolloré était capable
2  de mobiliser 72 M€. Est-ce que vous avez noté que cette banque indique toutefois que
3  l'attestation est délivrée à titre de confidentialité et sans garantie ni responsabilité ?

4  **M. Guitera**.- C'est ce que je lis.

5  **Me Fischer**.- Est-ce que vous pensez qu'une attestation avec ce type de mention
6  engage une banque ?

7  **M. Guitera**.- Je n'ai pas vu le détail de l'attestation de BNP Paribas. Je note que la
8  Générale dit que Bolloré, à ce jour, dispose d'une ligne de crédit non tirée d'un montant
9  de 72 M€.

10  **Me Fischer**.- C'est la Société Générale.

11  **M. Guitera**.- J'ai des travaux à financer de 93 M€, je vois qu'il y a une ligne non tirée
12  de 72 M€, je suis couvert à 85 %, surtout que, de mémoire, le financement c'est 20/80,
13  20 % fonds propres, 80 % dette. Cela veut dire que je suis couvert quasiment à 100 %.

14  **Me Fischer**.- Concernant le calendrier, qui est un point important qui a été discuté,
15  vous indiquez aux paragraphes 55 à 60 de votre rapport que vous vous basez sur les
16  informations que vous avez reçues de la Défenderesse ou de son conseil ou est-ce
17  que vous avez fait des investigations particulières ?

18  **M. Guitera**.- Non, je n'ai fait aucune investigation. J'ai juste lu les différents documents.

19  **Me Fischer**.- Est-ce que vous avez eu connaissance ou est-ce que vous avez
20  conscience du périmètre de la concession ?

21  **M. Guitera**.- Je ne comprends pas la question.

22  **Me Fischer**.- Est-ce qu'on a porté à votre connaissance le périmètre géographique de
23  la concession ?

24  **M. Guitera**.- Oui. J'ai regardé l'offre technique et l'offre financière. Pour moi, le
25  périmètre de la concession, c'est le lot qui a été mis en concession, le périmètre
26  auquel correspondent les 93,7 M€ d'investissement.

27  **Me Fischer**.- Vous avez indiqué au paragraphe 58 que la fameuse plateforme
28  ferroviaire avait été mise à disposition le 23 mars 2010.

29  **M. Guitera**.- Tout à fait.

30  **Me Fischer**.- Est-ce que vous confirmez cette date ?

31  **M. Guitera**.- C'est ce que j'ai lu. Dit autrement, je n'ai fait aucune investigation sur ce
32  sujet. C'est ce qui m'a été dit, je n'ai pas d'opinion là-dessus.

33  **Me Fischer**.- Vous n'avez pas vérifié ?

34  **M. Guitera**.- Non.

35  **Me Fischer**.- Vous n'avez pas vérifié si la société Getma était informée par avance de
36  la date de remise de cette plateforme ?

37  **M. Guitera**.- Mes seules diligences par rapport au calendrier ont été de lire l'avenant,
38  l'offre financière et l'offre technique et de prendre connaissance de ces éléments. Je
39  n'ai fait aucune autre diligence sur le calendrier.

40  **Me Fischer**.- Est-ce que vous pouvez prendre la pièce C-80 sous l'onglet n° 2 qui est
41  un avis technique du 9 février 2011, c'est-à-dire dans les jours qui ont précédé la
42  résiliation de la Convention de concession, avis technique qui, sauf erreur de ma part,
43  a été établi par M. Morlaye Camara qui assiste à notre audience ?

44  **M. Guitera**.- Je l'ai devant moi.

1   **Me Fischer**.- Sur ce document, quelle est la date d'entrée en vigueur ?

2   **M. Guitera**.- Pardon, je voudrais d'abord le lire.

3   **Me Fischer**.- Excusez-moi.

4   *(M. Guitera parcourt le document).*

5   **M. le Président**.- Nous sommes sur C-80 ?

6   **Me Fischer**.- C-80, sur la première page où vous avez les étapes successives.

7   **M. Guitera**.- Oui ?...

8   **Me Fischer**.- Il est en quelque sorte confirmé la date de mise à disposition. C'est le
9   23 ou le 27 mars, qu'importe, nous avons vu qu'il y avait des coquilles. Il est également
10  indiqué : « Entrée en vigueur de la Convention de concession : 23 mars 2010 ». Est-ce
11  que vous connaissiez ce document ?

12  **M. Guitera**.- Premièrement, je ne connais pas ce document. Deuxièmement, pour moi,
13  le document faisant foi pour l'entrée en vigueur de la Convention est l'avenant. À ma
14  connaissance, et je crois que j'ai vu cela dans les écritures, le terminal était opéré à
15  partir de juin 2009 déjà par Getma International. C'est à ce titre d'ailleurs que j'ai
16  compris de la déclaration de M. Quérel que les *cash flows* d'exploitation retirés de cette
17  exploitation étaient de 10 M€ annuels. Donc si on prend une demi-année, cela ferait à
18  peu près 5 M€ pour l'année 2009. Ensuite, ces dates contredisent complètement
19  toutes les autres. Je n'ai pas d'opinion, je ne connais pas ce document.

20  **Me Fischer**.- Si je comprends bien, vous avez lu les mémoires mais pas les pièces.

21  **M. Guitera**.- J'ai lu les pièces qui étaient nécessaires pour ma mission. Par rapport à la
22  pluralité des pièces disponibles, cette pièce n'a effectivement pas retenu mon attention
23  de manière particulière. Les paramètres de calcul que j'ai pris dans mes différents
24  travaux sont parfaitement indiqués. S'il y a un débat juridique ou un débat factuel sur
25  les différentes dates, ce n'est pas un débat à avoir avec moi.

26  **Me Fischer**.- Pourtant, il y a des dates qui sont dans votre rapport, que vous retenez...

27  **M. Guitera**.- ...comme hypothèses.

28  **Me Fischer**.- Donc les dates retenues dans votre rapport sont des hypothèses ?

29  **M. Guitera**.- Les dates de mon rapport sont des dates figurant dans l'offre financière et
30  dans le *business plan*. Autrement dit, c'était le rythme des décaissements… Sauf à ce
31  qu'il y ait une autre erreur que je ne connais pas dans le *business plan*, le rythme des
32  décaissements des investissements dans le *business plan* était effectivement sur 2 ans
33  et demi ; c'est dans mon autre rapport. De mémoire, les décaissements devaient être
34  finis fin 2010. Je vous renvoie paragraphe 49, page 12 du rapport faisant l'objet de
35  cette présentation. Vous voyez en fait qu'il avait été prévu dans le *business plan* initial
36  de décaisser, je dis bien « de décaisser »... Quand on dit « décaisser », cela veut dire
37  que les travaux sont finis parce qu'on décaisse quand le travail a été fait, il y a des
38  acomptes mais le solde c'est à réception. Il était prévu de décaisser 109 M€ jusqu'à la
39  fin 2010. Les décaissements commençant en 2008 par le Ticket d'Entrée et les
40  matériels de transport, grues et autres.

41  **Me Fischer**.- J'aurais souhaité vous renvoyer à l'article 47 de votre premier rapport,
42  sur lequel nous sommes, paragraphe 47, où vous indiquez que « Getma International a
43  par ailleurs présenté dans son Offre financière un programme ferme d'investissements
44  sur 2 ans maximum ». Vous reprenez dans un tableau avec un détail en fonction des
45  phases et vous mettez une date d'achèvement T0 pour 27 mois. C'est 24 ou 27 mois,
46  selon votre compréhension ?

1  **M. Guitera**.- Cela est une coquille. C'est 24 après T0+3. Il y a 3 mois... Là, je vous
2  renvoie à l'avenant 1.

3  **Me Fischer**.- C'est une coquille ou ce n'est pas une coquille ? Vous avons vu que
4  d'anciens élèves de Harvard font des erreurs.

5  **M. Guitera**.- Ce serait une erreur de plume. Puis-je avoir l'Offre financière et
6  l'avenant 1 ?

7  **M. le Président**.- Non, Monsieur. Essayez de répondre de mémoire. Sinon, dites : « Je
8  ne sais pas ». Ce sont des données sur lesquelles vous n'êtes ni témoin ni expert, je
9  ne vois donc pas pourquoi on s'étend là-dessus. Alors, poursuivez.

10  **M. Guitera**.- C'est par rapport à T0. Effectivement, date de début, date d'achèvement :
11  il débute à T0+3 et se termine à T0+27. En fait, c'est 3 plus 24 égalent 27.

12  **Me Fischer**.- Ce sont des hypothèses de calcul.

13  **M. Guitera**.- Non, cela vient de l'Offre financière. *« Source : Offre Financière. T0 =
14  date d'entrée en vigueur de la Convention »*.

15  **Me Fischer**.- C'est un calcul basé sur l'offre, c'est-à-dire sur la théorie de l'origine.

16  **M. Guitera**.- C'est l'offre contractuelle faite par Getma International à la République de
17  Guinée. Je n'en sais pas plus.

18  **Me Fischer**.- Au paragraphe 58, sauf erreur, vous indiquez : « *Étant donné que Getma
19  International a pris possession du TAC en juin 2009, soit 5 mois avant la signature de
20  l'Avenant n° 1, nous avons considéré que cette période pouvait être utilisée par Getma
21  International afin de réaliser les études préparatoires nécessaires* ».

22  Qui est-ce, « nous » ?

23  **M. Guitera**.- Tout à fait. « *Nous* », c'est KPMG. Dans le tableau que j'ai présenté, j'ai
24  recalculé...

25  **Me Fischer**.- Est-ce que KPMG a des compétences en matière de travaux et de délais
26  nécessaires pour réaliser des études préparatoires de génie civil ?

27  **M. Guitera**.- La réponse est non. Je compléterai ma réponse en disant que dans mon
28  expérience professionnelle, j'ai quand même vu un certain nombre de sujets ; donc...
29  Mais, effectivement, je ne suis pas ingénieur BTP, je confirme ce fait.

30  **Me Fischer**.- Merci beaucoup.

31  Au paragraphe 61, concernant la phase 2 et le nouveau quai, vous indiquez : « Il est
32  évident que si la société Getma International voulait tenir les engagements qu'elle avait
33  affichés dans sa réponse à l'appel d'offres -et notamment en termes de délais-, alors
34  Getma International aurait […] dû […] ».

35  Cette évidence, d'où la sortez-vous ?

36  **M. Guitera**.- Dès l'instant que vous voulez dépenser 90 M€ en 2 ans, il faut que vous
37  ayez déjà fait l'avant-projet définitif et sélectionné les fournisseurs. Je ne vois pas, si
38  vous n'avez pas sélectionné les fournisseurs, comment ils peuvent produire.

39  **Me Fischer**.- Pour vous, la question du calendrier est une évidence.

40  **M. Guitera**.- C'est une hypothèse de départ. Je prends ces éléments. S'il y a après
41  des éléments techniques qui font que les dates ne sont pas les bonnes, il appartient au
42  Tribunal d'en décider.

43  **Me Fischer**.- Quelle hypothèse prenez-vous ? Dans votre rapport, il y a deux
44  hypothèses. Une hypothèse de 2 ans maximum qui sont devenus 24 mois,

1 paragraphe 47. Page 12, il y a une note en pied de page où vous indiquez qu'on est
2 plutôt dans 35 mois au total.

3 **M. Guitera**.- L'hypothèse que j'ai retenue, en tout cas dans la présentation que j'ai
4 faite, c'est effectivement 27 mois, donc 24 + 3 à compter de la signature de l'avenant.

5 Quelle que soit l'hypothèse retenue, il y a une certitude : à part que le montant n'est
6 pas certain puisque c'est 20 millions selon les travaux de Price et 15 millions selon la
7 déclaration de M. Quérel, le montant de *cash* dépensé en investissements au 8 mars
8 2011, c'était 20 millions dont, selon les cas, 12 millions ou 16 millions de matériels, et
9 donc 3 millions d'immobilisations. Cela est une certitude. Enfin, ce sont les éléments
10 qui ressortent des pièces qui m'ont été fournies. Le reste, c'est au Tribunal d'apprécier.

11 **Me Fischer**.- Est-ce que vous avez eu connaissance du Mémoire en duplique du
12 24 mars 2013 et du tableau figurant à la page 82 dans le paragraphe 316 ? C'est sur
13 l'avancement de la plateforme du chemin de fer. L'avez-vous sous les yeux ?

14 **M. Guitera**.- Oui, je l'ai sous les yeux.

15 **Me Fischer**.- Compte tenu de l'état d'avancement, compte tenu de votre expérience,
16 vous nous l'avez indiqué, sur des projets de génie même si vous n'êtes pas un
17 spécialiste, est-ce que vous pensez qu'en 60 jours, on pouvait terminer les travaux qui
18 étaient à 95,68 % pour le terrassement, 87 % pour les pavés, 47 % pour l'électricité ?

19 **M. Guitera**.- Un, je ne connais pas la source de ce document, donc... Deuxième
20 élément, je n'étais pas présent sur place.

21 **Me Fischer**.- C'est le…

22 **M. Guitera**.- Je précise ! Un, je ne le connais pas. Deuxièmement, la plateforme 1B,
23 c'est le montant de dépenses de 840 000 €. Par rapport à l'Offre financière, c'est
24 840 000 € par rapport à 92,713 M€. Vous confirmez que j'ai bien compris ?

25 **Me Fischer**.- C'est à peu près 1 M€.

26 **M. Guitera**.- Donc 1 M€ sur 93 M€, d'accord.

27 Je n'étais pas sur place, je ne connais pas le sous-jacent. Cela étant dit, soit
28 l'électricité est sur le chemin critique... La question est : est-ce que les travaux sont sur
29 le chemin critique ou pas ? Soit il n'y a pas d'obstacle de chemin critique et à 95 %
30 d'avancement sur un projet à 900 000 €, en 60 jours, cela me paraît pas complètement
31 irréaliste. Si en revanche, on est sur le chemin critique et qu'il y a un blocage de
32 chemin critique, le jeu change complètement puisqu'on est sur une exponentielle. Je
33 n'ai pas la réponse, je ne sais pas.

34 **Me Fischer**.- Comment se fait-il que par ailleurs vous ayez des évidences et qie là,
35 quand on vous pose une question, vous n'avez plus d'évidence ?

36 **M. Guitera**.- Mon évidence est purement comptable et financière. Je constate que
37 l'engagement de dépenses est de 92,713 M€. Je constate que le décaissement est
38 entre 15 M€ et 20 M€. Je constate qu'il n'y a pas de financement en place. À partir de
39 là, c'est... Il appartient au Tribunal d'en décider.

40 **M. le Président**.- Non, il appartient au Tribunal de décider même en amont de ce que
41 vous dites, et non pas seulement de ce que vous lui laissez. Merci.

42 **M. Guitera**.- Pardon ! Bien évidemment. Je simplifiais mon propos.

43 **Me Fischer**.- J'essaie de sauter quelques questions.

44 Au paragraphe 64 de votre premier rapport, vous indiquez : « De plus, des pièces
45 présentées par PwC dans les annexes à son rapport montrent qu'à la date de
46 résiliation, la sélection des fournisseurs au titre de la phase 2 »— c'est-à-dire le
47 deuxième quai, l'extension— « n'avait pas encore débuté ».

1   Comment pouvez-vous dire cela ? Est-ce que vous le confirmez ?

2   **M. Guitera**.- Écoutez, oui. Il faudrait que je reprenne... Je lis tout. *A priori*, oui. Il
3   faudrait que je reprenne les pièces mais *a priori*, oui.

4   **Me Fischer**.- Vous le confirmez.

5   Est-ce que vous pouvez vous rapporter à la pièce C 72, sous l'onglet n° 1 ? Cette
6   pièce était communiquée au moment où vous avez établi votre rapport. Est-ce qu'il ne
7   résulte pas de ce rapport d'une Commission d'évaluation que la sélection des
8   fournisseurs était initiée ? Est-ce qu'il ne résulte pas de la page 27 que quatre
9   fournisseurs avaient concouru dans le cadre d'un appel d'offres ?

10   **M. Guitera**.- Un, il faudrait que je relise ce document en détail puisque je ne crois pas
11   que ce soit une annexe fournie par PwC. Les documents sur lesquels je me base sont
12   dans les annexes fournies par PwC. Il faudrait donc que je lise intégralement…

13   **M. Fischer**.- Vous avez donc décidé de ne pas regarder les pièces que nous avions
14   communiquées dans le cadre de nos mémoires, mais simplement d'examiner les
15   mémoires.

16   **M. Guitera**.- Non, pas du tout. J'ai regardé effectivement les pièces qui étaient jointes
17   à celles de Price. Je note que ce document-là, *« Commission d'évaluation »*, est du
18   28 février au 17 mars 2011 à Paris. Ce document est postérieur. Sur la base… comme
19   nous avons une deuxième journée, je pourrai revenir vers vous demain.

20   **M. le Président**.- Non, excusez-moi, on ne reviendra pas demain sur les deux rapports
21   qui font l'objet de l'examen de ce soir pour la raison très simple que nous n'en avons
22   pas le temps. Si chacun passe deux heures sur un petit rapport pour chaque expert, il
23   faut prévoir trois jours d'experts. Si on avait prévu trois jours, très bien ! Le Tribunal
24   serait ravi de revenir. Mais comme on ne les a pas prévus, il faut que vous répondiez
25   maintenant.

26   **M. Guitera**.- Je me suis basé sur les documents ―il me semble― d'Inros Lackner,
27   mais à vérifier, figurant en annexe du rapport Price et donnant effectivement différents
28   éléments.

29   **Me Fischer**.- Au vu de ce document, est-ce que vous maintenez votre opinion selon
30   laquelle la sélection des fournisseurs au titre de la phase 2 n'avait pas encore été
31   initiée ?

32   **M. Guitera**.- Je n'ai pas lu ce document, comme je viens de vous le dire. Je ne connais
33   donc pas les conditions dans lesquelles il a été élaboré. Je note qu'il est postérieur.
34   Donc je ne change pas mon avis... Enfin, tant que je n'ai pas étudié en détail ce
35   document et ne connais pas les conditions de son élaboration, mon opinion reste la
36   même.

37   **Me Fischer**.- Est-ce que vous avez connaissance du fournisseur qui *in fine* a réalisé le
38   quai n° 2, l'extension du terminal ?

39   **M. Guitera**.- Je sais qu'il y avait TSM... Il y a plusieurs corps de métiers qui
40   interviennent, il y a de mémoire à peu près 20 ou 30 fournisseurs.

41   **Me Fischer**.- L'entreprise générale.

42   **M. Guitera**.- TSM Guinée est beaucoup intervenue. Ces éléments sont dans mon
43   deuxième rapport, que je n'ai pas.

44   **Me Fischer**.- Est-ce que vous pouvez vous reporter à la pièce R 60, sous l'onglet 7, et
45   à la dernière page, bien que ce ne soit pas... Est-ce que vous notez que le fournisseur
46   retenu par le nouveau concessionnaire, la compagnie chinoise CHEC, faisait partie des
47   fournisseurs qui avaient soumissionné à l'appel d'offres lancé par Getma
48   International ?

1 **M. Guitera**.- Ce fournisseur, en tout cas, ne figure pas, de mémoire, dans les
2 fournisseurs existants au 8 mars 2011, cela, c'est sûr. C'est quasiment certain. Je
3 vérifierai, mais c'est quasiment certain.

4 **Me Fischer**.- Est-ce que, et ce sera ma dernière question, au dernier paragraphe,
5 le 2.4, il y a un programme prévisionnel de travaux -qui se termine en avril 2014, ce qui
6 est cohérent avec ce qui nous a été indiqué tout à l'heure, c'est-à-dire une inauguration
7 vers le mois de mai 2014-, est-ce que vous notez que le démarrage des travaux se fait
8 en novembre 2012 ?

9 **M. Guitera**.- La signature du marché, effectivement, est en novembre 2012.

10 **Me Fischer**.- Selon votre compréhension, est-ce que cela veut dire qu'entre la
11 signature de la Convention de concession en mars 2011 et la signature du marché, en
12 novembre 2012, il y a eu un temps nécessaire à la réalisation d'études ?

13 **M. Guitera**.- Je ne sais pas quand... je ne peux pas répondre à la question, je ne
14 connais pas les événements qui se sont déroulés entre ces deux dates. Ce que je
15 note, en revanche, c'est qu'effectivement le planning hors études s'étend de
16 décembre 2012 à avril 2014, soit 16 mois, si je ne me trompe pas dans mon calcul,
17 16 ou 17 mois, ce qui est cohérent avec les 24 mois, enfin, ce qui est même plus
18 agressif que les 24 mois...

19 **Me Fischer**.- *In fine*, vous avez indiqué, je crois au paragraphe 72 de votre rapport,
20 qu'il était « surprenant que, dans le cadre de la procédure, la Demanderesse n'ait pas
21 produit les documents qu'elle devait transmettre à ses prêteurs avant le 30 juin 2010,
22 qui traitaient spécifiquement des moyens de financement des engagements pris dans
23 le cadre de la soumission. »

24 **M. Guitera**.- Il était indiqué effectivement que le... -je n'ai plus précisément en tête le
25 texte-, que dans le cadre de la Convention de 89, il devait être fourni avant cette date
26 en 2010 les financements dédiés pour Conakry. Il me semble. Je n'ai pas le document
27 devant moi, donc...

28 **Me Fischer**.- Est-ce ainsi que vous avez conseillé à la République...

29 **M. Guitera**.- Pardonnez-moi, ma réponse a été rapide. Le document, c'est le plan de
30 financement des travaux. Je cite. C'est le paragraphe 70 de mon rapport, qui ne fait
31 que reprendre l'article 20.21 de la Convention de prêt, je cite : « L'emprunteur
32 s'engage à présenter au prêteur, au plus tard le 30 juin 2010, un plan de financement
33 des travaux ; à remettre à l'Agent du Crédit, au plus tard, le 30 juin 2010, un *business
34 plan* actualisé. » Je suppose qu'il s'agit du document modifié. Mais, effectivement, moi,
35 je n'ai pas vu ces documents-là. Je ne sais pas s'ils existent.

36 **Me Fischer**.- Est-ce que, comme vous avez conseillé à la République de Guinée de
37 vous confier une mission supplémentaire, vous lui avez conseillé de formuler une
38 demande de communication de documents ?

39 **M. Guitera**.- Moi, je n'ai rien conseillé à personne. J'ai mentionné et, après, j'ai eu une
40 demande. Je ne conseille rien à personne.

41 **Me Fischer**.- Est-ce que vous savez si, dans le cadre de cette procédure, ces
42 documents ont été sollicités ?

43 **M. Guitera**.- Non. Je l'ignore.

44 **Me Fischer**.- Quelles sont les conséquences du non-respect des ratios financiers ?

45 **M. Guitera**.- Déjà, une hausse du taux d'intérêt qui est Euribor+, et il y a un
46 *(red shed ?)*, donc ça monte. Ensuite, comme toujours, une mise sous tension, une
47 mise sous contrainte par les banques.

1  **Me Fischer**.- Est-ce que vous savez si la société Getma International a, depuis, été
2  mise sous tension sous la contrainte des banques ?

3  **M. Guitera**.- La seule chose que je sais, c'est la lecture qui a été faite du document
4  fourni de 2013 indiquant qu'il y avait eu une cession d'actifs.

5  L'impression, vu de l'extérieur et sur la base de ce document dont je n'ai pas vu
6  l'intégralité, donc je ne me base que là-dessus, est qu'effectivement, de la part des
7  banques, il y a une action assez forte puisque la société Getma a dû vendre des actifs.

8  Typiquement… Il y a deux choses : cession de l'Algérie (20 millions), action de *cash
9  collection*. C'est typiquement ce que l'on voit dans les LBO, des achats avec dettes à
10  effet de levier, quand l'exploitation n'est pas ce que l'on attendait et qu'il faut
11  rapidement faire rentrer de l'argent, vendre des actifs pour que les banquiers soient un
12  peu moins agressifs. Enfin, c'est mon sentiment. Je n'ai pas vu d'autres documents,
13  mais l'extrait de ce document que j'ai vu tendrait à me faire penser qu'effectivement, la
14  situation est tendue.

15  **M. le Président**.- On est en...

16  **M. Guitera**.- 2013, ce coup-ci.

17  **Me Fischer**.- C'est ma véritable dernière question. Pour l'instant, pour cette séquence,
18  vous nous avez dit tout à l'heure : ce sont des supputations. Ce que vous venez de
19  dire, est-ce que ce sont également des supputations ?

20  **M. Guitera**.- Tout à fait. C'est une hypothèse. C'est la conclusion que je tirerais, sur la
21  base d'expériences passées, d'un document. Ni plus ni moins.

22  **Me Fischer**.- Ma question est précise, puisque vous avez employé un terme précis,
23  celui de « supputations ». Là, sommes-nous toujours dans des supputations ?

24  **M. Guitera**.- Dans une hypothèse. « Supputations » a un caractère péjoratif. Une
25  hypothèse.

26  **Me Fischer**.- Ce n'est pas moi qui l'ai employé.

27  **M. Guitera**.- Oui, je précise : une conjecture, si vous préférez.

28  **Me Fischer**.- Ce sont des conjectures.

29  **M. le Président**.- Le Tribunal a l'intention, si Mme Bardot nous prête main-forte, de
30  terminer ce soir les deux premiers rapports parce qu'il n'est absolument pas possible
31  de les garder pour demain. Il y a beaucoup trop de choses pour demain. Je demande à
32  Me Jaeger s'il a des questions à poser à M. Guitera.

33  **Me Jaeger**.- Non, Monsieur le Président.

34  **M. le Président**.- Est-ce que vous avez des questions à poser, Maître Fischer, à
35  Mme Perrier ?

36  **Me Fischer**.- Si vous m'autorisez une minute de réflexion... Je suis en train de
37  regarder et de me remémorer la présentation de Mme Perrier pour savoir si elle n'a
38  pas déjà répondu aux questions. Je crois qu'elle a répondu à toutes les questions que
39  j'envisageais, ce qui démontre son haut niveau de compétence et son anticipation.

40  Juste, mais je crois que vous l'avez dit, Madame Perrier, la mission que vous avez
41  reçue dans le cadre de votre rapport du 19 avril 2013 ?

42  **Mme Perrier**.- C'était uniquement d'analyser quel impact pouvait avoir eu l'erreur
43  identifiée par KPMG…

44  **M. le Président**.- Elle l'a dit.

45  **Mme Perrier**.- … sur le résultat de l'appel d'offres.

1 **M. le Président**.- Maître Jaeger, d'abord dites-moi si vous avez d'autres questions, et,
2 deuxièmement, pour combien de temps ?

3 **Me Jaeger**.- J'en ai, Monsieur le Président, c'est la mauvaise nouvelle. La bonne
4 nouvelle, c'est que ce sera environ une demi-heure, ou peut-être moins d'ailleurs.

5 **M. le Président**.- Je propose, pour que nos sténotypistes puissent respirer un peu, que
6 l'on arrête 10 à 15 minutes et l'on reprendra pour une demi-heure.

7 Pour demain, nous sommes contraints : nous ne pouvons pas commencer avant
8 9 heures 45, mais il faut absolument terminer demain. Le Tribunal allouera donc à
9 chaque partie un crédit de trois heures qu'elle utilisera comme elle voudra, auquel
10 s'ajoutera une présentation, par Mme Perrier, de combien de temps ?

11 **Mme Perrier**.- Je pense que cela devrait faire moins de 30 minutes, entre 20 et
12 25 minutes.

13 **M. le Président**.- Et vous, Monsieur Guitera ?

14 **M. Guitera**.- Pareil.

15 **M. le Président**.- Hier, vous nous avez dit 5 minutes, vous en avez pris 55. Ce ne sera
16 pas plus de 30. Donc 30 minutes, 30 minutes, trois heures à chacune des parties. Le
17 Tribunal se permettra de couper la parole si cet horaire n'est pas respecté.

18 D'autre part, après avoir reçu l'avis et l'encouragement de mes coarbitres, je tiens à
19 vous signaler que le Tribunal ne prendra en considération que ce qui entre dans la
20 compétence et la connaissance des experts, donc ce n'est pas la peine que vous vous
21 battiez sur le reste puisque les experts ne sont pas témoins de fait. Ils donnent un avis
22 technique sur ce qu'ils savent. Merci.

23 *Suspendue à 17 heures 55, l'audience est reprise à 18 heures 14.*

24 ➢ ***Cross Examination* par la Défenderesse**

25 **M. le Président**.- Nous reprenons. La parole est à Maître Jaeger.

26 **Me Jaeger**.- Merci, Monsieur le Président.

27 Madame Perrier, bonjour.

28 **Mme Perrier.**- Bonjour.

29 **Me Jaeger**.- Vous avez fait un rapport, c'est la pièce C-233, dans lequel vous analysez
30 l'impact des erreurs du *business plan* sur la décision qu'a pris la Commission
31 d'évaluation. N'est-ce pas un exercice un peu inhabituel de la part d'un expert-
32 comptable ?

33 **Mme Perrier**.- On peut dire que c'est un exercice inhabituel. Toutefois, pour faire ce
34 travail, je me suis appuyée sur un document qui était très complet, qui avait été établi
35 par la Commission d'appel d'offres. C'est donc sur cette base que j'ai fait mon travail.
36 Ce document est très complet puisque, comme je l'ai expliqué tout à l'heure, il donne
37 les points attribués pour chaque hypothèse et la façon dont les points ont été attribués.
38 Donc cela me semble tout à fait possible comme travail pour un expert financier.

39 **Me Jaeger**.- Le document que vous avez analysé n'est pas un document comptable,
40 en fait c'est un document qui apprécie un dossier. C'est le résultat de l'appréciation
41 d'un dossier que vous avez analysé.

42 **Mme Perrier.**- J'ai analysé effectivement le document qui résultait des analyses de la
43 commission de sélection.

**Me Jaeger**.- Le cabinet KPMG a constaté des erreurs dans le *business plan* qui avait été remis à la Commission, notamment une surévaluation de 20 % du chiffre d'affaires, une surévaluation de 38 % du résultat courant avant impôt, une surévaluation de 69 % de la valeur actuelle nette du projet. Est-ce que vous contestez ces chiffres ?

**Mme Perrier**.- À vrai dire, je ne peux ni les confirmer ni les infirmer puisque je ne les ai pas vérifiés. Cela ne rentrait pas dans ma mission.

**Me Jaeger**.- Pourtant, cela rentrerait plutôt dans vos compétences que d'apprécier l'impact sur la décision de la Commission. Comment se fait-il que vous ayez choisi de ne pas vérifier ces chiffres ?

**Mme Perrier**.- Ce n'est pas moi qui ai décidé de la mission qui m'était attribuée.

**Me Jaeger**.- Est-ce que vous avez décidé de ne pas les vérifier après les avoir vérifiés ?

**Mme Perrier**.- Non. Je ne les ai jamais vérifiés.

**Me Jaeger**.- Par conséquent, c'est votre cliente, Getma, qui a décidé de ne pas vous demander de vérifier le *business plan* ?

**Mme Perrier**.- Oui, c'est vrai que cela ne rentrait pas dans ma mission, mais je pense qu'en tout état de cause, cela n'aurait pas changé que je confirme ou que j'infirme l'erreur, je n'aurais pas changé l'étendue de mes diligences ni ma conclusion puisque j'ai fait un travail d'analyse sur la base du dossier d'appel d'offres.

**Me Jaeger**.- Si vous pouvez vous reporter au paragraphe 25 de votre rapport, dans ce paragraphe 25 vous tirez une conclusion, et une conclusion assez forte puisque vous dites : « De ce fait, les erreurs matérielles relevées par KPMG, dont nous rappelons que nous n'avons pas vérifié le *quantum*, ne peuvent en aucun cas avoir eu un quelconque impact sur le processus de sélection. » Le terme « en aucun cas » est un terme extrêmement fort. Est-ce que vous avez la certitude que ce rapport ne peut pas avoir eu d'impact sur la décision de la Commission ?

**Mme Perrier**.- Comme je l'ai indiqué dans mon rapport, je me suis appuyée sur le dossier de la commission. Je pense que dans toutes les procédures d'appel d'offres public, il est très important que les commissions qui font le choix d'un candidat par rapport à d'autres puissent étayer leurs décisions. Là, nous avons un dossier qui était la décision, qui donne un calcul de points. C'est sur la base de ce nombre de points que le candidat a été choisi. En fait, ce que je peux dire c'est que quand on regarde comment ces points ont été affectés le *business plan* et le résultat du *business plan* pour le Concessionnaire ne figurent pas dans le dossier de la commission. C'est pour cela que j'ai pu faire cette conclusion.

**Me Jaeger**.- Est-ce que vous voulez dire par là que si les membres de la commission avaient su qu'on leur avait fourni un *business plan* grossièrement surévalué, ils auraient dit : ce *business plan* est irréaliste, il présente des valeurs très surévaluées par rapport à la réalité mais cela n'a pas d'importance pour nous, nous n'en tiendrons pas compte ?

**Mme Perrier**.- Je ne peux pas me mettre à la place de la commission. Ce que je vois juste, c'est ce qui est écrit, c'est le dossier qui a été produit et les critères d'analyse.

**Me Jaeger**.- Le simple fait qu'on présente un document faux à la commission peut entraîner des conséquences et la commission peut en tirer des conséquences sur l'opinion qu'elle a de l'opérateur qui fournit un document faux.

**Mme Perrier**.- Je pense que la commission avait un certain nombre de critères précis qu'elle a suivis. Après, je ne peux pas me mettre à la place de cette commission pour savoir quelle aurait été sa réaction si elle avait su qu'il y avait une erreur dans le *business plan*.

1  **Me Jaeger**.- Donc vous n'excluez pas que ce *business plan* faux ait pu avoir un impact
2  sur la décision de la commission.

3  **Mme Perrier**.- Pas sur la base des critères qui sont indiqués dans le dossier. Sur la
4  base des critères...

5  **Me Jaeger**.- Vous prenez pour hypothèse que ce sont les seuls critères que la
6  commission a pris en compte.

7  **Mme Perrier**.- Nous sommes dans une procédure d'appel d'offres public avec des
8  critères précis qui sont également publics, je ne vois donc pas comment la commission
9  aurait pu en prendre d'autres. En conclusion, je maintiens que sur la base de ce
10  dossier qui explique le nombre de points que les candidats ont obtenu, la commission
11  a choisi Getma International.

12  **Me Jaeger**.- Si on sort un peu du cadre que vous vous êtes fixé, qui est de vous
13  référer uniquement à la notation et au nombre de points, et si on prend l'hypothèse de
14  personnes qui exercent un jugement sur un *business plan*, est-ce que le chiffre
15  d'affaires, le résultat, la valeur d'actif net ne sont pas des critères qui pouvaient
16  intéresser une personne raisonnable qui aurait apprécié ce *business plan* ?

17  **Mme Perrier**.- Peut-être mais je ne pense pas que c'était l'objectif de la commission.

18  **Me Jaeger**.- Vous ne le pensez pas mais vous ne le savez pas. En particulier, ces
19  chiffres-là, est-ce qu'ils peuvent avoir un intérêt pour apprécier la capacité de
20  l'opérateur, du candidat disons, à financer les investissements ?

21  **Mme Perrier**.- Sur la base du dossier, je ne pense pas. Enfin, je n'ai pas vu que la
22  commission avait utilisé ce *business plan* pour déterminer la capacité financière.

23  **Me Jaeger**.- Ce n'est pas ma question. J'ai précisé qu'on sortait du cadre que vous
24  vous êtes fixé parce que ce qui m'intéresse maintenant, c'est de sortir de ce cadre très
25  mécanique que vous avez adopté pour savoir si les chiffres qui ont été présentés, par
26  exemple la valeur d'actif net, seraient des éléments qui pourraient être appréciés pour
27  déterminer la capacité de financement du candidat.

28  **Mme Perrier**.- Par exemple, si une banque voulait faire un dossier de financement,
29  c'est cela ?

30  **Me Jaeger**.- Si, par exemple, on voulait faire un financement de projet.

31  **Mme Perrier**.- Pour faire un financement de projet, il y a tout un dossier à établir qui
32  comprend un *business plan* mais aussi d'autres éléments.

33  **Me Jaeger**.- Et la valeur d'actif net est un des critères qui seront pris en compte par les
34  prêteurs.

35  **Mme Perrier**.- La valeur du projet est effectivement un élément. Mais ce *business plan*
36  présenté par Getma International n'était pas destiné à l'obtention d'un financement de
37  projet.

38  **Me Jaeger**.- Ce n'est pas ma question. Vous l'avez déjà indiqué. Je voudrais que nous
39  restions dans le cadre de la valeur de ce *business plan* en soi. C'est un document,
40  vous êtes d'accord avec moi, qui peut permettre d'apprécier la capacité du candidat à
41  mettre en place un financement de projet.

42  **Mme Perrier**.- Le *business plan* en général, tout à fait.

43  **Me Jaeger**.- Par conséquent, si la valeur d'actif net est surévaluée de 69 % cela
44  présente une vision optimiste de la capacité de financement de ce candidat.

45  **Mme Perrier**.- Oui. Enfin… J'ai quand même relevé qu'après correction des erreurs
46  identifiées par KPMG, la valeur reste significative puisqu'on est à presque 100 M€. Ce
47  n'est quand même pas une somme négligeable.

1 **Me Jaeger**.- Mais quelle était la valeur dans le *business plan* ?

2 **Mme Perrier**.- Elle était plus élevée. Je peux reprendre le chiffre-là mais il a été dit et
3 redit, je devrais m'en souvenir.

4 **Me Jaeger**.- Je vais vous le dire.

5 **Mme Perrier**.- Si je comprends bien, le chiffre du *business plan* non corrigé est de
6 267 928 000 €.

7 **Me Jaeger**.- 267 M€ au lieu de 100 M€, cela fait une grosse différence.

8 **Mme Perrier**.- Oui, cela ferait une différence mais ce que je veux juste dire, c'est
9 qu'une valeur actuelle nette de 100 M€ pour un projet est quand même une valeur très
10 élevée qui permet d'amortir un certain nombre de chocs, si je peux reprendre
11 l'expression employée tout à l'heure.

12 **Me Jaeger**.- Si vous vous reportez au paragraphe 22 de votre rapport, vous indiquez :
13 « De fait, ils n'ont aucun impact sur le total des redevances attendues par le
14 Concédant, celles-ci ne dépendant que du montant unitaire de la redevance par TEU
15 et du volume traité par année ». Donc vous constatez en réalité ici que les chiffres qui
16 sont indiqués dans le *business plan* ne modifient pas le montant des redevances. C'est
17 cela que vous voulez dire ?

18 **Mme Perrier**.- Je veux dire que les chiffres indiqués ne modifient pas finalement ce qui
19 ressort du *business plan*. Ce qui est utilisé, d'après le dossier, c'est le volume, le
20 volume selon les trois hypothèses et sur cinq ans. Je veux juste dire que les erreurs
21 relevées n'impactent pas les volumes, elles impactent le chiffre d'affaires sur le
22 scanner, qui n'a rien à voir avec les volumes.

23 **Me Jaeger**.- Ici vous parlez de redevances. La redevance c'est le revenu que le
24 Concédant tire de la concession. Pour simplifier, c'est ce qui est payé par le
25 Concessionnaire au Concédant.

26 **Mme Perrier**.- Tout à fait. Et donc cette redevance totale qui est calculée dans le cadre
27 du dossier, c'est le trafic multiplié par une redevance unitaire qui figurait également
28 dans le dossier.

29 **Me Jaeger**.- Vous dites qu'ils n'ont aucun impact sur le total des redevances. C'est
30 cela, votre affirmation. En revanche, est-ce que ces chiffres peuvent avoir un impact
31 sur la capacité du Concessionnaire à payer ces redevances ?

32 **Mme Perrier**.- Je fais juste une petite précision : le total des redevances, c'est le total
33 tel que présenté par la Commission. Donc c'est uniquement une catégorie des
34 redevances. Ce ne sont pas toutes les redevances.

35 Pour ce qui est de votre question sur la capacité du Concessionnaire à payer la
36 redevance, je crois qu'avec un *business plan*, même corrigé, qui fait apparaître
37 presque 100 millions de valeur sur la durée de la Concession, ce montant prenant en
38 compte toutes les redevances payées au Concédant, je ne pense pas qu'il y ait le
39 moindre problème.

40 **Me Jaeger**.- Vous ne pensez pas qu'il y ait le même problème sur la capacité...

41 **Mme Perrier**.- J'en suis même certaine… sur la capacité du Concessionnaire à payer
42 la redevance.

43 **Me Jaeger**.- …parce qu'il aurait une marge suffisante. D'accord.

44 Quand vous dites cela, c'est avant de faire les investissements ou après avoir fait les
45 investissements ?

1   **Mme Perrier.**- C'est sur la base du *business plan* présenté. Dans le *business plan*, il y
2   a des investissements qui sont prévus. Je raisonne là sur la base du *business plan*
3   uniquement.

4   **Me Jaeger.**- Après investissements.

5   **Mme Perrier.**- Oui, après investissements.

6   **Me Jaeger.**- Au paragraphe 23, vous indiquez : « Il apparaît que l'objectif de la
7   commission n'était pas d'apprécier le montant des chiffres d'affaires et résultats
8   dégagés par le concessionnaire mais les redevances que le Concédant allait pouvoir
9   retirer de la Concession ».

10   À votre avis, est-ce que le seul objectif de cette Concession était de percevoir des
11   redevances ?

12   **Mme Perrier.**- Je pense que c'était un objectif important et en tout cas, sur la base de
13   la notation des *business plans*, c'est ce que je note.

14   **Me Jaeger.**- Et c'est comme cela que vous le présentez. Effectivement, vous
15   présentez l'objectif de la Commission comme étant de percevoir des redevances.
16   Disons l'objectif de la Concession vue par la commission.

17   Il a été dit par des témoins — je crois que vous étiez là —, notamment M. Camara, que
18   l'objectif principal de la Concession…

19   **Mme Perrier.**- Je n'étais pas là.

20   **Me Jaeger.**- Alors, je vous le dis, l'objectif principal de la Concession n'est pas de
21   percevoir les redevances, mais c'est de faire les travaux, l'extension du port. Si on se
22   place dans cette optique-là, c'est-à-dire d'apprécier la capacité de l'opérateur ou du
23   candidat à faire des travaux, les choses sont différentes.

24   **Mme Perrier.**- Quand j'ai écrit ce paragraphe, c'était dans le cadre de ces travaux. Je
25   parlais de l'objectif de la Commission dans son analyse des *business plans*. Je ne
26   parlais pas du tout de l'objectif de la Commission par rapport à l'intégralité du projet.

27   **Me Jaeger.**- Non mais là, vous dites que l'objectif de la Commission n'est pas
28   d'apprécier le chiffre d'affaires et les résultats. On a vu tout à l'heure que le chiffre
29   d'affaires, les résultats et la VAN (Valeur Actuelle Nette) avaient un impact sur la
30   capacité de financement du candidat et vous dites : « Tout cela, ce n'est pas l'objectif
31   de la Commission ». En réalité, apprécier la capacité de l'opérateur à faire les travaux
32   et à les financer est aussi un des objectifs de la Commission.

33   **Mme Perrier.**- Je voulais juste rappeler que moi, mon rapport porte sur le *business
34   plan* et la façon dont ce *business plan* a pu influer la notation. Donc je n'ai regardé que
35   la notation et les critères utilisés pour apprécier le *business plan*.

36   **Me Jaeger.**- Cela, on a compris, et je vous ai demandé de sortir de ce cadre pour
37   répondre à la question.

38   **Mme Perrier.**- Oui mais vous me ramenez à mon paragraphe 23, donc on est dans le
39   cadre du rapport !

40   **Me Jaeger.**- Vous me dites que votre paragraphe 23 n'est vrai que pour autant qu'on
41   se situe dans l'hypothèse mécanique de la notation mais qu'en revanche, il ne serait
42   plus vrai si on se situait dans une appréciation générale de l'offre.

43   **Mme Perrier.**- C'est possible, mais ce n'est pas ce que j'ai analysé.

44   **Me Jaeger.**- D'accord. Je vous remercie. Je n'ai pas d'autres questions.

45   **M. le Président**.- Merci, Monsieur. Est-ce que les questions de Me Jager et les
46   réponses qu'il a reçues vous inspirent quelques questions ?

1 **Me Fischer**.- Elles m'inspirent, avec votre autorisation, deux questions extrêmement
2 brèves.

3 **M. le Président**.- Je vous en prie, Monsieur.

4 ➢ ***Re-Cross examination* par la Demanderesse**

5 **Me Fischer**.- Ces questions sont inspirées par une question de Me Jaeger.
6 Mme Perrier, en parlant de ce *business plan,* a dit : « Ce document est faux ». Votre
7 confrère, M. Guitera, a considéré… a employé l'adjectif « erroné » ou a qualifié ce
8 *business plan* ou la zone qui nous occupe « d'erreur ».

9 Selon votre compétence technique d'expert-comptable, vous pensez que c'est un
10 document faux ou un document erroné ?

11 **Mme Perrier**.- Je dirai qu'il est erroné.

12 **Me Fischer**.- Merci.

13 Me Jaeger vous a posé des questions sur le point de savoir si le *business plan* erroné
14 était de nature à avoir une incidence sur la possibilité de lever des fonds et dans le
15 cadre de la recherche d'un financement, ce qui sortait d'ailleurs un peu de votre
16 mission, vous l'avez rappelé.

17 Dans la mesure où un financement aurait été recherché une fois la concession
18 adjugée, et dès lors que la République de Guinée avait décidé de ne pas concéder
19 l'activité scanner, pensez-vous que la société Getma International, pour rechercher des
20 financements, aurait retranché la partie scanner ?

21 **Mme Perrier**.- Écoutez, je l'imagine, très certainement.

22 **Me Fischer**.- Très certainement. Merci. Je n'ai pas plus d'autres questions.

23 ➢ **Questions des arbitres**

24 **M. le Président**.- J'ai une petite question. Si j'ai bien compris M. Guitera, Getma devait
25 dépenser dans les deux ans un peu plus de 100 millions. C'est cela ?

26 **M. Guitera**.- Un peu plus de 100 millions si on prend en compte le Ticket d'entrée,
27 93 millions si on prend en compte uniquement les investissements, oui.

28 **M. le Président**.- Donc en prenant en compte le Ticket d'entrée, cela fait 108 millions.

29 **M. Guitera**.- Tout à fait.

30 **M. le Président**.- Pour un projet que vous évaluez à 83.

31 **M. Guitera**.- Attention, 83, c'est le profit sur le projet. C'est le net des encaissements et
32 des décaissements. Cela veut dire qu'en dépensant 106 millions, on va commencer
33 par récupérer les coûts, donc on arrive à zéro. Après, on fait un profit. C'est la valeur
34 actualisée de ce profit qui est de 86 millions sur 25 ans.

35 **M. le Président**.- Et qui est, d'après la méthode, la valeur du projet ?

36 **M. Guitera**.- Oui. C'est le profit que va dégager le projet.

37 **M. le Président**.- D'accord. Mais ce profit cumulé et actualisé exprime la valeur du
38 projet.

39 **M. Guitera**.- Pour l'entreprise, oui.

1  **M. le Président**.- Donc cela veut dire qu'au jour d'aujourd'hui, moi, Getma, j'ai un
2  projet qui a une valeur actualisée de 83 millions sur lesquels, en moins de 2 ans, je
3  vais dépenser 108 que je ne récupérerai jamais !

4  **M. Guitera**.- Si, vous allez récupérer 86 plus 108.

5  Vous avez des coûts. La valeur actuelle nette, c'est le différentiel entre les coûts... en
6  fait, c'est le profit. Donc c'est l'actualisation du profit. Prenons un exemple. Vous
7  mettez...

8  **M. le Président**.- Attendez, je vais vous faire une réponse qui vous permettra de
9  simplifier vos explications. Est-ce que cela veut dire que la valeur actuelle est après
10 remboursement des investissements ?

11 **M. Guitera**.- Oui.

12 **M. le Président**.- Y compris des fonds propres ?

13 **M. Guitera**.- Des 103 ou108 millions investis.

14 **M. le Président**.- 108 millions investis. Donc j'ai un projet qui permet de rembourser
15 108 millions et de me garder 83.

16 **M. Guitera**.- Après actualisation, et sur la base d'un taux d'actualisation de 4,8…

17 **M. le Président**.- Peu importe cela, ce sont des détails. Cela change les montants
18 mais pas la structure de raisonnement.

19 **M. Guitera**.- Sur le principe, oui.

20 **M. le Président**.- Donc, finalement, c'est un projet qui vaut 83 millions en me coûtant
21 zéro !

22 **M. Guitera**.- Non, il y a un décaissement…

23 **M. le Président**.- En fin de compte, je récupère mon décaissement et je garde 83.

24 **M. Guitera**.- Je ne pense pas qu'on puisse...

25 **M. le Président**.- C'est cela, le *discounted cash-flow*, non ?

26 **M. Guitera**.- Oui et non. Cela ne vous coûte pas zéro, ce n'est pas vrai. Vous
27 investissez de l'argent en attendant un retour en face. Le retour actualisé de cet
28 argent, c'est 83 millions. Mais si vous n'aviez pas investi...

29 **M. le Président**.- D'accord, j'entends bien que cela ne me coûte pas zéro puisqu'il faut
30 que je commence par sortir l'argent. Mais en opération finale, en solde, je récupère ce
31 que j'ai sorti et j'ai 83 millions en plus.

32 **M. Guitera**.- Oui, pour simplifier, oui.

33 **M. le Président**.- Puisque vous avez cité votre théorème de 57, (Monroley ?) disait
34 que le *discounted cash-flow*, c'était le billard à trois bandes.

35 Est-ce qu'il y a d'autres questions ?

36 **Me Teynier**.- Pour rebondir, admettons qu'un concessionnaire soit évincé illicitement.
37 Si vous avez ce type de données telles que vous les avez corrigées, est-ce que cela
38 veut dire que ce qu'il serait en droit de réclamer au titre d'un gain manqué, c'est cette
39 valeur de 83 millions que vous estimez ? Parce que vous avez fait aussi un calcul,
40 d'une certaine manière, de préjudice sans y avoir été invité, sans qu'on vous l'ait
41 demandé. D'un point de vue méthodologique, je cherche simplement à comprendre.

42 **M. Guitera**.- Je voudrais faire une réponse en deux temps, les deux temps étant
43 importants.

1 Sur le principe, oui. Sur le principe, effectivement c'est un gain manqué. Maintenant,
2 sur le *quantum*, je n'ai fait aucun travail sur le *quantum* et comme je l'ai dit à de
3 nombreuses reprises, le taux de 4,88 % repose sur un certain nombre d'hypothèses en
4 termes de taux, en termes de ratio fonds propres/dette (20/80). Si vous prenez un ratio
5 50/50, vous partez au sud.

6 Donc ne retenez pas... cela peut être une incompréhension. Ne retenez pas de mes
7 propos ou de mes écrits...

8 **Me Teynier**.- J'ai bien compris que vous êtes parti d'un taux d'actualisation qui avait
9 été présenté par Getma, que vous avez recalculé en fonction des données de l'appel
10 d'offres, mais simplement d'un point de vue de méthode et de principes, ce chiffre de
11 83 millions —83, 50, 22, peu importe— pourrait être considéré comme un gain
12 manqué...

13 **M. Guitera**.- Oui.

14 **Me Teynier**.- … calculé jusqu'au terme de la Convention et par application, là, de la
15 méthode là du *discounted cash-flow*.

16 **M. Guitera**.- Oui.

17 **M. le Président**.- Et le fait qu'il soit perçu au début de la concession n'y change rien à
18 cause de l'actualisation ?

19 **M. Guitera**.- Je ne comprends pas votre question.

20 **M. le Président**.- Eh bien voilà, je comprends la réponse ! Je veux dire, le fait que l'on
21 perçoive cette valeur, à la considérer exacte comme représentant la valeur du projet, le
22 fait qu'on la perçoive trois, quatre ou cinq ans après le début de la concession au lieu
23 de 25 ans après, cela ne modifie pas le montant puisque le montant est un montant
24 actualisé. C'est cela ?

25 **M. Guitera**.- La réponse est oui, *modulo*, comme je l'ai dit, le problème du taux
26 d'actualisation. Une approche un peu différente : si vous vous situez —là encore, je
27 reviens à ma comptabilité de caisse— à la date de résiliation, il y a eu 30 millions
28 investis, donc 15 millions en Ticket d'entrée, 15 millions en matériels et en travaux,
29 dont 12 en matériels, si j'ai bien compris, et 3 en travaux.

30 En face, on a obtenu 10 millions d'exploitation, ce que j'ai compris, de *cash-flow* en
31 2010. Mettons que ce soit à peu près pareil en 2009, mais il y a plus de mois, et un
32 peu moins en 2011, mettons qu'on ait eu 17 millions de *cash-flow* opérationnel. Donc
33 j'ai 30, qui est mon investissement initial, moins 17. Mes matériels roulants, je les
34 récupère. On verra demain qu'il y a un débat sur le montant des réparations et le
35 principe... Mais je les récupère moyennant des réparations. Sans me prononcer, on
36 verra demain.

37 Si je fais ce calcul-là, je vois que si je tire un trait à l'instant *t*, en *cash* pur, je suis
38 quasiment ce qu'on appelle *square*. Mes décaissements et mes encaissements sont
39 quasiment matchés, enfin équivalents.

40 **M. le Président**.- Oui, mais j'ai perdu ma capacité de faire des bénéfices.

41 **M. Guitera**.- Vous avez effectivement perdu le gain futur... enfin... dit autrement... mais
42 attention ! Le gain futur est conditionné par le fait que vous fassiez des travaux, etc.

43 **M. le Président**.- Et des investissements.

44 **Me Teynier**.-  Si vous ne les faites pas...

1   **M. Guitera**.- Si vous ne les faites pas, vous ne les avez pas. Si vous ne les faites pas,
2   vous conservez votre *cash-flow* de 10 millions par an, qui est un *cash-flow*
3   d'exploitation et vous pouvez effectivement le conserver tant que le terminal
4   fonctionne, sans problème majeur. En revanche, vous ne remplissez toujours pas votre
5   obligation de travaux.

6   **M. le Président**.- Oui, nous sortons du sujet sur ce que signifie le montant de la valeur
7   accumulée actualisée.

8   Merci, cela m'a éclairé en disant que je récupère mes investissements. Sinon, à la
9   place du Port de Conakry, j'ai un imbécile qui met 108 millions pour quelque chose qui
10   vaut 83, je me serais précipité même après toutes les corrections ! Mais vous me dites
11   que ce n'est pas cela. Parfait.

12   Est-ce qu'il y a d'autres questions ?

13   **Me Jaeger.-** Il n'y a pas d'autres questions.

14   **M.·le Président.-** Eh bien merci. Merci Madame, merci Monsieur.

15   Je vais vous demander, conformément à l'usage, de n'avoir aucun rapport avec les
16   Parties jusqu'à la fin de votre audition de demain.

17   Demain, nous commençons à 9 heures 45 par un exposé de Mme Perrier sur son
18   rapport, suivi d'un exposé de M. Guitera qui a annoncé, il y a cinq minutes, qu'il
19   prendra une demi-heure sur son propre rapport. Ensuite, nous ferons le même jeu
20   qu'aujourd'hui, mais il y aura une pendule double, vous le savez, celle des échecs. On
21   va donc donner trois heures à chacun.

22                          *L'audience est suspendue  à 18 heures 43.*