IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| In the Matter of the Arbitration of Certain Controversies between<br><br>GETMA INTERNATIONAL,<br><br>Petitioner,<br><br>and<br><br>THE REPUBLIC OF GUINEA,<br><br>Respondent. | Civil Action No. 1:14-cv-01616-RBW |
|---|---|

**GETMA REPLY MEMORANDUM IN FURTHER SUPPORT OF PETITION**

Allen B. Green (D.C. Bar No. 222158)
William T. O'Brien (D.C. Bar No. 450891)
Ivan W. Bilaniuk (D.C. Bar. No. 494315)
MCKENNA LONG & ALDRIDGE LLP
1900 K Street, N.W.
Washington, D.C. 20006
Telephone: (202) 496-7500
Fax: (202) 496-7756

*Attorneys for Petitioner*
*Getma International*

Dated: April 27, 2015

# TABLE OF CONTENTS

**Page**

I. INTRODUCTION ..... 1

II. ARGUMENT ..... 2

A. The Tribunal Provided the Republic of Guinea a Full and Fair Opportunity to Present Its Corruption Allegations and Evidence During the Arbitration ..... 2

1. The Right to be Heard Under U.S. Law and Arbitrators' Discretion ..... 2

2. The Tribunal Gave Guinea a Full and Fair Opportunity to Present its Case ..... 3

a. Guinea had a full opportunity to raise its corruption allegations ..... 3

b. The Republic of Guinea only presented alleged evidence of corruption at the end of the case and the Tribunal extended proceedings to accommodate Guinea ..... 4

c. The Republic of Guinea addressed its dearth of corruption evidence by hiring an investigator three months after closing arguments ..... 5

d. Republic of Guinea's right to be heard did not require the Tribunal to extend the case a second time for another four months ..... 5

e. The Republic of Guinea raised no issues with due process during the arbitration and only does so now because it lost ..... 8

f. Guinea has no new evidence to support its corruption allegations after sixteen months underscoring that Guinea had its opportunity to present its case ..... 8

B. The Arbitration Rejected the Republic of Guinea's Allegations and Evidence of Corruption and This Court May Not Retry the Merits of the Case ..... 9

1. Standard of Review ..... 9

2. The Arbitral Tribunal Fully Adjudicated and Rejected the Republic of Guinea's Allegations of Corruption ..... 9

a. The Tribunal observed the Republic of Guinea's consistent failure to substantiate its allegations of corruption ..... 9

b. The Dec. 16, 2013 hearing transcript and the Tribunal's Award reflect its full consideration of Guinea's evidence of corruption ..... 10

c. The Republic of Guinea conjured allegations of corruption as an after-the-fact explanation for breaching the Concession Agreement ....12

3. Guinea Presents No New Evidence of Corruption ....14

C. The Allegation of Arbitrator Misconduct Concerning Tribunal Fees Getma and Guinea Both Agreed to Pay Is Merely An After-Loss Litigation Tactic ....14

1. The Arbitration Clause Provision on Fees Replaced the CCJA Rules on Fees as Permitted by Article 10 of the Uniform Act on Arbitration ....14

a. By the Republic of Guinea's own admission, U.S. Courts recognize the importance of adhering to the Parties' express agreements ....15

b. The Arbitration clause in the Agreement indicates the Parties expressly excluded the provision of the CCJA Rules prohibiting fee arrangements ....15

2. Guinea Expressly Agreed to Fees Being Set at €450,000 ....17

3. Guinea's Claim it was Coerced Into Agreeing to Increase Fees Is Not Credible ....17

a. Refusing to work without advance payment is not coercive because it is a norm in international arbitration and also in the CCJA Rules ....17

b. Guinea is represented by experienced international arbitration counsel who is not vulnerable to coercion and agreed to the fee amount as fair ....18

4. The Fees and Costs the CCJA Set were Provisional and to be Adjusted ....18

a. Both the CCJA Rules and CCJA ruling indicate the deposit is an advance ....19

b. By objective measure, the fee can only be a provisional advance and not full compensation because the arbitrators would only earn about € 21 per hour ....19

c. The Parties, CCJA, and Tribunal all proceeded with the understanding the advance would be adjusted higher based on the expressed will of the Parties ....21

d. The CCJA inexplicably refused to adjust the advance on fees higher ....22

5. Getma's Counsel's Meeting With the CCJA President was Done With the Mandate of the Parties and Tribunal ....22

6. Guinea's Allegation that the Tribunal's Award Was "Up for Sale" is Frivolous Because Guinea Only Stated It Would not Pay Fees After the Tribunal Had Executed the Award ....................23

7. The Tribunal Suing Getma in Paris for Guinea's Balance of the Increased Fees and Costs Demonstrates There Is No Special Tribunal-Getma Relationship....................24

8. According to CCJA Rules, At Most the Agreement About the Increase in Fees is Null and Void, and Not the Award Itself ....................24

9. Guinea Claims Arbitrator Misconduct While Orrick, its Counsel, Appointed Arbitrator Teynier in a Different Arbitration....................25

## TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Cargill Rice, Inc. v. Empresa Nicaraguense Dealimentos Basicos*, 25 F.3d 223 (4th Cir. 1994) ....................15

**China Nat'l Chartering, Corp. v. Pactrans Air & Sea, Inc.*, No. 09 C 7629, 2012 WL 6055299 (N.D. Ill. Dec. 6, 2012) ....................9, 14

*Encyclopaedia Universalis S.A. v. Encyclopaedia Britannica, Inc.*, 403 F.3d 85 (2d Cir. 2005)....................15

**Generica Ltd. v. Pharm. Basics, Inc.*, 125 F.3d 1123 (7th Cir. 1997) ....................2, 3

*Goldman, Sachs & Co. v. Athena Venture Partners, L.P.*, No. 13-MC-130, 2013 WL 3955136 (E.D. Pa. Aug. 1, 2013)....................15

*Harvey Aluminum v. United Steelworkers of America*, 263 F.Supp. 488 (C.D. Cal. 1967) ....................3

*Hoteles Condado Beach, La Concha & Convention Ctr. v. Union De Tronquistas Local 901*, 763 F.2d 34 (1st Cir. 1985)....................2, 3

*Iran Aircraft Indus. v. Avco Corp.*, 980 F.2d 141 (2d Cir. 1992)....................2, 3

**Karaha Bodas Co. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara*, 364 F.3d 274 (5th Cir. 2004) ....................2

*Mathews v. Eldridge*, 424 U.S. 319, 96 S.Ct. 893 (1976)....................2

*Polimaster Ltd. v. RAE Sys., Inc.*, 623 F.3d 832 (9th Cir. 2010) ....................15

*Slaney v. The Intern. Amateur Athletic Fed.*, 244 F.3d 580 (7th Cir. 2001) ....................9

*Sonera Holding B.V. v. Cukurova Holding A.S.*, 895 F. Supp. 2d. 513 (S.D.N.Y. 2012)....................3

*Szuts v. Dean Witter Reynolds, Inc.*, 931 F.2d 830 (11th Cir. 1991) ....................15

*Teamsters, Chauffeurs, Warehousemen and Helpers, Local Union No. 506 v. E.D. Clapp Corp.*, 551 F.Supp 570 (N.D.N.Y. 1982)....................3

*Tempo Shain Corp. v. Bertek, Inc.*, 120 F.3d 16 (2d Cir. 1997)....................3

**OTHER AUTHORITIES**

Gary B. Born, *International Commercial Arbitration* (Kluwer Law International, 2d. ed. 2014) ....................2, 3, 17, 19, 21

Michael Mcilwrath & John Savage, *International Arbitration and Mediation: A Practical Guide* (Kluwer Law International 2010)....................17, 21

New York Convention, Article V, June 20, 1958, 21 U.S.T. 2517 ....................2, 9, 15

## I. INTRODUCTION

The Republic of Guinea's ("Guinea's") opposition to Getma's petition to enforce the arbitral award it won following a three-year arbitration over Guinea's termination of a concession agreement is yet another attempt to delay Getma's collecting on the award. Guinea's arguments boil down to three attacks on the integrity of a distinguished and impartial arbitral tribunal — attacks made only after Guinea lost its case. The first is Guinea's allegations of corruption regarding the contract at issue were not heard. The second asks this Court to re-try, in effect, the case. The third is the Tribunal impermissibly sought to be paid what it considered a fair amount for its services, an amount agreed to by both Guinea and Getma.

In its first argument, Respondent claims that its right to be heard was not met, despite waiting until four months after closing arguments to provide any purported "evidence" of corruption it had alleged in its pleadings. Although the record had effectively closed, the Tribunal nevertheless permitted Guinea to submit its evidence and ordered a special hearing focused on Guinea's allegations of corruption.

Preposterously, the Republic of Guinea now is claiming, after it lost the case, that it did not have the right to be heard because the Tribunal did not extend proceedings another four months so that it could attempt to gather more evidence of alleged corruption, and did not schedule yet another hearing. In its second argument, Respondent sets forth the evidence that it submitted and/or discussed at the special corruption hearing and that the Tribunal considered in a reasoned Award, thus attempting before this Court to retry the arbitration on the merits. Respondent does not get a "second bite at the apple" under United States law.

Concerning its third argument, both Guinea and Getma, represented by experienced, highly qualified counsel, who had participated in many international arbitrations, agreed to a fair payment to the arbitrators for their work. That the institution administering the arbitration

disagreed, for whatever internal reasons, does not invalidate this Award. Guinea's new argument after it lost, that experienced counsel was "coerced" into agreeing to a relatively modest fee for three years of work, does not withstand impartial scrutiny.

This Court should dismiss these after-loss litigation tactics and enforce Getma's Award.

## II. ARGUMENT

### A. The Tribunal Provided the Republic of Guinea a Full and Fair Opportunity to Present Its Corruption Allegations and Evidence During the Arbitration

#### 1. The Right to be Heard Under U.S. Law and Arbitrators' Discretion

To invoke a due process defense to enforcement of an arbitral award under the New York Convention's Article V(1)(b) in a U.S. court, a party must establish that it was denied a fundamentally fair hearing comprised of an opportunity to be heard "at a meaningful time and in a meaningful manner." *See Karaha Bodas Co. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara*, 364 F.3d 274, 298-99 (5th Cir. 2004); *Iran Aircraft Indus. v. Avco Corp.*, 980 F.2d 141, 145-46 (2d Cir. 1992) (quoting *Mathews v. Eldridge*, 424 U.S. 319, 333, 96 S.Ct. 893, 902 (1976)). Under U.S. law, a "fundamentally fair hearing is one that meets the minimal requirements of fairness – adequate notice, a hearing on the evidence, and an impartial decision by the arbitrator." *Generica Ltd. v. Pharm. Basics, Inc.*, 125 F.3d 1123, 1130 (7th Cir. 1997) (internal quotations and citations omitted). The party opposing enforcement needs to establish it was *actually* deprived of a fair hearing. *Id*. (enforcing award despite curtailed cross examination of witness because arbitrator permitted development of record from other evidence).

Arbitrators "enjoy[] wide latitude in conducting an arbitration hearing," and are "not constrained by formal rules or procedure or evidence." *Id.* (quoting *Hoteles Condado Beach, La Concha & Convention Ctr. v. Union De Tronquistas Local 901*, 763 F.2d 34, 38 (1st Cir. 1985)); Gary B. Born, *International Commercial Arbitration*, 3521-22 (Kluwer Law International, 2d.

ed. 2014).[1] Parties who have contracted to "remedy their disputes through arbitration rather than litigation should not expect the same procedures they would find in the judicial arena." *Generica Ltd.,* 125 F.3d at 1130. Arbitrators are not required to hear "all of the evidence tendered by the parties," provided the parties have been given an "adequate opportunity to present its evidence and arguments." *Id.* (quoting *Hoteles Condado,* 763 F.2d at 38). *See Sonera Holding B.V. v. Cukurova Holding A.S.*, 895 F. Supp. 2d. 513, 521 (S.D.N.Y. 2012) (finding respondent's due process rights were not violated when tribunal refused to reopen a hearing to permit in-person testimony when respondent was permitted to present testimony in written form and tribunal accepted it as truthful). Arbitrators enjoy broad discretion in conducting hearings because "the arbitrator's rule is to resolve disputes" without becoming mired in all the procedural niceties observed by federal courts. *Generica Ltd.*, 125 F.3d at 1130.[2]

**2. <u>The Tribunal Gave Guinea a Full and Fair Opportunity to Present its Case</u>**

a. <u>Guinea had a full opportunity to raise its corruption allegations</u>

From the outset of arbitration, Guinea was free to litigate the defense of corruption. In

[1] Born notes that only "[i]n a few egregious cases . . . courts have refused to recognize awards because of an arbitrator's refusal to permit a party to present material evidence," and that "[e]ven in such cases, the award-debtor is required to show that the (improper) exclusion of evidence had a material effect on the arbitral process or decision." Born, *supra*, at 3521-22. Respondent notes some of these egregious cases, but is unable to establish that the present case is similarly "egregious." *See Iran Aircraft Indus.*, 980 F.2d at 146 (finding that by leading the award-debtor to "believe it had used a proper method to substantiate its claim" before rejecting its claim for "lack of proof," court had denied award-debtor opportunity to present its case); *Teamsters, Chauffeurs, Warehousemen and Helpers, Local Union No. 506 v. E.D. Clapp Corp.*, 551 F.Supp 570, 574 (N.D.N.Y. 1982) (holding an arbitrator denied a party opportunity to present its case when parties agreed to allow simultaneous consideration of merits and arbitrability and arbitrator "stormed out of the proceedings" before both sides were able to present their cases in full); *Tempo Shain Corp. v. Bertek, Inc.*, 120 F.3d 16, 20 (2d Cir. 1997) (finding due process violation when witness testimony was excluded for being "cumulative," but was only evidence to rebut appellee's unsupported claim); *Hoteles Condado*, 763 F.2d at 40 (affirming vacatur when no live testimony was available and arbitrator failed to give any weight to a transcript constituting party's sole source of evidence, effectively denying one party opportunity to present any evidence); *Harvey Aluminum v. United Steelworkers of America*, 263 F.Supp. 488, 493 (C.D. Cal. 1967) (vacating award when arbitrator refused to consider one party's testimony, citing a non-binding rule of evidence, when neither party was on notice of evidentiary rule's applicability to arbitration).

[2] The *Generica* court elaborated, "accept[ing] arbitration entails a trade-off. A party can gain a quicker, less structured way of resolving disputes; and it may also gain the benefit of submitting its quarrels to a specialized arbiter.... Parties lose something, too: the right to seek redress from the courts for all but the most exceptional errors at arbitration." *Generica Ltd.*, 125 F.3d at 1130 n.5 (internal quotations omitted).

the Mar. 12, 2012 initial meeting, Guinea stated it intended to elucidate alleged "irregularities in awarding the concession to Getma." *See* Second Declaration of Cédric Fischer ("2nd Fischer Decl.") ¶ 11; Ex. 5 to Declaration of Laurent Jaeger in Support of Opposition to Petition (ECF No. 19-5) ("Jaeger Decl.") at 12 (Mar. 12, 2012 Meeting Minutes).  It also reserved its rights to "seek reparation for other illegal acts . . . ."  Ex. 5 to Jaeger Decl. at 12 (Mar. 12, 2012 Meeting Minutes).  Guinea expressly raised corruption in its Oct. 18, 2012 and Mar. 24, 2013 briefs.  *See* 2nd Fischer Decl. ¶¶ 11-12.  During May 2013 witness hearings, Guinea was unable to provide evidence of the corruption it alleged.  *See id*. ¶ 13.  Guinea raised the issue of corruption during closing arguments on Jul. 8, 2013, but was forced to admit it had no evidence:

> Mr. Jaeger:  the information that we did have [at the time] lead us to work on a different path, which was the path of corruption.  That is why we worked on a certain number of items having to do with the call for tender procedure because we had at that moment started out to show the existence of acts of corruption at the time of the signing of the Agreement.  ***We did not find proof of these facts, we have not found sufficient proof to uphold this argument in your Court.***

Ex. 3 at 72:41-48, 73:12-29 (Transcript ("Tr.") of Jul. 8, 2013 Hearing ("Hr'g"))(emphasis added); *see also* 2nd Fischer Decl. ¶ 14.

   b. <u>The Republic of Guinea only presented alleged evidence of corruption at the end of the case and the Tribunal extended proceedings to accommodate Guinea</u>

   On Nov. 4, 2013, almost four months after closing arguments, Guinea claimed it had "recently obtained" evidence about corruption and requested a hearing.  *See* Ex. 32 to Jaeger Decl. (L. Jaeger L'tr (Nov. 4, 2013)).  Getma requested that it be provided time to respond to any such evidence.  *See* 2nd Fischer Decl. ¶ 17; Ex. 5 at 3 (C. Fischer L'tr (Nov. 5, 2013)).

   The Tribunal permitted Guinea to submit its evidence in order to "respect the principle that the parties have the right to be present and heard" despite the "lateness of the Republic of Guinea's request," and its already having had the opportunity to litigate the issue of corruption. *See* Ex. 33 to Jaeger Decl. (Proced. Order No. 8 (Nov. 7, 2013)).  The Tribunal set Nov. 14, 2013

as the deadline for Guinea to produce all its evidence and gave Getma until Nov. 29, 2013 to respond, at which point the Tribunal would decide whether to conduct a hearing.  *See id.*

Guinea chose to submit only an unsupported declaration of Mr. Steven Fox as evidence despite having said that it had "specific and detailed" evidence regarding the "exact amount of money paid by Getma International, as well as the names of the people who received it."  *See* Ex. 32 to Jaeger Decl. (L. Jaeger L'tr (Nov. 4, 2013)); Ex. 34 to Jaeger Decl. (Statement of Mr. Steven Fox)).  With Procedural Order No. 9, the Tribunal called a special hearing on Dec. 16, 2013 to consider this new evidence and ordered no new exhibits would be accepted.  *See* Ex. 35 to Jaeger Decl. (Proced. Order No. 9 (Dec. 2, 2013)).  Mr. Fox would testify on behalf of Guinea.

     c.   <u>The Republic of Guinea addressed its dearth of corruption evidence by hiring an investigator three months after closing arguments</u>

Guinea obtained its "evidence" so late because it only hired Mr. Steven Fox, an anti-corruption consultant and investigator, on Oct. 4, 2013, three months after closing arguments and two years after it had raised corruption allegations in its first brief.  *See* 2nd Fischer Decl. ¶ 23; Ex. 7 at 6:5 (Tr. of Dec. 16, 2013 Hr'g).  The Tribunal found "everything that is being produced today could have been produced before."  Ex. 1 to Fischer Decl. (Final Award) ¶ 79.

     d.   <u>Republic of Guinea's right to be heard did not require the Tribunal to extend the case a second time for another four months</u>

On Dec. 14, 2013, two days before the scheduled hearing, counsel for Guinea requested to submit more witness statements.  *See* Ex. 39 to Jaeger Decl. (L. Jaeger Email (Dec. 14, 2013)).  Guinea represented that as a result of Mr. Steven Fox's "investigation," Guinean judicial authorities had prepared two witness statements of civil servants who had served on the bid evaluation commission for the Concession Agreement and requested to admit the statements as evidence.  *Id.*  The morning of the hearing, Guinea transmitted to Getma these statements and a criminal complaint filed in a Guinean court against Guinean civil servants for alleged corruption

involving the Agreement.  *See* Ex. 40 to Jaeger Decl. (L. Jaeger L'tr (Dec. 16, 2013)).

Guinea knew about these witnesses since at least the time that it announced, on Nov. 4, 2013, that it had new evidence of corruption because Mr. Fox's statement identifies the two witnesses as among those he alleged received bribes.  *See id.*; Ex. 34 to Jaeger Decl. (Statement of Steven Fox).  Thus, at the latest, these individuals were identified during Fox's month-long "investigation" in Oct. 2013.  Guinea does not explain why it only obtained the statements on the eve of the Dec. hearing, despite knowing of the witnesses since at least Oct. 2013.  They were only a few lines stating the witness's role in the commission awarding the Agreement and that a Guinean civil servant named Mamadou Diallo handed them an envelope(s) of money stating that the money was on behalf of Getma.  Exs. 37, 38 to Jaeger Decl. (Witness Statements).

The Tribunal exercised its discretion to refuse to accept these witness statements formally into evidence because Guinea did not show good cause for its tardiness.  Nevertheless, the Tribunal did consider the contents of the witness statements through the testimony of Mr. Fox, who explained that the two individuals he had identified in his report acknowledged receiving bribes: "I am also conscious that two of the individuals identified in our report have now acknowledged receiving bribes in connection with the request for proposals for the port of Conakry, and have signed under oath.  They are Guinean government employees."  Ex. 7 at 14:8-16 (Tr. of Dec. 16, 2013 Hr'g); *see also* 2nd Jaeger Decl. ¶ 23.

The Tribunal also exercised its discretion to evaluate the evidence at the hearing and deny a four-month extension.  Ultimately, the Tribunal refused to extend proceedings further and rendered a reasoned award rejecting Guinea's corruption allegations.  *See* Ex. 42 to Jaeger Decl. (Proced. Order No. 11 (Jan. 8, 2014)); Ex. 1 to Fischer Decl. (Final Award) ¶¶63-82.  The Tribunal balanced Guinea's right to due process with Getma's right of access to justice in the

arbitration which had already lasted two and a half years: "[a]ccepting such a delay would amount to leaving the proceedings to the whims of one of the parties and depriving the other party of its legitimate right of access to justice." *Id.* ¶ 80.

Guinea's contemporaneous justification for the termination was based on alleged breach of contract, and it was not until the arbitration that Guinea conjured allegations of corruption as an after-the-fact justification for termination. *See* Section II.B.2.c below.

Guinea disingenuously argues the Tribunal acted against the Parties' will when it refused to grant the four-month extension by misrepresenting the nature of its request and Getma's response. Guinea asked for four months minimum: "After this period of time, the Tribunal will decide whether the debate should be closed or whether it should instead continue. That is the request that we make today before your Tribunal. We would like a period of four months to establish these facts. This seems to us the minimum time required to obtain and gather the additional necessary evidence." Ex. 41 to Jaeger Decl. at 25:31-35 (Tr. of Dec 16, 2013 Hr'g).

Getma strongly opposed the extension and Guinea is quoting Getma out of context. *See* Resp. Mem. at 18. Getma stated it could have tolerated providing "a few weeks" if Guinea needed time to examine documents it had collected, but that is not what Guinea is asking for because it does not have collected documents it needs to review; rather Guinea is trying to delay the issuance of the award by a "slow-drip" release of its purported evidence:

> If today, you were told, "I have two witnesses, I have exhibits and documents, I would like to be able to send them to you, to enter them into evidence, give me four months (though that is a little excessive), give me a few weeks to be able to examine them," there would not be the slightest problem. ***What they are asking you today is different.*** **[…]**
>
> ***If tomorrow, you were to issue a procedural order saying, "Send your evidence, the Tribunal wishes to examine such evidence, and the morning of the next hearing, there will be other evidence" and so on, that would be contrary to all the rules.***

*See* Ex. 41 to Jaeger Decl. at 29:5-11, 30:5-9 (Tr. of Dec. 16, 2013 Hr'g) (emphasis added).

      e.    The Republic of Guinea raised no issues with due process during the arbitration and only does so now because it lost

On multiple occasions, the Tribunal inquired of the Parties whether they had any problems or issues with how the arbitration was being run.  *See* 2nd Fischer Decl. ¶¶ 13, 15. Each time, Guinea answered it had no issues with the arbitration.  *Id.*  Respondent is thus estopped from raising its due process argument after it lost the arbitration.

At the end of the three-day evidentiary hearing in May of 2013, where Guinea failed to provide evidence of corruption, the Tribunal asked whether the Parties had "reservations to make or criticisms to be formulated as to how the proceeding was conducted."  *See* 2nd Fischer Decl. ¶ 13; Ex. 2 at 59:30-35 (Tr. of May 29, 2013 Hr'g).  Guinea said it had none.  *Id.*  After the Jul. 8, 2013 closing arguments, the Tribunal asked whether the Parties feel "that they had the leisure to express themselves sufficiently?"  Guinea answered yes, and denied having reservations as to the legality of the proceeding.  2nd Fischer Decl. ¶ 15; Ex. 4 at 84:22-27 (Tr. of Jul. 8, 2013 Hr'g).

Even after the conclusion of the Dec. 16, 2013 hearing regarding corruption, Guinea had no issues.  When the Tribunal asked "[d]o you have any other objections or comments on the way in which the proceedings have been conducted?" Guinea stated "Mr. President, we have no comments or objections whatsoever to make as to the manner in which the debate was conducted."  *See* Ex. 41 to Jaeger Decl. at 35: 1-6 (Tr. of Dec. 16, 2013 Hr'g).

      f.    Guinea has no new evidence to support its corruption allegations after sixteen months underscoring that Guinea had its opportunity to present its case

Sixteen months after the Dec. 16, 2013 special hearing on corruption, Guinea has no new evidence to support its corruption allegations underscoring how there was no due process violation.  Guinea claims it did not have an opportunity to be heard in the arbitration because the Tribunal did not grant it the four months it stated it needed "to submit a complete file to [the

Tribunal], with evidence." Ex 41 to Jaeger Decl. at 33:25-30 (Tr. of Dec. 1, 2013 Hr'g). Guinea spoke of the evidence it would gather from the purported investigation and criminal proceeding in Guinea initiated with the Dec. 13, 2013 complaint. *See* Ex. 43 to Jaeger Decl. (L. Jaeger L'tr (Jan. 15, 2014)). Guinea has had sixteen months and has nothing more.

### B. The Arbitration Rejected the Republic of Guinea's Allegations and Evidence of Corruption and This Court May Not Retry the Merits of the Case

#### 1. Standard of Review

The party opposing recognition and enforcement of an award is not permitted to retry the merits of the underlying arbitration and obtain a "second bite of the apple." *China Nat'l Chartering, Corp. v. Pactrans Air & Sea, Inc.*, No. 09 C 7629, 2012 WL 6055299, at *5 (N.D. Ill. Dec. 6, 2012) (citing *Slaney v. The Intern. Amateur Athletic Fed.*, 244 F.3d 580, 581 (7th Cir. 2001) ("Our judicial system is not meant to provide a second bite of the apple for those who have sought adjudication of their disputes in other forums and are not content with the resolution they have received."). Further, a court may not undertake a substantive review of the underlying case, and, according to the New York Convention, must recognize and enforce the award unless a narrow exception applies. *See id.* ("District courts do not sit to hear claims of factual or legal error by an arbitrator as an appellate court does in reviewing decisions of lower courts.").

#### 2. The Arbitral Tribunal Fully Adjudicated and Rejected the Republic of Guinea's Allegations of Corruption

a. The Tribunal observed the Republic of Guinea's consistent failure to substantiate its allegations of corruption

Respondent's transparent attempt to relitigate the merits of the underlying arbitration is inappropriate. It already had a full and fair opportunity to litigate the issue of corruption as discussed in detail above in Sections II.A.2. Notably, Guinea's only witness, Mr. Sory Camrara, the deputy director of the Port Authority of Conakry, even contradicted Guinea's prior assertions of alleged corruption by admitting that the international tender procedure in which Getma won

the Concession Agreement was conducted regularly:

> Mr. Fischer – [A]bout the normalcy of the procedure, the minister who signed said that it was normal and you, you told us, just a moment ago, if I understood correctly, that you agreed, that it had been normal. ***Do you confirm that the procedure was normal?***
>
> Mr. Camara – ***Yes, the way things developed, it's normal.***

*See* 2nd Fischer Decl. ¶ 13; Ex. 1 at 42:4-8 (Tr. of May 28, 2013 Hr'g)(emphasis added).

As already discussed above at Section II.A.2.b, four months after closing arguments on Jul. 8, 2013, and in the midst of the Tribunal's deliberations, Guinea requested, and the Tribunal permitted it, to submit evidence of the corruption it alleged. *See* Ex. 32 to Jaeger Decl. (L. Jaeger L'tr (Nov. 4, 2013)); Ex. 33 to Jaeger Decl. (Proced. Order No. 8 (Nov. 7, 2013)). The Tribunal then conducted a hearing dedicated to Guinea's evidence of corruption at which it had the opportunity to assess the merits of Guinea's claims. *See* 2nd Fischer Decl. ¶ 23; Ex. 7 at 14:8-16, 11:28-32 (Tr. of Dec. 16, 2013 Hr'g).

b. <u>The Dec. 16, 2013 hearing transcript and the Tribunal's Award reflect its full consideration of Guinea's evidence of corruption</u>

The Tribunal considered Guinea's evidence and adjudicated the allegations of corruption, as is demonstrated by the transcript of the hearing and the Award. Notably, Respondent did not translate the full transcript of the Dec. 16, 2013 hearing dedicated to Respondent's allegations of corruption. The full transcript demonstrates the Tribunal was able to assess the evidence Guinea submitted, as well as, additional evidence it offered. For example, Fox testified about the contents of the two brief witness statements Guinea announced it had obtained on the eve of the hearing. *See* Ex. 7 to 2nd Fischer Decl. at 14, ln. 8-16 (Tr. of Dec. 16, 2013 Hr'g); *see* Exs. 37, 38 to Jaeger Decl. (Witness Statements).

Fox admitted, in testimony omitted in Guinea's translation, that his two-page declaration was based on no direct knowledge or specific documents or other evidence. Despite claiming to

have "evidence," Mr. Fox admitted he had obtained no documents relevant to the issue of corruption and that his comments are "based on conversations." 2nd Fischer Decl. ¶ 25; Ex. 7 at 12: 21-34 (Tr. of Dec. 16, 2013 Hr'g). He also admitted to never having worked in Guinea himself, but cryptically stated that "we also have work done for us in Guinea by a source who, in turn, appears with the various Guinean sources that have given extra information in addition to the primary sources." Ex. 7 at 11:1-8 (Tr. of Dec. 16, 2013 Hr'g); 2nd Fischer Decl. ¶ 24.

Mr. Fox's testimony primarily relied on these sources, whom he refused to identify, that he claimed had "direct knowledge of the matter that took place." 2nd Fischer Decl. ¶ 24; Ex. 7 at 11:28-32 (Tr. of Dec. 16, 2013 Hr'g). He explained that he could not share the names of these sources because "those people shared information that they had based on the fact that the information would be treated as secret. That is how we work." Ex. 7 at 11:28-32 (Tr. of Dec. 16, 2013 Hr'g); 2nd Fischer Decl. ¶ 24. He also stated that he had no direct contact with the two individuals who controlled the companies alleged to have been involved in the corruption. 2nd Fischer Decl. ¶ 26; Ex. 7 at 12:35-39, 13:34-38 (Tr. of Dec. 16, 2013 Hr'g). Fox finally admitted that he "did not contact any of the individuals who took part in the process of granting the concession." 2nd Fischer Decl. ¶ 26; Ex. 7 at 14:21-22 (Tr. of Dec. 16, 2013 Hr'g).

In the Final Award, the Tribunal, in rejecting Guinea's argument of corruption and denying its requests for four additional months to gather evidence, found no credible evidence of corruption, having considered Mr. Fox's testimony and witness statement, his reliance on various individuals for information and his unwillingness to identify his sources:

> The tribunal notes that Mr. Steven FOX was not a direct or indirect witness of the acts of corruption that he reports. He refers to unreported statements from witnesses, which he characterizes as direct or indirect and whose identity he refuses to reveal. He does not refer to any documents. He does not directly challenge GETMA and does not make any reference to any account it held that was used to make illegal payments. Now, the tribunal must judge by itself and

not delegate its power to Mr. FOX, however credible he may be.

Ex. 1 to Fischer Decl. (Final Award) ¶ 76. The Tribunal ruled, "Mr. FOX's omissions do not make it possible to verify his sources, his methods and the content of the information he reports. They make his allegations unverifiable by the tribunal." *See id.* It was unpersuaded by Mr. Fox's witness statement, which it found "[did] not make it possible to grant the slightest relevance to the particularly serious allegation of corruption." *Id.* Apparently, "[t]he same [was] true for the very last-minute affidavits," which the Tribunal noted were "prepared on December 13, for the hearing of December 16." *Id.*

c. The Republic of Guinea conjured allegations of corruption as an after-the-fact explanation for breaching the Concession Agreement

The Tribunal also considered the circumstances of Guinea's requests and considered whether Guinea was engaging in delay tactics: "the issue of corruption [had] been raised since the start" and "Guinea waited several months after the end of the hearings to submit new evidence to the tribunal." *Id.* ¶ 78. The Tribunal found "everything that is being produced today could have been produced before" as discussed earlier at Section II.A.2.c. Ex. 1 to Fischer Decl. (Final Award) ¶ 79. It concluded Guinea's requests do "***not necessarily*** demonstrate a deliberate intent to stall or a lack of procedural fairness." *See id.* at ¶ 80 (emphasis added).

The corruption allegations are indeed an after-the-fact justification for the termination. When Guinea terminated the Agreement, it justified the termination on Getma's alleged breach of its contractual obligations, not on any allegations of fraud or corruption. *Id.* at ¶¶ 37, 63. During the arbitration, however, it changed its story to allege that President Alpha Condé cracked down on the Concession Agreement because of corruption. 2nd Fischer Decl. ¶ 11.

Termination of Getma for purported corruption is contradicted by Guinea's public admission of the reason for the termination and also by Guinea's actions. First, Guinea's

President admitted in an interview that the reason he cancelled the Concession Agreement was because he made a campaign promise to his allies to do so with the plan to award it to the French company Bolloré:

> ***Before my election, I had said to friends who had supported me that if I win, I was going to terminate this contract.***  Ask any Guinean in what context this contract was signed.  And, before I even arrived, the port's Board of Directors had annulled, had asked the government to annul, the contract, and President Conté had suspended the contract.  When President Dadis came in, he upheld the suspension. . . . And from the moment when, when it was planned that if the first one doesn't have the contract, it's the second one who gets it, the second one, that's BOLLORÉ . . . .[When the contract was annulled] [w]e didn't need to organize a call for tender because it was stated in the call for tender that if the first one is deficient, the second one automatically gets the contract.

2nd Fischer Decl. ¶ 31 and Ex. 8 at 13 (Interview of Alpha Condé to France 24 of Feb. 6, 2012).

Bolloré is reported to be allied with President Condé.  *Id.*  Guinea's only witness at the May 2013 hearing confirmed that the Board of Directors of the Port of Conakry planned to give the contract to Bolloré when it terminated the Concession Agreement:

> Judge – Wait.  Mr. Camara, you said, if I understood correctly, that the Board of Directors decided to stick to the conclusions from the evaluations that had been done and to terminate without going through the legal procedure.
>
> Mr. Camara – Yes.
>
> Judge – ***Does that mean that the Board of Directors terminated Getma's concession with the idea that it would attribute it to Bolloré?***
>
> Mr. Camara – ***Yes.***

*See* 2nd Fischer Decl. ¶ 32; Ex. 1 at 54:36-42 (Tr. of May 28, 2013 Hr'g) (emphasis added).

Second, Guinea has promoted the very person it alleges handed out bribes on behalf of Getma, Mr. Mamadou Diallo.  Diallo was promoted by President Condé to the position of Deputy National Director of the Merchant Marine, in June 2014, months after his alleged "corrupt" actions had been brought to light by Mr. Fox.  *See* 2nd Fischer Decl. ¶ 21; Ex. 6 at 1 (Presidential Decree (Jun. 19, 2014).  Furthermore, the Tribunal noted that during discovery,

when Getma had made requests relevant to the issue of corruption, Guinea refused on grounds of relevance. Ex. 1 to Fischer Decl. (Final Award) ¶ 78.

Finally, it is utterly unremarkable that a sovereign such as Guinea managed to have its state judicial agent file a criminal complaint with allegations of corruption against Getma a mere three days before an arbitral hearing dedicated to reviewing Guinea's evidence of corruption allegations against Getma. It is also unremarkable that a sovereign could secure witness statements from its civil servants admitting that they took a bribe when they could not be subject to criminal liability because the statute of limitations had passed. 2nd Fischer Decl. ¶ 22.

#### 3. Guinea Presents No New Evidence of Corruption

Now, Guinea seeks an additional "bite of the apple" by attempting to relitigate the issue of corruption. *See China Nat'l Chartering, Corp.*, 2012 WL 6055299, at *5. Remarkably, Guinea attempts to do so in this Court without even providing any new evidence of corruption sixteen months after the Dec. 16, 2013 corruption hearing. The U.S. judicial system is not intended to provide infinite bites of the apple "for those who have sought adjudication of their disputes in other forums and are not content with the resolution." *Id.*

### C. The Allegation of Arbitrator Misconduct Concerning Tribunal Fees Getma and Guinea Both Agreed to Pay Is Merely An After-Loss Litigation Tactic

#### 1. The Arbitration Clause Provision on Fees Replaced the CCJA Rules on Fees as Permitted by Article 10 of the Uniform Act on Arbitration

The Tribunal is actually *adhering* to the Parties' agreement in the arbitration clause of the Concession Agreement, in accordance with Article 10 of the Uniform Act on Arbitration by requiring adjustment of its fees according to the work expended while presiding over the arbitration. The main thrust of Guinea's argument is that the Tribunal breached the contract by requesting an increase in the arbitrators' fees since the CCJA Rules prohibit fee arrangements between parties and arbitrators. This argument is grounded on a false premise. What Guinea

(and CCJA) fail to acknowledge is that Article 10 of the Uniform Act on Arbitration, which prevails over the CCJA Rules, gives precedence to the Parties' *express* agreement in the Concession Agreement regarding the fee arrangement.

a. By the Republic of Guinea's own admission, U.S. Courts recognize the importance of adhering to the Parties' express agreements

The New York Convention echoes the OHADA Uniform Act on Arbitration's recognition of the importance of adhering to the Parties' express agreements regarding arbitration proceedings. Guinea is correct that "[c]ourts in the United States have repeatedly emphasized that the Convention 'favors enforcement of arbitration clauses *according to the intent of the contracting parties*' and thus 'recognizes the central role of the parties in fashioning arbitration procedure, and provides sanctions for failing to adhere to the agreed procedures.'" Resp. Mem. at 33. In this case, the Tribunal adhered to the Parties' agreement and the will of the Parties and so the cases cited by Guinea have no bearing on the issue of fees.[3]

b. The Arbitration clause in the Agreement indicates the Parties expressly excluded the provision of the CCJA Rules prohibiting fee arrangements

The Parties expressly excluded the CCJA provision prohibiting fee arrangements with

[3] The cases cited by Guinea all address situations where a tribunal did not comply with either the explicit letter or the obvious intent of the Parties' arbitration clause, namely regarding the issues of arbitrator qualifications, composition of the tribunal, adherence to agreed-upon procedural rules, and the location of the tribunal. *See Polimaster Ltd. v. RAE Sys., Inc.*, 623 F.3d 832, 841-42 (9th Cir. 2010) (finding that because "the parties ***expressly*** agreed to submit disputes to arbitration at "defendant's [site]," the arbitrator could not "rewrite the forum selection clause," even in the interest of efficiency) (emphasis added); *Encyclopaedia Universalis S.A. v. Encyclopaedia Britannica, Inc.*, 403 F.3d 85, 90-91 (2d Cir. 2005) (affirming refusal to confirm award because two members of an arbitral tribunal could not appoint a third arbitrator because the party-appointed arbitrators had not attempted to agree on a third arbitrator when the arbitration clause required the two party-appointed arbitrators to *disagree* on the third arbitrator before the tribunal could appoint one); *Cargill Rice, Inc. v. Empresa Nicaraguense Dealimentos Basicos*, 25 F.3d 223, 225-26 (4th Cir. 1994) (denying enforcement because arbitration committee did not adhere to the parties' arbitration clause, which required that the arbitrators be chosen by mutual agreement); *Szuts v. Dean Witter Reynolds, Inc.*, 931 F.2d 830, 831 (11th Cir. 1991) (reversing an award because the tribunal violated an arbitration clause by conducting the arbitration with only two arbitrators, even though the parties' arbitration clause expressly stated that "[a]ny arbitration hereunder shall be before at least three arbitrators."); *Goldman, Sachs & Co. v. Athena Venture Partners, L.P.*, No. 13-MC-130, 2013 WL 3955136, at *8 (E.D. Pa. Aug. 1, 2013) (vacating an award when the tribunal failed to comply with the party's arbitration clause, which explicitly required the arbitrators to be qualified under FINRA's rules, standards and code of conduct).

arbitrators by virtue of the Arbitration Clause. Article 10 of the Uniform Act on Arbitration states that "[e]xcept where the parties expressly exclude the application of certain provisions of the arbitration rules of an institution, submission to this arbitration institution shall bind them to apply the arbitration rules of such institution." *See* Ex. 3 to Jaeger Decl., Art. 10 (Uniform Act on Arb. (Oct. 17, 1993)). This provision requires the CCJA to respect the Parties' agreement.[4]

The standard CCJA rule on fees, found in Article 24, permit the Tribunal to shift fees and award costs as it sees fit in its final award. Ex. 2 to Jaeger Decl., Art. 24.1 (CCJA Arbitration Rules (Dec. 9, 1998)). Initially, the costs of arbitration are set by the court according to the CCJA fee schedule, but the tribunal can subsequently shift the fees and award costs to the parties in its final award according to the outcome of the arbitration. *Id.* at Art. 24.1, 24.2. The CCJA Court can increase or decrease the fees as it sees necessary. *Id.* at Art. 24.3.

But, Getma and Guinea, in the Concession Agreement, agreed that each shall be responsible for the cost of the arbitrator that it appoints. They also agreed that other costs shall be allocated equally, instead of being subject to fee-shifting in the final award. Ex. 2 to Fischer Decl. (Concession Agreement Art. 31). This provision indicates that the Parties had contracted out of the default CCJA rule in Article 24 by explicitly agreeing to each be responsible for their own arbitrator's costs, which could have varied based on differing hourly rates, and to share other arbitration costs. Pursuant to Article 10, the Parties' express wishes should have prevailed and the CCJA should have permitted the increase in fees paid to the arbitrators.[5]

---

[4] President Fadlallah explained to the CCJA in a letter dated Sept. 16, 2013 the importance of Article 10: "[t]hat text expressly authorizes the Parties to deviate from certain provisions of the Rules of the institution in charge of organizing the arbitration." Ex. 14 (I. Fadlallah L'tr (Sept. 16, 2013)).

[5] President Fadlallah wrote a letter to the CCJA Secretary General outlining this argument and explaining the Tribunal's position on June 3, 2014. (*See* Ex. 29 to Jaeger Decl. at 5 (I. Fadlallah L'tr (June. 3, 2014)). This letter followed a lengthy correspondence between the Tribunal and CCJA, throughout which President Fadlallah and Mr. Fischer explained the impropriety of the CCJA's August 1, 2013 rejection of the claim for revision of fees. *See* 2nd

*{footnote continued}*

**2. Guinea Expressly Agreed to Fees Being Set at €450,000**

Guinea twice agreed to arbitral fees being set at €450,000. The first time, Guinea responded to the Tribunal Chairman's letter of Apr. 22, 2013, asking for comment on his request to set total fees at €450,000, by stating it had no comment. *See* 2nd Fischer Decl. ¶ 41; Ex. 19 to Jaeger Decl. (L. Jaeger L'tr (May 10, 2013)). The second time, Guinea stated in a one-sentence email to the Chairman on Jun. 28, 2013, "[w]e hereby confirm to you that the Republic of Guinea has agreed to a total fee for the Arbitral Tribunal of €450,000." *See* Ex. 23 to Jaeger Decl. (R. Sellem Email (Jun. 28, 2013)).

Almost a year later, counsel for Guinea provided notice that it refused to pay anything more than the fee set by the CCJA. 2nd Fischer Decl. ¶ 62; Ex. 16 (L. Jaeger L'tr (May 19, 2014)). Guinea asserts it had only consented to the fee arrangement "for purposes of facilitating a ruling by the CCJA on the Tribunal's request to increase its fee." *See* Resp. Mem. at 38. Guinea's argument fails because it did not qualify its agreement or make any reservation.

**3. Guinea's Claim it was Coerced Into Agreeing to Increase Fees Is Not Credible**

a. Refusing to work without advance payment is not coercive because it is a norm in international arbitration and also in the CCJA Rules

A norm in international arbitration is that arbitrators are not expected to work for free[6] or make significant financial outlays. *See* 2nd Fischer Decl. ¶ 39. They should receive at least an advance on their fees and funds for costs, especially considering the often protracted nature of arbitration. Born, *supra*, 2017, 2023; Michael Mcilwrath & John Savage, *International Arbitration and Mediation: A Practical Guide*, 265-66 (Kluwer Law International 2010).

---

*{continued from previous page}*
Fischer Decl. ¶ 49; Ex. 13 (I. Fadlallah L'tr (Sept. 6, 2013)**)**; *id.* Ex. 14 (I. Fadlallah L'tr (Sept. 16, 2013)); Ex. 30 to Jaeger Decl. ¶ 56 (C. Fischer L'tr (Sept. 19, 2013)).

[6] Born, *supra*, 2017 ("Even where national law does not expressly provide for a right of remuneration, it is indisputable that an arbitrator is entitled to financial compensation for his or her services in an international arbitration . . . . [t]here is no serious authority to the contrary.")

The CCJA Rules themselves even acknowledge the right of a tribunal to refuse to work if it does not receive payment in accordance with the CCJA's requirements. Article 11.3 states that "[w]hen a supplementary deposit has [sic] been rendered necessary, the arbitrator shall suspend his work until the supplementary deposit has [sic] been paid to the Secretary general." *See* Ex. 2 to Jaeger Decl. at Art. 11.3 (CCJA Arbitration Rules (Dec. 9, 1998)). Thus, the Tribunal threatening to stop work if they did not get paid should not be surprising.

b. <u>Guinea is represented by experienced international arbitration counsel who is not vulnerable to coercion and agreed to the fee amount as fair</u>

Guinea's attempt to paint itself as a vulnerable party, bending to the "coercion" of the Tribunal, belies that it is represented by an experienced arbitration team from a global law firm. Its main counsel is Laurent Jaeger, co-head of Orrick's worldwide International Arbitration group, who acted as counsel in more than one hundred arbitrations and served as an arbitrator himself in more than thirty. *See* 2nd Fischer Decl. ¶ 71; Ex. 21 at 1-3 (L. Jaeger Orrick Biography). Such experienced counsel would not expressly consent to a fee of €450,000 simply because it felt "pressure[d] … to accede to the Tribunal's demands . . . ." Resp. Mem. at 41.

Mr. Jaeger is well aware of the fees for European-based experienced international arbitrators such as the ones the Parties chose. It was Mr. Jaeger who proposed Mr. Fadlallah for chairman. 2nd Fischer Decl. ¶ 35. As discussed below, the advance and the CCJA's fee schedule is objectively far below the norm for compensation of international arbitrators in comparable cases. Guinea agreed to the fee and cost amount for the same reasons Getma consented to the fee arrangement: (1) the Parties wanted the Tribunal to work to resolve their dispute and (2) the compensation was objectively fair based on the amount of work involved.

**4. <u>The Fees and Costs the CCJA Set were Provisional and to be Adjusted</u>**

Guinea's claim that the arbitration fees were "fixed" at the beginning of the arbitration is objectively false. Resp. Mem. at 35. Not only is this claim contrary to the record, but it is also

contrary to international arbitration practice. Generally, an advance on costs is set and adjusted later in the process. *See* Born, *supra*, 2023.[7]

a. <u>Both the CCJA Rules and CCJA ruling indicate the deposit is an advance</u>

Guinea fixates on CCJA Articles 10.1 and 24.2 in a vacuum, ignoring that Article 11.1 demonstrates that the initial "fixed" costs functions as an advance to the arbitrators by referencing the amount of "deposit." *See* Ex. 2 to Jaeger Decl., Art. 11.1 (CCJA Arbitration Rules (Dec. 9, 1998)). This advance was based on *anticipated* costs and the rules expressly permit the amount to be adjusted based on the complexity of the case, the length of the proceedings, and actual administrative costs. *Id.* at Art. 24.1; 24.2.

The CCJA's Oct. 24, 2011 order setting the advance contemplates future fee adjustment in accordance with actual expenses. The order contains a chart with a column titled "Allowance for arbitration costs ***(minimum)***." *See* Ex. 4 to Jaeger Decl. at Art. 2 (Judgment No. 56 (May 10, 2011))(emphasis added). The modifier "minimum" indicates that the CCJA anticipated adjusting the amount upward based on actual costs and case progress.

b. <u>By objective measure, the fee can only be a provisional advance and not full compensation because the arbitrators would only earn about € 21 per hour</u>

Objective evaluation of the arbitral fees indicates that the advance fixed by the CCJA is an order of magnitude below international norms for international arbitrator compensation. The provisional advance paid was equivalent to €61,712, which amounted to €20,570 per arbitrator.[8] *See* 2nd Fischer Decl. ¶ 37. The estimate of the effective hourly rate is *€21* per hour based on the

[7] "An arbitrator is free to require that the parties make advance payments to secure the arbitrator's future fees and expenses. Many institutional rules provide for advances on the costs of the arbitration from the parties (shared 50/50, subject to subsequent reallocation in a final award, based upon the projected arbitrator's fees and expenses). In *ad hoc* arbitrations, arbitrators may require that the parties make joint advance payments to the tribunal to be held as security against future fees and expenses." Born, *supra*, 2023.

[8] The advance of €20,570 is even *lower* than the minimum according to the CCJA fee schedule, which sets a range of €21,351- €77,409 for a case worth €42,005,221. *See* 2nd Fischer Decl.¶ 38; Ex. 9 (CCJA Fee Calculation).

Chairman's stating that the Tribunal spent over a thousand hours on the case. *See* Ex. 29 to Jaeger Decl. at 5 (I. Fadlallah L'tr (Jun. 3, 2014)). In addition, the Tribunal's incurred costs in purchasing office supplies and paying the Tribunal's secretary were three times the amount allocated by the CCJA. Ex. 29 to Jaeger Decl. at 3 (I. Fadlallah L'tr (Jun. 3, 2014)).

The Final Award also demonstrates the Tribunal's substantial workload. The arbitration lasted almost three years and involved claims/counterclaims totaling over €42,005,221. *See* Ex. 1 to Fischer Decl. (Final Award) ¶¶ 13-24, 56. The proceedings included more than five days of hearings, five memoranda on the merits, two submissions on jurisdiction, four submissions summarizing claims and on Parties' costs and expenses, and twenty-four submissions regarding requests for production. 2nd Fischer Decl. ¶ 66; Ex. 1 to Fischer Decl. (Final Award) ¶¶ 13-16. The Tribunal issued eleven procedural orders and a 113-page award. *Id*. ¶¶ 18-24.

Another measure is comparing the Tribunal's fees with compensation of other professionals in the case. Guinea paid its investigator €77,519 for his month-long investigation, two-page witness statement, and testimony, almost four times the amount paid to each arbitrator. 2nd Fischer Decl. ¶ 67. Also, the Parties spent €3M on attorneys' and expert fees, as Chairman Fadlallah pointed out to the CCJA, in asserting that the arbitrators were effectively providing their services as charity. *See* Ex. 29 to Jaeger Decl. at 5 (I. Fadlallah L'tr (Jun. 3, 2014)).

The compensation per arbitrator of €20,570 is also grossly below international compensation standards. Cost calculators from three major arbitration institutions provide estimates of arbitral fees for cases with equivalently-sized claims. *See* 2nd Fischer Decl. ¶ 69. Even conservatively assuming only average complexity, the fees should be five to eight times higher than €20,570 as this summary of data from the Second Fischer Declaration shows:

| Institution | Avg./med. complexity | Min./low complexity | Max./high complexity |
|---|---|---|---|
| Int'l Chamber of Commerce (ICC) | €130,422 | €48,094 | €212,750 |
| Arb. Inst. of Stockholm Chamber of Commerce | €108,905 | €38,102 | €179,708 |
| London Ct. of Int'l Arbitration (LCIA) | €169,087 | €118,361 | €219,814 |

c. The Parties, CCJA, and Tribunal all proceeded with the understanding the advance would be adjusted higher based on the expressed will of the Parties

As Guinea's experienced international arbitration practitioners know, the normal practice is to advance to arbitrators provisional amounts for fees and costs and adjust the amount upward based on case progress. *See* Mcilwrath & Savage, *supra*, 265-66; Born, *supra*, 2023. While arbitrators may fix an hourly rate up front, the practice is to calculate fees based on time actually spent. Mcilwrath & Savage, *supra*, 265-66; Born, *supra*, 2023. Thus, final calculation of fees takes place near or at the end of proceedings. Arbitrators should not be forced to outlay their own money or lose money as the arbitrators in this case have. *See* Born, *supra*, 2017.

At the time of the Tribunal's formation, the CCJA was aware that the Chairman nominee Professor Fadlallah was concerned about the low advance fee schedule. When the CCJA Secretariat learned that he had recommended that the other arbitrators not accept the assignment without a fee revision, the Secretariat requested that no reservations be lodged because the advance fees were fixed to allow the matter to proceed and would be readjusted later. *See* Ex. 29 to Jaeger Decl. at 5 (I. Fadlallah L'tr (Jun. 3, 2014)).

Pursuant to the CCJA's express characterization of the fee advance as "minimum," the Parties proceeded with the understanding that the provisional advance would be adjusted higher. *See* Ex. 4 to Jaeger Decl.; Art. 2 (CCJA Determination (May 10, 2011). On Apr. 22, 2013, the Chairman wrote to the Parties with a quotation of fees for the Tribunal's services. *See* Ex. 14 to Jaeger Decl. (I. Fadlallah L'tr (Apr. 22, 2013)). Considering the "size of the dispute" and "questions raised," the Chairman set the fees at €450,000, and requested comments from both

parties. *Id.* Both parties responded that they had "no comment" with regard to the fee increase. *See* Ex. 18 to Jaeger Decl. (C. Fischer L'tr (May 3, 2013)); Ex. 19 to Jaeger Decl. (L. Jaeger L'tr (May 10, 2013). The President of the Tribunal requested clarification. *See* Ex. 20 to Jaeger Decl. at 5:43-46 (Hr'g Tr. (May 27, 2013)).

Communications that followed with Guinea and the CCJA all indicated that the adjustment was a mere formality. Mr. Jaeger told Mr. Fischer off-the-record that he personally believed the fee increase was fair and anticipated obtaining approval from his client. 2nd Fischer Decl. ¶ 43. The CCJA Secretariat, in its Jun. 24, 2013 letter, stated it was awaiting Guinea's confirmation so it could "proceed, by decision, to adjust the amount of the fees of the three arbitrators." *Id*. ¶ 45; Ex. 10 (CCJA Gen. Sec'y L'tr (Jun. 24, 2013)). After Guinea confirmed in writing, the CCJA acknowledged receipt and promised to "contact the Court soon to adjust the fees of the three arbitrators." 2nd Fischer Decl. ¶ 47; (Ex. 23 to Jaeger Decl. (R. Sellem Email (Jun. 28, 2013)); Ex. 11 (CCJA Email (Jun. 28, 2013)).

d. <u>The CCJA inexplicably refused to adjust the advance on fees higher</u>

A month later, on Aug. 1, 2013, to the surprise of the Parties and the Tribunal, the CCJA, without explanation, refused to endorse the agreement between the Parties. Ex. 25 to Jaeger Decl. (CCJA Decision (Aug. 1, 2013)). The Chairman followed up with the CCJA on their decision. 2nd Fischer Decl. ¶ 48; Ex. 12 (I. Fadlallah L'tr (Aug. 12, 2013)). Surprisingly, the CCJA, had not even inquired with the Tribunal about actual costs incurred and hours spent. *See* Ex. 29 to Jaeger Decl. at 5 (I. Fadlallah L'tr (Jun. 3, 2014)).

**5. <u>Getma's Counsel's Meeting With the CCJA President was Done With the Mandate of the Parties and Tribunal</u>**

Getma's counsel's meeting with the CCJA President on Sept. 18, 2013 was not *ex parte* lobbying as Guinea asserts. *See* Jaeger Decl. ¶¶ 18-20. The meeting was conducted with Guinea's knowledge and consent to convince the CCJA about fairly compensating the Tribunal.

When the CCJA denied the Parties' request to increase fees, in its Aug. 1, 2013 decision, the Chairman, on Sept. 5, 2013, requested a conference call with the Parties. Ex. 27 to Jaeger Decl. (I. Fadlallah Email (Sept. 5, 2013)). During this call, both parties supported the Chairman's opinion of the low provisional fees. 2nd Fischer Decl. ¶ 50. Mr. Jaeger, in light of his extensive experience as an arbitral advocate and arbitrator, stated the amount proposed by the Tribunal was consistent with international standards. *Id.* The Chairman also requested information about the CCJA, and Mr. Fischer extended the courtesy by sending information copied and pasted from the CCJA's website. *See* 2nd Fischer Decl. ¶ 51; Ex. 28 to Jaeger Decl. at 5 (C. Fischer Email (Sept. 6, 2013)). Jaeger's claim that this information, "as far as I am aware, was not solicited by the Tribunal" is false. *See* Jaeger Decl. ¶ 17; 2nd Fischer Decl. ¶51.

During the call, the Parties and Chairman confirmed the next course of action to send Getma's counsel, Mr. Fischer, to meet with the CCJA President in Abidjan. 2nd Fischer Decl. ¶ 53. The Parties hoped such a meeting would draw the Court's attention to the fee issue. Immediately after the meeting on Sept. 18, 2013, Mr. Fischer held a conference call from Abidjan to report on the meeting, as had been agreed. *Id*. ¶¶ 54-55. As during the Sept. 5, 2013 call, Mr. Jaeger raised no issues or concerns. *Id.*

In a letter to the CCJA President the following day, Sept. 19, 2013, Mr. Fischer clarified the facts surrounding the misunderstanding about the fees. *See* 2nd Fischer Decl. ¶ 57; Ex. 30 to Jaeger Decl. at 6-7 (C. Fischer L'tr (Sept. 19, 2013)). Mr. Jaeger was copied on this letter. 2nd Fischer Decl. ¶ 57; Ex. 15 (C. Fischer Email (Sept. 19, 2013).

### 6. Guinea's Allegation that the Tribunal's Award Was "Up for Sale" is Frivolous Because Guinea Only Stated It Would not Pay Fees After the Tribunal Had Executed the Award

Guinea's allegation that the Tribunal effectively put the award up for sale to the party that would pay its fees is frivolous. *See* Section II.C.3 above. Guinea has no evidence to support

such a serious charge of corruption against highly respected arbitrators. As far as the Tribunal knew, when it was preparing the Award, both parties had agreed to pay the increased fees of €450,000 and the only issue was the CCJA had not formalized the increase. *See* 2nd Fischer Decl. ¶¶ 44-46, 52; s*ee also* Section II.C.2 above. The Tribunal executed the Award on Apr. 29, 2014 and informed the Parties. *See* Ex. 1 to Fischer Decl. (Final Award) at 113; *see also* Ex. 45 to Jaeger Decl. (I. Fadlallah L'tr (Apr. 30, 2014). Three weeks later on May 19, 2014, Guinea reversed its position on fees stating it would not pay its share of the fees requested by the Tribunal. *See* 2nd Fischer Decl. ¶ 62; Ex. 16 (L. Jaeger L'tr (May 19, 2014)). Thus, the Tribunal only learned that Guinea was rescinding its agreement to arbitrator fees of €450,000 three weeks after it had finalized and executed the arbitral award. *See* 2nd Fischer Decl. ¶ 62.

**7. <u>The Tribunal Suing Getma in Paris for Guinea's Balance of the Increased Fees and Costs Demonstrates There Is No Special Tribunal-Getma Relationship</u>**

Respondent's attempts to imply that Getma enjoys a special relationship with the Tribunal are contradicted by the Tribunal's suing Getma for the balance of fees owed by Guinea. On Sept. 22, 2014, the Tribunal wrote a final demand letter to the Parties in pursuit of full compensation threatening legal action as Guinea had not paid its half of the €450,000 fees. *See* Ex. 51 to Jaeger Decl. (I. Fadlallah L'tr (Sept. 22, 2014)). Then the arbitrators sued Getma, and not Guinea, in France for the fees under a theory of joint and several liability because Guinea would "raise various immunities" and ultimately refuse to pay. 2nd Fischer Decl. ¶ 65; Ex. 17 (*Fadlallah, et al. v. Getma*, Summons (Jan 8, 2015)); Ex. 18 (Pleadings (Jan 8, 2015)).[9]

**8. <u>According to CCJA Rules, At Most the Agreement About the Increase in Fees is Null and Void, and Not the Award Itself</u>**

[9] The Paris Court ruled Getma had no joint and several liability because both parties had contracted to pay for their own arbitrator's fees and the arbitration award provided no provision for joint and several liability. 2nd Fischer Decl. ¶ 65; Ex. 19 (Pleadings in Defense (Jan. 28, 2015)); Ex. 20 (Provisional Order (Feb. 16, 2015)).

Even if the Court finds that the Parties did not contract out of the CCJA Rules, in accordance with Article 10 of the OHADA Uniform Act on Arbitration, as discussed in Section II.C.1., annulment is not the proper remedy. As Orrick's counsel himself wrote the CCJA, if the CCJA exclusively sets arbitrators' fees, "any separate agreement between parties and arbitrators as to their fees shall be null and void." Ex. 16 (L. Jaeger L'tr (May 19, 2014)); *see also* 2nd Fischer Decl. ¶ 62. While the CCJA threatens that the award may be "subject to invalidation by the community's high court," the CCJA Rules provide that, at most, merely the fee agreement is null and void. Ex. 47 to Jaeger Decl. (CCJA Sec'y Gen. Email (May 19, 2014)); Ex. 48 to Jaeger Decl. (CCJA Gen. Sec'y L'tr (May 20, 2014)).

**9. Guinea Claims Arbitrator Misconduct While Orrick, its Counsel, Appointed Arbitrator Teynier in a Different Arbitration**

If the claims of arbitrator misconduct were valid, counsel for Guinea would likely not select these arbitrators to serve in their other arbitrations. In fact, Orrick Rambaud Martel of Paris, France, counsel for Guinea, allowed a client in another arbitration to select one of these arbitrators, Eric Teynier, to serve as Chairman. *See* Ex. 22 (ICSID case details, *Société des Mines de Loulo S.A. v. Republic of Mali.*) Notably, Teynier was chosen on Nov. 25, 2013 – long after his purported "misconduct" in this arbitration. *Id.* Orrick selecting Teynier as an arbitrator in another case, demonstrates that the misconduct allegations are just a litigation tactic.

## CONCLUSION

Guinea's opposition to the petition is meritless and yet another attempt to delay Getma's ability to enforce the award it has won after a four-year journey. Accordingly, Getma respectfully requests that this Court confirm the award and enter judgment in its favor.

## REQUEST FOR ORAL HEARING

Getma respectfully requests an oral hearing on its Petition.

Dated:  April 27, 2015

Respectfully submitted,

/s/ Allen B. Green
Allen B. Green (D.C. Bar No. 222158)
William T. O'Brien (D.C. Bar No. 450891)
Ivan W. Bilaniuk (D.C. Bar. No. 494315)
MCKENNA LONG & ALDRIDGE LLP
1900 K Street, N.W.
Washington, D.C. 20006
Telephone:  (202) 496-7500
Fax:  (202) 496-7756
*Attorneys for Petitioner Getma International*

**CERTIFICATE OF SERVICE**

I hereby certify that on this 27th day of April 2015, the foregoing Memorandum in Further Support of Petition, proposed order, and supporting declaration, and exhibits were electronically filed with the clerk of the court using the CM/ECF system, which automatically serves counsel of record:

Jeffrey M. Prokop, Esq.
Brook Daley, Esq.
ORRICK HERRINGTON & SUTCLIFFE LLP
1152 15th Street, N.W.
Washington, DC 20005

Jamie L. Shookman, Esq.
ORRICK HERRINGTON & SUTCLIFFE LLP
51 West 52nd Street
New York, NY 10019-6142

/s/ Allen B. Green
Allen B. Green (D.C. Bar No. 222158)
MCKENNA LONG & ALDRIDGE LLP
1900 K Street, N.W.
Washington, D.C. 20006
Telephone: (202) 496-7500
Fax: (202) 496-7756

*Attorney for Petitioner Getma International*