IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

In the Matter of the Arbitration of Certain
Controversies between

GETMA INTERNATIONAL,

    Petitioner,

and

THE REPUBLIC OF GUINEA,

    Respondent.

Civil Action No. 1:14-cv-01616-RBW

## SECOND DECLARATION OF CÉDRIC FISCHER

I, Cédric Fischer, do hereby state the following:

1.  I am over the age of 21 and am competent to make this declaration.

2.  I am a member of the Bar of Paris, France, since 1980.

3.  I am an attorney and founding partner with the law firm of Fischer Tandeau de Marsac Sur & Partners ("Fischer Tandeau") since 1985. Fischer Tandeau has an office located at 67 Boulevard Malesherbes, Paris, France 75008.

4.  I hold a masters degree (DEA) of private law from Paris II-Assas Law University. I have been a member of the "Comparative Law Society" (societé de législation comparée) since 1999.

5.  I am a former member of the Bar Council of Paris (2004-2006).

6.  I have extensive experience representing clients before French courts and international arbitral tribunals, as well as enforcing international arbitration awards.

7.      Fischer Tandeau was counsel for Petitioner, Getma International ("Getma") in Arbitration Case No. 001/2011/ARB before the Common Court of Justice and Arbitration of Abidjan (CCJA) of the Organisation pour l'Harmonisation en Afrique du Droit des Affaires (OHADA) translated as Organization for the Harmonization of Business Law in Africa. The arbitration concerned the Republic of Guinea's termination of Getma in breach of a Concession Agreement signed with Getma to develop and operate the country's main port in its capital city Conakry ("Concession Agreement"). I am the principal attorney who represented Getma in that arbitration.

8.      I make this declaration in support of Getma's Reply Memorandum in Further Support of its Petition to Confirm Arbitration Award and to Enter Judgment as well as Getma's Opposition to the Republic of Guinea's Motion to Stay.

## I.   THE ARBITRATION PROCEEDINGS

### A.   The Republic of Guinea Raised Allegations of Corruption in the Arbitration

9.      The Republic of Guinea is opposing enforcement of the CCJA arbitration award alleging corruption surrounding Getma's signing of the Concession Agreement with the Republic of Guinea on September 22, 2008.

10.     Getma filed its Request for Arbitration on May 10, 2011 with the CCJA, after the Republic of Guinea had terminated the agreement without compensating Getma, and after Getma had attempted to negotiate over the dispute.

11.     Guinea raised corruption allegations from the start of the arbitration that lasted nearly three years. *See* Ex. 1 to Fischer Decl. (Final Award) ¶ 63. In the meeting minutes of the preliminary hearing of March 12, 2012, the Guinean State noted "irregularities in awarding the concession to Getma." Ex. 5 to Jaeger Decl. at 12 (Minutes of the Meeting of March 12, 2012). In its first brief in the arbitration dated October 18, 2012, over four years after the alleged acts of

2

corruption, the Republic of Guinea made corruption allegations.  In this brief, Guinea alleged

measures had been taken by President Alpha Condé to fight corruption and alleged that members

of the Concession Agreement award committee and negotiating team had been corrupted.  But,

Guinea did not ground its claims of corruption on any facts or evidence.

12.     Five months later, in its March 24, 2013 brief, Guinea merely repeated the

corruption allegations from its Response Brief, but provided no evidence of corruption.

13.     The Tribunal conducted the arbitration hearing to hear fact witness and expert

testimony from May 27-29, 2013.  At no point was the Republic of Guinea able to raise any

specific allegations or provide evidence of the corruption it alleged.  The evidence that the

Republic of Guinea did submit was consistent with there not being any corruption:  the Republic of

Guinea's only witness, Mr. Sory Camrara, admitted that the international tender procedure, after

which Getma International had been declared successful, was conducted properly without

irregularities.  *See* Ex. 1 at 42:4-8 (Transcript ("Tr.") of May 28, 2013 Hearing ("Hr'g")).  At the

close of the hearing on May 29, 2013, the Tribunal asked whether either party had "reservations to

make or criticisms to be formulated as to how the proceeding was conducted in this arbitration,"

and both parties responded that they had no reservations.  *See* Ex. 2 at 59:30-35 (Tr. of May 29,

2013 Hr'g).  The President of the Tribunal confirmed that the parties did "not have any criticisms

or reservations to formulate as to how the proceeding has been conducted in this arbitration." *Id.* at

59:36-38.

14.     In its closing arguments on July 8, 2013, Laurent Jaeger, counsel for the Republic

of Guinea, raised the issue of corruption during the hearing.  When he did so, Getma's co-counsel,

Jose Miguel Judice, immediately protested because the issue had not been addressed in the

evidentiary hearing and because there was no foundation for the implication.  When Getma's

3

counsel pressed him on the matter, Jaeger admitted that he had no evidence of any corruption to support the allegation. *See* Ex. 3 at 72:43–73:29 (Tr. of July 8, 2013 Hr'g).

15.     At the hearing for closing arguments on July 8, 2013, both parties confirmed that they had "leisure to express themselves sufficiently." *See* Ex. 4 at 84:22-27 (Tr. of July 8, 2013 Hr'g).[1]  Both parties reiterated that they had no reservations to make as to the legality of the proceeding. *Id.* at 84:28-32.

16.     On November 4, 2013, Laurent Jaeger, wrote to the Tribunal, claiming that his client "recently obtained information and [pieces of] evidence about the circumstances surrounding" the Concession Agreement which constitute "acts of corruption" and requested a hearing. Ex. 32 to Jaeger Decl. (Letter from L. Jaeger to Tribunal (Nov. 4, 2013)).

17.     On November 5, 2013, I wrote the Tribunal on behalf of Getma, requesting that Getma be provided time to respond to any evidence. Ex. 5 at 3 (November 5, 2013 Letter from C. Fischer to President of Tribunal).

18.     The Tribunal granted Guinea's request and gave it until November 14, 2013 to submit the information and evidence it had obtained to Getma. Ex. 33 to Jaeger Decl. (Procedural Order No. 8 from Tribunal (Nov. 7, 2013)). Getma did not oppose the hearing. The Tribunal granted Getma until November 29, 2013 to respond.

19.     On November 14, 2013, the Republic of Guinea submitted only a two-page statement by a consultant named Steven Fox whom it had hired to investigate its corruption allegations. Ex. 34 to Jaeger Decl. (Witness Statement of Mr. Steven Fox). This document

---

[1] Exhibit 4 is an excerpt of one page from the transcript of the July 8, 2013 hearing. The full transcript of the July 8, 2013 hearing in the original French language (Getma_c_Guinée_Plaidoiries_2013.07.08_V1.doc.pdf ) is already included as part of Exhibit 3 and therefore is not duplicated as part of Exhibit 4.

contained only hearsay and false information from sources he claimed had knowledge of the alleged corruption. *See id.*

**B.     The December 16, 2013 Hearing on the Republic of Guinea's Alleged Evidence of Corruption**

20.     The Tribunal called a special hearing on December 16, 2013 dedicated solely to Guinea's evidence of corruption that it had produced to Getma on November 14, 2013. The Tribunal also ordered "[n]o new exhibits will be accepted." Ex. 35 to Jaeger Decl. (Procedural Order No. 9 from Tribunal (Dec. 2, 2013)).

21.     Two days before the hearing, on Saturday December 14, 2013, the Republic of Guinea informed the Tribunal that as a result of Mr. Steven Fox's investigation that the Republic of Guinea had begun a criminal investigation. Ex. 39 to Jaeger Decl. (Email from L. Jaeger to C. Fischer and Tribunal (Dec. 14, 2013). The Republic of Guinea also represented that it had witness statements from two members of the commission responsible for awarding the Concession Agreement, who stated that they had received cash payments from a Guinean citizen, Mr. Mamadou Diallo, pretending to act on Getma's behalf. *See id.*[2] Mr. Diallo has no link to Getma and the witness statements did not allege any facts about any link. *See id.* I later learned that this citizen, Mr. Mamadou Diallo, had been promoted on June 19, 2014, by a personal Presidential Decree by President Condé to the National Deputy Director of the Merchant Marine. *See* Ex. 6 at 1 (Presidential Decree of Pres. Condé (June 19, 2014)). The Presidential Decree stated that he had been promoted from a position in the "Design and Planning Office." *Id.*

22.     The Republic of Guinea's counsel, Laurent Jaeger, on Monday, December 16, 2013 at 9:55 am, sent to Getma's counsel, *but not the Tribunal*, a copy of the two witness statements

---

[2] The Republic of Guinea has submitted these two very brief witness statements in the U.S. enforcement proceeding as Exs. 37 and 38 to the Jaeger Declaration.

and a criminal complaint alleging bribery that had supposedly been filed in Conakry three days earlier on Friday, December 13, 2013.  Ex. 40 to Jaeger Decl. (Letter from L. Jaeger to C. Fischer (Dec. 16, 2013)).  The complaint also accused civil servants of corruption, but they could not be subject to criminal liability because the statute of limitations had passed.  *See id.*

23.  Although the documents were not formally introduced into evidence, the Republic of Guinea's witness, Mr. Steven Fox, who had been hired on October 4, 2013, testified about the criminal complaint, the two very brief witness statements in which the witnesses admitted to having received bribes, and about other purported evidence of alleged corruption including information from secret sources.  *See* Ex. 7 at 6:5, 14:8-16, 11:28-32 (Tr. of Dec. 16, 2013 Hr'g)[3].

24.  Mr. Fox primarily relied on, but refused to identify, the sources who he claimed had "direct knowledge of the matter that took place" because those people had shared the information with the understanding the "information would be treated as secret."  *Id.* at 11:28-32.  Mr. Fox admitted to never working in Guinea himself.  *Id.* at 11:1-8.  Fox claimed he had a source who works for his company in Guinea and refused to give the names of that source or of any of the individuals with whom his source spoke.  *Id.*

25.  Despite claiming to have "evidence," and in addition to refusing to name his sources, Mr. Fox admitted he had obtained no documents relevant to the issue of corruption because all the comments have been made "based on conversations."  *Id.* at 12:21-34.

26.  Mr. Fox admitted he had no direct contact with the individuals who controlled the two companies that the Republic of Guinea alleged were involved in corruption  (Mr. Challoub

---

[3] Exhibit 7 contains the full translation of the transcript of the December 16, 2013 hearing because the Republic of Guinea submitted only a partial translation of the transcript.  The attached Exhibit 7 consists of the Republic of Guinea's Exhibit 41 to Laurent Jaeger's declaration containing the full transcript of the July 8, 2013 hearing in the original French language, but only pages 17-35 in English translation plus the translation of the balance of the transcript or pages 1-17.

and Mr. Richard Talbot), and admitted to having no contact with ""any of the individuals who took part in the process of granting the concession." *Id.* at 12:35-39, 13:34-38, 14:21-22.

27.     At the hearing, the Republic of Guinea requested a four-month delay to gather more evidence of corruption and sought permission to produce new exhibits. *See* Ex. 41 to Jaeger Decl. at 25:17-35 (Tr. of Dec. 16, 2013 Hr'g). Getma opposed the request for the delay at the hearing stating that it could understand if Guinea had requested a few weeks to review a large amount of documents that it had amassed, but what Guinea was asking for was a much longer delay so that it could fabricate evidence and delay issuance of the award. *Id.* at 29:5-11, 30:1-9.

28.     The Tribunal issued a procedural order declaring that the Republic of Guinea's requests concerning new evidence and a four-month delay were linked to the Tribunal's analysis of the case as a whole and so it joined the issues to its deliberations on the merits and closed the debate. Ex. 42 to Jaeger Decl. (Procedural Order No. 11 from Tribunal (Jan. 8, 2014)).

29.     At the conclusion of the hearing, the Tribunal asked the parties "[d]o you have any other objections or comments on the way in which the proceedings have been conducted?" and counsel for the Republic of Guinea stated "Mr. President, we have no comments or objections whatsoever to make as to the manner in which the debate was conducted." Ex. 41 to Jaeger Decl. at 35:1-6 (Tr. of Dec. 16, 2013 Hr'g).

### C.     The Republic of Guinea Has Admitted that Its Termination of the Concession Agreement Was Not Because of Any Corruption

30.     The Republic of Guinea's decree terminating the Concession Agreement stated that it was being terminated because of some unspecified alleged breaches of contract by Getma.

31.     The President of the Republic of Guinea admitted in an interview that the reason he cancelled the Concession Agreement was because he had made a campaign promise to his allies to cancel the Concession Agreement with Getma with the plan to award it to the French company

Bolloré.  The interviewer referred to the allegations that Bolloré was an ally of his and the President did not deny it.  The President referred to alleged breaches of contract by Getma in its performance, but not to any corruption allegations. Attached is a true and correct copy of a transcript of an interview President Alpha Condé gave to the French news organization France 24 and the details on how bailiff Maurice Lotte accessed the video from the France 24 website to prepare the transcript at Getma's request. *See* Ex. 8 at 13-14 (Minutes of Mar. 8, 2012 of interview of Alpha Condé to France 24 of Feb. 6, 2012).

32.     In addition, Guinea's only witness at the May 2013 hearing admitted that the Board of Directors of the Port of Conakry terminated the Concession Agreement with Getma for the purpose of giving the Concession Agreement to Bolloré. *See* Ex. 1 at 54:36-42 (Tr. of May 28, 2013 Hr'g).

**D.     Composition of the Tribunal**

33.     The formation of the tribunal proceeded normally with both parties selecting European arbitrators.   In accordance with the dispute resolution provision, Getma appointed Juan Antonio Cremades, based in Paris and Madrid when it filed its request for arbitration.

34.     The Republic of Guinea initially selected Mr. Philippe Leboulanger, based in Paris, who later refused his appointment.  On December 1, 2011, the Republic of Guinea then selected Eric Teynier, who is also based in Paris. *See* Ex. 1 to Fischer Decl. (Final Award) ¶¶ 6-7.

35.     During our preliminary discussion on the President of the Tribunal with Mr. Jaeger, we agreed that the President shall not be of French nationality, but should be a fluent French speaker.  We also agreed with Jaeger that, since the arbitration seat would remain in Abidjan, Ivory Coast, the hearings should take place in Paris, France so as to mitigate the cost of the proceeding, considering that all arbitrators and counsel are Paris-based.  Jaeger suggested Professor Ibrahim Fadlallah as a candidate for President of the Tribunal and I agreed.

36.     The Tribunal of distinguished arbitrators was constituted on January 25, 2012 with the CCJA's confirmation of the Tribunal President. *See id.* ¶ 3.

**E.     Fees and Compensation**

37.     After the submission of the Request for Arbitration, which calculated an amount in controversy of FCFA 22,434,448,328 (€34,201,096), the Court set the *minimum* amount of an advance on arbitration expenses at FCFA 100,480,332 (€153,181.28),[4] including FCFA 40,480,332 (€61,711.87) in fees for the three arbitrators, FCFA 25,000,000 (€38,112.26) in expenses for the three arbitrators, and FCFA 5,000,000 (€7,622.45) in operating expenses for the Tribunal. *See* Ex. 4 to Jaeger Decl. (Judgment No. 56 from the Tribunal (May 10, 2011)). Because there were three arbitrators, the fees per arbitrator amounted to FCFA 13,493,444 (€20,570.00). Effectively, these fees corresponded to the minimum amount for the advance set forth by Decision 004/99/CCJA on February 3, 1999. The Court expressly stated that this was a "minimum." *See id.*

38.     The amount in controversy was later revised upward to FCFA 27,553,618,751 (€42,005,221). Based on the CCJA fee schedule set on February 3, 1999, this should have resulted in a calculated minimum advance on fees of FCFA 14,005,361.84 (€21,351.04) and a maximum fee of FCFA 50,776,809.26 (€ 77,408.75).[5]

39.     Because it is often difficult to calculate the length or difficulty of a case at the outset of arbitration, the normal practice in international arbitration is to require a provisional advance from the parties, which is then adjusted upward according to the actual fees and expenses incurred throughout the proceeding. This provisional advance gives the arbitrators an advance on their fees while also providing funds for costs in advance, to avoid requiring them to pay out of pocket and

---

[4] The amount was converted from FCFA to Euros using the fixed FCFA/Euro exchange rate equal to 0.0015244902 (xe.com). All numbers rounded to the nearest FCFA/Euro.

[5] Ex. 9 (Fischer CCJA Fee Schedule Calculation).

seek reimbursement.  Then, toward the end or at the end of the proceedings, the number of hours

spent by the arbitrators on the proceedings is determined before final fees are set.  Arbitrators are

generally not forced to spend their own money or lose money while serving as arbitrators.

40.     On April 22, 2013, the President of the Tribunal informed Parties that the total fees

of the Tribunal should be fixed at €450,000 considering the anticipated volume of work based on

the size of the dispute and the questions raised.  The Tribunal President's figure took into

consideration the "size of the dispute" and the "questions raised."  He requested Parties'

comments.  Ex. 14 to Jaeger Decl. (Letter from I. Fadlallah to Fischer & Mahé, and Agboyibor –

Jaeger & Sellem (Apr. 22, 2013)).

41.     Both parties responded to the Tribunal President's letter of April 22, 2013 on

arbitrator fees.  Neither Getma's counsel nor Republic of Guinea's counsel had any comment on

the request for fees.  Ex. 18 to Jaeger Decl. (Letter from C. Fischer, et al. to I. Fadlallah (May 3,

2013); Ex. 19 to Jaeger Decl. (Letter from L. Jaeger to I. Fadlallah (May 10, 2013)).

42.     During the hearing on May 27, 2013, the President of the Tribunal informed the

parties that the Secretariat of the Court asked him to clarify that the parties "no comment" about

the arbitral fees meant that they have no objection to the increase in fees to €450,000.  *See* Ex. 20 to

Jaeger Decl. at 5:43-46 (Hr'g Tr. (May 27, 2013)).

43.     On a break during the evidentiary hearings from May 27-29, 2013, I spoke

off-the-record with Jaeger about the fees.  Jaeger said that he had no answer yet from the client but

that his personal view was that the fee amount requested by the Tribunal was appropriate for the

case.  Jaeger told me that he saw no issue from his side and was sure that he would get

confirmation from his client.

10

44.     On May 30, 2013, I confirmed with the Tribunal that Getma agreed to set total arbitrator fees at €450,000. Ex. 21 to Jaeger Decl. (Letter from E. Mahé, et al. to I. Fadlallah (May 30, 2013)).

45.     On June 24, 2013, The CCJA Secretariat informed the Tribunal President that it had received confirmation that Getma agreed to the fees and was awaiting Guinea's confirmation so it could "proceed, by decision, to adjust the amount of the fees of the three arbitrators." Ex. 10 (Letter from CCJA General Secretary to I. Fadlallah (June 24, 2013)).

46.     On June, 28, 2013 Guinea stated unequivocally in an email that it agreed that the fees should be increased to €450,000. The entire one-sentence communication stated: "We hereby confirm to you that the Republic of Guinea has agreed to a total fee for the Arbitral Tribunal of €450,000." Ex. 23 to Jaeger Decl. (Email from R. Sellem to I. Fadlallah (June 28, 2013)).

47.     The CCJA secretariat confirmed receipt of Guinea's email agreeing to the €450,000 fees and promised to "contact the Court soon to adjust the fees of the three arbitrators." Ex. 11 (Email from Office of CCJA Secretary General to I. Fadlallah and R. Sellem (June 28, 2013)).

48.     After the CCJA denied the request to increase fees by letter of August 1, 2013, Ex. 25 to Jaeger Decl. (CCJA Decision No. 081 (Aug. 1, 2013)), President Fadlallah followed up with the CCJA on their decision, requesting "some explanations" on their "unreasoned decision." Ex. 12 (Letter from I. Fadlallah to CCJA General Secretary (Aug. 12, 2013)).

49.     The Secretary of the Tribunal President sent an email on September 5, 2013 requesting a conference call the next day. Ex. 27 to Jaeger Decl. (Email from I. Fadlallah to L. Jaeger (Sept. 5, 2013)).

50.     The parties and Tribunal President had a conference call on September 6, 2013. During the call on September 6, 2013, Laurent Jaeger and I concurred with the Tribunal President's opinion concerning the low level of the provisional fees set by the CCJA considering the Tribunal's workload on the case. Jaeger stated on the call that the proposed amount by the Tribunal was in line with international standards. Jaeger serves as an advocate in international arbitrations and also is a well-known international arbitrator as his online biography attests on his firm's website. The CCJA Court's decision to decline adjusting the fees was difficult to understand for the arbitrators and practitioners, especially considering that both Parties gave express consent.

51.     Also on the September 6, 2013 call, Tribunal President Fadlallah asked the parties if they could provide information about who served on the CCJA. I extended the courtesy and sent basic information about the CCJA and its composition pasted from the CCJA's website to the arbitrators with a copy to Republic of Guinea's counsel. Ex. 28 to Jaeger Decl. (Email from C. Fischer to I. Fadlallah (Sept. 6, 2013)).

52.     That same day, President Fadlallah wrote to the President of the CCJA to clarify the situation with the CCJA given that the Parties had "expressed their unconditional agreement for the Court's fees to be set at €450,000 . . . ." Ex. 13 (Letter from I. Fadlallah to CCJA President (Sept. 6, 2013)). On September 16, President Fadlallah sent a follow-up letter to the CCJA citing Article 10 of the Uniform Act on Arbitration (he cited the OHADA Treaty in error) to support his point that the parties through their dispute resolution provision had contracted out of the CCJA's rules on fees. Ex. 14 (Letter from I. Fadlallah to CCJA President (Sept. 16, 2013)).

53.     During the above-mentioned September 6, 2013 call, the parties and Tribunal President also agreed on the next course of action. Unanimously, we decided to explain,

face-to-face, to the President of the CCJA Court, the issue raised by the Order rendered during the summer.

54.     It was then jointly decided that I would meet with the CCJA President in Abidjan in order to draw the CCJA's attention to the fees issue and that I would keep Tribunal President Fadlallah and Laurent Jaeger closely informed. I traveled to Abidjan and met with the President of the CCJA.

55.     As had been agreed by the parties and the Tribunal President, I held a conference call on September 18, 2013 from Abidjan, immediately after my meeting, to report on the meeting. During this call, as during the September 6 call, Laurent Jaeger neither protested nor expressed any disagreement with this approach.

56.     Furthermore, neither the Republic of Guinea, nor its counsel asked for any explanation or protested against Getma's inclusion of the costs of my Abidjan trip to meet the CCJA's President as part of Getma's costs incurred in the arbitration.

57.     I also wrote the CCJA President a letter the next day, Sept. 19, 2013, after returning to Paris, to officially confirm the information and arguments put forward during the meeting and to clarify the apparent misunderstanding about the fees in writing. Ex. 30 to Jaeger Decl. (Letter from C. Fischer to Tribunal (Sept. 19, 2013)). I copied Laurent Jaeger on this letter. Ex. 15 (Email from C. Fischer to the Secretary of the CCJA President (Sept. 19, 2013)). Laurent Jaeger did not protest or raise any issue about this letter either.

58.     On October 3, 2013, the Court upheld its decision of August 1, 2013 denying the Tribunal's request for an increase in fees even though the parties stated that they were in favor of the increase. Ex. 31 to Jaeger Decl. (Decision No. 096/2013/Ccja/Adm/Arb (Oct. 3, 2013)).

59.     On April 30, 2014, the Tribunal wrote to the parties informing them that the award has been signed, as of April 29, 2014, and requesting payment of the €450,000 fee before the award was notified to the parties.  Ex. 45 to Jaeger Decl. (Letter from I. Fadlallah to Parties Requesting Payment (April 30, 2014)).

60.     Two weeks later, I wrote to the CCJA to confirm that the fees issue was not an impediment to notification of the Award.  Ex. 46 to Jaeger Decl. (Letter from C. Fischer to CCJA (May 14, 2014)).

61.     On May 19, 2014, The CCJA Secretary General then wrote the Tribunal citing to the CCJA Rules of Arbitration and prohibiting it from pursuing its €450,000 fees from the Parties. Ex. 47 to Jaeger Decl. (Letter from CCJA Secretary General to Tribunal and Parties (May 19, 2014)).

62.     Also on May 19, 2014, Mr. Jaeger wrote the CCJA explaining that it would not pay the fees requested by the Tribunal.  Ex. 16 (Letter from L. Jaeger to CCJA (May 19, 2014)).  This letter, three weeks after the Tribunal had executed and issued its Final Award, is the first time that Guinea informed the CCJA, the Parties or the Tribunal that it was rescinding its agreement to arbitrator fees of €450,000.  The Final Arbitration Award was served by the CCJA Secretary General on May 26, 2014.

63.     On June 3, 2014, the Tribunal President wrote an extended letter to the CCJA expressing his concern with the CCJA's reprimand.  Ex. 29 to Jaeger Decl. (Letter from I. Fadlallah to CCJA General Secretary (June 3, 2014)).  In this letter, President Fadlallah, justified why the arbitrator fees needed to be increased over the provisional advance because of the significant work on the case.  He stated, *inter alia*, that, the Tribunal had spent over a thousand hours on the arbitration and that office expenses and secretarial costs were three times what the

CCJA allocated in its initial advance. *Id.* at 5. Additionally, he highlighted that the arbitration cost the Parties close to €3 million in attorney and expert fees and only two percent of the cost was allocated to the costs of the three arbitrators. *Id.* Further, Fadlallah expressed his disappointment in this inequitable decision because he had been under the impression from the CCJA that the fees would increase. *Id.* at 3.

64.     On September 22, 2014, the Tribunal wrote its final demand letter to the Parties in pursuit of full compensation. Ex. 51 to Jaeger Decl. (Letter from I. Fadlallah to Getma and Guinea (Sept. 22, 2014)). In this letter, the Tribunal threatened legal action if the Parties did not pay the balance of fees owed by Guinea, as Getma had already paid their respective half of the €450,000. *Id.*

65.     When Guinea still did not comply, Fadlallah and the other arbitrators filed suit against Getma in France, on the basis that ultimately Getma was responsible for the entire commitment under a theory of joint and several liability. Ex. 17 (*Fadlallah, et al. v. Getma,* Summons to Attend Urgent Proceedings (Jan 8, 2015)); Ex. 18 (*Fadlallah, et al. v. Getma,* Pleadings in Response (Jan 8, 2015)). Getma's pleading in response argued that there was no joint and several liability for the total amount of fees because both parties had contracted to pay for their own arbitrator's fees and the arbitration award provided no provision for joint and several liability. Ex. 19 (*Fadlallah, et al. v. Getma,* Pleadings in Defense (Jan. 28, 2015)). Ultimately, the Commercial Court of Paris found that no joint and several liability existed. Ex. 20 (*Fadlallah, et al. v. Getma,* Provisional Order (February 16, 2015)).

66.     In this case, each arbitrator was paid FCFA 13,493,444 (€20,570) for proceedings that lasted close to three years, included more than five days of hearings, that examined five memoranda on the merits, two submissions on jurisdiction given a parallel ICSID arbitration

between the parties, two submissions summarizing claims, two submissions on parties' costs and expenses, and twenty-four submissions regarding requests for production of documents. Ex. 1 to Fischer Decl. (Final Award) ¶¶ 13-16. The Tribunal was required to issue eleven procedural orders and an award that is 113 pages long. *Id.* ¶¶ 18-24.

67.     By comparison, the Republic of Guinea paid its investigating consultant Steven Fox FCFA 50,849,063 (€77,518.90),[6] more than the fees for the three arbitrators combined, to obtain a two page "attestation" after a one month investigation.

68.     It is possible to estimate the effective hourly rate of compensation that the Tribunal received because Chairman Fadlallah, in his June 2014 letter, stated that the Tribunal spent over 1,000 hours on the case. Thus, three arbitrators working for over 1,000 hours each amounts to an effective pay rate of less than **€20.57 an hour**.

69.     Objectively, the total fees and the estimated per hour rate of compensation are vastly below the normal pay for arbitrators, particularly for arbitrators from Europe, as the cost calculators from the three major international arbitration institutions demonstrate when inputting the claim size of the matter *Getma v. Republic of Guinea* dispute. The International Chamber of Commerce (ICC) international arbitration cost calculator shows that for a case with the claim amount of the case at hand, the per arbitrator fee would be a minimum of €48,094, a maximum of €212,750, and an average of €130,422. Under the Arbitration Institute of the Stockholm Chamber of Commerce cost calculator, the per arbitrator fee in an average case with the same claim amount would be a minimum of €38,102, a maximum of €179,708, and a median of €108,905. According to the London Court of International Arbitration cost calculator, the per arbitrator fee in a medium

---

[6] Date of Arbitral Award, 04/29/14, conversion rate equal to .0015244902 (xe.com).

complexity case would be €169,087, in a low complexity case €118,361 and in a high complexity case €219,814. The chart below illustrates this fee comparison:

**Fees Per Arbitrator in Other Tribunals**
**for Amount in Controversy of:  FCFA 27,553,618,751**

**International Chamber of Commerce**

|  | Average | Minimum | Maximum |
|---|---|---|---|
| US $ | $180,083 | $66,407 | $293,759 |
| Converted to € | **€130,422** | **€48,094** | **€212,750** |

Conversion to US $ (FCFA/US$ exchange rate 0.0021049741): $57,999653.83
US$/€ Exchange rate (Apr. 29, 2014) is 0.7242322558.

Source for calculator:
http://www.iccwbo.org/products-and-services/arbitration-and-adr/arbitration/cost-and-payment/cost-calculator/

**Arbitration Institute of the Stockholm Chamber of Commerce***

|  | Median | Minimum | Maximum |
|---|---|---|---|
| € | **€108,905** | **€38,102** | **€179,708** |

*Fee for Chairman, other arbitrators compensated at 60% of Chairman's fee
Conversion to € (exchange rate 0.0015244902): €42,005,221.76

Source for calculator: http://www.sccinstitute.com/dispute-resolution/calculator/

**London Court of International Arbitration**

|  | Medium Complexity Case With 3 Arbitrators | Low Complexity Case With 3 Arbitrators | High Complexity Case With 3 Arbitrators |
|---|---|---|---|
| £ | £138,739 | £97,117 | £180,361 |
| Converted to € | **€169,087** | **€118,361** | **€219,814** |

Conversion to British £ (FCFA/£ exchange rate 0.0012508688): £34,465,962.02
British Pound to Euro Exchange rate (Apr. 29, 2014) is 1.2187450962

Source for calculator: https://www.international-arbitration-attorney.com/lcia-arbitration-cost-calculator/

**F.     The Republic of Guinea's Allegations of Tribunal Misconduct and Coercion by the Tribunal**

70.     I have reviewed the Declaration of Laurent Jaeger, my opposing counsel in the arbitration, and his allegations that the Tribunal committed misconduct with respect to fees and that he and the Republic of Guinea were coerced by the Tribunal to agree to the increased

17

arbitrator fees. The record and other facts demonstrate that the Republic of Guinea and its experienced arbitration counsel were not intimidated and coerced and the Tribunal did not commit misconduct.

71.     I have personal knowledge of the Republic of Guinea's counsel. Orrick Rambaud Martel of Paris, France is a global law firm and Guinea's team are experienced international arbitration practitioners. I also have personal knowledge of lead counsel Laurent Jaeger's strong international reputation as an international arbitration advocate and arbitrator. Jaeger is the co-head of Orrick's worldwide International Arbitration group, and his online biography states that he has acted as counsel in more than one hundred arbitrations and as an arbitrator in more than thirty arbitrations. A true and correct copy of Jaeger's online law firm biography is attached as Ex. 21 at 1-3.

72.     During the course of the nearly three-year arbitration, Republic of Guinea's counsel and lead counsel Laurent Jaeger strongly advocated for the Republic of Guinea at all stages of the arbitration. The actions of Guinea's counsel throughout the arbitration did not indicate that they were intimidated or pressured by the Tribunal.

73.     As I already noted above, when asked during the course of the arbitration whether the Republic of Guinea had any reservations about how the arbitration was conducted, Laurent Jaeger stated each time that the Republic of Guinea had no reservations. Jaeger is an experienced arbitral advocate and knows that if he had any issues, that he should voice his reservation to preserve the issue and to avoid waiver.

74.     The actions after the CCJA arbitration with Getma by the Republic of Guinea's counsel, Orrick Rambaud Martel of Paris, France, also demonstrate that there was no arbitrator misconduct. Republic of Guinea's counsel is representing another client in an investment

arbitration and the parties in that arbitration jointly selected Eric Teynier to serve as chair in that arbitration on November 25, 2013 -- after the purported "misconduct" which the Republic of Guinea accuses Teynier and the other arbitrators in this arbitration. Attached is a true and correct copy at Exhibit 22 of the publicly available case details for the ICSID arbitration available at ICSID's website.

## II.   THE ANNULMENT PROCEEDINGS

### A.    Timeline for Resolution of Annulment Proceedings

75.    As I stated in greater detail in my first declaration, on April 29, 2014, the Tribunal issued the Final Award ruling that the termination was unlawful, rejecting Guinea's corruption allegations and awarding Getma a total of €38,531,127 on its claims. The CCJA served the Award on the Parties on May 26, 2014. *See* Ex. 1 to Fischer Decl. (Final Award).

76.    Getma immediately moved to enforce the arbitral award in France on June 2, 2014 and obtained an Exequatur Judgment Order from the President of the Paris High Court dated June 18, 2014. Attached are true and correct copies of the Court order and the first and last pages of the Award which have been stamped and certified by the Court. Ex. 23 at 2 (Order Rendered by Paris High Court (June 18, 2014)); Ex. 24 (First and Last Page of Award Exequatur Granted (June 18, 2014)). Under French law, the exequatur judgment consists of the Court order along with the court-stamped and certified copy of the Award.

77.    The Republic of Guinea was served the exequatur judgment on July 18, 2014. A true and correct copy of proof of the act of service is attached as Ex. 25 at 1-2 (Act of Service (July 18, 2014)).

78.    The Republic of Guinea never responded or appealed the exequatur judgment. The Court of Appeal of Paris issued a Certificate of No Appeal on October 21, 2014, the day after the Republic of Guinea's deadline to appeal. A true and correct copy of this Certificate of No Appeal

is attached as Ex. 26 (Certificate of No Appeal (Oct. 21, 2014)).  Guinea can no longer appeal the exequatur judgment under French law.

79.    The Republic of Guinea filed an annulment petition in the CCJA on July 23, 2014. Ex. 52 to Jaeger Decl. (Guinea Annulment Petition (July 23, 2014)).  The petition raised three allegations:  first, that the award was contrary to international public policy; second, that the Tribunal violated the principle that both parties have the right to be present and heard; and third, that the arbitrators breached their fiduciary duty.  *Id.*  Getma responded to the petition on December 23, 2014 and has a rejoinder due on April 20, 2015.

80.    There are no formal or informal CCJA rules establishing a timeline for resolution of these annulment proceedings, and the time for resolution may be anywhere from a year and a half to almost four years.

81.    I dispute the conclusions drawn in Jaeger's Declaration regarding the estimated time for conclusion of the annulment proceedings.  Jaeger Decl. ¶ 42.  The conclusion that the CCJA takes approximately one and a half years from the date of the filing of an annulment petition to issue a ruling is based on a review of eight annulment decisions between 2007-2011. Ex. 53 to Jaeger Decl. (Attorney prepared chart "Annulment Petitions Contesting the Validity of Arbitral Awards Before the CCJA").  While six of the cases did take less than two years to resolve, Jaeger ignores that in recent years the CCJA has taken longer to resolve cases.  In the four more recent cases with annulment petitions that Jaeger cites, in which the petitions were filed in 2008-2010, two of the cases took significantly longer – over three years, nine months in one case and over two years, four months in another case.

**B.     CCJA Standard of Review**

82.     The standard of review the Republic of Guinea states the CCJA will employ when reviewing the annulment petition is incorrect.  First, French law is not the binding authority for OHADA and the Republic of Guinea because French law is only persuasive authority.

83.     Second, the Republic of Guinea misstates the standard of review French courts apply in reviewing arbitral awards.  French courts are very deferential with regard to enforcement of arbitral awards and even recognize awards that have been set aside in the courts of primary jurisdiction.

84.     The Republic of Guinea's errs in relying on the French cases *Gas Turbine v. Westerman* and *Thales Euromissile* for the standard of review.  The type of contracts at issue in those cases are distinct from the Concession Agreement at issue in this case.  Both of the contracts at issue in *Gas Turbine* and *Thales Euromissile* were intentionally formed for the purpose of violating French and international public policy through a wrongful act:  an agency agreement to conceal bribes as commission payments to the agent and an agreement to violate EU competition rules respectively.  The *Gas Turbine* and *Thales Euromissile* courts refused to give effect to the contracts at issue because the contracts blatantly violated public order and their purpose was contrary to public policy.  In contrast, the purpose of the Concession Agreement in this case does not violate public policy, intend to violate public policy, or contemplate wrongful acts.  In addition, in *Thales Euromissile*, the arbitral tribunal had not dealt with the argument that the contract at issue violated international public policy.

85.     In 2014, the French Supreme Court clarified the standard of review when a judge is considering a request to annul an arbitral award.  The Republic of Guinea ignores this case.  The French Supreme Court upheld the Court of Appeals of Paris's refusal from 2009 to set aside an ICC arbitral award because the Court of Appeals judge was not permitted to inquire into the

underlying merits of the case.  Cass. Civ. First, Dec. 2, 2014, No. 10-17076 appeal.  The French

judge in the enforcement proceedings was only allowed to review the award itself, despite

underlying concerns of violation of international law.  The French Supreme Court upheld the

rationale of the Court of Appeals that the Tribunal had already examined the issue of corruption

and concluded there was no act of corruption.

### C.     Hardship Imposed by Potential Stay

86.     The Republic of Guinea's attempt to delay enforcement proceedings increases the

harm already done to Getma by the breach of the Concession Agreement with Guinea's unilateral

termination without compensation.  Getma, in good faith, had been in the midst of performance on

the contract and Guinea has not paid for the benefits it received from Getma.  Additionally, Getma

made a significant financial outlay by purchasing equipment necessary for performance of the

contract and in reliance on the contract, but has not received payment from Guinea for these

outlays.

## III.    CONCLUSION

87.     Based upon my personal knowledge, I certify that the documents attached to this

declaration are genuine, true and correct copies.

I declare under penalty of perjury that the foregoing is true and correct to the best of my

knowledge, information, and belief.

Executed this 20th day of April 2015 in Paris, France.

Cédric Fischer
FISCHER TANDEAU DE MARSAC SUR & PARTNERS
67, boulevard Malesherbes
75008 Paris, France
Telephone: +33 (0)1 47 23 47 24
Fax: +33 (0)1 47 23 90 53