# EXHIBIT 7

**CCJA (OHADA) Case No. 001/2011/ARB**

<u>**Getma International**</u>
v.
<u>**Republic of Guinea**</u>

*Hearing of December 16, 2013*
Version 1 (to be proofread by the Parties)

2

**LIST OF PERSONS PRESENT**

**Members of the Arbitration Tribunal**

- Prof. Ibrahim Fadlallah, President
- Eric Teynier, Esq., Arbitrator
- Prof. Juan Antonio Cremades, Arbitrator
- Texidor, Esq., Associate of Prof. Fadlallah

**Tribunal Clerkship**

- Ms. Marie Sfeir Slim

**For the Claimant**

- Cédric Fischer, Esq.        Fischer, Tandeau de Marsac, Sur and Partners
- Tristan de Puget, Esq.     Fischer, Tandeau de Marsac, Sur and Partners
- José-Miguel Judice, Esq.        PLMJ
- Mr. Jean-Daniel Littler        Getma International

**For the Respondent**

- Laurent Jaeger, Esq.        Orrick Rambaud Martel
- Romain Sellem, Esq.        Orrick Rambaud Martel
- Agnes Bizard, Esq.        Orrick Rambaud Martel
- Julie Audoux, Esq.        Orrick Rambaud Martel, intern
- Mr. Steven Fox        Veracity Worldwide LLC

**Conference Stenographer**

- Ms. Sylvie Briant

## C O N T E N T S

OPENING OF THE HEARING BY THE PRESIDENT ......................................................... 4

EXAMINATION OF MR. STEVEN FOX ........................................................................ 4

►DIRECT EXAMINATION BY THE RESPONDENT ........................................................ 5

►CROSS EXAMINATION BY THE CLAIMANT .............................................................. 7

►QUESTIONS OF THE ARBITRATORS............................................................................ 17

► PLEADING OF THE CLAIMANT… ERROR! BOOKMARK NOT DEFINED.

► REPLY OF THE RESPONDENT … ERROR! BOOKMARK NOT DEFINED.

► REPLY OF THE CLAIMANT … ERROR! BOOKMARK NOT DEFINED.

► QUESTIONS OF THE ARBITRATORS…. ERROR! BOOKMARK NOT DEFINED.

PROCEDURAL QUESTIONS  ................................................................................ 34

4

1   The hearing is opened at 2:35 p.m., with Prof. Fadlallah presiding, on the premises of the ICC, 112
2   avenue Kleber, in Paris, 16th district.

3   | **Opening of the hearing by the President** |
    | --- |

4   **Mr. President** - Hello, Gentlemen. *(Start of proceeding away from microphone.)*

5   The question of the R-107 document has been raised. It is a question that you will be able to mention
6   in your comments after the examination of Mr. Steven Fox, and the Tribunal will then see what it is
7   appropriate to do.

8   So as not to waste too much time and to leave a short time of deliberation for the Tribunal after this
9   hearing, I propose that we hear Mr. Steven Fox immediately.

10  **Mr. Jaeger.** Is that the correct pronunciation?

11  **Mr. Jaeger -** Yes, it is, Mr. President.

12  *(Entry of Mr. Steven Fox.)*

13  | **Examination of Mr. Steven Fox** |
    | --- |

14  **Mr. President**. – Hello, Sir. Could you perhaps press the button on the
15  microphone?

16  *(The witness does so.)*

17  Thank you. Do you wish to speak French or English?
18  **Mr. Fox** *(interpretation)* - I would prefer to speak English.
19  **Mr. President** - Do you need the translation of the questions?

20  **Mr. Fox** *(interpretation)* - I can hear the first questions in French but if any questions are raised by
21  those questions, in that case, I would prefer to hear the
22  translation.

23  **Mr. President** - Let us do as follows: the questions will be asked, according to the speaker, in French
24  or in English, and the responses will be given in English.

25  Sir, first I would like you to indicate for the transcript your last name, first name, date and place of
26  birth, current residence and profession.

27  **Mr. Fox** *(interpretation)* - My name is Steven Fox, my middle name is Bradley but I never use it and
28  my family name is Fox.

29  May 1, 1969 is my date of birth, in New York State, and that is where

30  I live.

31  **Mr. President** - And what is your current profession?

32  **Mr. Fox** *(interpretation)* - I am a consultant specialized in market monitoring and the fight against
33  corruption. I am the CEO of a company called Veracity Worldwide Limited Liability
34  Corporation.

35  **Mr. President** - Sir, this Tribunal expects you to tell the truth, the whole truth, and nothing but the
36  truth. Do you promise to do that?

37  **Mr. Fox** *(interpretation)* - I understand my obligation, which is to tell nothing but the truth.
38

1   **Mr. President** - Thank you.

2   I will now give the floor to Mr. Jaeger, who has fifteen minutes to present the document to you. Then,
3   we will proceed to the cross examination.

4   Mr. Jaeger, you have the floor.

5   **>       Direct examination by the Respondent**

6   **Mr. Jaeger -** Thank you Mr. President. With your permission, the questions will be asked by Ms.
7   Bizard.

8   **Ms. Bizard -** Hello Mr. President, Arbitrators.

9   Mr. Fox, could you explain to us what your experience is in investigating
10  cases of corruption?

11  **Mr. Fox** *(interpretation)* - Regarding my experience in the field of the fight against corruption, since
12  August 2005, i.e. over these past seven years, I have been active in monitoring, particularly
13  investigations against corruption. I am the CEO and founder of Veracity since
14  April 1, 2007.

15  I have conducted about 150 different missions for my clients. Many tasks have had to do with
16  corruption. Therefore, I have broad experience in this field. It is about understanding Africa,
17  being interested in it, and more specifically Guinea, where many projects have been
18  undertaken since 2005. Between 2011 and 2013, there were major projects in the mining sector of
19  which you are
20  probably aware.

21  **Ms. Bizard -** Could you explain to us under what circumstances you were involved in the Getma
22  case?

23  **Mr. Fox** *(interpretation)* - I participated in the Getma investigation via the Orrick firm. As I have said, I
24  had already worked on the Simandu investigation. That case was managed, at the start, by the firm of
25  DLA Piper firm. During the summer of 2013, the Orrick firm was heading up part of the case
26  concerning Simandu.

27  I met Pascal Alibor (?), whom you may know, and Pascal raised the following possibility: he asked
28  whether it was possible to increase and to build, based on the knowledge
29  gathered on fighting corruption, more specifically in Guinea, whether or not that
30  knowledge could be applied to the
31  Getma case.

32  **Mr. President** - Mr. Fox, I am not asking you to speak more quietly but
33  less quickly.

34  **Mr. Fox** *(interpretation)* - Excuse me, I come from New York. We have a habit of speaking very fast
35  but I will make an effort to slow down.

36  **Mr. President** - I have seen Woody Allen's movies…

37  Go ahead.

38  **Ms. Bizard -** In the Getma case, what are the difficulties that you encountered to obtain
39  information?

40  **Mr. Fox** *(interpretation)* - In any investigation regarding corruption, and more specifically in the Getma
41  investigation, the important thing is the propensity of the sources to share their knowledge and their
42  direct understandings, to be able to identify the specific
43  sources that have a direct knowledge of
44  what happened.

1  It is also important to inspire confidence so that those sources will share their knowledge
2  confidentially and securely, and therefore their knowledge of very precise circumstances. It is also to
3  have the analysis capacity to evaluate the validity of the information supplied by each source.

4  **Ms. Bizard -** When did you obtain the information that appears in your deposition?

5  **Mr. Fox** *(interpretation)* - More specifically, we were hired, on October 4, 2013, and we collected
6  information during the following weeks. All the data were collated until the
7  start of November 2013.

8  I would like to highlight the following fact: the important thing was to reinforce the work done during
9  the two previous years in connection with other anti-corruption cases, particularly the Simandu case
10  in Guinea. Therefore, we were very much apprised of the environment in which we were working and
11  we knew well the people who could put us into
12  contact with those who had direct knowledge of
13  the actions in question.

14  **Ms. Bizard -** Could you give us information on your sources?

15  **Mr. President -** Can you spell the name of the other case on which you
16  worked?

17  **Mr. Fox** *(interpretation)* - The other case on which we worked is the Simandu case. Simandu is the
18  largest metallurgical mining concession in Guinea. The Beny Steinmetz Resources group, BSGR, is
19  the company that was the subject of that anti-corruption
20  investigation.

21  **Ms. Bizard -** Could you give us information on your sources?

22  **Mr. Fox** *(interpretation)* - Of course, as to our sources, we endeavor to understand the context in
23  which the source knows what he knows. Is he active in a context that gives him a direct knowledge of
24  that information?

25  Did it prove to be reliable in the past? Are there interests at play?

26  We do not rely on information from just one source; we crosscheck all information from various
27  sources.

28  **Ms. Bizard -** Could you explain to us the role of Mr. Gamal Challoub?

29  **Mr. Fox** *(interpretation)* - Absolutely. Mr. Challoub is what I would call the financier of the matter. He
30  is active in the field, in Guinea, and acts on behalf of Mr. Richard Talbot. He plays the role of liaison
31  agent. The payments intended for Guinean state representatives pass through him. He is what we
32  call the "big fish."
33  There are little fish also.

34  Concerning the big fish, here, we are referring to people who are members of the government; Prime
35  Minister Souaré, the Minister of Transport as well as the
36  Minister of Finance.

37  At a lower echelon, there was a commission of eight members, and six out of the eight received
38  payments in exchange for their activities.

39  **Ms. Bizard -** Was Mr. Challoub compensated for his role?

40  **Mr. Fox** *(interpretation)* - Was he compensated for his activities? Mr. Challoub received an equity
41  stake in the joint venture that was created. Whether that was done directly or indirectly, by means of
42  an equity stake in that company, yes,
43  Mr. Challoub profited from the business.

44  **Ms. Bizard -** Can you tell us who the other main players in the
45  corruption are?

46  **Mr. Fox** *(interpretation)* - As I just said a moment ago, at the highest level, the most important
47  individuals                  include                  specifically                  Prime                  Minister

1  Souaré, the Minister of Transport who played the most important role among all the
2  ministers, without forgetting the Minister of Finance and the Members of the Commission, who also
3  played a role. Six of those eight members play a role in these actions,
4  and Mr. Kara (?) also.

5  **Ms. Bizard -** Can you explain to us why your sources testified
6  anonymously?

7  **Mr. Fox** *(interpretation)* - Absolutely.

8  Why did the sources want to speak anonymously and confidentially?

9  I have worked in this field for a certain time. For me, when a source talks, it is often out of ideology,
10  out of his conviction to do what is right, to share information but, in exchange, the supplied
11  information must be treated professionally, by me or my company.
12  To assemble the various parts so that the true story can come to light, so that the
13  truth can see the light of day and
14  justice can prevail.

15  **Ms. Bizard -** Can you tell us whether all your information sources are in Guinea or whether some
16  sources were foreign?

17  **Mr. Fox** *(interpretation)* - Yes, the sources with which we spoke are both in Guinea and abroad. As
18  for the primary sources that have direct knowledge, two of those sources are European, so they are
19  not located in Guinea, but they know Guinea very well
20  and have worked and lived in Guinea for a long time. In addition, we relied on twenty
21  additional sources, which we could describe as
22  being Guinean and which hold positions in Guinea.

23  The two primary sources are not Guinean; they are European and have a direct knowledge of the
24  actions in question.

25  **Ms. Bizard -** Thank you very much.

26  **Mr. President** - Thank you.

27  Mr. Fischer, you have the floor.

28  > **Mr. Fischer <u>Cross examination by the Claimant</u>**

29  **Mr. Fischer -** You have asked to speak English, do you
30  have difficulties speaking French?

31  **Mr. Fox** *(interpretation)* - If I have understood the question correctly, when it concerns a very precise
32  legal terminology, I would not be at ease if I were to speak French. I am not a lawyer, but a diplomat
33  by training. Currently,
34  I collect information in rather difficult environments.

35  **Mr. Fischer -** You indicated in your document that you were commissioned in 2005, in Guinea. Who
36  commissioned you in 2005?

37  **Mr. Fox** *(interpretation)* - We do not talk about our clients for obvious reasons of confidentiality. It was
38  not the government of that time. It was an international institution that was interested in corruption in
39  Guinea at the time.

40  **Mr. Fischer -** Do you think that you are authorized not to disclose the name of your agents in 2005,
41  while you have said that you would tell the whole truth?

42  **Mr. Fox** *(interpretation)* - (...)

1   **Mr. President** - Why not suggest that the witness put on a headset and listen to the English
2   translation?

3   **Mr. Fischer -** Do you believe that, although you said you would "tell the whole truth" to the
4   Arbitration Tribunal, you may not reveal the
5   name of your limited partners in 2005?

6   **Mr. Fox** *(interpretation)* - If you think, Mr. Fischer, that it is absolutely fundamental to know the name
7   of that financial institution based in Washington and which commissioned us in 2005, yes, I can
8   answer this question. I do not think that it
9   would bother them at all.

10   **Mr. Fischer -** Everything that you say is important.

11   **Mr. Fox** *(interpretation)* - In that case, in 2005, we were retained by the International Finance
12   Corporation.

13   **Mr. Fischer -** You told us that you were…

14   **Mr. President** - …one moment. The translation suggests, if you have problems with questions that
15   are sometimes complicated in French, you should listen to the translation
16   through the headset.

17   *(The witness nods his head as a sign of consent.)*

18   **Mr. Fischer -** You told us, for our case, that you were commissioned in October 2013 by the Orrick
19   firm. Is that correct?

20   **Mr. Fox** *(interpretation)* - That is correct.

21   **Mr. Fischer -** So you were commissioned in connection with this proceeding? What is the amount of
22   your fees for your intervention in
23   this proceeding?

24   **Mr. Fox** *(interpretation)* - The question is: how much were we
25   compensated for the work done?

26   **Mr. Fischer -** That is correct.

27   **Mr. Fox** *(interpretation)* - The precise total, excluding travel expenses, is
28   104,400 dollars.

29   **Mr. Fischer -** Do you have a fee based on the results of the proceeding?

30   **Mr. Fox** *(interpretation)* - Absolutely not. We do not receive fees based on results produced. We are
31   commissioned to determine the truth. Our remuneration does absolutely not depend on whether or
32   not it is a success.

33   **Mr. Fischer -** Why do you think you were commissioned in October 2013 while the question of
34   corruption has been addressed in the proceeding since 2011?

35   **Mr. Fox** *(interpretation)* - If I have understood correctly, your question is two-fold.

36   The investigation into corruption started in 2011,
37   as it is a specific subject.

38   **Mr. Fischer -** No, that is not exactly what I wanted to say.

39   **Mr. Fox** *(interpretation)* - To be sure that I understand correctly, I will now
40   listen to the translation.

41   **Mr. President** - The question is: you say you were commissioned in 2013, why October 2013 while,
42   in this arbitration, the question of corruption has
43   been raised since 2011?

44   Is that correct, Mr. Fischer?

1   **Mr. Fischer -** That is exactly correct, Mr. President.
2   **Mr. Fox** *(interpretation)* - That is a very good question. Keep in mind, as I said previously, that
3   Veracity, the company of which I am the CEO, was hired at the summer of 2011 by DLA Piper, which
4   in turn was working for the Republic of Guinea. DLA Piper continued to work on the Simandu case
5   from 2011 until 2013.

6   Around April 2013, Orrick started to take over part of the commercial aspects. The question of
7   corruption related to Simandu may appear as a diversion but it is important in the context. There is a
8   ramification toward a commercial case that continues to date and a criminal case. These cases have
9   been placed in the hands of the judicial authorities in Guinea and the United States. We can speak
10   about that again
11   later if it is relevant.

12   Concerning the calendar which certainly interests the Arbitration Tribunal, as for knowing why we
13   were hired only in October 2013, the first substantive meeting between myself and the Orrick team
14   concerning the Simandu case took place on
15   September 26.

16   One week after that, we were hired for this particular case, when it became clear, for the attorney
17   Aboyibor (?), that we could provide interesting information to build on the questions of corruption that
18   had been obtained in the Simandu case and to apply that
19   specific knowledge to the Getma contract.

20   I hope that answers your question.

21   **Mr. Fischer -** What were your diplomatic posts?
22   **Mr. Fox** *(interpretation)* - As a diplomat, I served at the United States embassy in Bujumbura in
23   Burundi, during the civil war in that country, then at the United States embassy, here, in Paris where I
24   worked in consular and political affairs. I handled certain matters in those
25   two contexts.

26   Then, I quit diplomacy to get an MBA in Fontainebleau, then I returned to government service. I
27   worked for the State Department in Washington on anti-terrorism coordination in Israeli-Palestinian
28   matters. I was then sent to Algiers, where I was in charge of the political and economic section of the
29   United States embassy in
30   Algiers until 2005.

31   **Mr. Fischer -** Have you worked or do you still work for an
32   intelligence service?

33   **Mr. Fox** *(interpretation)* - There were many indications in the press to the effect that I might have
34   worked in the past for an intelligence service.
35   The answer is that I worked for the
36   United States State Department.

37   **Mr. Fischer -** To be more precise, if you have to answer my question with "yes" or "no,"
38   please answer "yes" or "no," and I am indeed saying
39   "intelligence service," and not for a state?

40   **Mr. Fox** *(interpretation)* - I worked for the United States State Department, the equivalent of the Quay
41   d'Orsay.

42   **Mr. Fischer -** When I say "a state," it is a sovereign state like the United States, France or other
43   countries. I would like to know whether you worked for a service, or whether you still work for an
44   intelligence service of a country.

45   **Mr. Fox** *(interpretation)* - The question is in two parts. The question is: "do you still work," which
46   would imply that I worked in the past. At present, the answer is: I do not
47   currently work for intelligence
48   services today.

1   **Mr. Fischer -** And in the past?

2   **Mr. Fox** *(interpretation)* - In *Jeune Afrique*, we read articles that talk about Steven Fox, an
3   "American spy." If you read *Jeune Afrique*,
4   one could suppose that that is the case.

5   **Mr. Fischer -** You know that we are in France, and currently
6   subject to French law.

7   **Mr. Fox** *(interpretation)* - I would also say that, under the laws of the United States, if one works for
8   intelligence services, it is illegal to reveal that under
9   American law.

10  **Mr. President -** Mr. Fischer, you are speaking too soon, the
11  translation is not finished.

12  **Mr. Fox** *(interpretation)* - What I am saying is that those who were employed by intelligence services
13  in the United States and in other countries, including in France,
14  would be bound by their oath with respect to the DES (?) or the intelligence services of each one of
15  those countries. They must maintain that discretion, that
16  confidentiality, that secrecy.

17  **Mr. Fischer -** Thank you. On what date did you draw up the document
18  disclosed under…

19  **Mr. President -** …wait, I do not understand!

20  **Mr. Fox** *(interpretation)* - To be more precise. The law says that a third party may not reveal that fact
21  in regard to a specific person. I did not say anything other than that, I answered the question from Mr.
22  Fischer, who thought that it was important. Mr. Fischer seems to be trying to establish the credibility
23  of what I am saying and that it is the truth.

24  May I continue?

25  **Mr. President -** I am a humble lawyer, there is too much subtlety in your answer. Help me to
26  understand correctly what you said.

27  **Mr. Fox** *(interpretation)* - I will answer very modestly: I served as a humble diplomat, and I served as
28  a humble civil servant of my country.

29  **Mr. President -** Very well.

30  Mr. Fischer?

31  **Mr. Fischer -** Thank you, Mr. President. On what date did you draw up the document disclosed under
32  No. R-107?

33  **Mr. Fox** *(interpretation)* - Could I have a clarification: on what date was it submitted or
34  drafted?

35  **Mr. Fischer -** Drafted.

36  **Mr. Fox** *(interpretation)* - It was drafted during the first week of November. It was submitted on
37  November 14th. There was no date on the document itself, but the document was attached to an
38  email that was sent at 4:26 p.m., New York time, on
39  November 14th of this year.

40  **Mr. Fischer -** Do you think that it would have been appropriate to date it?

41  **Mr. Fox** *(interpretation)* - Given that the document was attached to an email, that there is a time-
42  stamp with each email, we thought
43  that it would be more precise to have the specific time.

44  **Mr. Fischer -** Did you personally conduct investigations in Guinea?

45  **Mr. Fox** *(interpretation)* - With regard to Guinea or in the field in Guinea?

1   **Mr. Fischer -** In the field. Physically, personally, were you in Guinea and did you meet with contact
2   individuals?

3   **Mr. Fox** *(interpretation)* - The answer is: with regard to the two primary European sources that had a
4   direct knowledge of the matter, they were met here, in Paris, in the eighth and sixteenth
5   arrondissements. In addition, we also have work done for us in Guinea by a
6   source who, in turn, appears with the various Guinean sources
7   that have given extra information in addition to the
8   primary sources.

9   **Mr. Fischer -** I was going to get to that later, so let's start there.

10  **Mr. President** - Mr. Fischer, please leave time for the translation, otherwise there is no transcript. Go
11  ahead.

12  **Mr. Fischer -** Who are those two people whom you met in France
13  ?

14  **Mr. President** - Excuse me. Mr. Fox did not say that it
15  was he who met with them.

16  **Mr. Fox** *(interpretation)* - To be precise, Mr. President, the two sources referred to as being the
17  European sources, I did indeed have direct contact with those people, one by telephone, the other in
18  person.

19  **Mr. Fischer -** To avoid any ambiguity, so you did have personal contact with the two primary
20  sources?

21  **Mr. Fox** *(interpretation)* - That is correct.

22  **Mr. Fischer -** Who are those primary sources?

23  **Mr. Fox** *(interpretation)* - Each one of those sources are people who have had lengthy experience
24  with Guinea and a direct knowledge of the matter that took place.

25  **Mr. Fischer -** What are their names?

26  **Mr. Fox** *(interpretation)* - As we have said, we are not willing to share the names with you. There is
27  no reason to continue on this matter.

28  **Mr. Fischer -** You refuse to tell the Tribunal the name of the persons who made serious accusations
29  of corruption?

30  **Mr. Fox** *(interpretation)* - Absolutely, based on fact that those people shared information that they had
31  based on the fact that that information would be treated as secret.
32  That is how we work.

33  If I may say, Mr. President, to anticipate a question that will perhaps be asked later, it could be asked:
34  was that information simply hearsay or allegations? The intention is to be able to give a landscape, a
35  cartography, an indication of the fundamental question.
36  Was there corruption or not concerning the awarding of the
37  concession to Getma?

38  Based on the professional judgment and the reputation of the company and myself, the answer is a
39  categorical yes.

40  For the purposes of the Tribunal, is it necessary to continue? I am sure that they would be delighted
41  to have that evidence.

42  **Mr. President** - Mr. Fox, please, you are under cross examination, and under cross examination, you
43  have to answer questions. Open-ended questions, which give you the opportunity to expound, are
44  asked under direct examination. You have been asked some of them. If Mr. Jaeger wants to revisit
45  that, I will give him the floor again.

1  For the questions asked by the opposing party, please limit yourself to answering the question. Your
2  answer is, "I cannot reveal those sources because they
3  provided their information on a basis of secrecy." That is all.

4  **Mr. Fox** - That is correct.

5  **Mr. Fischer -** Do you have a code of ethics in your profession?

6  **Mr. Fox** *(interpretation)* - In the sense that one would have a code as a member of the Paris bar or
7  other legal profession, the answer is no.

8  Do we have standards of integrity and rules by which we work in our highly reputable firm, the answer
9  is yes.

10  The principle is always to reveal the truth and to exhibit the highest ethics and
11  integrity at all times.

12  **Mr. Fischer -** In Guinea, which persons were questioned?

13  **Mr. Fox** *(interpretation)* - A variety of people including people who worked as advisers of the
14  government or advisers in various ministries or to the presidency, people who were journalists,
15  businessmen, accountants, and others having a general knowledge of the
16  business environment and business
17  community in Guinea.

18  **Mr. Fischer -** Are you also refusing to give the name of those people?

19  **Mr. Fox** *(interpretation)* - I will take the same approach to all the sources that
20  provided information.

21  **Mr. Fischer -** Were you given documents?

22  **Mr. Fox** *(interpretation)* - At this stage, in the investigation, all our comments were made based on
23  conversations. We have not yet received documents.
24  We expect to receive documents in the future.

25  **Mr. Fischer.** – Just so we're clear: therefore, you have neither seen nor
26  received any document?

27  **Mr. Fox** *(interpretation)* - Mr. President, I would like to answer that question
28  in two parts.

29  As a direct answer to your question, to date, no document has been received. If you allow me, very
30  briefly, based on the experience of the Simandu case, some documents surfaced during the
31  investigation with enough time so that an investigation in proper and due form could take place. I am
32  100% confident that the Republic of Guinea will be able by various legal means to obtain documents
33  that will be directly relevant to the
34  case in point.

35  **Mr. Fischer -** Did you have contact with Mr. Gamal Challoub?

36  **Mr. Fox** *(interpretation)* - If the question is "did I speak to him," the answer is no. It is not usual to
37  speak directly with someone who has interests in a case, but we speak with people who have
38  knowledge about a case. We may have
39  spoken with people who spoke with Mr. Challoub.

40  **Mr. Fischer -** In document R-107, you mention the company named Transco. According to you, what
41  was the role of Transco?

42  **Mr. Fox** *(interpretation)* - There were two participating companies, Mr. Talbot's and the one controlled
43  by Mr. Challoub. Those two companies came together to participate in the request for proposals for
44  the concession, for the port.

45  **Mr. Fischer -** Did you personally make sure of Transco's role?

1    **Mr. Fox** *(interpretation)* - A clarification: when we have more time, we must concentrate on the
2    various elements at various times that can be verified once, twice or three times. With regard to
3    Transco, there may be an error in the description of Transco as a company. If a detail is incorrect,
4    inaccurate, does that undermine the
5    confidence that one can have in all the rest of the document?

6    **Mr. Fischer** - In connection with your investigations, have you been to Switzerland?

7    **Mr. Fox** *(interpretation)* - Did we go to Switzerland?
8    No, not in the context of this investigation.

9    **Mr. Fischer** - Obviously.

10    In exhibit R 107 you indicate that a transfer was made from the city of
11    Zug in Switzerland?

12    **Mr. Fox** *(interpretation)* - That is correct.

13    **Mr. Fischer** - Is that information given based solely on a conversation with a person whose name you
14    refuse to give, or is that information given based on a
15    material element?

16    **Mr. Fox** *(interpretation)* - With regard to this question, you asked the question about deontology or
17    code of ethics, it would be inappropriate for a company like ours to obtain banking information. It is
18    plausible that the Republic of Guinea, through an LMA, might request information from the union bank
19    in Switzerland, in Zug, or Crédit Lyonnais in
20    Monte Carlo. Based on information received from sources, it would seem that funds may have
21    passed through that specific bank.

22    **Mr. President** - What specific bank?

23    **Mr. Fox** *(interpretation)* - LCL, Crédit Lyonnais in Monaco.

24    **Mr. President** - There was a transit of funds through LCL Monaco.
25    You said "*it would seem.*"

26    **Mr. Fox** *(interpretation)* - Based on the information from the source that we received, we think we
27    understand that funds may have transited
28    through Crédit Lyonnais in Monaco.

29    **Mr. Fischer** - How can you be certain of that transfer, to say that there was a
30    transfer, while you tell us that one of the rules is double
31    checking, and that you did not see anything yourself?

32    **Mr. Fox** *(interpretation)* - Because we spoke with a source that is able to understand the diagrams
33    and financial transactions of Getma International.

34    **Mr. Fischer** - I am a little curious. You implicate Mr. Richard Talbot. Did you try to contact him and
35    question him?

36    **Mr. Fox** *(interpretation)* - I do not know where he is now, in heaven or in hell, but it would not be
37    possible to speak to him, or even wise in this context. Insofar as Mr. Talbot is no longer among us, it
38    is difficult to speak to him.

39    **Mr. Fischer** - Don't you think that it is regrettable that this investigation
40    was ordered so late?

41    **Mr. Fox** *(interpretation)* - Is not up to me to judge what is regrettable or not. Indeed, it is fortuitous that
42    the investigation is conducted before we can understand whether
43    corruption occurred or not.
44    To answer the question "was there corruption, yes or no?" based on our investigation, my answer is:
45    "yes, there was corruption."

1 **Mr. Fischer -** From that, I must conclude that you prefer to give credence to the word of anonymous
2 people rather than to directly address the persons who are allegedly under accusation? Is this
3 correct?

4 **Mr. Fox** *(interpretation)* - That is not correct. If we ask the question of knowing the motivation, the
5 motive, those persons have every interest in lying and covering the fact that they were guilty of
6 corruption. That would be the
7 logical answer to this question.

8 **Mr. Fischer -** Do you know whether a criminal proceeding has been opened in Guinea or elsewhere
9 concerning alleged acts of corruption?

10 **Mr. Fox** *(interpretation)* - I know indeed that a criminal complaint was filed in Guinea against the
11 people.

12 **Mr. Fischer -** Do you know against whom that proceeding was opened?

13 **Mr. Fox** *(interpretation)* - The proceeding corresponds perfectly to the document that you have in
14 front of your eyes, and I am also conscious that two of the individuals identified in our report have
15 now acknowledged receiving bribes in connection with the request for proposals for the port of
16 Conakry, and have signed under oath. They are Guinean government employees.

17 **Mr. Fischer -** Did you have personal, physical or telephone contact
18 with Mr. Sory Camara?

19 **Mr. Fox** *(interpretation)* - No.

20 **Mr. Fischer -** Did you have personal, physical or telephone contact with Mr. Mamadouba Sankhon?

21 **Mr. Fox** *(interpretation)* - The answer is no. If we want to review the list, I did not contact any of the
22 individuals who took part in the process of granting the concession.

23 **Mr. Fischer -** If you did not have contact with them, how can you say that—and I reemphasize—Mr.
24 Mamadouba Sankhon, who was apparently
25 excluded from the negotiations, asked that the concession project contract be the subject of an audit?

26 **Mr. Fox** *(interpretation)* - Just to be clear, you made reference to two people who did not receive any
27 payment out of the eight people, if I believe my report?

28 **Mr. Fischer -** I will specify my question, which perhaps is not clear.

29 **Mr. President** - No, your question is clear. Mr. Fox must be looking at the note or the report that he
30 wrote.

31 *(The note is given to the witness.)*

32 **Mr. Fischer -** First, I refer to Mr. Mamadouba Sankhon, who you say is chief executive officer of
33 Conakry, below…

34 **Mr. Fox** *(interpretation)* - Yes.

35 **Mr. Fischer -** …and who reportedly ordered an audit, by the firm of FFA. How did you acquire that
36 information since you were not in
37 contact with Mr. Mamadouba Sankhon?
38 **Mr. Fox** *(interpretation)* - Mr. Mamadouba Sankhon was not the only person apprised of that audit. In
39 any conversation, there are inevitably various speakers. So he was not the only one apprised of it.

40 **Mr. Fischer -** Isn't it one of the rules of your profession to get as close as possible to the source of
41 information in order to verify it?

1  **Mr. Fox** *(interpretation)* - That depends on the source, and knowing whether it is possible to get as
2  close as possible. You know, it's like Icarus: if you get too close to the sun, you risk burning your
3  wings.

4  **Mr. Fischer -** You did not have the possibility of having access to Mr. Mamadouba
5  Sankhon?

6  **Mr. Fox** *(interpretation)* - The answer is no.

7  **Mr. Fischer -** Did you have contact with Mr. Sory Camara or Mr. Morlaye
8  Camara?

9  **Mr. Fox** *(interpretation)* - Neither of them.

10  **Mr. Fischer -** Do you know their opinion on the legality of the procedure of the request-for-
11  proposals?

12  **Mr. Fox** *(interpretation)* - To my mind, their opinions on the question are well known.

13  **Mr. Fischer -** Have you read the briefs exchanged by the parties in connection with
14  this arbitration?

15  **Mr. Fox** *(interpretation)* - What briefs?

16  **Mr. Fischer -** The briefs of Guinea and Getma. There are procedural documents. Did the Orrick firm
17  give them to you?

18  **Mr. President -** It seems to me that the word "brief" is not being understood.
19  *(The President continues in English.)*

20  **Mr. President** *(interpretation)* - Mr. Fischer is talking about the briefs submitted in connection with
21  this arbitration.

22  **Mr. Fox** *(interpretation)* - I have not read the briefs in question, but as to the summary of the events
23  with date and makeup of the various speakers, there was
24  indeed a brief to which I have had access.

25  **Mr. Fischer -** You were not informed of the briefs, Getma's submissions,
26  Getma's three briefs?

27  **Mr. Fox** *(interpretation)* - You have asked me what I have read. We have had a long debate
28  concerning the facts.

29  **Mr. Fischer -** I am not talking about a discussion. I am asking you specifically, have you read the
30  procedural documents?

31  **Mr. Fox** *(interpretation)* - No.

32  However, I have answered within an agreed-upon perimeter concerning the question of knowing the
33  facts dating back to 2008, at the request of Getma, did certain individuals give bribes in order to
34  obtain the contract, yes or no.

35  **Mr. Fischer -** While you were designated exclusively…

36  **Mr. President -** Excuse me, Mr. Fischer.

37  Is the document that was given to you summarizing the facts a special document made for you or a
38  procedural document?

39  **Attorney Jeager -** Mr. President, perhaps I can answer, to save time.

40  **Mr. President -** If you wish.

41  **Attorney Jeager -** We made a document expressly for Mr. Fox, he did not see the briefs.

42  **Mr. Fischer -** Could we have that document?

43  **Mr. Jaeger -** We can communicate it to you, there is certainly no problem.

1   **Mr. President** - Any new communication must be subject, no matter which side it comes from, to a
2   request for advance approval of the Tribunal. If you wish to do so, you will make the request, and the
3   Tribunal will decide.

4   **Mr. Fischer -** I expand my question: do you think it is professional to be involved in an arbitration in
5   tardy fashion, chronologically tardy, without taking cognizance of the evidentiary exhibits of that
6   arbitration, and do you think it is professional to cite a situation of two people,
7   one of whom has been questioned as a witness in the arbitration,
8   Mr. Sory Camara, without taking cognizance of
9   Mr. Sory Camara's statements?

10  **Mr. Fox** (interpretation) - As to the preparation for the proceeding, from my standpoint, I consider it
11  professional to be involved in the arbitration that we are involved in today, and I am here to answer
12  very specific questions: was there corruption, yes or no? Is there a reasonable basis to believe in
13  these actions? If the answer is yes, who was
14  involved and how?

15  As these are professional questions that are part of my mandate, and for which we have been paid
16  104,000 dollars to date, I think that we have fulfilled our
17  mandate perfectly in terms of our professionalism, i.e. I have met the expectations
18  that were placed on me.

19  **Mr. Fischer -** Is Ms. Marie Mansour one of the indirect sources?

20  **Mr. Fox** (interpretation) - Ms. Mansour is the subject of our investigation. She played a role in
21  connection with the Ministry of Transport. She was a legal adviser. According to our sources, Ms.
22  Mansour has close ties to Mr. Challoub, nothing romantic, I assure you, completely platonic, but she
23  knows Mr. Challoub and has represented him.

24  **Mr. Fischer -** I have two last questions.

25  Do you know the current location of Mr. Challoub and his opinion on the termination of the concession
26  of the port?

27  **Mr. Fox** (interpretation) - I do not know his current location today even though we have spoken about
28  it a lot in the past. I know according to the team of the Orrick firm that Mr. Challoub refused to provide
29  information he was asked to do so.

30  **Mr. Fischer -** Were you informed of the latest statements of Mr. Mamadouba Sankhon on the
31  outcome of this arbitration proceeding?

32  **Mr. Fox** (interpretation) - No, I am not apprised of them.

33  **Mr. President** – Mr. Jaeger?

34  **Mr. Jaeger -** We are not up apprised of those statements. Are they in the
35  proceedings today?

36  **Mr. Fischer -** It was a question. They have not been produced. We are talking a lot about Mr.
37  Sankhon, so I just wanted to know the level of knowledge that the witness had of Mr. Sankhon. He
38  has confirmed to us that he did not have any contact, and that he is not apprised of anything. That is
39  sufficient for me.

40  Mr. President, we have finished within the time allotted.

41  **Mr. President** - Thank you, Sir. Thank you, Mr. Fischer.

42  Mr. Fox, the people who were met with in Paris; you spoke to one of them on the telephone and, the
43  other, you met with, is that in fact what you said?

44  Did you participate in the meeting in Paris or was it another meeting?

45  **Mr. Fox** (interpretation) - I participated in the meetings, absolutely.

46  Mr. Jaeger, a re-direct?

1   **Mr. Jaeger -** No, I do not have any question, Mr. President.

2   **Mr. President** - Do my co-arbitrators have any questions?

LanguageWorks
1123 Broadway
New York, NY 10010
Tel. 212 447 6060
Fax 212 447 6257

## LanguageWorks

STATE OF NEW YORK        )
                         )          ss
COUNTY OF NEW YORK   )

## CERTIFICATION

This is to certify that the attached, to the best of my knowledge and belief, are true and

accurate translations into English of:

**2312 2014 Piece D45**
**29012015 CCJA Discours markup**
**16 09 2013 2013 09 16 GetmaOhada**
**19 05 2014 Lettre Orrick à la CCJA**
**24 06 2013 Lettre à Fadlallah honoraires**
**2015.03.02 Declaration of Laurent Jaeger - Exhibit 41**
**Getma_c_Guinée_Plaidoiries_2013.07.08_V1**
**Re dossier 0012011ARB du 10 mai 2011**
**RE Getma International c République de Guinée (aff n0012011ARB); Honoraires Tribunal Arbitral**
**transcript audience (version initiale)**
**Transcript audience**
**01 08 2013 Décision Honoraires arb - aff 001.2011**
**03 10 2013 décision 096-001.2011.ARB sur les honoraires**
**05 11 2013 lettre au Tribunal arbitral**
**06 09 2013 lettre à la CCJA**
**12 08 2013 sur décisions du 01.08.13**
**04 02 2015 Concl en replique demandeurs**
**16 02 2015 Ordonnance refere 16 02 2015**
**0801 2015 assignation en referee**

completed on April 10, 2015, originally written in French.

_____
Amy Stoyko
Co-Director of Production
LanguageWorks

Sworn to and subscribed before me,
This 10th day of April, 2015.

_____
Notary Public

# EXHIBIT 7
# FRENCH VERSION

# EXHIBIT 41

# Affaire CCJA (OHADA) n°001/2011/ARB

## <u>Société Getma International</u>
c/
## <u>République de Guinée</u>

### *Audience du 16 décembre 2013*

### Version 1 (à relire par les Parties)

---------------------------------------------------------------------------------------------------------------------

*Simone Bardot, Sténotypiste de conférences – 20, boulevard de la Bastille – 75012 Paris*
*Tél. 01.42.40.52.38 & 06.03.12.46.16  -  Simone_Bardot@msn.com*

**LISTE DE PRESENCE**

- **Membres du Tribunal Arbitral**
  - M. le Prof. Ibrahim Fadlallah, Président
  - Me Éric Teynier, Arbitre
  - M. le Prof. Juan Antonio Cremades, Arbitre
  - Me Texidor, Associée du Prof. Fadlallah

- **Secrétariat du Tribunal**
  - Mme Marie Sfeir Slim

- **Pour la Demanderesse**
  - Me Cédric Fischer         Fischer, Tandeau de Marsac, Sur et Associés
  - Me Tristan de Puget    Fischer, Tandeau de Marsac, Sur et Associés
  - Me José-Miguel Júdice              PLMJ
  - M. Jean-Daniel Littler              Getma International

- **Pour la Défenderesse**
  - Me Laurent Jaeger              Orrick Rambaud Martel
  - Me Romain Sellem              Orrick Rambaud Martel
  - Me Agnès Bizard              Orrick Rambaud Martel
  - Me Julie Audoux              Orrick Rambaud Martel, stagiaire
  - M. Steven Fox              Veracity Worldwide LLC

- **Sténotypiste de conférences**
  - Mme Sylvie Briant

## S O M M A I R E

**OUVERTURE DE L'AUDIENCE PAR LE PRÉSIDENT**.................................................................. **4**

**AUDITION DE M. STEVEN FOX**..................................................................................................... **4**

➢    **DIRECT EXAMINATION PAR LA DÉFENDERESSE**............................................... 5

➢    **CROSS EXAMINATION PAR LA DEMANDERESSE** ............................................. 7

➢    **QUESTIONS DES ARBITRES**.................................................................................. 17

➢    **PLAIDOIRIE DE LA DÉFENDERESSE** ....ERROR! BOOKMARK NOT DEFINED.ERREUR ! SIGNET NON DÉFINI.

➢    **PLAIDOIRIE DE LA DEMANDERESSE** ...ERROR! BOOKMARK NOT DEFINED.ERREUR ! SIGNET NON DÉFINI.

➢    **RÉPLIQUE DE LA DÉFENDERESSE**.......ERROR! BOOKMARK NOT DEFINED.ERREUR ! SIGNET NON DÉFINI.

➢    **RÉPLIQUE DE LA DEMANDERESSE**......ERROR! BOOKMARK NOT DEFINED.ERREUR ! SIGNET NON DÉFINI.

➢    **QUESTIONS DES ARBITRES**.... ERROR! BOOKMARK NOT DEFINED.ERREUR ! SIGNET NON DÉFINI.

**QUESTIONS DE PROCÉDURE**.................................................................................................... **34**

| 1<br>2 | *L'audience est ouverte à 14 heures 35, sous la présidence de M. le Prof. Fadlallah,*<br>*dans les locaux de la CCI, 112 avenue Kleber, à Paris 16ᵉᵐᵉ.* |

| 3 | **Ouverture de l'audience par le Président** |

4   **M. le Président**.- Bonjour Messieurs. (*Début d'intervention hors micro.*)

5   A été évoquée la question du document R-107. C'est une question que vous pourrez
6   évoquer dans vos observations après l'audition de M. Steven Fox, et le Tribunal verra
7   ensuite ce qu'il aurait lieu de faire.

8   Pour ne perdre trop de temps et laisser un petit temps de délibération au Tribunal
9   après cette audience, je propose que l'on écoute tout de suite M. Steven Fox.

10   **Me Jaeger** Est-ce la bonne prononciation ?

11   **Me Jaeger**.- C'est bien cela, Monsieur le Président.

12   (*Entrée de M. Steven Fox.*)

| 13 | **Audition de M. Steven Fox** |

14   **M. le Président**.- Bonjour Monsieur. Peut-être pourriez-vous appuyer sur le bouton du
15   micro.

16   (*Le témoin s'exécute.*)

17   Merci. Souhaitez-vous parler en français ou en anglais ?

18   **M. Fox** (*interprétation*)**.-** Je préfèrerais m'exprimer en anglais.

19   **M. le Président**.- Avez-vous besoin de la traduction des questions ?

20   **M. Fox** (*interprétation*)**.-** Je peux entendre les premières questions en français mais si
21   des questions sont suscitées par ces mêmes questions, dans ce cas, je préférerais
22   entendre la traduction.

23   **M. le Président**.- Faisons ainsi : les questions seront posées, selon l'interlocuteur, en
24   français ou en anglais et les réponses seront données en anglais.

25   Monsieur, je voudrais d'abord que vous indiquiez pour le *transcript* vos nom, prénom,
26   date et lieu de naissance, domicile actuel et profession.

27   **M. Fox** (*interprétation*)**.-** Je m'appelle Steven Fox, mon deuxième prénom est Bradley
28   mais je ne l'utilise jamais et mon nom de famille est Fox.

29   Le 1ᵉʳ mai 1969, c'est ma date de naissance, dans l'État de New York, et c'est là que je
30   vis.

31   **M. le Président**.- Et quelle est votre profession actuelle ?

32   **M. Fox** (*interprétation*)**.-** Je suis consultant spécialisé dans la veille de marché et la
33   lutte contre la corruption. Je suis PDG d'une entreprise qui s'appelle Veracity
34   Worldwide Limited Liability Corporation.

35   **M. le Président**.- Monsieur, ce Tribunal attend de vous que vous disiez la vérité, toute
36   la vérité, rien que la vérité. Est-ce que vous vous y engagez ?

37   **M. Fox** (*interprétation*)**.-** Je comprends mon obligation qui est de ne dire que la vérité.

1    **M. le Président**.- Je vous remercie.

2    Je vais maintenant donner la parole à Me Jaeger qui a quinze minutes pour vous
3    présenter le document. Ensuite, nous passerons au *cross examination*.

4    Maître Jaeger, vous avez la parole.

5    ➢   **Direct examination par la Défenderesse**

6    **Me Jaeger**.- Merci Monsieur le Président. Avec votre permission, les questions seront
7    posées par Mme Bizard.

8    **Me Bizard**.- Bonjour Monsieur le Président, Messieurs les Arbitres.

9    Monsieur Fox, pourriez-vous nous expliquer quelle est votre expérience en matière
10    d'enquête sur des dossiers de corruption ?

11    **M. Fox** *(interprétation)*.- Concernant mon expérience dans le domaine de la lutte anti-
12    corruption, depuis août 2005, c'est-à-dire au cours de ces sept dernières années,
13    j'évolue dans le domaine de la veille, notamment des enquêtes contre la corruption. Je
14    suis PDG et fondateur de Veracity depuis le 1er avril 2007.

15    J'ai mené quelque 150 missions différentes pour mes clients. Nombre de tâches ont eu
16    trait à la corruption. J'ai donc une large expérience dans ce domaine. Il s'agit de
17    comprendre l'Afrique, de s'y intéresser, et plus spécifiquement la Guinée où de
18    nombreux projets ont été entrepris depuis 2005. Entre 2011 et 2013, il y a eu des
19    projets importants dans le domaine de l'industrie extractive dont vous êtes
20    probablement au courant.

21    **Me Bizard**.- Pourriez-vous nous expliquer dans quelles circonstances vous êtes
22    intervenu sur le dossier Getma ?

23    **M. Fox** *(interprétation)*.- J'ai participé à l'enquête Getma par le cabinet Orrick. Comme
24    je l'ai dit, j'avais déjà travaillé dans l'enquête Simandu. Ce dossier était géré, au départ,
25    par le cabinet DLA Piper. Au cours de l'été 2013, le cabinet Orrick s'est trouvé à la tête
26    d'une partie du dossier relatif à Simandu.

27    J'ai rencontré Pascal Alibor (?), que vous connaissez peut-être, et Pascal a soulevé la
28    possibilité suivante, il a demandé s'il était possible de décupler et de construire, sur la
29    base des connaissances accumulées en matière de lutte contre la corruption, plus
30    spécifiquement en Guinée, si oui ou non, ces connaissances pouvaient s'appliquer au
31    dossier Getma.

32    **M. le Président**.- Monsieur Fox, je ne vous demande pas de parler plus bas mais
33    moins vite.

34    **M. Fox** *(interprétation)*.- Excusez-moi, je viens de New York. On a l'habitude de parler
35    très rapidement mais je ferai un effort pour ralentir.

36    **M. le Président**.- J'ai vu les films de Woody Allen…

37    Allez-y.

38    **Me Bizard**.- Dans l'affaire Getma, quelles sont les difficultés que vous avez
39    rencontrées pour obtenir des informations ?

40    **M. Fox** *(interprétation)*.- Dans toute enquête en matière de corruption, et plus
41    spécifiquement dans l'enquête Getma, l'important, c'est la propension des sources à
42    partager leurs connaissances et leurs compréhensions directes, c'est d'être en mesure
43    d'identifier les sources spécifiques ayant une connaissance directe de ce qui s'est
44    passé. Il est également important d'inspirer la confiance pour que ces sources

1  partagent leurs connaissances de façon confidentielle et sûre, donc leurs
2  connaissances des circonstances bien précises. C'est avoir également la capacité
3  d'analyse afin d'évaluer la validité des informations fournies par chaque source.

4  **Me Bizard**.- Quand avez-vous obtenu les informations figurant dans votre attestation ?

5  **M. Fox** *(interprétation).-* Plus spécifiquement, nous avons été engagés, le 4 octobre
6  2013, et nous avons collecté les informations au cours des semaines suivantes. Toutes
7  les données ont été collationnées jusqu'au début novembre 2013.

8  J'aimerais mettre en exergue le fait suivant : l'important était de potentialiser les
9  travaux effectués au cours des deux années précédentes dans le cadre d'autres
10  dossiers anti- corruption, notamment l'affaire Simandu en Guinée. On était donc très
11  au fait de l'environnement dans lequel on évoluait et on connaissait bien les gens qui
12  pouvaient nous mettre en contact avec ceux qui avaient une connaissance directe des
13  agissements en question.

14  **Me Bizard**.- Pourriez-vous nous donner des informations sur vos sources ?

15  **M. le Président**.- Pouvez-vous épeler le nom de l'autre affaire sur laquelle vous avez
16  travaillé ?

17  **M. Fox** *(interprétation).-* L'autre affaire sur laquelle on a travaillé est l'affaire Simandu.
18  Simandu, c'est la plus grosse concession minière métallurgique en Guinée. Le groupe
19  Benny Steinmetz Ressources, BSGR, c'est l'entreprise qui a fait l'objet de cette
20  enquête anti-corruption.

21  **Me Bizard**.- Pourriez-vous nous donner des informations sur vos sources ?

22  **M. Fox** *(interprétation).-* Bien entendu, s'agissant de nos sources, nous nous attachons
23  à comprendre le cadre dans lequel la source sait ce qu'elle sait. Évolue-t-elle dans un
24  cadre qui lui donne une connaissance directe de ces informations ? S'est-elle montrée
25  fiable par le passé ? Y a-t-il des intérêts en jeu ?

26  Nous ne nous fondons pas sur les informations issues d'une seule source, on croise
27  toutes ces informations émanant de différentes sources.

28  **Me Bizard**.- Pourriez-vous nous expliquer le rôle de M. Gamal Challoub ?

29  **M. Fox** *(interprétation).-* Tout à fait. Monsieur Challoub est ce que j'appellerais le
30  financier de l'affaire. Il évolue sur le terrain, et agit au nom de M. Richard
31  Talbot. Il joue le rôle d'agent de liaison. C'est par lui que passent les paiements à
32  destination de représentants étatiques guinéens. C'est ce que l'on appelle les « gros
33  poissons ». Il y a des petits poissons également.

34  Concernant les gros poissons, ici, on se réfère à des personnes membres du
35  gouvernement ; le Premier ministre Souaré, le ministre du Transport ainsi que le
36  ministre des Finances.

37  À un échelon moindre, il y avait une commission de huit membres, et six sur huit ont
38  reçu des paiements en échange de leurs activités.

39  **Me Bizard**.- Monsieur Challoub a-t-il été rémunéré pour son rôle ?

40  **M. Fox** *(interprétation).-* A-t-il été rémunéré pour ses activités ? Monsieur Challoub a
41  reçu une participation dans l'entreprise commune qui a été créée. Que cela se fasse
42  de façon directe ou indirecte, par le biais d'une participation dans cette entreprise, oui,
43  M. Challoub a tiré bénéfice de l'affaire.

44  **Me Bizard**.- Pouvez-vous nous dire qui sont les autres acteurs principaux de la
45  corruption ?

46  **M. Fox** *(interprétation).-* Comme je viens de le dire il y a un instant, au niveau le plus
47  élevé, les individus les plus importants comprennent notamment le Premier ministre

1  Souaré, le ministre du Transport qui a joué le rôle le plus important parmi tous les
2  ministres, sans oublier le ministre des Finances et les membres de la commission qui
3  ont également joué un rôle. Six de ces huit membres ont joué un rôle dans ces
4  agissements, et M. Kara (?) également.

5  **Me Bizard**.- Pouvez-vous nous expliquer pourquoi vos sources ont témoigné de
6  manière anonyme ?

7  **M. Fox** *(interprétation)*.- Absolument.

8  Pourquoi les sources souhaitent s'exprimer de façon anonyme et confidentielle ?

9  Je travaille dans ce domaine depuis un certain temps. Moi, lorsqu'une source
10  s'exprime, c'est souvent par idéologie, par sa conviction de faire ce qui est bien, de
11  partager des informations mais, en échange, les informations fournies doivent être
12  traitées de façon professionnelle, par moi ou par mon entreprise. Rassembler les
13  différentes pièces de façon que la véritable histoire puisse se faire jour, que la vérité
14  puisse éclater au grand jour et que la justice puisse prévaloir.

15  **Me Bizard**.- Pouvez-vous nous dire si toutes vos sources d'information se trouvent en
16  Guinée ou si des sources étaient étrangères ?

17  **M. Fox** *(interprétation)*.- Oui, les sources avec lesquelles on s'est entretenu sont à la
18  fois en Guinée et à l'étranger. Les sources principales ayant une connaissance directe,
19  deux de ces sources sont européennes, donc pas localisées en Guinée, mais
20  connaissent très bien la Guinée et ont longtemps travaillé et vécu en Guinée. De
21  surcroît, nous nous fondons sur vingt sources supplémentaires que l'on pourrait décrire
22  comme étant guinéennes et qui occupent des postes en Guinée.

23  Les deux sources principales ne sont pas guinéennes, elles sont européennes et ont
24  une connaissance directe des agissements en question.

25  **Me Bizard**.- Merci beaucoup.

26  **M. le Président**.- Merci.

27  Maître Fischer, vous avez la parole.

28  ➢  **Me Fischer Cross examination par la Demanderesse**

29  **Me Fischer**.- Vous avez demandé à vous exprimer en anglais, avez-vous des
30  difficultés d'expression en français ?

31  **M. Fox** *(interprétation)*.- Si j'ai bien compris la question, lorsqu'il s'agit d'une
32  terminologie juridique bien précise, je ne serais pas à l'aise si je devais m'exprimer en
33  français. Je ne suis pas avocat, mais diplomate de formation. À l'heure actuelle, je
34  collecte des informations dans des environnements assez difficiles.

35  **Me Fischer**.- Vous avez indiqué dans votre document avoir été mandaté en 2005, en
36  Guinée. Par qui avez-vous été mandaté en 2005 ?

37  **M. Fox** *(interprétation)*.- Nous ne parlons pas de nos clients pour des raisons évidentes
38  de confidentialité. Ce n'était pas le gouvernement de l'époque. Il s'agissait d'une
39  institution internationale qui s'intéressait à la corruption en Guinée à l'époque.

40  **Me Fischer**.- Vous considérez que vous êtes autorisé à ne pas révéler le nom de vos
41  mandataires en 2005, alors que vous avez déclaré que vous diriez toute la vérité ?

42  **M. Fox** *(interprétation)*.- (…)

1   **M. le Président**.- Pourquoi ne pas proposer au témoin de mettre un casque et
2   d'écouter la traduction vers l'anglais ?

3   **Me Fischer.-** Vous considérez que, bien que vous ayez déclaré « dire toute la vérité »
4   devant le Tribunal arbitral, vous pouvez ne pas révéler le nom de vos commanditaires
5   en 2005 ?

6   **M. Fox** *(interprétation)*.- Si vous pensez, Maître Fischer, qu'il est absolument
7   fondamental de connaître le nom de cette institution financière basée à Washington et
8   qui nous a mandatés en 2005, oui, je peux répondre à cette question. Je ne pense pas
9   que cela les gênerait le moins du monde.

10   **Me Fischer.-** Tout ce que vous dites est important.

11   **M. Fox** *(interprétation)*.- Dans ce cas, en 2005, nous avons été diligentés par
12   l'International Finance Corporation, la Compagnie Financière Internationale.

13   **Me Fischer.-** Vous nous avez indiqué que vous avez été…

14   **M. le Président**.- …un instant. La traduction suggère, si vous avez des problèmes
15   pour des questions parfois compliquées en français, que vous écoutiez la traduction à
16   travers le casque.

17   *(Le témoin hoche la tête en signe d'assentiment.)*

18   **Me Fischer**.- Vous nous avez indiqué, pour notre affaire, avoir été mandaté en octobre
19   2013 par le cabinet Orrick. C'est bien cela ?

20   **M. Fox** *(interprétation)*.-  C'est bien ça.

21   **Me Fischer**.- Vous avez donc été mandaté dans le cadre de cette procédure ? Quel
22   est le montant de vos honoraires pour votre intervention dans le cadre de cette
23   procédure ?

24   **M. Fox** *(interprétation)*.- La question est : combien avons-nous été rémunérés pour les
25   travaux effectués ?

26   **Me Fischer.-** C'est cela.

27   **M. Fox** *(interprétation)*.- Le total précis, en excluant les dépenses de voyage,
28   104 400 dollars.

29   **Me Fischer.-** Avez-vous un honoraire lié aux résultats de la procédure ?

30   **M. Fox** *(interprétation)*.- Absolument pas. Nous ne recevons pas d'honoraires en cas
31   de résultats produits. Nous sommes mandatés pour déterminer la vérité. Notre
32   rémunération ne dépend absolument pas du succès remporté ou pas.

33   **Me Fischer**.- Pourquoi pensez-vous avoir été mandaté en octobre 2013 alors que la
34   question de la corruption a été évoquée dans le cadre de la procédure depuis 2011 ?

35   **M. Fox** *(interprétation)*.- Si j'ai bien compris, votre question est double.

36   L'enquête en matière de corruption a démarré en 2011, s'agissant d'un sujet
37   spécifique…

38   **Me Fischer**.- Non, ce n'est pas exactement ce que j'ai voulu dire.

39   **M. Fox** *(interprétation)*.- Pour être sûr de bien comprendre, je vais maintenant écouter
40   la traduction.

41   **M. le Président**.- La question est : vous dites avoir été mandaté en 2013, pourquoi
42   octobre 2013 alors que, dans cet arbitrage, la question de corruption est soulevée
43   depuis 2011 ?

44   C'est bien cela, Maître Fischer ?

9

1   **Me Fischer.-** C'est exactement cela Monsieur le Président.

2   **M. Fox** *(interprétation).-* C'est une très bonne question. Gardez à l'esprit, comme je l'ai
3   dit précédemment, que Veracity, l'entreprise dont je suis le CIO, a été engagée à l'été
4   2011 par DLA Piper qui travaillait à son tour pour la République de Guinée. DLA Piper
5   continue à travailler sur l'affaire Simandu depuis 2011 jusqu'en 2013.

6   Vers avril 2013, Orrick a commencé à reprendre une partie des aspects commerciaux.
7   La question de la corruption liée à Simandu apparaît peut-être comme une diversion
8   mais c'est important dans le contexte. Il y a une ramification vers une affaire
9   commerciale qui continue à ce jour et une affaire pénale. Ces affaires ont été mises
10  entre les mains des autorités judiciaires en Guinée et aux États-Unis. On peut en
11  reparler par la suite si c'est pertinent.

12  Concernant le calendrier qui intéresse certainement le Tribunal arbitral, quant à savoir
13  pourquoi nous avons été engagés seulement en octobre 2013, la première réunion de
14  fond entre moi-même et l'équipe d'Orrick concernant l'affaire Simandu a eu lieu le
15  26 septembre.

16  Huit jours après cela, nous avons été engagés sur cette affaire particulière, lorsqu'il est
17  devenu clair, pour Me Aboyibor (?), que l'on pouvait apporter une information
18  intéressante pour construire sur les questions de corruption qui avaient été obtenues
19  dans l'affaire Simandu et appliquer ces connaissances particulières au contrat Getma.

20  J'espère que cela répond à votre question.

21  **Me Fischer.-** Quels ont été vos postes diplomatiques ?

22  **M. Fox** *(interprétation).-* En tant que diplomate, j'ai servi à l'ambassade des États-Unis
23  à Bujumbura au Burundi, pendant la guerre civile dans ce pays, puis à l'ambassade
24  des États-Unis, ici, à Paris où j'ai travaillé aux affaires consulaires et politiques. J'ai
25  traité certaines affaires dans ces deux contextes.

26  Ensuite, j'ai quitté la diplomatie pour faire un MBA à Fontainebleau, puis je suis
27  retourné au service du gouvernement. J'ai travaillé pour le département d'état à
28  Washington sur la coordination contre le terrorisme dans les affaires israélo-
29  palestiniennes. J'ai ensuite été envoyé à Alger où j'étais en charge de la section
30  politique et économique de l'ambassade des États-Unis à Alger jusqu'en 2005.

31  **Me Fischer**.- Avez-vous travaillé ou travaillez-vous toujours pour un service de
32  renseignement ?

33  **M. Fox** *(interprétation).-* Il y a eu beaucoup d'indications dans la presse selon
34  lesquelles j'aurais pu travailler peut-être dans le passé pour un service de
35  renseignement. La réponse est que j'ai travaillé pour le département d'état des États-
36  Unis.

37  **Me Fischer.-** Pour être plus précis, si vous avez à répondre par « oui » ou par « non »
38  à ma question, répondez-vous « oui » ou « non », et je dis bien « service de
39  renseignement », et non pas pour un état ?

40  **M. Fox** *(interprétation).-* J'ai travaillé pour le département d'état des États-Unis,
41  l'équivalent du Quai d'Orsay.

42  **Me Fischer.-** Quand je dis « un état », c'est un état souverain comme les États-Unis, la
43  France ou d'autres pays. J'aimerais savoir si vous avez-vous travaillé pour un service,
44  ou si vous travaillez toujours pour un service de renseignement d'un pays.

45  **M. Fox** *(interprétation).-* La question est en deux parties. La question est : « est-ce que
46  vous travaillez encore », ce qui impliquerait que j'ai travaillé dans le passé. À l'heure
47  actuelle, la réponse est : je ne travaille pas actuellement pour des services de
48  renseignement aujourd'hui.

10

1   **Me Fischer.**- Et par le passé ?

2   **M. Fox** *(interprétation).-* Dans *Jeune Afrique*, on lit des articles qui parlent de Steven
3   Fox, un *« espion américain »*. Si vous lisez *Jeune Afrique*, on pourrait supposer que
4   c'est le cas.

5   **Me Fischer.**- Vous savez que nous sommes en France, et actuellement soumis au
6   droit français.

7   **M. Fox** *(interprétation).-* Je dirais également que, dans le cadre des lois des États-
8   Unis, si l'on travaille pour des services de renseignement, il est illégal de le révéler
9   dans le droit américain.

10  **M. le Président.**- Maître Fischer, vous intervenez trop tôt, la traduction n'est pas
11  terminée.

12  **M. Fox** *(interprétation).-* Ce que je dis, c'est que ceux qui ont été employés par des
13  services de renseignement aux États-Unis et dans d'autres pays, y compris en France,
14  seraient liés dans le cadre de leur serment vis-à-vis de la DES(?) ou des services de
15  renseignement de chacun de ces pays. Ils doivent maintenir cette discrétion, cette
16  confidentialité, ce secret.

17  **Me Fischer.**- Je vous remercie. À quelle date avez-vous établi le document
18  communiqué sous…

19  **M. le Président.**- …attendez, moi, je ne comprends pas !

20  **M. Fox** *(interprétation).-* Pour être plus précis. La loi dit qu'une tierce partie ne peut pas
21  révéler ce fait à propos d'une personne précise. Je n'ai rien dit d'autre que cela, j'ai
22  répondu à la question de M. Fischer qui pensait qu'il était important… Monsieur
23  Fischer semble essayer d'établir la crédibilité de ce que je dis et que c'est la vérité.

24  Puis-je poursuivre ?

25  **M. le Président.**- Je suis un modeste juriste, il y a trop de finesse dans votre réponse.
26  Aidez-moi à comprendre juste ce que vous avez dit.

27  **M. Fox** *(interprétation).-* Je vais répondre très modestement : j'ai servi en tant que
28  modeste diplomate, et j'ai servi en tant que modeste fonctionnaire de mon pays.

29  **M. le Président.**- Très bien.

30  Maître Fischer ?

31  **Me Fischer.**- Merci Monsieur le Président. À quelle date avez-vous établi le document
32  communiqué sous le n° R-107 ?

33  **M. Fox** *(interprétation).-* Pourrais-je avoir une précision : à quelle date a-t-il été soumis
34  ou rédigé ?

35  **Me Fischer.**- *Drafted.*

36  **M. Fox** *(interprétation).-* Cela a été rédigé au cours de la première semaine de
37  novembre. Cela a été soumis le 14 novembre. Il n'y avait pas de date sur le document
38  lui-même, mais le document a été annexé à un courriel qui a été envoyé à 16 heures
39  26, heure de New York, le 14 novembre de cette année.

40  **Me Fischer.**- Pensez-vous qu'il aurait été opportun de le dater ?

41  **M. Fox** *(interprétation).-* Étant donné que le document était annexé à un courriel, qu'il y
42  a une horodatage avec chaque courriel, on a considéré qu'il serait plus précis d'avoir
43  l'heure précise.

44  **Me Fischer.**- Avez-vous personnellement mené des investigations en Guinée ?

45  **M. Fox** *(interprétation).-* En ce qui concerne la Guinée ou sur le terrain en Guinée ?

**Me Fischer**.- *On the ground.* Physiquement, personnellement, avez-vous été en Guinée et avez-vous rencontré des interlocuteurs ?

**M. Fox** *(interprétation)*.- La réponse est : en ce qui concerne les deux sources européennes primaires qui ont eu une connaissance directe de l'affaire, elles ont été rencontrées ici, à Paris, dans les huitième et seizième arrondissements. En plus de cela, nous avons également le travail effectué pour nous en Guinée par une source qui, à son tour, apparaît avec les diverses sources guinéennes qui ont donné des informations supplémentaires s'ajoutant aux sources primaires.

**Me Fischer.-** J'allais y venir après, alors commençons par là.

**M. le Président**.- Maître Fischer, s'il vous plaît, laissez le temps à la traduction, sinon, on n'a pas de *transcript*. Allez-y.

**Me Fischer**.- Quelles sont ces deux personnes que vous avez rencontrées en France ?

**M. le Président**.- Excusez-moi. Monsieur Fox n'a pas dit que c'est lui qui les a rencontrées.

**M. Fox** *(interprétation)*.- Pour être précis, Monsieur le Président, les deux sources référencées comme étant les sources européennes, j'ai en effet eu des contacts directs avec ces personnes, l'une par téléphone, l'autre en personne.

**Me Fischer**.- Pour ne pas avoir d'ambiguïté, vous avez donc bien eu un contact personnel avec les deux sources principales ?

**M. Fox** *(interprétation)*.- C'est exact.

**Me Fischer**.- Qui sont ces sources principales ?

**M. Fox** *(interprétation)*.- Chacune de ces sources sont des personnes ayant eu une longue expérience de la Guinée et une connaissance directe de l'affaire qui a eu lieu.

**Me Fischer**.- Quel est leur nom ?

**M. Fox** *(interprétation)*.- Comme nous l'avons dit, nous ne sommes pas disposés à partager les noms avec vous. Il n'y a aucune raison de poursuivre sur cette affaire.

**Me Fischer**.- Vous refusez d'indiquer au Tribunal le nom des personnes qui ont porté des accusations, graves par nature, de corruption ?

**M. Fox** *(interprétation)*.- Absolument, sur la base du fait que ces personnes ont partagé de l'information qu'elles avaient sur la base du fait que ces informations seraient traitées comme secrètes. C'est ainsi que nous travaillons.

Si je puis dire, Monsieur le Président, pour anticiper une question qui sera peut-être posée par la suite, on pourrait dire ; est-ce que cette information était simplement du ouï-dire ou des allégations ? L'intention est de pouvoir donner un paysage, une cartographie, une indication de la question fondamentale. Y a-t-il eu corruption ou pas concernant l'attribution de la concession à Getma ?

Sur la base du jugement professionnel et de la réputation de l'entreprise et de moi-même, la réponse est un oui catégorique.

Aux fins du Tribunal, faut-il poursuivre ? Je suis certain que l'on serait ravi d'avoir ces preuves.

**M. le Président**.- Monsieur Fox, s'il vous plaît vous êtes en *cross*, et en *cross*, on répond aux questions. Les questions ouvertes, qui vous donnent la possibilité de développer, c'est du *direct*. On vous en a posées quelques-unes. Si Me Jaeger veut y revenir, je lui redonnerai la parole.

1 Pour les questions posées par la partie opposée, s'il vous plaît, limitez-vous à répondre
2 à la question. Votre réponse est « je ne peux pas révéler ces sources parce qu'elles
3 ont fourni leurs informations sur une base de secret ». C'est tout.

4 **M. Fox.-** C'est exact.

5 **Me Fischer.-** Avez-vous dans votre profession un code de déontologie ?

6 **M. Fox** *(interprétation).-* Dans le sens où l'on aurait un code en tant que membre du
7 barreau de Paris ou une autre profession juridique, la réponse est non.

8 Avons-nous certaines normes d'intégrité et de règles sur lesquelles nous travaillons
9 dans notre firme de grande réputation, la réponse est oui.

10 Le principe est toujours de rapporter la vérité et de faire preuve de la plus haute
11 éthique et d'intégrité à tout moment.

12 **Me Fischer.-** En Guinée, quelles personnes ont été interrogées ?

13 **M. Fox** *(interprétation).-* Une diversité de personnes incluant des personnes qui ont
14 servi comme conseillers du gouvernement ou conseillers dans différents ministères ou
15 à la présidence, des personnes qui étaient des journalistes, des hommes d'affaires,
16 des comptables, et d'autres ayant une connaissance générale de l'environnement des
17 affaires et de la communauté des affaires en Guinée.

18 **Me Fischer.-** Refusez-vous également de donner le nom de ces personnes ?

19 **M. Fox** *(interprétation).-* J'appliquerai la même approche à toutes les sources qui ont
20 fourni des informations.

21 **Me Fischer.-** Vous a-t-on fourni des documents ?

22 **M. Fox** *(interprétation).-* À ce stade, dans l'enquête, toutes nos observations ont été
23 faites sur la base de conversations. Nous n'avons pas encore reçu de documents.
24 Nous nous attendons à recevoir des documents à l'avenir.

25 **Me Fischer.-** Pour que les choses soient bien claires : vous n'avez donc ni vu ni reçu
26 aucun document ?

27 **M. Fox** *(interprétation).-* Monsieur le Président, je souhaiterais répondre à cette
28 question en deux parties.

29 En réponse directe à votre question, à ce jour, il n'y a eu réception d'aucun document.
30 Si vous me le permettez, très brièvement, de par l'expérience de l'affaire
31 Simandu, des documents ont fait surface au cours de l'enquête avec suffisamment de
32 temps pour qu'une enquête en bonne et due forme ait lieu. Je suis confiant à 100 %
33 que la République de Guinée pourra par différents moyens juridiques obtenir des
34 documents qui seront directement pertinents à l'affaire en question.

35 **Me Fischer.-** Avez-vous eu un contact avec M. Gamal Challoub ?

36 **M. Fox** *(interprétation).-* Si la question est « lui ai-je parlé », la réponse est non. Il n'est
37 pas habituel de parler directement à quelqu'un qui a des intérêts dans une affaire, mais
38 on parle à des personnes qui ont connaissance d'une affaire. On peut avoir parlé à des
39 personnes qui ont parlé à M. Challoub.

40 **Me Fischer.-** Dans le document R-107, vous évoquez la société Transco. Quel a été,
41 selon vous, le rôle de la société Transco ?

42 **M. Fox** *(interprétation).-* Il y avait deux compagnies participantes, celle de M. Talbot et
43 celle contrôlée par M. Challoub. Ces deux sociétés se sont rejointes pour participer à
44 l'appel d'offres pour la concession, pour le port.

45 **Me Fischer.-** Vous êtes-vous assuré personnellement du rôle de la société Transco ?

13

1  **M. Fox** *(interprétation)*.- Une précision : lorsqu'on a plus de temps, on doit se
2  concentrer sur les différents éléments à divers moments qui peuvent être vérifiés une
3  fois, doublement ou triplement. En ce qui concerne Transco, il y a peut-être une erreur
4  de la description de Transco comme une compagnie. Si un détail est incorrect, inexact,
5  est-ce que cela sape la confiance que l'on peut avoir de tout le reste du document ?

6  **Me Fischer**.- Dans le cadre de vos investigations, avez-vous été en Suisse ?

7  **M. Fox** *(interprétation)*.- Est-ce que l'on est allé en Suisse ? Non, pas dans le contexte
8  de cette enquête.

9  **Me Fischer**.- Bien évidemment.

10  Vous indiquez dans la pièce R-107 qu'un virement est intervenu à partir de la ville de
11  Zug en Suisse ?

12  **M. Fox** *(interprétation)*.- C'est exact.

13  **Me Fischer**.- Est-ce que cette information n'est donnée que sur la base d'une
14  conversation avec une personne dont vous refusez de donner le nom, ou cette
15  information est-elle donnée sur la base d'un élément matériel ?

16  **M. Fox** *(interprétation)*.- En ce qui concerne cette question, vous avez posé la question
17  de la déontologie ou du code éthique, il serait inapproprié pour une entreprise comme
18  la nôtre d'obtenir des informations bancaires. Il est plausible que la République de
19  Guinée, *via* un LMA, demande de l'information de l'union bancaire en Suisse, à Zug, ou
20  au Crédit Lyonnais à Monte-Carlo. Sur la base d'informations reçues de sources, il
21  semblerait que des fonds aient pu transiter par cette banque précise.

22  **M. le Président**.- Quelle banque précise ?

23  **M. Fox** *(interprétation)*.- LCL, le Crédit Lyonnais à Monaco.

24  **M. le Président**.- Il y a eu un transit de fonds par LCL Monaco. Vous avez dit *« il
25  semblerait »*.

26  **M. Fox** *(interprétation)*.- Sur la base de l'information de la source que nous avons
27  reçue, nous pensons comprendre que des fonds ont pu transiter par le Crédit Lyonnais
28  à Monaco.

29  **Me Fischer**.- Comment pouvez-vous avoir la certitude de ce transfert, affirmer qu'il y a
30  eu un transfert, alors que vous nous dites que l'une des règles est le double contrôle,
31  et que vous n'avez rien vu vous-même ?

32  **M. Fox** *(interprétation)*.- Parce que nous avons parlé avec une source qui est en
33  mesure de comprendre les schémas et opérations financières de Getma International.

34  **Me Fischer**.- Je suis un peu interrogatif. Vous mettez en cause M. Richard Talbot.
35  Avez-vous essayé de prendre contact avec lui et de l'entendre ?

36  **M. Fox** *(interprétation)*.- Je ne sais pas où il est en ce moment, au ciel ou en enfer,
37  mais il ne serait pas possible de lui parler, ni même judicieux dans ce cadre. Dans la
38  mesure où M. Talbot n'est plus parmi nous, il est difficile de lui parler.

39  **Me Fischer**.- Ne croyez-vous pas qu'il est regrettable que cette investigation ait été
40  ordonnée si tardivement ?

41  **M. Fox** *(interprétation)*.- Ce n'est pas à moi de juger de ce qui est regrettable ou pas.
42  Effectivement, il est fortuit que l'enquête soit diligentée avant que l'on puisse
43  comprendre si la corruption s'est produite ou pas.

44  Pour répondre à la question « oui ou non, y a-t-il eu corruption ? », sur la base de nos
45  investigations, je vous réponds ; « oui, il y a eu corruption ».

1 **Me Fischer**.- Je dois en conclure que vous préférez accorder un crédit à la parole de
2 personnes anonymes plutôt que de vous adresser directement aux personnes
3 supposées être en cause ? Est-ce exact ?

4 **M. Fox** *(interprétation)*.- Ce n'est pas correct. Si on se pose la question de savoir la
5 motivation, le mobile, ces personnes ont tout intérêt à mentir et à couvrir le fait qu'elles
6 se sont rendues coupables de corruption. Ce serait la réponse logique à cette
7 question.

8 **Me Fischer**.- Savez-vous si une procédure pénale a été engagée en Guinée ou
9 ailleurs concernant les prétendus faits de corruption ?

10 **M. Fox** *(interprétation)*.- Je sais effectivement qu'une plainte au pénal a été déposée
11 en Guinée à l'encontre des personnes.

12 **Me Fischer**.- Savez-vous contre qui cette procédure aurait été engagée ?

13 **M. Fox** *(interprétation)*.- La procédure correspond parfaitement au document que vous
14 avez en face des yeux, et je suis également conscient que deux des individus identifiés
15 dans notre rapport ont maintenant reconnu avoir reçu des pots-de-vin dans le cadre de
16 l'appel d'offres pour le port de Conakry, et ont signé sous serment. Il s'agit de
17 fonctionnaires guinéens.

18 **Me Fischer**.- Avez-vous eu un contact personnel, physique ou téléphonique avec
19 M. Sory Camara ?

20 **M. Fox** *(interprétation)*.- Non.

21 **Me Fischer**.- Avez-vous eu un contact personnel, physique ou téléphonique avec
22 M. Mamadouba Sankhon ?

23 **M. Fox** *(interprétation)*.- La réponse est non. Si on veut passer la liste en revue, je n'ai
24 contacté aucun des individus ayant participé au processus d'octroi de la concession.

25 **Me Fischer**.- Si vous n'avez pas eu de contact avec eux, comment pouvez-vous
26 affirmer que -et je repends- M. Mamadouba Sankhon, qui était apparemment exclu des
27 négociations, a demandé que le projet de contrat de concession fasse l'objet d'un
28 audit ?

29 **M. Fox** *(interprétation)*.- Histoire d'être clair, vous faites référence aux deux personnes
30 qui n'ont pas reçu de paiement sur les huit personnes, si j'en crois mon rapport ?

31 **Me Fischer**.- Je vais préciser ma question qui n'est peut-être pas claire.

32 **M. le Président**.- Non, votre question est claire. Il faudrait que M. Fox ait sous les yeux
33 la note ou le rapport qu'il a écrit.

34 *(La note est remise au témoin.)*

35 **Me Fischer**.- En premier lieu, je me réfère à M. Mamadouba Sankhon, que vous
36 indiquez être directeur général de Conakry, en bas…

37 **M. Fox** *(interprétation)*.- Oui.

38 **Me Fischer**.- …et qui aurait missionné un audit, le cabinet FFA. Comment avez-vous
39 eu cette information puisque vous n'avez pas été en contact avec M. Mamadouba
40 Sankhon ?

41 **M. Fox** *(interprétation)*.- Monsieur Mamadouba Sankhon n'était pas la seule personne
42 au courant de cet audit. Dans toute conversation, il y a forcément différents
43 interlocuteurs. Il n'était donc pas le seul à être au courant.

44 **Me Fischer**.- Cela ne fait pas partie des règles de votre métier d'aller au plus près de
45 la source d'une information afin de la vérifier ?

1  **M. Fox** *(interprétation).-* Cela dépend de la source, et de savoir s'il est possible de s'en
2  approcher le plus possible. Vous savez, c'est comme Icare : si on s'approche trop du
3  soleil, on risque de se brûler les ailes.

4  **Me Fischer.**- Vous n'avez pas à eu la possibilité d'avoir un accès à M. Mamadouba
5  Sankhon ?

6  **M. Fox** *(interprétation).-* La réponse est non.

7  **Me Fischer**.- Avez-vous eu un contact avec M. Sory Camara ou avec M. Morlaye
8  Camara ?

9  **M. Fox** *(interprétation).-* Ni l'un ni l'autre.

10  **Me Fischer**.- Connaissez-vous leur opinion sur la régularité de la procédure d'appel
11  d'offres ?

12  **M. Fox** *(interprétation).-*  À mon sens, leurs avis sur la question sont bien connus.

13  **Me Fischer.**- Avez-vous lu les mémoires échangées par les parties dans le cadre de
14  cette procédure d'arbitrage ?

15  **M. Fox** *(interprétation).-* Quels mémoires ?

16  **Me Fischer.**- Les mémoires de la Guinée et de Getma. Il y a des pièces de procédure.
17  Est-ce que le cabinet Orrick vous les a remis ?

18  **M. le Président**.-  Il me semble que c'est le mot « mémoire » qui n'est pas compris.
19  *(Monsieur le Président poursuit en anglais.)*

20  **M. le Président** *(interprétation).-* Monsieur Fischer parle des mémoires soumis dans le
21  cadre de cette procédure d'arbitrage.

22  **M. Fox** *(interprétation).-* Je n'ai pas lu les mémoires en question, mais s'agissant du
23  résumé des événements avec date et intégration des différents intervenants,
24  effectivement, il y a eu un mémoire auquel j'ai eu accès.

25  **Me Fischer**.- Vous n'avez pas eu connaissance des mémoires, des *submissions* de
26  Getma, les trois mémoires de Getma ?

27  **M. Fox** *(interprétation).-* Vous me demandez ce que j'ai lu. Nous avons eu un long
28  débat concernant les faits.

29  **Me Fischer**.- Je ne parle pas d'une discussion. Je vous demande précisément si vous
30  avez lu les actes de la procédure ?

31  **M. Fox** *(interprétation).-* Non.

32  J'ai cependant répondu dans le cadre d'un périmètre convenu concernant la question
33  de savoir les faits remontant à 2008, à la demande de Getma, est-ce que, oui ou non,
34  certains individus ont octroyé des pots-de-vin afin d'obtenir le contrat.

35  **Me Fischer.**- Alors que vous avez été désigné exclusivement…

36  **M. le Président**.-…excusez-moi Maître Fischer.

37  Le document qui vous a été remis résumant les faits est un document spécial fait pour
38  vous ou un document de la procédure ?

39  **Me Jeager.**- Monsieur le Président, je peux peut-être répondre, pour gagner du temps.

40  **M. le Président**.- Si vous voulez.

41  **Me Jeager.**- On a fait un document exprès pour M. Fox, il n'a pas vu les mémoires.

42  **Me Fischer.**- Pourrait-on avoir ce document ?

43  **Me Jaeger**.- On peut vous le communiquer, il n'y a certainement pas d'inconvénient.

1  **M. le Président**.- Toute nouvelle communication doit être soumise, de quelque côté
2  qu'elle vienne, à une demande d'autorisation préalable du Tribunal. Si vous souhaitez
3  le faire, vous en ferez la demande, et le Tribunal décidera.

4  **Me Fischer**.- Je complète ma question : pensez-vous professionnel d'intervenir dans le
5  cadre d'un arbitrage de façon tardive, chronologiquement tardive, sans prendre
6  connaissance des pièces de cet arbitrage, et pensez-vous professionnel de faire état
7  d'une situation de deux personnes dont l'une a été entendue comme témoin dans la
8  procédure d'arbitrage, M. Sory Camara, sans prendre connaissance des déclarations
9  de M. Sory Camara ?

10  **M. Fox** *(interprétation)*.- S'agissant de la préparation à la procédure, de mon point de
11  vue, je considère professionnel d'intervenir dans le cadre qui nous occupe aujourd'hui,
12  et je suis ici pour répondre à des questions bien spécifiques : oui ou non, y a-t-il eu
13  corruption ? Y a-t-il un fondement raisonnable pour croire à ces agissements ? Si la
14  réponse est oui, qui était impliqué et quelle manière ?

15  S'agissant de questions professionnelles faisant partie de mon mandat, et pour
16  lesquelles nous avons été rémunérés 104 000 dollars jusqu'ici, je pense que nous
17  avons rempli notre mandat de façon parfaite s'agissant de notre professionnalisme,
18  c'est-à-dire que j'ai répondu aux attentes qui m'étaient posées.

19  **Me Fischer**.- Madame Marie Mansour fait-elle partie des sources indirectes ?

20  **M. Fox** *(interprétation)*.- Madame Mansour fait l'objet de notre enquête. Elle a joué un
21  rôle dans le cadre du ministère du Transport. Elle était conseillère juridique. D'après
22  nos sources, Mme Mansour a des liens étroits avec M. Challoub, rien de romantique, je
23  vous assure, tout à fait platonique, mais elle connaît M. Challoub et l'a représenté.

24  **Me Fischer**.- J'ai deux dernières questions.

25  Connaissez-vous la position actuelle de M. Challoub et son opinion sur la résiliation de
26  la concession du port ?

27  **M. Fox** *(interprétation)*.- Je ne connais pas sa position actuelle aujourd'hui même si on
28  en a beaucoup parlé par le passé. Je sais d'après l'équipe du cabinet Orrick que M.
29  Challoub a refusé de fournir des informations quand la demande lui en a été faite.

30  **Me Fischer**.- Avez-vous été informé des dernières déclarations de M. Mamadouba
31  Sankhon sur l'issue de la présente procédure d'arbitrage ?

32  **M. Fox** *(interprétation)*.- Non, je ne suis pas au courant.

33  **M. le Président**.- Maître Jaeger ?

34  **Me Jaeger**.- Nous ne sommes pas au courant de ces déclarations. Sont-elles dans les
35  débats aujourd'hui ?

36  **Me Fischer**.- C'était une question. Elles n'ont pas été produites. On parle beaucoup de
37  M. Sankhon, je voulais donc juste savoir le niveau de connaissance qu'avait le témoin
38  de M. Sankhon. Il nous a confirmé qu'il n'a eu aucun contact, et qu'il n'est au courant
39  de rien. Cela me suffit.

40  Monsieur le Président, nous en avons terminé, en deçà du temps accordé.

41  **M. le Président**.- Merci Monsieur. Merci Maître Fischer.

42  Monsieur Fox, les personnes rencontrées à Paris ; vous avez parlé à l'une d'elles au
43  téléphone et, l'autre, vous l'avez rencontrée, c'est bien ce que vous avez dit ?

44  Avez-vous participé à la rencontre à Paris où c'était une autre rencontre ?

45  **M. Fox** *(interprétation)*.- J'ai participé aux réunions, tout à fait.

46  Maître Jaeger, un *re-direct* ?

1  **Me Jeager.-** Non, je n'ai pas de question Monsieur le Président.

2  **M. le Président**.- Mes coarbitres ont-ils des questions ?

3  ➢ **Questions du Tribunal arbitral**

4  **Me Teynier**.- Je poserai deux questions.

5  S'il vous plaît, Monsieur Fox, vous avez dit, tout à l'heure, que vous étiez confiant que,
6  dans le cours de votre enquête, des documents apparaîtraient. Avez-vous une idée,
7  d'après votre expérience, du temps dans lequel ces documents apparaîtront,
8  apparaîtraient ?

9  Deuxième sous-question : ces documents qui apparaîtraient apporteraient-ils des
10  preuves que des sommes auraient été versées, les sommes précises que vous
11  indiquez dans votre *affidavit*, soit aux membres du gouvernement, soit aux membres
12  de la commission d'évaluation ?

13  **M. Fox** *(interprétation)***.-** Monsieur le Président, ne croyez pas que je digresse. C'est en
14  lien direct avec votre question. S'agissant d'éléments de preuve supplémentaires qui
15  se feraient jour au cours de l'enquête, si on revient à l'affaire Simandu, le ministre
16  Thiam a fait l'acquisition de propriétés aux États-Unis exactement à la même époque
17  des faits. On a donc pu conclure que ces propriétés ont été acquises grâce aux pots-
18  de-vin. Le ministre des Transports aurait acheté des propriétés à la fois aux États-Unis
19  et au Canada. Ces informations nous sont apparues récemment et nécessitent un
20  suivi.

21  Nous pensons qu'il sera possible d'établir, avec des éléments de preuve à l'appui, que
22  ces propriétés ont été acquises par le ministre à l'époque, ce qui entre en lien direct
23  avec les paiements et les pots-de-vin.

24  Ce que l'on a constaté à l'époque, il est très possible, tout à fait plausible, que la même
25  chose se passe dans le cadre de la présente affaire, même si les personnes
26  impliquées sont différentes.

27  **Me Teynier**.- Vous avez dit précédemment que deux personnes avaient admis avoir
28  reçu des sommes d'argent, des *primes*, dans le cours des procédures guinéennes.
29  Quel est le nom de ces deux personnes ? Ces noms sont-ils publics en Guinée ?

30  **M. Fox** *(interprétation)***.-** Je ne sais pas si les noms sont publics en Guinée. Je sais
31  simplement que ces deux personnes ont signé des déclarations auprès des autorités
32  guinéennes certifiant qu'elles avaient reçu un paiement en échange du rôle joué pour
33  l'octroi de la concession.

34  **Me Teynier**.- Pouvez-vous nous donner leur nom s'il vous plaît ?

35  **M. Fox** *(interprétation)***.-** J'ai leur nom. Si vous me donnez un instant, je peux les
36  vérifier.

37  **M. le Président**.- Excusez-moi…

38  *(Le Tribunal arbitral se retire pour se concerter.)*

39  **M. le Président**.- Monsieur Teynier, reposez votre question, s'il vous plaît.

40  **Me Teynier**.- Vous avez dit, dans le cours de votre déposition, que quelques
41  personnes avaient admis avoir reçu des sommes dans le cadre des procédures
42  guinéennes. Avez-vous connaissance du nom de ces personnes ?

43  **M. Fox** *(interprétation)***.-** Oui.

18

1 **Me Teynier**.- Souhaitez-vous donner le nom de ces personnes au Tribunal arbitral ou
2 êtes-vous en possibilité de le faire ?

3 **M. Fox** *(interprétation)*.**-** Tout à fait. En fait, je pourrais avec plaisir vous lire toute la
4 déposition qu'ils ont faite.

5 **Me Teynier**.- Ce n'est pas la question que j'ai posée. Ce n'est pas le désir que j'ai
6 émis. J'ai juste posé une question stricte et simple, et je ne vous demande pas de lire
7 quelque document que ce soit.

8 **M. Fox** *(interprétation)*.**-** Les deux personnes ayant fait des déclarations jusqu'à
9 présent sont M. Demba Kourouma et la déclaration a été faite le 13 décembre 2013. La
10 deuxième personne est M. Ibrahim Lamizana, nom de famille Condé.

11 **M. le Président**.- Toujours le 13 décembre 2013 ?

12 **M. Fox** *(interprétation)*.**-** C'est exact.

13 Monsieur le Président, je ne sais pas si c'est approprié, mais les deux personnes ont
14 désigné la même personne comme étant la personne leur ayant remis les fonds.

15 **M. le Président**.- Avez-vous d'autres questions ?

16 **Me Teynier**.- Pas de question.

17 **M. le Président**.- Je voudrais savoir comment vous avez eu connaissance de ces
18 documents ?

19 **M. Fox** *(interprétation)*.**-** On m'a envoyé ces deux documents. Ils m'ont été envoyés par
20 l'avocat d'Orrick samedi après-midi. Je les ai lus en personne, il y a trois heures, au
21 bureau d'Orrick.

22 **M. le Président**.- Savez-vous si ces documents ont été produits dans le cadre de la
23 procédure pénale ?

24 **M. Fox** *(interprétation)*.**-** Oui, je pense que cela a été le cas.

25 **M. le Président**.- Merci.

26 Ces échanges soulèvent-ils un souhait ou d'autres questions de la part des parties ?

27 **Me Jaeger**.- Pas de question de notre part.

28 **Me Fischer**.- Pas de question.

29 **M. le Président**.- Très bien.

30 Monsieur Fox, nous vous remercions. Vous êtes libéré.

31 **M. Fox** *(interprétation)*.**-** Merci.

32 Je me permets de vous rappeler simplement, mais c'est à peine utile avec quelqu'un
33 comme vous, que la procédure d'arbitrage est confidentielle. Merci.

34 **M. le Président**.- Cinq minutes d'interruption, après quoi, nous entendrons les avocats.

35 Je vous signale aussi que nous devons traiter de la question de la confidentialité de la
36 pièce R-107. Nous aimerions vous entendre à cet égard. Merci.

37 **Me Jaeger**.- Monsieur le Président, est-ce que le Tribunal voit un inconvénient à ce
38 que M. Steven Fox reste dans la salle ?

39 **M. le Président**.- Il faut poser la question à Getma.

40 **Me Fischer**.- Je ne m'y oppose pas. Comme cela, pour une fois, M. Fox aura un accès
41 direct aux sources !

42 **M. le Président**.- Je ne sais pas si l'autorisation emporte acceptation de la remarque.

1    Vous pouvez rester. Merci.

2    *La séance, suspendue à 15 heures 55, est reprise à 16 heures 05.*

3    **M. le Président**.- Nous reprenons.

4    Maître Jaeger, vous avez la parole.

5

| **Plaidoirie de la Défenderesse** |
| --- |

6    **Me Jaeger**.- Merci Monsieur le Président, Messieurs les Arbitres.

7    À l'issue de cette audience, et de l'audition de M. Fox en particulier, le Tribunal est
8    confronté à plusieurs questions, la principale étant de savoir si cette affaire de
9    corruption n'est qu'un gigantesque bluff ou si, au contraire, ces actes de corruption ont
10    réellement eu lieu.

11    L'autre est de savoir si les propos tenus par M. Fox sont fondées sur des sources
12    sérieuses ou que le fruit de son imagination ou si encore il aurait été manipulé par de
13    faux informateurs.

14    Enfin, l'une des questions que vous aurez à résoudre est de savoir s'il convient de
15    clôturer les débats à ce stade de la procédure ou, au contraire, de laisser se dérouler
16    le débat sur la corruption.

17    Je vais m'efforcer d'apporter des réponses à ces questions.

18    Le premier élément que je souhaiterais traiter est de savoir de quelles preuves nous
19    disposons exactement. C'est le premier point de ma plaidoirie, celui du faisceau
20    d'indices et de preuves qui démontre la probabilité de faits de corruption.

21    Je parle là bien sûr des éléments qui sont dans cette procédure, dans cet arbitrage,
22    aujourd'hui. À ce stade, l'enquête ne fait que commencer. Une plainte pénale a été
23    déposée par les autorités guinéennes suite aux révélations de M. Fox, et une enquête
24    est en cours.

25    Bien que l'on n'en soit qu'au début, nous avons déjà un faisceau d'indices et de
26    preuves dans cet arbitrage démontrant que l'existence de faits de corruption est
27    extrêmement probable à ce stade.

28    Je commencerai par les indices, j'aborderai ensuite les preuves.

29    Le premier indice, c'est le caractère endémique de la corruption en Guinée en 2008.

30    Le contrat de concession a été conclu en 2008, à la fin du règne de l'ancien dictateur,
31    M. Lansana Conté, qui était à l'époque malade. L'entourage de M. Lansana Conté, et
32    son gouvernement, à l'époque, prenaient beaucoup de libertés et s'arrogeaient
33    beaucoup de privilèges. Cet environnement est un facteur d'appréciation important pris
34    en compte par les tribunaux arbitraux.

35    En d'autres termes, quand les tribunaux apprécient la probabilité de faits de corruption,
36    ils se réfèrent à l'environnement. Je citerai à cet égard une sentence CIRDI qui a été
37    rendue dans l'affaire Rumeli c/ Kazakhstan dans laquelle les arbitres disent ceci, le
38    tribunal arbitral dit ceci : *« La nature endémique dans certains pays d'un fait allégué a*
39    *été considérée comme étant une preuve circonstancielle de ces faits. »*

40    Je précise qu'il s'agit d'une traduction en anglais et que *« preuves circonstancielle »*
41    doit être pris au sens anglo-saxon. En français, on dirait « preuve indirecte »

1  La sentence continue en disant : *« Par exemple, dans l'arbitrage CCI n° 39-16,*
2  *l'ampleur de la corruption en Iran a été considérée comme une preuve circonstancielle*
3  *de l'existence de faits de corruption. De manière similaire, les rapports internationaux*
4  *et des articles largement diffusés, qui ont été communiqués, prouvent deux éléments*
5  *pour lesquels des preuves circonstancielles sont particulièrement pertinentes, à savoir*
6  *le manque général d'impartialité des organes du défendeur et la collusion entre deux*
7  *puissants groupes de la famille régnante au Kazakhstan. »*

8  Cet élément -et je répète qu'il s'agit d'un indice et non d'une preuve bien sûr- vous
9  permet d'apprécier la probabilité de faits de corruption à cette époque. Il faut savoir
10 qu'en 2008, la Guinée figure en 173$^e$ place sur 180 dans le classement de
11 *transparency international.*

12 **M. le Président**.- Ils ne sont pas derniers ?

13 **Me Jaeger**.- Non, mais ils figurent quand même parmi les mauvais élèves de la classe
14 en matière de lutte contre la corruption.

15 Je ne dis pas que, parce que la corruption régnait en Guinée à cette époque, vous
16 devez automatiquement en conclure que la convention de concession a été conclue
17 sous l'empire de la corruption. Ce n'est pas mon propos. Je dis simplement que,
18 lorsque vous aurez à examiner s'il convient d'accorder du crédit aux éléments qui vous
19 ont été rapportés par M. Fox, et s'il convient de se pencher sur ce débat, sur la
20 corruption et les preuves nouvelles apportées par la République de Guinée, vous
21 pourrez prendre en compte cette probabilité.

22 Le deuxième indice est celui que nous avons développé à l'audience du 8 juillet 2013.
23 C'est le comportement de Getma au moment de la conclusion de la convention de
24 concession.

25 Je ne vais bien sûr pas reprendre tous ces éléments. Le Tribunal se rappelle que l'une
26 des questions était celle du partenariat qui avait été conclu par Getma avec le groupe
27 MSC, Mediterranean Shipping Company, à l'époque de l'appel d'offres.

28 Le Tribunal se rappelle exactement que, sur la base de ce partenariat, Getma, dans
29 son offre, s'était prévalue de l'expérience de MSC en matière de terminaux à
30 conteneurs alors que Getma n'en avait pas, et aussi du soutien financier de ce
31 puissant partenaire.

32 Ce qui était surprenant, c'est que le contrat de partenariat qui avait été produit dans le
33 cadre de l'appel d'offres avait été conclu pour la durée de l'appel d'offres. Il y était
34 stipulé que le partenariat prendrait fin à la date où la convention de concession serait
35 conclue. C'est surprenant car c'est précisément au moment où le partenariat trouvait
36 son utilité qu'il prenait fin…

37 **M. le Président**.- …s'il vous plaît, cela a été dit en juillet. Ne débordez pas de la
38 question qui nous réunit aujourd'hui. Merci beaucoup.

39 **Me Jaeger**.- Fort bien, Monsieur le Président.

40 Une question inexpliquée à ce sujet est de savoir pourquoi la commission n'a pas
41 remarqué cette anomalie et n'a pas posé de questions à Getma sur la question de
42 savoir si ce partenariat allait se poursuivre ou pas. Cela laisse penser qu'effectivement,
43 certains membres de la commission auraient pu être incités à ne pas poser de
44 question et à ne pas s'interroger sur ces faits pourtant importants dans le cadre de
45 l'attribution du marché.

46 C'est donc un second indice : ce faux partenariat qui demeure inexpliqué sans la
47 corruption devient, au contraire, tout à fait explicable si la corruption est présente.

1   Concernant les preuves actuellement disponibles, vous avez entendu le témoignage
2   de M. Fox. Vous avez lu son attestation. Vous avez pu apprécier le sérieux de ses
3   allégations et de son enquête.

4   Monsieur Fox est un professionnel qui dispose d'une grande expérience en matière de
5   recherche d'informations sur la corruption. Il a procédé de manière méthodique. Il s'est
6   adressé à des sources indépendantes. Il a recoupé des informations qui lui étaient
7   données par ses sources, que ce soit en Europe ou en Guinée. Il ne s'est pas contenté
8   d'interroger les personnes présentes en Guinée mais aussi d'aller chercher ailleurs de
9   manière à obtenir des sources indépendantes. Sur la base de ses investigations et de
10  ses recherches, il a obtenu des informations concordantes, et surtout des informations
11  précises.

12  Au fond, ce qui est nouveau ici, et qu'apporte l'attestation de M. Fox, ce sont les noms
13  précis des personnes ayant participé à cette entreprise de corruption et leur rôle exact
14  ainsi que les montants qu'ils ont perçus.

15  Certes, nos contradicteurs ont fait valoir que ce témoignage est fondé sur du ouï-dire et
16  que le Tribunal n'a pas été mis en présence des véritables auteurs de la corruption ou
17  de ceux qui ont assisté directement à ces faits de corruption. Ils ont d'ailleurs ironisé
18  dans leur lettre du 25 novembre 2013 en disant que c'était une nouvelle version de
19  l'homme qui a vu l'homme qui a vu l'ours.

20  Ce n'est pas cela. En réalité, le témoignage de M. Fox apporte beaucoup. Il apporte
21  des faits vérifiables. Pour la première fois, nous avons des faits vérifiables. Il ne s'agit
22  pas de simples rumeurs de corruption. On ne peut pas vérifier ces dernières. Il s'agit
23  de faits concrets.

24  Il s'agit de savoir si M. Cheick Touré, ministre des Transports, a bien perçu un million
25  de dollars, ou peut-être plus (je ne sais pas), pour obtenir la signature de la convention
26  de concession. Il y a un nom. Il s'agit d'informations que l'on peut vérifier, et la réponse
27  à cette question-là est une réponse par oui ou par non. C'est l'important. On a des
28  informations par lesquelles on peut répondre par oui ou par non, et non pas des
29  informations vagues ne permettant pas réellement des investigations. Le fait de savoir
30  qui sont les individus ayant perçu des sommes permet aux autorités guinéennes de les
31  interroger dans le cadre d'une enquête pénale, de confronter leurs déclarations et
32  d'obtenir des éléments autres ; des sources, des documents, qui permettront
33  d'apporter avec certitude la preuve de ces informations.

34  Ce n'est donc pas simplement un témoignage indirect, ce sont des informations
35  précises et vérifiables.

36  Lorsque nous avons obtenu cette attestation, c'était le 14 octobre, semble-t-il, dernier...

37  **Me Fischer.**- ...le 14 novembre dernier.

38  **Me Jeager.**- Le 14 novembre dernier. Nous nous sommes demandés si nous pouvions
39  produire ces informations devant le Tribunal et si nous pouvions demander
40  l'autorisation au Tribunal de les produire. Nous avons décidé que nous étions en
41  mesure de le faire parce que ces informations avaient paru avoir une crédibilité
42  suffisante en raison notamment de la personnalité, du professionnalisme de leur
43  auteur, mais aussi parce que, si nous ne les fournissions pas au Tribunal, nous nous
44  exposions à ce que le Tribunal tranche cette affaire sans disposer d'éléments
45  importants, d'informations importantes susceptibles d'avoir un impact sur la
46  sentence. C'est dans ces circonstances-là que nous avons estimé devoir fournir ces
47  informations au Tribunal arbitral et demander à M. Fox de témoigner devant le Tribunal
48  arbitral.

1 En matière de preuves, les choses avancent. Comme cela vous a été indiqué par M.
2 Fox, les autorités guinéennes dans le cadre de l'enquête qu'elles mènent
3 actuellement…

4 Des informations supplémentaires ont été obtenues, notamment, des informations
5 émanant cette fois des individus mis en cause. Il s'agit de membres de la commission
6 d'évaluation des offres dont le nom a été donné par M. Steven Fox, qui ont reconnu les
7 faits devant les autorités guinéennes.

8 À notre demande, les autorités guinéennes leur ont fait établir une déclaration écrite
9 signée par eux pour que cette dernière puisse être produite devant votre Tribunal.
10 Nous vous avons informés samedi de l'existence de ces déclarations en vous indiquant
11 que nous demanderions à cette audience au Tribunal de nous autoriser à les produire
12 dans les débats.

13 J'ajoute que nous avons transmis, ce matin, une copie de ces déclarations à nos
14 confrères. Nos confrères sont donc en possession d'une copie de ces déclarations.

15 **M. le Président.-** Excusez-moi, je vous arrête un instant.

16 Ces déclarations, avez-vous dit, ont été établies en vue d'être produites devant le
17 Tribunal. J'ai cru entendre M. Fox dire qu'elles avaient été établies dans le cadre de
18 l'enquête pénale. Les deux informations sont-elles exactes ?

19 **Me Jaeger.-** Non. Je crois que M. Fox n'est pas un juriste. Il n'a pas compris votre
20 question.

21 En fait, ces déclarations ont été obtenues par les autorités guinéennes mais pas dans
22 le cadre de l'instruction en d'autres termes. Ce ne sont pas des déclarations devant un
23 juge d'instruction.

24 **M. le Président.-** Poursuivez.

25 **Me Jaeger.-** La plainte pénale, qui a été déposée par les autorités guinéennes, l'a été
26 le même jour que ces déclarations, c'est-à-dire le 13 décembre 2013, il y a trois jours.
27 Une plainte pénale a été déposée, plainte pénale qui n'est pas une plainte contre x
28 mais une plainte à personne dénommée contre toutes les personnes visées dans
29 l'attestation de M. Steven Fox. Par conséquent, l'instruction de cette affaire ne fait que
30 commencer.

31 Tels sont les éléments d'indices et les preuves dont nous disposons aujourd'hui.

32 Regardons la question de l'impact de ces éléments sur l'arbitrage.

33 Le premier, bien sûr, c'est que ces éléments perturbent le déroulement de cette
34 procédure et le calendrier initialement envisagé par le Tribunal et les parties.

35 Nous sommes tout à fait conscients de la perturbation que constitue une demande au
36 Tribunal de suspendre ses délibérations pour prendre connaissance de preuves
37 nouvelles. Nous n'avons pas traité cette question à la légère.

38 Dès le début de cette procédure, et nous avons été assez francs avec le Tribunal, nous
39 avons soulevé la question de la corruption. Cette question a été mentionnée dans
40 l'acte de mission, dans le procès-verbal du 12 mars 2012. Vous vous souvenez qu'à
41 l'audience du 8 juillet 2013, nous vous avons dit ne pas avoir trouvé les preuves de la
42 corruption. C'est pour cela que nous ne l'avons pas plaidée devant vous.

43 Bien que la question ait été ouverte, bien que nous ayons des présomptions, nous
44 n'étions pas en mesure de l'approuver.

45 Je me souviens d'ailleurs que le seul prononcé du mot de « corruption » avait fait
46 bondir mes contradicteurs. Ils s'étaient offusqués de ce que nous vous fournissions

1  cette information, mais c'est la pure vérité. Nous n'avions pas, à cette époque-là, les
2  preuves.

3  **M. le Président**.- J'étais moi-même intervenu d'ailleurs pour dire « si vous avez des
4  preuves en substance, allons-y, sinon le Tribunal ne sait pas quoi en faire ».

5  Allez-y, poursuivez.

6  **Me Jaeger.-** Nous n'avions pas les preuves, et c'est pourquoi que nous n'avons pas
7  considéré, par exemple, que l'indice résultant du faux partenariat est un élément
8  suffisant pour prouver la corruption. Nous considérions qu'il nous fallait davantage de
9  preuves.

10 Aujourd'hui, la République de Guinée est présentée par Getma comme un plaideur de
11 mauvaise foi qui perturbe le déroulement de l'arbitrage, dont on nous dit que son seul
12 but est de retarder la procédure, voire d'empêcher la procédure d'aboutir.

13 En réalité, nous ne sommes pas un plaideur de mauvaise foi. Si la République n'a pas
14 pu apporter la preuve de la corruption qu'elle a invoquée dans cet arbitrage, c'est que
15 ces preuves étaient bien entendu dissimulées. Il est très difficile d'apporter de telles
16 preuves.

17 La République de Guinée a commencé ses investigations en 2012, et elle s'est heurtée
18 à un mur de silence en Guinée. Sur cette question, elle n'a pas pu obtenir
19 d'informations.

20 Il s'agit d'une conséquence directe du comportement de Getma et de la nature de ses
21 agissements. En réalité, l'argent payé par Getma aux fonctionnaires lui a permis non
22 seulement d'obtenir la concession mais aussi le silence de ceux impliqués dans les
23 actes de corruption.

24 Par conséquent, il ne faut pas inverser les choses, présenter celui qui apporte
25 tardivement des preuves de la vérité comme un plaideur de mauvaise foi. Le plaideur
26 de mauvaise foi est celui qui cache, qui dissimule la vérité au Tribunal, pas celui qui
27 l'apporte tardivement.

28 Si nous n'avons pas apporté ces éléments de preuve avant, c'est uniquement parce
29 que nous n'avions pas pu les avoir. Il n'y a aucune manœuvre. Nous n'avions aucun
30 intérêt à attendre. Si nous avions eu ces preuves en 2012, nous les aurions
31 immédiatement fournies au Tribunal arbitral, cela va de soi. Nous n'avions absolument
32 aucun intérêt à attendre le délibéré pour sortir des éléments de preuve si nous les
33 avions eus avant.

34 Par conséquent, on ne peut pas véritablement reprocher à la République de Guinée
35 d'avoir perturbé le déroulement de la procédure, le véritable perturbateur est Getma
36 qui a dissimulé la fraude qu'elle a initiée.

37 Deuxième impact de ces éléments sur l'arbitrage, c'est la question du risque d'injustice.
38 D'après Getma, l'argument de la corruption n'aurait qu'un but dilatoire. Nous aurions
39 soulevé ces éléments en cours de délibéré uniquement pour retarder le rendu de la
40 sentence.

41 On comprend mal pourquoi la République de Guinée aurait intérêt à retarder la
42 sentence.

43 Nous la retarderions de quelques mois peut-être, c'est-à-dire qu'au lieu d'être rendue
44 en décembre 2013, elle serait rendue en mars 2014. Cela ne présente strictement
45 aucun intérêt pour la République de Guinée, quels que soient d'ailleurs les termes de
46 cette sentence que nous ne connaissons pas.

47 **M. le Président**.- Nous non plus !

24

**Me Jaeger.**- En revanche, Monsieur le Président, la question du délai est cruciale pour Getma, non pas parce qu'elle attend avec impatience cette sentence, mais parce qu'elle souhaite que la clôture des débats soit prononcée le plus rapidement possible et que la question de la corruption ne soit pas abordée devant ce Tribunal.

Si Getma n'avait aucun doute sur son innocence dans la question de la corruption, elle devrait au contraire souhaiter le débat, elle devrait souhaiter que la vérité soit faite devant ce Tribunal et que le débat sur la corruption se déroule pleinement.

Bien au contraire, je comprends de ses derniers courriers qu'elle s'oppose à ce que le Tribunal examine les éléments de preuve qui seront fournis par la République de Guinée.

Dans cette décision, vous voyez que, dans la balance, il y a d'un côté la célérité de l'arbitrage. Le seul intérêt finalement de clôturer les débats aujourd'hui serait de permettre un rendu de la sentence rapide. On parle là de quelques mois. De l'autre côté de la balance, il y a le risque d'injustice que constituerait une clôture prématurée des débats et le risque que la sentence soit rendue par le Tribunal sans qu'il ait une connaissance pleine et entière des faits.

Je dirais que ce risque d'injustice est d'autant plus grave qu'il s'agit bien sûr d'une question d'ordre public international, il s'agit d'une question de corruption, sur laquelle le Tribunal a un devoir particulier d'investigation. Le Tribunal doit se pencher sur les questions d'ordre public avec une attention toute particulière.

Si vous me le permettez, je citerai les propos de M. Bernardo Cremades dans le dossier spécial du Bulletin de la CCI de 2003 sur la corruption et la fraude dans l'arbitrage. Je cite ses propos car ils sont particulièrement intéressants pour la question dont vous avez à débattre aujourd'hui. Ce que M. Bernardo Cremades dit est la chose suivante : *« Peut-être que la plus grande erreur qu'un Tribunal arbitral puisse commettre, en présence de soupçons de corruption, de blanchiment d'argent ou de fraudes graves, est de l'ignorer. Il est bien préférable que le soupçon soit reconnu, et que les preuves soient prises en compte même si la conclusion finale doit être que ces preuves ne sont pas convaincantes. »*

Il ajoute un peu plus loin : *« C'est la seule ligne de conduite qui permette d'assurer le caractère exécutoire de la sentence et l'intégrité de l'arbitrage commercial international en tant qu'institution. »*

Ces propos ne sont pas, contrairement à ce que l'on pourrait croire, des propos systématiquement favorables à la partie qui se dit victime de faits de corruption ou de fraude. Pas du tout, ce n'est pas ce que dit M. Cremades.

Monsieur Cremades nous dit qu'en présence de soupçon de corruption, il faut en quelque sorte –si vous me permettez l'expression- vider l'abcès tout de suite de manière à ce que le Tribunal puisse rendre une décision éclairée.

Si le Tribunal clôture les débats, ne laisse pas le débat s'instaurer sur les faits de corruption, il rendra une sentence qui, d'une manière ou d'une autre, sera critiquable.

Ce que nous vous disons, c'est que, même dans l'hypothèse où vous penseriez que ces faits de corruption ne sont pas probables, ne sont pas plausibles, il serait de l'intérêt de cet arbitrage d'ouvrir le débat, ne serait-ce que pour en avoir le cœur net.

C'est sur ces bases-là que nous demandons au Tribunal de nous autoriser à présenter des éléments supplémentaires. Nous avons annoncé, dans notre lettre du 4 novembre 2013, que nous demanderions à cette audience au Tribunal de permettre à la République de Guinée de modifier ses demandes et d'établir les faits relatifs à la corruption.

1   Il faut rappeler bien sûr que les débats n'ont pas été encore clôturés dans cette
2   procédure. L'article 17 du procès-verbal de la réunion du 12 mars 2012 prévoit
3   qu'après la présentation de l'état des frais, le Tribunal rendra une ordonnance de
4   clôture des débats lorsqu'il estimera l'affaire est en état d'être jugée. À ce stade,
5   l'ordonnance de clôture n'a pas encore été prononcée.

6   Nous sommes donc dans le cadre du règlement de l'arbitrage, de la CCJA, et
7   notamment de son article 18 qui indique « *en cours de procédure, les parties ont toute*
8   *liberté pour évoquer de nouveaux moyens à l'appui des demandes qu'elles ont*
9   *formulées* ».

10  L'article 19 continue en disant : « *Elles peuvent formuler de nouvelles demandes,*
11  *etc.* » Ce n'est pas le sujet. Nous sommes dans le cadre de demandes que nous avons
12  formulées. En effet, la question relative à la régularité de la convention de concession
13  a déjà été posée au Tribunal arbitral dans le cadre du procès-verbal du 12 mars 2012.
14  Il ne s'agit donc pas de nouvelles demandes, et la République de Guinée est donc en
15  droit, dans le cadre de cet arbitrage, de présenter les preuves de ces allégations à
16  l'appui des demandes qu'elle a déjà formulées.

17  La tenue de cette audience et l'audition de M. Fox ont permis de démontrer que les
18  preuves de ces actes sont désormais disponibles. Elles sont à portée de la main. Nous
19  avons indiqué disposer d'attestations des auteurs de ces faits de corruption, que nous
20  sommes disposés à remettre au Tribunal, s'il nous y autorise.

21  Nous avons aussi indiqué, M. Fox l'a indiqué et nous l'indiquons : d'autres preuves se
22  feront jour au cours de l'enquête pénale qui vient de démarrer. Nous avons très peu de
23  doutes sur ce point. Il suffit de voir avec quelle rapidité les premières attestations, les
24  premiers aveux sont arrivés, pour se douter de ce qu'il y en aura d'autres et qu'il y aura
25  d'autres preuves (soit par témoignage soit par document) de ces faits de corruption.

26  C'est dans ce cadre que la République demande au Tribunal l'autorisation de présenter
27  d'autres preuves de ces faits de corruption dans le cadre de la présente procédure.
28  Nous vous demandons d'accorder à la République de Guinée un délai pour présenter
29  l'ensemble des preuves qu'elle aura recueilli accompagné d'une note expliquant en
30  quoi ces éléments sont pertinents pour établir la corruption.

31  À l'issue de ce délai, le Tribunal estimera s'il est utile que le débat soit clos ou si, au
32  contraire, il doit se poursuivre. C'est la demande que nous faisons aujourd'hui devant
33  votre tribunal. Nous souhaiterions un délai de quatre mois pour établir ces faits. Cela
34  nous semble être le délai minimum pour obtenir les preuves supplémentaires et réunir
35  les preuves nécessaires.

36  Voilà en ce qui concerne notre demande.

37  J'aborderai maintenant la question de la confidentialité. Tant que l'affaire n'est pas
38  jugée, notamment tant qu'elle n'aura pas fait l'objet de jugement par les autorités
39  judiciaires en Guinée, nous sommes dans le cadre d'une instruction. Nous sommes
40  dans le cadre de l'instruction pénale qui se déroule en Guinée et nous pensons que,
41  pour la sérénité de cette instruction, pour la sérénité de l'enquête qui va avoir lieu, il est
42  préférable que toutes les informations échangées devant ce Tribunal, que ce soit
43  l'attestation de M. Fox, les autres éléments de preuve, les autres attestations que nous
44  pourrions être amenés à produire, y compris les débats au cours de cette audience,
45  demeurent strictement confidentiels.

46  **M. le Président**.- Confidentialité même à l'égard de l'instruction pénale ?

47  **Me Jaeger**.- Non, ce n'était pas mon idée. À l'égard du juge d'instruction, il n'y a pas
48  de raison d'appliquer une quelconque confidentialité. Si le juge d'instruction
49  s'intéressait à ce qui se dit dans cette procédure, je ne vois pas pourquoi il ne pourrait
50  pas y avoir accès.

1 En revanche, nous demandons que les parties ne diffusent pas ou ne publient pas les
2 informations échangées dans le cadre de cette procédure.

3 **M. le Président**.- C'est pourquoi il faut préciser de quoi on parle.

4 Est-ce que l'instruction est secrète en Guinée ?

5 **Me Jaeger**.- Je vous avoue mon ignorance là-dessus.

6 **M. le Président**.- Je ne vous demande rien, c'était juste une question.

7 Merci, Maître Fischer, vous avez la parole.

8 | **Plaidoirie de la Demanderesse** |
|---|

9 **Me Fischer**.- Merci Monsieur le Président.

10 J'ai l'impression que nous sommes en 2004, quand des services de renseignement
11 nous disaient qu'en Irak, il y avait des armes de destruction massive et qu'on allait voir
12 ce qu'on allait voir ! Et on a vu la crédibilité que l'on pouvait attacher à de tels propos.

13 Aujourd'hui, dans une situation beaucoup moins dramatique, bien heureusement, nous
14 sommes également sur le même schéma de pensée. Alors que le Tribunal arbitral a
15 bien voulu nous informer qu'il envisageait malgré les difficultés auxquelles il était
16 confronté de rendre sa sentence pour la fin de l'année 2013, on nous écrit le 4
17 novembre 2013 : « *La République de Guinée a très récemment obtenu des*
18 *informations et des éléments de preuve sur les circonstance de la conclusion de la*
19 *convention.* » En d'autres termes, le 4 novembre 2013, nous avons des éléments de
20 preuve.

21 Quelles sont ces éléments de preuve ?

22 C'est une attestation du 14 novembre 2013, postérieure à la lettre qui vous saisissait,
23 dans laquelle M. Steven Fox vient relater des faits qui, apparemment, seraient précis
24 mais dont il dit aujourd'hui que ce ne sont que des informations récoltées verbalement.
25 « *Je n'ai jamais eu la moindre preuve, jamais le moindre élément matériel, je n'ai fait*
26 *que rencontrer des personnes.* »

27 Quand on lui demande qui sont ces personnes, il vous répond, comme un journaliste :
28 « *secret des sources* », alors qu'il nous révèle ou nous confirme une information sur
29 son passé, information susceptible de poursuites au pénal. C'est-à-dire qu'une
30 information importante, et on veut bien le comprendre, essentielle sur sa situation, il
31 vous la révèle car il fait bien évidemment confiance à la confidentialité de ce Tribunal et
32 aux participants à la procédure d'arbitrage. Il a d'ailleurs rappelé que les avocats
33 étaient soumis à des règles professionnelles. Il sait que nous sommes soumis à une
34 obligation de secret professionnel. Mais l'information essentielle est de savoir qui a
35 informé M. Steven Fox de ces prétendus faits.

36 Il vient vous dire, vous, Tribunal, vous ne pouvez pas en connaître.

37 Dans le même temps, la République de Guinée vient vous dire : « Il faut un délai pour
38 apporter les preuves. »

39 On refuse aujourd'hui de vous donner la première preuve essentielle, et que vient-on
40 vous dire sur la base de ces « on-dit », de ces rumeurs que rien ne vient accréditer ?
41 Qu'il va y avoir ou qu'il y a une instruction pénale. C'est totalement inexact.

42 Il y a, pour l'instant, et on le sait depuis ce matin, c'est d'ailleurs assez risible, une
43 plainte pénale contre certaines personnes, et non pas toutes, visées dans le document

1 de M. Steven Fox. On vient vous dire que l'instruction qui n'est pas encore ouverte va
2 permettre de faire sortir tout un tas d'éléments de preuve.

3 On vient également vous dire qu'il y a une autre affaire Simandu et que les choses se
4 sont passées de telle façon dans l'affaire Simandu ; donc nécessairement, dans
5 l'affaire Getma, il y aura exactement la même chose alors que, et ce n'est contesté par
6 personne, nous ignorons tous cette affaire Simandu. Elle n'a aucun lien ni direct ni
7 indirect avec notre procédure, nos affaires, ni en fait ni en droit et on ne voit pas
8 pourquoi, dans une affaire qui traîne déjà depuis 2011, où il n'y a toujours pas de
9 preuve, il y aurait par la suite des preuves et que, dans notre affaire, il y en aurait.

10 N'oublions pas que cette affaire de corruption est sur la place publique en quelque
11 sorte depuis 2008.

12 Depuis 2008, et cela figure dans la procédure, il y a des accusations de corruption.
13 Souvenez-vous que les sociétés Getma International et Necotrans ont été amenées à
14 déposer une plainte en diffamation contre une libelle. On s'est aperçu que l'auteur de
15 cette libelle était un prétendu diplomate résidant en Italie.

16 Cette allégation existe depuis cinq ans. Cette allégation existe depuis l'arrivée au
17 pouvoir de M. Alpha Condé, et M. le professeur Alpha Condé n'a pas fondé la
18 résiliation dont nous avons très longuement discuté, sur laquelle bien entendu je ne
19 vais pas revenir, sur des faits de corruption.

20 Bien plus, au cours de la procédure, nous avons demandé dans le cadre d'une
21 demande de production de documents, le 30 novembre 2012, que la Guinée
22 communique la position actuelle de l'ensemble des personnes ayant fait l'objet de la
23 commission de dépouillement des offres. C'était attirer l'attention de la Guinée, du
24 Tribunal, sur un soupçon qui pouvait porter sur des personnes dénommées. On nous a
25 répondu que cela n'avait rien à voir avec notre procédure.

26 Par ordonnance, vous avez considéré qu'effectivement, il n'était pas pertinent de
27 communiquer ces informations.

28 Pensez-vous qu'en 2012, la Guinée aurait investigué, aurait demandé à son Parquet
29 de bien vouloir faire une enquête ? Rien du tout !

30 Ce n'est pas que lorsque le prononcé de la sentence se profilait, en octobre 2013 (s'il
31 faut en croire M. Steven Fox), un peu à l'occasion d'une discussion entre avocats,
32 entre cabinets d'avocats, concernant une autre affaire : *« Tiens, dans une autre affaire,*
33 *j'ai trouvé des éléments. Pourquoi ne pas me missionner dans cette affaire ? »*

34 Nous sommes en octobre 2013, alors que les prétendus faits auraient été commis en
35 2008, et que l'on en parle dans l'arbitrage depuis 2011, 2012, et qu'en 2012, on refuse
36 d'aller vers ce terrain. Que se passe-t-il ? Rien !

37 Nous attendions des éléments de preuve, on vous les refuse. On vous dit qu'il y a un
38 premier élément, un contexte de corruption. En 2008, la Guinée était, mais je ne sais
39 plus quel était son niveau, je regrette de ne pas l'avoir…

40 **M. le Président.**- 173 sur 180.

41 **Me Fischer.**- Les choses s'améliorent en Guinée : elle est, en 2013, 150ème sur 177.
42 Cela veut peut-être dire qu'il y a moins de pays dans le monde. La France est autour
43 des 23 ou 25ème, selon les années. Cela ne permet peut-être pas à un pays comme la
44 France de donner des leçons de morale.

45 Qu'avons-nous comme preuve ?

46 Aujourd'hui, vous n'avez rien du tout.

47 En réalité, la technique est simple, et on l'a plaidé : l'ordre public international, et le
48 respect de l'ordre public international, est essentiel. « Si vous passez outre, nous

1 ferons une action en nullité devant la CCJA dont on connaît le respect pour les règles
2 d'ordre public, et donc purgez cette question. »

3 Nous n'avons, quant à nous, aucune difficulté pour examiner les éléments de preuve,
4 et nous aurions aimé examiner les témoignages de ces deux « gorges profondes ».

5 Pourquoi n'étaient-ils pas là aujourd'hui ?

6 C'est avec grand plaisir que nous avons écouté M. Steven Fox, mais il y avait deux
7 personnes à écouter.

8 Comment votre Tribunal pourra-t-il aller plus avant alors que l'on refuse de donner le
9 nom de ces informateurs ?

10 Bien plus, et la Guinée est fidèle à sa pratique depuis le début de la procédure
11 arbitrale. On vous dit : « Vous allez voir ce que vous allez voir. Nous n'avons pas de
12 preuve mais, grâce à l'ouverture d'une instruction qui n'existe pas, grâce au dépôt de
13 la plainte, il va y avoir des preuves très rapidement. »

14 D'ailleurs, nous avons dans la poche, deux attestations de deux personnes, M. Demba
15 Kourouma et M. Condé qui ont reconnu avoir perçu des sommes.

16 On vient vous dire : « La preuve, ces gens s'accusent de de corruption. »
17 Nécessairement, des gens qui viennent la corde au cou reconnaître qu'ils ont été
18 corrompus, c'est sérieux car ils risquent des peines extrêmement graves. La
19 manœuvre est habile. On sait qu'ils ne risquent rien. Le code de procédure pénale
20 guinéen comporte, comme notre droit français, une disposition sur la prescription des
21 délits. C'est l'article 4. Les délits se prescrivent par trois ans, comme en France, les
22 contraventions par un an et les crimes par dix ans.

23 Aujourd'hui, cette procédure pénale ne peut, à l'égard des prétendus auteurs,
24 corrupteurs passifs ou corrupteurs actifs, déboucher sur rien. Ils sont protégés alors
25 que, si la Guinée avait eu la volonté d'avancer sur cette question, en 2011, elle aurait
26 pu le faire et demander à son Parquet d'investiguer.

27 La pièce qui n'est pas encore dans le débat, mais qui nous a été envoyée ce matin,
28 c'est-à-dire la plainte du 13 décembre qui vise ces prétendus faits, est déposée (c'est
29 là encore une merveille de la loi guinéenne) par l'agent judiciaire de l'état. Dans un
30 pays avec une -j'essaie de peser mes mots- législation conforme à certains standards
31 qui représente l'état, lorsque l'ordre public est violé ? C'est le Parquet. C'est le
32 procureur de la république.

33 Il est vrai que l'agent judiciaire de l'état a un pouvoir assez étonnant, c'est le décret du
34 5 mai 1997 qui l'institut : *« Sur requête de l'agent judiciaire de l'état, le ministre de la
35 Justice, garde des Sceaux, peut ordonner la révision d'une décision ou d'un arrêt de la
36 cour dans l'intérêt de la loi ou pour la sauvegarde des biens matériels ou immatériels
37 de l'état. »*

38 C'est-à-dire que l'entité, l'autorité publique qui, aujourd'hui, aurait saisi (on n'a pas
39 vraiment la justification) un juge d'instruction ou aurait fait les préliminaires pour mettre
40 en marche l'action publique, c'est une autorité qui peut demander au garde des sceaux
41 de réviser une décision qui porterait atteinte aux biens matériels ou immatériels de
42 l'état.

43 Je crois que les débats ou les échanges plus exactement que nous avons depuis le
44 4 novembre sont une nouvelle tentative vraiment désespérée de la Guinée d'essayer
45 de retarder le prononcé de votre sentence.

46 La société Getma est parfaitement d'accord avec l'opinion de M. Bernardo Cremades :
47 les questions gravissimes de corruption doivent être examinées et purgées, et encore
48 une fois, la société Getma n'a aucune difficulté avec cela.

1 Encore faut-il que l'on mette le Tribunal en mesure de purger cette question, et qu'on
2 ne lui dise pas, alors qu'on le sait, puisqu'il a déclaré qu'il devrait rendre sa sentence,
3 qu'on ne lui dise pas : « Donnez-moi quatre mois pour produire mes preuves. »

4 Quelles preuves ? Des preuves que l'on va continuer à fabriquer ?

5 Si, aujourd'hui, on vous disait « j'ai deux témoins, j'ai des pièces et des documents, je
6 veux pouvoir les communiquer, les verser au débat, donnez-moi quatre mois (c'est un
7 peu excessif), donnez-moi quelques semaines pour que nous puissions les
8 examiner. », il n'y aurait pas la moindre difficulté.

9 Ce que l'on vous demande aujourd'hui est différent. C'est un délai non pas pour
10 produire des preuves et discuter de ces preuves, mais un délai pour aller fabriquer des
11 preuves !

12 Soyons sérieux : une instruction en République de Guinée, à la requête de l'agent
13 judiciaire de l'état, sera-t-elle prise au sérieux par votre Tribunal alors que, s'il y a un
14 minimum de respect des règles de droit, que doit faire le juge d'instruction ? Je pense
15 que les règles procédurales guinéennes sont à peu près les mêmes que les règles
16 françaises. Il doit dire : « refus d'informer, prescription, c'est trop tard ».

17 J'en aurais terminé en faisant référence à la question posée précédemment, à
18 M. Steven Fox dont la réponse m'a à vrai dire sidéré : « avez-vous un contact avec
19 M. Mamadouba Sankhon ?

20 Non, et nous en avons beaucoup parlé, nous savons que, depuis l'origine il est le fer
21 de lance de la contestation de la convention de concession. Contrairement à M. Steven
22 Fox qui n'a pas dû « double checker » ou « triple checker », contrairement à ce qu'il
23 indique : il n'était pas le directeur du port au moment de l'attribution de la convention
24 de concession. Il ne l'est devenu que par la suite. C'est juste une petite difficulté de
25 méthodologie.

26 Monsieur Mamadouba Sankhon qui a un accès facile, sans problème, qui vient
27 facilement en France, n'a même pas été entendu. Il aurait été intéressant de
28 l'entendre, et bien sûr, il conviendra de l'entendre, puisque, selon ses dernières
29 déclarations, il est informé (contrairement à vous-mêmes) de la décision que vous allez
30 rendre. Il a déclaré à la presse que la Guinée allait être condamnée, je vous l'annonce
31 car vous n'êtes peut-être pas des lecteurs assidus de la presse guinéenne, à payer à
32 la société Getma 47 millions d'euros. C'est quelqu'un qui aurait dû être nécessairement
33 entendu, mais par M. Steven Fox.

34 Il en a été, comme de M. Mamadouba Sankhon, comme des autres interlocuteurs,
35 comme de M. Soré Camara que votre Tribunal a très longuement entendu, on s'est
36 contenté d'un coup de téléphone.

37 Pour en terminer, Monsieur le Président, Messieurs les membres du Tribunal,
38 examiner des preuves : aucune difficulté ; entendre des témoins : aucune difficulté,
39 encore faut-il des preuves, des témoins.

40 En l'espèce, vous avez un journaliste qui protège ses sources et vous n'avez pas de
41 témoin direct ou même indirect de fait aujourd'hui face à une telle situation.

42 Ce que votre Tribunal peut considérer, que l'on vous a apporté la preuve, ne serait-ce
43 qu'un indice, qu'il y a de la corruption dans le monde (nous le savons tous) et que la
44 France n'est pas exempte de ce fléau. Pouvez-vous considérer là qu'il y a un élément
45 de preuve à examiner ? Pour ma part, je ne le crois pas.

46 Bien évidemment, la société Getma s'en rapporte avec une grande sérénité à la
47 décision que vous prendrez, si ce n'est qu'elle redoute que, si une décision est prise,
48 elle ne soit pas respectée.

1    Reportons-nous à vos ordonnances de procédure et à l'ordonnance de procédure n° 9
2    qui jusqu'à plus ample information est un acte important dans le cadre d'une
3    procédure. *« L'audience se tiendra le 16 décembre. Elle sera uniquement consacrée à
4    la pièce R-107. »*

5    Par une manœuvre de dernière instance, la Guinée a élargi l'objet de l'audience
6    aujourd'hui. Si demain, vous prenez une ordonnance de procédure en disant :
7    « Communiquez, le Tribunal veut examiner telle preuve, et le matin même de la
8    prochaine audience, il y aura d'autres éléments », et ainsi de suite, cela est contraire à
9    toutes les règles.

10   Dernier point : la question de la confidentialité, j'imagine qu'une instruction en Guinée
11   est confidentielle mais personne de la société Getma, du groupe Necotrans, n'est visé
12   par la plainte qui a été déposée.

13   Une procédure dans laquelle nous ne sommes pas, et nous n'avons d'ailleurs pas
14   l'intention d'y être. Nous y sommes complètement étrangers.

15   Nous avons concernant l'arbitrage des règles. Il est bien évident que les qualités que
16   M. Steven Fox a fini à reconnaître sur son activité passée n'intéresse personne d'autre
17   que l'arbitrage, et n'étant ni lecteur ni informateur de feuilles de choux, il n'y a pas de
18   difficulté là-dessus.

19   Il ne faudrait pas que l'on puisse faire état dans la procédure en Guinée d'éléments
20   alors que, nous, nous ne puissions pas nous défendre. Tel est le problème !

21   On nous a dit : « Il y a des comptes à Zug, des comptes à Monaco et au Crédit
22   Lyonnais. » Je puis vous assurer et vous l'affirmer, car nous avons le temps d'un appel
23   téléphonique aux dirigeants du groupe Necotrans sur ce qu'il en était : aucune société
24   du groupe Necotrans n'a de compte à Zug, aucune société du groupe Necotrans n'a de
25   compte Crédit Lyonnais ou LCL (je ne sais pas comment on dit) à Monaco.

26   Il ne faudrait pas que par cette règle de confidentialité à laquelle nous avons bien
27   volontiers souscrit, on ne puisse pas se défendre et être poursuivis ou diffamés -
28   comme cela a déjà été le cas- en Guinée. C'est la seule limite de la question de la
29   confidentialité mais, si c'est sur les qualités de M. Steven Fox, éminentes qualités,
30   ancien élève d'une grande école française, il n'y a aucune difficulté à cet égard.

31   Je crois avoir tout dit, et je ne voudrais pas re-plaider ce que nous avons longtemps
32   plaidé devant vous.

33   **M. le Président**.- Notre décision, qu'elle qu'en soit la nature, le dira : le Tribunal estime
34   que la confidentialité ne peut pas porter atteinte aux droits de la défense qui sont d'un
35   niveau supérieurs comme règle. Si c'est votre problème, nous constaterons ce que les
36   parties ont dit là-dessus.

37   Maître Jaeger, vous voulez faire une réplique, cinq minutes, pas plus.

38   | **Réplique de la Défenderesse** |
     | --- |

39   **Me Jaeger**.- Merci Monsieur le Président.

40   Quelques points, quelques observations simplement : tout d'abord, je n'ai pas brandi la
41   menace du recours en annulation devant le Tribunal. Je n'ai pas brandi devant vous la
42   menace d'un recours en annulation contre votre sentence, je ne le fais jamais.

43   **Me Fischer**.- Vous êtes plus fin que cela !

44   **Me Jaeger**.- Sur la prescription, il est possible, et je ne connais pas le droit pénal
45   guinéen, qu'il y ait une prescription de trois ans, encore faudrait-il que cette

31

| 1 | prescription commence à démarrer au jour de la commission de l'infraction et non au |
| 2 | jour de sa découverte. Il s'agit d'une infraction occulte dont je ne sais pas si la |
| 3 | prescription a commencé à courir dans cette affaire, et quand. Je crois que ce point |
| 4 | n'est pas aussi simple qu'il n'y paraît. |

1 prescription commence à démarrer au jour de la commission de l'infraction et non au
2 jour de sa découverte. Il s'agit d'une infraction occulte dont je ne sais pas si la
3 prescription a commencé à courir dans cette affaire, et quand. Je crois que ce point
4 n'est pas aussi simple qu'il n'y paraît.

5 **M. le Président**.- Vous croyez que les Guinéens sont capables de faire d'un délit
6 financier un crime contre l'humanité qui ne commence à se prescrire que lorsqu'on le
7 poursuit ? Je pense à l'ABS bien sûr et à la jurisprudence de la cour de cassation.

8 En tout cas, nous prenons note de ce que vous avez dit.

9 **Me Jaeger**.- C'est un point purement technique.

10 Concernant les commentaires faits par mon confrère sur la plainte, nous lui avons
11 effectivement communiqué la plainte ce matin. Elle n'est pas dans les débats, je
12 m'abstiendrai donc de la commenter. Mon confrère a indiqué, et c'est désormais dans
13 les débats, que Getma ne figure pas dans la plainte. Getma est une personne morale,
14 le code pénal guinéen n'autorise pas de poursuivre des personnes morales. Voilà
15 l'explication pourquoi Getma n'y figure pas.

16 **M. le Président**.- Il a dit aussi *« aucune personne de Getma »*. Ai-je bien entendu ?

17 **Me Jaeger**.- C'est exact. La plainte prévoit, si je me souviens bien, une liste de noms
18 contre lesquels la plainte est faite à personnes dénommées, et la plainte ajoute *« ainsi*
19 *que toute personne évidemment qui pourrait être impliquée dans les faits »*. S'il s'avère
20 que des individus chez Getma autres que M. Richard Talbot, qui est décédé
21 malheureusement, donc ne peut plus être poursuivi, étaient impliqués, et qu'il s'avère
22 que c'est le cas, ce sera l'objet de poursuites pénales en Guinée.

23 Je note que mon confrère était favorable à l'audition des deux personnes ayant
24 reconnu les faits. Il s'étonne que ces deux personnes n'aient pas été convoquées à
25 l'audience. Nous avions estimé que cela suffisait comme cela concernant la
26 perturbation de cette procédure.

27 Votre ordonnance était claire : aucune nouvelle pièce, aucun élément de preuve ne
28 pouvait très produit avant l'audience. Nous n'avons pas jugé opportun de faire venir à
29 la dernière minute deux témoins surprises, je ne suis pas sûr que les témoins auraient
30 trouvé ce procédé bienvenu.

31 En revanche, nous n'excluons pas que ces personnes soient effectivement entendues
32 dans le cadre d'une audience par la suite. C'est tout à fait possible. Je ne sais pas si
33 elles seraient disposées à le faire mais nous pourrions vérifier, et nous pourrions
34 éventuellement demander à ces personnes de se présenter devant vous.

35 Je note que mon confrère ne s'oppose pas formellement à ce que le débat initié
36 aujourd'hui se prolonge sur la question de la corruption. Il s'en remet à votre décision.
37 J'en déduis que Getma International n'est pas opposée à une poursuite du débat pour
38 le délai que nous avons demandé qui est un délai de quatre mois, et j'en prends note.

39 Enfin, concernant la confidentialité, les deux parties sont d'accord pour que les pièces,
40 notamment l'attestation de M. Fox, soient gardées confidentielles par les deux parties
41 dans cette affaire.

42 **M. le Président**.- Durant l'arbitrage, et pas si les droits de la défense sont en cause.
43 C'est bien ce que j'ai compris de Me Fischer. Maître Fischer dit « pour que l'on puisse
44 se défendre  et sans que l'on puisse nous opposer la confidentialité ».

45 Êtes-vous d'accord là-dessus ?

46 **Me Jaeger**.- Oui, pour autant, dans ce cas, il faudrait demander au Tribunal
47 l'autorisation de lever la confidentialité.

48 **M. le Président**.- Au Tribunal arbitral.


1  **Me Jeager.-** Au vôtre. Si une partie estimait qu'il convient de dévoiler ces faits, elle
2  pourrait vous autoriser à le faire.

3  **Me Fischer.-** Ce n'est pas tout à fait cela.

4  **M. le Président.-** On va voir cela, et on va faire préciser à Me Fischer.

5  **Me Jaeger.-** Concernant les propos de cette personne dont je n'arrive même pas à
6  prononcer le nom qui aurait dévoilé dans la presse le résultat de cet arbitrage, je
7  l'apprends aujourd'hui. Ce n'est pas dans les débats, je ne vais pas commentée ce fait.
8  Je m'en étonne bien sûr, autant que mon confrère. Peut-être que le Tribunal est surpris
9  du résultat de sa décision.

10  **M. le Président.-** Le Tribunal peut vous dire qu'il est le premier surpris.

11  **Me Jaeger.-** Je n'ai pas d'autres observations, Monsieur le Président.

12  | **Duplique de la Demanderesse** |
   | --- |

13  **Me Fischer.-** J'ai l'impression que dans mes propos, il y a eu une ambiguïté sur les
14  deux personnes. Je ne parlais pas des deux personnes ayant établi une attestation ou
15  un document qui pourrait constituer une attestation. Je parlais bien évidemment des
16  deux sources de M. Fox. Les deux personnes qui s'accusent ou s'accuseraient d'avoir
17  perçu des fonds m'intéressent peu. Des gens qui disent « Je suis un corrompu et,
18  maintenant, je m'accuse de corruption », le crédit à accorder à une telle parole est
19  assez limité.

20  Les deux personnes dont je parlais sont les deux sources de M. Steven Fox qui
21  pourraient constituer des éléments de preuve, si tant est qu'elles-mêmes aient des faits
22  précis. Si on veut examiner les allégations de corruption, il faut commencer par le
23  commencement, suivre la même méthode que M. Fox : auditionner les deux
24  personnes.

25  Deuxièmement, sur la question de la confidentialité, dans la plainte déposée,
26  contrairement à ce qui a été dit tout à l'heure, il n'y a qu'une seule pièce : l'attestation
27  de M. Steven Fox. La pièce R-107 n'est donc pas réservée à notre procédure
28  d'arbitrage. Elle est sortie du fait de la Guinée, du fait de l'agent judiciaire de l'état qui
29  représente la Guinée dans cette procédure, de l'arbitrage. Le représentant d'une partie
30  à la procédure a pris une pièce de la procédure pour en faire un autre usage.
31  Aujourd'hui, on ne peut pas nous dire : « je vous interdis de faire un usage de cette
32  pièce » alors que c'est ce qu'a déjà fait la Guinée. Sur cette pièce, et exclusivement sur
33  cette dernière, il y aura peut-être une procédure judiciaire en Guinée.

34  **Me Jaeger.-** Je n'ai pas d'autres observations.

35  Sur la confidentialité, je crois que nous n'avons pas vraiment de désaccord. Nous
36  souhaiterions éviter une divulgation au public de ces informations-là. Qu'elles soient
37  présentées à des autorités judiciaires, cela va de soi. Si c'est nécessaire dans le cadre
38  d'une procédure, nous n'avons pas véritablement de difficultés. Je ne sais pas
39  pourquoi cela provoque l'hilarité de mon confrère…

40  **Me Júdice.-** Vous donnez des leçons, et vous me faites rire, cher ami. Cela arrive !

41  **M. le Président.-** De toute manière, le Tribunal ne se prononcera que sur la
42  confidentialité de la pièce dans le cadre de cet arbitrage.

43  La question des droits de la défense par une autre juridiction sont à assurer par cette
44  autre juridiction et non pas par ce Tribunal. C'est tout à fait normal d'ailleurs.

1  Enfin, il y aura un mot sur la confidentialité. Pour le moment, elle n'est pas levée sous
2  réserve des droits de la défense.

3  **Me Fischer**.- Monsieur le Président, elle n'est pas levée, si ce n'est que, d'ores et déjà,
4  la Guinée a fait état de cette pièce hors de l'arbitrage.

5  **M. le Président**.- Oui mais dans une procédure qui est, peut-être, elle-même secrète.
6  C'est pourquoi je préfère préserver les droits de la défense plutôt que de me prononcer
7  sur le secret d'une procédure pénale en Guinée sur laquelle ni l'un ni l'autre nous
8  sommes éclairés. Cependant, dans le cadre de cet arbitrage, elle demeure
9  confidentielle. Beaucoup de choses sont publiques et sont débattues dans l'arbitrage.
10  Elles sont néanmoins couvertes en tant que documents de l'arbitrage, en tant que
11  procédure de l'arbitrage, par la confidentialité arbitrale.

12  | **Questions du Tribunal arbitral** |
   | --- |

13  **Me Teynier**.- J'ai deux petites questions à la République de Guinée.

14  Vous demandez quelques mois, quatre mois. J'ai peine à comprendre à quel délai, à
15  quelle étape de procédure ces quatre mois correspondent. S'il s'agit d'attendre le
16  jugement des autorités judiciaires, donc de nature pénale guinéenne, soit il faut féliciter
17  la justice guinéenne pour sa rapidité, soit au contraire la craindre, mais cela me semble
18  un délai peu réaliste. Ou alors est-ce la fin de l'instruction prévisible ou la période
19  pendant laquelle l'état guinéen pense pouvoir obtenir des documents, et de quelle
20  nature ?

21  C'est ma première question.

22  Je vous laisse y répondre avant de poser ma deuxième question.

23  **Me Jaeger**.- Il ne s'agit pas évidement d'une demande de sursis à statuer dans
24  l'attende d'une décision du juge pénal guinéen. Il s'agit d'une demande concernant
25  purement l'administration de la preuve dans cet arbitrage. Nous pensons que, dans
26  quatre mois, nous serons en mesure de présenter à votre Tribunal des preuves
27  complémentaires des actes de corruption dont il est fait état. Nous pensons que c'est
28  un délai raisonnable pour vous soumettre un dossier complet avec des preuves et vous
29  permettre d'apprécier sur la base de ce dossier s'il y a lieu de clôturer les débats ou de
30  poursuivre le débat engagé aujourd'hui.

31  **Me Teynier**.- Ma deuxième question est que vous avez indiqué que ces éléments
32  nouveaux, que vous pensez pouvoir apporter, ne modifieraient pas la nature des
33  demandes de la République de Guinée, si j'ai bien compris, les demandes à l'arbitrage.

34  **Me Jaeger**.- Je me suis mal fait comprendre là-dessus. J'ai indiqué qu'aujourd'hui, nos
35  demandes n'étaient pas modifiées. En effet, la question que nous avons posée de la
36  corruption a déjà été posée au Tribunal dans le cadre du procès-verbal du 12 mars. En
37  revanche, dans notre lettre du 4 nombre, si je me souviens bien de la date, nous avons
38  indiqué au Tribunal que nous solliciterions l'autorisation de modifier nos demandes sur
39  la base des éléments. En d'autres termes, si dans quatre mois, nous avons des
40  preuves graves concordantes, des faits de corruption, nous ne nous interdisons pas de
41  vous soumettre une demande conventionnelle au titre du dommage qui aurait été
42  causé à la Guinée.

43  **Me Teynier**.- Je ne visais pas ce cas de figure. Je pensais aux griefs dont on a
44  abondamment parlé pendant toute la procédure de nullité de la convention. Ces faits, à
45  supposer qu'ils soient établis, à supposer que la clôture ne soit pas prononcée, ne
46  modifieraient pas le fait que vous ne souleviez toujours pas la nullité de la convention.
47  On avait en effet eu ce débat, résiliation, nullité, etc.

1  **Me Jaeger**.- Il me semble qu'au contraire, si ces faits étaient établis, la question de la
2  nullité de la convention serait au cœur de cet arbitrage car c'est la conséquence
3  directe de la constatation de faits de corruption. Aujourd'hui, nous ne modifions pas
4  nos demandes. Nous disons que, dans le cadre de la saisine du Tribunal, nous
5  apportons des preuves supplémentaires. C'est tout. Sur la base de ces preuves, nous
6  demanderons éventuellement l'autorisation au Tribunal de modifier les demandes que
7  nous avons formulées.

8  **M. le Président**.- Le Tribunal se retire quelques instants.

9  *La séance, suspendue à 17 heures 17, est reprise à 17 heures 32.*

10  | **Questions procédurales** |
     |---|

11  **M. le Président**.- Messieurs, le Tribunal a le double souci de ne pas ignorer une
12  corruption établie et de ne pas prolonger indéfiniment la procédure sur des allégations
13  dont le poids peut être considéré comme discutable. Compte tenu de cette dualité, ce
14  qu'il va décider maintenant ménage les deux possibilités.

15  La première chose, le Tribunal prendra une décision, sous une forme ou une autre,
16  mais il la prendra sur les demandes de production et de délai. Il se peut qu'il joigne
17  cela au fond parce que cela peut être intimement lié à son appréciation du fond de
18  l'affaire.

19  La deuxième chose, c'est que, dans la perspective où l'on n'aurait pas de prolongation,
20  et pour gagner du temps, le Tribunal souhaite avoir vos deux états de frais dans les
21  délais aussi rapprochés que possible. Si la procédure devait rebondir, vous aurez le
22  loisir de les mettre à jour.

23  Les états de frais, je sais que vous êtes, l'un et l'autre des membres de grands
24  cabinets, parfois, cela peut vouloir dire retard de la comptabilité, parfois dire que l'on
25  fait les choses rapidement. Nous souhaiterions recevoir vos états de frais, allez, on
26  vous donne deux jours de repos à Noël (le dernier jour ouvrable est un vendredi),
27  jusqu'au vendredi 27 décembre.

28  Mettez-vous d'accord entre vous pour la forme de cet état de frais. Si vous vous
29  contentez d'une liste faite par chaque cabinet, cela nous suffit.

30  Souhaitez-vous faire des observations réciproques sur vos états de frais ?

31  **Me Jaeger**.- De notre côté, nous ne pensons pas que cela soit nécessaire.

32  **Me Fischer**.- Je partage cette opinion. Pour éviter des aller/retour vraisemblablement
33  inutiles, je propose que les états de frais soient soumis à la même forme que ceux
34  précédemment fournis, forme que j'ai d'ailleurs oubliée. Nous nous étions mis
35  d'accord, il n'y avait eu aucune difficulté.

36  **M. le Président**.- Si vous voulez reprendre les anciens en les mettant à jour…

37  **Me Fischer**.- …si le Tribunal est d'accord.

38  **M. le Président**.- Aucun problème ! Il y a sûrement des honoraires de cabinet.
39  Reprenez les anciens et mettez-les à jour, c'est tout. Il y a les honoraires de Veracity,
40  et le travail de vos cabinets.

41  Avez-vous des choses à ajouter Messieurs ?

42  **Me Fischer**.- La Demanderesse n'a rien à ajouter à l'issue de cette audience.

1   **M. le Président**.- Avez-vous d'autres objections ou d'autres observations sur la
2   manière dont la procédure a été menée ?

3   **Me Fischer**.- Objectivement, elle apparaît avoir été menée en conformité avec le
4   règlement CCJA et les principes généraux.

5   **Me Jaeger**.- Monsieur le Président, nous n'avons aucune observation ni objection
6   quelconque à formuler sur la manière dont les débats ont été conduits.

7   **M. le Président**.- Merci beaucoup.

8   Je lève l'audience. J'attends votre état de frais mis à jour.

9   Je remercie les interprètes si elles sont encore là. Je remercie Mme la sténotypiste.

10   Combien de temps vous faut-il pour nous envoyer le *transcript* ?

11   **Mme Briant.-** Vous aurez le *transcript* d'ici la fin de la semaine.

12   **M. le Président**.- C'est très bien. Vous aurez donc le *transcript* d'ici la fin de la
13   semaine, et vous corrigerez au cours de la semaine à venir. Ainsi, d'ici la fin de la
14   semaine suivante, nous aurons tout : le *transcript* corrigé et vos états de frais.

15   Merci beaucoup. L'audience est levée.

16   *L'audience est levée à 17 heures 45.*

**Translation**

Translation of Excerpts from "Transcript de l'Audience du 16.12.13"

| 17 |
| --- |

[...]

3      ➢ **Questions from the Arbitral Tribunal**

4      **Mr. Teynier. –** I will ask two questions.

5      If you please, Mr. Fox, you said earlier that you were confident that over the course of your inquiry
6      documents would appear. Do you have an idea, in your experience, of the time frame within which
7-8     these documents will appear, or would appear?

9      Second sub-question: these documents that would appear, would they provide evidence that money
10     was paid, the exact amounts that you indicate in your affidavit, either to members of the government
11-12   or to members of the evaluation commission?

13     **Mr. Fox** (*via interpreter*).- Mr. President, do not think that I digress. This relates directly to your
14     question. With respect to the additional evidence that may come to light in the course of an inquiry, to
15     come back to the Simandu matter, Minister Thiam acquired property in the United States at the exact
16     same time as the acts in question. We were therefore able to conclude that these properties were
17     acquired using the bribes. The Minister of Transportation is believed to have bought property in both
18-20   the United States and Canada. We obtained this information recently and need to follow up.

21     We believe that it will be possible to establish, based on evidence, that the properties were acquired by
22-23   the then-minister, which creates a direct link between the payments and the bribes.

24     What we noticed at the time, it is very possible, entirely plausible, that the same thing is happening in
25-26   this matter, even though the people involved are different.

27     **Mr. Teynier.-** You said previously that two people had admitted having received money, *gifts*, in the
28     course of the Guinean procedures. What are the names of these two people? Are these names public in
29     Guinea?

30     **Mr. Fox** (*via interpreter*).- I do not know if the names are public in Guinea. I only know that these two
31     people gave signed statements to the Guinean authorities certifying that they had received payments
32-33   in exchange for the role they played in granting the concession.

34     **Mr. Teynier.-** Could you give me their names, please?

35-36   **Mr. Fox** (*via interpreter*).- I have their names. If you give me a moment, I can check them.

37     **The President.-** Excuse me.

38     (*The arbitrators withdraw to confer.*)

39     **The President.-** Mr. Teynier, ask your question again, please.

40     **Mr. Teynier.-** You said, during your deposition, that a few people had admitted receiving money in
41-42   connection with the Guinean procedures. Do you know the names of these people?

43     **Mr. Fox** (*via interpreter*).- Yes.

1   **Mr. Teynier.-** Would you like to give the names of these people to the Arbitral Tribunal, or are you
2   able to do so?

3-4   **Mr. Fox.-** (*via interpreter*).- Absolutely. In fact, I would be happy to read you their entire deposition.

5   **Mr. Teynier.-** That is not the question that I asked. It is not the desire that I expressed. I merely asked
6-7   a strict and simple question, and I am not asking you to read any documents at all.

8   **Mr. Fox** (*via interpreter*).- The two people who have given statements thus far are Mr. Demba
9   Kourouma, and the statement was given on 13 December 2013. The second person is Mr. Ibrahim
10   Lamizana, family name Condé.

11   **The President.-** Still on 13 December 2013?

12   **Mr. Fox** *(via interpreter)*.- That is correct.

13   Mr. President, I do not know if it is appropriate, but the two people named the same person as being
14   the person who delivered the money to them.

15   **The President.-** Do you have any other questions?

16   **Mr. Teyner.-** No questions.

17-18   **The President.-** I would like to know how you became aware of these documents?

19   **Mr. Fox** *(via interpreter)*.- These two documents were sent to me. They were sent to me by the
20-21   attorney at Orrick Saturday afternoon. I read them personally, three hours ago, at Orrick's offices.

22   **The President.-** Do you know if these documents were produced in connection with the criminal
23   proceedings?

24   **Mr. Fox** *(via interpreter)*.- Yes, I believe that that was the case.

25   **The President.-** Thank you.

26   Has this questioning raised any desires or other questions from the parties?

27   **Mr. Jaeger.-** No questions from us.

28   **Mr. Fischer.-** No questions.

29   **The President.-** Very good.

30   Mr. Fox, we thank you. You are free to go.

31   **Mr. Fox** *(via interpreter)*.- Thank you.

32   I would simply remind you, but it's hardly necessary with someone like you, that the arbitration
33   procedure is confidential. Thank you.

34   **The President.-**  Five minute break, after which we will hear the attorneys.

35   I will also point out to you that we must discuss the question of the confidentiality of Exhibit R-107.
36   We would like you to speak to that. Thank you.

37   **Mr. Jaeger.-** Mr. President, does the Tribunal have any objection to Mr. Steven Fox remaining in the
38   room?

39   **The President.-** You would have to ask Getma.

40   **Mr. Fischer.-** I have no objection. That way, for a change, Mr. Fox will have direct access to the
41   sources!

42   **Mr. President.-** I do not know if the authorization requires acceptance of the remark.

| | |
|---|---|
| 1 | You may remain. Thank you. |
| 2 | *The hearing was adjourned at 3:55 PM and reconvened at 4:05 PM.* |
| 3 | **The President.-** We are in session. |
| 4 | Mr. Jaeger, you have the floor. |
| 5 | **Respondent's Closing Arguments** |
| 6 | **Mr. Jaeger.-** Thank you Mr. President and Arbitrators. |
| 7 8 9-10 | After this hearing, and in particular Mr. Fox's testimony, the Tribunal is confronted with several questions, the most important of which is whether this corruption issue is just an enormous bluff or whether these acts of corruption actually took place. |
| 11 12-13 | Another is whether Mr. Fox's words are based on real sources or on the fruit of his own imagination, or even the result of his being manipulated by false informers. |
| 14 15-16 | Finally, one of the questions that you will have to resolve is whether the debate should be closed at this point in the proceedings or whether the debate on corruption should be allowed to take place. |
| 17 | I will try to provide answers to these questions. |
| 18 19 20 | The first item I would like to deal with is the question of exactly what evidence we have. This is the first point in my argument, that of the body of evidence and clues pointing to the probability that acts of corruption were committed. |
| 21 22 23-24 | Here, I am speaking, of course, of items that are in these proceedings, in this arbitration, today. At this stage, the investigation is just beginning. A criminal complaint has been filed by the Guinean authorities following Mr. Fox's discoveries, and an investigation is in progress. |
| 25 26-27 | Although we are only at the beginning, we already have a body of direct and circumstantial evidence in this arbitration demonstrating that the existence of acts of corruption is extremely probable at this stage. |
| 28 | I will begin with the circumstantial evidence, and  will then address the direct evidence. |
| 29 | The first clue is the endemic nature of corruption in Guinea in 2008. |
| 30 31 32 33-34 | The concession agreement was entered into in 2008, at the end of the reign of the former dictator, Mr. Lansana Conté, who was ill at the time. Mr. Conté's entourage and administration at the time took many liberties and arranged for many privileges. This environment is an important factor taken into account by arbitral tribunals. |
| 35 36 37 38-39 | In other words, when tribunals evaluate the probability of acts of corruption, they do so in the context of the environment. In that regard, I will cite an ICSID award rendered in the matter of Rumeli v. Kazakhstan, in which the arbitrators, the arbitral tribunal, stated as follows: "*[t]he endemic nature of a fact alleged in certain countries has been considered to be circumstantial evidence of the facts alleged.*" |
| 40 | I note that this is a translation from English, and that "*circumstantial evidence*" must be understood in its English meaning. In French, we would say "indirect evidence" |

20

| 1 | The award continues as follows: "*For instance, in ICC arbitration No. 3916, the widespread nature of* |
| 2 | *corruption in Iran was considered to be circumstantial evidence for the existence of corrupt practices.* |
| 3 | *Similarly, in the case at hand, the international reports and widely published articles submitted prove* |
| 4 | *the two points on which circumstantial evidence is most relevant, namely general lack of impartiality of* |
| 5-7 | *the organs of Respondent and collusion between powerful groups of the ruling family in Kazakhstan.*" |

8   This element – and I repeat that this is circumstantial evidence and not direct evidence, of course –
9   enables you to evaluate the probability of corrupt acts at that time. It should be noted that in 2008,
10-11   Guinea was 173rd out of 180 countries in the international transparency rankings.

12   **The President.**- They weren't last?

13   **Mr. Jaeger.-** No, but they are nevertheless among the worst students in the class with respect to the
14   fight against corruption.

15   I am not saying that just because corruption reigned in Guinea at the time, you must automatically
16   conclude that the concession agreement was obtained through corruption. That is not my intent. I am
17   simply saying that when you are considering whether to give credence to the information reported by
18   Mr. Fox, and in the event that you reach the debate on corruption and the new evidence brought by
19-21   the Republic of Guinea, you will be able to take this probability into account.

22   The second piece of circumstantial evidence is the one that we discussed at the hearing on 8 July 2013
23-24   – Getma's behavior at the time of entry into the concession agreement.

25   Obviously, I am not going to go through each of those facts again. The Tribunal will recall that one of
26   the questions was that of the partnership arrangement that Getma entered into with the MSC group,
27   Mediterranean Shipping Company, at the time of the call for tenders.

28   The Tribunal will remember clearly that on the basis of that argument, Getma relied in its bid on
29   MSC's experience  with respect to container terminals, whereas Getma itself had none, and also relied
30-31   on the financial support of this powerful partner.

32   What was surprising was that the partnership agreement that had been produced in connection with
33   the call for tenders had been entered into for the duration of the tender procedure. It was stipulated
34   in the agreement that the partnership would end on the date on which the concession agreement was
35   entered into. This is surprising, since the partnership ended at precisely the time when it would have
36   become useful.

37   **The President.-** Excuse me, this was all said in July. Do not go beyond the question that brings us
38   here today. Thank you.

39   **Mr. Jaeger.-**  Very well, Mr. President.

40   One unexplained question in that regard is why the commission did not notice this anomaly and did
41   not ask Getma any questions as to whether the partnership would continue or not. This would lead
42   one to believe that, in fact, certain members of the commission may have been induced not to ask any
43-45   questions and not to ask about these important facts in connection with awarding the contract.

46   Therefore, this is a second piece of circumstantial evidence: this false partnership that remains
47   unexplained without corruption suddenly becomes entirely understandable if corruption is present.

21

| | |
|---|---|
| 1<br>2<br>3 | With respect to currently available evidence, you have heard Mr. Fox's testimony. You have read his witness statement. You have been able to evaluate the seriousness of his allegations and investigations. |
| 4<br>5<br>6<br>7<br>8-11 | Mr. Fox is a professional with a great deal of experience in seeking information about corruption. He worked methodically. He sought out independent sources. He cross-verified information given to him by different sources, whether in Europe or in Guinea. He did not merely question people located in Guinea, but also searched elsewhere in order to obtain independent sources. On the basis of his investigations and research, he obtained corroborating, specific information. |
| 12<br>13<br>14 | In the end, what is new here and what Mr. Fox's witness statement adds are the specific names of the people who participated in this corruption scheme and their exact roles, a well as the amounts that they received. |
| 15<br>16<br>17<br>18-19 | Now, our opponents have asserted that this testimony is based on hearsay and that the Tribunal has not brought together the true authors of the corruption or those who were directly present during these acts of corruption. Moreover, they stated with irony in their letter dated 25 November 2013 that this was a new version of the "man who saw the man who saw the bear." |
| 20<br>21<br>22-23 | That is not the case. In reality, Mr. Fox's testimony adds much to the matter. It adds verifiable facts. For the first time, we have verifiable facts. These are not simple rumors of corruption. Rumors cannot be verified. These are concrete facts. |
| 24<br>25<br>26<br>27<br>28<br>29<br>30<br>31-33 | The question is whether Mr. Cheick Touré, Minister of Transportation, in fact received one million dollars, possibly more (I do not know), to ensure that the concession agreement was signed. There is a name. This is information that can be verified, and the response to that question is yes or no. This is what is important. We have information to which we can respond yes or no, rather than vague information that cannot really be investigated. Knowing who the individuals are who received money allows the Guinean authorities to question them within the framework of a criminal investigation, to test their statements and to obtain other information; sources and documents that will enable them to prove the information with certainty. |
| 34-35 | Therefore, this is not merely circumstantial testimony, but specific and verifiable information. |
| 36 | When we obtained this witness statement, it was last 14 October, I believe... |
| 37 | **Mr. Fischer.-** Last 14 November. |
| 38<br>39<br>40<br>41<br>42<br>43<br>44<br>45-48 | **Mr. Jaeger.-** Last 14 November. We wondered whether we could produce this information before the Tribunal and whether we could ask the Tribunal for authorization to produce it. We decided that we could, because the information seemed to us to have sufficient credibility, in particular due to the reputation and professionalism of their author, but also because if we did not provide it to the Tribunal, we were risking the Tribunal deciding this matter without having significant items, significant information that could have an impact on the award. It was under those circumstances that we decided we had to provide this information to the Arbitral Tribunal and ask Mr. Fox to testify before the Arbitral Tribunal. |

22

| | |
|---|---|
| 1<br>2-3 | With respect to evidence, things are progressing. As Mr. Fox indicated, in connection with the inquiry that the Guinean authorities are currently conducting |
| 4<br>5<br>6-7 | Additional information has been obtained, in particular, information that comes, this time, from the individuals in question. They are the members of the bid evaluation commission whose names were given by Mr. Steven Fox, who have acknowledged the facts to the Guinean authorities. |
| 8<br>9<br>10<br>11-12 | At our request, the Guinean authorities asked them to prepare signed written statements to be produced in this Tribunal. We informed you on Saturday of the existence of these statements, indicating that during this hearing we would ask the Tribunal to authorize us to enter them into evidence. |
| 13<br>14 | I would add that this morning we sent a copy of the statements to opposing counsel. Opposing counsel therefore has a copy of the statements. |
| 15 | **The President.-** Excuse me, let me stop you for a moment. |
| 16<br>17<br>18 | You say that these statements were prepared with a view to being produced in this Tribunal. I thought I heard Mr. Fox say that they had been prepared in connection with the criminal investigation. Are both pieces of information correct? |
| 19-20 | **Mr. Jaeger.-** No. I believe that Mr. Fox is not a lawyer. He did not understand your question. |
| 21<br>22-23 | In fact, the statements were obtained by the Guinean authorities but not in connection with the investigation. In other words, they are not statements made for an investigating judge. |
| 24 | **The President.-** Continue. |
| 25<br>26<br>27<br>28<br>29-30 | **Mr. Jaeger.-** The criminal complaint, which was filed by the Guinean authorities, was filed on the same day as these statements, that is to say on 13 December 2013, three days ago. A criminal complaint was filed, a criminal complaint that is not against "X" but against a named person, against all the people referred to in Mr. Steven Fox's witness statement. As a result, the investigation of this matter is just beginning. |
| 31 | These are the various clues and evidence that we possess today. |
| 32 | Let us look at the question of the impact of this information on the arbitration. |
| 33<br>34 | The first, of course, is that this information affects the course of these proceedings and the calendar as initially foreseen by the Tribunal and the parties. |
| 35<br>36-37 | We are fully aware of the inconvenience involved in asking the Tribunal to suspend its deliberations in order to take new evidence. We have not taken this matter lightly. |
| 38<br>39<br>40<br>41<br>42 | From the very beginning of these proceedings, and we were fairly frank with the Tribunal, we have been raising the question of corruption. This question was mentioned in the Terms of Reference, in the report dated 12 March 2012. You will remember that at the hearing on 8 July 2013, we told you that we had not found evidence of corruption. That is why we did not argue it before you. |
| 43<br>44 | Although the question was brought up, although we had assumptions, we were not in a position to prove them. |
| 45<br>46 | In addition, I remember that merely saying the word "corruption" made the other party jump. They were outraged that we were providing |

| | |
|---|---|
| 1-2 | this information, but it is the complete truth. At the time, we did not have proof. |
| 3-4 | **The President.-** Furthermore, I myself interrupted to say, "If you have substantive evidence, go ahead, otherwise the Tribunal doesn't know what to do with it." |
| 5 | Go ahead, continue. |
| 6<br>7<br>8-9 | **Mr. Jaeger.-** We did not have evidence, and that is why we did not feel that the indication provided by the false partnership was sufficient to prove corruption. We believed that we needed more evidence. |
| 10<br>11<br>12 | Today, Getma is trying to paint a picture of the Republic of Guinea as a bad-faith actor disrupting the arbitration, supposedly with the sole purpose of slowing the proceedings or even preventing them from reaching completion. |
| 13<br>14<br>15-16 | In reality, we are not in bad faith. The Republic of Guinea has been unable to prove the corruption that it has raised in this arbitration only because the evidence has been hidden. It is very difficult to produce such evidence. |
| 17<br>18-19 | The Republic of Guinea began its investigations in 2012 and was confronted with a wall of silence in Guinea. It was unable to obtain information about this issue. |
| 20<br>21<br>22-23 | This is a direct consequence of Getma's conduct and of the nature of its actions. In reality, the money that Getma paid to government functionaries enabled it to obtain not only the concession but also the silence of those involved in the acts of corruption. |
| 24<br>25<br>26-27 | As a result, we must not reverse the truth, presenting the party that is late in producing evidence of the truth as the party that is in bad faith. The party in bad faith is the one that dissembles or hides the truth from the Tribunal, not the party that belatedly demonstrates the truth. |
| 28<br>29<br>30<br>31-33 | The only reason that we did not bring this evidence earlier is that we were unable to obtain it. There has been no maneuvering. It was not in our interest to wait. If we had obtained this evidence in 2012, we would immediately have provided it to the Arbitral Tribunal; that goes without saying. We had absolutely no motive to wait for oral arguments before presenting evidence if we had had it earlier. |
| 34<br>35-36 | As a result, the Republic of Guinea really cannot be accused of having disrupted the proceedings; the real disruptor is Getma, which hid the fraud that it initiated. |
| 37<br>38<br>39-40 | The second impact of this information on the arbitration is the question of the risk of injustice. According to Getma, the corruption argument was merely a stalling tactic. Getma alleges that we raised this information during deliberations solely to delay rendering the award. |
| 41-42 | It is hard to see why the Republic of Guinea would be interested in delaying the award. |
| 43<br>44<br>45-46 | We will possibly delay it by a few months; in other words, instead of being rendered in December 2013, it would be rendered in March 2014. The Republic of Guinea has absolutely no interest in that occurring, whatever the terms of the award may be, which we do not know. |
| 47 | **The President.-** Neither do I! |

24

1   **Mr. Jaeger.-** On the other hand, Mr. President, the question of delay is crucial for Getma, not because it
2   is eagerly awaiting the award, but because it wishes to close the debate as quickly as possible and to
3-4   prevent the Tribunal from examining the issue of corruption.

5   Rather, if Getma had no doubt as to its innocence on the question of corruption, it should welcome this
6   debate; it should want the truth to be demonstrated before this Tribunal and for the debate on
7   corruption to play itself out.

8   Instead, I understand from its most recent letters that it objects to the Tribunal's examining the
9-10   evidence that will be provided by the Republic of Guinea.

11   In this decision, you see that on the scale, on the one hand, there is the speed of the arbitration. In the
12   end, the only reason to close the debate today would be to enable the award to be rendered more
13   rapidly. We are speaking here of a few months. On the other side of the scale there is the risk of
14   injustice from closing the debate prematurely and the risk that the Tribunal will render the award
15-16   without full and complete knowledge of the facts.

17   I would venture to say that this risk of injustice is even more serious, given that this is a question of
18   international public policy, which the Tribunal has a particular duty to investigate. The Tribunal must
19-20   pay particular attention to questions of public policy.

21   If you will permit me, I will quote the words of Mr. Bernardo Cremades in the 2003 special issue of the
22   ICC Bulletin on corruption and fraud in arbitration. I quote these words because they are particularly
23   relevant to the issue that you have before you today. Mr. Bernardo Cremades said as follows: "*Possibly
24   the greatest error that an arbitral tribunal can commit, where there is any suspicion of corruption,
25   money-laundering or serious fraud, is to ignore it. It is far preferable for the suspicion to be
26   acknowledged and for the evidence to be taken into account, even if the final conclusion is that the
27-29   evidence is not convincing.*"

30   He adds a bit further, "*This is the only approach that can ensure the enforceability of the award and the
31-32   integrity of international commercial arbitration as an institution.*"

33   These statements are not, contrary to what one might believe, systematically favorable to the party
34   that claims to be the victim of acts of fraud or corruption. Not at all, that is not what Mr. Cremades is
35   saying.

36   Mr. Cremades is telling us that where there is a suspicion of corruption, it is necessary, so to speak – if
37   you will permit me to use the expression – to drain the abscess right away, so that the Tribunal can
38   render an enlightened decision.

39   If the Tribunal closes the debate, does not allow debate about corruption, it will render an award that
40   will be, one way or the other, subject to criticism.

41   What we are telling you is that even in the event that you think that the acts of corruption are not
42   probable, are not plausible, it would be in the interest of this arbitration to open the debate, if for no
43   other reason than to have a clean slate.

44   It is on that basis that we ask the Tribunal to authorize us to present additional evidence. We
45   announced in our letter dated 4 November 2013 that we would ask the Tribunal at this hearing to
46-48   allow the Republic of Guinea to modify its claims and to establish the facts relating to corruption.

25

1  It must be remembered, of course, that the debate has not yet been closed in these proceedings. Article
2  17 of the minutes of the meeting of 12 March 2012 provides that after presentation of the status of
3  costs, the Tribunal will render an order to close the debate when it believes that the matter is ready to
4-5  be judged. At this stage, the closure order has not yet been rendered.

6  The situation thus falls within the CCJA Rules of Arbitration, and in particular Article 18, which
7  provides that "*during the proceedings, the parties are free to add new grounds in support of the claims*
8-9  *that they have made.*"

10  Article 19 continues, "*They may form new claims, etc.*" This is not the subject at hand. We are still
11  within the framework of the claims that we already made. Indeed, the question of the legality of the
12  concession agreement has already been raised to the Arbitral Tribunal in connection with the minutes
13  of 12 March 2012. Therefore, these are not new claims, and the Republic of Guinea has the right, in
14  connection with this arbitration, to present the evidence of these allegations in support of the claims
15-16  that it has already made.

17  This hearing and Mr. Fox's testimony have enabled us to show that evidence of these acts is now
18  available. They are within our reach. We informed you that we had witness statements from the
19  people who committed these acts of corruption, which we are able to deliver to the Tribunal if it will
20  authorize us to do so.

21  We have also stated, Mr. Fox stated it and we also state it: other evidence will come to light in the
22  course of the criminal investigation that is just getting underway. We have very little doubt on that
23  point. It is clear from the speed with which the first witness statements, the first confessions, have
24  come in, that there will be others and that there will be other evidence (either through testimony or in
25  documentary form) of these acts of corruption.

26  It is in this context that the Republic of Guinea asks the Tribunal for authorization to present
27  additional evidence of these acts of corruption in connection with these proceedings. We ask you to
28  grant additional time to the Republic of Guinea to present all of the evidence that it has gathered,
29  accompanied by a memorandum explaining how these items are relevant in establishing corruption.
30

31  After this period of time, the Tribunal will decide whether the debate should be closed or whether it
32  should instead continue. That is the request that we make today before your tribunal. We would like a
33  period of four months to establish these facts. This seems to us the minimum time required to obtain
34-35  and gather the additional necessary evidence.

36  That is all with respect to our request.

37  Now I will address the question of confidentiality. For so long as the matter has not been ruled on, in
38  particular for so long as there has been no judgment by the Guinean judicial authorities, we are in a
39  period of investigation. We are in a period of criminal investigation that is taking place in Guinea, and
40  we think, to protect that investigation, to protect the inquiry that will take place, it would be
41  preferable for all of the information exchanged before this Tribunal, whether it is Mr. Fox's witness
42  statement, the other evidence, the other witness statements that we may produce, including the
43  debates in the course of this hearing, remain strictly confidential.
44-45

46  **The President.-** Confidentiality even from the criminal investigation?

47  **Mr. Jaeger.-** No, that was not my idea. With regard to the investigating judge, there is no reason to
48  impose any confidentiality. If the investigating judge were interested in what was said in these
49-50  proceedings, I do not see why he should not have access to it.

26

1  On the other hand, we ask that the parties not disclose or publish the information exchanged in
2  connection with these proceedings.

3  **The President.-** That is why we have to clarify what we are talking about.

4  Is the investigation secret in Guinea?

5  **Mr. Jaeger.-** I must admit I do not know.

6  **The President.-** I am not asking you to do anything, it was just a question.

7  Thank you, Mr. Fischer, you have the floor.

8  Claimant's Closing Arguments

9  **Mr. Fischer.-** Thank you, Mr. President.

10  I feel like we are in 2004, when the intelligence community told us that there were weapons of mass
11  destruction in Iraq and we were going to go find what we could find! And we all saw the credibility of
12  those statements.

13  Today, we are in a much less dramatic situation, fortunately, but the thought process is the same. Just
14  as the Arbitral Tribunal informed us that, despite the difficulties in had encountered, it expected to
15  render its award by the end of 2013, we receive a letter dated 4 November 2013: "*The Republic of
16  Guinea has very recently obtained information and evidence relating to the circumstances surrounding
17-20  entry into the agreement.*" In other words, on 4 November 2013, we have evidence.

21  What is this evidence?

22  It is a witness statement dated 14 November 2013, after the letter petitioning the Tribunal, in which
23  Mr. Steven Fox relates facts that are apparently specific but which he tells us today is merely
24  information collected orally. "*I never had the slightest bit of evidence, I never had the slightest physical
25-26  item, all I did was meet with people.*"

27  When we ask him who these people are, he answers, like a journalist: "*my sources are secret*" even as
28  he reveals to us or confirms to us information about his past, information that could lead to criminal
29  prosecution. That is to say that he reveals to you important, and, I daresay, essential information about
30  his situation, because he clearly has confidence in the confidentiality of this Tribunal and the
31  participants in the arbitration proceedings. In addition, he notes that the lawyers are subject to
32  professional rules. He knows that we are subject to an obligation of professional secrecy. But the
33-35  essential information is who informed Mr. Steven Fox of these supposed facts.

36  And he comes in and tells you, you, Tribunal, you can't be told that.

37-38  At the same time, the Republic of Guinea says to you, "We need more time to produce evidence."

39  They are refusing today to give you the first essential piece of information, and what do they tell you
40  on the basis of this hearsay, these rumors that they cannot back up? That there is going to be or that
41  there is currently a criminal investigation. This is completely false.

42  For the moment, as we found out this morning, and it's pretty laughable, there is a criminal complaint
against certain of the people, though not all of them, referred to in Mr. Fox's

27

1  document. They come in here and tell you that the investigation that has not yet begun will bring out
2  all sorts of evidence.

3  They also tell you that there is this other matter Simandu, and that things happened in such-and-such
4  a way in the Simandu matter, and therefore, necessarily, in the Getma matter the same things will
5  happen – even though, and no one disputes this, none of us knows anything about this Simandu
6  matter. It has no direct or indirect connection to these proceedings, in this matter, either as a matter of
7  fact or a matter of law, and it is hard to see why, in a matter that has been going on since 2011, in
8  which there is still no evidence, there would later be evidence and that the same would be true of our
9  case.

10  Let us not forget that this corruption matter has been in the public area  in one way or another since
11  2008.

12  Since 2008, and this has occurred in these proceedings, there have been accusations of corruption.
13  Remember that Getma International and Necotrans were forced to file a lawsuit for defamation.  We
14-15  discovered that the author of the libel was a supposed diplomat residing in Italy.

16  This allegation has been around for five years. This allegation has been around since Mr. Alpha Condé
17  came to power, and Professor Condé did not base the termination, which we discussed at length and
18-19  which I will not come back to, on acts of corruption.

20  What is more, in the course of the proceedings, as part of a document production request dated 30
21  November 2012, we asked Guinea to provide us with the current positions of the people on the
22  commission that opened the bids. This must have drawn the attention of Guinea and of the Tribunal to
23  any suspicion that might exist about the people named. Guinea responded to us that that had nothing
24-25  to do with our proceedings.

26-27  You issued an order that, indeed, there was nothing relevant to justify disclosing this information.

28  Would you think that in 2012, Guinea might have investigated, might have asked its State Prosecutor
29  to conduct an inquiry? Not at all!

30  It was only when the award was drawing near, in October 2013 (if Mr. Fox is to be believed), during a
31  conversation between lawyers, between law firms, about another matter: "*You know, in another
32-33  matter, I found some evidence. Why don't you hire me for this matter?*"

34  Now it's October 2013, whereas the claimed acts of corruption would have taken place in 2008, and
35  we have been speaking about them in the arbitration since 2011, 2012, and in 2012, we refused to go
36  down this road. What happens? Nothing!

37  We were waiting for evidence, it has been refused. They tell you there is a first piece of evidence, a
38  context of corruption. In 2008 Guinea was – I don't remember the exact ranking, I'm sorry I don't have
39  it with me --

40  **The President.-** 173 out of 180.

41  **Mr.Fischer.-** Things are getting better in Guinea. In 2013, it is 150th out of 177. Maybe that means that
42  there are fewer countries in the world. France is about 23rd or 25th, depending on the year. Maybe that
43-44  means that France should not be giving lessons in morality.

45  What do we have as evidence?

46  Today, you have nothing at all.

47  In reality, the technique is simple, and it was argued thus: international public policy, and respect for
    international public policy, is essential. "If you go beyond that, we

28

| | |
|---|---|
| 1 | will bring an action for annulment before the CCJA, which we know respects the rules of public policy, |
| 2 | and get rid of this question." |

3   We, ourselves, have no problem with examining the evidence, and we and we would have liked to have
4   examined the testimony of these two "Deep Throats".

5   Why weren't they here today?

6-7   It was with great pleasure that we listened to Mr. Steven Fox, but there were two people to be heard.

8-9   How can your Tribunal go further when they refuse to give the name of these informers?

10   What is more, and Guinea has been true to its practice since the beginning of the arbitration
11   proceedings. They say to you: "You will see what you will see. We have no evidence, but thanks the
12   commencement of an investigation that does not exist, thanks to the filing of the complaint, there will
13   be evidence very soon."

14   In addition, we have in our pocket two witness statements from two people, Mr. Demba Kourouma and
15   Mr. Condé, who admit that they received money.

16   They just tell you, "The evidence, these people admit to corruption." Necessarily, people who come in
17   with a rope around their necks admit that they were corrupted, it's serious, because they are at risk for
18   very severe punishment. The maneuver is skillful. We know that they risk absolutely nothing. The
19   Guinean Penal Code includes, as does our French law, a statute of limitation on such non-felony
20   offenses (*délits*). It is in Article 4. Non-felony offenses have a statute of limitations of three years, as in
21   France, misdemeanors (*contraventions*) have a statute of limitations of one year and felonies (*crimes*)
22   have a statute of limitation of ten years.

23   Today, this criminal proceedings cannot, with regard to the claimed perpetrators, lead to anything,
24   whether for passive or active corruption. They are protected, whereas, if Guinea had wanted to make
25-26   progress on this question in 2011, it could have done so and asked its Public Prosecutor to investigate.

27   The exhibit that has not yet been entered into evidence, but that was sent to us this morning, namely
28   the complaint dated 13 December that refers to the alleged facts, was filed (and here is another marvel
29   of Guinean law) by the state judicial agent. In a country with – I am weighing my words – legislation
30   that conforms to certain standards, who represents the state when public policy has been violated? It
31-32   is the Public Prosecutor. It is the State Prosecutor.

33   It is true that the state judicial agent has fairly surprising powers instituted by the decree of 5 May
34   1997, which provides, "*Upon the request of the state judicial agent, the Minister of Justice, Keeper of the
35   Seals, may order revision of a decision or ruling of the court in the interest of the law or in order to
36-37   safeguard tangible or intangible property of the state.*"

38   That is to say that the entity, the public authority, that today allegedly (we do not really have proof)
39   brought a complaint before an investigating judge or took the preliminary steps to trigger a public
40   action, is an authority that may ask the Minister of Justice to revise a decision that damages the
41-42   tangible or intangible property of the state.

43   I believe that the debate, or, more accurately, the conversations that we have had since 4 November
44-45   are a new, truly desperate attempt by Guinea to delay the rendering of your award.

46   Getma is in full agreement with the opinion of Mr. Bernardo Cremades: the very serious questions of
47-48   corruption should be examined and dealt with, and once more, Getma has no problem with that.

29

| | |
|---|---|
| 1<br>2<br>3 | However, the Tribunal must be given the means to deal with this question, and it is not acceptable to tell it, when they know that the Tribunal has announced that it will shortly render its award, it is not acceptable to say, "Give me four months to produce my evidence." |
| 4 | What evidence? Evidence that they will continue to fabricate? |
| 5<br>6<br>7-8 | If today, you were told, "I have two witnesses, I have exhibits and documents, I would like to be able to send them to you, to enter them into evidence, give me four months (though that is a little excessive), give me a few weeks to be able to examine them," there would not be the slightest problem. |
| 9<br>10-11 | What they are asking you today is different. It is a delay not in order to produce evidence and discuss this evidence, but a delay to go fabricate evidence! |
| 12<br>13<br>14<br>15<br>16 | Let's be serious: an investigation in the Republic of Guinea, at the request of the state judicial agent – will that be taken seriously by your Tribunal given that, if there is a minimum of compliance with the rules of law, what will the investigating judge have to do? I think that the Guinean procedural rules are pretty much the same as the French rules. He will have to say, "I cannot investigate, it is time barred, it is too late." |
| 17 | I will finish by referring to the question asked earlier of Mr. Fox, whose answer, quite honestly, astonished me: "Have you had any contact with Mr. Manadouba Sankhon? |
| 20<br>21<br>22<br>23<br>24-25 | No, and we discussed this at length, we know that, since the beginning he has been spearheading the objections to the concession agreement. Contrary to Mr. Fox, who must not have "double checked" or "triple checked," contrary to what we have been told: he was not the director of the port at the time the concession agreement was awarded. He only became so later. This is just one small difficulty in methodology. |
| 26<br>27<br>28<br>29<br>30<br>31<br>32-33 | Mr. Mamadouba Sankhon, who is easy to reach, without any difficulty, who can easily travel to France, was not even questioned. It would have been worthwhile to question him, and, of course, it would be proper to question him, since, according to his last statements, he has been informed (contrary to yourselves) of the decision that you are going to render. He has stated to the press that Guinea was going to be ordered, I am telling you this since you may not be avid readers of the Guinean press, to pay Getma €47 million. This is someone who definitely should have been questioned, but by Mr. Steven Fox. |
| 34<br>35-36 | It could have been done for Mr. Mamadouba Sankhon, as with the other witnesses, as with Mr. Soré Camara, who testified at length to your Tribunal, we managed with a telephone call. |
| 37<br>38-39 | In conclusion, Mr. President and members of the Tribunal, examine the evidence: no difficulty; hear witnesses: no difficulty, but there must be evidence, there must be witnesses. |
| 40<br>41 | In this case, you have a journalist who is protecting his sources and you have no direct or even indirect witnesses today, in this situation. |
| 42 | What your Tribunal may find, what has been shown, even if only indirectly, is that there is corruption in the world (we all know that) and that France is not exempt from this scourge. Can you find that there is evidence there to be examined? For my part, I do not believe so. |
| 46<br>47-48 | Obviously, Getma awaits with great serenity the decision that you will render, other than the concern that if a decision is made, it will not be respected. |

1    Let us refer to your procedural orders and procedural order number 9, which, pending further
2    information, is an important document for a proceeding. "*The hearing will take place on 16 December.*
3-4    *It will be devoted solely to Exhibit R-107.*"

5    By a last-minute maneuver, Guinea extended the subject of today's hearing. If tomorrow, you were to
6    issue a procedural order saying, "Send your evidence, the Tribunal wishes to examine such evidence,
7    and the morning of the next hearing, there will be other evidence" and so on, that would be contrary to
8-9    all the rules.

10    Last point: the question of confidentiality, I imagine that investigations in Guinea are confidential, but
11-12    no one from Getma or from the Necotrans group is mentioned in the complaint that was filed.

13    A procedure in which we are not involved, and, moreover, have no intention of being involved. We
14    have no connection to it.

15    We have rules for the arbitration. It is very clear that the nature of Mr. Steven Fox's past activities will
16    interest no one outside this arbitration, and being neither a reader nor an interpreter of cabbage
17-18    leaves, there is no difficulty there.

19    It is not acceptable to be able to assert information in the Guinean proceedings while we, we cannot
20    defend ourselves. That is the problem!

21    We have been told, "There are accounts in Zug, accounts in Monaco and at Crédit Lyonnais." I can
22    assure you and confirm to you, because we called the management of the Necotrans group to ask
23    about this: no company in the Necotrans group has an account in Zug, no company in the Necotrans
24-25    group has a Crédit Lyonnais or LCL (I don't know how to say that) account in Monaco.

26    This confidentiality rule that we readily agreed to cannot be allowed to render us unable to defend
27    ourselves or to be prosecuted or defamed – as has already occurred – in Guinea. This is the only limit
28    to the question of confidentiality, but if it is about Mr. Steven Fox, excellent qualities, graduate of a
29-30    French *grande école* (elite school), then there is no difficulty.

31-32    I think I have said everything, and I would not want to re-argue what we have long argued before you.

33    **The President.-** Our decision, whatever it may be, will say this: the Tribunal believes that
34    confidentiality must not be allowed to harm the rights of the defense, which as a rule rank higher. If
35-36    that is your problem, we take note of what the parties have said on the subject.

37    Mr. Jaeger, would you like to reply, five minutes, not more.

38    <div align="center">**Respondent's Reply**</div>

39    **Mr. Jaeger.-** Thank you, Mr. President.

40    Just a few points, a few comments: first, I did not brandish the threat of a petition for annulment
41    before the Tribunal. Je did not brandish before you the threat of a petition for annulment against your
42    award, I never do so.

43    **Mr. Fischer.-** No, you are too clever for that!

44    **Mr. Jaeger.-** As for the statute of limitations, it is possible, and I am not familiar with Guinean criminal
      law, that there is a three-year statute of limitations, but it would also mean that

1     the limitation period would have to begin on the date on which the infraction was committed and not
2     on the date of its discovery. This is a hidden infraction for which I do not know whether the statute of
3     limitations has begun to run in this matter, and when. I believe that this point is not as simple as it
4     appears.

5     **The President.-** You think that the Guineans would turn a financial offense into a crime against
6     humanity for which the statute of limitations does not begin to run until the prosecution commences? I
7     think of ABS, of course, and the case law of the Court of Cassation.

8     In any event, we take note of what you have said.

9     **Mr. Jaeger.-** That is a purely technical point.

10     Concerning my colleague's comments on the complaint, we did indeed send him the complaint this
11     morning. It is not entered into evidence, I will therefore refrain from commenting on it. My colleague
12     indicated, and that is now on the record, that Getma is not mentioned in the complaint. Getma is a legal
13     entity, and the Guinean Penal Code does not authorize prosecutions of legal entities. There is the
14-15    explanation for why Getma is not mentioned.

16     **The President.-** He also said "*no one from Getma*". Did I hear correctly?

17     **Mr. Jaeger.-** That is correct. The complaint provides, if I remember right, a list of names against whom
18     the complaint has been made, persons who are named, and the complaint adds, "*as well as any person,*
19     *of course, who may be involved in the acts.*" If it turns out that individuals at Getma other than Mr.
20     Richard Talbot, who unfortunately has passed away and therefore can no longer be prosecuted, were
21     involved, and if it turned out that it is the case, that will be the subject of criminal prosecutions in
22     Guinea.

23     I note that opposing counsel was in favor of hearing the testimony of the two people who had admitted
24     the acts. He is surprised that these two people were not summoned to the hearing. We believed that
25     that was sufficient as it concerned the disruption of these proceedings.
26

27     Your order was clear: no new exhibits, no new evidence could be produced before the hearing. We did
28     not think it was advisable to have two surprise witnesses come at the last minute; I'm not sure that
29-30    that the witnesses would have found these proceedings welcome.

31     On the other hand, we are not ruling out taking the testimony of these two people in connection with a
32     later hearing. That is absolutely possible. I do not know if they would be inclined to do it but we can
33-34    find out, and we could possibly ask these people to appear before you.

35     I note that opposing counsel does not formally object to continuing the debate initiated today on the
36     question of corruption. He submits to your decision. I deduce from this that Getma International is not
37     opposed to continuing the proceedings for the period of time that we have requested, a period of four
38     months, and I so note.

39     Finally, with respect to confidentiality, the two parties are in agreement that the exhibits, in particular
40-41    Mr. Fox's witness statement, will be kept confidential by both parties to this matter.

42     **The President.-** During the arbitration, and not if the rights of the defense are at risk. That is what I
43     understood from Mr. Fischer. Mr. Fischer said, "so that we are able to defend ourselves without having
44     confidentiality used against us."

45     Do you agree?

46     **Mr. Jaeger.-** Yes, although in that case, they would have to ask the Tribunal for authorization to
47     release the confidentiality.

48     **The President.-** The Arbitral Tribunal.

32

1     **Mr. Jaeger.-** You. If a party believed that it was necessary to reveal these facts, it could ask you to
2     authorize doing so.

3     **Mr. Fischer.-** That's not entirely correct.

4     **The President.-** We will look into that and let Mr. Fischer know.

5     **Mr. Jaeger.-** Concerning the statements of this person whose name I can't even pronounce, who
6     allegedly revealed the result of this arbitration in the press, I just learned about that today. It is not in
7     evidence, I am not going to discuss that. I am surprised, of course, as much as my colleague is. Perhaps
8-9    the Tribunal is surprised by the result of its decision.

10    **The President.-** The Tribunal can tell you that it is the most surprised.

11    **Mr. Jaeger.-** I have no further comments, Mr. President.

12 | **Claimant's Rejoinder** |
|---|

13    **Mr. Fischer.-** I get the impression that in my remarks, there was some ambiguity about the two
14    people. I was not speaking of the two people who prepared witness statements or a document that
15    could constitute a witness statement. I was speaking, of course, of Mr. Fox's two sources. The two
16    people who admitted or allegedly admitted having received funds do not interest me very much.
17    People who say, "I am corrupt and now I admit to corruption," the credence to be given to such a
18-19  statement is fairly limited.

20    The two people I was speaking of are Mr. Steven Fox's two sources who could provide evidence, if they
21    themselves should happen to have specific facts. If we want to examine the allegations of corruption,
22    we must start begin at the beginning, using the same method as Mr. Fox: question the two people.

25    Second, on the question of confidentiality, in the complaint that was filed, contrary to what was said
26    earlier, there is only one exhibit: Mr. Steven Fox's witness statement. Exhibit R-107 is therefore not
27    just for our arbitration proceedings. It resulted from the actions of Guinea, from the actions of the state
28    judicial agent who represents Guinea in these proceedings, in this arbitration. The representative of
29    one party to the proceedings took an exhibit from the proceedings for another use. They cannot today
30    say to us, "I forbid you to make use of this exhibit" when Guinea has already done just that. About this
31-32  exhibit, and exclusively on this exhibit, there may be a judicial proceeding in Guinea.

34    **Mr. Jaeger.-** I have no further comments.

35    I think that we do not really disagree about confidentiality. We would like to avoid disclosure of this
36    information to the public. It goes without saying that it will be presented to the judicial authorities. If
37    necessary in connection with a procedure, we do not really have any problem. I do not know why this
38-39  is provoking hilarity on the part of my colleague

40    **Mr. Júdice.-** You are giving lessons, and you are making me laugh, dear friend. It happens!

41    **The President.-** In any event, the Tribunal will rule only on the confidentiality of this exhibit in
42    connection with this arbitration.

43    The question of the rights of the defense in another court are to be ensured by that other court and not
44    by this Tribunal. That is as it should be, by the way.

33

| | |
|---|---|
| 1 | Finally, there will be a word about confidentiality. For the moment, it has not been lifted, subject to the |
| 2 | rights of the defense. |

| | |
|---|---|
| 3 | **Mr. Fischer.-** Mr. President, it ha not been listed, except that Guinea has already used this exhibit |
| 4 | outside of this arbitration. |

| | |
|---|---|
| 5 | **The President.-** Yes, but in a procedure that is, possibly, itself secret. That is why I prefer to preserve |
| 6 | the rights of the defense rather than to make a decision about secrecy in a criminal proceeding in |
| 7 | Guinea about which neither of us has information. However, in connection with this arbitration, it |
| 8 | remains confidential. Many things are public and are debated in the arbitration. They are nevertheless |
| 9-11 | covered as documents in the arbitration, as an arbitration proceeding, by the arbitral confidentiality. |

| | |
|---|---|
| 12 | <div align="center">Questions from the Arbitral Tribunal</div> |

| | |
|---|---|
| 13 | **Mr. Teynier.-** I have two short questions for the Republic of Guinea. |

| | |
|---|---|
| 14 | You are asking for a few months, four months. I am having trouble understanding what time period or |
| 15 | procedural stage those four months correspond to. If it is a question of waiting for the judgment of the |
| 16 | judicial authorities, and thus a question of Guinean criminal procedure, we must either congratulate |
| 17 | the Guinean justice system for its speed, or else be concerned about it, but it seems to me that this time |
| 18 | period is not very realistic. Or is it the projected end of the investigatory period? Or the period during |
| 19-20 | which the Guinean state believes it will be able to obtain documents, and of what nature? |

| | |
|---|---|
| 21 | That is my first question. |

| | |
|---|---|
| 22 | I will let you respond before asking my second question. |

| | |
|---|---|
| 23 | **Mr. Jaeger.-** We are obviously not asking for a stay of the proceedings pending a decision by the |
| 24 | Guinean criminal courts. This is a request that relates strictly to the production of evidence in this |
| 25 | arbitration. We think that within four months, we will be able to present additional evidence of the |
| 26 | acts of corruption that have been mentioned. We think that a reasonable period of time to submit a |
| 27 | complete file to you, with evidence, and to enable you to analyze on the basis of that file whether the |
| 28-30 | debate should be closed or whether we should continue the debate that we have begun today. |

| | |
|---|---|
| 31 | **Mr. Teynier.-** My second question is that you indicated that these new items that you think you will be |
| 32 | able to produce would not change the nature of the Republic of Guinea's claims, if I understood |
| 33 | correctly, the claims in the arbitration. |

| | |
|---|---|
| 34 | **Mr. Jaeger.-** I did not make myself clear on that point. I indicated today that our claims have not been |
| 35 | amended. In fact, the question that we have raised about corruption was already raised by the |
| 36 | Tribunal in the context of the minutes of 12 March. On the other hand, in our letter of 4 November, if I |
| 37 | recall the date correctly, we indicated to the Tribunal that we would seek authorization to amend our |
| 38 | claims on the basis of these items. In other words, if in four months we have substantial corroborating |
| 39 | evidence of acts of corruption, we will consider filing a counter-claim for the damages caused to |
| 40-42 | Guinea. |

| | |
|---|---|
| 43 | **Mr. Teynier.-** That is not the scenario I was referring to. I was thinking about the claims that we |
| 44 | discussed at length throughout the proceedings of the agreement's invalidity. These facts, assuming |
| 45 | they were established, assuming that closure were not ordered, would not change the fact that you |
| 46 | would still not raise the invalidity of the agreement. We have had that debate, termination, invalidity, |
| 47 | etc. |

34

1     **Mr. Jaeger.-** On the contrary, it seems to me that if these facts were established, the question of the
2     agreement's invalidity would be at the heart of this arbitration, as it is the direct consequence of a
3     finding of corruption. Today, we are not amending our claims. We are saying that, in the context of this
4     Tribunal's assignment, we are bringing additional evidence. That is all. On the basis of that evidence,
5-7   we may ask the Tribunal for authorization to amend the claims that we have made.

8     **The President.-** The Tribunal will withdraw for a few moments.

9               *The hearing was adjourned at 5:17 PM and reconvened at 5:32 PM.*

10                                  **Procedural Questions**

11    **The President.-** Gentlemen, the Tribunal is has two concerns to balance – not ignoring established
12   corruption, and not indefinitely prolonging these proceedings based on allegations whose weight must
13   be considered debatable. Given this duality, what we will decide now takes into consideration the two
14   possibilities.

15   The first thing, the Tribunal will make a decision, in one form or another, but it will make that decision
16   on the requests for production and additional time. It may be that it will join those questions to the
17-18  merits, because it may be closely linked to the merits of the case.

19   The second thing is that, in the event that there is no extension, and in order to save time, the Tribunal
20   wishes to have your statements of costs as soon as possible. If the proceedings are resumed, you will
21-22  be able to update them.

23   The statements of costs, I know that you are both partners in large firms, sometimes that can slow
24   down accounting, sometimes things can be done rapidly. We would like to receive your statements of
25   costs, let's see, we will give you two days' rest for Christmas (the last business day is a Friday), until
26-27  Friday 27 December.

28   Agree between you as to the form of the statement of costs. If you wish simply to provide a list made
29   by each firm, that will suffice.

30   Do you wish to make any comments in reply about your statements of costs?

31   **Mr. Jaeger**.- On our side, we do not think that is necessary.

32   **Mr. Fischer.-** I agree. To avoid going back and forth unnecessarily, I propose that the statements of
33   costs are submitted in the same form as those we previously provided, a form that I have actually
34-35  forgotten. We had reached an agreement, there was no difficulty.

36   **The President.-** If you would like to use the old ones and update them

37   **Mr. Fischer.-** If the Tribunal is in agreement.

38   **The President.-** No problem! There are surely attorney's fees. Use the old ones and update them, that
39-40  is all. There are fees from Veracity, and the work by your firms.

41   Do you have anything to add, gentlemen?

42   **Mr. Fischer.-** The Claimant has nothing to add at the close of this hearing.

35

1    **The President.-** Do you have any other objections or comments on the way in which the proceedings
2    have been conducted?

3    **Mr. Fischer.-** Objectively, it seems to have been conducted in compliance with the CCJA Rules and
4    general principles.

5    **Mr. Jaeger.-** Mr. President, we have no comments or objections whatsoever to make as to the manner
6    in which the debate was conducted.

7    **The President.-** Thank you very much.

8    I am adjourning the hearing. I will await your updated statements of costs.

9    I thank the interpreters if they are still here. I thank the stenographer.

10    How long will you need to send us the transcript?

11    **Ms. Briant.-** You will have the transcript by the end of the week.

12    **The President.-** Very good. You will thus have the transcript by the end of the week, and you will
13    correct it over the course of the following week. Thus, by the end of next week, we will have everything
14    – the corrected transcript and your statements of costs.

15    Thank you very much. The hearing is adjourned.

16    *The hearing was adjourned at 5:45 PM.*

# Certification

**Jennifer Bader**
**ATA Certified Translator FR>EN**
**CLASS Translations, LLC**
**3305 Labyrinth Road**
**Baltimore, MD 21215**
**1-443-739-7823**

### CERTIFICATE OF ACCURACY

I, Jennifer Bader, hereby certify that I translated the documents listed in <u>Annex A</u> attached hereto from French into English and that, to the best of my ability, they are true and correct translations. I further certify that I am competent in both French and English to render and certify such translations.

*Jennifer Bader*
Jennifer Bader

*Victoria Denise Byrne*
Notary Public

VICTORIA DENISE BYRNE
NOTARY PUBLIC STATE OF MARYLAND
My Commission Expires July 28, 2018

*march, 02, 2015*

## Annex A

## List of Documents

Email from CCJA to Tribunal dated May 19, 2014

Minutes from the PAC December 31, 2009 and January 2, 2009 Meeting

Getma Financial Offer

July 23 2014 Petition to Challenge Validity

Minutes from the initial arbitral proceeding dated March 12, 2012

Transcript from the July 8, 2013 hearing

Letter from Guinea's counsel to the Tribunal dated November 4, 2013

Complaint against named persons on counts of corruption and influence peddling

Letter from Guinea's counsel to the Tribunal dated December 14, 2013

Witness statement of Mr. Demba Kourouma

Witness statement of Mr. Ibrahima Laminzana Conde

Tribunal Procedural Order dated November 7, 2013

Tribunal Procedural Order dated December 2, 2013

Letter from Guinea's counsel to Getma's counsel dated December 16, 2013

Transcript from December 16, 2013 hearing

Tribunal Procedural Order dated January 8, 2014

Letter from Guinea's counsel to the Tribunal dated January 15, 2014

Letter from the Tribunal to the Parties dated March 17, 2014

CCJA Decision dated October 3, 2013

Transcript of May 27, 2013 hearing

Letter from the Tribunal to the CCJA dated June 3, 2014

Email from the CCJA to the Tribunal dated May 19, 2014

Letter from the Tribunal to the Parties dated April 22, 2013

Email from the Tribunal to the Parties dated May 6, 2013

Letter from the Tribunal to the Parties dated May 10, 2013

Email from the Tribunal to the Parties dated May 23, 2013

Email from the Tribunal to Guinea's counsel dated June 25, 2013

Email from Guinea's counsel to the Tribunal dated June 28, 2013

CCJA Decision dated August 1, 2013

Letter from the Tribunal to the Parties dated April 30, 2014

Letter from the CCJA to Mr. Fischer dated May 20, 2014

Letter from Getma's counsel to the CCJA dated May 23, 2014

CCJA Decision dated March 12, 1999

Witness statement of Mr. Sory Camara

Letter from Getma's counsel to the tribunal dated May 30, 2013

Email from the Tribunal to Guinea's counsel dated September 5, 2013

Email from Mr. Fischer to the Tribunal dated September 6, 2013

Composition of the CCJA

Excerpt from Call for Tenders for the Award of a Concession for the Container Terminal of the Port of Conakry

Decision of the Paris Court of Appeals dated March 4, 2014

P.-G. Pougoué, Arbitration in the OHADA Zone

G. Kenfack Douajni, The Notion of International Public Policy in OHADA Arbitration