IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| In the Matter of the Arbitration of Certain Controversies between<br><br>GETMA INTERNATIONAL,<br><br>Petitioner,<br><br>and<br><br>THE REPUBLIC OF GUINEA,<br><br>Respondent. | Civil Action No. 1:14-cv-01616-RBW |

## DECLARATION OF MATHIAS AUDIT

I, MATHIAS AUDIT, law professor in Paris Ouest Nanterre La Défense University, of 20 rue Fortuny, 75017, Paris, France, hereby declare:

1.   Except where otherwise stated, I have personal and professional knowledge of the matters of Arbitration Law hereinafter stated.

2.   As a legal expert, I already have been involved in the arbitration dispute between the parties. During the arbitration proceeding, I have delivered a statement dated December 21st, 2012 regarding the question of whether any irregularities occurred in the award of the concession of the Port of Conakry to the Company GETMA INTERNATIONAL are able to ground the termination by Presidential Decree of 8 March 2011 of the Concession Contract concluded between this Company and the Republic of Guinea on 22 Sept. 2008.

3.   I make this Declaration in support of the Petitioner's applications filed before the United States District Court for the District of Columbia.  I am duly authorized by them to do so.

4.   I have reviewed the following documents:

   a.   Letter of GETMA's counsel dated 23 December 2014;

b. Arbitral Award No. 001/2011/ARB rendered between Société GETMA INTERNATIONAL and the Republic of Guinea dated April 29th, 2014;

c. Request of the Republic of Guinea Counsel's to challenge the validity of the Arbitral Award No. 001/2011/ARB dated July 24th, 2014;

d. Letter of GETMA's counsel dated April 17th, 2015;

e. Decision of the Common Court of Justice and Arbitration ("CCJA") dated November 19th, 2015 on the Challenge of the Arbitral Award No. 001/2011/ARB;

f. Certified Report dated January 7th, 2016 of an interview of the Minister of Justice of the Republic of Guinea, Mr. SAKO;

g. Letter of Professor Emeritus Ibrahim Fadlallah dated January 16th, 2016.

5. I have been asked by Petitioner to answer the three following questions:

a. Was the CCJA impartial and independent when it rendered the decision No. 139/2015 of November 19th, 2015 setting aside the arbitral award of April 29th, 2014 in the case No. 001/2011/ARB?

b. Does the lack of answer to GETMA's request for an oral procedure comply with CCJA procedural rules?

c. Did the separate agreement on the arbitrators' fees in the CCJA case No. 001/2011/ARB constitute a valid ground for challenging the arbitral award under OHADA law?

d. Did the separate agreement on the arbitrators' fees comply with the arbitral rules applicable to the CCJA arbitration case No. 001/2011/ARB?

6. As mentioned in my curriculum vitae attached to this declaration, I am a law professor in Paris Ouest Nanterre University, one of the leading law faculties in France, and I am specialized in Private International Law, International Commercial Law and Arbitration Law. Within my university, I am the co-head of the International Law Centre (*CEDIN – Centre de droit international*) and I am in charge of the Private International Law course and the International Commercial Law course, which both cover the international arbitration specific topic.

7.      I have written many articles or case comments on Private International Law, International Commercial Law and International Arbitration Law, including a book entitled Public Contracts and International Arbitration (Bruylant ed., 2011). I am also one of the co-authors, together with my colleagues Professor Sylvain BOLLÉE and Professor Pierre CALLÉ, of a legal treatise entitled Law of International Commercial transactions and Foreign Investments (*Droit du commerce international et des investissements étrangers* - 2014). I am also one of the members of the reviewing board of the *Revue de l'arbitrage*, the leading French law journal in this field, and of the Arbitration Academy Board. I am also a member of the ICC Arbitration Commission.

8.      In my private practice, I am a partner in Steering Law Firm, a Paris based law firm comprising offices in Dubai (UAE), Beirut (Lebanon) and Niamey (Niger) as well. In this respect, I am mostly acting as arbitrator or counsel in international arbitration proceedings.

9.      In the light of my professional experience, I feel able to answer the above-mentioned questions of the Petitioner. However, before answering the above-mentioned questions, I will give a general overview of the OHADA and CCJA arbitration system.


I.      **GENERAL OVERVIEW OF THE OHADA AND CCJA ARBITRATION SYSTEM**

10.     The Organization for the Harmonization of Business Law in Africa, better known by its French acronym as OHADA was created by the Port Louis Treaty signed in 1993[1] and modified by the 2008 Quebec Treaty[2] ("OHADA Treaty") by a group of West and Central African sub-Saharan states[3]. Contrary to other regional integration organizations where the objectives are essentially of an economic nature, the OHADA's aims are of a legal one[4]. Indeed, its main purpose is to provide legal and judicial certainty and

---

[1] Treaty on the Organization for the Harmonization of Business Law, signed in Port-Louis, Mauritius on October 17th, 1993.

[2] Treaty of Quebec signed on October 17th, 2008 ("OHADA Treaty").

[3] To date: Benin, Burkina Faso, Cameroon, Central African Republic, Chad, Federal Islamic Republic of the Comoros, Republic Democratic of Congo, Republic of Congo, Ivory Coast, Gabon, Guinea, Guinea-Bissau, Equatorial Guinea, Mali, Niger, Senegal, Togo.

[4] S.-P. LEVOA AWONA, *CCJA*, in P.-G. POUGOUE (Dir.), *Encyclopédie du droit OHADA*, Lamy, 2011, at §1.

standardization, and thus promote investment and economic activity in its Member States. To do so, the OHADA Treaty promotes arbitration for the settlement of contractual disputes[5].

11.     It is important to note that as to OHADA legal system as a whole, OHADA arbitration has been strongly influenced by French arbitration law. This statement is widely recognized[6].

12.     The basis of OHADA arbitration can be found in two different texts:

-     The Uniform Act on Arbitration ("UAA"), which regulates usual or standard arbitration, comprising ad hoc and institutional arbitration in OHADA Contracting Parties, on the one hand, and;

-     The Rules of Arbitration of the Common Court of Justice and Arbitration ("CCJA") on the other. The said rules aim at regulating arbitration administrated by the CCJA.

13.     The CCJA, on which we will primarily focus in this declaration, has several functions, namely contentious and jurisdictional functions in that it rules on disputes relating to the application of OHADA business law[7] as well as consultative functions as the Court gives legal opinion on questions on the interpretation of the application of the OHADA business law[8].

14.     Furthermore, like the International Chamber of Commerce of Paris ("ICC") to give a well-known example, the CCJA is an arbitration center. Yet, the CCJA differs from the ICC in that it also has jurisdictional functions. Indeed, the Court, through an order of President or judge delegated for this purpose, may grant exequatur of an arbitral award.

---

[5] Preamble of the OHADA Treaty.

[6] See e.g.: C. D. SOSSA & J. DJOGBENOU, *Droit de l'arbitrage OHADA*, Session de formation ERSUMA, Porto-Novo, du 4 au 8 octobre 2010, p. 25; R. AMOUSSOU-GUENOU, *« L'Afrique, la mondialisation et l'arbitrage international »*, Petites affiches, 7 décembre 1998, n° 146, p. 8. On the general influence of French Law on the OHADA legal system, see: *« L'influence internationale du droit français »*, Etude adoptée par l'Assemblée générale du Conseil d'Etat, le 19 juin 2001, La Documentation française, p. 38.

[7] Title II of the Rules of the Procedure of the Common Court of Justice and Arbitration.

[8] Title III of the Rules of the Procedure of the Common Court of Justice and Arbitration.

This order shall confer on the award an enforceable character in all the OHADA Contracting States[9].

15.     The CCJA can also decide on the challenges of the arbitral awards rendered under the CCJA Rules. These challenges can be made through three different types of recourses, namely the challenge of validity, but also through extraordinary recourses such as the recourse for revision and third-party revision.

16.     Regarding more precisely the challenge of validity, one of the parties may request the annulment by the CCJA of an award rendered under the auspices of the CCJA Arbitration Rules on the ground of Article 29 of the said Rules, provided that the parties have not excluded this possibility in their arbitration agreement[10]. This challenge is considered as the equivalent of recourse to set aside the award, which is an available recourse under the UAA and other domestic laws[11]. This actually involves that one of these recourse excludes the other[12].

17.     The grounds on which the recourse against the award has to rely upon are identical to the denial of exequatur grounds. They are listed in Article 30.6 of the CCJA Rules as follows:

    (1)     If the arbitrator rules without an arbitration agreement or on an agreement that is void or has expired;

    (2)     If the arbitrator ruled without conforming to the assignment that he has been conferred;

    (3)     When the principle of adversary procedure has not been respected;

    (4)     If the award is contrary to international public policy.

---

[9]   Article 25 of the OHADA Treaty and Article 30.1 and Article 30.2 of the Rules of Arbitration of the Common Court of Justice and Arbitration.

[10]  Article 29.2 of the Rules of Arbitration of the Common Court of Justice and Arbitration.

[11]  B. MARTOR, N. PILKINGTON, D. SELLERS, S. THOUVENOT, *Le droit uniforme africain des affaires issu de l'OHADA*, Lexis Nexis, 2004, at §1251.

[12]  P. MEYER, *Arbitrage CCJA*, in P.-G. POUGOUE (Dir.), *Encyclopédie du droit OHADA*, Lamy, 2011, at §90.

18.    They are also partially the same as the grounds for setting aside the award under the UAA. It can be assumed that the interpretation given by the CCJA to the grounds for challenging the validity is applicable to the grounds for setting aside the award and vice versa[13].

19.    If the Court grants the request of the contesting party, it shall annul the award. Like other decisions rendered by the CCJA in its jurisdictional function[14], such decision is enforceable within the OHADA territory.

20.    In addition, the CCJA may review the merits of the case if both parties so request. If the parties have not requested the evocation, the proceedings shall be taken over at the request of the earlier party as from, when appropriate, the last act of arbitral proceedings recognized as valid by the Court. This evocation implies that both parties give their mutual consent. This means that if only one party requests such evocation, the Court will reject it[15].

## II.    WAS THE CCJA IMPARTIAL AND INDEPENDENT WHEN IT RENDERED THE DECISION No. 139/2015 OF NOVEMBER 19TH, 2015 SETTING ASIDE THE ARBITRAL AWARD OFAPRIL 29TH, 2014 IN THE CASE No. 001/2011/ARB?

### II.1    BASIC FACTUAL AND LEGAL SITUATION

21.    It is universally admitted that judges in every international court and tribunal must be independent and impartial[16]. The OHADA legislation addresses this issue by setting out a series of criteria. Human Rights treaties also strengthen these fundamental principles.

---

[13] P. MEYER, *supra* FN 12, at §91.

[14] Article 1.2 of the Rules of Arbitration of the Common Court of Justice and Arbitration.

[15] CCJA, Court Decision No. 028/2007, *Société Nestlé Sahel*. See also: P. LEBOULANGER, G. KENFACK DOUAJNI, *Arbitration under the Common Court of Justice and Arbitration of the OHADA Contracting States*, in L. BOSMAN (Ed.), *Arbitration in* Africa: A Practitioner's Guide, Kluwer Law International 2013, at p. 329.

[16] R. MACKENZIE and P. SANDS, "*International Courts and Tribunals and the Independence of the International Judge*", 44 Harvard Intl LJ 271 (2003), p. 275.

### II.1.1   OHADA Legislation

### (i)      *Principle of Institutional Independence*

22.    The institutional independence of the CCJA is enshrined in Article 7 of the Regulation No. 004/2000/CM on the financial conditions and advantages of the judges of the CCJA, of the Permanent Secretary, of the General Director of the Regional High Judiciary School ("Regulation No. 004/2000/CM") according to which the judges of the CCJA, as civil servants of the OHADA, are independent from all others authorities, in particular from the Contacting States national administrations, from regional and international organizations, as well as from private companies.

### (ii)     *CCJA Judges Appointment*

23.    Following Article 31 § 1 of the OHADA Treaty, the Court shall consist of nine judges elected for a non-renewable seven-year period. Nonetheless, the Council of Ministers may, taking into account the particular needs and financial possibilities, decide to increase the number of judges[17], which it actually did since the number of the judges has been increased from nine to thirteen judges since July 24th, 2014[18]. The appointed judges of the CCJA are chosen among nationals of the Contracting States, and belong to one of the following categories:

    1°.    Judges having acquired a judicial experience of at least fifteen years and satisfying the conditions necessary to the exercise, in their respective country, of high judicial functions;

    2°.    Barristers who are members of the Bar of one of the Contracting States and who have at least fifteen years standing;

    3°.    Law Professors having at least fifteen years of professional experience[19].

---

[17] Article 31 § 2 of the OHADA Treaty.

[18] Decision No. 01/2014/CM/OHADA increasing the number of judges of the CCJA signed on July 24th, 2014.

[19] Article 31 § 3 of the OHADA Treaty.

24.     One third of the Members of the CCJA must belong to the categories of Barristers and Law Professors referred to in paragraphs 2° and 3° above[20]. Moreover, the CCJA may not have more than one judge per Member State[21].

25.     The Permanent Secretary Office shall invite the Contracting States to proceed, within a period of at least four months before the elections, with the nomination of the candidates to the Court[22]. Each Contracting State is entitled to appoint a maximum of two candidates. No candidature is admissible during the two months preceding the polling date[23]. The candidate must satisfy the following criteria:

    a.     be a national of one of the Contracting States;

    b.     enjoy its civil, political rights and his full rights as a citizen;

    c.     be of good moral character;

    d.     provide copies of the following elements:

- a curriculum vitae;
- a birth certificate or any other documents in lieu thereof;
- a nationality certificate;
- an extract from the judicial record no older than three months;
- certified copies of diplomas and university qualification;
- a medical certificate[24].

26.     Any failure on the part of the candidate to produce or falsification of the documents aforementioned results in the rejection of the applicant's candidature. In addition,

---

[20] Article 31 § 4 of the OHADA Treaty.

[21] Article 31 § 5 of the OHADA Treaty.

[22] Article 33 of the OHADA Treaty.

[23] Article 3 § 2 of the Regulation No. 01/2014/CM/OHADA relating to the requirements of selection and election of the judges of the CCJA.

[24] Article 4 of the Regulation No. 01/2014/CM/OHADA.

falsification of any of these documents constitutes, regardless of the date on which it is found, a ground for revocation without notice or compensation and without prejudice to prosecution[25].

27.   Then, an *ad hoc* Committee in charge of the selection of the candidatures is established within a two-month period before the polling date. This Committee is comprised of five legal personalities, namely one former judge of the CCJA, two magistrates of Supreme Courts or Cassation Courts of the Contracting Parties reflecting the regional balance of the OHADA territory and two legal experts chosen reflecting the same balance, amongst which one is or was a Chairman of the Bar Association or is a Law Professor. The members of this Committee are chosen by the President of the Council of Ministers on a proposal from the Permanent Secretary[26].

28.   When evaluating the applications, this Committee takes into account the following criteria:

-   technical expertise;
-   intellectual capacities and general culture;
-   moral probity;
-   level of legal knowledge and professional experience;
-   capacity for judgment, perspicacity, faculty of balancing;
-   verbal communication skills;
-   motivation to exercise the functions of a judge[27].

29.   The Committee listens to the candidates, ranks them in order of merit and makes recommendations. The Permanent Secretary sends these recommendations to the Council

---

[25] Article 5 of the Regulation No. 01/2014/CM/OHADA.

[26] Article 7 § 1, § 2 and § 3 of the Regulation No. 01/2014/CM/OHADA.

[27] Article 10 of the Regulation No.01/2014/CM/OHADA.

of Ministers[28]. The Council of Ministers elects by secret ballot the judges of the CCJA through uninominal suffrage, according to a majority, two rounds system[29].

30.     After their election, the members of the Court shall solemnly take oath to undertake faithfully their function in full impartiality[30]. During the exercise of their functions, the members of the CCJA are equal, regardless of their age, of the polling date or of their years of service[31].

### (iii)    *CCJA Judges Security of Tenure*

31.     The judges' tenure starts from the 1st January of the year following the poll[32] and cannot be revoked once they have been elected. Indeed, all members of the Court shall remain in duty until the date when his successor takes up his office[33].

### (iv)    *CCJA Judges Privileges and Immunities*

32.     The judges of the CCJA enjoy diplomatic privileges and immunities during the exercise of their functions[34]. However, depending on the circumstances, these privileges and immunities may be waived by the Council of Ministers[35]. Furthermore, the Judges shall not, without due authorization of the Court, be prosecuted for acts accomplished outside their official capacities[36].

---

[28] Article 11 of the Regulation No. 01/2014/CM/OHADA.

[29] Article 12 of the Regulation No. 01/2014/CM/OHADA.

[30] Article 34 of the OHADA Treaty; Article 3 § 1 of the Rules of the Procedure of the CCJA.

[31] Article 2.1 of the Rules of the Procedure of the CCJA.

[32] Article 1.2 of the Rules of the Procedure of the CCJA.

[33] Article 36 § 2 of the OHADA Treaty.

[34] Article 49 § 1 of the OHADA Treaty.

[35] Article 49 § 2 of the OHADA Treaty.

[36] Article 49 § 3 of the OHADA Treaty.

*(v)*     ***Outside Activities***

33.    The judges of the CCJA are not allowed to exercise any political or administrative functions. Moreover, any remunerated activities must be authorized by the Court[37]. During the exercise of their functions, the judges cannot acquire or receive shares or any interest or remuneration whatsoever in a public or industrial private, commercial or financial company. They cannot be company board members[38].

*(vi)*     ***Financial Security***

34.    The base salary of the judges of the CCJA is determined by the Council of Ministers. This salary must take into account the high responsibility related to the functions, the international character of the Organization, the efforts exercised by the Organization to attract candidates of high ability, as well as the living costs of the seat of the institution[39]. Besides, the judges enjoy family benefits[40] and other advantages as to the accommodation and the transport[41].

## II.1.2  Human Rights Treaties

35.    One of the purposes of the OHADA Treaty is to use the harmonization of business law as a means of reinforcement of the rule of law[42], and one fundamental pillar of a democratic society is the principle of judges' independence and impartiality.

36.    The principle of impartiality is enshrined in Article 7(1) of the African Charter on Human and People's Rights to which all OHADA Contracting States are bound. The African Commission on Human and People's Rights also held that this principle is non-

---

[37] Article 37 of the OHADA Treaty.

[38] Article 7 of the Regulation No. 004/2000/CM on the financial conditions and advantages of the judges of the CCJA, of the Permanent Secretary, of the General Director of the Regional High Judiciary School.

[39] Article 1 of the Regulation No. 004/2000/CM.

[40] Chapter I, Section II of the Regulation No. 004/2000/CM.

[41] Chapter II, Section I and Section II of the Regulation No. 004/2000/CM.

[42] Preamble of the OHADA Treaty.

derogable[43]. This Charter in force must, therefore, be performed in good faith by all OHADA Contracting States[44].

37.     Furthermore, the principle of independence closely linked with the latter can be found in Article 14(1) of the UN 1966 International Covenant on Civil and Political Right ("ICCPR") to which all the Contracting States of the OHADA are Parties[45].

## II.2     ANSWER TO THE QUESTION

### II.2.1  The ontological lack of independence issue of the CCJA

38.     The CCJA is, for the time being, a unique organ in the world in that it combines a twofold function as both a Court of supranational jurisdiction and at the same time an international arbitral institution[46].

39.     In this regard, the most important fear is that the independence of the judges of the CCJA be violated since the CCJA could decide on a challenge of an arbitral award rendered between the same parties under its auspices that it already had to deal with, in its administrative role[47]. By doing so, the judges of the CCJA cannot be considered

---

[43] ACHPR, *Civil Liberties Organization, Legal Defense Centre, Legal Defense and Assistance Project v. Nigeria*, Communication No. 218/98, decision adopted during the 29th Ordinary session, May 7th, 2001, p. 3.

[44] Article 31(1) of the Vienna Convention on the law of the treaties of May 23rd, 1969.

[45] The Republic of Guinea has signed (28/02/1967) and ratified (24/01/1978) the ICCPR.

[46] P. LEBOULANGER, G. KENFACK DOUAJNI, *Arbitration under the Common Court of Justice and Arbitration of the OHADA Contracting States*, in L. BOSMAN (Ed.), *Arbitration in Africa*: A Practitioner's Guide, Kluwer Law International 2013, at p. 329.

[47] P-G. POUGOUE, J-M TCHAIKOUA & A. FENELON, *Droit de l'arbitrage dans l'espace OHADA*, P.U.A, 2014, at § 277 referred in N. IBRAHIM, *« L'indépendance de la Cour Commune de Justice et d'Arbitrage: Un nécessaire affermissement »*, Revue trimestrielle de droit africain, n°888, July 1st, 2014, p. 330

independent, namely to be free to perform the obligations imposed by the judicial function in an impartial manner[48].

40. In the present case, the CCJA has indeed firstly intervened in its administrative functions, *i.e.* as an arbitration centre, and then in its jurisdictional functions, *i.e.* as a judicial court having jurisdiction on the challenge of the award.

41. On May 10th, 2011, GETMA filed a request for arbitration to the General Secretary of the CCJA, as required by the Article 5 of the Rules of Arbitration of the CCJA. Following Article 31 of the concession contract, the Parties designated one arbitrator and the chosen arbitrators in turn designated the Presiding arbitrator, which all the Parties and arbitrators did. Following Article 2.2 of the Rule of the Arbitration of the CCJA, the CCJA confirmed the different choices made by three decisions[49]. On January 27th, 2012, the CCJA transmitted the case to the arbitral tribunal and informed the Parties that the tribunal has been constituted and that the case was submitted to the arbitrators in conformity with Article 8.2 of the Rule of the CCJA.

42. The CCJA was later involved in the agreement of the Parties on the arbitrators' fees since it rejected on two occasions the agreement made[50]. The CCJA, therefore, had on considerable occasions the possibility to review the agreement on the arbitrators' fees.

43. All of the above demonstrates that the CCJA was involved in the matter even before the challenge of validity made by the Republic of Guinea before the CCJA.

---

[48] J. CRAWFORD & J. MCINTYRE, "*The independence and Impartiality of the International Judiciary", in* S. SHETREET, C. FORSYTH (Ed.), "*The Culture of Judicial Independence: Conceptual Foundations and Practical Challenges*", Martinus Nijhoff Publishers, 2012, at p. 196.

[49] Decision of the CCJA confirming Mr. Juan Cremades dated November 28th, 2011; Decision of the CCJA confirming Mr. Eric Teynier dated December 7th, 2011; Decision of the CCJA confirming Pr. Ibrahim Fadlallah dated January 25th, 2012 referred in the Request of the Republic of Guinea Counsel's to challenge the validity of the Arbitral Award No. 001/2011/ARB dated July 24th, 2014, p.9.

[50] Decision No. 081/2013/CCJA/ADM/ARB dated August 1st, 2013; Decision No. 096/2013/CCJA/ADM/ARB dated October 3rd, 2013 referred in the Request of the Republic of Guinea Counsel's to challenge the validity of the Arbitral Award No. 001/2011/ARB dated July 24th, 2014, pp. 40-41.

44.     This challenge was mainly directed towards the separate agreement on the arbitrators'
        fees in violation of Article 24.2, 24.3, 25.1 of the Rule of arbitration of the CCJA and the
        Decision No. 004/99/CCJA. The CCJA, in its jurisdictional function, had then to decide
        on a case that it already dealt with before within its administrative function.

45.     Following the principle *Nemo judex in re sua* according to which no one may be the
        judge in his own case, a judge must not be involved in a dispute that he will have to
        decide on.

46.     How a court, by rejecting twice the agreement of the parties on the arbitrator's fees
        beforehand can, without any influence whatsoever, give an impartial and independent
        answer when requested to rule of the same issue? This obviously raises considerable
        doubts as the CCJA independence and impartiality.

47.     This dual role of the CCJA could only be reasonable if its jurisdictional functions and its
        administrative functions were strictly separated. The general view in the legal literature is
        that judges in charge of the administration of the arbitral procedure should then not serve
        on the bench[51].

48.     It follows that in the present case, the CCJA being the arbitration centre and the Court in
        front of whom the award is challenged raises significant concerns regarding its lack of
        independence.

**II.2.2   The lack of independence and impartiality of CCJA Judge Fodé KANTE**

49.     The independence of the judiciary system, as previously said (*supra*, § 39), means the
        freedom for the judge to perform his judicial functions in an impartial manner[52]. This
        implies that every judge, in the exercise of his functions, be protected from any influence
        that may threaten its impartiality, such the one that may be exercised by the

---

[51] Ph. LEBOULANGER, *« L'arbitrage et l'harmonisation du droit des affaires en Afrique »*,
Revue de l'arbitrage, Vol. 1999, Issue 3 at § 97.

[52] J. CRAWFORD, J. MCINTYRE, *supra* FN 48, p. 196.

Government[53]. This notably follows from Article 7 of Regulation No. 004/2000/CM which requires the judges to be independent from all others authorities.

50.     The impartiality of the judiciary in turn means the absence of subordination from the parties to the conflict, from any power interested in a given resolution of the conflict[54]. Following the aforementioned principle *Nemo judex in re sua*, a judge must not be involved in a dispute that he will have to decide on. This principle of natural justice imposes on the judge a neutral behavior ensuring that an equitable judgment be rendered: "*Justice must not only be done, it must be seen to be done*"[55].

51.     It should also be noted that no existing rules within the OHADA system provide the possibility for the parties to challenge the judges of the CCJA for lack of impartiality or independence and for the judge to withdraw from a case[56].

52.     We will see below that the circumstances surrounding the nomination and the appointment of Judge KANTE, a Guinean judge, as well as its implications on the case raises reasonable doubts as to his impartiality and independence.

53.     Following Article 33 of the OHADA Treaty, by invitation of the Permanent Secretary Office, Contracting States may proceed, within a period of at least four months before the elections, with the nomination of the candidates to the Court. This candidate is then subject to an election process along with the other nominees. It appears from the Certified Report dated January 7th, 2016, that the Minister of Justice of the Republic of Guinea, Mr. SAKO, wanting to have a Guinean judge at the CCJA, made all necessary efforts to reach that aim. These efforts have been successful since Judge KANTE, former Judge of the Tribunal of Kaloum, sub-prefecture in the Conakry Region of Guinea, now serves on the CCJA bench.

---

[53] *Ibid*.

[54] *Ibid*.

[55] *R. v. Sussex Justices ex parte McCarthy*, Heward CJ (1924).

[56] Following Article 5 of the Regulation No. 01/2014/CM/OHADA, a judge may only be revoked in case of falsification of the documents required for the elections.

54.    Theoretically, this appointment neither violates the terms of the Article 33 of the OHADA Treaty nor Article 7 of the Regulation No. 004/2000/CM. The mere fact for a State to nominate one of his nationals satisfying all the necessary requirements of the OHADA legislation should not, by itself, be contested.

55.    Nevertheless, it is worth mentioning that the link between an international judge and his home State lies at the heart of the question of independence of the former[57]. International judges may, sometimes unconsciously, be influenced by the culture and the political, economic or military power of their home State[58]. Indeed, in international justice, sensitivity to national identification is a significant reality[59]. Contrary to domestic judges, international judges cannot entirely disregard their nationality when deciding on a case[60].

56.    In addition, the nomination and election of judges to international courts are politicized. According to Professor VOETEN, the Government can use the appointment process to influence judicial behavior in two ways, namely by selecting judges whom they expect to make decisions that match their interests and by using threats of *ex post* sanctions and rewards to provide incentive to judges[61].

57.    In the present case, Minister SAKO used the first way of influence by nominating Judge KANTE with the aim that the latter, if dealing with a contentious case involving Guinea, will give all information that may be in the interests of the REPUBLIC OF GUINEA to the Ministry of Justice.

---

[57]  E. JOUANNET, *"Actualité des questions d'indépendance et d'impartialité des juridictions internationales : la consolidation d'un tiers pouvoir international ?"*, *in* H. RUIZ FABRI & J.-M. SOREL (eds.), *Indépendance et Impartialité des juges internationaux*, Coll. Contentieux international, Editions Pedone, 2010,  p. 285.

[58]  E. JOUANNET *supra* FN 57, p.  284.

[59]  E. JOUANNET *supra* FN 57, p. 286.

[60]  *Ibid.*

[61]  E. VOETEN, *"The Politics of International Judicial Appointments"*, Chicago Journal of International Law: Vol. 9: No. 2, Art. 3 (2009), p. 388.

58.     Therefore, the objectives of the nomination of Judge KANTE constitute a breach of the
        protection required to the principle of independence of the judiciary. This also raises
        significant doubts as to his impartiality to any dispute involving the Republic of Guinea.

59.     Following the Certified Report dated January 7th, 2016, Minister SAKO reveals that not
        only did he nominate Judge KANTE to have access to certain elements of the case but
        also that the Ministry of Justice actually did receive useful information regarding the
        present case. The Guinean judge advised his home State by underlying the incoherencies
        and insufficiencies of the State of Guinea's defense. According to the Minister, this
        substantially helped the Republic of Guinea to win the case.  We will mention below two
        relevant excerpts of his interview:

        "We did our best for Guinea to have a judge at the Court of Abidjan […] and last
        year we get the former President of the Tribunal of Kaloum, Fodé KANTE,
        elected, who is now a judge in Abidjan. [62]"

        "When there is a dispute against Guinea, the judge will alert the Ministry of
        Justice on the imperfections of the Guinean defense, drawing our attention […] on
        the incoherencies, that is what we did. We asked the counsels of the Guinean State
        to review their defense, to use [arguments relating to] corruption […] so that the
        appeal is profitable to the Guinean State. That is what happened.[63]"

60.     These statements raise important doubts as to the respect of the secrecy of the
        deliberations by Judge KANTE and undoubtedly demonstrate that CCJA Judge Fodé
        KANTE was actually biased in rendering Decision No. 139/2015 setting aside the arbitral

[62] Certified Report dated of January 7th, 2016, p. 12. Free translation. The original text in French
language is: « On a tout fait pour que la Guinée ait un juge à la Cour d'Abidjan […] et on a pu
faire élire l'année dernière l'ancien Président du Tribunal de Kaloum, Fodé KANTE qui est
actuellement juge à Abidjan. »

[63] Certified Report dated of January 7th, 2016, p. 13. Free translation. The original text in French
language is: « Quand il y a un contentieux contre la Guinée, le Juge va alerter la Chancelleries
sur les imperfections de la défense guinéenne, attirant notre attention […] sur les incohérences,
donc c'est ce qu'on a fait. On a demandé aux avocats de l'Etat Guinéen de revoir leur défense
autrement, d'utiliser [des arguments relatif à la] corruption  […] pour que l'appel soit profitable à
l'Etat Guinéen, c'est ce qui s'est passé. »

award as he acted as a subordinate to his home State and helped its defense. All these elements impair the fairness of the CCJA set aside decision.

## III.    DOES THE LACK OF ANSWER TO GETMA'S REQUEST FOR AN ORAL PROCEDURE COMPLY WITH CCJA PROCEDURAL RULES?

### III.1    BASIC FACTUAL AND LEGAL SITUATION

61.    Following Article 34(1) of the Rules of the Procedure of the CCJA, the procedure before it is essentially a written one. Nevertheless, the Court can, at the request of one of the Parties, organize in certain disputes *via* an oral procedure.

62.    Furthermore, according to Article 34(2), the chief clerk informs the Parties of the decision and on the date of the audience fixed by the President. Following Decision No. 008/2013 of March 17th, 2013 rendered by the CCJA, the request of one Party for an oral procedure before the CCJA can be rejected when the Parties have regularly concluded on all arguments, produce all document and when the dispute has no specificity rendering necessary an oral procedure[64].

63.    Following Article 40 of the Rules of the Procedure of the CCJA, the court decision is rendered in a public audience and the Parties are duly invited. Furthermore, the original of the decision is signed by the President of the Court and the chief clerk. Then, a certified copy must be sent to each Party who can ask for a copy of the decision.

64.    The use of the present simple verbs instead of using modal verbs of possibility[65] shows that the answer from the chief clerk, the public audience as well as the notification of a certified copy are not possibilities but  obligations.

---

[64] CCJA, Court Decision No. 008/2013, March 17th, 2013, *SGBC SA v. Mr. WABO René*.

[65] Modal verbs of possibility are used in the Title II: Article 27 bis (4), Article 27 ter (1), Article 28(4), Article 30(1), Article 31(1), Article 32(2), Article 33, Article 34(1), Article 37, Article 38(2), Article 40(2), Article  44(1), Article  44(1) quarter,  Article 45(1), Article 45 bis (2), Article 45 ter, Article 46(2), Article 46(5), Article 47(1), Article 49(1), Article 49(3), Article 49(5), Article 52(2) and Article 52(4) of the Rules of the Procedure of the Common Court of Justice and Arbitration.

### III.2   ANSWER TO THE QUESTION

65.   In the present case, the oral procedure has been requested from GETMA's counsel by a letter dated December 23rd, 2014 and, again, by a later letter dated April 17th, 2015 addressed to Mr. LENDONGO, clerk chief of the CCJA.

66.   From the documents submitted to me, it appears that GETMA never received any answer in this respect. Moreover, this lack of answer is confirmed by an e-mail dated November 26th, 2015 sent to the President of the Court.

67.   These lacks of answer as well as the absence of a public audience thus violate Article 34(2) and Article 40 of the Rules of the Procedure of the CCJA.


### IV.   DID THE SEPARATE AGREEMENT ON THE ARBITRATORS' FEES IN THE CCJA CASE No. 001/2011/ARB CONSTITUTE A VALID GROUND FOR CHALLENGING THE ARBITRAL AWARD UNDER OHADA LAW?

### IV.1   BASIC FACTUAL AND LEGAL SITUATION

68.   The present dispute originates from the termination by the Republic of Guinea, by mean of a Presidential Decree dated March 8th, 2011, of a port concession contract concluded between the French company GETMA INTERNATIONAL and the former in September 22nd, 2008 attributing GETMA the concession of the container terminal of the port of Conakry.

69.   Subsequently, GETMA filed a request for CCJA arbitration, on May 10th, 2011, in conformity with Article 31 of the concession contract and designated Mr. Juan Antonio CREMADES as arbitrator. The Republic of Guinea in turn nominated Mr. Eric TEYNIER as arbitrator. The co-arbitrators then designated Professor Ibrahim FADLALLAH as President of the Arbitral Tribunal.

70.   The Arbitral Tribunal rendered an award on April 29th, 2014 declaring the irregularity of the termination of the concession contract and ordering the Republic of Guinea to pay

€38.531.127 million in damages plus interest. The French company commenced proceedings to enforce the award by the US courts.

71.    Meanwhile, the Republic of Guinea applied to set-aside the award before the CCJA on the grounds, amongst others, that the tribunal had not fulfilled its mandate in that the arbitrators deliberately disregarded 24.2, 24.3, 25.1 of the Rule of arbitration of the CCJA and the Decision No. 004/99/CCJA dated February 3rd, 1999 on the arbitration's fees by entering into a separate fee agreement with the parties.

72.    In a judgment of November 19th, 2015, the CCJA ruled that the arbitral award should be set aside on the grounds that the arbitrators had breached their mandate by negotiating with the parties a separate agreement over their fees.


## IV.2    ANSWER TO THE QUESTION

73.    As already mentioned (*supra*, § 17), the possible grounds to challenge an award rendered under the auspices of the CCJA Arbitration Rules lies in Article 30.6 of the said Rules.

74.    One of these possible award annulment grounds is the non-respect of its judicial mission by the arbitral tribunal. It is ruled in Article 30.6 (2), which reads as follows:

> "If the arbitrator ruled without conforming to the assignment that has been conferred.[66]"

75.    This provision is equivalent to Article 1520-3° of the French Civil Procedure Code, which reads as follows:

> "The action for annulment is opened only if: [...] 3. The arbitral tribunal ruled without complying with the mission entrusted to him.[67]"

---

[66] Free translation. The original text in French language is: « Si l'arbitre a statué sans se conformer à la mission qui lui avait été conférée. »

[67] Free translation. The original text in French language is: « Le recours en annulation n'est ouvert que si : […] 3° Le tribunal arbitral a statué sans se conformer à la mission qui lui avait été confiée. »

76.     A similar disposition also lies in Article 34(2)(a)(iii) of the 1985 UNCITRAL Model Law
        on International Commercial Arbitration or in Article V(1)(c) of the 1958 UN
        Convention on the Recognition and Enforcement of Foreign Arbitral Awards signed in
        New York.

77.     Although Article 30.6 (2) of the CCJA Arbitration Rules is not expressly addressed in the
        CCJA decision No. 139/2015 of November 19th, 2015, it appears that this was the legal
        ground that the Court has implemented in order to set-aside the Arbitral Award of April
        29th, 2014 in the case No. 001/2011/ARB. The mention of "the violation by the
        arbitrators of their mission" (award, p. 4 and 6) undoubtedly refers to Article 30.6 (2) of
        the CCJA Arbitration Rules.

78.     However, when setting aside the arbitral award of April 29th, 2014 in the case
        No. 001/2011/ARB on this precise ground, the CCJA respects neither the general
        principles of Arbitration Law, nor its own case-law regarding the arbitrator's mandate
        delimitation.

79.     Under general Arbitration Law Principles, the assignment of the arbitrators is delimited
        by the matter in dispute which the parties determine. The conformity with this assignment
        implies that the arbitrators must rule upon the dispute, the whole dispute and nothing but
        the dispute.

80.     In their International Arbitration Law treatise, Professor Christophe SÉRAGLINI and
        Jérôme ORTSCHEIDT state the following:

        "**The dispute will indeed define the mission entrusted to the arbitral tribunal**,
        which it should not exceed the terms under penalty of cancellation of the
        award[68]."

---

[68] Ch. SERAGLINI, J. ORTSCHEIDT, *Droit de l'arbitrage interne et international*,
Montchrestien, 2013, at §815. Free translation. The original text in French language is: « L'objet
du litige va en effet définir la mission confiée au tribunal arbitral, dont celui-ci ne doit pas
dépasser les termes sous peine d'annulation de la sentence. »

81.     They also state that:

>   "**The dispute is determined by each party's claims**[69]."

82.     Therefore, it appears that the arbitrator's assignment is delimited by the claims filed by each party by the arbitral tribunal.

83.     In a Decision No. 011/2011 rendered on November 29th, 2011 by the CCJA itself in the *Mali v. Société ABS International Corporate LTD* case, the Court has implemented this universally admitted Arbitration Law Principle. The CCJA judges stated as follows:

>   "It is well established according to the jurisprudence that **the arbitrator's mandate**, defined in the arbitral agreement, **is mainly delimited by the object of the dispute, determined by the parties' claims**, without having regard to the wording of the arbitrator's terms of reference.[70]"

84.     Therefore, it appears that for the CCJA, in accordance with general Principles of Arbitration Law, the dispute is delimitated by the parties' claims. In reverse, the arbitrators' fees determination is normally not part of the dispute, as there is no claim by either party in this respect. The sole fact that the arbitrators' fees are mentioned within an arbitral award does not lead to the conclusion that this question is part of the dispute and, by consequence, enters the arbitral tribunal assignment.

---

[69] *Ibid*. Free translation. The original text in French language is: « L'objet du litige est déterminé par le jeu des prétentions originaires de chaque partie. » See also: Cour de cassation, 1st Chamber, March 6th, 1996, Revue de l'arbitrage 1997, p. 72, note J.-J. Arnaldez.

[70] CCJA, Court Decision No. 011/2011, November 29th, 2011, *Mali v. Société ABS International Corporate LTD*. Free translation. The original text in French language is:  « Il est de jurisprudence que la mission des arbitres, définie par la convention d'arbitrage, est délimitée principalement par l'objet du litige, tel qu'il est déterminé par les prétentions des parties, sans s'attacher uniquement à l'énoncé des questions dans l'acte de mission. »

85.   It follows that even though the fees are mentioned in the award, this cannot be a ground to challenge the award itself on the basis that the arbitrator would have ruled without conforming to his assignment.[71].

86.   This solution has been very clearly stated by the Paris Court of Appeal, which is the French court having jurisdiction upon international arbitration cases, in a 1996 *Société Qualiconsult*'s case[72]. Like in the present case, the contesting parties challenged the arbitral award on the ground that the parties and the arbitrators have agreed on the latter's fees in violation of the schedule of fees of the French Association of Arbitration. However, the Court rejected their challenge by considering that the determination of the fees of the arbitrators is not part of the matter in dispute.

87.   As a consequence, the Paris Court of Appeal concluded that the determination of the fees of the arbitrators cannot be a ground for challenge. The contestation of such fees must then be done before an ordinary court of law.

88.   One could easily draw an analogy from the latter case with the present case.

89.   In its Decision No. 139/2015 of November 19th, 2015, the CCJA has stated that the arbitral award of April 29th, 2014 should be set-aside, because the arbitrators did not respect their assignment when concluding a separate agreement with the parties on the fees. In so ruling, the Court considered that:

> "The arbitrators' fees are exclusively fixed by the Court, in conformity with the schedule of fees annexed to the Decision No. 004/99/CM of February 3rd, 1999. The Court may fix the fees of the arbitrator at an amount more or less than that of the normal rate, where the circumstances of the case make it exceptionally

---

[71] Ch. JARROSSON, Commentary of Court of Cassation, 2nd Chamber, October 28th, 1987, *S.A.R.L. Bureau Qualitas et Conte v. Viet et Boudy*, Revue de l'arbitrage, Vol. 1988, Issue 1, pp. 149-152.

[72] Ch. JARROSSON, Commentary of Paris Court of Appeal, December 19th 1996, *Société Qualiconsult et autres v. Groupe Lincoln*, Revue de l'arbitrage, Vol. 1998, Issue 1, pp. 124-130.

necessary. Any separate agreement by the parties and the arbitrators on their fees shall be null and void.[73]"

90.    But this question of the fees was not part of the dispute. During the arbitral proceeding, there has been no claim from the Claimant or the Defendant in this respect.

91.    It is therefore surprising that the CCJA has set-aside the award on the ground of the non-respect of the arbitrators' assignment, especially because the Court usually takes a particularly restrictive approach in considering the grounds of challenge[74]. In Decision No. 010/2003 rendered by the CCJA, the Court takes a two-step approach:

> "[The Court of Appeal] should have not only preliminarily indicated the scope of the arbitrators' assignment, having due regard to the arbitral agreement, but also specified how the arbitrators did not comply with their assignment before drawing any conclusion.[75]"

92.    This last reasoning has clearly not been followed by the CCJA in the present case. The Court purely and solely applied Articles 24.2, 24.3, 25.1 of the Rules of Arbitration of the CCJA as well as the Decision No. 004/CCJA referred by the contesting party to set-aside the arbitral award.

93.    In light of what constitutes the arbitrator's assignment as well as the restrictive approach usually taken by the CCJA in dealing with the grounds of challenge, the only conclusion

---

[73] Free translation. The original text in French language is: « Les honoraires des arbitres sont exclusivement fixés par la Cour, conformément au barème annexé à la Décision No. 004/99/CCJA du 3 février 1999 ; […] la Cour peut fixer les honoraires des arbitres à un montant supérieur ou inférieur à ce qui résulterait de l'application de ce barème, si les circonstances de l'espèce le rendent exceptionnellement nécessaire ; […] tout accord séparé entre les parties et l'arbitre sur ses honoraires est nul et de nul effet. »

[74] P. MEYER, « *Le droit de l'arbitrage dans l'espace OHADA, dix ans après l'Acte uniforme* », Revue de l'Arbitrage, Vol. 2010, Issue 3, § 19.

[75] CCJA, Court Decision No. 010/2003, June 19th, 2003, *Monsieur et Madame Delpech v. Société SOTACI.* Free translation. The original text in French language is: « [La Cour d'appel] devait non seulement indiquer préalablement l'étendue de la mission des arbitres eu égard notamment à la convention d'arbitrage mais également spécifier en quoi les arbitres ont failli à leur mission avant de tirer les conséquences. »

to be made is that the agreement made by the parties and the arbitrators on the arbitrators' fees should have not validly constituted a ground for challenge.

## V.  DID THE SEPARATE AGREEMENT ON THE ARBITRATORS' FEES COMPLY WITH THE ARBITRAL RULES APPLICABLE TO THE CCJA ARBITRATION CASE No. 001/2011/ARB?

### V.1  BASIC FACTUAL AND LEGAL SITUATION

#### V.1.1  The standard CCJA Arbitration Rules

94.  Article 24.2 of the CCJA Arbitration Rules states the following:

> "The costs of arbitration shall include:
>
> (a) The fees of the arbitrator and administrative expenses determined by the Court, possible expenses of the arbitrator, costs of the functioning of the Tribunal, fees and expenses of experts in case of expert evidence. **The fees of arbitrators and administrative expenses shall be fixed in accordance with the rate established by the general meeting of the Court approved by the Council of Ministers of OHADA ruling under the conditions provided in article 4 of the Treaty**.
>
> (b) Normal costs incurred by the parties for their defense as determined by the arbitrator to whom the claims of the parties are forwarded.[76]"

95.  Therefore, under CCJA Arbitration Rules, there is a schedule of fees that should be followed by both parties and arbitrators. In a way, the fees' schedule is part of the Rules

---

[76]  Free translation. The original text in French language is: « Les frais de l'arbitrage comprennent: a) les honoraires de l'arbitre et les frais administratifs fixes par la Cour, les frais éventuels de l'arbitre, les frais de fonctionnement du tribunal arbitral, les honoraires et les frais des experts en cas d'expertise. Les honoraires des arbitres et les frais administratifs de la Cour sont fixés conformément à un barème établi par l'Assemblée générale de la Cour et approuvé par le Conseil des ministres de l'OHADA statuant dans les conditions prévues à l'article 4 du Traité ; b) les frais normaux exposés par les parties pour leur défense, selon l'appréciation qui est faite par l'arbitre des demandes formulées sur ce point par les parties. »

themselves[77]. However, the Court has the possibility to increase them when exceptional circumstances occur.  Article 24.3 of the CCJA Arbitration Rules reads as follows:

> "Where the circumstances of the case make it exceptionally necessary, the Court may fix the fees of the arbitrator at an amount more or less than that of the normal rate.[78]"

96.     But if the Court has this power, the possibility for the arbitrators and the parties to agree on a new fees rate is denied under CCJA Arbitration Rules. Article 9 of the Decision No. 004/99/CCJA of February 3rd, 1999 on the arbitration's fees ("Decision No. 004/CCJA") expressly exclude any such agreement:

> "The fees and expenses of the arbitrators shall be determined exclusively by the Court. **Any separate agreement by the parties and the arbitrators on their fees shall be null and void**.[79]"

**V.1.2   The Uniform Act on Arbitration**

Article 10 of the UAA Rules reads as follows:

> "The fact that the parties defer to an arbitration institution commits them to apply this institution's Arbitration Rules, **except when the parties expressly exclude certain provisions**.[80]"

---

[77] J.-L. DELALANDE, *« Les honoraires dans l'arbitrage institutionnel »*, Revue de l'arbitrage, Vol. 1990, Issue 2, p. 369.

[78] Free translation. The original text in French language is: « Si les circonstances de l'espèce le rendent exceptionnellement nécessaire, la Cour peut fixer les honoraires de l'arbitre à un montant supérieur ou inférieur à ce qui résulterait de l'application du barème. »

[79] Free translation. The original text in French language is: « Les honoraires et dépenses de l'arbitre sont exclusivement fixés par la Cour, en accord avec ce qui est prévu par le Règlement d'arbitrage. Tout accord séparé entre parties et arbitres sur leurs honoraires est nul et non avenu. »

[80] Free translation. The original text in French language is: « Le fait pour les parties de s'en remettre à un organisme d'arbitrage les engage à appliquer le Règlement d'arbitrage de cet organisme, sauf pour les parties à en écarter expressément certaines dispositions. »

97.    This means that under UAA Rules, when having recourse to institutional arbitration, the parties can expressly exclude certain provision of the arbitration rules of the chosen arbitration centre.

98.    However, the question of the application of the UAA in CCJA arbitration has long been on debate. According to Professor MEYER, the basic sources of OHADA arbitration are constituted by what he calls "certain sources" and "uncertain sources"[81]:

-    The first category of sources refers to rules that certainly govern CCJA arbitration proceedings. Professor MEYER divides these into two sub-categories, namely the "internal certain sources" such as the OHADA Treaty, the Rule of the Arbitration of the CCJA, the Decision No. 004/99/CM and the "external certain sources" embodied particularly by the New York Convention of the 10th of June 1958;

-    The second category includes sources that do not govern CCJA arbitration.  Professor MEYER includes the UAA in this category.

99.    This distinction enables to understand the two existing types of arbitrations in the OHADA arbitration system, namely the ordinary arbitration, comprising ad hoc and institutional arbitration, governed by the UAA, on the one hand, and arbitration administrated by the CCJA, on the other.

100.    Professor MEYER mainly bases his analysis on the Decision No. 45 rendered on July 17th, 2008 by the CCJA in which the Court stated that the UAA relating to the law of arbitration is not applicable to institutional arbitration such as the CCJA arbitration[82].

101.    There are other views in the legal literature about whether the UAA applies to CCJA arbitration.

---

[81] P. MEYER, *supra* FN 12, at § 2-9

[82] CCJA, Court Decision No. 45, July 17th, 2008, *Société Nationale pour la Promotion dite SONAPRA v. Société des Huileries du Bénin dite SHB*. See also: P. MEYER, *« Le droit de l'arbitrage dans l'espace OHADA, dix ans après l'Acte uniforme »*, Revue de l'Arbitrage, Vol. 2010 Issue 3,  § 14.

102.   According to Professor KENFACK DOUAJNI:

"One must not lose sight of the fact that the UAA is also likely to apply to the CCJA arbitration, all the more that the CCJA Rules occasionally implicitly refers to the UAA"[83].

103.   Furthermore, Achille NGWANZA states that:

"The UAA serves as the applicable law within the OHADA territory and has an abrogatory value on all contrary domestic provisions. Consequently, the UAA not only governs ad hoc arbitration but also institutional arbitration administered by private arbitral institutions of the OHADA territory"[84].

104.   Nevertheless, Professor MEYER's views should certainly be reconsidered in the light of a more recent decision, namely the Decision No. 011/2011 rendered on November 29th, 2011 by the CCJA in which the Court referred to the UAA regarding an arbitral award rendered under the CCJA[85]. Indeed, Professor MEYER expressed such views before the latter decision was issued.

105.   This ruling should not be surprising since the UAA is intended to widely be applied. Indeed, its Article 1 states that: "*This Uniform Act shall apply to any arbitration when the seat of the Arbitral Tribunal is in one of the Member State*".

---

[83] G. KENFACK DOUAJNI, *L'arbitrage OHADA*, 2014, P.U.P.P.A, at § 169. Free translation. The original text in French language is: « Il ne doit pas être perdu de vue que l'AUA est également susceptible de s'appliquer à l'arbitrage CCJA, d'autant plus que le Règlement CCJA renvoie implicitement parfois audit AUA ».

[84] A. NGWANZA, Note – CCJA, Decision No. 011/2011, 29th of November 2011, *Mali v. Société ABS International Corporate LTD, Cahiers de l'arbitrage*, p. 1139. Free translation. The original text in French language is: « L'AUA tient lieu de loi d'arbitrage dans l'espace OHADA et a une valeur abrogatoire sur toutes les dispositions nationales contraires. En conséquence, l'AUA porte aussi bien sur les arbitrages ad hoc que les arbitrages institutionnels organisés par les centres d'arbitrage privés de l'espace OHADA. »

[85] CCJA, Court Decision No. 011/2011, November 29th, 2011, *Mali v. Société ABS International Corporate LTD*.

**V.2     ANSWER TO THE QUESTION**

**V.2.1   The separate agreement on the arbitrator's fee and compliance with the standard CCJA Arbitration Rules**

106.     By concluding a separate agreement on the arbitrator's fees, the parties and the arbitrators have not complied with the standard CCJA Arbitration Rule on fees.   Whether the separate agreement complied with the CCJA Rules applicable to the CCJA arbitration between the parties, depends on whether the Uniform Act on Arbitration applied.

**V.2.2   The separate agreement on the arbitrator's fee and compliance with the CCJA Arbitration Rules if the UAA Rules also apply**

107.     In the present case, the seat of the Arbitral Tribunal is within the OHADA territory. As a consequence, and in light of this recent ruling, the UAA should also govern the proceedings.

108.     Given this recent ruling that the UAA generally should also apply in CCJA arbitrations, and given that the parties' dispute resolution agreement departs from the CCJA rule on fees and costs, whether the separate agreement on the arbitrator's fees complies with the rules that applied to the present arbitration would be influenced by whether the CCJA informed the parties before taking on the arbitration that it would not honor the part of the dispute resolution agreement that departs from the CCJA rule.   My understanding is that the CCJA did not provide any such notice before accepting to administer the arbitration. Therefore, this leads to the conclusion that the separate agreement on the arbitrator's fees complied with the rules applicable to the arbitration in the present case.

**V.      CONCLUSION**

109.     In answer to the four questions submitted to me, my conclusions are the following:

a. Even when putting aside the fact that the Common Court of Justice and Arbitration twofold function as both a Court of supranational jurisdiction and at the same time an international arbitral institution raises a lack of independence significant issue, certain facts undoubtedly demonstrates that CCJA Guinean judge Mr. Fodé KANTE was actually biased in rendering decision No. 139/2015 of November 19th, 2015 setting aside the arbitral award of April 29th, 2014 in the case No. 001/2011/ARB as he acted as a subordinate to his home State by helping it to prepare its defense and these facts impair the fairness of the decision.

b. The lack of answer of the CCJA to GETMA's counsel's request for an oral procedure by a letter dated December 23rd, 2014 and by a later letter dated April 17th, 2015 addressed to Mr. LENDONGO, clerk chief of the CCJA, does not comply with Article 34(2) of the Rules of the Procedure of the CCJA.

c. The separate agreement made by the parties and the arbitrators on the arbitrators' fees cannot be considered as part of the arbitrator's assignment and therefore cannot be a valid ground for the annulment of the arbitral award of April 29th, 2014 in the case No. 001/2011/ARB under Article 30.6 (2) of the CCJA Arbitration Rules.

d. The separate agreement on the arbitrators' fees appears to comply with the arbitral rules applicable to the CCJA arbitration case because it appears that the UAA also applies.  It appears that the UAA also applies given a recent CCJA ruling that the UAA generally applies in CCJA arbitrations and given my understanding that the CCJA before accepting to administer the arbitration did not inform the parties that it would not be honoring the part of their dispute resolution agreement that departed from the CCJA rule on arbitrator fees.

\*       \*       \*

110. I DECLARE under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge, information, and belief.

Executed on: February 23rd, 2016

Paris, France

_____
Mathias Audit