## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____
)
In the matter of the Arbitration of Certain )
Controversies Between )
)
GETMA INTERNATIONAL, )
)
    Petitioner, )   Civil Action No. 14-1616 (RBW)
)
and )
)
THE REPUBLIC OF GUINEA, )
)
    Respondent. )
_____)

### MEMORANDUM OPINION

  Getma International ("Getma"), the petitioner, commenced this civil action against the

Republic of Guinea ("Guinea"), the respondent, seeking confirmation and enforcement of a

foreign arbitral award ("arbitral award" or "award") pursuant to the Federal Arbitration Act, 9

U.S.C. § 201 (2012).  See, e.g., Petition to Confirm Arbitration Award and to Enter Judgment

("Confirm Pet.") at 1.  The Court previously stayed this case, pending the outcome of Guinea's

attempt to have the award annulled.  See In re Certain Controversies Between Getma Int'l &

Republic of Guinea ("In re Getma"), _ F. Supp. 3d _, _, 2015 WL 6735625, at *7 (D.D.C. 2015).

That stay was effectively lifted after the parties informed the Court that the award had been

annulled, see December 22, 2015 Joint Status Report at 1-2, ECF No. 29, whereupon the Court

ordered the parties to propose a briefing schedule concerning whether the Court should confirm

and enforce the award, notwithstanding the annulment, see January 5, 2016 Order, ECF No. 30.

Briefing has now been completed, and upon careful consideration of the parties' submissions,[1] the Court concludes that it cannot confirm and enforce the award.

## I.   BACKGROUND

The Court previously set out many of the facts underlying this case.  In re Getma, _ F. Supp. 3d at _, 2015 WL 6735625, at *1-2.  The Court supplements that background as follows.

### A.  The Arbitration Proceeding

In October 2011, after the parties agreed to resolve their dispute before a foreign arbitral tribunal ("arbitral tribunal" or "tribunal")—composed of three arbitrators—concerning the termination of the Concession Agreement pursuant to the Common Court of Justice and Arbitration ("CCJA") Arbitration Rules,[2] see id. at _, *1, the CCJA ordered that the parties pay for certain fees and costs in advance of the arbitration, Declaration of Laurent Jaeger ("First Jaeger Decl."), ECF No. 18-5, Exhibit ("Ex.") 4 (October 24, 2011 CCJA Order ("Oct. 24, 2011 CCJA Order")) at 5-6,[3] which amounted to about €154,000, including approximately €62,000 in arbitrators' fees, see Confirm Mem. at 6; Confirm Opp'n at 6.  After the tribunal was constituted in early 2012, the tribunal sought permission from the Secretary General of the CCJA

---

[1]  In addition to Getma's petition to confirm and enforce the arbitral award, the Court considered the following submissions in rendering its decision: (1) Getma Revised Memorandum of Points and Authorities in Support of Petition to Confirm Arbitration Award and to Enter Judgment ("Confirm Mem."); (2) the Republic of Guinea's Revised Memorandum of Points and Authorities in Opposition to Getma International's Petition to Confirm Award ("Confirm Opp'n"); and (3) Getma International's Revised Reply Memorandum in Further Support of Petition to Confirm Arbitration Award and to Enter Judgment ("Confirm Reply").

[2]  As the Court explained in its earlier opinion, the CCJA was established by the OHADA Treaty, which was signed by certain West and Central African states ("OHADA member states"), including Guinea, generally to create a uniform system of commercial dispute resolution.  See In re Getma, _ F. Supp. 3d at _, 2015 WL 6735625, at *1 n.2.  The CCJA can administer arbitration proceedings instituted pursuant to the CCJA Arbitration Rules, as well as review arbitral awards.  See id.

[3]  In referencing the parties' exhibits, the Court will use the page numbers assigned to the exhibits by the Court's electronic court filing ("ECF") system.

("Secretary General")[4] on or about April 11, 2013, to contact the parties' counsel about an

increase in the arbitrators' fees.  See, e.g., First Jaeger Decl., Ex. 29 (June 3, 2014 Letter From

Arbitral Tribunal to Secretary General ("June 3, 2014 Letter")) at 12 ("If the Secretary General

finds the time to be opportune, the [t]ribunal can discuss . . . [the fees issue] with the [p]arties'

[c]ounsel." (emphasis and quotation marks omitted)); First Jaeger Decl., Ex. 25 (August 1, 2013

CCJA Order ("Aug. 2013 CCJA Order")) at 5 ("In light of the letter dated [April 11, 2013] from

the . . . [t]ribunal . . . to the Secretary General relative to the request that the [CCJA] revise the

global fee payable to the [t]ribunal upward to €450,000[.]").  The Secretary General permitted

the tribunal to do so on April 15, 2013.  See, e.g., First Jaeger Decl., Ex. 29 (June 3, 2014 Letter)

at 12 ("[Y]ou may, as you have requested, bring this . . . [fees issue] to the [p]arties' [c]ounsel

and keep me informed of the outcome."); First Jaeger Decl., Ex. 25 (Aug. 2013 CCJA Order) at

5 (noting that the Secretary General sent a letter on April 15, 2013, to the arbitral tribunal

regarding request for increased arbitrators' fees).

On April 22, 2013, the arbitral tribunal contacted the parties about increasing the

arbitrators' fees from approximately €62,000 to approximately €450,000.  First Jaeger Decl., Ex.

14 (April 22, 2013 Letter From Arbitral Tribunal to the Parties) at 5-6 ("Given the size of the

dispute and of the questions raised, the arbitrators believe that in order to enable them to properly

perform their duties, the overall fee of the arbitral [t]ribunal should be fixed at €450,000.  The

[t]ribunal wishes to obtain any comments from the parties with respect to this estimate.").

By May 10, 2013, the parties had responded to the arbitral tribunal, informing it that they

had "no comments" regarding the request for increased arbitrators' fees.  First Jaeger Decl., Ex.

---

[4]  The parties do not explain the responsibilities of the Secretary General to the Court, but the record suggests that
the Secretary General generally performs administrative tasks for the CCJA and serves as a liaison between the
arbitral tribunal and the CCJA.

18 (May 3, 2013 Letter From Getma to Arbitral Tribunal) at 4; First Jaeger Decl., Ex. 19 (May 10, 2013 Letter From Guinea to Arbitral Tribunal) at 5; see also First Jaeger Decl., Ex. 16 (May 10, 2013 Letter From Arbitral Tribunal to Parties ("May 10, 2013 Letter")) at 5. The tribunal interpreted the parties' silence on the fee issue as "hav[ing] no objection to [the] fee revision," First Jaeger Decl., Ex. 16 (May 10, 2013 Letter) at 5, and sought the parties' confirmation of this interpretation. Id. at 6. The parties eventually agreed to the tribunal's solicitation for increased arbitrators' fees in June 2013. See First Jaeger Decl., Ex. 23. (June 25, 2013 and June 28, 2013 Emails ("June 2013 Emails")) at 5. The tribunal then immediately notified the Secretary General of the parties' consent to increased arbitrators' fees, and the Secretary General informed the tribunal that he would "contact the [CCJA] soon to adjust the fees of the . . . [tribunal]." Second Declaration of Cédric Fischer ("Second Fischer Decl."), ECF No. 25-13, Ex. 11 (June 28, 2013 Email From Secretary General to Arbitral Tribunal ("June 28, 2013 Letter")) at 2.

However, on August 1, 2013, the CCJA denied the arbitral tribunal's attempt to revise and increase the arbitrators' fees that the CCJA initially ordered, citing 1999 CCJA precedent. See First Jaeger Decl., Ex. 25 (Aug. 2013 CCJA Order) at 5-6. In pertinent part, the 1999 CCJA precedent states:

> The [CCJA] shall determine the arbitrator's fees pursuant to [a fixed schedule], or at its discretion where the amount in controversy has not been stated.
>
> If the circumstances of the case render it necessary on an exceptional basis, the [CCJA] may set the arbitrator's fees at an amount that is greater or less than the amount that would result from application of the scale. . . .
>
> When it sets the arbitrator's fees, the [CCJA] shall take into consideration the work done by arbitrator, the time spent, the speed of proceedings[,] and the complexity of the dispute, so as to reach a figure within the limits provided for, or above or below such limits under . . . exceptional circumstances . . . .

> Where a matter is submitted to more than one arbitrator, the [CCJA] may, at its discretion, increase the amount set aside for payment of fees, generally up to a limit of three times that provided for a single arbitrator. . . .
>
> The arbitrator's fees and expenses are set exclusively by the Court, in accordance with the provisions of the Rules of Arbitration. Any separate arrangement between the parties and the arbitrators concerning their fees is null and void.

First Jaeger Decl., Ex. 26 (February 3, 1999 CCJA Order ("Feb. 3, 1999 CCJA Order")) at 7-8.

Despite the CCJA's August 2013 order, Getma lobbied the CCJA on September 19, 2013, to reconsider its decision denying the arbitral tribunal's demand for increased fees.[5] See First Jaeger Decl., Ex. 30 (September 19, 2013 Letter From Getma to CCJA ("Sept. 19, 2013 Letter")) at 6-8. Shortly thereafter, on October 3, 2013, the CCJA again declined to increase the initial arbitrators' fees, relying on the same 1999 CCJA precedent that it cited in its August 2013 order. First Jaeger Decl., Ex. 31 (October 3, 2013 CCJA Order ("Oct. 3, 2013 CCJA Order")) at 5-6.

On April 30, 2014, the arbitral tribunal informed the parties that it had resolved the parties' dispute and would issue an award that included a demand for €450,000 in arbitrators' fees. First Jaeger Decl., Ex. 45 (April 30, 2014 Letter From Arbitral Tribunal to Parties ("Apr. 30, 2014 Letter")) at 9. On or about May 19, 2014, the Secretary General contacted the tribunal, notifying it that the Secretary General was in receipt of the tribunal's April 30, 2014 communication to the parties. First Jaeger Decl., Ex. 47 (May 19, 2014 Email from Secretary General to Arbitral Tribunal ("May 19, 2014 Email")) at 5. After recognizing that the award would include a demand for increased arbitrators' fees, and notwithstanding the CCJA's

---

[5] Following the CCJA's August 2013 order, the tribunal apparently continued to contact the CCJA about the fees issue in September 2013. See Second Fischer Decl., Ex. 14 (September 16, 2013 Letter From Arbitral Tribunal to CCJA ("Sept. 16, 2013 Letter")) at 2; see also First Jaeger Decl., Ex. 29 (June 3, 2014 Letter) at 13; First Jaeger Decl., Ex. 31 (October 3, 2013 CCJA Order ("Oct. 3, 2013 CCJA Order")) at 6 (considering two letters written in September 2013 from the tribunal to the CCJA).

previous orders rejecting such a demand, the Secretary General "formally prohibited" the tribunal from seeking any increased arbitrators' fees.[6] Id.; see also First Jaeger Decl., Ex. 48 (May 20, 2014 Letter From Secretary General to Getma ("May 20, 2014 Letter")) at 6 ("I call your attention to the fact that, if the final award includes the payment of the amount of €450,000 to the arbitrators, in accordance with the invalid arrangement, the award will potentially be subject to invalidation by . . . [the CCJA].").  The tribunal ultimately issued an award in favor of Getma,[7] which did not include an increase in the arbitrators' fees.  See First Jaeger Decl., Ex. 49 (May 22, 2014 – May 23, 2014 Emails ("May 2014 Emails")) at 6.

After the arbitral tribunal issued the award, the tribunal continued to express its frustration with the CCJA over the CCJA's repeated refusal to allow the tribunal to seek increased arbitrators' fees from the parties.  First Jaeger Decl., Ex. 29 (June 3, 2014 Letter) at 10-16.  And somehow, the tribunal eventually collected half of the increased arbitrators' fees from Getma (approximately €225,000) in September 2014.  See First Jaeger Decl., Ex. 51 (September 22, 2014 Letter From Arbitral Tribunal to Parties ("Sept. 22, 2014")) at 4; Confirm Mem. at 14; Confirm Opp'n at 15; see also First Jaeger Decl., Ex. 50 (August 27, 2014 Letter From Arbitral Tribunal to Parties ("Aug. 27, 2014 Letter")) at 4.  But Guinea declined to follow suit and pay any increased arbitrators' fees, reneging on its promise to do so earlier.  See First Jaeger Decl., Ex. 51 (Sept. 22, 2014) at 4; Second Fischer Decl., Ex. 16 (May 19, 2014 Letter From Guinea to Secretary General ("May 19, 2014 Letter")) at 2-3.

---

[6]  In addition to the August 2013 and October 2013 orders, the CCJA apparently denied the arbitral tribunal's request for increased arbitrators' fees two additional times.  See First Jaeger Decl., Ex. 29 (June 3, 2014 Letter) at 13 ("Unfortunately, the [CCJA] confirmed its position a fourth time on [April 14, 2014].").

[7]  The award was approximately €39 million.  See In re Getma, _ F. Supp. 3d at _, 2015 WL 6735625, at *1.

### B.  The Annulment Proceeding

"In July 2014, Guinea filed an annulment petition with the CCJA, seeking to have the

CCJA set aside the arbitral award."  In re Getma, _ F. Supp. 3d at _, 2015 WL 6735625, at *2.

That petition was successful, as the CCJA, sitting en banc, annulled the arbitral award on the

ground that the arbitral tribunal violated the CCJA Arbitration Rules, and thus, the tribunal's

"mission" to conduct the arbitration proceeding in accordance with those rules, in seeking

increased arbitrators' fees from the parties, which only the CCJA had authority to order the

parties to do.  See Confirm Mem. at 15, 39-40; Confirm Opp'n at 16, 33; see also Joint Status

Report, Ex. A (December 1, 2015 CCJA Order ("Dec. 1, 2015 CCJA Order")) at 13-15.  Despite

the annulment of the award, Getma has petitioned the Court to confirm and enforce the award.

## II.   LEGAL STANDARD

The Convention on the Recognition and Enforcement of Foreign Arbitral Awards of June

10, 1958, also known as the "New York Convention," is enforced through the Federal

Arbitration Act, 9 U.S.C. § 201 (2012).  See, e.g., G.E. Transp. S.P.A. v. Republic of Albania,

693 F. Supp. 2d 132, 136 & n.5 (D.D.C. 2010).  The New York Convention authorizes the

recipient of a foreign arbitral award to seek confirmation and enforcement of the award in federal

court.  See 9 U.S.C. §§ 202, 207.  The New York Convention provides that a court "shall

confirm the award unless it finds one of the grounds for refusal or deferral of recognition or

enforcement of the award specified in the said Convention."  Id. § 207.  Such grounds include

the following: incapacity of the parties; invalidity of the underlying agreement; deficient notice

of the arbitration proceedings; an award beyond the scope of the arbitration agreement; improper

composition of the arbitration panel; and an award that has not yet become binding, or has been

set aside or suspended by a competent authority of the country in which, or under the law of

which, that award was made.  TermoRio S.A. E.S.P. v. Electranta S.P., 487 F.3d 928, 934-35

(D.C. Cir. 2007).

### III.    ANALYSIS

Getma generally contends that the annulment of the arbitral award was "repugnant to

U.S. public policy" because it "violat[ed] basic notions of justice," and the Court should,

therefore, confirm and enforce the award.  Confirm Mem. at 26.  The New York Convention

does confer upon courts the discretion to enforce an annulled award, but that discretion is

"narrowly" confined and may only be exercised "where enforcement would violate the . . .

[United States'] most basic notions of morality and justice."  TermoRio, 487 F.3d at 938.  This

standard is "high and infrequently met," except in "clear-cut cases."  Id. (quoting Tahan v.

Hodgson, 662 F.2d 862, 866 n.17 (D.C. Cir. 1981)); see also Gold Reserve Inc. v. Bolivarian

Republic of Venezuela, _ F. Supp. 3d _, _, 2015 WL 7428532, at *14 (D.D.C. 2015)

("[V]iolations of the most basic notions of morality and justice is a high bar . . . .").  The District

of Columbia Circuit has explained that the "test of public policy cannot be simply whether . . . [a

court] would set aside an arbitration award if the award had been made and enforcement had

been sought . . . [in the United States]."  TermoRio, 487 F.3d at 938.  The New York Convention

"contemplates that different . . . [countries] may have different grounds for setting aside

arbitration awards."  Id.  Courts "must be very careful in weighing notions of 'public policy' in

determining whether to credit the judgment of a [foreign] court in . . . vacating an arbitration

award."  Id.  The New York Convention "does not endorse a regime" in which courts "routinely

second-guess the judgment" of a foreign court with competent jurisdiction to annul an arbitral

award.  Id. at 937.  Where a foreign court has annulled an arbitral award, a court in this country

may only ignore that annulment on "limited . . . occasions" where extraordinary circumstances

have been presented.  Id. at 938.  For example, "[i]n the classic formulation, a judgment that 'tends clearly' to undermine the public interest, the public confidence in the administration of the law, or security for individual rights of personal liberty or of private property is against public policy."  Id. (quoting Ackermann v. Levine, 788 F.2d 830, 841 (2d Cir. 1986)).  On the other hand, "erroneous legal reasoning or misapplication of law is generally not a violation of public policy within the meaning of the New York Convention."  Gold Reserve, _ F. Supp. 3d. at _, 2015 WL 7428532, at *14 (quoting Karaha Bodas Co., LLC v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara, 364 F.3d 274, 306 (5th Cir. 2004)).

   None of Getma's public policy-oriented contentions compel the Court to go against the grain and ignore the CCJA's annulment of the arbitral award.  The parties agreed to be bound by the CCJA Arbitration Rules.  Confirm Pet., Declaration of Cédric Fischer ("First Fischer Decl."), ECF No. 1-1, Ex. 2 (Concession Agreement) at 3 ("[Any] . . . claim, dispute or difference will be permanently and irrevocably settled through arbitration proceedings subject to the . . . [CCJA Arbitration Rules].").  According to those rules, the CCJA is the highest court of review.  See In re Getma, _ F. Supp. 3d at _, 2015 WL 6735625, at *1 n.2.  The CCJA ordered the arbitral tribunal on multiple occasions to abandon its efforts to solicit increased arbitrators' fees from the parties.  See First Jaeger Decl., Ex. 31 (Oct. 3, 2013 CCJA Order) at 5-6; First Jaeger Decl., Ex. 25 (Aug. 2013 CCJA Order) at 5-6.  In doing so, the CCJA relied on its own precedent, as well as its arbitration rules, which unambiguously supports the position that the determination of arbitrators' fees is the exclusive province of the CCJA, and neither the tribunal nor the parties could invade that authority.  First Jaeger Decl., Ex. 26 (Feb. 3, 1999 CCJA Order) at 8 ("The arbitrator's fees and expenses are set exclusively by the Court, in accordance with the provisions of the Rules of Arbitration.  Any separate arrangement between the parties and the arbitrators

<u>concerning their fees is null and void</u>." (emphasis added)).  Yet, the tribunal seemingly ignored

that authority by defying the CCJA's orders and pursuing increased arbitrators' fees with the

parties.

Getma faults the CCJA for allegedly having initially "encouraged" the arbitral tribunal to

consult with and solicit an agreement from the parties regarding increased arbitrators' fees, only

to reverse its position subsequently.  Confirm Mem. at 29, 34-36, 41-42; <u>see also</u> First Jaeger

Decl., Ex. 29 (June 3, 2014 Letter) at 12 (Secretary General permitting arbitral tribunal to contact

parties about increasing arbitrators' fees and requesting it to apprise the Secretary General about

any communications on the subject); First Jaeger Decl., Ex. 31 (Oct. 3, 2013 CCJA Order) at 5-

6; First Jaeger Decl., Ex. 25 (Aug. 2013 CCJA Order) at 5-6.  The Court is unconvinced that the

annulment decision under these circumstances—albeit somewhat unusual—violated the most

basic notions of justice.  First, <u>only the Secretary General</u> permitted the tribunal to contact the

parties about increasing the arbitrators' fees.  First Jaeger Decl., Ex. 29 (June 3, 2014 Letter) at

12.  Getma cannot dispute that the CCJA, and <u>not</u> the Secretary General, has the ultimate

authority and discretion to increase the arbitrators' fees.  <u>See, e.g.</u>, First Jaeger Decl., Ex. 26

(Feb. 3, 1999 CCJA Order) at 8.  Second, to characterize the Secretary General's communication

with the tribunal as "encouragement" is not entirely accurate.  The Secretary General permitted

the tribunal to open discussions with the parties about increasing the arbitrators' fees and asked

to be kept informed of the "outcome" of those discussions.  <u>See</u> First Jaeger Decl., Ex. 29 (June

3, 2014 Letter) at 12.  The Secretary General never affirmatively represented that the CCJA

would eventually approve any agreement that the tribunal solicited—he merely informed the

tribunal that he would contact the CCJA about revising the arbitrators' fees.  <u>See</u> Second Fischer

Decl., Ex. 11 (June 28, 2013 Letter) at 2.  Third, even under the assumption that the Secretary

General's communication with the tribunal served as a proxy for the CCJA's tacit consent to solicit additional arbitrators' fees from the parties, the CCJA's later rescission of that approval was entirely consistent with CCJA precedent.[8]  <u>See</u> First Jaeger Decl., Ex. 26 (Feb. 3, 1999 CCJA Order) at 8.  And such conduct is not repugnant to United States public policy, especially where courts in this country are free to reconsider and change their rulings when the circumstances demand that result, such as when controlling precedent has been overlooked.  <u>See, e.g.</u>, Fed. R. Civ. P. 54(b); <u>Loumiet v. United States</u>, 65 F. Supp. 3d 19, 24 (D.D.C. 2014) ("A motion to reconsider brought under Rule 54(b) may be granted 'as justice requires.' Considerations a court may take into account under this standard include whether the court 'patently' misunderstood a party, made a decision beyond the adversarial issues presented to the court, <u>made an error in failing to consider controlling decisions or data</u>, or whether a controlling or significant change in the law or facts has occurred since the submission of the issue to the Court." (emphasis added) (quoting <u>Singh v. George Wash. Univ.</u>, 383 F. Supp. 2d 99, 101 (D.D.C. 2005))).  There is no substantive difference between the CCJA's decision to rescind its purported approval of the increased arbitrators' fees and a court's decision to reconsider and amend its earlier ruling.  Fourth, Getma conflates expectations with obligations.  Although Getma recognizes that the CCJA Arbitration Rules "expressly permit" the arbitrators' fees to be adjusted and the CCJA may have "contemplate[d]" an upward adjustment of those fees, Confirm Mem. at 33, that authorization does not impose an obligation on the CCJA to increase the arbitrators' fees, <u>see</u> First Jaeger Decl., Ex. 26 (Feb. 3, 1999 CCJA Order) at 7 ("The Court shall

---

[8]  Getma criticizes the CCJA for failing to conduct a more extensive inquiry that could have likely led it to increase the arbitrators' fees.  <u>See</u> Confirm Mem. at 34-35.  This criticism presents no opportunity to ignore the annulment of the award on public policy grounds.  <u>See</u> <u>Indus. Risk Insurers v. M.A.N. Gutehoffnungshutte GmbH</u>, 141 F.3d 1434, 1446 (11th Cir. 1998) ("The [New York] Convention does not, however, include a defense against enforcement of an award on the ground that the award is 'arbitrary and capricious.'").

determine the arbitrator's fees pursuant to [a fixed schedule], or at its discretion where the amount in controversy has not been stated.  If the circumstances of the case render it necessary on an exceptional basis, the Court <u>may</u> set the arbitrator's fees at an amount that is greater or less than the amount that would result from application of the scale." (emphasis added)); <u>see also</u> First Jaeger Decl., Ex. 2 (CCJA Arbitration Rules) at 15-16 ("The costs of arbitration shall include . . . the fees of the arbitrator and administrative expenses determined by the [CCJA] . . . . Where the circumstances of the case make it exceptionally necessary, the [CCJA] <u>may</u> fix the fees of the arbitrator at an amount more or less than that of the normal rate." (emphasis added)). At worse, the CCJA conceivably abused its discretion—but even such a transgression would be an insufficient ground to ignore the annulment.  <u>See</u> <u>infra</u>.

Getma posits that the CCJA's refusal to increase the arbitrators' fees was an attempt by the CCJA to "sabotage the arbitration," as its refusal to increase the arbitrators' fees threatened the possibility that the arbitral tribunal would "suspend its work" and "forestall issuance of an award adverse to [an] OHADA member [state]."  Confirm Mem. at 35.  This conspiracy theory is not only speculative, but ill-conceived.[9]  The theory presumes that the CCJA <u>already</u> would have known the outcome of the arbitration proceeding whenever it rejected the tribunal's request to seek increased arbitrators' fees from the parties.  But nothing in the record suggests that the CCJA based its orders on the outcome of the arbitration.  Rather, the record demonstrates that the CCJA rejected the tribunal's request for increased arbitrators' fees in August 2013 and October 2013, relying on CCJA precedent, <u>see</u> First Jaeger Decl., Ex. 31 (Oct. 3, 2013 CCJA Order) at 5-

---

[9] Any suggestion that the CCJA is inherently biased in favor of OHADA member states is unfounded.  <u>See</u> Confirm Mem. at 34-35.  In signing the Concession Agreement, Getma "had little trouble in deciding to litigate . . . [any conceivable] breach of contract claim" according to the CCJA Arbitration Rules.  <u>TermoRio S.A. E.S.P. v. Electrificadora Del Atlantico S.A. E.S.P.</u>, 421 F. Supp. 2d 87, 101 (D.D.C. 2006), <u>aff'd sub nom.</u> <u>TermoRio</u>, 487 F.3d at 930.  "This action alone suggests considerable confidence and trust in the . . . [CCJA]." <u>Id.</u>  In any event, "[o]n a legal basis, it takes much more than an allegation that a decision was results-oriented to demonstrate that it was 'repugnant,' particularly when, as here, the decision seems plausible on the merits."  <u>Id.</u> at 102.

6; First Jaeger Decl., Ex. 25 (Aug. 2013 CCJA Order) at 5-6, and that it possibly first learned

about the award against Guinea on or about January 2014, <u>see</u> First Jaeger Decl., Ex. 44 (March

17, 2014 Letter From Tribunal to Secretary General ("Mar. 17, 2014 Letter")) at 5.

Getma argues that the CCJA should have honored the parties' agreement to pay the

increased arbitrators' fees.  <u>See</u> Confirm Mem. at 36-39, 42.  However, by the parties' own

accord they were prohibited from doing so, as the Concession Agreement compelled the parties

to resolve disputes "through arbitration proceedings, subject to the . . . [CCJA Arbitration

Rules]."  Confirm Pet., First Fischer Decl., Ex. 2 (Concession Agreement) at 3.  And those rules

assign the fee-setting responsibility exclusively to the CCJA.  First Jaeger Decl., Ex. 2 (CCJA

Arbitration Rules) at 15-16 ("The costs of arbitration shall include . . . the fees of the arbitrator

and administrative expenses determined by the [CCJA] . . . .  Where the circumstances of the

case make it exceptionally necessary, the [CCJA] may fix the fees of the arbitrator at an amount

more or less than that of the normal rate."); <u>see also</u> First Jaeger Decl., Ex. 26 (Feb. 3, 1999

CCJA Order) at 8 ("The arbitrator's fees and expenses are set exclusively by the Court, in

accordance with the provisions of the Rules of Arbitration.  Any separate arrangement between

the parties and the arbitrators concerning their fees is null and void.").  The fact that the CCJA

rejected the parties' purported and concerted attempt to strip it of that responsibility is neither

unjust nor extraordinary.  <u>See</u> <u>Thai-Lao Lignite (Thailand) Co. v. Gov't of Lao People's</u>

<u>Democratic Republic</u>, 997 F. Supp. 2d 214, 224 (S.D.N.Y. 2014) (rejecting public policy

challenge in part because agreement that permitted party to waive right of appeal was contrary to

law of foreign tribunal that had primary jurisdiction); <u>see also</u> <u>TermoRio</u>, 487 F.3d at 937

(foreign tribunal "necessarily may set aside an award on grounds that are not consistent with the

laws and policies" of this Court); <u>Parsons & Whittemore Overseas Co. v. Societe Generale De</u>

L'Industrie Du Papier (RAKTA), 508 F.2d 969, 975 (2d Cir. 1974) ("By agreeing to submit

disputes to arbitration, a party relinquishes his courtroom rights . . . in favor of arbitration 'with

all of its well[-]known advantages and drawbacks.'" (quoting Wash.-Balt. Newspaper Guild v.

Washington Post Co., 442 F.2d 1234, 1238 (D.C. Cir. 1971))).  This rejection would be

permitted even where the arbitrators' fees were dramatically lower than arbitrators' fees

regulated by international tribunals other than the CCJA.[10]  See Confirm Mem. at 33; see also

Parsons & Whittemore Overseas, 508 F.2d at 975.  And to the extent that the parties could even

contract to circumvent these rules, see First Jaeger Decl., Ex. 26 (Feb. 3, 1999 CCJA Order),

they failed to do that here.  The relevant part of the dispute resolution clause in the Concession

Agreement states that "[e]ach of the [p]arties will bear the cost of the arbitrator it appoints" and

that "other costs incurred for arbitration will be shared equally by the [p]arties."  Confirm Pet.,

First Fischer Decl., Ex. 2 (Concession Agreement) at 3.  Thus, the plain language of the parties'

agreement does not indicate that the term "cost" is synonymous with the term "fee," so this

portion of the dispute resolution clause on its face has no bearing on arbitrators' fees.

Notwithstanding this uncertainty, and even under the assumption that "cost" and "fee" are

intended to be used synonymously, this portion of the dispute resolution clause does not affect

how the arbitrators' fees would be determined—it only affects how the fees would be

apportioned among the parties after the fees are established.[11]

---

[10]  The irony of Getma's position is not lost on the Court—whereas most, if not all, parties would not complain about being relieved of the obligation to pay €25,000 in legal fees, Getma is nevertheless insisting that it was properly required to pay increased arbitrators' fees, despite the CCJA's orders to the contrary.

[11]  According to Getma, "the CCJA should have, at a minimum[,] informed the parties as a condition of administering the case that they would not honor the parties' contracting in their arbitration clause from the CCJA fee provisions."  Confirm Mem. at 38.  But, as the Court has just explained, the parties were not legally permitted under either CCJA precedent or the CCJA Arbitration Rules to adjust the arbitrators' fees, and even if they could, they did not do so by the plain language of the Concession Agreement.  And it is unclear why Getma believes that the CCJA should have reviewed the parties' arbitration clause before the arbitration proceeding commenced.  The

(continued . . . )

Getma accuses Guinea—more specifically, the Guinean Minister of Justice ("Minister of Justice")—of improperly causing a Guinean judge, Fodé Kante, to be appointed to the CCJA for the purpose of annulling the arbitral award and engaging in ex parte communications with Judge Kante during the annulment proceeding. See Confirm Mem. at 26-28, 41. These accusations are allegedly supported by a post-annulment interview with the Minister of Justice, wherein he essentially represented that Judge Kante counseled him in secret as to how Guinea could present a favorable case before the CCJA. See Third Declaration of Cédric Fischer ("Third Fischer Decl."), Ex. 8 (December 25, 2015 Guinean Minister of Justice Interview ("Dec. 25, 2015 Interview")) at 11, 13-14, 16. To refute these charges, Guinea submits the affidavit of the Minister of Justice. Confirm Opp'n, Declaration of Check Sako in Opposition to Getma's Petition to Confirm ("Sako Decl.") ¶ 1. The Minister of Justice denies neither the interview nor what he said in the interview. See id. ¶¶ 3, 8, 13. Instead, the Minister of Justice distances himself from the interview, claiming that the representations that he made during the interview were "wholly inaccurate." Id. ¶¶ 3, 6. According to the Minister of Justice: Judge Kante was appointed to the CCJA according to OHADA law with the approval of all OHAHA member states, id. ¶¶ 4, 8, 10-11; Judge Kante's appointment occurred "well after Guinea made its last submission to the [CCJA] concerning" the annulment proceeding, id. ¶ 7, see also id. ¶¶ 16-17; and no representative of Guinea communicated with Judge Kante during the annulment proceeding, id. ¶¶ 6, 14. And the Minster of Justice represents that he "regret[s] . . . inflat[ing] the role of the Ministry of Justice in obtaining a favorable result" before the CCJA. Id. ¶ 13.

---

( . . . continued)
fees issue was only brought to the CCJA's attention, through a letter to the Secretary General, on or about April 2013. The CCJA then issued an August 2013 Order, denying the request and explaining the reason for the denial. Moreover, Getma should and could have known when it chose to abide by the CCJA Arbitration Rules that arbitrators' fees were set exclusively by the CCJA. See Parsons & Whittemore Overseas, 508 F.2d at 975 (agreement to arbitrate claims, includes potential "drawbacks" of arbitration (quoting Wash.-Balt. Newspaper Guild, 442 F.2d at 1238)).

The post-annulment conduct of the Minister of Justice certainly raises concern.  The Court, nevertheless, finds the Minister of Justice's declaration credible and that the interview was more likely the product of erroneous self-promotion rather than actual truth.  There is no dispute that Guinea's last submission to the CCJA occurred approximately two months before Judge Kante joined the CCJA and that Guinea was unable to supplement its submissions in any substantive manner thereafter because the CCJA did not conduct oral arguments in the annulment proceeding.  Further, simply because Judge Kante was a Guinean judge is not alone proof that he was biased in favor of annulling the award in favor of Guinea.[12]  And Judge Kante was only one judge on an en banc panel[13] that unanimously annulled the award consistent with the August 2013 and October 2013 CCJA orders on the fees issue, as well as CCJA precedent and the CCJA Arbitration Rules.  See First Jaeger Decl., Ex. 31 (Oct. 3, 2013 CCJA Order) at 5-6; First Jaeger Decl., Ex. 25 (Aug. 2013 CCJA Order) at 5-6; First Jaeger Decl., Ex. 26 (Feb. 3, 1999 CCJA Order); see also First Jaeger Decl., Ex. 48 (May 20, 2014 Letter) at 6 ("I call your attention to the fact that, if the final award includes the payment of the amount of €450,000 to the arbitrators, in accordance with the invalid arrangement, the award will potentially be subject to invalidation by . . . [the CCJA].").

Finally, Getma protests the annulment because it departs significantly from certain CCJA precedent and arbitration rules.  See Confirm Mem. at 39-41, 42.  But, as the Court noted earlier,

---

[12]  Again, Getma agreed to an arbitration process that allowed Guinea to petition the CCJA to annul the award, and thus, it could and should have known that the CCJA was composed of judges from OHADA member states and that there was a possibility that a Guinean judge could preside over an annulment proceeding.  See Parsons & Whittemore Overseas, 508 F.2d at 975 (agreement to arbitrate claims, includes conceivable "drawbacks" of arbitration (quoting Wash.-Balt. Newspaper Guild, 442 F.2d at 1238)); see also TermoRio, 421 F. Supp. 2d 87 at 101 (decision to arbitrate suggests trust in the arbitration process).

[13]  The Court declines to reach the extraordinary conclusion, in the absence of convincing evidence in the record, that Judge Kane's alleged bias in favor of Guinea, if any, tainted the other CCJA judges and their decision to annul the award.

"erroneous legal reasoning or misapplication of law is generally not a violation of public policy within the meaning of the New York Convention."[14] Gold Reserve, _ F. Supp. 3d. at _, 2015 WL 7428532, at *14 (quoting Karaha Bodas, 364 F.3d at 306); see also Indus. Risk Insurers v. M.A.N. Gutehoffnungshutte GmbH, 141 F.3d 1434, 1446 (11th Cir. 1998) ("The [New York] Convention does not, however, include a defense against enforcement of an award on the ground that the award is 'arbitrary and capricious.'"); M & C Corp. v. Erwin Behr GmbH & Co., KG, 87 F.3d 844, 851 (6th Cir. 1996) ("Nor can review for a 'manifest disregard of the law' be pigeonholed into the 'violation of public policy' basis for refusal to confirm an award contained in . . . the New York Convention."); Chevron Corp. v. Republic of Ecuador, 949 F. Supp. 2d 57, 71 (D.D.C. 2013) (explaining same), aff'd sub nom. Chevron Corp. v. Ecuador, 795 F.3d 200 (D.C. Cir. 2015).

## IV.    CONCLUSION

To be sure, the parties' foreign arbitration process was not without some unusual events. However, these events were the product of their arms' length negotiation of the dispute resolution clause in the Concession Agreement.  The parties must bear the consequences of those events unless the events violate the "most basic notions of morality and justice," TermoRio, 487 F.3d at 938, which is a "high bar" to overcome, Gold Reserve, _ F. Supp. 3d at _, 2015 WL 7428532, at *14.  Given the "emphatic federal policy in favor of arbitral dispute resolution . . . that applies with special force in the field of international commerce," the presumption favoring such resolution has not been defeated.  Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc., 473 U.S. 614, 631 (1985).  What Getma seeks in this case "would seriously undermine a principal precept of the New York Convention: an arbitration award does not exist to be enforced

---

[14]  This reasoning applies with equal force to Getma's objection to the CCJA's failure to set arbitrators' fees in accordance with its own arbitrators' fees schedule.  See Confirm Mem. at 31-32.

in . . . [this Court] if it has been lawfully 'set aside' by a competent authority in the [foreign] State in which the award was made." <u>TermoRio</u>, 487 F.3d at 936.  Therefore, the Court cannot confirm and enforce the arbitral award that was annulled.

      **SO ORDERED** on this 9th day of June, 2016.[15]

REGGIE B. WALTON
United States District Judge

---

[15]  The Court has contemporaneously issued an Order consistent with this Memorandum Opinion.